## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends,** 1515 Cherry St., Philadelphia, PA 19102 <br><br> **New England Yearly Meeting of the Religious Society of Friends,** 901 Pleasant St., Worcester, MA 01602 <br><br> **Baltimore Yearly Meeting of the Religious Society of Friends, Inc.,** 17100 Quaker Lane, Sandy Spring, Montgomery County, MD 20860 <br><br> **Adelphi Friends Meeting of the Religious Society of Friends,** 2303 Metzerott Rd., Adelphi, Prince George's County, MD 20783 <br><br> and <br><br> **Richmond Friends Meeting of the Religious Society of Friends,** 4500 Kensington Ave., Richmond, VA 23221 <br><br> Plaintiffs, <br><br> **v.** <br><br> **U.S. Department of Homeland Security** and **Kristi Noem**, in her official capacity as Secretary of the Department of Homeland Security, 2707 Martin Luther King Jr Ave. SE, Washington, DC 20528 <br><br> Defendants. | Civil Case No. _____ <br><br> Jury Trial Demanded |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Philadelphia Yearly Meeting of the Religious Society of Friends, New England Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Adelphi Friends Meeting of the Religious Society of Friends, and Richmond Friends Meeting of the Religious Society of Friends, on their own behalf and on behalf of their members, allege as follows:

## INTRODUCTION

1.  Whether it's to sit in expectant waiting, to deliver or receive a weekly homily, to lead or participate in Jama'ah, or to participate in religious observances requiring a minyan, communal worship is fundamental to the religious exercise of many. For Plaintiffs—Quaker congregations—communal worship is not just important, it is the very process of worship itself. And it is something that Quakers have been doing in this country for over 350 years.

2.  Quaker worship is not led by an individual charged to direct services. Instead, in Quaker worship, people sit together silently and await messages from God. When anyone attending the worship receives a message from God that is meant to be shared with others, they stand and deliver that message to everyone. Quakers believe that every person, no matter their background, can be a conduit for a message from the Divine. Indeed, Quakers believe that those with varied life experiences—including immigrants—can provide unique messages from God. Being able to receive those messages is fundamental to Quaker religious exercise.

2

3.    For over 30 years, it has been the government's official policy to not enforce immigration laws in "protected areas," which include houses of worship (and other religious ceremonies like weddings and funerals), absent certain extraordinary circumstances.[1] Rightly so. Enforcement in protected areas like houses of worship would, in the government's own words, "restrain people's access to essential services or engagement in essential activities."

4.    Despite this longstanding policy, the Department of Homeland Security last week authorized agents to conduct immigration-enforcement operations in protected areas, including churches and religious ceremonies. The 2025 Policy gives agents unfettered authority to carry out enforcement in these formerly protected areas. The policy's only attempt at limiting that authority directs agents to use their own, subjective "common sense."

5.    Within days of introducing the new policy, DHS started enforcement actions at houses of worship.

6.    Allowing armed government agents wearing ICE-emblazoned jackets to park outside a religious service and monitor who enters or to interrupt the service and drag a congregant out during the middle of worship is anathema to Quaker religious exercise. The very threat of that enforcement deters congregants from attending services, especially members of immigrant communities. Losing congregants is a substantial burden on Plaintiffs' religious exercise, especially when

---

[1] *See* Memorandum from Alejandro N. Mayorkas, Secretary, Department of Homeland Security, to Tae D. Johnson, *et al.*, Guidelines for Enforcement Actions in or Near Protected Areas (Oct. 27, 2021), https://tinyurl.com/mrykx3j4 ["Mayorkas Memo"].

those congregants would bring to worship different backgrounds and life experiences. And deterring worshippers from attending services chills Plaintiffs' First Amendment rights of association.

7.    Because "attending religious services" is "at the very heart" of the "guarantee of religious liberty," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19-20 (2020), if the government is going to impede that guarantee, it must meet the strictest of justifications. With respect to the 2025 Policy, it cannot. After all, DHS has already acknowledged that it "can accomplish [its] enforcement mission without denying or limiting individuals' access to" protected areas, including "places of worship."[2]

8.    In all events, if an agency is going to upend a longstanding policy, it must follow specific procedures, which include explaining the reason for its about-face and considering alternatives. DHS's new policy does not acknowledge that houses of worship are sacred spaces. It does not acknowledge that for many, religious exercise is an essential activity (as the previous policy did). And it does not even consider what unconstrained immigration enforcement at houses of worship would mean as a result. Instead, it treats houses of worship as nothing more than places where "criminal aliens—including murderers and rapists" go to "hide."[3]

---

[2] Mayorkas Memo, *supra* note 1, at 2.
[3] Press Release, Department of Homeland Security, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025), https://tinyurl.com/28yjjvpy ["2025 Policy Press Release"].

9.   As such, and as further explained below, this Court should declare unconstitutional any policy permitting government agents to carry out immigration-enforcement activities at or near houses of worship when the policy is limited only by individual agents' subjective "common sense," vacate the 2025 Policy, and enjoin DHS and its constituent agencies from implementing or enforcing the policy.

## JURISDICTION AND VENUE

10.  This Court has federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiffs allege violations of the First Amendment of the United States Constitution, U.S. Const. amend. I; the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb(a)-2000bb-4; and the Administrative Procedure Act, 5. U.S.C. § 701, *et seq.*

11.  Venue is proper under 28 U.S.C. § 1391(e)(1) because at least one of the plaintiffs resides in this district and no real property is involved in the action.

12.  This Court has the authority to grant the relief requested by Plaintiffs under Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the Administrative Procedure Act, 5. U.S.C. § 701, *et seq.*; and under the Court's inherent equitable authority.

## PARTIES

13.  Plaintiff Philadelphia Yearly Meeting of the Religious Society of Friends is the formal and legal association of more than 100 local Quaker congregations throughout parts of Pennsylvania, Maryland, Delaware, and New Jersey. It was

established in 1682, when William Penn arrived in Pennsylvania. It is located in Philadelphia, Pennsylvania.[4]

14. Plaintiff New England Yearly Meeting of the Religious Society of Friends is the formal and legal association of local Quaker congregations in the six New England states: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. It is the oldest Yearly Meeting in the world and has met continuously since 1661. It is located in Worcester, Massachusetts.

