**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*, <br><br> Plaintiffs, <br><br> **v.** <br><br> **U.S. Department of Homeland Security,** *et al.*, <br><br> Defendants. | **Civil Case No. 8:25-cv-243-TDC** |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

Introduction ..................................................................................................................... 1

Factual Background ......................................................................................................... 2

   **I.**   DHS's move from "protected areas" to "common sense" ................................. 2

   **II.**   Plaintiffs' religious exercise ........................................................................... 7

   **III.**   The harm that DHS's new policy inflicts on Plaintiffs .................................. 12

Argument ....................................................................................................................... 14

   **I.**   Plaintiffs are likely to succeed on the merits .............................................. 15

      A.   DHS's new policy violates Plaintiffs' First Amendment rights of expressive association. ............................................................................................... 15

         **i.**   Immigration-enforcement operations at houses of worship directly and substantially interfere with the right to gather for religious exercise. ...... 15

         **ii.**   The government cannot satisfy exacting scrutiny ...................................... 17

      B.   DHS's new policy violates Plaintiffs' rights under RFRA. ......................... 19

         **i.**   Plaintiffs have shown a substantial burden on their religious exercise. ... 19

         **ii.**   The government cannot satisfy strict scrutiny ........................................... 23

   **II.**   Plaintiffs will suffer irreparable harm unless DHS's new policy is enjoined. ................. 25

   **III.**   The balance of equities and public interest favor Plaintiffs. ............................ 26

   **IV.**   Because DHS's policy violates the First Amendment, the Court should enjoin enforcement as to houses of worship nationwide. ........................................... 28

Conclusion ..................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Alameen v. Coughlin*,
    892 F. Supp. 440 (E.D.N.Y. 1995) ......................................................................................26

*Am. Coll. of Obstetricians & Gynecologists v. United States Food & Drug*
    *Admin.*,
    472 F. Supp. 3d 183 (D. Md. 2020) .................................................................................28

*Ams. for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021) ..........................................................................................15, 18, 19

*Arizona v. United States*,
    567 U.S. 387 (2012) ........................................................................................................29

*Ass'n of Cmty. Cancer Ctrs. v. Azar*,
    509 F. Supp. 3d 482 (D. Md. 2020) .................................................................................26

*Benham v. City of Charlotte*,
    635 F.3d 129 (4th Cir. 2011) ...........................................................................................15

*Berean Baptist Church v. Cooper*,
    460 F. Supp. 3d 651 (E.D.N.C. 2020)..............................................................................28

*Bethel World Outreach Ministries v. Montgomery Cnty. Council*,
    706 F.3d 548 (4th Cir. 2013) ...........................................................................................20

*Boy Scouts of Am. v. Dale*,
    530 U.S. 640 (2000).........................................................................................................16

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014).........................................................................................................24

*Centro Tepeyac v. Montgomery Cnty.*,
    722 F.3d 184 (4th Cir. 2013) ...........................................................................................27

*Couch v. Jabe*,
    679 F.3d 197 (4th Cir. 2012) ...........................................................................................24

*Dayton Bd. of Educ. v. Brinkman*,
    433 U.S. 406 (1977).........................................................................................................28

*Doe v. Pittsylvania Cnty.*,
    842 F. Supp. 2d 927 (W.D. Va. 2012) ................................................................27

*Doe v. Reed*,
    561 U.S. 186 (2010)................................................................................................18

*El Ali v. Barr*,
    473 F. Supp. 3d 479 (D. Md. 2020) ......................................................................15

*Emp. Div. v. Smith*,
    494 U.S. 872 (1990)................................................................................................19

*Elrod v. Burns*,
    427 U.S. 347 (1976)................................................................................................25

*Fighting Finest, Inc. v. Bratton*,
    95 F.3d 224 (2d Cir. 1996).....................................................................................15

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021)................................................................................................23

*Gibson v. Fla. Legis. Investigation Comm.*,
    372 U.S. 539 (1963)................................................................................................16

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
    546 U.S. 418 (2006)................................................................................................24

*Grace United Methodist Church v. City of Cheyenne*,
    451 F.3d 643 (10th Cir. 2006) ...............................................................................15

*Guilford Coll. v. McAleenan*,
    389 F. Supp. 3d 377 (M.D.N.C. 2019) ..................................................................29

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021) .....................................................................28, 29, 30

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) .............................................................................25

*Holt v. Hobbs*,
    574 U.S. 352 (2015)..........................................................................................20, 26

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*,
    17 F.3d 691 (4th Cir. 1994) ...................................................................................25

*Int'l Refugee Assistance Project v. Trump*,
    883 F.3d 233 (4th Cir. 2018) .................................................................................25

*Jensen v. Md. Cannabis Admin.*,
   719 F. Supp. 3d 466 (D. Md. 2024) ........................................................................27

*Jolly v. Coughlin*,
   76 F.3d 468 (2d Cir. 1996) ....................................................................................26

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
   2 F.4th 330 (4th Cir. 2021) ............................................................................25, 27

*Lovelace v. Lee*,
   472 F.3d 174 (4th Cir. 2006) .........................................................................20, 24

*Lyng v. Int'l Union*,
   485 U.S. 360 (1988) ..............................................................................................15

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
   485 U.S. 439 (1988) ..............................................................................................20

*Mahmoud v. McKnight*,
   688 F. Supp. 3d 265 (D. Md. 2023) .......................................................20, 25, 27

*McCutcheon v. Fed. Election Comm'n*,
   572 U.S. 185 (2014) ..............................................................................................19

*In re Microsoft Corp. Antitrust Litig.*,
   333 F.3d 517 (4th Cir. 2003) ................................................................................14

*Miranda v. Garland*,
   34 F.4th 338 (4th Cir. 2022) .................................................................................26

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958) ..............................................................................................16

*Nken v. Holder*,
   556 U.S. 418 (2009) ..............................................................................................26

*Pursuing Am. Greatness v. Fed. Election Comm'n*,
   831 F.3d 500 (D.C. Cir. 2016) .............................................................................26

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ...............................................................29

*Religious Sisters of Mercy v. Becerra*,
   55 F.4th 583 (8th Cir. 2022) ..........................................................................25, 26

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ..................................................................................15, 16, 17

iv

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) ..........................................................27

*Roe v. Dep't of Defense*,
  947 F.3d 207 (4th Cir. 2020) .................................................28, 29, 30

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020)......................................................................1

*Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*,
  547 U.S. 47 (2006)......................................................................16

*Shelton v. Tucker*,
  364 U.S. 479 (1960).................................................................16, 18

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ............................................................29

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
  450 U.S. 707 (1981).................................................................16, 20

*Trump v. Int'l Refugee Assistance Project*,
  582 U.S. 571 (2017)....................................................................28

*U.S. Dep't of Lab. v. Wolf Run Mining Co.*,
  452 F.3d 275 (4th Cir. 2006) ............................................................14

*United States v. South Carolina*,
  720 F.3d 518 (4th Cir. 2013) ............................................................14

*W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
  553 F.3d 292 (4th Cir. 2009) ............................................................25

*Washington v. Klem*,
  497 F.3d 272 (3d Cir. 2007)............................................................24

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008).......................................................................14

## Statutory Authority

42 U.S.C. §§ 2000bb-2000bb-4 ..............................................................2

## Other Sources

Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting
  ICE Agents, Orders Parole Review*, Fox News (Jan. 21, 2025),
  https://tinyurl.com/an68p3ex. .........................................................5

*Baptist Denominations in America,* Baylor University,
https://tinyurl.com/mvatcm8t ..................................................................................29

Billal Rahman, *ICE Strikes During Church Service to Arrest Migrant*, Newsweek
(Jan. 30, 2025), https://tinyurl.com/y82np8vn ...........................................................6

