**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,<br><br>and<br><br>**New York Yearly Meeting of the Religious Society of Friends, Inc.,**<br>15 Rutherford Place, New York, NY 10003<br><br>**Cooperative Baptist Fellowship**,<br>160 Clairemont Ave. Suite 300<br>Decatur, GA 30030<br><br>and<br><br>**Sikh Temple Sacramento**,<br>2301 Evergreen Ave<br>West Sacramento, CA 95691<br><br>              Plaintiffs,<br><br>**v.**<br><br>**U.S. Department of Homeland Security**, *et al.*,<br><br>              Defendants. | **Civil Case No. 8:25-cv-243-TDC**<br><br>Jury Trial Demanded |

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Philadelphia Yearly Meeting of the Religious Society of Friends, New England Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Adelphi Friends Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society

of Friends, Cooperative Baptist Fellowship, and Sikh Temple Sacramento, on their own behalf and on behalf of their members, allege as follows:

## INTRODUCTION

1.    Whether it's to sit in expectant waiting, to deliver or receive a weekly sermon, to join a langer, or to participate in religious observances requiring a minyan, communal worship is fundamental to the religious exercise of many.

2.    For over 30 years, it has been the government's official policy to not enforce immigration laws in "protected areas," which include houses of worship (and other religious ceremonies like weddings and funerals), absent exigent circumstances or internal supervisory approval. That is because enforcement in protected areas like houses of worship would, in the government's own words, "restrain people's access to essential services or engagement in essential activities."

3.    Despite this longstanding policy, the Department of Homeland Security has now reversed course—authorizing agents to conduct immigration-enforcement operations at protected areas, including houses of worship. The 2025 Policy neither limits such operations to situations involving exigent circumstances nor requires agents seeking to conduct such operations to seek supervisory approval. Instead, the 2025 Policy gives agents unfettered authority to carry out enforcement in formerly protected areas, bound only by individual agents' own subjective "common sense."

4.    Allowing armed government agents wearing ICE-emblazoned jackets to park outside a religious service and monitor who enters or to interrupt the service and drag a congregant out during the middle of worship is anathema to Plaintiffs' religious exercise. The very threat of that enforcement deters congregants from attending services, especially members of immigrant communities. Losing congregants is a substantial burden on Plaintiffs' religious exercise,

especially when those congregants would bring to worship different backgrounds and life experiences. And deterring worshippers from attending services chills Plaintiffs' First Amendment rights of association.

5.    Because "attending religious services" is "at the very heart" of the "guarantee of religious liberty," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19-20 (2020), if the government is going to impede that guarantee, it must meet the strictest of justifications. With respect to the 2025 Policy, it cannot. After all, DHS has already acknowledged that it can accomplish its enforcement mission without limiting individuals' access to protected areas, including places of worship.

6.    In all events, if an agency is going to upend a longstanding policy, it must follow specific procedures, which include explaining the reason for its about-face and considering alternatives. DHS's new policy does not acknowledge that houses of worship are sacred spaces. It does not acknowledge that for many, religious exercise is an essential activity (as the previous policy did). And it does not even consider what unconstrained immigration enforcement at houses of worship would mean as a result. Instead, it treats houses of worship as nothing more than places where "criminal aliens—including murderers and rapists" go to "hide." Ex. 30, Press Release, Department of Homeland Security, *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole* (Jan. 21, 2025), https://tinyurl.com/28yjjvpy ["2025 Policy Press Release"], PYM-000329.

7.    As such, and as further explained below, this Court should declare unconstitutional any policy permitting government agents to carry out immigration-enforcement activities at or near houses of worship when the policy is limited only by individual agents' subjective "common

sense," vacate the 2025 Policy, and enjoin DHS and its constituent agencies from implementing or enforcing the policy.

## JURISDICTION AND VENUE

8.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiffs allege violations of the First Amendment of the United States Constitution, U.S. Const. amend. I; the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb(a)- 2000bb-4; and the Administrative Procedure Act, 5. U.S.C. § 701, *et seq.*

9.    Venue is proper under 28 U.S.C. § 1391(e)(1) because at least one of the plaintiffs resides in this district and no real property is involved in the action.

10.   This Court has the authority to grant the relief requested by Plaintiffs under Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the Administrative Procedure Act, 5. U.S.C. § 701, *et seq.*; and under the Court's inherent equitable authority.

## PARTIES

11.   Plaintiff Philadelphia Yearly Meeting of the Religious Society of Friends is the formal and legal association of more than 100 local Quaker congregations throughout parts of Pennsylvania, Maryland, Delaware, and New Jersey. It was established in 1682, when William Penn arrived in Pennsylvania. It is located in Philadelphia, Pennsylvania.

12.   Plaintiff New England Yearly Meeting of the Religious Society of Friends is the formal and legal association of local Quaker congregations in the six New England states: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. It is the oldest Yearly

Meeting in the world and has met continuously since 1661. It is located in Worcester, Massachusetts.

13. Plaintiff Baltimore Yearly Meeting of the Religious Society of Friends is the formal and legal association of more than 40 local Quaker congregations throughout parts of Pennsylvania, Maryland, Virginia, West Virginia, and Washington, D.C. It was established in 1672 and, with the exception of one year due to the 1918 influenza pandemic, has met annually since. It is located in Sandy Spring, Maryland.

14. Plaintiff New York Yearly Meeting of the Religious Society of Friends is a not-for-profit religious corporation that is the governing and advisory umbrella organization for 65 Quaker congregations across New York, New Jersey, and Connecticut. It has existed since 1695. It is located in New York, New York.

15. Plaintiff Adelphi Friends Meeting of the Religious Society of Friends is a religious corporation located in Adelphi, Maryland. It is part of the Baltimore Yearly Meeting of the Religious Society of Friends.

16. Plaintiff Richmond Friends Meeting of the Religious Society of Friends is a religious corporation located in Richmond, Virginia. It is part of the Baltimore Yearly Meeting of the Religious Society of Friends.

17. Plaintiff Cooperative Baptist Fellowship, which is incorporated in Georgia, is a religious network that includes Baptist churches, individuals, and partners. It includes more than 1,400 individual congregations among numerous other field personnel, chaplains and pastoral counselors, and partner organizations.

18. Plaintiff Sikh Temple Sacramento is a *gurdwara*: a Sikh place of worship, learning, and community. It is a religious corporation located in West Sacramento, California.

19. Defendant Department of Homeland Security is the federal agency responsible for enforcing United States immigration laws and policies. DHS is an agency within the meaning of 5 U.S.C. § 551(1).

20. DHS contains component agencies, including U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, and U.S. Customs and Border Patrol.

