**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

PHILADELPHIA YEARLY MEETING OF
THE RELIGIOUS SOCIETY OF FRIENDS,
*et al.*,

      Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

      Defendants.

Civil Action No. 8:25-cv-00243-TDC

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

I.    Statutory Background ................................................................................. 2

II.   Immigration Enforcement Guidance Memoranda ........................................... 4

III.  Plaintiffs' Challenge ................................................................................ 5

STANDARD OF REVIEW ..................................................................................... 6

ARGUMENT ....................................................................................................... 6

I.    Plaintiffs' Motion Should Be Denied Because Their Claims Are Not Likely To
      Succeed On The Merits............................................................................... 6

      A.    Plaintiffs Lack Standing................................................................... 6

            1.    Plaintiffs have not shown a threatened injury that is certainly
                  impending. .......................................................................... 7

            2.    Plaintiffs cannot show causation............................................ 12

            3.    Plaintiffs cannot show redressability. ..................................... 13

      B.    This Court Lacks Jurisdiction to Issue the Requested Injunction........................ 14

      C.    Plaintiffs Have Failed to Establish a Likelihood of Success on their RFRA
            Claim................................................................................................. 15

            1.    Plaintiffs have not demonstrated that their religious exercise is
                  substantially burdened by the 2025 Memorandum directing law
                  enforcement officers to exercise "common sense" and "discretion."....... 15

            2.    The Court should not issue a broad advisory opinion about
                  RFRA's application because there is no specific government action
                  to analyze. .......................................................................... 18

      D.    Plaintiffs Have Failed to Show that the 2025 Memorandum Likely
            Violates Their First Amendment Rights of Expressive Association ................... 20

            1.    Plaintiffs have not shown that the 2025 Memorandum interferes
                  with their right to gather for religious exercise.......................... 20

      2.       The Court should not issue a broad advisory opinion about the First Amendment's application because there is no government action to analyze. ................................................................... 23

II.      The Plaintiffs Have Not Shown Irreparable Harm ........................................... 24

III.    Plaintiffs Have Not Shown That The Balance Of Equities And Public Interest Tip In Their Favor. ................................................................................................. 25

IV.    A Nationwide Injunction Is Improper And Is In Any Event Not Necessary To Redress Plaintiffs' Claims. ................................................................................ 26

CONCLUSION ............................................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Pastides*,
    900 F.3d 160 (4th Cir. 2018) ................................................................................. 7

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) ............................................................................... 28

*Arizona v. Biden*,
    31 F.4th 469 (6th Cir. 2022) ............................................................................... 29

*Arizona v. United States*,
    567 U.S. 387 (2012) ............................................................................... 2, 3, 14

*Benham v. City of Charlotte*,
    635 F.3d 129 (4th Cir. 2011) ......................................................................... 7, 21, 22

*Biden v. Texas*,
    597 U.S. 785 (2022) ................................................................................. 15

*Blackie's House of Beef, Inc. v. Castillo*,
    659 F.2d 1211 (D.C. Cir. 1981) ................................................................. 25, 26

*Bond v. United States*,
    742 F. App'x 735 (4th Cir. 2018) ................................................................... 7

*Bowen v. Roy*,
    476 U.S. 693 (1986) ............................................................................ 17, 22, 23

*Boys Scouts of Am. v. Dale*,
    530 U.S. 640 (2000) ............................................................................ 20, 21, 23

*California v. Texas*,
    593 U.S. 659 (2021) ................................................................................. 12

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ................................................................................. 24

*City of Boerne v. Flores*,
    521 U.S. 507 (1997) ................................................................................. 20

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ............................................................................... 7, 11

*Clapper v. Amnesty In't USA*,
    568 U.S. 398 (2013) ........................................................................... *passim*

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013) ........................................................................ 7

*CPC Int'l, Inc. v. Skippy Inc.*,
    214 F.3d 456 (4th Cir. 2000) ...................................................................... 30

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) .................................................................................... 13

*DHS v. New York*,
    140 S. Ct. 599 (2020) .................................................................................. 28

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
    952 F.2d 802 (4th Cir. 1991) ...................................................................... 24

*El Ali v. Barr*,
    473 F. Supp. 3d 479 (D. Md. 2020) ........................................................... 20

*Employment Division, Department of Human Resources of Oregon v. Smith*,
    494 U.S. 872 (1990) .................................................................................... 16

*Fiallo v. Bell*,
    430 U.S. 787 (1977) .................................................................................... 29

*Fighting Finest, Inc. v. Bratton*,
    95 F.3d 224 (2d Cir. 1996) ......................................................................... 20

*Florida v. HHS*,
    19 F.4th 1271 (11th Cir. 2021) ................................................................... 29

*Garey v. James S. Farrin, P.C.*,
    35 F.4th 917 (4th Cir. 2022) ......................................................................... 7

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022) .............................................................................. 14, 15

*Gill v. Whitford*,
    585 U.S. 48 (2018) ...................................................................................... 26

*Goodall ex rel. Goodall v. Stafford Cnty. Sch. Bd.*,
    60 F.3d 168 (4th Cir. 1995) ........................................................................ 16

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006) .................................................................................... 19

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999) .............................................................................. 26, 27

iv

*John Doe No. 1 v. Reed,*
    561 U.S. 186 (2010) .................................................................................. 23

*Labrador v. Poe,*
    144 S. Ct. 921 (2024) ............................................................................... 28

*Laird v. Tatum,*
    408 U.S. 1 (1972) ............................................................................. 7, 8, 21

*Liberty Univ., Inc. v. Lew,*
    733 F.3d 72 (4th Cir. 2013) ................................................................ 16, 17

*Louisiana v. Becerra,*
    20 F.4th 260 (5th Cir. 2021) ................................................................... 29

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .............................................................................. 6, 12

*Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. UAW,*
    485 U.S. 360 (1988) ............................................................................. 20, 21

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
    485 U.S. 439 (1988) ............................................................................. 17, 23

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ................................................................................. 26

*MicroStrategy Inc. v. Motorola, Inc.,*
    245 F.3d 335 (4th Cir. 2001) ..................................................................... 6

*NAACP v. Alabama ex rel Patterson,*
    357 U.S. 449 (1958) ................................................................................. 21

*Nat'l Treasury Emps. Union v. Von Raab,*
    489 U.S. 656 (1989) ................................................................................. 25

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................. 25

*Ozonoff v. Berzak,*
    744 F.2d 224 (1st Cir. 1984) ...................................................................... 8

*Pierce v. N.C. State Bd. of Elections,*
    97 F.4th 194 (4th Cir. 2024) .................................................................... 29

*Reno v. American-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ................................................................................. 25

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ........................................................................................... 11, 20, 22

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006) .................................................................................................... 20

*Scotts Co. v. United Indus. Corp.*,
  315 F.3d 264 (4th Cir. 2002) .................................................................................... 24

*Texas v. United States*,
  14 F.4th 332 (5th Cir. 2021), *vacated on rehearing en banc*, 24 F.4th 407 (5th Cir. 2021) .... 28

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ........................................................................................ 27, 28, 29

*United Presbyterian Church in the U.S.A. v. Reagan*,
  738 F.2d 1375 (D.C. Cir. 1984) ............................................................................... 8, 9

*United States v. Iowa*,
  No. 24-2265, 2025 WL 287401 (8th Cir. Jan. 24, 2025) ......................................... 25