15. Plaintiff Baltimore Yearly Meeting of the Religious Society of Friends is the formal and legal association of more than 40 local Quaker congregations throughout parts of Pennsylvania, Maryland, Virginia, West Virginia, and Washington, D.C. It was established in 1672 and, with the exception of one year due to the 1918 influenza pandemic, has met annually since. It is located in Sandy Spring, Maryland.

16. Plaintiff Adelphi Friends Meeting of the Religious Society of Friends is a religious corporation located in Adelphi, Maryland. It is part of the Baltimore Yearly Meeting of the Religious Society of Friends.

17. Plaintiff Richmond Friends Meeting of the Religious Society of Friends is a religious corporation located in Richmond, Virginia. It is part of the Baltimore Yearly Meeting of the Religious Society of Friends.

---

[4] A "Yearly Meeting" in the Quaker religion is an association, an annual gathering, and the way of describing Quakers within a certain region. *See infra* ¶ 5356.

18. Defendant Department of Homeland Security is the federal agency responsible for enforcing United States immigration laws and policies. DHS is an agency within the meaning of 5 U.S.C. § 551(1).

19. DHS contains component agencies, including U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, and U.S. Customs and Border Patrol.

20. Defendant Kristi Noem is sued in her official capacity as the Secretary of the Department of Homeland Security.

## LEGAL BACKGROUND

### *First Amendment Freedom of Expressive Association*

21. The Supreme Court has recognized "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). The freedom of association is "an indispensable means of preserving other individual liberties," *id.*, for the "freedom to speak [or] to worship . . . could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed," *id.* at 622.

22. Courts have repeatedly affirmed that associating for religious exercise, including communal religious worship, is among those activities protected by the right to expressive association. *See, e.g., Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606-08 (2021); *Roberts*, 468 U.S. at 618; *Grace United Methodist Church v. City*

*of Cheyenne*, 451 F.3d 643, 658 (10th Cir. 2006); *El Ali v. Barr*, 473 F. Supp. 3d 479, 523 (D. Md. 2020) (the right to expressive association protects against government action that "interfere[s] with association in pursuit of political, social, economic, educational, religious, or cultural ends") (quoting *Roberts*, 468 U.S. at 622).

23. Government action that interferes with a person's freedom of expressive association violates the First Amendment if the interference is "'direct and substantial' or 'significant.'" *El Ali*, 473 F. Supp. 3d at 523 (quoting *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996), and *Lyng v. Int'l Union*, 485 U.S. 360, 366, 367 & n.5 (1988)). Such infringement "can take a number of forms," *Roberts*, 468 U.S. at 622, including imposing penalties as a result of membership in a group, compelling the disclosure of the fact of membership in a group, interfering in an organization's internal organization or operations, or otherwise making membership or participation in a group "less attractive," *Rumsfeld v. Forum for Academic & Inst. Rts., Inc.*, 547 U.S. 47, 69 (2006). The interference may be indirect: "The Supreme Court has recognized that the First Amendment protects the right of expressive association against both 'heavy-handed frontal attacks, but also from being stifled by more subtle government interference.'" *Pathfinder Fund v. Agency for Int'l Dev.*, 746 F. Supp. 192, 195 (D.D.C. 1990) (quoting *Lyng*, 485 U.S. at 367 n.5 (1988)).

24. Courts must give deference to an association's own articulated view of what would burden its expression: "As we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640,

653 (2000). "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Id.* at 650-61 (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 714 (1981) (alteration in original)).

25. Infringements on expressive association may be justified only by the government showing "a substantial relation between the [challenged action] and a sufficiently important governmental interest" and that the government action is "narrowly tailored to the interest it promotes." *Ams. for Prosperity*, 594 U.S. at 607 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). For the government to prevail under this exacting-scrutiny inquiry, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.*

### *Religious Freedom Restoration Act*

26. In 1990, the Supreme Court held that under the First Amendment's Free Exercise Clause, if government burdens on religious exercise are neutral and generally applicable—meaning they apply to religious and nonreligious actors alike—the government burdens need to survive only rational-basis review. *Employment Div. v. Smith*, 494 U.S. 872, 888 (1990).

27. Congress expressly disagreed with the holding in *Smith*, 42 U.S.C. § 2000bb(a), and enacted RFRA to "restore the compelling-interest test" that existed before *Smith*. *Id.* § 2000bb(b)(1).

28. Under RFRA, the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government action satisfies strict scrutiny—that is, the government action

"(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.

29. "A person whose religious exercise has been burdened" in violation of RFRA "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c).

### Administrative Procedure Act

30. The Administrative Procedure Act governs the way that federal agencies operate. Passed in 1946 to improve the administration of justice, it (1) ensures that the public is informed about agency organization, procedures, and rules; (2) provides for public participation in the rulemaking process; (3) prescribes uniform standards for agency rulemaking and proceedings; and (4) reiterates the law surrounding judicial review.[5]

31. Congress passed the APA to "safeguard" against arbitrary agency action. *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950). As one Senator put it, the law functioned as a procedural "bill of rights for the hundreds of thousands of Americans whose affairs are controlled or regulated" by the federal government. 2 Cong. Rec. 2149 (1946) (statement of Sen. McCarran).

32. To that end, the APA prescribes certain procedures that agencies must follow when promulgating, altering, or rescinding rules. 5 U.S.C. § 551(5). One such

---

[5] Tom C. Clark, *Attorney General's Manual on the Administrative Procedure Act* 9 (1947), https://tinyurl.com/4jaje27s.

requirement is that agencies go through notice-and-comment rulemaking for most rules they promulgate—including those that they alter or rescind. *See* 5 U.S.C. §§ 553(b)-(d); 5 U.S.C. §§ 551(4)-(5); *see also Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015). Notice-and-comment rulemaking requires agencies to publish a proposed rule, solicit input from the public, and meaningfully account for and address those comments when issuing a final rule.

33. The APA includes a presumption of judicial review. 5 U.S.C. § 702; *see Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967).

34. The statute requires courts to hold unlawful and set aside final agency actions that are, among other things, arbitrary and capricious or without observance of procedure required by law. 5 U.S.C. §§ 706(2)(A), (D). Courts may find agencies at fault for both their positive steps—such as the issuance of a rule, order, or sanction— and their failures to act. 5 U.S.C. § 551(13).