Hartford Institute for Religious Research, *Fast Facts on American Religion*,
https://tinyurl.com/mr2pfp4c ................................................................................19

Karoline Leavitt, White House Press Secretary, Press Briefing (Jan. 29,
2025), https://tinyurl.com/mu27wcc4. ......................................................................6

*Mayor Ras. J. Baraka's Statement on ICE Raid on Newark Business
Establishment*, City of Newark (Jan. 23, 2025), https://tinyurl.com/yjdy7pf9 .........................6

Memorandum from the Acting Associate Commissioner of the Immigration and
Naturalization Service to the District Directors and Chief Patrol Agents
(May 17, 1993)..............................................................................................................3

Memorandum from Alejandro N. Mayorkas to U.S. Immigration and Customs
Enforcement and Customs and Border Protection Personnel (Oct. 27, 2021)....................4, 18

Memorandum from the Assistant Secretary of U.S. Immigrations and Customs
Enforcement to All Field Office Directors and All Special Agents in Charge
(Jul. 3, 2008) .................................................................................................................3

Memorandum from John Morton to Field Office Directors, Special Agents in
Charge, and Chief Counsel (Oct. 24, 2011) ..............................................................4

Miriam Jordan et al., *Immigrant Communities in Hiding: 'People Think ICE Is
Everywhere'*, N.Y.Times (Jan. 31, 2025), https://tinyurl.com/zm2bj7eh ................................6

Press Release, Department of Homeland Security, Statement from a DHS
Spokesperson on Directives Expanding Law Enforcement and Ending the
Abuse of Humanitarian Parole (Jan. 21, 2025), https://tinyurl.com/28yjjvpy ...............5, 18, 24

Shannon Schumacher et al., *Understanding the U.S. Immigrant Experience: The
2023/KFF LA Times Survey of Immigrants*, KFF (Sept. 17, 2023),
https://tinyurl.com/bdeh6dju ....................................................................................6

## INTRODUCTION[1]

For many people across the country, "attending religious services" is "at the very heart" of the "guarantee of religious liberty." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19-20 (2020). It is hard to imagine a greater infringement on that guarantee than government agents surveilling attendees, pulling parishioners aside for questioning, or entering a house of worship—while armed—to interrupt worship and carry out immigration enforcement.

The government has long recognized this: For over three decades, the government has restricted immigration enforcement at houses of worship and religious ceremonies, concluding that it can enforce immigration laws without barging into what it formerly called "protected areas." But that is precisely what the Department of Homeland Security has now given its agents authority to do. The only limitation? That agents use "a healthy dose of common sense."

The result is that people—regardless of their immigration status—now fear attending their houses of worship. In addition to losing the ability to exercise their faith, they also lose community and access to critical services, among other things. Their fellow congregants lose important members of their worship community. And the houses of worship lose vital members.

For Plaintiffs, that doesn't simply mean fewer people in the seats (although that is an injury in its own right). For Quakers, who believe that every person can be a conduit for messages from the Divine, when DHS deters immigrants from attending worship, it quite literally deprives Quakers of messages from God. For Cooperative Baptists, who believe that Christ's teachings compel welcoming the stranger as their own, it hobbles their ministry. And for Sikhs, whose services and fellowship are both communal efforts, it hinders their ability to carry out essential religious practices with the entire Sangat, or religious community.

---

[1] All citations to exhibits refer to exhibits to the Amended Complaint, Dkt. 25.

What's more, DHS's new policy forces Plaintiffs to make an impossible choice between two religious beliefs: on one hand, encouraging anyone to join in worship and, on the other, not putting someone in harm's way through a possible encounter with an armed federal agent.

The First Amendment and the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-2000bb-4, require that if the government is going to so burden Plaintiffs' rights to expressive association and religious exercise, it must satisfy exacting and strict scrutiny, respectively. It cannot. After all, as DHS has itself put it, the agency "can accomplish [its] enforcement mission without denying or limiting individuals' access to" protected areas, including "places of worship."

Many people will not go to worship this weekend. Many who do will continue to lose the opportunity to worship with their co-congregants who are already avoiding services out of fear. And many houses of worship (and their congregants) will not be able to live out their core religious beliefs of welcoming the stranger. The constitutional and statutory protections for religious exercise cannot turn on the whims of individual agents' "common sense." As long as they do, people will continue to avoid houses of worship. They will avoid gathering to sing hymns, sit in expectant waiting, share langar, and otherwise engage in their religious communities.

Given the grave harms that DHS's policy is causing Plaintiffs and people of faith around the country through its violation of the U.S. Constitution and the Religious Freedom Restoration Act, this Court should enjoin its enforcement until it can consider the full merits of the case.

## FACTUAL BACKGROUND

### I. DHS's move from "protected areas" to "common sense"

**1.** For more than 30 years, it has been the government's policy to not conduct immigration-enforcement operations in "protected areas," also referred to as "sensitive locations."

In 1993, Acting Associate Commissioner of the Immigration and Naturalization Service, James Puleo, directed that enforcement operations at places of worship, funerals, or other religious ceremonies "require advance written approval by the District Director or Chief Patrol Agent." Ex. 11, Memorandum from the Acting Associate Commissioner of the Immigration and Naturalization Service to the District Directors and Chief Patrol Agents (May 17, 1993), PYM-000067. The memo directed the District Director or Chief Patrol Agent to weigh "[t]he availability of alternative measures," "[t]he importance of the enforcement objective," and how agents could "minimize the impact on operation of the … place of worship." *Id.* at PYM-000068. The memo explained that exceptions to the policy must be approved beforehand in writing unless certain exigent circumstances arose that require an officer to proceed—for those, "the matter must be reported immediately" up the chain of command.

In 2008, Assistant Secretary of U.S. Immigrations and Customs Enforcement, Julie Myers, reiterated the importance of avoiding enforcement "at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies, except in limited circumstances." Ex. 15, Memorandum from the Assistant Secretary of U.S. Immigrations and Customs Enforcement to All Field Office Directors and All Special Agents in Charge (Jul. 3, 2008), PYM-000080. According to Assistant Secretary Myers, "[p]recedent for this approach is clear." Once again, the memo outlined the kinds of extreme situations that would require ICE personnel to act at or near sensitive locations, including "terrorism-related investigations, matters of public safety, or actions where no enforcement activity is involved." *Id.* at PYM-000081.

In 2011, ICE Director, John Morton, issued a memo superseding the 1993 and 2008 memos. Director Morton explained that the "policy is designed to ensure" that enforcement does not occur at "sensitive locations such as schools and churches unless" exigent circumstances exist—such as

terrorism, imminent risk of death, pursuit of a dangerous felon, or an imminent risk of destruction of evidence material to a criminal case—or the agents had received prior written approval. Ex. 16, Memorandum from John Morton to Field Office Directors, Special Agents in Charge, and Chief Counsel (Oct. 24, 2011), PYM-000082. Under the 2011 memo, even when an enforcement action was merely near a sensitive location, ICE agents were required to "conduct themselves in a discrete manner, maintain surveillance if no threat to officer safety exists, and immediately consult their supervisor prior to taking other enforcement action(s)." *Id.* at PYM-000084.

In 2021, DHS Secretary Alejandro Mayorkas rescinded and superseded the prior memos while reaffirming the government's longstanding policy. Secretary Mayorkas's memo described a "fundamental" and "bedrock" principle: DHS can accomplish its mission "without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." Ex. 20, Memorandum from Alejandro N. Mayorkas to U.S. Immigration and Customs Enforcement and Customs and Border Protection Personnel (Oct. 27, 2021), PYM-000189. The memo recognized that enforcement actions even near sensitive locations could "restrain people from accessing the protected area to receive essential services or engage in essential activities." *Id.* at PYM-000190. DHS agents thus have an "obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area." Enforcement actions included "arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." *Id.* at PYM-000191.