21. Defendant Kristi Noem is sued in her official capacity as the Secretary of the Department of Homeland Security.

## FACTUAL ALLEGATIONS

### DHS abandons protected areas for "common sense."

22. For more than 30 years, it has been the government's policy to not conduct immigration-enforcement operations in "protected areas," also referred to as "sensitive locations." *See* Ex. 20, Memorandum from Alejandro N. Mayorkas, Secretary, Department of Homeland Security, to Tae D. Johnson, *et al.*, Guidelines for Enforcement Actions in or Near Protected Areas (Oct. 27, 2021), https://tinyurl.com/mrykx3j4 ["Mayorkas Memo"].

23. In 1993, Acting Associate Commissioner of the Immigration and Naturalization Service James Puleo directed that enforcement operations at places of worship, funerals, or other religious ceremonies "require advance written approval by the District Director of Chief Patrol Agent." Ex. 11, Memorandum from James A. Puleo, Immigration and Naturalization Service Acting Associate Commissioner, "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" HQ 807-P (May 17, 1993), at PYM-000067. The memo outlined the

standards by which a district director or chief patrol agent should decide whether a proposed enforcement action was appropriate, including "[t]he availability of alternative measures," "[t]he importance of the enforcement objective," and how agents could "minimize the impact on operation of the … place of worship." *Id.* at PYM-000068. The memo explained that exceptions to the policy must be approved beforehand in writing unless certain exigent circumstances arose that require an officer to proceed—for those, "the matter must be reported immediately" up the chain of command. *Id.*

24.  In a 1993 memo, for example, the Chief Patrol Agent in Laredo, Texas, directed field agents that "[p]laces of worship will not be entered for the purpose of apprehending illegal aliens even if in hot pursuit unless an Assistant Chief or above has authorized it." Ex. 9, Memorandum from Jose E. Garza, Chief Patrol Agent for Laredo, Texas, "Sector Policy Regarding Entry Into Places of Worship, Schools and Private Residence" LRT 40/4-P (Jan. 21, 1993).

25.  In 2008, Assistant Secretary of U.S. Immigration and Customs Enforcement Julie Myers reiterated the importance of avoiding enforcement "at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies, except in limited circumstances." Ex. 15, Memorandum from Julie L. Myers, Assistant Secretary, U.S. Immigration and Customs Enforcement, "Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations" 10029.1 (July 3, 2008), at PYM-00080. According to Assistant Secretary Myers, "[p]recedent for this approach is clear." *Id.* And while the 2008 memo indicated that "ICE policies and procedures" did not otherwise prohibit enforcement at protected areas, the 1993 memo "remains in effect." *Id.* at PYM-000081. Once again, the memo outlined the kinds of extreme situations that would require ICE personnel to act at or near sensitive

locations, including "terrorism-related investigations, matters of public safety, or actions where no enforcement activity is involved." *Id.*

26.  In 2011, ICE Director John Morton issued a memo superseding the 1993 and 2008 memos. Ex. 16, Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, "Enforcement Actions at or Focused on Sensitive Locations" 10029.2 (Oct. 24, 2011), PYM-000082-84. The 2011 policy was designed to ensure that enforcement actions neither occurred at nor were focused on sensitive locations such as schools and churches absent either exigent circumstances (such as terrorism, imminent risk of death, pursuit of a dangerous felon, or an imminent risk of destruction of evidence material to a criminal case) or prior written approval. *Id.* at PYM-000082. Under the 2011 memo, even enforcement actions not initiated at or focused on sensitive locations required ICE agents at or near such locations to "conduct themselves in a discrete manner, maintain surveillance if no threat to officer safety exists, and immediately consult their supervisor prior to taking other enforcement action(s)." *Id.* at PYM-000084.

27.  In 2021, Department of Homeland Security Secretary Alejandro Mayorkas rescinded and superseded the prior memos while reaffirming the government's longstanding policy. Ex. 20, Mayorkas Memo, at PYM-000188-89. Secretary Mayorkas's memo described a "fundamental" and "bedrock" principle: DHS can accomplish its mission "without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." *Id.* at PYM-000189. The memo explicitly recognized that enforcement actions even near sensitive locations could "restrain people from accessing the protected area to receive essential services or engage in essential activities." *Id.* at PYM-000190. DHS agents thus have an "obligation to refrain, to the

fullest extent possible, from conducting a law enforcement action in or near a protected area." *Id*. Enforcement actions "include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." *Id.* at PYM-000191.

28.  The 2021 memo, like those before it, recognized that certain exigent circumstances might require immigration enforcement at protected areas. But outside of those exigent circumstances, "an Agent or Officer must seek prior approval" before conducting an enforcement operation at or near a sensitive location. *Id.* The memo contained a boilerplate paragraph at the end averring that the memo "does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at PYM-000192.

29.  Despite the boilerplate language, ICE's website on protected areas explained that "[a]bsent exigent circumstances, DHS officers and agents *must* seek prior approval" before taking enforcement actions at protected areas. Ex. 22, Immigration and Customs Enforcement, Protected Areas Enforcement Actions, https://tinyurl.com/h4u5hfrv (last accessed Jan. 27, 2025) (emphasis added), at PYM-000249. And it explains that individuals who believe DHS officers violated the protected-areas policy should file complaints with ICE, CBP, Office of the Inspector General, or DHS Office for Civil Rights and Civil Liberties. *Id.* at PYM-000250.

30.  What's more, Congress itself has required ICE to submit public reports on enforcement activities at protected areas, including "the total number of enforcement actions at sensitive locations, broken down by field office; type of sensitive location; whether prior approval was given; what type of exigent circumstances existed, if any; and the number of non-targeted

individuals who were also apprehended." Ex. 21, Department of Homeland Security, *Immigration Enforcement at Sensitive Locations, Fiscal Year 2020 Report to Congress*, at PYM-000196 (April 18, 2022) (quoting House Report 116-180, part of the Fiscal Year 2020 Department of Homeland Security Appropriations Act (P.L. 116-93)).

31.  On January 21, 2025, Fox News reported the not-yet-public rescission of the protected-areas policy. Ex. 27, Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting ICE Agents, Orders Parole Review*, Fox News (Jan. 21, 2025), https://tinyurl.com/an68p3ex. Fox's story quoted unnamed ICE agents who said that rescinding the memo would "free them up" to aggressively conduct immigration-enforcement operations. *Id.* at PYM-000315.

32.  Later that day, DHS issued a statement officially announcing that it had rescinded the existing policy governing protected areas and had replaced it with one that removes all guardrails limiting agents' ability to carry out enforcement actions at or near houses of worship. The new policy contains no replacement constraints on agents' authority at these formerly protected areas, which DHS's statement described as places that "criminal aliens" use "to hide." Instead, DHS now merely put its trust in individual agents "to use common sense." Ex. 30, 2025 Policy Press Release.

33.  Although it has not yet been posted publicly, on January 31, counsel for DHS supplied Plaintiffs' counsel with a copy of a January 20, 2025, memo from acting DHS secretary Benjamin Huffman. *See* Ex. 43, Memorandum from Benjamine C. Huffman, Acting Secretary, Department of Homeland Security, "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025).