*United States v. Texas*,
  599 U.S. 670 (2023) .................................................................................... 11, 14, 25, 28

*Va. Soc'y for Human Life, Inc. v. FEC*,
  263 F.3d 379 (4th Cir. 2001) .............................................................................. 26, 27

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) .................................................................................................... 9

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ................................................................................................ 7, 10

*Winter v. NRDC*,
  555 U.S. 7 (2008) ............................................................................................ 6, 24, 25

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) .................................................................................................. 16

**STATUTES**

5 U.S.C. §§ 701 *et seq.* ................................................................................................. 5

8 U.S.C. § 1103 ............................................................................................................. 3

8 U.S.C. §§ 1221-31 ...................................................................................................... 4

8 U.S.C. § 1226 ............................................................................................................. 3

8 U.S.C. § 1231 ................................................................................................................. 3

8 U.S.C. § 1252 ...................................................................................................... 2, 4, 14

8 U.S.C. § 1357 ......................................................................................................... 3, 14

42 U.S.C. § 2000bb ......................................................................................................... 16

42 U.S.C. §§ 2000bb-2000bb-4 ........................................................................................ 5

42 U.S.C. § 2000bb-1 ................................................................................................ 18, 19

**RULES**

Fed. R. Civ. P. 65 .......................................................................................................... 30

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 8 ........................................................................................................ 2

**OTHER AUTHORITIES**

*The Federalist No. 78* ...................................................................................................... 27

**<u>INTRODUCTION</u>**

This action requests the Court issue an injunction over a hypothetical dispute that might arise from hypothetical, future interactions and subsequently hypothetical harms.  In so doing, Plaintiffs ask the Court to interfere with potential law enforcement activities based on speculation and without establishing their standing to do so.  Black letter and clear Supreme Court precedent bars the issuance of an injunction in this context.  Plaintiffs' motion for a temporary restraining order ("TRO") and preliminary injunction should be denied.

Plaintiffs are eight religious organizations who seek a nationwide injunction prohibiting the Department of Homeland Security ("DHS") from following a guidance memorandum issued in January 2025 instructing field agents to exercise their "common sense" and "discretion" when conducting immigration enforcement activities near places of worship and other sensitive locations.  To be clear, enforcement activities near places of worship have been permitted for decades.  The only thing that has changed is that pre-approval from a supervisory official is no longer mandatory.  And the DHS memorandum expressly contemplates that components may issue their own guidance, which the U.S. Immigration and Customs Enforcement ("ICE") has recently done, instructing supervisory officials to make "case-by-case determinations about enforcement actions near protected areas."  Plaintiffs speculate, without any evidentiary basis, that this modest change in the pre-approval process may result in their places of worship being targets of enforcement operations.  They assert the memorandum is deterring congregants from attending in-person worship services and is chilling their right to expressive association.

Plaintiffs' conjecture, however, about possible injury from possible future law enforcement actions is insufficient to establish Article III standing under longstanding principles, much less irreparable injury required for the extraordinary remedy of a preliminary injunction.  In any event,

those speculative harms are outweighed by the Government's and public's strong interest in enforcement of the immigration laws and avoiding interference with discretionary law enforcement decisions.

Plaintiffs' arguments on the merits fare no better. Plaintiffs ignore that Congress has enacted a clear jurisdictional bar to the relief they seek by prohibiting lower courts from issuing injunctions that restrain certain provisions of the Immigration and Nationality Act ("INA") authorizing arrests. *See* 8 U.S.C. § 1252(f). DHS's memorandum directing officers to use their "common sense" and "discretion" does not impose a substantial burden on Plaintiffs' exercise of their religion. And Plaintiffs' novel expressive association theory fails because this case does not present a situation where the Government is imposing a significant burden on Plaintiffs' right to associate, such as coercing Plaintiffs to accept persons who express conflicting messages or religious beliefs.

At bottom, Plaintiffs ask this Court to superintend the discretionary decisions of law enforcement officers on the basis of a hypothetical and speculative injury. The Court should refuse that extraordinary request for a preliminary injunction and deny Plaintiffs' motion.

## **BACKGROUND**

### I.    **Statutory Background**

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012); *see also* U.S. Const. art. I, § 8, cl. 4 (granting Congress the power to "establish a uniform Rule of Naturalization"). Through the INA and related statutes, Congress has established an "extensive and complex" framework for the "governance of immigration and alien status." *Arizona*, 567 U.S.

at 395. Under this framework, the Executive Branch is tasked with enforcing the Nation's immigration laws. *See* 8 U.S.C. § 1103(a)(1).

To facilitate enforcement of the immigration laws, Congress vested the Executive Branch with authority to interview, arrest, detain, and remove aliens who are unlawfully present or otherwise removable. *See, e.g.*, *id.* § 1226(a) (permitting arrest and detention upon warrant issued by Secretary of Homeland Security); *id.* § 1226(c)(1) (Secretary "shall take into custody" aliens who have committed certain crimes); *id.* § 1231(a)(1)(A), (2) (authorizing detention of aliens with final removal orders and mandating it for certain criminal aliens); *id.* § 1357(a)(1), (2) (listing powers of DHS that may be exercised without warrant, including interrogation of "any alien or person believed to be an alien as to his right to be or remain in the United States" and arrest in certain circumstances).

"A principal feature of th[is]" congressionally established "removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. Indeed, as relevant here, Congress has placed no limitations on the Executive's arrest authority with a warrant under section 1226 or its investigative authority under section 1357 that are tied to the location of those activities. Had Congress wanted to preclude enforcement actions in a particular place, it would have done so, as it did in sections 1357(a)(3) (prohibiting officers from entering a "dwellin[g]" on private lands within 25 miles of an international border without a warrant) and 1357(e) (prohibiting officers from entering a farm or other outdoor agricultural operation for investigative purposes "without the consent of the owner (or agent thereof).

To streamline the removal proceedings, Congress has restricted judicial review by removing courts' jurisdiction to hear certain claims in certain forums. As relevant here, except in a case brought by "an individual alien" in removal proceedings, and "[r]egardless of the nature of

3

the action or claim of the identity of the party or parties bringing this action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of" 8 U.S.C. §§ 1221-31. *Id.* § 1252(f)(1).