35. A final agency action marks the consummation of agency decisionmaking and is an action from which legal consequences flow. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotations and citations omitted).

36. "[A]gency action is arbitrary and capricious if it departs from agency precedent without explanation." *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1124 (D.C. Cir. 2003). Agencies must "examine the relevant data and articulate a satisfactory explanation" when altering or rescinding their rules. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And, when altering or

rescinding their rules, agencies must specifically consider the reliance interests of parties who depended on the rule's prior iteration. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30-33 (2020).

37.  Although courts may not review actions committed to agency discretion by law, § 701(a)(2), that exception is construed narrowly to "honor the presumption" of judicial review embodied in the statute broadly. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018).

## FACTUAL ALLEGATIONS

### For decades, DHS maintained a policy of nonenforcement in protected areas.

38.  For more than 30 years, it has been the government's policy to not conduct immigration-enforcement operations in "protected areas," also referred to as "sensitive locations."

39.  In 1993, Acting Associate Commissioner of the Immigration and Naturalization Service James Puleo directed that enforcement operations at places of worship, funerals, or other religious ceremonies "require advance written approval by the District Director of Chief Patrol Agent."[6] The memo outlined the standards by which a district director or chief patrol agent should decide whether a proposed enforcement action was appropriate, including "[t]he availability of alternative measures," "[t]he importance of the enforcement objective," and how agents could

---

[6] Memorandum from James A. Puleo, Immigration and Naturalization Service Acting Associate Commissioner, "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" HQ 807-P, at 1 (May 17, 1993).

12

"minimize the impact on operation of the … place of worship."[7] The memo explained that exceptions to the policy must be approved beforehand in writing unless certain exigent circumstances arose that require an officer to proceed—for those, "the matter must be reported immediately" up the chain of command.[8]

40. In a 1993 memo, for example, the Chief Patrol Agent in Laredo, Texas, directed field agents that "[p]laces of worship will not be entered for the purpose of apprehending illegal aliens even if in hot pursuit unless an Assistant Chief or above has authorized it."[9]

41. In 2008, Assistant Secretary of U.S. Immigration and Customs Enforcement Julie Myers reiterated the importance of avoiding enforcement "at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies, except in limited circumstances."[10] According to Assistant Secretary Myers, "[p]recedent for this approach is clear."[11] And while the 2008 memo indicated that "ICE policies and procedures" did not otherwise prohibit enforcement at protected areas, the 1993 memo "remains in effect."[12] Once again, the memo outlined the kinds of extreme situations that would require ICE personnel to

---

[7] *Id.* at 2.
[8] *Id.*
[9] Memorandum from Jose E. Garza, Chief Patrol Agent for Laredo, Texas, "Sector Policy Regarding Entry Into Places of Worship, Schools and Private Residence" LRT 40/4-P (Jan. 21, 1993).
[10] Memorandum from Julie L. Myers, Assistant Secretary, U.S. Immigration and Customs Enforcement, "Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations" 10029.1, at 1 (July 3, 2008).
[11] *Id.*
[12] *Id.* at 2.

act at or near sensitive locations, including "terrorism-related investigations, matters of public safety, or actions where no enforcement activity is involved."[13]

42. In 2011, ICE Director John Morton issued a memo superseding the 1993 and 2008 memos.[14] The 2011 policy was designed to ensure that enforcement actions neither occurred at nor were focused on sensitive locations such as schools and churches absent either exigent circumstances (such as terrorism, imminent risk of death, pursuit of a dangerous felon, or an imminent risk of destruction of evidence material to a criminal case) or prior written approval.[15] Under the 2011 memo, even enforcement actions not initiated at or focused on sensitive locations required ICE agents at or near such locations to "conduct themselves in a discrete manner, maintain surveillance if no threat to officer safety exists, and immediately consult their supervisor prior to taking other enforcement action(s)."[16]

43. In 2013 U.S. Customs and Border Protection issued a memo similarly restricting CBP operations at sensitive locations.[17]

44. In 2021, Department of Homeland Security Secretary Alejandro Mayorkas rescinded and superseded the prior memos while reaffirming the government's longstanding policy.[18] Secretary Mayorkas's memo described a "fundamental" and "bedrock" principle: DHS can accomplish its mission "without denying or limiting

---

[13] *Id.*
[14] Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, "Enforcement Actions at or Focused on Sensitive Locations" 10029.2 (Oct. 24, 2011).
[15] *Id.* at 1.
[16] *Id.* at 3.
[17] Mayorkas Memo, *supra* note 1.
[18] *Id.* at 2.

individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more."[19] The memo explicitly recognized that enforcement actions even near sensitive locations could "restrain people from accessing the protected area to receive essential services or engage in essential activities."[20] DHS agents thus have an "obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area."[21] Enforcement actions "include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance."[22]

45. The 2021 memo, like those before it, recognized exigent circumstances that might require immigration enforcement at protected areas. But outside of those exigent circumstances, "an Agent or Officer must seek prior approval" before conducting an enforcement operation at or near a sensitive location. The memo contained a boilerplate paragraph at the end averring that the memo "does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter."

46. Despite the boilerplate language, ICE's website on protected areas explains that "[a]bsent exigent circumstances, DHS officers and agents *must* seek prior

---

[19] *Id.*
[20] *Id.*
[21] *Id.* at 3.
[22] *Id.* at 4.

approval" before taking enforcement actions at protected areas.[23] And it explains that individuals who believe DHS officers violated the protected-areas policy should file complaints with ICE, CBP, Office of the Inspector General, or DHS Office for Civil Rights and Civil Liberties.[24]

47. What's more, Congress itself has required ICE to submit public reports on enforcement activities at protected areas, including "the total number of enforcement actions at sensitive locations, broken down by field office; type of sensitive location; whether prior approval was given; what type of exigent circumstances existed, if any; and the number of non-targeted individuals who were also apprehended."[25]

**DHS replaces protected areas with "common sense."**

48. On January 21, 2025, Fox News reported the not-yet-public rescission of the protected-areas policy.[26] Fox's story quoted unnamed ICE agents who said that rescinding the memo would "free them up" to aggressively conduct immigration-enforcement operations.[27]