The 2021 memo, like those before it, recognized exigent circumstances that might require immigration enforcement at sensitive locations. But outside of those exigent circumstances, "an

Agent or Officer must seek prior approval" before conducting an enforcement operation at or near a sensitive location. *Id.*

**2.** On January 21, Fox News reported on the not-yet-public rescission of the protected-areas policy. Ex. 27, Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting ICE Agents, Orders Parole Review*, Fox News (Jan. 21, 2025), https://tinyurl.com/an68p3ex, PYM-000315-317. Fox's story quoted unnamed ICE agents who said that rescinding the memo would "free them up" to aggressively conduct immigration-enforcement operations. *Id.*

Later that evening, DHS issued a statement officially announcing that it had rescinded the protected-areas policy. DHS explained that the policy "tied the hands" of federal agents. The statement describes houses of worship specifically as places that "criminal aliens—including murderers and rapists" use "to hide." Revoking the previous policy, DHS directed that agents "use common sense." Ex. 30, Press Release, Department of Homeland Security, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025), https://tinyurl.com/28yjjvpy ["2025 Policy Press Release"], PYM-000329.

The announcement is just as notable for what it did not say. DHS did not acknowledge that for many, houses of worship are sacred spaces for profound religious experiences. It did not recognize that for more than thirty years, people have relied on the government's promise that it would invade those spaces and religious practices only in exceptional circumstances. It did not consider alternative methods to satisfy the government's interests. And it did not provide any information or data whatsoever—including about the supposed epidemic of violent criminals hiding in schools and churches—to explain its complete about-face.

**3.** Given how DHS characterized houses of worship and that ICE agents described the new policy as "free[ing] them up," it is no surprise that people across the country are afraid to go to

their houses of worship. *See* Am. Compl. ¶ 48. These fears are affirmed by stories of ICE within the last week going to houses of worship to conduct enforcement. *See, e.g.*, Ex. 34, Billal Rahman, *ICE Strikes During Church Service to Arrest Migrant*, Newsweek (Jan. 30, 2025), https://tinyurl.com/y82np8vn, PYM-000347-360.

And although the policy references "murderers and rapists," the White House Press Secretary explained that the president has "said countless times" that "he is focused on launching the largest mass deportation operation in American history of illegal criminals," and that "if you are an individual, a foreign national, who illegally enters the United States of America, you are, by definition, a criminal." Ex. 44, Karoline Leavitt, White House Press Secretary, Press Briefing (Jan. 29, 2025), https://tinyurl.com/mu27wcc4, PYM-000583. One former senior DHS official stated that fear is the point: "'The administration is creating a climate of fear as part of a self-deportation plan.'" Ex. 33, Miriam Jordan et al., *Immigrant Communities in Hiding: 'People Think ICE Is Everywhere'*, N.Y. Times (Jan. 31, 2025), https://tinyurl.com/zm2bj7eh, PYM-000344.

It is not only undocumented people who are afraid—the largest study of immigrants in the U.S. found that 26% of all immigrants, *regardless of their own legal status*, "worry they or a family member could be detained or deported." Ex. 23, Shannon Schumacher et al., *Understanding the U.S. Immigrant Experience: The 2023/KFF LA Times Survey of Immigrants*, KFF (Sept. 17, 2023), https://tinyurl.com/bdeh6dju, PYM-000261. That makes sense: DHS has recently detained American citizens too. *See, e.g.*, Ex. 31, *Mayor Ras. J. Baraka's Statement on ICE Raid on Newark Business Establishment*, City of Newark (Jan. 23, 2025), https://tinyurl.com/yjdy7pf9, PYM-000330-333. And as explained below, these reasonable fears have added to Plaintiffs' harms.

## II. Plaintiffs' religious exercise

**A.** The Religious Society of Friends—also known as Quakers—have been in the United States longer than the United States has existed. Quakers are no strangers to government burdens on their religious practice. They came to this country to flee religious persecution in England. But it wasn't until 1682, when William Penn arrived in Pennsylvania (the same year that Plaintiff Philadelphia Yearly Meeting was founded), that Quakers found refuge for their religious practice. Ex. 6, Duncan-Tessmer Decl. ¶¶ 5-7, PYM-000041-47. Central to Pennsylvania's founding was the Quaker belief in religious exercise free of government intervention. *Id.* The success of that belief was one of the foundations for the First Amendment's Religion Clauses. *Id.*

Quaker Plaintiffs are all Quaker meetings—the Quaker term for congregations. Am. Compl. ¶ 37. Monthly meetings are the basic organizational unit, where people go to worship weekly in their communities—Plaintiffs Adelphi Friends Meeting and Richmond Friends Meeting are monthly meetings. *Id.* ¶ 38. Yearly Meetings are regional associations of monthly (and quarterly) meetings. Yearly meetings are the highest organizational body in the Quaker faith. *Id.* ¶ 39. Plaintiffs Philadelphia Yearly Meeting, New England Yearly Meeting, Baltimore Yearly Meeting, and New York Yearly Meeting cover thirteen states (and the District of Columbia). They have been operating since 1682, 1661, 1672, and 1695, respectively. *Id.* ¶¶ 11-14.

Because the Quaker faith is not controlled or determined by any person or authoritative body, specific beliefs and practices may vary among Quakers.[2] But what follows are descriptions of four core beliefs and practices shared by Plaintiffs.

---

[2] There are four main branches of Quakerism. Plaintiffs all belong to the liberal branch (which does not reflect any political ideology), so this brief will focus on the beliefs of that branch.

First, Quakers believe that humans can, and do, experience God directly—called encounter. At any given time, any given person may experience the divine. That person may receive a message that is intended to be shared broadly. Different life experiences and backgrounds lead people to hear and understand the Spirit of God in different ways. Put simply, everyone who enters the door to a meeting house may be a source of divine revelation. So, it is essential for Plaintiffs' spiritual development to be able to hear God's word, no matter who it comes from. Am. Compl. ¶¶ 42-45.

Second, Quakers have developed practices to encourage encounters with God—called worship. Quaker worship involves regular gatherings, usually in a meeting house. The worshippers face the center of the room and sit silently in expectant waiting. Although it might appear from the outside that the worshippers are not doing anything, every person is quieting their mind and emotions, making space for God to enter. For some, God enters and delivers a message that is personal. For others, God enters and delivers a message that is intended to be shared with the rest of the worshippers. When someone receives that kind of message, they stand and speak, sharing that message with the rest of the Meeting. That is called vocal ministry. Vocal ministry can come from anyone, no matter their background. Am. Compl. ¶¶ 46-49.

Third, Quakers have developed practices to help understand encounters with God—called discernment. Discernment is the process of interpreting God's will in making decisions. So all Quaker meetings are acts of worship. Am. Compl. ¶¶ 50-51.

Fourth, Quakers are led to live their values in particular ways—called testimony. The most well-known testimony is the peace testimony; most Friends oppose war for any reason. Most would describe themselves as pacifists. Community is another core testimony—Quakers believe that community is global, not limited to members of the Quaker faith. Am. Compl. ¶¶ 52-54.

These religious tenets have led Quaker Plaintiffs to develop deep and meaningful connections to immigrant communities as exercises and expressions of faith. Quaker Plaintiffs believe in welcoming anyone, especially those who are most marginalized. And they encourage immigrants who want to worship to join them—not merely as welcome guests, but as people who allow all in worship to "experience God in a broader, more encompassing way." Ex. 1, Levi Decl. ¶ 60, PYM-000010. That is because they believe that different life experiences of immigrants change their own worship (whether an immigrant partakes in vocal ministry or not). *Id*. ¶¶ 60, 65-66.