34.  The memo officially rescinds and supersedes the Mayorkas Memo. *Id*. In line with DHS's public statement, the memo does away with any designation of protected areas, does not require

any internal process for enforcement at or near protected areas, and has no mention at all of exigent circumstances justifying enforcement at or near protected areas. *Id.* Instead, the memo states that enforcement officers "frequently apply enforcement discretion to balance a variety of interests" and directs that they should keep using that discretion "along with a healthy dose of common sense."

35.  Although DHS undid more than 30 years of policy, it did not explain why the previous policy had failed. It did not address how people may have come to rely on the policy. And it did not outline any alternatives that it considered.

**Plaintiffs' religious beliefs and their connection to immigrant communities**

***The Religious Society of Friends***

36.  Quakers, or Friends, are members of the Religious Society of Friends, a religious movement dating to the seventeenth century. *See* Ex. 28, *The Quaker Story*, Quaker.org, https://tinyurl.com/25fu7z4k.

37.  Quakerism emerged from the Christian tradition. Today, many Friends consider themselves Christians, though many do not. *See* Ex. 1, Levi Decl. ¶ 10.

38.  While Quakers have no formal hierarchy, they are generally organized into Yearly Meetings, Quarterly Meetings, and Monthly Meetings. A "meeting" is an association, a gathering held at a certain interval (*i.e.*, yearly, quarterly, or monthly), and a way of describing Quakers within a certain region. *See* Ex. 2, Merrill Decl. ¶ 3.

39.  Monthly meetings are the basic organizational unit in the Quaker religion. They are local congregations that hold weekly worship services and, once a month, hold a meeting for worship with attention to business. *See id.* ¶ 6.

40. The Yearly Meeting is the highest organizational body in the Quaker religion. Yearly Meetings are regional associations of local Quaker meetings. As their name suggests, Yearly Meetings gather at least annually to worship and make decisions about issues affecting their constituent quarterly and monthly meetings. *Id.* ¶¶ 12-13.

41. The Quaker faith does not have any spiritual leader, creed, catechism, or canonical statement of belief. *See* Ex. 1, Levi Decl. ¶ 14.

42. Because tenets of the Quaker faith are neither determined by a religious authority nor codified into a universal creed, specific beliefs vary among different Quaker branches and from person to person.

43. Generally speaking, there are four core insights into what it means to be a Quaker: encounter, worship, discernment, and testimony. *Id.* ¶ 12.

44. Quakers believe that humans can and do experience God directly—known as "encounter." Encounter is sometimes referred to as seeking the inner light, inner voice, or the Christ within. *Id.* ¶ 16; Ex. 3, Steigerwald Decl. ¶ 11.

45. Quakers believe that everyone has their own connection to spirit, or access to the divine.

46. In the Quaker tradition, different life experiences, backgrounds, and cultures lead people to hear and experience God differently. Having a diversity and richness of human experience yields a fuller understanding of how God speaks to the Quakers, individually and as a community. *See, e.g.*, Ex. 1, Levi Decl. ¶ 17.

47. Quaker worship, which consists of sitting in silence and waiting to hear the voice of God, is designed to encourage that encounter.

12

48. Opening meetings to anyone who desires to attend is an important aspect of Quaker worship, because every individual who attends presents an opportunity for God to speak to worshippers through them.

49. Quakers believe that everyone who attends worship meetings is participating in worship, whether they speak or not.

50. The communal aspect of worship is central to the exercise of the Quaker faith. Ex. 1, Levi Decl. ¶ 25.

51. Quakers have also developed practices—known as "discernment"—to help understand their encounters with God. *Id.* ¶ 26.

52. For Quakers, discernment is the process of interpreting God's will and making decisions. Such decisions may be personal or may be for the sake of the community. *Id.* ¶ 27.

53. Quakers have a set of values, known as testimonies, that inform and guide how they live and worship. *Id.* ¶¶ 30-34.

54. Some Quakers use the acronym SPICES to help explain some core beliefs of Quaker testimony: simplicity, peace, integrity, community, equality (both social and spiritual), and stewardship. *Id.* ¶ 34; Ex. 4, Kingsley Decl. ¶ 29.

55. Pacifism is deeply ingrained in the Quaker faith. The Friends have a religious commitment to oppose violence in all forms. They do not take up arms, and the presence of arms inside their meeting houses would violate this founding principle of their faith. *See, e.g.*, Ex. 3, Steigerwald Decl. ¶¶ 42-43.

56. Given the Quaker values of welcoming strangers, worshipping with all-comers from diverse backgrounds, community, and service, many Quaker meetings, including Plaintiffs, have built deep and meaningful connections to immigrant communities.

57. Plaintiff Adelphi Friends Meeting, for example, is located in an area with a significant immigrant population. Ex. 3, Steigerwald Decl. ¶ 24. It has "had a large number of immigrants come to worship" and has been "enriched" by their presence. Ex. 1, Levi Decl. ¶¶ 64-65. To foster inclusivity for its immigrant members and others in the community, Adelphi Friends Meeting translates committee minutes into Spanish and includes Spanish-language materials about the faith in its foyer. Ex. 3, Steigerwald Decl. ¶ 24. It has, at times, hung a banner to welcome immigrants— reading "Do not mistreat strangers. Treat them as citizens. Love them as yourself." *Id.* ¶ 26. Adelphi Friends Meeting has likewise supported immigrant families settling into the community, including families from Afghanistan, Burundi, Kenya, and Nicaragua, many of whom were refugees. *Id.* ¶ 27. Some of those families joined the meeting for worship. *Id.*

58. Plaintiff Richmond Friends Meeting has likewise developed important ties to nearby immigrant communities. It hosts English classes at its meeting house that are taught by a local community group; it has provided financial and other assistance to immigrant women to help them develop livelihoods; and its members help settle new immigrants, including by driving them to immigration appointments. Ex. 4, Kingsley Decl. ¶¶ 22-26. These acts are exercises of the Richmond Friends Meeting's and its members' religious beliefs. *Id.* ¶ 26-27.

59. Plaintiff New England Yearly Meeting provides interpretative services at its large meetings because the Quaker faith has strong ties to Central and South America and, as a result, there are attendees (both citizens and noncitizens) for whom Spanish is their first language. Ex. 2,

14

Merrill Decl. ¶ 30. There is also a strong Quaker presence in Africa. New England Yearly Meeting has a monthly meeting that consists of members of the African diaspora. *Id.* ¶ 30.

60.   One of New England Yearly Meeting's constituent monthly meetings, the Putney Friends Meeting, has a decades-long history of supporting its local immigrant community as an exercise of Quaker religious beliefs and commitments. It fulfills those commitments by, among other things, welcoming immigrant families to the area and volunteering with and providing financial assistance to local organizations that support asylum seekers. Ex. 5, Marbury Decl. ¶¶ 21-26.