## II.    Immigration Enforcement Guidance Memoranda

Since at least 1993, the Government has permitted immigration enforcement activities at or near sensitive locations, including places of worship in exigent circumstances or with prior supervisory approval. *See* Ex. 11, PYM-000067-69; Ex. 15, PYM-00080-81, Ex. 16, PYM-00082-84; Ex. 17, PYM-000085-86. In 2021, the Secretary of Homeland Security updated the guidance regarding enforcement activities at sensitive locations. Ex. 20, PYM-00188-92. The 2021 memorandum directed that, absent a non-exhaustive list of exigent circumstances, prior approval from Agency headquarters or a designated delegee was required before conducting an enforcement operation at or near a sensitive location, including places of worship. *Id.* at PYM-000191-92. Consistent with prior memoranda, the 2021 memorandum noted that when contemplating enforcement actions, the "exercise of judgment is required." *Id.*

The Acting Secretary of Homeland Security rescinded the 2021 memorandum on January 20, 2025, observing that "[i]t is not necessary . . . for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced." Ex. 43, PYM-000574. The 2025 Memorandum directs law enforcement officials to continue to "apply enforcement discretion" and "common sense" to "balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location." *Id.* In addition, the 2025 Memorandum authorizes the Director of ICE and the Commissioner of the U.S. Customs and Border Patrol to issue "further guidance to assist officers in exercising appropriate enforcement discretion." *Id.*

4

On January 31, 2025, the Acting Director of ICE issued a memorandum confirming that ICE "will not be issuing bright line rules regarding where immigration laws are permitted to be exercised." Ex. 55, Memorandum from Caleb Vitello, Acting Director, ICE, "Common Sense Enforcement Actions in or Near Protected Areas" (Jan. 31, 2025), PYM-000669-70. The Acting Director, however, charged supervisory officials "with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." *Id.* at PYM-000670. Such officials "may provide authorization for such actions either verbally or in writing." *Id.*

## III.    Plaintiffs' Challenge

On January 27, 2025, Plaintiffs, several religious organizations, initiated this lawsuit alleging the 2025 Memorandum substantially burdens their exercise of religion in violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb-2000bb-4, impedes their First Amendment right of expressive association, and violates various provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.* Compl. for Declaratory and Injunctive Relief, ECF No. 1 ("Compl."), ¶¶ 93-154. Plaintiffs sought a declaration that the 2025 Memorandum is unconstitutional, and an order enjoining Defendants from "implementing, enforcing, or taking any action pursuant to" the memorandum. Compl., Prayer for Relief 38-39.

Plaintiffs amended their complaint on February 4, 2025, adding three religious organizations to the lawsuit. *See* Am. Compl., ECF No. 28. Plaintiffs also moved the Court for a TRO and preliminary injunction on the basis that the 2025 Memorandum violates their First Amendment right to expressive association and their right to exercise religion under RFRA.[1] *See*

---

[1] Plaintiff did not seek an injunction on the basis of their APA claims, *see* Am. Compl. ¶¶ 147-181, and Defendants therefore do not address those claims here.

Mem. in Support of Pls.' Mot. for Temporary Restraining Order and Prelim. Inj., ECF No. 26-1 (Feb. 4, 2025) ("Mot.").  Plaintiffs request a nationwide injunction prohibiting Defendants from (1) "implementing, enforcing, acting pursuant to, or reinstating" the 2025 Memorandum and (2) carrying out immigration enforcement operations at places of worship absent a "judicial warrant or exigent circumstances."  Pls.' Proposed Order, ECF No. 26-2.

## STANDARD OF REVIEW

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted).  To obtain a preliminary injunction, Plaintiffs must make a "clear showing" of each of the four factors: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that the public interest favors the requested equitable relief. *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## ARGUMENT

**I.     Plaintiffs' Motion Should Be Denied Because Their Claims Are Not Likely To Succeed On The Merits.**

### A. Plaintiffs Lack Standing.

To establish standing, a plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is "concrete and particularized," "actual or imminent" and not "conjectural" or "hypothetical"; there must be a "causal connection between the injury and the conduct complained of" such that the injury is fairly traceable to the defendant; and it must be "likely," and not merely "speculative," that the injury will be redressed by a favorable decision from the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  As the party invoking federal court jurisdiction, Plaintiffs "bear[] the burden of establishing these elements." *Id.* at 555.

Because Plaintiffs seek prospective equitable relief, the "threatened injury must be *certainly impending*" and not merely *"possible."* *Clapper v. Amnesty In't USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Notably, a showing of certainly impending injury is necessary where, as here, Plaintiffs seek the extraordinary remedy of a preliminary injunction. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (holding prospective relief unavailable based on mere speculation of future injury); *Garey v. James S. Farrin, P.C.,* 35 F.4th 917, 923 (4th Cir. 2022) (stating that "mere possibility is hardly the kind of non-speculative, imminent danger that can support injunctive relief").

**1. Plaintiffs have not shown a threatened injury that is certainly impending.**

Plaintiffs allege they are injured by the 2025 Memorandum because the threat of enforcement of the Nation's immigration laws at or near places of worship deters people, including immigrants, from attending their worship services "for fear of surveillance, interrogation, or raids by armed officers[.]" Am. Compl. ¶¶ 4, 124-31, 140-42; Mot. at 12-14, 16. This chilling effect, Plaintiffs contend, will result in the reduction in the number and diversity of congregants, impeding both their free exercise of religion and their "ability to practice [their faith] communally, as their religious beliefs call them to do." Am. Compl. ¶¶ 125, 141; Mot. at 16-17. But "subjective or speculative accounts" of a chilling effect "are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Cooksey v. Futrell*, 721 F.3d 226, 236 (4th Cir. 2013) (cleaned up) (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 235 (4th Cir. 2011); *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). The chilling effect, particularly in the context of a First Amendment claim, "must have some objective manifestation," *Bond v. United States*, 742 F. App'x 735, 737 (4th Cir. 2018) (quoting *Cooksey*, 721 F.3d at 236), and be "likely to deter a person of ordinary firmness from the exercise" of his or her rights, *Abbott v. Pastides*, 900 F.3d 160, 169 (4th Cir. 2018). Plaintiffs' allegations do not meet this standard.

Plaintiffs do not allege that an enforcement operation has occurred at or near one of their worship services since the 2025 Memorandum was issued.  Nor have Plaintiffs alleged that either they or their members have been the target of an enforcement operation.  Instead, Plaintiffs contend that the mere issuance of the 2025 Memorandum directing officers to use "common sense" and "discretion" when deciding where to enforce immigration laws has "caused many immigrants to fear attending houses of worship" and some houses of worship have canceled in-person services or have locked their doors.  Am. Compl. ¶¶ 87-90; Mot. at 12-14, 16-17.  But a chilling effect that "arise[s] merely from" speculation about a possible policy change or "the . . . knowledge that a governmental agency was engaged in certain activities or from the . . . concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional" detrimental action amounts to speculation about hypothetical applications of the guidance and thus does not meet the objective standard.  *Laird*, 408 U.S. at 11.

In *Laird*, the plaintiff challenged an Army surveillance and data-gathering program alleging the program chilled the exercise of his First Amendment rights.  *Id.* at 6-10.  The Supreme Court held that a plaintiff "who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, *without more*, of a governmental investigative and data-gathering activity" lacks standing.  *Id.* at 10 (emphasis added).  In interpreting the phrase "without more," then-Judge Breyer observed that the cases that had found standing based on a chilling effect "typically involved instances in which the government in effect forced an individual to choose between either (1) bringing his speech or associational activity into conformity with a (typically vague) standard or (2) risking loss of employment opportunity (or a job)."  *See Ozonoff v. Berzak*, 744 F.2d 224, 229 (1st Cir. 1984) (Breyer, J.).  Then-Judge Scalia reached a similar conclusion in analyzing *Laird's* "chilling effect" holding.  *See United Presbyterian Church in the U.S.A. v.*

*Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984).  "All of the Supreme Court cases employing the concept of 'chilling effect[,]'" he observed, "involve situations in which the plaintiff has unquestionably suffered some concrete harm (past or immediately threatened) apart from the 'chill' itself."  *Id.*

That is not the case here.  Nothing in the 2025 Memorandum issues "commands or prohibitions to" Plaintiffs or their members, and it "sets forth no standards governing their conduct."  *Id.*  As such, Plaintiffs have not established that they suffer a "concrete harm . . . apart from the 'chill' itself."  *Id.*  Plaintiffs disagree, characterizing the 2025 Memorandum as imposing an "impossible choice" between "violat[ing] their core religious belief in welcoming all to worship or violat[ing] their core religious beliefs by not placing others in harm's way."  Am. Compl. ¶ 127. The absence of commands or prohibitions in the 2025 Memorandum, however, belies Plaintiffs' contention.  The "choice" Plaintiffs face is grounded in their subjective fear—not coercive government conduct requiring them to choose between their religious beliefs and violating a criminal law, receiving a benefit, losing an employment opportunity, or with respect to the Plaintiff organizations, restricting their ability to carry out their mission.