49. Later that day, DHS issued a statement officially announcing that it had rescinded the existing policy governing protected areas and had replaced it with one that removes all guardrails limiting agents' ability to carry out enforcement actions

---

[23] Immigration and Customs Enforcement, Protected Areas Enforcement Actions, https://tinyurl.com/h4u5hfrv (last accessed Jan. 27, 2025) (emphasis added).
[24] *Id.*
[25] Department of Homeland Security, *Immigration Enforcement at Sensitive Locations, Fiscal Year 2020 Report to Congress* (April 18, 2022) (quoting House Report 116-180, part of the Fiscal Year 2020 Department of Homeland Security Appropriations Act (P.L. 116-93)).
[26] Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting ICE Agents, Orders Parole Review*, Fox News (Jan. 21, 2025), https://tinyurl.com/an68p3ex.
[27] *Id.*

at or near houses of worship. The new policy contains no replacement constraints on agents' authority at these formerly protected areas, which DHS's statement described as places that "criminal aliens" use "to hide." Instead, DHS will now merely put its trust in individual agents "to use common sense."[28]

**DHS's new policy will harm Plaintiffs.**

*Plaintiffs' religious beliefs*

50. Quakers, or Friends, are members of the Religious Society of Friends, a religious movement dating to the seventeenth century.[29]

51. Quakerism emerged from the Christian tradition. Today, many Friends consider themselves Christians, though many do not.[30] *See* Ex. A, Levi Decl., ¶ 10.

52. While Quakers have no formal hierarchy, they are generally organized into Yearly Meetings, Quarterly Meetings, and Monthly Meetings.

53. A "meeting" is an association, a gathering held at a certain interval (*i.e.*, yearly, quarterly, or monthly), and a way of describing Quakers within a certain region. *See* Ex. B, Merrill Decl., ¶ 3.

54. Monthly meetings are the basic organizational unit in the Quaker religion. They are local congregations that hold weekly worship services and, once a month, hold a meeting for worship with attention to business. *See id.* ¶ 6. Plaintiffs Adelphi Friends Meeting and Richmond Friends Meeting are monthly meetings.

---

[28] 2025 Policy Press Release, *supra* note 3.
[29] *See The Quaker Story*, Quaker.org, https://tinyurl.com/25fu7z4k (last accessed Jan. 27, 2025).
[30] *See FAQs*, New England Quakers, https://tinyurl.com/mrz6whcw (last accessed Jan. 27, 2025).

17

55. Quarterly meetings are gatherings of monthly meetings in a specific geographic area. They gather three or four times per year for worship and to make decisions about the issues that concern the monthly meetings in the region. *Id.* ¶¶ 8-9.

56. The Yearly Meeting is the highest organizational body in the Quaker religion. Yearly Meetings are regional associations of local Quaker meetings. As their name suggests, Yearly Meetings gather at least annually to worship and make decisions about issues affecting their constituent quarterly and monthly meetings. *Id.* ¶¶ 12-13.

57. The Quaker faith does not have any spiritual leader, creed, catechism, or canonical statement of belief. *See* Ex. A, Levi Decl., ¶¶ 11, 14.

58. Because tenets of the Quaker faith are neither determined by a religious authority nor codified into a universal creed, specific beliefs vary among different Quaker branches and from person to person. What follows are beliefs generally shared by Plaintiffs.

59. There are four core insights into what it means to be a Quaker: encounter, worship, discernment, and testimony. *Id.* ¶ 12.

60. Quakers believe that humans can and do experience God directly—known as "encounter." Encounter is sometimes referred to as seeking the inner light, inner voice, or the Christ within. *Id.* ¶¶ 13-16; Ex. C, Steigerwald Decl., ¶ 11.

61. Quakers believe that everyone has their own connection to spirit, or access to the divine.

18

62. In the Quaker tradition, different life experiences, backgrounds, and cultures lead people to hear and experience God differently. Having a diversity and richness of human experience yields a fuller understanding of how God speaks to the Quakers, individually and as a community. *See, e.g.*, Ex. C, Steigerwald Decl., ¶ 17.

63. Quaker worship is designed to encourage that encounter.

64. At its core, Quaker worship consists of sitting in silence and waiting to hear the voice of God.

65. Opening meetings to anyone who desires to attend is an important aspect of Quaker worship, because every individual who attends presents an opportunity for God to speak to worshippers through them.

66. Quakers believe that everyone who attends worship meetings is participating in worship, whether they speak or not.

67. The communal aspect of worship is central to the exercise of the Quaker faith. There are meetings that some refer to as "gathered meetings," in which there is a shared feeling among those in the meeting of having been in the same spiritual presence together, which can only happen through communal participation in worship. Ex. A, Levi Decl., ¶ 25.

68. Quakers have also developed practices—known as "discernment"—to help understand their encounters with God. *Id.* ¶ 26.

69. For Quakers, discernment is the process of interpreting God's will and making decisions. Such decisions may be personal or may be for the sake of the community. *Id.* ¶ 27.

70. Quakers have a set of values, known as testimonies, that inform and guide how they live and worship. *Id.* ¶¶ 30-34.

71. Some Quakers use the acronym SPICES to help explain some core beliefs of Quaker testimony. SPICES stands for simplicity, peace, integrity, community, equality (both social and spiritual), and stewardship. *Id.* ¶ 34; Ex. D, Kingsley Decl., ¶ 29.

72. Pacifism is deeply ingrained in the Quaker faith. The Friends have a religious commitment to oppose violence in all forms. They do not take up arms, and the presence of arms inside their meeting houses would violate this founding principle of their faith. *See, e.g.*, Ex. C, Steigerwald Decl., ¶¶ 42-43.

***Plaintiffs' connections to immigrant communities***

73. Given the Quaker values of welcoming strangers, worshipping with all-comers from diverse backgrounds, community, and service, many Quaker meetings, including Plaintiffs, have built deep and meaningful connections to immigrant communities.