Quaker Plaintiffs live out their testimonies with immigrant communities in myriad ways. Adelphi Friends Meeting, for example, is located in an immigrant-majority area, so the meeting offers translated materials, among other things. *See* Ex. 3, Steigerwald Decl. ¶¶ 24-27, PYM-000023. Richmond Friends Meeting hosts English classes at its meeting house that are taught by a local community group; has provided financial and other assistance to immigrant women; and its members help settle new immigrants, including by driving them to immigration appointments. *See* Am. Compl. ¶ 75; Ex. 4, Kingsley Decl. ¶¶ 22-26, PYM-000031. New England Yearly Meeting provides interpretive services at its large meetings, reflecting its strong ties to Central and South America. Ex. 2, Merrill Decl. ¶ 29, PYM-000017. And the strong Quaker presence in Africa means that Plaintiffs have welcomed African immigrants—including by helping refugees and asylum seekers, some of whom go on to join the Quaker community. Am. Compl. ¶¶ 74-80.

**B.** Cooperative Baptist Fellowship is a network of churches, individuals, and partners inviting each other into deeper community, equipping each other for ministry, and seeking the transformation of God's world. As Baptists, CBF and its member congregations believe that God invites them and equips them to share and spread the hope of Christ. Ex. 49, Baxley Decl. ¶ 14,

PYM-000610-622.[3] Baptists believe it is most essential to do what Jesus tells them to do. Most directly, Jesus said in Matthew 25: "I was a stranger and you welcomed me." *Id.* ¶ 16. In the faces of those fleeing political or religious persecution, or who are seeking sanctuary from tyrants, Baptists see nothing less than the face of Jesus. To welcome a stranger is to welcome Jesus. *Id.* ¶ 17. Therefore, Baptists have a spiritual obligation to welcome the stranger, according to which they accept immigrants and refugees into their communal worship and serve them through their ministries without regard to immigration status. *Id.* ¶¶ 17-19, 30, 40; Ex. 50, Carter Decl. ¶¶ 11-12, 29, 32, 52, PYM-000623-632.

To fulfill their spiritual duties, CBF churches offer a broad array of services and classes to minister to their communities—including to immigrants. Those ministries include food pantries, children's ministry, clothing closets, job-training programs, housing assistance, English classes, child-care assistance, medical and dental clinics, addiction recovery programs, hypothermia-prevention shelters, and mental-health counseling. Ex. 49, Baxley Decl. ¶ 31, PYM-000610. Most of these ministries take place in the same church building used for worship services. *Id.* CBF members have even offered temporary housing for immigrants on church property. Ex. 50, Carter Decl. ¶¶ 36, 40-41, PYM-000623. Creating the conditions for people to thrive—not just survive—is an expression of their religious beliefs. *Id.* ¶ 31. CBF members generally do not ask those they serve about their immigration status. *Id.* ¶ 12.

---

[3] There are a variety of Baptist denominations in the U.S. and throughout the world. For ease of reference, "Baptist" throughout this motion refers to those affiliated with CBF

**C.** Sikh Temple Sacramento is a Gurdwara. Gurdwaras are Sikh places of worship, learning, and community gathering. Ex. 47, Shergill Decl. ¶ 6, PYM-000599. Gurdwaras are sacred and sovereign institutions where Sikhs gather for fellowship, worship, and langar (sharing in a communal meal). Id. ¶ 7. They are central to major life events for Sikhs. *Id.* ¶ 8. Central to the concept of a gurdwara, including Sikh Temple Sacramento, is that all people must be welcomed without fear. Sikh Temple Sacramento flies the Sikh flag, or Nishaan Sahib, as a beacon of refuge and hope. The Nishaan Sahib signals that anyone from any religion, community, or background is welcome. *Id.* ¶¶ 9-10.

The Sikh faith is centered around Ik Onkar, or oneness. Sikhs believe that people of all faiths worship one divine being who created this world and lives within it. The divine is equally present in all people, and every human is equal in the eyes of God—whatever their religion, social identity, or immigration status. *Id.* ¶ 11. The Guru Granth Sahib, Sikh scripture, is at the center of Sikh life. The Guru Granth Sahib is written as poetry and music, so part of Sikh worship services is conducted via communal singing. *Id.* ¶ 12. The community is essential to worship at Gurdwaras. Community members and musicians, including children, lead the congregation in singing and prayer and explain basic ideas and lessons. *Id.* ¶ 13. While most of Sikh Temple Sacramento's larger gatherings take place on Sunday, langar is always available. *Id.* ¶ 14. The community with whom Sikhs gather for worship and communal meals is known as a Sangat. The Sangat is necessary for Sikhs to meaningfully express their faith. *Id.* ¶¶ 17-18. For example, Amrit—an initiation rite that is a core component of Sikh practice—must be received from others. The congregation of those who have received Amrit is known as the Khalsa. *Id.* ¶ 19. For these reasons and others, communal effort, worship, and fellowship are key to Sikh practice. *Id.* ¶¶ 7, 17.

### III. The harm that DHS's new policy inflicts on Plaintiffs

DHS's new policy seriously harms Plaintiffs' religious exercise and will continue to do so.

**A.** For one, DHS's new policy has frightened people across the country from attending houses of worship. That harms Quakers "personally, viscerally, emotionally, and theologically." Ex. 1, Levi Decl. ¶ 69, PYM-000011. Quakers deeply believe that every person can receive and deliver messages from God. And they believe that different backgrounds and life experiences affect "how one hears the spirit and what conclusions one might draw." *Id.* ¶ 60, PYM-000010. Deterring immigrants from worshipping in-person with a Quaker meeting would therefore directly interfere with Plaintiffs' religious exercise by lessening their "ability to hear God and what God is trying to tell [them]." *Id.* ¶¶ 64-67, PYM-000010-11.

Moreover, Plaintiffs' Quaker beliefs make it essential that they "encourage others for whom [that] path is meaningful to join." Ex. 6, Duncan-Tessmer Decl. ¶ 25, PYM-000044-45. But by opening meeting houses to immigration-enforcement activities, DHS's new policy inhibits Plaintiffs from doing just that. *See, e.g.*, Ex. 1, Levi Decl. ¶ 70, PYM-000011; Ex. 2, Merrill Decl. ¶ 43, PYM-000018 (explaining that he "cannot be as encouraging of immigrants joining us for worship" under DHS's new policy). Knowingly putting a person in harm's way or subjecting them to the possibility of a violent encounter with an armed law-enforcement officer would violate Quaker beliefs in peace and nonviolence. Ex. 7, Gillooly Decl. ¶ 42, PYM-000055.

Finally, Quakers have held a religious commitment against violence for hundreds of years. *See* Ex. 2, Merrill Decl. ¶ 39, PYM-000017. For many Quakers, "[t]he presence of a weapon in a Quaker meeting would be absolutely unacceptable." Ex. 6, Duncan-Tessmer Decl. ¶¶ 43-44, PYM-000047. The presence of armed immigration officers at meeting houses—which the new policy allows—would thus significantly hamper Plaintiffs' ability to exercise their faith. *See, e.g.*,

Ex. 2, Merrill Decl. ¶ 39, PYM-000017. Importantly, even the *threat* of armed government agents at meeting houses—which has existed since the moment DHS announced its new policy—does the same. *See, e.g.*, Ex. 1, Levi Decl. ¶ 73, PYM-000012.

**B.** For CBF, the threat of immigration-enforcement activities is deterring some congregants from attending worship and some immigrant members have expressed fear for their safety. Ex. 49, Baxley Decl., ¶¶ 44-45, PYM-000618. Some CBF members, while they do not inquire about their congregants' immigration status, are aware of congregants who are undocumented immigrants or whose statuses are in jeopardy. Ex. 48, Hayes Decl., ¶¶ 20-21, PYM- 000607-8. The policy has created such fear and confusion that even congregants who believe their immigration status to be legal now question their place and safety within the church, and some fear that their Hispanic appearance will make them a target. Ex. 50, Carter Decl., ¶¶ 48-49, PYM-000629-30. This burdens congregations' ability to engage in communal worship, a core aspect of their religious exercise. *Id.* ¶ 52.