61.   Likewise, Quaker religious beliefs led Plaintiff Philadelphia Yearly Meeting to adopt strategic directions—"connecting" and "belonging"—aimed at building community with Quakers across the region and beyond, including among immigrant populations. Ex. 6, Duncan-Tessmer Decl. ¶¶ 23-25. One of its monthly meetings, for example, is located in an area with a large immigrant population and is deeply involved with local immigrant organizations in the community. *Id.* ¶ 32. Another of its monthly meetings hosts a fellow Quaker congregation started by a family of East African Friends in its meeting house. *Id.* ¶ 31.

62.   Plaintiff Baltimore Yearly Meeting's members are called by God to build relationships with fellow Quakers across geographical and theological lines, which its members carry out by gathering with a range of diverse Quaker communities, including some largely Spanish-speaking congregations. Some of Baltimore Yearly Meeting's constituent monthly meetings are located in areas with large populations of immigrants, and some of the monthly meetings have substantial numbers of active members who are immigrants, particularly African immigrants. Ex. 7, Gillooly Decl. ¶¶ 26-27. Its monthly meetings, including Adelphi Friends Meeting and Richmond Friends Meeting, have developed close connections to their immigrant communities, as described above.

15

63.  Plaintiff New York Yearly Meeting, too, has close ties to the immigrant communities near its monthly meetings. One of its meetings is made up almost entirely of refugees; another is closely engaged with the migrant community that lives nearby; and another is considering whether to add a Spanish-language weekly meeting to accommodate the large and growing Spanish-speaking population in the region. *See* Ex. 53, Mohlke Decl. ¶¶ 25-27. Yet another of its monthly meetings, located in downtown Brooklyn, welcomes immigrants and refugees into its meeting house with a large sign out front, holds monthly dinners for members of the community, and hosts at its meeting house an organization that provides services to immigrants. *See* Ex. 52, Black Decl. ¶¶ 25, 27-28.

***Cooperative Baptist Fellowship***

64.  CBF is a network of churches, individuals, and partners inviting each other into deeper community, equipping each other for ministry, and seeking the transformation of God's world. Ex. 49, Baxley Decl. ¶ 2.

65.  CBF is made up of more than 1,400 individual congregations, more than 40 field personnel (what some other religions refer to as missionaries) bearing witness to Jesus Christ around the world, nearly 1,200 endorsed chaplains and pastoral counselors, 15 state and regional organizations, dozens of theological schools and partner organizations, and much more. *Id.* ¶ 3.

66.  CBF's 1,400 congregations operate in 37 states, Puerto Rico and the District of Columbia in the United States. *Id.* ¶ 5.

67. The relationship between CBF and its member congregations involves mutual participation and contribution. Congregations contribute to CBF financially, serve on its governance bodies, and participate in missions and advocacy. CBF supports congregations in

myriad ways, including through financial assistance and field personnel. CBF also seeks to help pastors and other congregational leaders thrive through offering leadership development, educational materials, spiritual formation support and opportunities for networking and renewal. *Id.* ¶ 4.

68.   As Baptists,[1] CBF and its members believe that God invites them and equips them to share and spread the hope of Christ. *Id.* ¶ 14.

69.   And as followers of Jesus, Baptists believe it is most essential to do what Jesus tells them to do. Most directly, Jesus said in Matthew 25: "I was a stranger and you welcomed me." Baptists understand that Jesus was himself a refugee. *Id.* ¶ 16.

70.   In the faces of immigrants and refugees who are fleeing political or religious persecution, or who are seeking sanctuary from tyrants, Baptists see nothing less than the face of Jesus. To welcome a stranger is to welcome Jesus. *Id.* ¶ 17.

71.   In his first mission sermon, Jesus announced that his calling was to "bring good news to the poor, release to the captives, recovery of sight to the blind and to let the oppressed go free." Baptists fulfill that mission of Jesus by, among other things, showing hospitality to immigrants and refugees. *Id.* ¶ 18.

72.   CBF and its members are therefore spiritually committed to ministry among immigrants and refugees. These ministries with immigrants and refugees are matters of deep faith in that they flow from the commands of Jesus and the teachings of Scripture. *Id.* ¶ 26.

---

[1] There are a variety of Baptist denominations in the United States and throughout the world. References to "Baptists" throughout this Amended Complaint are to congregations and individuals affiliated with CBF.

73. For more than two decades CBF has had a team of field personnel serving in the United States doing ministry with people from other countries. Ex. 49, Baxley Decl. ¶ 27. Several field personnel work directly with immigrants including asylum seekers, refugees, visa holders and those without documentation. *Id.* ¶ 12. They do so without regard to legal immigration status. *Id.* ¶ 30. CBF members generally do not inquire about their congregants' immigration statuses, though some are aware that their congregations include undocumented immigrants. *See* Ex. 48, Hayes Decl. ¶ 21.

74. CBF members have built relationships with CBF's field personnel to support their ministries and learn firsthand how immigration issues in border states impact the rest of the country. Ex. 49, Baxley Decl. ¶ 12. A significant number of CBF members are also engaged in direct ministry with immigrants and refugees. *Id.* ¶ 28; Ex. 50, Carter Decl. ¶ 36; Ex. 48, Hayes Decl., ¶¶ 16-18; Ex. 51, Garcia Decl. ¶ 12.

75. CBF members offer a broad array of services and classes to minister to their local communities—including immigrants. Those ministries include, but are not limited to, food pantries, children's ministry, clothing closets, job-training programs, housing assistance, child-care assistance, medical and dental clinics, addition recovery programs, hypothermia-prevention shelters, and mental-health counseling. Most of these ministries take place in the same church building used for worship services. *Id.* ¶ 31.

76. Some of CBF's members' ministries are specifically geared to immigrant communities. The most prominent are English as a Second Language classes. The majority of ESL classes are held in the same church buildings used for worship services. Ex. 49, Baxley Decl. ¶ 32; Ex. 48, Hayes Decl. ¶ 18.

18

77.  CBF's ministry provides immigrants with community, a sense of belonging, connection to other people, temporary housing, and other things necessary for anyone to grow and flourish in a new country. Creating the conditions for people to thrive—not just survive—is an expression of Baptist religious beliefs. *Id.* ¶ 34.

***Sikh Temple Sacramento***

78.  Sikh Temple Sacramento is a *Gurdwara*. Gurdwaras are Sikh places of worship, learning, and community gathering. Ex. 47, Shergill Decl., ¶ 6.

79.  Gurdwaras are sacred and sovereign institutions where Sikhs gather for fellowship, worship, and *langar* (sharing in a communal meal). *Id.* ¶ 7. They are central to all major life events for Sikhs. *Id.* ¶ 8.