The "intensity" and "fervor" of Plaintiffs' disagreement with the 2025 Memorandum also does not confer standing.  *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982).  As the Supreme Court has explained, "the psychological consequence presumably produced by observation of conduct with which one disagrees" is not the type of injury that supports standing to sue, "even though the disagreement is phrased in constitutional terms."  *Id.*

*Clapper v. Amnesty Int'l USA* reinforces that Plaintiffs lack standing.  In *Clapper*, the Supreme Court rejected the argument that a group of lawyers and journalists could demonstrate an

9

Article III injury based on an "objectively reasonable likelihood" that their communications would be "intercepted . . . at some point in the future." 568 U.S. at 410. Such a standard, the Court held, "is inconsistent with our requirement that 'threatened injury must be certainly impending to constitute injury in fact.'" *Id*. (quoting *Whitmore*, 495 U.S. at 158). In *Clapper*, it was purely "speculative whether the Government will imminently target communications to which [Plaintiffs] are parties." 568 U.S. at 411. Here, it is equally speculative that a memorandum directing law enforcement officers to use "common sense" and "discretion" will imminently result in immigration enforcement actions at Plaintiffs' houses of worship. A claim of harm founded on this type of subjective "chill," which is in turn based upon an entirely conjectural threat of law enforcement activity that may never come to pass, cannot suffice to show Article III injury.

Moreover, just as in *Clapper*, Plaintiffs' argument rests on a highly speculative chain of possibilities that is simply too attenuated to satisfy the requirement that the "threatened injury" must be "certainly impending." *Id*. at 410. Plaintiffs' argument rests on a highly speculative fear that: (1) immigration officials will decide to target aliens who attend Plaintiffs' places of worship; (2) immigration officials will exercise their discretion to take enforcement action with respect to those targeted aliens at or near Plaintiffs' places of worship, (3) having decided to take enforcement action at or near Plaintiffs' places of worship, immigration officials will proceed under circumstances that Plaintiffs find objectionable, either without a warrant or in a non-exigent circumstance, (4) congregants, including nonmembers and aliens, will then decide not to attend worship services or other communal gatherings in person in response to their individual fears about the potential future immigration enforcement activity at or near places of worship, and (5) congregants, including nonmembers and aliens, who chose not to attend worship services in person, will not avail themselves of remote options to the extent such options are available. *See,*

10

*e.g.*, Ex. 1, PYM-000006 ¶ 38 (noting availability of Zoom option).  Such an "attenuated chain of possibilities," is simply too speculative to establish the existence of a threatened injury that is certainly impending.  *See Clapper*, 568 U.S. at 410; *Lyons*, 461 U.S. at 111.

Nor does reduced attendance at worship and other communal gatherings demonstrate that the 2025 Memorandum interferes with Plaintiffs' "internal organization or affairs," Mot. at 17 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984)), because the guidance to law enforcement officers to continue to exercise their discretion and common sense does not command Plaintiffs to conduct their internal affairs in any particular manner.  *See, e.g.*, *Roberts*, 468 U.S. at 623 (finding an intrusion into an organization's affairs where a government statute required a group to admit members they did not desire).

Finally, to the extent there is any doubt that Plaintiffs are unlikely to satisfy the injury inquiry, the Supreme Court's recent decision in *United States v. Texas*, 599 U.S. 670 (2023), confirms that Plaintiffs lack a cognizable injury.  At bottom, Plaintiffs' challenge to the 2025 Memorandum asks this Court to second guess the Government's decision regarding where and how vigorously to direct its enforcement resources.  The Supreme Court, however, has made clear that parties challenging immigration enforcement priorities lack an Article III injury because such lawsuits "run up against the Executive's Article II authority to enforce federal law," *id.* at 678, and "courts generally lack meaningful standards for assessing the propriety of enforcement choices" with respect to arrest and detention, given the needs of the Executive Branch to weigh "resource constraints and regularly changing public-safety and public-welfare needs" when devising policy, *id.* at 679-80.  Although *Texas* involved claims that the Government was not fully complying with its statutory obligation to arrest aliens pending their removal, the Supreme Court's rationale is

equally applicable to claims alleging injury from the Government's authority to enforce the Nation's immigration laws in a more aggressive manner.

### 2. Plaintiffs cannot show causation.

Even if Plaintiffs could demonstrate a threatened injury that is certainly impending, their injury is not fairly traceable to the 2025 Memorandum but rather would be the consequence of the "unfettered choices" made by some of the "independent actors" that are not before the Court. *Lujan*, 504 U.S. at 562 (citation omitted). Because Plaintiffs' alleged injury is tied to the decisions of unnamed individuals—members and even nonmembers—who might be chilled from attending their services, they face an even higher bar to establish standing. An injury suffices for Article III standing only if it is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* at 560 (brackets, citation, and ellipses omitted). "Where a causal relation between injury and challenged action depends upon the decision of an independent third party" (*e.g.*, a non-member's decision not to attend worship services), "standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021); *see Clapper*, 568 U.S. at 414 (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").

Where causation hinges upon the choices of third parties, a plaintiff must adduce facts to show that those choices "have been or will be made in such a manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562. Plaintiffs have not satisfied that higher burden. Plaintiffs' claim that the 2025 Memorandum "deters people from attending religious services," thereby "reducing the number and diversity of worshippers and interfering with their ability to practice communally" Am. Compl. ¶¶ 124-25; *see also id.* ¶ 140-141, rests on a

speculative chain of attenuated possibilities, *see supra* at 10-11.  As such, it is conjecture to assume that all aliens and other nonmember individuals who wish to attend Plaintiffs' worship services and participate in communal ministry activities would be deterred from doing so.

**3.  Plaintiffs cannot show redressability.**

Finally, even if Plaintiffs could demonstrate that their claimed injuries are certainly impending, the relief Plaintiffs seek would not redress it.  Plaintiffs' requested injunction permits enforcement activity in exigent circumstances and in circumstances where immigration authorities have a "judicial warrant."  Mot. at 30; Pls.' Proposed Order.  Setting aside the propriety of Plaintiffs' "judicial warrant" demand, it is entirely speculative whether the requested injunction, if issued, would remove the possibility of enforcement activity at or near Plaintiffs' places of worship.  Plaintiffs acknowledge, even under the prior guidance memoranda, that immigration enforcement activity was permitted at or near sensitive locations, including places of worship, with supervisor approval or when exigent circumstances were present.  *See* Am. Compl. ¶¶ 2, 30, Ex. 21, PYM-000243-46; Mot. at 3-5.