74. Plaintiff Adelphi Friends Meeting, for example, is located in an area with a significant immigrant population. Ex. C, Steigerwald Decl., ¶ 24. It has "had a large number of immigrants come to worship" and has been "enriched" by their presence. Ex. A, Levi Decl., ¶¶ 64-65. To foster inclusivity for its immigrant members and others in the community, Adelphi Friends Meeting translates committee minutes into Spanish and includes Spanish-language materials about the faith in its foyer. Ex. C, Steigerwald Decl., ¶ 24. It has, at times, hung a banner to welcome immigrants—

reading "Do not mistreat strangers. Treat them as citizens. Love them as yourself." *Id.* ¶ 26. Adelphi Friends Meeting has likewise supported immigrant families settling into the community, including families from Afghanistan, Burundi, Kenya, and Nicaragua, many of whom were refugees. *Id.* ¶ 27. Some of those families joined the meeting for worship. *Id.*

75.  Plaintiff Richmond Friends Meeting has likewise developed important ties to nearby immigrant communities. It hosts English classes at its meeting house that are taught by a local community group; it has provided financial and other assistance to immigrant women to help them develop livelihoods; and its members help settle new immigrants, including by meeting them as they arrive and driving them to immigration appointments. Ex. D, Kingsley Decl., ¶¶ 22-26. These acts are exercises of the Richmond Friends Meeting's and its members' religious beliefs. *Id.* ¶ 26-27.

76.  The yearly meetings and their constituent monthly meetings likewise have deep and important relationships to immigrant communities.

77.  Plaintiff New England Yearly Meeting provides interpretative services at its large meetings because the Quaker faith has strong ties to Central and South America and, as a result, there are attendees (both citizens and noncitizens) for whom Spanish is their first language. Ex. B, Merrill Decl., ¶ 29. There is also a strong Quaker presence in Africa. New England Yearly Meeting has a monthly meeting that consists of members of the African diaspora. *Id.* ¶ 30.

78.  One of New England Yearly Meeting's constituent monthly meetings, the Putney Friends Meeting, has a decades-long history of supporting its local immigrant

community as an exercise of Quaker religious beliefs and commitments. It fulfills those commitments by, among other things, welcoming immigrant families moving to the area and volunteering with and providing financial assistance to local organizations that support asylum seekers. Ex. E, Marbury Decl., ¶ 21-26.

79. Likewise, Quaker religious beliefs led Plaintiff Philadelphia Yearly Meeting to adopt strategic directions—"connecting" and "belonging"—aimed at building community with Quakers across the region and beyond, including among immigrant populations. Ex. F, Duncan-Tessmer Decl., ¶¶ 22-24. One of its monthly meetings, for example, is located in an area with a large immigrant population and is deeply involved with local immigrant organizations in the community. *Id.* ¶ 31. Another of its monthly meetings hosts a fellow Quaker congregation started by a family of East African Friends in its meeting house. *Id.* ¶ 30.

80. Plaintiff Baltimore Yearly Meeting's members are called by God to build relationships with fellow Quakers across geographical and theological lines, which its members carry out by gathering with a range of diverse Quaker communities, including some largely Spanish-speaking congregations. Ex. G, Gillooly Decl., ¶¶ 28-30. Some of Baltimore Yearly Meeting's constituent monthly meetings are located in areas with large populations of immigrants, and some of the monthly meetings have substantial numbers of active members who are immigrants, particularly African immigrants. *Id.* ¶¶ 25-26; Ex. H, Mohr Decl., ¶¶ 31-32, 35. Its monthly meetings, including Adelphi Friends Meeting and Richmond Friends Meeting, have developed

close connections to their immigrant communities, as described above. *See supra* ¶¶ 74-75.

81. Overall, all Plaintiffs have active, deep ties to immigrant communities. Those ties are an expression of the Quaker faith. And they bring new immigrant members into the faith.

**The 2025 Policy's interference with Plaintiffs' religious exercise**

82. The new DHS policy "has sown fear within . . . migrant friendly congregations," and faith leaders have made clear that it will cause many immigrants to fear attending houses of worship.[31]

83. Some houses of worship even canceled in-person services before DHS's official announcement, fearing that their congregations would be subject to ICE raids without warning.[32]

84. Indeed, within days of DHS announcing the recission of the protected-areas policy, three of the largest Catholic organizations in the United States—the U.S. Conference of Catholic Bishops, the Catholic Health Association of the United States, and Catholic Charities USA—stated publicly that, "[w]ith the mere rescission of the protected areas guidance," they were "already witnessing reticence among immigrants to engage in daily life, including . . . attending religious services."[33] The

---

[31] Giovanna Dell'Orto *et al.*, *Trump won't ban immigration arrests at churches. Now clergy are weighing how to resist*, Associated Press (Jan 23, 2025), https://tinyurl.com/mvbp3txu.

[32] *See, e.g.*, Laura Rodríguez Presa, *Chicago church stops hosting in-person Spanish services amid fears of mass deportations from Trump administration*, Chicago Tribune (Jan. 2, 2025), https://tinyurl.com/2cp62xrn.

[33] Human Dignity is Not Dependent on a Person's Citizenship or Immigration Status, U.S. Conference of Catholic Bishops (Jan. 23, 2025), https://tinyurl.com/mwrrr98e.

National Association of Evangelicals similarly addressed the new DHS policy, stating that "[e]ven the announcement of this policy has caused fear, deterring some from attending church."[34]

85. These fears are coming to fruition. On January 26, the first Sunday following implementation of the 2025 Policy, ICE agents attempted to enter Fuente de Vida Church in Tucker, Georgia, while its pastor was actively preaching to approximately 70 congregants.[35] Fear of DHS's new policy had led the church to lock its doors, so the agents waited outside until the congregant they sought—a father of two—exited the church.[36]

86. The deterrent effect of the new policy extends far beyond undocumented congregants. Ample data shows "[f]ears of detention and deportation are a concern for immigrants across immigration statuses."[37] For example, a 2023 study described as "the largest and most representative survey of immigrants living in the U.S. to date" found that that 26% of all immigrants, regardless of their own legal status, "worry they or a family member could be detained or deported." That finding echoed previous research showing that even those with legal status fear immigration