CBF Congregations have also reported that fewer people are engaging with ministry for immigrant communities. *Id.* ¶¶ 50-52. This harms Baptists who have a spiritual duty of hospitality that requires them to use their "tangible resources" such as space in their buildings, campuses, and land to welcome immigrants. *Id.* ¶¶ 30, 32. When immigrants are fearful of houses of worship because of DHS's new policy, they are less willing to be served by church ministries on church property. So churches are left less able to serve them in accordance with their Baptist obligations. That leaves congregations unable to encourage immigrants to join them for both worship and ministry services at their churches when doing so might put those immigrants in danger. *Id.* ¶ 63; Ex. 48, Hayes Decl., ¶ 26, PYM-000608.

**C.** DHS's new policy "had an immediate chilling effect on worship and fellowship" at Sikh Temple Sacramento. Ex. 47, Shergill Decl. ¶ 22, PYM-000602. Leadership has already heard from members of their Sangat "who are concerned that participation in Sikh religious life at the Gurdwara may put them at risk because of the new policy." *Id.* ¶ 23. About half of Sikh Temple Sacramento's congregation are first-generation immigrants, and "even people with legal immigration status are unsure whether it is safe to attend." *Id.* ¶¶ 24-25. "DHS's new policy is also reducing Gurdwara attendance and interfering with [the Sangat's] religious exercise by renewing their collective concern, grounded in Sikh history, of government interference in [their] ability to freely practice [their] faith." *Id.* ¶ 28. "Sikhs' ability to practice [their] faith freely, openly, and without concern" will persist "as long as DHS's new policy is in effect." *Id.* ¶ 30.

## ARGUMENT

Granting a temporary restraining order or preliminary injunction can "protect the status quo," "prevent irreparable harm during the pendency of a lawsuit," and give the Court time to "render a meaningful judgment on the merits." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)). The substantive standard for granting a temporary restraining order is the same as for a preliminary injunction. *U.S. Dep't of Lab. v. Wolf Run Mining Co.*, 452 F.3d 275, 281 (4th Cir. 2006).

Preliminary relief—whether a temporary restraining order or a preliminary injunction—is appropriate if plaintiffs show that: "(1) there is a likelihood of success on the merits; (2) there is a likelihood the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in movant's favor; and (4) the injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). All four factors weigh in Plaintiffs' favor.

14

## I.  Plaintiffs are likely to succeed on the merits.

By deterring people from attending houses of worship, among other things, DHS's new policy burdens Plaintiffs' core religious exercise under both the First Amendment and RFRA. It does so without any reasonable justification, much less one that satisfies exacting or strict scrutiny.

### A.  DHS's new policy violates Plaintiffs' First Amendment rights of expressive association.

#### i.  Immigration-enforcement operations at houses of worship directly and substantially interfere with the right to gather for religious exercise.

The Supreme Court has recognized "a right to associate for the purpose of engaging in those activities protected by the First Amendment" including "the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). The freedom of association is "an indispensable means of preserving other individual liberties," *id.*, for the "freedom to speak [or] to worship . . . could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed," *id.* at 622. And courts have repeatedly affirmed that the right to associate for communal religious worship, is among those activities protected by expressive association. *See, e.g.*, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606-08 (2021); *Roberts*, 468 U.S. at 618, 622; *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 658 (10th Cir. 2006); *El Ali v. Barr*, 473 F. Supp. 3d 479 (D. Md. 2020).

Government action violates the First Amendment if it interferes with a person's freedom of expressive association in a "'direct and substantial' or 'significant'" way. *El Ali*, 473 F. Supp. 3d at 523 (quoting *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996), and *Lyng v. Int'l Union*, 485 U.S. 360, 366-67 n.5 (1988)). So too for government action that results in "self-censorship"—government action that chills a person's expressive-association rights because it is "likely [to] deter a person of ordinary firmness from the exercise of" those rights. *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011).

Infringement on the right of expressive association "can take a number of forms," *Roberts*, 468 U.S. at 622, including imposing penalties because of membership in a group, interfering in an organization's internal organization or operations, or otherwise making membership or participation in a group "less attractive," *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 69 (2006). Importantly, courts give deference to an association's own articulated view of what would burden its expression: "As we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000). "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment Protection." *Id.* at 650-51 (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 714 (1981)).

If the First Amendment right to associate for the purpose of engaging in protected religious exercise means anything, it must protect communal religious worship. That is quintessential association in furtherance of a religious end. *See Roberts*, 468 U.S. at 622. DHS's new policy infringes on Plaintiffs' and their members' expressive-association rights by deterring attendance at worship, ministry, and other events that occur at houses of worship. Specifically, the policy chills attendance, especially of immigrants, by causing fear of surveillance, interrogation, or arrest, at or near houses of worship. Courts have long recognized the chilling effect that government surveillance may have on a person's exercise of associational rights. *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) (describing the "vital relationship between freedom to associate and privacy in one's associations")); *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539 (1963); *Shelton v. Tucker*, 364 U.S. 479 (1960).

DHS goes further and adds the threat of investigation and arrest. That deters immigrant worshippers. But the chilling effect is not limited to immigrants. Sikhs have a history of armed

intrusion into their worship spaces, including by the government, and the threat of such action is "reducing Gurdwara attendance and interfering with [their] religious exercise by renewing [that] collective concern." Ex. 47, Shergill Decl. ¶¶ 28-29, PYM-000602. And non-immigrant CBF parishioners are likewise "disturbed by DHS's new policy" and "considering not attending worship out of fear of armed intrusion by ICE." Ex. 48, Hayes Decl. ¶ 27, PYM- 000608.

Even those who are not themselves deterred from gathering for religious worship suffer injury to their expressive-association rights. Sikhs seek the presence of their Sangat to meaningfully express their faith, Ex. 47, Shergill Decl. ¶ 17, PYM-000601; and Quakers believe that a diversity of worshippers allows them to experience God in a broader, more encompassing way, Ex. 1, Levi Decl. ¶ 60, PYM- 000010. They are deprived of the ability to associate with others for the purpose of communal worship if they have fewer congregants with whom to worship.

If that all weren't enough, DHS's new policy also violates Plaintiffs' expressive-association rights by interfering with each Plaintiffs' "internal organization or affairs," *Roberts*, 468 U.S. at 623. For CBF, reduced attendance by immigrants will mean having fewer immigrants in leadership positions, which will harm their ability for their faith body to look "more like the body of Christ." Ex. 49 Baxley Decl., ¶¶ 37, 51, PYM-000617. For example, at Oakland Baptist Church, a parishioner who is now "fearful of attending services" previously "led [the church's] children's time moments during worship." Ex. 48, Hayes Decl. ¶ 20, PYM- 000607. And because Quaker and Sikh Plaintiffs do not have ordained clergy but instead rely on worshippers themselves to lead worship and fellowship, *see, e.g.*, Am. Compl. ¶¶ 47, 83, reduced attendance by immigrants means fewer unique contributions to the religious exercise of everyone present.

### ii.  The government cannot satisfy exacting scrutiny.

The government's infringement on Plaintiffs' expressive-association rights may be justified only by the government's showing "a substantial relation between the [challenged action] and a

sufficiently important governmental interest," *Ams. for Prosperity*, 594 U.S. at 607 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)), and that the government action is "narrowly tailored to the interest it promotes," *Ams. for Prosperity*, 594 U.S. at 611 (quoting *Doe*, 561 U.S. at 196). The government cannot satisfy its burden on either prong.