80.  Central to the concept of a gurdwara, including Sikh Temple Sacramento, is that all people must be welcomed without fear. Sikh Temple Sacramento flies the Sikh flag, or *Nishaan Sahib*, as a beacon of refuge and hope. The *Nishaan Sahib* signals that anyone from any religion, community, or background is welcome. *Id.* ¶¶ 9-10.

81.  The Sikh faith is centered around *Ik Onkar*, or oneness. Sikhs believe that people of all faiths worship one divine being who created this world and lives within it. The divine is equally present in all people, and every human being is equal in the eyes of God—whatever their religion, social identity, or immigration status. *Id.* ¶ 11.

82.  The *Guru Granth Sahib*, Sikh scripture, is at the center of Sikh life. The Guru Granth Sahib is written as poetry and music, so part of Sikh worship services are conducted via communal singing. *Id.* ¶ 12.

83.   The community is essential to worship at gurdwaras, including Sikh Temple Sacramento. Community members and musicians, including children, lead the congregation in singing and prayer and explain basic ideas and lessons. *Id.* ¶ 13.

84.   While most of Sikh Temple Sacramento's larger gatherings take place on Sunday, langar is always available. *Id.* ¶ 14.

85.   The community with whom Sikhs gather for worship and communal meals is known as a *Sangat*. *Id.* ¶ 16. The presence of the sangat is necessary for Sikhs to meaningfully express their faith. *Id.* ¶¶ 17-18. For example, *Amrit* is an initiation rite that is a core component of Sikh practice. Amrit must be received from others, and the congregation of those who have received Amrit is known as the *Khalsa*. *Id.* ¶¶ 18-19.

86.   For these reasons and others, communal effort, worship, and fellowship are key to gurdwaras and to Sikh religious practice.

**The 2025 Policy has chilled religious exercise nationwide.**

87.   The new DHS policy "has sown fear within . . . migrant friendly congregations," and faith leaders have made clear that it has caused many immigrants to fear attending houses of worship. Ex. 25, Giovanna Dell'Orto *et al.*, *Trump won't ban immigration arrests at churches. Now clergy are weighing how to resist*, Associated Press (Jan 23, 2025), https://tinyurl.com/mvbp3txu.

88.   Some houses of worship even canceled in-person services before DHS's official announcement, fearing that their congregations would be subject to ICE raids without warning. *See, e.g.*, Ex. 39, Laura Rodríguez Presa*, Chicago church stops hosting in-person Spanish services amid fears of mass deportations from Trump administration*, Chicago Tribune (Jan. 2, 2025), https://tinyurl.com/2cp62xrn.

89.  Indeed, within days of DHS announcing the recission of the protected-areas policy, three of the largest Catholic organizations in the United States—the U.S. Conference of Catholic Bishops, the Catholic Health Association of the United States, and Catholic Charities USA—stated publicly that, "[w]ith the mere rescission of the protected areas guidance," they were "already witnessing reticence among immigrants to engage in daily life, including . . . attending religious services." Ex. 42, *Human Dignity is Not Dependent on a Person's Citizenship or Immigration Status*, U.S. Conference of Catholic Bishops (Jan. 23, 2025), https://tinyurl.com/mwrrr98e. The National Association of Evangelicals similarly addressed the new DHS policy, stating that "[e]ven the announcement of this policy has caused fear, deterring some from attending church." Ex. 32, Press Release, National Association of Evangelicals, National Association of Evangelicals Responds to New Executive Orders (Jan. 22, 2025), https://tinyurl.com/277svcma.

90.  These fears are coming to fruition. On January 26, the first Sunday following implementation of the 2025 Policy, ICE agents attempted to enter Fuente de Vida Church in Tucker, Georgia, while its pastor was actively preaching to approximately 70 congregants. Ex. 34, Billal Rahman, *ICE Strikes During Church Service to Arrest Migrant*, Newsweek (Jan. 30, 2025), https://tinyurl.com/y82np8vn. Fear of DHS's new policy had led the church to lock its doors, so the agents waited outside until the congregant they sought—a father of two—exited the church. *Id.*

91.  The deterrent effect of the new policy extends far beyond undocumented congregants. Ample data shows "[f]ears of detention and deportation are a concern for immigrants across immigration statuses." Ex. 23, Shannon Schumacher et al., *Understanding the U.S. Immigrant Experience: The 2023/KFF LA Times Survey of Immigrants*, KFF (Sep. 17, 2023),

https://tinyurl.com/bdeh6dju. For example, a 2023 study described as "the largest and most representative survey of immigrants living in the U.S. to date" found that that 26% of all immigrants, regardless of their own legal status, "worry they or a family member could be detained or deported." *Id.* at PYM-000259-61. That finding echoed previous research showing that even those with legal status fear immigration enforcement because they are "fearful for their family members or because their own 'status' might be questioned." Ex. 54, Karen Hacker et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA*, 73(4) Social Science & Medicine 586 (2011), https://tinyurl.com/5p4xr7af.

92.  Such fears are reasonable. In 2021, the Government Accountability Office reported that ICE "arrested 674, detained 121, and removed 70 potential U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020." Ex. 19, U.S. Gov't Accountability Office, GAO-21-487, *Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations*, at PYM-000092 (2021). The same year, ICE arrested Brian Bukle, who had at that point been a citizen for over 50 years, and detained him for 36 days before acknowledging his citizenship. Ex. 24, Yesenia Amaro*, He's a U.S. citizen, but ICE detained him and tried to deport him. Now he's getting $150k*, Fresno Bee (Dec. 14, 2022), https://tinyurl.com/2p9mzhmz. Just this month, U.S. Border Patrol agents conducting a four-day dragnet operation slashed the tires of a naturalized citizen who they subsequently arrested, despite having confirmed his status. Ex. 37, Michael Hiltzik, *Column: Inside the Bakersfield raids that showed how Trump's immigration policies will sow chaos*, L.A. Times (Jan. 22, 2025), https://tinyurl.com/uywz9mjy. And just this month, ICE agents conducting a warrantless raid in

New Jersey detained a U.S. military veteran. Ex. 31, *Mayor Ras. J. Baraka's Statement on ICE Raid on Newark Business Establishment*, City of Newark (Jan. 23, 2025), https://tinyurl.com/yjdy7pf9.

**The 2025 Policy has burdened Plaintiffs' religious exercise.**

*Religious Society of Friends*

93. Government enforcement actions that "stop[] people from entering" meeting houses affect Quakers "personally, viscerally, emotionally, and theologically." Ex. 1, Levi Decl. ¶ 69. The same is true for enforcement actions that scare people away. *Id.*

94. A diversity of worshippers is an essential component of the Quaker value of "experience[ing] God in a broader, more encompassing way," as "one's life experience affects how one hears the spirit and what conclusions one might draw." *Id.* ¶ 60. Deterring immigrants from worshipping in-person with a Quaker meeting would therefore directly interfere with Plaintiffs' religious exercise by lessening their "ability to hear God and what God is trying to tell [them]." *Id.* ¶ 67.