Further, as Plaintiffs point out, some houses of worship canceled in-person services *before* DHS announced the new issuance of the 2025 Memorandum in light of concerns about the anticipated shift in immigration enforcement priorities.  Am. Compl. ¶ 88.  Consequently, it is purely speculative that the requested injunction would dispel the deterrent effect Plaintiffs' claim the 2025 Memorandum will have on attendance at Plaintiffs' worship services and ministry activities.  Plaintiffs have thus failed to demonstrate their requested injunction will redress their threatened injury.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) (finding "redressability [that] requires speculat[ion]" is insufficient to support standing).

Even if this were not the case, Plaintiffs' purported injury is not redressable. Challenges to the Executive Branch's discretionary choices about immigration enforcement is an area in which federal courts generally do not intrude. *See Texas*, 599 U.S. at 679 (observing that the Executive Branch, not the judiciary, is tasked with enforcing federal law and retains discretion over whether to arrest and remove aliens) (citing *Arizona*, 567 U.S. at 396); *id.* at 680 ("this Court has consistently recognized that federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions").

### B. This Court Lacks Jurisdiction to Issue the Requested Injunction.

Under section 8 U.S.C. § 1252(f)(1) of the INA, lower courts lack "jurisdiction or authority to enjoin or restrain the operation," of sections 1221-1231—the provisions "governing the inspection, apprehension, examination, and removal of aliens"—except as to claims asserted by individual foreign nationals. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022) (interpreting section 1252(f)(1) to bar plaintiffs' statutory and constitutional claims for class-wide relief). The provisions subject to this jurisdictional bar include section 1226, which authorizes the arrest and detention of aliens upon a warrant issued by the Secretary of Homeland Security, and section 1231, which authorizes detention of aliens with final removal orders.[2]

The Supreme Court has explained that section 1252(f)(1) "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzales*, 596 U.S. at 550. So long as an order enjoins or restrains action that "in the Government's view" serves to

---

[2] Section 1252(f)(1)'s jurisdictional restriction does not include section 1357, which provides that "without [a] warrant," a federal officer may "arrest any alien in the United States, if he has reason to believe that the alien . . . is in the United States in violation of any . . . law or regulation and is likely to escape before a warrant can be obtained . . . ." 8 U.S.C. § 1357(a)(2).

"enforce, implement, or otherwise carry out" the referenced sections of the INA, it is impermissible—regardless of whether the court considers the Government to be carrying out those sections as "properly interpreted." *Id.* at 550-52.  Because the requested nationwide injunction would restrict the manner in which the Government engages in immigration enforcement activity at or near places of worship, it restrains the Government "from actions that[,]" in the Government's view, "are allowed" by sections 1226 and 1231, and it "interfere[s] with the Government's efforts to operate" those provisions. *Id.* at 551.  Plaintiff's requested injunction, to the extent it would apply to sections 1221-1231 of the INA, is therefore barred by section 1252(f)(1). *See Biden v. Texas*, 597 U.S. 785, 797 (2022) (holding that lower-court order enjoining DHS's Migrant Protection Protocols "violated" section 1252(f)(1)).

**C. Plaintiffs Have Failed to Establish a Likelihood of Success on their RFRA Claim.**

**1. Plaintiffs have not demonstrated that their religious exercise is substantially burdened by the 2025 Memorandum directing law enforcement officers to exercise "common sense" and "discretion."**

The Court should also find that Plaintiffs have no likelihood of success on their RFRA claim.  Plaintiffs allege the "very possibility" of "enforcement operations—including raids, arrests, investigations, interviews, and surveillance—inside, on the grounds of, and near houses of worship," has a "deterrent effect" on "attendance at houses of worship, especially for immigrants and especially at times designated for communal gathering." Mot. at 20.  But the "deterrent effect" on attendance at communal gatherings does not impose a "substantial burden" on Plaintiffs' and their members' religious beliefs, as RFRA requires.

RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the Government demonstrates that application of the burden to the person—(1) is in furtherance of a compelling

government interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b). RFRA does not define "substantial burden," so courts look to First Amendment cases decided before *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), to construe the term. *See* 42 U.S.C. § 2000bb(b)(1); *see also Goodall ex rel. Goodall v. Stafford Cnty. Sch. Bd.*, 60 F.3d 168, 171 (4th Cir. 1995) ("Since RFRA does not purport to create a new substantial burden test, we may look to pre-RFRA cases in order to assess the burden on the plaintiffs for their RFRA claim."). Under those cases, a substantial burden exists when the government places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 100 (4th Cir. 2013) (citation omitted). The quintessential example of such coercive pressure is *Wisconsin v. Yoder*, 406 U.S. 205 (1972), cited favorably by Congress when passing RFRA, where members of the Amish religion were convicted of violating a Wisconsin law that required their children to attend school until the children reached the age of sixteen, under the threat of criminal sanctions for the parents. *Id.* at 207-08; *see* 42 U.S.C. § 2000bb(b). The Supreme Court reversed the defendants' convictions, holding the application of the compulsory school-attendance law to the defendants "unduly burden[ed]" the exercise of their religion, in violation of the Free Exercise Clause. *Yoder*, 406 U.S. at 220. Such substantial coercive pressure is not present in the 2025 Memorandum, which simply directs officers to exercise "discretion" and "common sense" when deciding where to enforce federal immigration law.

Plaintiffs contend that "[b]y any metric," the 2025 Memorandum substantially burdens their members' religious exercise. Mot. at 20. To the contrary, by its plain terms, the 2025 Memorandum does not directly coerce Plaintiffs' members because it does not expressly issue any

16

commands or prohibitions to them. Plaintiffs therefore have not—and cannot—demonstrate that the guidance substantially burdens their religious exercise through direct coercion.

Nor does the 2025 Memorandum indirectly coerce Plaintiffs or their members by imposing "substantial pressure" to modify their behavior or violate their religious beliefs. *Liberty Univ., Inc.*, 733 F.3d at 100 (citation omitted). RFRA, like the Free Exercise Clause, "simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particularized citizens." *Bowen v. Roy*, 476 U.S. 693, 699 (1986) (plurality op.); *see also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450-51 (1988) (relying on *Bowen* in holding that an Indian Tribe lacked a protectable free exercise interest in objecting to the Government's use of its own land). Here, as in *Bowen* and *Lyng*, Plaintiffs object to an exercise of the Government's internal affairs—the issuance of a guidance document that calls for law enforcement officials to exercise their discretion and does not require any particular action against any particular individual, group of individuals, or religious entity, and that has not resulted in any action against Plaintiffs. Plaintiffs cite no authority holding that a general law enforcement policy, particularly one predicated on "common sense" and officer "discretion," constitutes a substantial burden on religious exercise because of a completely speculative deterrent effect it supposedly has on in-person attendance at places of worship. That failure alone suggests that Plaintiffs have not met their burden.

In addition, contrary to Plaintiffs' assertion, *see* Mot. at 22, it is speculative that Plaintiffs' members and other congregants will chose to refrain from in-person attendance at worship services and other communal gatherings. For example, the concerns of the Sangat members that "participation in Sikh religious life at the Gurdwara *may* put them at risk because of the new policy," *id.* (citation omitted and emphasis added), do not support the conclusion that members

17

with those concerns will chose not to attend services and other communal gatherings. Rather it implies that members of the Sangat with those concerns *may* choose to not attend in-person, and that their decision rests on individualized considerations.