---

[34] Press Release, National Association of Evangelicals, National Association of Evangelicals Responds to New Executive Orders (Jan. 22, 2025), https://tinyurl.com/277svcma.
[35] Eryn Rogers, *Ice launches 'targeted operations' in metro Atlanta*, WSBTV (Jan. 27, 2025), https://tinyurl.com/4npauepz; Marcelo Wheelock, *Agentes de ICE llegan a iglesia en Tucker y se llevan a un feligrés*, Telemundo Atlanta (Jan. 27, 2025), https://tinyurl.com/yc46kyuv.
[36] Wheelock, *supra* note 35.
[37] Shannon Schumacher et al., *Understanding the U.S. Immigrant Experience: The 2023/KFF LA Times Survey of Immigrants*, KFF (Sep. 17, 2023), https://tinyurl.com/bdeh6dju.

enforcement because they are "fearful for their family members or because their own 'status' might be questioned."[38]

87. Such fears are reasonable. In 2021, the Government Accountability Office reported that ICE "arrested 674, detained 121, and removed 70 potential U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020."[39] The same year, ICE arrested Brian Bukle, who had at that point been a citizen for over 50 years, and detained him for 36 days before acknowledging his citizenship.[40] Just this month, U.S. Border Patrol agents conducting a four-day dragnet operation slashed the tires of a naturalized citizen who they subsequently arrested, despite having confirmed his status.[41] And just last week, ICE agents conducting a warrantless raid in New Jersey detained a U.S. military veteran.[42]

88. Government enforcement actions that "stop[] people from entering" meeting houses affect Quakers "personally, viscerally, emotionally, and theologically." Ex. A, Levi Decl., ¶ 69. The same is true for enforcement actions that scare people away. *Id.*

---

[38] Karen Hacker et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA,* 73(4) Social Science & Medicine 586 (2011).

[39] U.S. Gov't Accountability Office, GAO-21-487, Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations (2021).

[40] Yesenia Amaro*, He's a U.S. citizen, but ICE detained him and tried to deport him. Now he's getting $150k,* Fresno Bee (Dec. 14, 2022), https://tinyurl.com/2p9mzhmz.

[41] Michael Hiltzik, *Column: Inside the Bakersfield raids that showed how Trump's immigration policies will sow chaos,* L.A. Times (Jan. 22, 2025), https://tinyurl.com/uywz9mjy.

[42] *Mayor Ras. J. Baraka's Statement on ICE Raid on Newark Business Establishment,* City of Newark (Jan. 23, 2025), https://tinyurl.com/yjdy7pf9.

89. A diversity of worshippers is an essential component of the Quaker value of "experience[ing] God in a broader, more encompassing way," as "one's life experience affects how one hears the spirit and what conclusions one might draw." *Id.* ¶ 60. Deterring immigrants from worshipping in-person with a Quaker meeting would therefore directly interfere with Plaintiffs' religious exercise by lessening their "ability to hear God and what God is trying to tell [them]." *Id.* ¶¶ 64-67.

90. Moreover, Plaintiffs' Quaker beliefs make it essential that they "encourage others for whom [that] path is meaningful to join." Ex. F, Duncan-Tessmer Decl., ¶ 25. But DHS's new policy, by opening meeting houses to immigration-enforcement activities, inhibits Plaintiffs from doing just that. *See, e.g.*, Ex. A, Levi Decl., ¶ 70; Ex. B, Merrill Decl., ¶ 43 (explaining that he "cannot be as encouraging of immigrants joining us for worship" under DHS's new policy). Knowingly putting a person in harm's way or subjecting them to the possibility of a violent encounter with an armed law-enforcement officer would violate Quaker beliefs in peace and nonviolence. Ex. G, Gillooly Decl., ¶ 42.

91. Quakers have held a religious commitment against violence for hundreds of years. *See* Merrill Decl. ¶ 39. For many Quakers, "[t]he presence of a weapon in a Quaker meeting would be absolutely unacceptable." Ex. F, Duncan-Tessmer Decl., ¶¶ 43-44. The presence of armed immigration officers at meeting houses—which the new policy allows—would thus significantly hamper Plaintiffs' ability to exercise their faith. *See, e.g.*, Ex. B, Merrill Decl., ¶ 39; Ex. A, Levi Decl., ¶ 73. Importantly, even the *threat* of armed government agents at meeting houses—which has existed

since the moment DHS announced its new policy—does the same. *See, e.g.*, Ex. B, Merrill Decl., ¶ 39; Ex. A, Levi Decl., ¶ 73.

**CLAIMS FOR RELIEF**

**COUNT I**

**Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-2000bb-4**

92. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

93. In RFRA, Congress concluded that because "free exercise of religion" is "an unalienable right," "governments should not substantially burden religious exercise without compelling justification." 42 U.S.C. § 2000bb. Even "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise." *Id.*

94. As such, "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

95. Anyone "whose religious exercise has been burdened in violation" of RFRA may raise a RFRA claim and "obtain appropriate relief" against the government. 42 U.S.C. § 2000bb-1(c).

96. DHS's new policy allows its agents to conduct enforcement operations—including arrests, investigations, interviews, and surveillance—at and near houses of worship and religious ceremonies, including Quaker meeting houses.

97. Permitting immigration-enforcement operations at or near houses of worship deters people from attending religious services, even if they are lawful permanent residents or citizens.

98. Quaker beliefs insist that worship be open to all who wish to join. Quaker religious practices depend on communal worship. And Quakers believe that the presence of worshippers from different backgrounds is integral to hearing messages from God.

99. DHS's new policy thus substantially burdens Plaintiffs' free exercise of religion by reducing the number and diversity of worshippers, which in turn interferes with a meeting's ability to hear and receive messages from God.

100. DHS's new policy immediately created the threat of federal officers surveilling and arresting meeting attendees, rendering Plaintiffs unable to encourage anyone who feels called to join to do so.

101. The policy thus substantially burdens Plaintiffs' free exercise of religion by rendering Plaintiffs unable to live their testimony of welcoming others as part of worship.

102. For more than three hundred years, Quakers have held a religious commitment against violence. The presence of armed government agents at or near meeting houses would be incredibly disruptive to Plaintiffs' ability to worship—as is the mere threat of such action, which DHS's change in policy immediately created.

103. DHS's rescission of the protected areas policy thus substantially burdens Plaintiffs' free exercise of religion by violating their commitment to anti-violence.