For starters, there is no relation, substantial or otherwise, between conducting immigration enforcement at houses of worship and a sufficiently important government interest. *See id.* That is because the interest DHS seeks to vindicate is a fiction. In DHS's statement announcing the policy change, it expresses an interest in freeing up agents to root out criminals—"including murderers and rapists"—who it says are hiding in schools and churches. *See* 2025 Policy Press Release, Ex. 29, PYM-000326-8. But it provides no evidence that the threat has any basis in reality. Because "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights," *Ams. for Prosperity*, 594 U.S. at 607, infringing the right to gather for religious worship based on rank speculation cannot be the sort of "sufficiently important governmental interest" that exacting scrutiny requires. *Id.*

Nor can DHS survive exacting scrutiny's narrow-tailoring requirement by relying generally on its interest in immigration enforcement. Although exacting scrutiny does not require showing the least-restrictive means, the breadth of government action "must be viewed in the light of less drastic means for achieving the same basic purpose." *Id.* (quoting *Shelton*, 364 U.S. at 488). Put simply, there cannot be "a dramatic mismatch," *id.* at 612, between a government interest and the policy that it has adopted to satisfy that interest. As DHS has itself acknowledged, the agency "can accomplish [its] enforcement mission without denying or limiting individuals' access to" protected areas, including "places of worship." Ex. 20, Mayorkas Memo at PYM-000189. If the government's interest is in immigration enforcement broadly, then there is no reason it cannot limit

its enforcement to myriad ways that do not implicate important First Amendment rights. And in the rare instance that the government has an actual interest in enforcement at a house of worship, then it can seek a judicial warrant or rely on exigent circumstances (if they exist). But grave and immediate harms to First Amendment rights based on a general interest in law enforcement "is not a regime 'whose scope is in proportion to the interest served.'" *Ams. for Prosperity*, 594 U.S. at 614 (quoting *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 218 (2014)).

To put the "dramatic mismatch," *Ams. for Prosperity*, 594 U.S. at 612, in concrete terms: There are upwards of 350,000 religious congregations in the United States. *See* Ex. 46, Hartford Institute for Religious Research, *Fast Facts on American Religion*, https://tinyurl.com/mr2pfp4c, PYM-000597-98. DHS insists that it can enter each one to root out violent criminals. Yet is has not pointed to a *single* instance of a violent criminal using a specific house of worship as a hiding place, never mind what it would need to show to justify its policy of enforcement at houses of worship across the board. It is hard to imagine a more dramatic mismatch.

**B.  DHS's new policy violates Plaintiffs' rights under RFRA.**

Under RFRA, government actions—including ones of general applicability—that "substantially burden" religious exercise must satisfy strict scrutiny. That is, the action is valid only if the government shows that it is in furtherance of a compelling governmental interest and the least-restrictive means of furthering that interest. The 2025 Policy substantially burdens houses of worship, including Plaintiffs, and reflects no attempt by the government to further its interest through the least-restrictive means possible.

**i.  Plaintiffs have shown a substantial burden on their religious exercise.**

A substantial burden on religious exercise exists where government "requires (or forbids) the performance of an act that [a claimant's] religious belief forbids (or requires)," *Emp. Div. v. Smith*, 494 U.S. 872, 878 (1990). So too when the government "put[s] substantial pressure on an adherent

to modify his behavior and to violate his beliefs," *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 555 (4th Cir. 2013) (citing *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006)).[4] Not all "incidental effects" of government action that "may make it more difficult" for a person to practice their religious beliefs amount to a substantial burden. *See, e.g.*, *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450-51 (1988). But the substantial-burden requirement does not require a claimant to show direct government coercion. *See, e.g.*, *Mahmoud v. McKnight*, 688 F. Supp. 3d 265, 280-89 (D. Md. 2023). Rather, "[c]oercion can be direct or indirect." *Id.* at 288. "Indirect coercion exists when government action places 'substantial pressure on an adherent to modify his behavior and violate his beliefs[.]'" *Id.* at 289 (quoting *Thomas*, 450 U.S. at 717-18).

By any metric, DHS's new policy substantially burdens Plaintiffs' and their congregants' religious exercise. A quintessential aspect of all Plaintiffs' religious exercise is regular, communal worship. The policy allows armed ICE agents to conduct enforcement operations—including raids, arrests, investigations, interviews, and surveillance—inside, on the grounds of, and near houses of worship. The very possibility of these enforcement actions deters attendance at houses of worship, especially for immigrants and especially at times designated for communal gathering. That deterrent effect does not evaporate when an individual has legal immigration status, *see, e.g.*, Ex. 47, Shergill Decl. ¶¶ 23-24, PYM-000602, or even when an individual is not an immigrant at all, *see, e.g.*, *id.* ¶ 28; Ex. 1, Levi Decl. ¶ 73, PYM-000012; Ex. 48, Hayes Decl. ¶ 27, PYM-000608.

---

[4] *Bethel* evaluated the meaning of "substantial burden" under the Religious Land Use and Institutionalized Persons Act, not RFRA. But because RFRA and RLUIPA employ nearly virtually identical language and serve the same congressional purpose, the two statutes allow claimants "to seek religious accommodations pursuant to the same standard." *Holt v. Hobbs*, 574 U.S. 352, 358 (2015) (internal citation omitted).

Nor is its harm limited to the specific individuals who feel forced to choose between religious observance and risking their freedom.

For Quakers specifically, worshipping in community is crucial because Friends believe that access to the divine comes through the presence and participation of those with whom they worship. *See* Ex. 1, Levi Decl. ¶¶ 13-18, PYM-000003. No minister, formal spiritual leader, or holy book guides the meeting or dictates its content. Instead, God speaks to the individual people engaged in communal worship, and a deep spiritual experience is made possible through each person's presence. *See id.*; Ex. 3, Steigerwald Decl. ¶¶ 34-36, PYM-000024-5. Whether or not they speak, each attendee represents a unique opportunity to hear from and speak to the divine, and including people from diverse backgrounds yields broader access to God. *See* Ex. 8, Mohr Decl. ¶¶ 29-30, PYM-000058. As such, an all-comers policy with an emphasis on inclusivity—including by welcoming all to worship regardless of their legal or social status, or even whether they identify as Quaker—is a fundamental expression of Quaker Plaintiffs' religious beliefs. *See* Ex. 1, Levi Decl. ¶¶ 59-60, PYM-000010. What's more, the 2025 Policy puts Quaker Plaintiffs' members to an impossible choice: either violate their core religious belief in welcoming all-comers to worship or violate their core religious belief in not placing anyone in the path of violence or in harm's way *See, e.g.*, Ex. 7, Gillooly Decl., ¶¶ 42-43, PYM-000055.

In the Sikh faith, Gurdwaras—places where Sikhs gather for worship, learning, and community—are sacred, sovereign, and central to all major life events. Ex. 47, Shergill Decl. ¶¶ 6-8, PYM-000599-600. Fully and meaningfully practicing the Sikh faith requires joining with the community in service and prayer. *Id.* ¶ 15. The Sikh faith does not have an ordained clergy, and community members often lead the congregation or explain basic ideas and lessons during worship. *Id.* ¶¶ 13, 15. Because the Guru Granth Sahib is written as prose and poetry, part of every

worship service is conducted with communal singing. *Id.* ¶ 12. The threat of government surveillance and raids at the Gurdwara thus burden Sikhs' religious exercise. *Id.* ¶ 21.