95. Moreover, Plaintiffs' Quaker beliefs make it essential that they "encourage others for whom [that] path is meaningful to join." Ex. 6, Duncan-Tessmer Decl. ¶ 26. But DHS's new policy, by opening meeting houses to immigration-enforcement activities, inhibits Plaintiffs from doing just that. *See, e.g.*, Ex. 1, Levi Decl. ¶ 70; Ex. 2, Merrill Decl. ¶ 43, PYM-000019 (explaining that he "cannot be as encouraging of immigrants joining us for worship" under DHS's new policy). Knowingly putting a person in harm's way or subjecting them to the possibility of a violent encounter with an armed law-enforcement officer would violate Quaker beliefs in peace and nonviolence.

96.  Quakers have held a religious commitment against violence for hundreds of years. For many Quakers, "[t]he presence of a weapon in a Quaker meeting would be absolutely unacceptable." Ex. 6, Duncan-Tessmer Decl. ¶ 45. The presence of armed immigration officers at meeting houses—which the new policy allows—would thus significantly hamper Plaintiffs' ability to exercise their faith. Importantly, even the *threat* of armed government agents at meeting houses—which has existed since the moment DHS announced its new policy—does the same. *See, e.g.*, Ex. 1, Levi Decl. ¶ 73.

***Cooperative Baptist Fellowship***

97.  Communal worship, including with people of different backgrounds, is a core aspect of CBF and its congregations' religious exercise.

98.  The threat of immigration-enforcement activities at CBF's congregations is deterring some congregants from attending worship. Ex. 49, Baxley Decl. ¶ 46. Immigrant members have expressed that they fear for their safety. Ex. 48, Hayes Decl. ¶ 20. Congregations have also reported that fewer people are engaging with ministry for immigrant communities. Ex. 49, Baxley Decl. ¶ 52.

99.  Some members, while they do not inquire about their congregants' immigration status, are aware of congregants whose statuses are in jeopardy. Ex. 48, Hayes Decl. ¶ 20. These congregants—who have also performed work for the church in various capacities—are fearful of attending services because ICE is now able to enter houses of worship. *Id.*

100. On top of that, the policy has created such confusion and fear that even congregants who believe their immigration status to be legal now question their place and safety within churches.

24

Ex. 50, Carter Decl. ¶ 48. Some of these congregants fear that their Hispanic appearance will make them a target. *Id.* ¶ 49.

101. Having fewer people in worship harms congregants' religious exercise because it diminishes their ability to worship freely with others, and it reduces the number of people singing, praying, and worshipping together. Since congregants are often volunteers or even employees of churches, their absence also reduces the church's ability to carry out its religious mission.

102. And having fewer immigrant worshippers harms congregants' religious exercise because it "diminish[es] the ways in which [they] can learn from those who have lived courageously and had different experiences of the Holy Spirit" and reduces the diversity that brings congregations "closer to resembling the body of Christ." *Id.* ¶ 58; Ex. 49, Baxley Decl. ¶ 50.

103. What's more, some Baptists have a spiritual duty of hospitality—referred to by some as "radical hospitality"—that requires them to use their "tangible resources" such as space in their buildings, campuses, and land to welcome immigrants into their communities. Ex. 50, Carter Decl. ¶ 32. These members' spiritual commitments are reflected in their ministries with refugees and immigrants, including through offering temporary housing on church property.

104. When immigrants are fearful of houses of worship because of DHS's new policy, they are less willing to be served by church ministries on church property. And so churches are left less able to serve them in accordance with their Baptist obligations.

105. The threat of armed immigration agents in sacred spaces also interferes with congregants' ability to attend services with a clear mind. *Id.* ¶ 60.

106. The threat of immigration enforcement at CBF congregations has also forced congregations to choose whether to lock their church doors—and thereby violate their core belief

that a congregation's doors should be open to anyone who wants to join for worship—or else risk armed officers entering their churches and subjecting congregants to harm.

***Sikh Temple Sacramento***

107. Fully and meaningfully practicing the Sikh faith requires joining with the community in service and prayer. Ex. 47, Shergill Decl. ¶ 16.

108. Because subjecting Gurdwaras to government surveillance and raids by armed agents deters attendance, the threat of that activity impedes Sikhs' ability to carry out essential religious practices. *Id.* ¶¶ 21-23.

109. At Sikh Temple Sacramento, approximately half of the congregation are first-generation immigrants. *Id.* ¶ 25.

110. After DHS announced the 2025 Policy, Sikh Temple Sacramento saw an "immediate chilling effect on worship and fellowship." *Id.* ¶ 22.

111. The Gurdwara's management committee has already heard from people who are "concerned that participation in Sikh religious life at the Gurdwara may put them at risk." *Id.* ¶ 23. While some of these people lack legal immigration status, "even people with legal immigration status are unsure whether it is safe to attend." *Id.* ¶ 24.

112. Even putting aside immigration status, the 2025 Policy reduces Gurdwara attendance and interferes with Sikh religious practices by renewing that community's collective concern, based on its history of having the sanctity of Gurdwaras violated, of "government interference in [their] ability to freely practice [their] faith." *Id.* ¶ 28.

26

113. Deterring community members from attending the Gurdwara "harms not just those who are too fearful to attend but also everyone else," as communal worship and fellowship is central to Sikh practice. *Id.* ¶ 27.

114. Sikhs' ability to practice their faith freely and without fear will be impaired "as long as DHS's new policy is in effect." *Id.* ¶ 30.

**CLAIMS FOR RELIEF**

**COUNT I**

**Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-2000bb-4**

115. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

116. In RFRA, Congress concluded that because "free exercise of religion" is "an unalienable right," "governments should not substantially burden religious exercise without compelling justification." 42 U.S.C. § 2000bb. Even "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise." *Id.*

117. As such, "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

118. Anyone "whose religious exercise has been burdened in violation" of RFRA may raise a RFRA claim and "obtain appropriate relief" against the government. 42 U.S.C. § 2000bb-1(c).

119. All Plaintiffs' beliefs insist that worship be open to all who wish to join, and all Plaintiffs' religious practices depend on communal worship.

120. Quakers believe that the presence of worshippers from different backgrounds is integral to hearing messages from God, since every person is a source of the divine. Everyone who attends worship, whether they speak or not, offers another avenue to speak to and hear from God.

121. Fully and meaningfully practicing the Sikh faith requires joining with the *Sangat* in service and prayer. Part of every Sikh worship service is conducted with communal singing, and community members often lead the congregation or explain basic ideas and lessons. It is essential to the Sikh faith that every Gurdwara welcomes all people.

122. Foundational theological and scriptural commands instruct CBF's members to practice "radical hospitality" by welcoming all, including by worshipping, singing, and praying together. CBF churches recognize the infinite worth of all people, and their faith compels them to share the love of Christ with others—including the immigrant and refugee communities—through worship and ministry.