The same holds true for the Quaker and Baptist Plaintiffs whose religious tenets rest on individuals attending worship services to provide an "opportunity to hear from and speak to [God]," Mot. at 21, and to hold "open" meetings for "public worship," *id.* at 22. The choice to attend these gatherings is individualized and thus based on a number of considerations. Thus, it is purely speculative that Plaintiffs' members and other community members, including immigrants, will choose not to attend worship services or other communal gatherings. Plaintiffs' contention that "the *threat* of armed government agents" at places of worship "makes worshippers less likely to gather," *id.* at 23, further demonstrates the speculative nature of the impact of the 2025 Memorandum. Again, that an individual is "less likely" to attend worship services does not mean all individuals will make that decision. Each person must consider factors unique to his or her individual circumstances to make that decision.

Further, the 2025 Memorandum does not force Plaintiffs to forego welcoming aliens at worship services, *id.* at 21, holding "open and regular meetings for the purpose of public worship," *id.* at 22, or providing "radical hospitality" by offering aliens in their communities assistance and ESL classes, *id.* at 22-23.

### 2. The Court should not issue a broad advisory opinion about RFRA's application because there is no specific government action to analyze.

Because Plaintiffs have failed to carry their burden of establishing that the 2025 Memorandum imposes a specific substantial burden on their religious exercise, RFRA does not require that Defendants respond further. *See* 42 U.S.C. § 2000bb-1. Indeed, without evidence that a particular application of the 2025 Memorandum has caused a substantial burden on Plaintiffs'

religious exercise, there is nothing to which Defendants can respond. *Cf. id.* § 2000bb-1(b) (explaining requisite government showing as to the "application of the burden"). Without particular concrete facts to analyze how the 2025 Memorandum might operate, it is impossible for the Court to issue a decision consistent with the Supreme Court's admonition that "RFRA, and the strict scrutiny test it adopted, contemplate an inquiry more focused than [a] categorical approach." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430 (2006).

On this record at this preliminary stage, there is only Plaintiffs' speculation about whether any immigration enforcement actions under the 2025 Memorandum would even occur at Plaintiffs' places of worship, let alone the necessary concrete facts about the specific factual circumstances under which those actions might take place. Different fact patterns will result in different legal analyses: apprehending a dangerous felon in the parking lot of a place of worship at 2 a.m. when no one is present may implicate different burdens and interests than Plaintiffs' unfounded speculation that large numbers of agents may descend on their places of worship and "drag a congregant out during the middle of worship." *See* Am. Compl. ¶ 4. At this juncture, it is entirely speculative whether Defendants would initiate an enforcement action under the 2025 Memorandum at Plaintiffs' place of worship, but even if that were to happen at some point in the future, it is impossible for the Court to assess *ex ante* the particular facts that would be relevant to the Government's compelling interest in that particular case.

The same is true of the least-restrictive-means analysis required by RFRA. In the absence of a particular factual situation in which Defendants actually engaged in an enforcement action at Plaintiffs' place of worship under the 2025 Memorandum, it is impossible to weigh the "harm of granting [a] specific exemption[] to [a] *particular* religious claimant[]." *O Centro*, 546 U.S. at 431 (emphasis added). The Court should not take a categorical approach to these fact-specific

questions by issuing a decision that results in an across-the-board prohibition of the 2025 Memorandum without regard to its application in a concrete factual setting. *See City of Boerne v. Flores,* 521 U.S. 507, 544 (1997) (Scalia, J., concurring in part) (observing that "the abstract proposition that government should not . . . place unreasonable burdens upon religious practice[] . . . must ultimately be reduced to concrete cases").

### D. Plaintiffs Have Failed to Show that the 2025 Memorandum Likely Violates Their First Amendment Rights of Expressive Association.

#### 1. Plaintiffs have not shown that the 2025 Memorandum interferes with their right to gather for religious exercise.

It is well settled that "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit" of religious ends. *Roberts*, 468 U.S. at 622. Government actions that may unconstitutionally infringe this right can take many forms, including imposing penalties or withholding a benefit because of membership in a disfavored group, *id.* at 622-23, and requiring disclosure of the fact of membership for groups seeking anonymity, which makes "group membership less attractive," *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 69 (2006). They can also take the form of interference with a group's internal organization or affairs by forcing the group to accept members it does not desire. *See Roberts*, 468 at 622-23; *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

The right of expressive association, however, "is not absolute." *Boy Scouts*, 530 U.S. at 648; *see also El Ali v. Barr*, 473 F. Supp. 3d 479, 523 (D. Md. 2020). "The law recognizes that some difficulty imposed on such freedoms do not, "without more, result in violation of the First Amendment." *El Ali*, 473 F. Supp. 3d at 523 (citation omitted). Accordingly, to state a claim for an expressive-association infringement, a plaintiff must show that the infringement was "'direct and substantial[.]" *Id.* (quoting *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996) and *Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. UAW*, 485

U.S. 360, 366-67 n.5 (1988)).  Stated differently, the challenged government action must directly and "significantly burden" a plaintiff's expressive associational rights.  *Boys Scouts*, 530 U.S. at 653.  Plaintiffs cannot demonstrate that the 2025 Memorandum, which directs law enforcement offers to continue to exercise "discretion" and "common sense," directly and significantly burdens the right to expressive association.

Plaintiffs argue the 2025 Memorandum violates their expressive associational rights in two ways.  First, they assert that the memorandum infringes on "Plaintiffs' and their members' expressive-association rights by deterring attendance at worship, ministry, and other events that occur at houses of worship."  Mot. at 16.  But, as discussed above, an infringement claim based on the chilling effect of governmental action may not be subjective or speculative.  *See Laird*, 408 U.S. at 13-14.  The chilling effect must be "objectively reasonable" such that it is "likely [to] deter a person of ordinary firmness from the exercise of First Amendment rights."  *Benham*, 635 F.3d at 135 (citation omitted).  First Amendment claims based on a chilling effect thus typically involve instances in which the plaintiff has suffered a concrete harm apart from the chill itself.

For example, in *NAACP v. Alabama ex rel Patterson*, 357 U.S. 449 (1958), a state court ordered the NAACP to produce records identifying the names and addresses of its members.  357 U.S. at 453.  The Supreme Court held that the order compelling disclosure of an organization's membership list violated the freedom to associate.  *Id.*  The Court reasoned that the NAACP had shown "that on past occasions revelation of the identity of its rank-and-file members ha[d] exposed the[ir] members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility."  *Id.* at 462.  Given these circumstances, the Court held "compelled disclosure of the NAACP's membership "is likely to affect adversely" NAACP's and its membership's ability to associate for purposes of fostering their beliefs.  *Id.*

21

Plaintiffs have not made a similar showing.  To begin, the 2025 Memorandum does not force Plaintiffs to identify their members or other congregants.  And Plaintiffs have not demonstrated that attendance at their places of worship has previously exposed their members and other worshippers to immigration enforcement surveillance, interrogation, or arrest.  The few instances of immigration enforcement activity Plaintiffs do point to did not occur at or near their places of worship and did not involve their members.  *See* Am. Compl. ¶¶ 90, 92.  As such, it is purely speculative that the 2025 Memorandum will subject Plaintiffs' members or other congregants to enforcement activity.  Applying the Court's reasoning in *NAACP*, the guidance is not "likely to deter a person of ordinary firmness from," *Benham*, 635 F.3d at 135, associating with others for purposes of worship and ministry.