104. To justify DHS's new policy, the government must satisfy strict scrutiny. It cannot.

105. The government has itself said that DHS can accomplish its mission "without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more."[43]

106. DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

## COUNT II

### First Amendment—Freedom of Expressive Association

107. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

108. The First Amendment of the U.S. Constitution safeguards the freedom of expressive association: the right to associate with others for the purpose of engaging in activities protected by the First Amendment, including speech, assembly, petition for the redress of grievances, and exercise of religion.

---

[43] Mayorkas Memo, *supra* note 1, at 2.

109.    The freedom of expressive association is a vital means to protect the liberties guaranteed by the First Amendment.

110.    Government cannot interfere in protected First Amendment activity in ways that are "'direct and substantial' or 'significant.'" *El Ali*, 473 F. Supp. 3d at 523 (quoting *Lyng*, 485 U.S. at 366, 367 n.5).

111.    Nor can government chill gathering to exercise First Amendment rights. Government action chills an individual's or entity's expressive-association freedom when it interferes, whether directly or indirectly, with the ability to associate for the purpose of engaging in expressive activity, including by making membership or participation in the association more difficult or less desirable.

112.    Plaintiffs and their congregants engage in protected expressive association when they gather in person for communal religious worship, an activity that is fundamental to their religious exercise.

113.    Plaintiffs suffer injury to their expressive-association rights because, among other reasons, DHS's new policy will result in fewer members and attenders—the core of Quaker worship. The policy will reshape the composition of Plaintiffs' worship meetings by diminishing the attendance and participation of members of immigrant communities, who are likely to experience (and share) the Divine in unique ways. And because the policy allows the presence of armed, uniformed federal agents—which undermines the message of pacifism and nonviolence central to the Quaker faith—it directly and substantially limits who will attend meetings.

114.    Plaintiffs' members and attenders will suffer too. People from varying backgrounds—especially immigrants—will be deterred from attending worship altogether for fear of surveillance, interrogation, or raids by armed officers. Plaintiffs' members and attenders will be deterred from encouraging and welcoming all-comers, regardless of immigration status. And members or attenders who are not themselves deterred from attending worship meetings will have fewer people with whom to worship, to say nothing of the impairment to the right to associate should meetings cancel in-person services altogether.

115.    In all, DHS's new policy burdens and chills the expressive-association rights of Plaintiffs and their congregants.

116.    To justify DHS's new policy, the government must satisfy exacting scrutiny. It must prove that it has a sufficiently important governmental interest and that the policy is narrowly tailored to that interest. It cannot.

117.    The government has already admitted that there are less restrictive means of fulfilling its interest. It has deployed those less restrictive means for more than three decades and cannot articulate a reason why they are now insufficient.

118.    DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

## COUNT III

**Violation of the Administrative Procedure Act—706(2)(A)**
**Arbitrary and capricious adoption of new protected-areas policy**

119.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

31

120.    Under the APA, a court shall "hold unlawful and set aside agency action" that is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

121.    Section 1103 authorizes the Secretary of Homeland Security to "establish such regulations" and "issue such instructions" to enforce "laws relating to . . . immigration." 8 U.S.C. § 1103. DHS's new protected-areas (or sensitive-locations) policy is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights [and] obligations" and creates "legal consequences." *Bennett*, 520 U.S. at 177-78 (internal citation omitted). This "pragmatic" assessment includes the creation or revocation of safe harbors. *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590, 599-600 (2016). Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); 5 U.S.C. § 706(2)(A); *see also Regents of the Univ. of California*, 591 U.S. at 17.

122.    For over 30 years, DHS has issued a consistent "statement of general . . . applicability and future effect designed to implement, interpret, or prescribe," 5 U.S.C. § 551(4) (defining "rule"), DHS agents' authority to conduct enforcement operations in protected areas.

123.    Under the APA, agencies cannot depart from prior policies without acknowledging that they are making such a change and explaining their reasoning for doing so. *Fox Television*, 556 U.S. at 515. Agencies must "examine the relevant data and articulate a satisfactory explanation" when altering or rescinding their rules. *State Farm*, 463 U.S. at 43; *see also Fox Television*, 556 U.S. at 515. And they

must specifically consider the reliance interests of those who may be impacted by a change in their policies. *Regents of the Univ. of California*, 591 U.S. at 30-31.

124.    In undoing decades of prior agency policy without reasoning, DHS engaged in arbitrary and capricious agency action. By failing to provide reasoning and considering alternative actions, DHS left unaddressed the decades of reliance interests held by Plaintiffs and others, further emphasizing the arbitrary and capricious nature of this action by DHS.

125.    Because DHS rescinded its previously operative protected-areas policy—and because DHS failed to "examine the relevant data and articulate a satisfactory explanation," including Plaintiffs' reliance interests—DHS's new policy is unlawful. DHS should be enjoined from implementing it.

126.    DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

## COUNT IV

### Violation of the Administrative Procedure Act—706(2)(B) Contrary to constitutional right

127.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

128.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

129.    Section 1103 authorizes the Secretary of Homeland Security to "establish such regulations" and "issue such instructions" to enforce "laws relating to . . . immigration." 8 U.S.C. § 1103. DHS's new protected-areas (or sensitive-locations)

policy is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights and obligations" and creates "legal consequences." *Bennett*, 520 U.S. at 177-78. This "pragmatic" assessment includes the creation or revocation of safe harbors. *Hawkes*, 578 U.S. at 600. Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); 5 U.S.C. § 706(2)(A); *see also Regents of the Univ. of California*, 591 U.S. at 17.

130.    Without the protected-area policy, DHS regulation 8 C.F.R.§ 287.8(f)(1)—and its new "common sense" standard—allows DHS agents to conduct immigration-enforcement operations at or near houses of worship or religious ceremonies.[44]

131.    For Plaintiffs, their members, and their attenders, in-person worship in which any and every person are welcomed to join is a core tenet of their religious exercise. The opportunity to engage in such communal worship is a long-held and vital part of their expression of faith.

132.    Without the protected-area policy, DHS regulation 8 C.F.R.§ 287.8(f)(1) discourages people from attending religious services. Specifically, the 2025 Policy will reduce the number and diversity of worshippers at Plaintiffs' meetings. The policy thus chills Plaintiffs' rights to the Freedom of Expressive Association.