That harm is far from speculative. At Sikh Temple Sacramento, where about half of the congregation are first-generation immigrants, the 2025 Policy "had an immediate chilling effect on worship and fellowship." *Id.* ¶¶ 22, 25. Members of the Sangat are now "concerned that participation in Sikh religious life at the Gurdwara may put them at risk because of the new policy." *Id.* ¶ 23. And "keeping community members from attending the Gurdwara harms not just those who are too fearful to attend but also everyone else at the Gurdwara." *Id.* ¶ 27.

For Baptists, the threat of immigration enforcement is diminishing the number of worshippers in pews along with opportunities to serve out their religious mission. Communal worship, including with people of different backgrounds, is a core aspect of religious exercise for CBF and CBF congregations. Ex 49, Baxley Decl., ¶¶ 46, 51, PYM-000618-9. Indeed, their faith requires them to hold open and regular meetings for the purpose of public worship, Christian education, and fellowship. Ex. 48, Hayes Decl. ¶¶ 23-24, PYM-000608. "Limiting those meetings to those with legal immigration status" would contradict Baptist faith, but so too would encouraging immigrants to attend church when doing so would subject them to targeting by ICE. *Id.* ¶¶ 25-26. This harm is already being felt. Due to the 2025 Policy, longstanding members of Oakland Baptist Church "are now fearful of attending services," as are other immigrant congregants—both documented and undocumented. *Id.* ¶¶ 20-21.

The 2025 Policy also harms CBF and its members by interfering with their spiritual obligation to provide "radical hospitality," including by using space in their buildings to welcome immigrants into their community. Ex. 50, Carter Decl. ¶¶ 30, 32, PYM-000627. For example, Oakland Baptist Church houses the Carolina Immigrant Alliance, and supporting the Alliance's work is an essential

component of living the church's faith. Ex. 48, Hayes Decl. ¶ 17, PYM-000607. But "[s]ince DHS changed its policy to allow ICE enforcement at churches, people in [the church's] community are afraid to come to the Immigrant Alliance for help." *Id.* Oakland likewise offers weekly ESL classes in its fellowship hall that are run by church volunteers. *Id.* ¶ 18. Since DHS changed its policy, "attendance at those classes has declined because people are afraid of immigration enforcement at the church." *Id.* This renders CBF and CBF churches less able to answer God's call to welcome the stranger. Ex. 50, Carter Decl. ¶ 55, PYM-000631.

DHS's new policy also substantially burdens Plaintiffs' religious exercise because even the *threat* of armed government agents at meeting houses—which has existed since the moment DHS announced its new policy—makes worshippers less likely to gather. *See* Ex. 7, Gillooly Decl. ¶ 44, PYM-000051. For many Quakers, "[t]he presence of a weapon in a Quaker meeting would be absolutely unacceptable." Ex. 6, Duncan-Tessmer Decl. ¶¶ 43-44, PYM-000047. For those who do attend, the possibility of armed intrusion impedes their ability to engage in the "expectant waiting" through which Quakers make space for God to enter. *See, e.g.*, Ex. 1, Levi Decl. ¶ 73, PYM-000012. For CBF and its congregants, the threat of armed immigration-enforcement officers also interferes with congregants' ability to attend services with a clear mind. Ex. 50, Carter Decl. ¶ 56, PYM-000631. The same for Sikh Plaintiffs. Ex. 47, Shergill Decl. ¶ 28, PYM-000602.

### ii.  The government cannot satisfy strict scrutiny

Because Plaintiffs have shown a substantial burden on their religious exercise, DHS's new policy must satisfy strict scrutiny, which it cannot do. DHS does not have a compelling interest in immigration-enforcement activity specifically at houses of worship. Even if it did, the policy does not further that interest through the least-restrictive means.

**a.** The government may not rest on "broadly formulated interests" or interests stated "at a high level of generality" to satisfy the compelling-interest requirement. *Fulton v. City of Philadelphia*,

593 U.S. 522, 541 (2021) (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430-32 (2006)). So the relevant inquiry here is not whether the government has a compelling interest in immigration enforcement or law enforcement generally. After all, "the mere assertion of security . . . reasons is not, by itself, enough." *Couch v. Jabe*, 679 F.3d 197, 201 (4th Cir. 2012) (quoting *Washington v. Klem*, 497 F.3d 272, 283 (3d Cir. 2007)).

Instead, the government must show that the particular policy, as applied to these Plaintiffs, furthers its asserted interest. *Id.* It cannot. The only actual interest that DHS has supplied is its interest in catching "criminal aliens—including murderers and rapists"—who the government says are "hid[ing] in America's schools and churches." See 2025 Policy Press Release. But DHS, which bears the burden of proving that its action furthers a compelling interest, *see Lovelace*, 472 F.3d at 191, has provided not one whit of evidence to support that its interest is genuine—as to Plaintiffs or any other house of worship. There is none. Nor has DHS explained why it believes that roving law-enforcement agents being free to enter any publicly accessible areas of houses of worship— checked only by "common sense"—would further its interest and yield the arrests of the dangerous criminals that it purports are hiding in churches. The Court can end its analysis here.

**b.** Even if the government did have a compelling interest, the new policy is not the least-restrictive means of furthering that interest. "The least-restrictive-means standard is exceptionally demanding." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). To survive strict scrutiny, the government must show that it lacks other means to achieve its interests without substantially burdening Plaintiffs' religious exercise. *See id.* But when the government successfully employs other methods of achieving the same goals, and those methods would not substantially burden religious exercise, then the government cannot satisfy the least-restrictive-means standard. *See id.* at 730-31. Even assuming that violent criminals are hiding in houses of

worship and even further assuming that DHS needs to arrest dangerous criminals in the houses of worship instead of somewhere public, then DHS agents can get a judicial warrant. (Agents could also feasibly enter a house of worship if there were exigent circumstances—a part of the previous protected-areas policy that DHS's new policy discarded.) That is how DHS enforces immigration laws in peoples' homes. There is no reason that DHS cannot do the same for houses of worship.

## II.  Plaintiffs will suffer irreparable harm unless DHS's new policy is enjoined.

Irreparable harm occurs "when the threatened injury impairs the court's ability to grant an effective remedy," *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 270 (4th Cir. 2018), *vacated on other grounds*, 585 U.S. 1028 (2018), especially when the harm suffered cannot be remedied by monetary damages, *see Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994).

"[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of [the] plaintiff's First Amendment claim," *W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009), because "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). Put simply, "when 'there is a likely constitutional violation, the irreparable harm factor is satisfied.'" *Mahmoud*, 688 F. Supp. 3d at 286 (quoting *Leaders*, 2 F.4th at 339).

So too under RFRA. "Other circuits are in agreement that 'establishing a likely RFRA violation satisfies the irreparable harm factor,'" *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 609 (8th Cir. 2022) (quoting *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013)), as "[c]ourts have persuasively found that irreparable harm accompanies a substantial

burden on an individual's rights to the free exercise of religion under RFRA." *Religious Sisters of Mercy*, 55 F.4th 583 at 609 (quoting *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996)). Given that "Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment," *Holt*, 574 U.S. at 357, "a finding under RFRA that a [policy] creates a substantial burden on an individual's exercise of his or her religion constitutes a finding of irreparable harm." *Alameen v. Coughlin*, 892 F. Supp. 440, 447-48 (E.D.N.Y. 1995).

Plaintiffs have shown that they are likely to prevail on both their First Amendment and RFRA claims. As described above (at 15-19), DHS's new policy is already chilling Plaintiffs' and their parishioners' First Amendment rights to associate for the purpose of religious worship. Likewise (as explained at 19-25), the new policy violates RFRA because it is already substantially burdening Plaintiffs' ability to freely exercise their religions by, among other things, deterring attendance, lessening their ability to worship and minister as their beliefs require, and putting them to an impossible choice between not encouraging attendance or putting people in harm's way. And the government cannot satisfy its burden under either exacting or strict scrutiny.