123. DHS's new policy allows its agents to conduct enforcement operations—including arrests, investigations, interviews, and surveillance—at and near houses of worship and religious ceremonies.

124. Permitting immigration-enforcement operations at and near houses of worship, including those in which Plaintiffs practice, deters people from attending religious services, even if they are lawful permanent residents or citizens.

125. DHS's new policy thus substantially burdens Plaintiffs' free exercise of religion by reducing the number and diversity of worshippers and interfering with their ability to practice communally, as their religious beliefs call them to do.

126. Because it creates a constant threat of federal officers surveilling and carrying out enforcement actions against worshippers, DHS's new policy also substantially burdens Plaintiffs' free exercise of religion by rendering Plaintiffs unable to encourage all to join without contradicting their faith.

127. The 2025 Policy puts Plaintiffs to an impossible choice: either violate their core religious belief in welcoming all to worship or violate their core religious beliefs by not placing others in harm's way.

128. For more than three hundred years, Quakers have held a religious commitment against violence. The presence of armed government agents at or near meeting houses would be incredibly disruptive to the Quakers' ability to worship—as is the mere threat of such action, which DHS's change in policy immediately created.

129. DHS's rescission of the protected areas policy thus substantially burdens Quaker Plaintiffs' free exercise of religion by violating their commitment to anti-violence.

130. Sikhs know the pain of having the sanctity of Gurdwaras violated, especially by the government. The threat of armed interference with their religious practice, which DHS's new policy created, reduces attendance and interferes with Sikh practice by renewing that collective concern.

131. DHS's new policy thus substantially burdens Plaintiff Sikh Temple Sacramento's free exercise of religion by renewing that community's collective concern of government interference and decreasing attendance at the Gurdwara.

132. To justify DHS's new policy, the government must satisfy strict scrutiny. It cannot.

133. The government has itself said that DHS can accomplish its mission "without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." Ex. 20, Mayorkas Memo, at PYM-000189.

134. DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

## COUNT II

### First Amendment—Freedom of Expressive Association

135. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

136. The First Amendment of the U.S. Constitution safeguards the freedom of expressive association: the right to associate with others for the purpose of engaging in activities protected by the First Amendment, including speech, assembly, petition for the redress of grievances, and exercise of religion.

137. Government cannot interfere in protected First Amendment activity in ways that are "'direct and substantial' or 'significant.'" *El Ali v. Barr*, 473 F. Supp. 3d 479, 523 (D. Md. 2020) (quoting *Lyng v. Int'l Union*, 485 U.S. 360, 366, 367 n.5 (1988)).

138. Nor can government chill gathering to exercise First Amendment rights. Government action chills an individual's or entity's expressive-association freedom when it interferes, whether directly or indirectly, with the ability to associate for the purpose of engaging in expressive activity, including by making membership or participation in the association more difficult or less desirable.

139. Plaintiffs and their congregants engage in protected expressive association when they gather for communal religious worship, an activity that is a core aspect of their religious exercise.

140. Plaintiffs suffer injury to their expressive-association rights because, among other reasons, DHS's new policy—which allows the presence of armed, uniformed federal agents in and around houses of worship—directly and substantially limits who will attend meetings. The policy is already resulting in and will continue to result in fewer congregants attending and participating in worship services. And it will reshape—and, indeed, is already reshaping—the composition of Plaintiffs' worship services and meetings by diminishing the attendance and participation of members of immigrant communities.

141. Plaintiffs' congregants suffer too. Congregants from varying backgrounds—especially immigrants—have been deterred from attending worship altogether for fear of surveillance, interrogation, or raids by armed officers, and will continue to be deterred. Congregants are otherwise deterred from encouraging and welcoming all-comers, regardless of immigration status. And those congregants who are not themselves deterred from gathering for communal worship will have fewer people with whom to worship.

142. In all, DHS's new policy burdens and chills the expressive-association rights of Plaintiffs and their congregants.

143. To justify DHS's new policy, the government must satisfy exacting scrutiny. It must prove that it has a sufficiently important governmental interest, and that the policy is narrowly tailored to that interest. It cannot.

144. The government has already admitted that there are less restrictive means of fulfilling its interest. It has deployed those less restrictive means for more than three decades and cannot articulate a reason why they are now insufficient.

145. DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

## COUNT III

### Violation of the Administrative Procedure Act—706(2)(A)
### Arbitrary and capricious adoption of new protected-areas policy

146. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

147. Under the APA, a court shall "hold unlawful and set aside agency action" that is arbitrary and capricious. 5 U.S.C. § 706(2).

148. The Secretary of Homeland Security is authorized to "establish such regulations" and "issue such instructions" to enforce "laws relating to . . . immigration." 8 U.S.C. § 1103(g)(2). DHS's new protected-areas (or sensitive-locations) policy is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights [and] obligations" and creates "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 156, 177-78 (1997) (internal citation omitted). This "pragmatic" assessment includes the creation or revocation of safe harbors. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599-600 (2016) (internal citation omitted). Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); 5 U.S.C. § 706.

32

149. For over 30 years, DHS has issued a consistent "statement of general . . . applicability and future effect designed to implement, interpret, or prescribe," 5 U.S.C. § 551(4) (defining "rule"), DHS agents' authority to conduct enforcement operations in protected areas.

150. Under the APA, agencies cannot depart from prior policies without acknowledging that they are making such a change and explaining their reasoning for doing so. *Fed. Commc'ns. Comm'n v. Fox Television*, 556 U.S. 502, 515 (2009). Agencies must "examine the relevant data and articulate a satisfactory explanation" when altering or rescinding their rules. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). And they must specifically consider the reliance interests of those who may be impacted by a change in their policies. *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30-31 (2020).

151. In undoing decades of prior agency policy without reasoning, DHS engaged in arbitrary and capricious agency action. By failing to provide reasoning and considering alternative actions, DHS left unaddressed the decades of reliance interests held by Plaintiffs and others, further emphasizing the arbitrary and capricious nature of this action by DHS.

152. Because DHS rescinded its previously operative protected-areas policy—and because DHS failed to "examine the relevant data and articulate a satisfactory explanation," including Plaintiffs' reliance interests—DHS's new policy is unlawful. DHS should be enjoined from implementing it.

153. DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

## COUNT IV

### Violation of the Administrative Procedure Act---706(2)(B)
### Contrary to constitutional right

154. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

155. Under the APA, a court shall "hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

156. The Secretary of Homeland Security is authorized to "establish such regulations" and "issue such instructions" to enforce "laws relating to . . . immigration." 8 U.S.C. § 1103. DHS's new protected-areas (or sensitive-locations) policy is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights and obligations" and creates "legal consequences." *Bennett*, 520 U.S. at 177-78 (internal citation omitted). This "pragmatic" assessment includes the creation or revocation of safe harbors. *Hawkes*, 578 U.S. at 600 (internal citation omitted). Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); 5 U.S.C. § 706(2)(A).