Second, Plaintiffs assert that the 2025 Memorandum interferes with Plaintiffs' "internal organization or affairs" because reduced attendance will result in "fewer immigrants in leadership positions" and "fewer unique contributions to the religious exercise of everyone present" for worship.  Mot. at 17 (citation omitted).  This argument is equally unavailing.

The Supreme Court has clearly stated that a government action interferes with a group's "internal organization or affairs" if the action "forces the group to accept members it does not desire."  *Roberts*, 468 U.S. at 623.  Plaintiffs, however, have not alleged that the 2025 Memorandum forces them to include persons in their worship activities.  Indeed, this lawsuit is predicated on Plaintiffs' desire to ensure that all individuals who wish to attend their worship activities may do so by compelling Defendants to exclude their congregants from potential immigration enforcement activities.  The Supreme Court rejected a similar lawsuit seeking to dictate the conduct of the Government's internal procedures in *Roy*, 476 U.S. 693, observing that the "Free Exercise Clause simply cannot be understood to require the Government to conduct its

own internal affairs in ways that comport with the religious beliefs of particular citizens." *Id*. at 699-700. To hold otherwise would open the door for a myriad of free exercise claims seeking to compel the Government "to satisfy every citizen's religious needs and desires." *Lyng*, 485 U.S. at 452. Plaintiffs' position has no limiting principle. If the Court were to accept Plaintiffs' logic, no criminal law could be enforced near places of worship because some worshippers might choose not to attend. And Plaintiffs' logic extends beyond places of places of worship and the immediate vicinity: Any religious organization could say that enforcement of the immigration laws impinges on its religious freedom because the removal of adherents or potential adherents reduces membership, prevents communal worship, and stops those removed from holding leadership positions. "[G]overnment simply could not operate" under such circumstances. *Id.*

Plaintiffs have thus not demonstrated the 2025 Memorandum directly and substantially burdens Plaintiffs' ability to gather for religious purposes.

> **2. The Court should not issue a broad advisory opinion about the First Amendment's application because there is no government action to analyze.**

As with Plaintiffs' RFRA claim, because Plaintiffs have failed to carry their burden of establishing that the 2025 Memorandum imposes a direct and significant burden on their right to expressive association, the First Amendment does not require Defendants to respond further. *See, Boy Scouts,* 530 U.S. at 656 (inquiring whether the application of a state law runs afoul of the freedom of expressive association after having determined the existence of a significant burden on expression). And without evidence that a particular application of the 2025 Memorandum has caused a direct and substantial burden on Plaintiffs' ability to gather for religious purposes, there is nothing to which Defendants can respond. *Cf. John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010) (explaining that under the exacting scrutiny standard, the Government must demonstrate a "substantial relation between" the government action and a "sufficiently important governmental

interest" (quoting *Citizens United v. FEC*, 558 U.S. 310, 366-67 (2010)).  For the reasons explained above with respect to Plaintiffs' RFRA claim, *see supra* at 18-20, there is no basis for the Court to issue a categorical decision about the legality of 2025 Memorandum in the context of an abstract expressive association claim in the absence of a concrete factual setting.

## II.    The Plaintiffs Have Not Shown Irreparable Harm.

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.  Conclusory or speculative allegations do not establish a likelihood of irreparable harm.  *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991); *see also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) ("The plaintiff must make a clear showing of irreparable harm . . . and the required irreparable harm must be neither remote nor speculative, but actual and imminent." (quoting *Direx*, 952 F.2d at 812)).

For the same reasons Plaintiffs lack standing to bring this lawsuit, *see supra* at 6-15, Plaintiffs fail to carry their burden of establishing irreparable harm.  Plaintiffs' claim that the 2025 Memorandum burdens their exercise of religion and infringes on their right to associate is based on the subjective fears of their members and other worshippers not before this Court.  As such, Plaintiffs' alleged harm is speculative and does not demonstrate a harm that is "certainly impending." *Clapper*, 568 U.S. at 409.

Plaintiffs also cannot establish irreparably injury by alleging RFRA and First Amendment violations.  *See* Mot. at 25.  That argument improperly conflates the merits with the harm analysis. As already explained, Plaintiffs have not shown that they are likely to succeed on the merits of those claims because Plaintiffs' allegations supporting those claims are based on the subjective fears of their members and other worshipers not before this court and thus are too speculative

demonstrate that the 2025 Memorandum substantially burdens the exercise of their religion or their ability to communally gather for purposes of worship and other ministry.

### III.    Plaintiffs Have Not Shown That The Balance Of Equities And Public Interest Tip In Their Favor.

The final two preliminary injunction factors, the public interest and the balance of the equities, also weigh against granting Plaintiffs' motion.  These factors merge when the Executive is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  As explained above, Plaintiffs cannot establish an injury sufficient to confer Article III standing, let alone the much higher standard of an irreparable injury required for a preliminary injunction.  *See Winter*, 555 U.S. at 21- 22 (stating that the moving party must establish that irreparable harm is "*likely* in the absence of an injunction" and not merely a "possibility").  In contrast, an injunction restraining the law enforcement discretion of individual offices would compromise the Government and the public's "significant" interest "in enforcement of the immigration laws." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) (citing cases); *see also Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989) (the Government has "compelling interests in safety and in the integrity of our borders").  Moreover, "[d]iscretion in the enforcement of federal immigration law is vital for accomplishing the purposes of federal immigration law." *United States v. Iowa*, No. 24-2265, 2025 WL 287401, at *6 (8th Cir. Jan. 24, 2025).  Due to "resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution policies." *Texas*, 599 U.S. at 680.  Indeed, the Executive's enforcement discretion in immigration law "implicates not only normal domestic law enforcement priorities but also foreign policy objectives." *Id.* at 679 (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)).  An injunction restricting the discretion of law enforcement officers in deciding when and where to enforce the Nation's immigration laws

would undermine these important interests and hinder "vigorous enforcement of [Congress's] prohibition against illegal immigration." *Castillo*, 659 F.2d at 1221. The balance of equities and the public interest thus tip in favor of Defendants.

## IV.    A Nationwide Injunction Is Improper And Is In Any Event Not Necessary To Redress Plaintiffs' Claims.

If the Court is inclined to grant Plaintiffs relief, it should reject their request for a sweeping nationwide injunction that would prohibit Defendants from following the 2025 Memorandum and "from carrying out immigration-enforcement operations at houses or worship absent a judicial warrant or exigent circumstances." Pls.' Proposed Order; *see* Mot. at 28 ("the Court should enjoin DHS from enforcing its policy in houses of worship nationwide"). Plaintiffs cite no case in which a court has issued comparable nationwide injunction restricting the exercise of law enforcement discretion. Longstanding equitable principles and binding precedent prohibit such an extraordinary order. Any relief in this case should be tailored solely to the named Plaintiffs and limited to restoring the status quo ante of applying the 2021 Memorandum to Plaintiffs.

Under Fourth Circuit precedent, courts may issue nationwide injunctions only when "necessary to afford relief to the prevailing party." *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001). That is because, as the Supreme Court has recognized, an injunction "must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).