---

[44] 8 C.F.R.§ 287.8(f)(1) addresses the standards for enforcement activities during "site inspections." The regulation states, "[s]ite inspections are Border and Transportation Security Directorate enforcement activities undertaken to locate and identify aliens illegally in the United States, or aliens engaged in unauthorized employment, at locations where there is a reasonable suspicion, based on articulable facts, that such aliens are present."

133.    The 2025 Policy cannot satisfy exacting scrutiny, so it is "contrary to constitutional right," 5 U.S.C. § 706(2)(B).

134.    It is thus unlawful, and DHS should be enjoined from implementing it.

135.    DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

## COUNT V

### Violation of the Administrative Procedure Act—706(2)(C)
### In excess of statutory jurisdiction, authority, or limitations

136.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

137.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

138.    Section 1103 authorizes the Secretary of Homeland Security to "establish such regulations" and "issue such instructions" to enforce "laws relating to . . . immigration." 8 U.S.C. § 1103. DHS's new protected-areas (or sensitive-locations) policy is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights and obligations" and creates "legal consequences." *Bennett*, 520 U.S. at 177-78. This "pragmatic" assessment includes the creation or revocation of safe harbors. *Hawkes*, 578 U.S. at 600. Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); 5 U.S.C. § 706(2)(A); *see also Regents of the Univ. of California*, 591 U.S. at 17.

139.    Without    the    protected-area    policy,    DHS    regulation 8 C.F.R. § 287.8(f)(1)—with the agency's new "common sense" standard—allows defendant agencies to conduct immigration-enforcement operations at or near houses of worship or religious ceremonies.

140.    For Plaintiffs, and their members, holding in-person worship in which any and every person are welcomed to join is a core tenet of their religious exercise. The opportunity to engage in such communal worship is a long-held and vital part of their expression of faith.

141.    Without the protected-area policy, DHS regulation 8 C.F.R. § 287.8(f)(1) discourages people from attending religious services. Plaintiffs will suffer myriad resulting harms, including losing messages from God. Plaintiffs also will not be able to encourage immigrants to join worship for fear that they will put the immigrants in harm's way. And due to Plaintiffs' substantial interactions with immigrant communities, they have a reasonable fear of immigration enforcement at their meetings. That very threat significantly burdens their religious exercise. The policy is thus a substantial burden on Plaintiffs' religious exercise under RFRA.

142.    The DHS policy cannot satisfy strict scrutiny, so it is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(B).

143.    It is thus unlawful, and DHS should be enjoined from implementing it.

144.    DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

## COUNT VI

**Violation of the Administrative Procedure Act— 5 U.S.C. § 706(2)(D)
Without observance of procedure required by law**

145.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

146.    DHS requires that its rules and regulations go through the notice-and-comment process generally required by the Administrative Procedures Act. *R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 194 (5th Cir. 2023); *see also Iowa League of Cities v. E.P.A.,* 711 F.3d 844, 875 (8th Cir. 2013); 5 U.S.C. §§ 553.

147.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

148.    Section 1103 authorizes the Secretary of Homeland Security to "establish such regulations" and "issue such instructions" to enforce "laws relating to . . . immigration." 8 U.S.C. § 1103. DHS's new protected-areas (or sensitive-locations) policy is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights and obligations" and creates "legal consequences." *Bennett*, 520 U.S. at 177-78. This "pragmatic" assessment includes the creation or revocation of safe harbors. *Hawkes*, 578 U.S. at 600. Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); 5 U.S.C. § 706(2)(A); *see also Regents of the Univ. of California*, 591 U.S. at 17.

149.    DHS has repealed its longstanding guarantee that, absent extraordinary circumstances, the government would not conduct immigration enforcement at protected areas, including houses of worship of other religious

37

ceremonies. The 2021 Mayorkas Memo, *supra* note 1, acts as the policy for DHS because it set a "statement of general . . . applicability and future effect designed to implement, interpret, or prescribe" the enforcement power of DHS agents. 5 U.S.C. § 551(4) (defining "rule").

150.    To alter or rescind its protected-areas rule, DHS must first engage in notice-and-comment rulemaking, as required by the APA. *Nat. Res. Def. Council*, 894 F.3d 95, 113 (2d Cir. 2018); *see also* 5 U.S.C. § 553.

151.    DHS did not engage in notice-and-comment rulemaking.

152.    Because DHS rescinded the longstanding protected-area rule without going through the notice-and-comment process required of agency rules, it is not in observance of procedure required by law.

153.    It is thus unlawful, and DHS should be enjoined from implementing it.

154.    DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.    Declare unconstitutional any policy permitting government agents to carry out immigration-enforcement activities at or near houses of worship when those policies are limited only by individual agents' subjective "common sense";

b.    Declare the 2025 Policy unconstitutional, void, and of no effect;

c.    Enjoin and vacate the 2025 Policy;

d.    Enjoin DHS and its constituent agencies from implementing, enforcing, or acting pursuant to the 2025 Policy on both a preliminary and permanent basis;

e.    Award Plaintiffs costs of suit, attorneys' fees, and expenses to the greatest extent authorized by all applicable laws; and

f.    Issue such other relief as the Court deems proper.

[DOCUMENT CONTINUES ON NEXT PAGE]

## JURY DEMAND

Plaintiffs demand a jury trial of all issues so triable under Rule 38 of the

Federal Rules of Civil Procedure.

January 27, 2025                Respectfully submitted,

                                 _/s/ Alethea Anne Swift_
                                Alethea Anne Swift (Bar No. 30829)
                                Bradley Girard[+]
                                Sarah Goetz*
                                Andrew Bookbinder*
                                Audrey Wiggins*
                                Skye Perryman*

                                **DEMOCRACY FORWARD FOUNDATION**
                                P.O. Box 34553
                                Washington, DC 20043
                                Phone: (202) 448-9090
                                Fax: (202) 796-4426
                                aswift@democracyforward.org
                                bgirard@democracyforward.org
                                sgoetz@democracyforward.org
                                abookbinder@democracyforward.org
                                awiggins@democracyforward.org
                                sperryman@democracyforward.org

                                *Counsel for Plaintiffs*

                                [+] *Application for full admission pending*
                                *Application for admission* pro hac vice *forthcoming*