## III. The balance of equities and public interest favor Plaintiffs.

The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). That is because "the government's interest *is* the public interest" in such cases. *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) (quoting *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)). These factors, too, militate in favor of granting the requested relief.

While Plaintiffs are currently suffering and will continue to suffer substantial harm to their religious-exercise and expressive-association rights, the government stands to suffer little—if

any—injury if the new policy is temporarily enjoined. The government "'is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional,'" because "'the public interest favors protecting constitutional rights.'" *Mahmoud*, 688 F. Supp. 3d at 286 (quoting *Leaders*, 2 F.4th at 346); *see Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013)). "If anything, the system is improved by such an injunction." *Centro Tepeyac*, 722 F.3d at 191. And preliminary relief that enjoins unlawful government conduct "will work no harm to the [government's] legitimate and lawful interests." *Doe v. Pittsylvania Cnty.*, 842 F. Supp. 2d 927, 935 (W.D. Va. 2012); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (government "cannot suffer harm from an injunction that merely ends an unlawful practice"). Because Plaintiffs have shown that they are likely to prevail on the merits of their constitutional and RFRA claims, the balance of equities and public interest weigh in favor of issuing a TRO.

Nor are defendants prejudiced by delay. Plaintiffs initiated this lawsuit within a week of DHS rescinding the protected-areas policy and filed a notice of this motion four days later (after requesting that the government pause the policy so that the parties did not need the court to intervene on an emergency basis). *See Jensen v. Md. Cannabis Admin.*, 719 F. Supp. 3d 466, 478 (D. Md. 2024) ("lack of urgency"—delay of several months—in seeking temporary or preliminary relief when plaintiffs had "ample time and opportunity" to bring their challenge tipped balance of equities in favor of defendants (internal quotations omitted)).

Perhaps more to the point, the government has operated for more than 30 years without a "common sense" standard. And federal law enforcement are no strangers to needing to follow a requirement to obtain a judicial warrant (absent exigent circumstances) when needing to make an

arrest. DHS is not harmed by following the same procedures for houses of worship that it applies to other protected areas as the court decides the merits of the case.

**IV. Because DHS's policy violates the First Amendment, the Court should enjoin enforcement as to houses of worship nationwide.**

A district court has "broad discretion to craft remedies based on the circumstances of a case," and should "mold[] its decree to meet the exigencies of the particular case." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326-27 (4th Cir. 2021) (internal quotation marks omitted) (quoting *Roe v. Dep't of Defense*, 947 F.3d 207, 232 (4th Cir. 2020)). Where "a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Berean Baptist Church v. Cooper*, 460 F. Supp. 3d 651, 664 (E.D.N.C. 2020) (internal quotation marks omitted) (quoting *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977)). Because Plaintiffs have shown a violation of their First Amendment rights, and for the reasons that follow, the Court should enjoin DHS from enforcing its policy in houses of worship nationwide.

The Fourth Circuit and Supreme Court have affirmed "the equitable power of district courts, in appropriate cases, to issue nationwide injunctions extending relief to those who are similarly situated to the litigants," *Roe*, 947 F.3d at 232 (4th Cir. 2020), especially where granting injunctive relief only to the plaintiffs in a case "would cause inequitable treatment" of similarly situated people, *HIAS, Inc.*, 985 F.3d at 326-27. *See also Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 582 (2017) (leaving in place nationwide injunctions to the extent they covered "parties similarly situated to" the plaintiffs). Nationwide relief is particularly appropriate if, as here, application of the challenged policy does not turn on individual characteristics of the plaintiffs. *Am. Coll. of Obstetricians & Gynecologists v. United States Food & Drug Admin.*, 472 F. Supp. 3d 183, 231 (D. Md. 2020). DHS's new policy gives it the authority to enter any house of worship across the country, no matter its religious beliefs. There is no reason that a Quaker meeting of the

liberal branch should be protected but a nearby evangelical Quaker meeting should not be. There is no reason that a gurdwara in Sacramento should be off limits but a gurdwara in New Jersey is fair game. And there is no reason that other Christian houses of worship shouldn't get the same protection as Cooperative Baptist churches. After all, "categorical policies relied upon by the Government call for categorical relief." *Roe*, 947 F.3d at 232-33.

Further, nationwide relief is appropriate when an injunction limited to specific plaintiffs would "undermine the very national consistency" that the relevant law "is designed to protect." *HIAS, Inc.*, 985 F.3d at 326-27. So "limiting the geographic scope of an injunction on an immigration enforcement policy 'would run afoul of the constitutional and statutory requirements for uniform immigration law and policy.'" *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 397 (M.D.N.C. 2019) (quoting *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1049 (N.D. Cal. 2018)). The Fifth Circuit, for example, upheld a nationwide injunction against DHS's DAPA program, reasoning that "[p]artial implementation of DAPA would 'detract[] from the "integrated scheme of regulation" created by Congress.'" *Texas v. United States*, 809 F.3d 134, 187-88 (quoting *Arizona v. United States*, 567 U.S. 387, 402 (2012)). This Court should do the same.

Nationwide relief is also appropriate for a simple practical reason: DHS is not equipped to distinguish houses of worship that are members of Plaintiffs' organizations from those that are not. Within the Quaker faith, there are four main branches. Plaintiffs here belong to the liberal branch, but many Quaker meetings belong to the other branches. (And even some Quakers within the liberal branch do not belong to any of Plaintiff Quakers' organizations.) Similarly, there are at least 20 different Baptist denominations in the United States, including CBF Baptists, Southern Baptist, Primitive Baptists, and more. Ex. 45, *Baptist Denominations in America,* Baylor

University, https://tinyurl.com/mvatcm8t, PYM-000595. On top of that, individual churches may be affiliated with more than one Baptist convention or denomination. Even further compounding the difficulty, Plaintiffs' members are not neatly segregated from nonmember houses of worship. Both Quaker and CBF Plaintiffs have members that hold their worship inside the building of a different denomination. *See* Ex. 7, Gillooly Decl. ¶ 8, PYM-000051; Ex. 49, Baxley Decl. ¶ 6, PYM-000611. Instructing DHS to understand and recognize these subtle distinctions within a single faith tradition would be impractical enough. Instructing them to do the same with respect to the three faith traditions represented here would be impossible.

To be sure, the court should also ensure that "a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *HIAS, Inc.*, 985 F.3d at 326–27 (internal quotation marks omitted) (quoting *Roe*, 947 F.3d at 231). Enjoining the DHS policy to prevent immigration enforcement at or near houses of worship absent a judicial warrant or exigent circumstances would provide complete relief to Plaintiffs but would not unduly burden the government. As explained above, if DHS's interest is in immigration enforcement overall, it does not need to enter houses of worship to do that (as it has generally avoided for the last 30 years). *See, e.g.*, Ex. 49, Baxley Decl. ¶ 61, PYM-000622. If the interest is, as DHS says, in apprehending violent criminals hiding in houses of worship, then DHS can follow the same procedures it already follows when it needs to enter a private home.

## CONCLUSION

For these reasons, the Court should grant the motion and enjoin the government from carrying out immigration-enforcement operations at houses of worship until the Court can further consider the merits.

February 4, 2025

Respectfully submitted,

_/s/ Alethea Anne Swift_
Alethea Anne Swift (Bar No. 30829)
Bradley Girard[+]
Sarah Goetz*
Andrew Bookbinder*
J. Sterling Moore*
Audrey Wiggins*
Skye Perryman*

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
aswift@democracyforward.org
bgirard@democracyforward.org
sgoetz@democracyforward.org
abookbinder@democracyforward.org
smoore@democracyforward.org
awiggins@democracyforward.org
sperryman@democracyforward.org

_Counsel for Plaintiffs_

[+] _Application for full admission pending_
*_Admitted_ pro hac vice

31