157. Without the protected-area policy, DHS regulation 8 C.F.R.§ 287.8(f)(1)—and its new "common sense" standard—allows DHS agents to conduct immigration-enforcement operations at or near houses of worship or religious ceremonies.[2]

---

[2] 8 C.F.R.§ 287.8(f)(1) addresses the standards for enforcement activities during "site inspections." The regulation states, "[s]ite inspections are Border and Transportation Security Directorate enforcement activities undertaken to locate and identify aliens illegally in the United States, or aliens engaged in unauthorized employment, at locations where there is a reasonable suspicion, based on articulable facts, that such aliens are present."

158. For Plaintiffs, their members, and their attenders, in-person worship in which any and every person are welcomed to join is a core tenet of their religious exercise. The opportunity to engage in such communal worship is a long-held and vital part of their expression of faith.

159. Without the protected-area policy, DHS regulation 8 C.F.R. § 287.8(f)(1) discourages people from attending religious services. Specifically, the 2025 Policy will reduce the number and diversity of worshippers at Plaintiffs' meetings. The policy thus chills Plaintiffs' rights to the Freedom of Expressive Association.

160. The 2025 Policy cannot satisfy exacting scrutiny, so it is "contrary to constitutional right," 5 U.S.C. § 706(2)(B).

161. It is thus unlawful, and DHS should be enjoined from implementing it.

162. DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

### COUNT V

### Violation of the Administrative Procedure Act---706(2)(C)
### In excess of statutory jurisdiction, authority, or limitations

163. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

164. Under the APA, a court shall "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

165. The Secretary of Homeland Security is authorized to "establish such regulations" and "issue such instructions" to enforce "laws relating to . . . immigration." 8 U.S.C. § 1103. DHS's new protected-areas (or sensitive-locations) policy is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights and obligations"

and creates "legal consequences." *Bennett*, 520 U.S. at 177-78 (internal citation omitted). This "pragmatic" assessment includes the creation or revocation of safe harbors. *Hawkes*, 578 U.S. at 600 (internal citation omitted). Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); 5 U.S.C. § 706.

166. Without the protected-area policy, DHS regulation 8 C.F.R.§ 287.8(f)(1)—with the agency's new "common sense" standard—allows defendant agencies to conduct immigration-enforcement operations at or near houses of worship or religious ceremonies.

167. For Plaintiffs, and their members, holding in-person worship in which any and every person are welcomed to join is a core tenet of their religious exercise. The opportunity to engage in such communal worship is a long-held and vital part of their expression of faith.

168. Without the protected-area policy, DHS regulation 8 C.F.R.§ 287.8(f)(1) discourages people from attending religious services. Plaintiffs will suffer myriad resulting harms, including losing messages from God. Plaintiffs also will not be able to encourage immigrants to join worship for fear that they will put the immigrants in harm's way. And due to Plaintiffs' substantial interactions with immigrant communities, they have a reasonable fear of immigration enforcement at their meetings. That very threat significantly burdens their religious exercise. The policy is thus a substantial burden on Plaintiffs' religious exercise under RFRA.

169. The DHS policy cannot satisfy strict scrutiny, so it is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C).

170. It is thus unlawful, and DHS should be enjoined from implementing it.

171. DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

36

**COUNT VI**

**Violation of the Administrative Procedure Act— 5 U.S.C. § 706(2)(D)
Without observance of procedure required by law**

172. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

173. DHS requires that its rules and regulations go through the notice-and-comment process generally required by the Administrative Procedure Act. *See R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 194 (5th Cir. 2023); *see also* 5 U.S.C. § 553.

174. Under the APA, a court shall "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

175. The Secretary of Homeland Security is authorized to "establish such regulations" and "issue such instructions" to enforce "laws relating to . . . immigration." 8 U.S.C. § 1103. DHS's new protected-areas (or sensitive-locations) policy is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights and obligations" and creates "legal consequences." *Bennett*, 520 U.S. at 177-78 (internal citation omitted). This "pragmatic" assessment includes the creation or revocation of safe harbors. *Hawkes*, 578 U.S. at 600 (internal citation omitted). Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); 5 U.S.C. § 706. The "APA authorizes courts to set aside agency actions that are 'without observance of procedure required by law.'" *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 494 (D. Md. 2020) (internal citation omitted); 5 U.S.C. § 706(2)(D).

176. DHS has repealed its longstanding guarantee that, absent extraordinary circumstances, the government would not conduct immigration enforcement at protected areas, including houses of worship of other religious ceremonies. The 2021 Mayorkas Memo acts as the policy for DHS

37

because it set a "statement of general . . . applicability and future effect designed to implement, interpret, or prescribe" the enforcement power of DHS agents. 5 U.S.C. § 551(4) (defining "rule").

177. To alter or rescind its protected-areas rule, DHS must first engage in notice-and-comment rulemaking, as required by the APA. *Nat. Res. Def. Council*, 894 F.3d 95, 113 (2d Cir. 2018); *see also* 5 U.S.C. § 553.

178. DHS did not engage in notice-and-comment rulemaking.

179. Because DHS rescinded the longstanding protected-area rule without going through the notice-and-comment process required of agency rules, it is not in observance of procedure required by law.

180. It is thus unlawful, and DHS should be enjoined from implementing it.

181. DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.      Declare the 2025 Policy unconstitutional;

b.      Vacate the 2025 Policy;

c.      Enjoin DHS and its constituent agencies from implementing, enforcing, or acting according to the 2025 Policy;

d.      Award Plaintiffs costs of suit, attorneys' fees, and expenses to the greatest extent authorized by all applicable laws; and

e.      Issue such other relief as the Court deems proper.

## JURY DEMAND

Plaintiffs demand a jury trial of all issues so triable under Rule 38 of the Federal Rules of Civil Procedure.

February 4, 2025                    Respectfully submitted,

  /s/ Alethea Anne Swift
Alethea Anne Swift (Bar No. 30829)
Bradley Girard[+]
Sarah Goetz*
Andrew Bookbinder*
J. Sterling Moore*
Audrey Wiggins*
Skye Perryman*

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
aswift@democracyforward.org
bgirard@democracyforward.org
sgoetz@democracyforward.org
abookbinder@democracyforward.org
smoore@democracyforward.org
awiggins@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs*

[+] *Application for full admission pending*
*Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I, Alethea Anne Swift, hereby certify the foregoing document was served on Defendants via CM/ECF in compliance with Federal Rule of Civil Procedure 5(a). Because at least one attorney for Defendants has not yet entered an appearance in this matter, Defendants were additionally served via emails to andrew.warden@usdoj.gov and kristina.wolfe@usdoj.gov.

_____
Alethea Anne Swift
*Counsel for Plaintiffs*