That principle has deep roots. It is well established that the scope of a court's statutory authority to enter injunctive relief is circumscribed by the type of relief that was "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527

U.S. 308, 318-19 (1999).  And the tradition of equity inherited from English law was premised on "providing equitable relief only to parties" because the fundamental role of a court was to "adjudicate the rights of 'individual[s].'" *Trump v. Hawaii*, 585 U.S. 667, 718 (2018) (Thomas, J., concurring) (quoting *The Federalist No. 78*, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961)).  As a result, "a plaintiff could not sue to vindicate the private rights of someone else." *Id.* Yet that is exactly the relief Plaintiffs seek in this case.  They ask this Court to enjoin Defendants law enforcement discretion on a nationwide basis as to an innumerable number of non-parties who are not before the Court.  But Plaintiffs have not availed themselves of any mechanism to represent the interests of non-parties:  they have not sought class certification or asserted third-party standing to represent others in this suit.  Plaintiffs therefore are not entitled to injunctive relief on behalf of every other religious organization and house of worship across the country, some of whom may have no objection to the 2025 Memorandum.

The Fourth Circuit rejected similar overbroad relief in *Virginia Society for Human Life, Inc. v. FEC*, 263 F.3d 379 (4th Cir. 2001).  There, the court vacated a permanent injunction that precluded a federal agency from enforcing, against any entity, a regulation held to have violated the First Amendment.  *Id.* at 393 ("We conclude that the district court abused its discretion by issuing a nationwide injunction, an injunction that prevents the FEC from enforcing the regulation against any party anywhere in the United States.").  The Court explained that an injunction covering the plaintiff "alone adequately protects it from the feared prosecution," and that "[p]reventing the [agency] from enforcing [the regulation] against other parties in other circuits does not provide any additional relief to [the plaintiff]." *Id.*  The same rationale requires denial of Plaintiffs' request for a nationwide injunction.

The problems caused by overbroad nationwide injunctions are well catalogued.  *See, e.g.*,

*Labrador v. Poe*, 144 S. Ct. 921, 926-28 (2024) (mem.) (Gorsuch, J., concurring); *DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (mem.) (Gorsuch, J., concurring); *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring); *Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring). Nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring); *see New York*, 140 S. Ct. at 600–01 (2020) (Gorsuch, J., concurring in grant of stay) (explaining that nationwide injunctions raise serious separation of powers concerns, hamper orderly judicial resolution of issues within and across cases, and improperly disadvantage the Federal Government); *Texas*, 599 U.S. at 694 (Gorsuch, J., concurring in the judgment) (reiterating concerns with "universal injunctions" and noting that "[m]atters have not improved with time"). Indeed, "in recent years the Supreme Court has repeatedly stayed nationwide injunctions that prevented the Executive Branch from pursuing its immigration policies." *Texas v. United States*, 14 F.4th 332, 341 (5th Cir. 2021) (citing cases), *vacated on rehearing en banc*, 24 F.4th 407 (5th Cir. 2021); *see also Labrador*, 144 S. Ct. at 921 (staying statewide injunction of Idaho law and limiting injunction only to plaintiffs).

Here, a nationwide injunction is wholly unnecessary to protect the named Plaintiffs who brought this lawsuit. Plaintiffs' speculative fear of possible immigration enforcement at their houses of worship pursuant to the 2025 Memorandum would be fully remedied by an injunction limited to the Plaintiffs that restores the 2021 Memorandum as to them. Such relief would return Plaintiffs to the same position they were in immediately before DHS issued the 2025 Memorandum, a position Plaintiffs did not contest in the four years the prior order was in effect. A narrow order of this type would appropriately "maintain the status quo until after a trial and final

judgment, which is the traditional function of a preliminary injunction." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024).

Plaintiffs' other arguments in favor of nationwide relief similarly miss the mark. The fact that the 2025 Memorandum involves a uniform immigration enforcement policy that "does not turn on individual characteristics of the plaintiffs" is not a basis to grant nationwide relief. *See* Mot. at 28. There is nothing odd or anomalous about enjoining application of the 2025 Memorandum as to Plaintiffs in this case, but not the remainder of the country. *See Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) (per curiam) (staying nationwide injunction because "[l]acking is either the constitutional uniformity principle . . . or concern that patchwork rulings would undermine an injunction limited to certain jurisdictions"); *Florida v. HHS*, 19 F.4th 1271, 1283 (11th Cir. 2021) (rejecting uniformity argument); *Arizona v. Biden*, 31 F.4th 469, 483–85 (6th Cir. 2022) (Sutton, C.J., concurring) (same). Law enforcement discretion is exercised on a case-by-case basis and is inherently party specific, thus there is no reason for an injunction to extend to non-parties who are not part of this lawsuit.

More fundamentally, Plaintiffs' uniformity argument usurps the role of the political branches. "[T]he admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Hawaii*, 585 U.S. at 702 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). When a district court issues party-specific relief barring the Government from applying a federal immigration policy to the named plaintiffs, the political branches may choose to achieve uniformity by suspending the policy elsewhere until the litigation is resolved, or may instead continue to apply the policy to everyone except the parties to the suit. In either case, that enforcement decision is for the political branches, not the Judiciary.

Plaintiffs also assert that party-specific relief is impracticable because they worship at many different locations and Defendant may not be able to "distinguish houses of worship that are members of Plaintiffs' organizations from those that are not." Mot. at 29-30. Plaintiffs, however, cite no authority to support nationwide relief on that novel basis. In any event, this concern is easily addressed by having Plaintiffs file a list of the locations and addresses of their houses of worship. Plaintiffs surely know the locations where they engage in religious activity. It would require little effort to include those locations in any Court order designating the specific houses of worship to which the 2021 Memorandum would continue to apply. In any event, this information would be required by Federal Rule of Civil Procedure 65(d), which provides that an injunction must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d); *see CPC Int'l, Inc. v. Skippy Inc.*, 214 F.3d 456, 459 (4th Cir. 2000) ("The terms of Rule 65(d) are mandatory and must be observed in every instance.") (internal quotation omitted).

Finally, the Court should reject the terms of Plaintiffs' overbroad injunction that would prohibit Defendants "from carrying out immigration-enforcement operations at houses or worship absent a judicial warrant or exigent circumstances." Pls.' Proposed Order. That language injunction far exceeds the guidance of the 2021 Memorandum and would drastically alter the status quo that existed for years before the 2025 Memorandum went into effect. As explained above, the 2021 memorandum simply required supervisor approval in the event of an enforcement action in a non-exigent circumstance, not a judicial warrant. Plaintiffs have provided no explanation or legal basis for the new judicial warrant requirement.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for preliminary relief should be denied.

Dated:  February 7, 2025                     Respectfully submitted,

                                             BRETT A. SHUMATE
                                             Acting Assistant Attorney General

                                             ALEXANDER K. HAAS
                                             Branch Director

                                             ANDREW I. WARDEN
                                             Assistant Branch Director

                                             /s/ *Kristina A. Wolfe*
                                             KRISTINA A. WOLFE (VA Bar No. 71570)
                                             Senior Trial Counsel
                                             United States Department of Justice
                                             Civil Division
                                             Federal Programs Branch
                                             1100 L Street, NW, Room 7506
                                             Washington, D.C. 20530
                                             Tel: 202-353-4519
                                             Fax: 202-616-8470
                                             Email:  Kristina.Wolfe@usdoj.gov