# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the
Religious Society of Friends,** *et al.*,

        Plaintiffs,

**v.**

**U.S. Department of Homeland Security,** *et al.*,

        Defendants.

**Civil Case No. 8:25-cv-243-TDC**

## REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Table of Authorities ............................................................................................................ ii

Introduction ........................................................................................................................ 1

Argument ............................................................................................................................ 2

   **I.**   Plaintiffs have standing and there is no bar to injunctive relief.......................... 2

     A.   Plaintiffs have standing........................................................................ 2

     B.   Section 1252(f)(1) does not bar injunctive relief. ........................................ 8

   **II.**  Plaintiffs have satisfied the standard for a preliminary injunction. .................. 10

     A.   Plaintiffs have shown a likelihood of success on the merits........................ 10

     B.   Plaintiffs have satisfied the remaining requirements for a preliminary injunction....... 12

   **III.**  Nationwide relief is appropriate.......................................................... 13

Conclusion ........................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Al Otro Lado v. Exec. Off. for Immigr. Rev.*,
   120 F.4th 606 (9th Cir. 2024) ........................................................................... 9

*Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*,
   1 F.4th 180 (4th Cir. 2021) ............................................................................. 4

*Babbitt v. Farm Workers Nat'l Union*,
   442 U.S. 289 (1979).......................................................................................... 4

*Benham v. City of Charlotte, N.C.*,
   635 F.3d 129 (4th Cir. 2011) ........................................................................ 4, 8

*Bennett v. Spear*,
   520 U.S. 154 (1997)....................................................................................... 6, 7

*Bond v. United States*,
   742 F. App'x 735 (4th Cir. 2018) ..................................................................... 4

*Bostic v. Schaefer*,
   760 F.3d 352 (4th Cir. 2014) ........................................................................... 3

*Bowen v. Roy*,
   476 U.S. 693 (1986)........................................................................................ 11

*Burwell v. Hobby Lobby*,
   573 U.S. 682 (2014)........................................................................................ 12

*California v. Texas*,
   593 U.S. 659 (2021).......................................................................................... 6

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013).......................................................................................... 5

*Const. Party of Pennsylvania v. Aichele*,
   757 F.3d 347 (3d Cir. 2014)............................................................................. 7

*Cooksey v. Futrell*,
   721 F.3d 226 (4th Cir. 2013) ........................................................................... 4

*Davison v. Randall*,
   912 F.3d 666 (4th Cir. 2019) ........................................................................... 3

*Edgar v. Coats*, 454 F. Supp. 3d 502 (D. Md. 2020), *aff'd sub nom. Edgar v. Haines*,
   2 F.4th 298 (4th Cir. 2021) ............................................................................. 3

*El Ali v. Barr*,
    473 F. Supp. 3d 479 (D. Md. 2020) ................................................................ 10

*FDA v. All. For Hippocratic Med.*,
    602 U.S. 367 (2024) ................................................................................ 6, 7

*Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*,
    No. 05-2164, 2007 WL 852521 (D. Kan. Mar. 16, 2007) .............................. 11

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013) ...................................................................................... 2

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012) .................................................................................... 13

*Hosp. Council of W. Pa. v. Pittsburgh*,
    949 F.2d 83 (3d Cir. 1991) ............................................................................ 8

*Hunt v. Washington State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ...................................................................................... 3

*Laird v. Tatum*,
    408 U.S. 1 (1972) ......................................................................................... 5

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) ........................................................................ 2

*Libertarian Party of Virginia v. Judd*,
    718 F.3d 308 (4th Cir. 2013) ........................................................................ 7

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...................................................................................... 3

*Lyng v. Int'l Union*,
    485 U.S. 360 (1988) .................................................................................... 10

*Medina v. United States*,
    259 F.3d 220 (4th Cir. 2001) ...................................................................... 14

*Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*,
    407 F. Supp. 3d 524 (D. Md. 2019) ...................................................... 2, 3, 8

*Pathfinder Fund v. Agency for Int'l Dev.*,
    746 F. Supp. 192 (D.D.C. 1990) ................................................................. 10

*People for the Ethical Treatment of Animals, Inc. v. Stein*,
    737 F. App'x 122 (4th Cir. 2018) ................................................................. 4

*Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*,
    122 F.4th 825 (9th Cir. 2024) ................................................................. 3

*Presbyterian Church (U.S.A.) v. United States*,
    870 F.2d 518 (9th Cir. 1989) ................................................................. 4

*Rutan v. Repub. Party of Ill.*,
    497 U.S. 62 (1990) .............................................................................. 11

*Sierra Club v. U.S. Dep't of Interior*,
    899 F.3d 260 (4th Cir. 2018) ................................................................. 6

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016), as revised (May 24, 2016) .................................... 3

*Texas v. U.S. Dep't of Homeland Sec.*,
    123 F.4th 186 (5th Cir. 2024) ................................................................. 9

*United Presbyterian Church in the U.S.A. v. Reagan*,
    738 F.2d 1375 (D.C. Cir. 1984). ............................................................ 5

*United States v. Texas*,
    599 U.S. 670 (2023) .............................................................................. 6

*Va. Soc'y for Hum. Life, Inc. v. FEC*,
    263 F.3d 379 (4th Cir. 2001) ................................................................. 13

**Statutes**

8 C.F.R. § 287.8(f) ...................................................................................... 8

8 U.S.C. § 1226 .......................................................................................... 9

8 U.S.C. § 1231 .......................................................................................... 9

8 U.S.C. § 1252 ..................................................................................... 8, 10

**Regulations**

Enhancing the Enforcement Authority of Immigration Officers,
    59 Fed. Reg. 42406-01 (Aug. 17, 1994) (codified at 8 C.F.R. pts. 242, 247) ................... 9

## INTRODUCTION

The President has promised "the largest deportation operation" in U.S. history, Ex. 57, Sara Dorn & Molly Bohannon, *Everything To Know About Trump's 'Mass Deportation' Plans: DHS Head Noem Suggest Non-Violent Immigrants Could Be Sent To Guantanamo*, Forbes (Feb. 9, 2025), https://tinyurl.com/mrx9y7d7, PYM-000681, and called for "millions and millions" of deportations, Ex. 58, Kristen Welker & Julia Ainsley, *Trump is 'angry' that deportation numbers are not higher*, NBC News (Feb. 7, 2025), https://tinyurl.com/yy4ec2wv, PYM-000692. To carry out that plan, ICE recently implemented daily arrest quotas. *Id.* "Border Czar" Tom Homan tells ICE agents daily that he is frustrated that they aren't making more arrests. *Id.* Defendant Secretary Noem posted a video of herself in a bullet-proof ICE vest captioned: "Getting the dirt bags off the streets." Ex. 59, Kristi Noem (@Sec_Noem), X (Jan. 28, 2025 10:35 AM ET), https://tinyurl.com/4uenfbc6, PYM-000693. And she refuses to rule out sending undocumented immigrants who have committed *non*violent crimes, like shoplifting, to Guantanamo Bay. Ex. 57, Forbes Article, PYM-000681. This is but a small snapshot of the environment in which DHS rescinded a 30-year policy limiting immigration enforcement at protected areas, including houses of worship.

The natural (and arguably intended) result is that people are afraid and confused. *See, e.g.*, Ex. 56, John-John Williams IV, *Trump's early actions drive Baltimore-area immigrants into hiding*, Baltimore Banner (Feb. 10, 2025), https://tinyurl.com/2s4eezxs, PYM-000671-680. Immigrants—no matter their legal status—are actively avoiding Plaintiff houses of worship for fear of immigration-enforcement activities. So too are nonimmigrants, including those who fear their sacred worship being interrupted by armed officers. That means that houses of worship are losing people critical to communal worship. They are losing the ability to perform their ministry (and

grow their religious community in the process). They are losing volunteers, leaders, and donors. And they are losing the ability to live out their religious beliefs by encouraging others to join— lest they violate another religious belief that prohibits knowingly putting a person in harm's way. These are all serious injuries that Plaintiffs have shown are caused by DHS's new policy. As a result, the new policy violates Plaintiffs' rights under the First Amendment and RFRA.

DHS ignores Plaintiffs' claims, instead reframing them as challenges to hypothetical individual raids. From that errant premise, DHS insists that Plaintiffs' injuries are speculative, that Plaintiffs merely disagree with (and are trying to direct) immigration policy, and that Plaintiffs' claims are jurisdictionally barred. What's more, DHS neglects to even address the applicable levels of scrutiny under either claim. And it insists that an injunction limited to Plaintiffs will make them whole. In short, DHS's opposition is nonresponsive to Plaintiffs' actual arguments and allegations. For the reasons that follow, Plaintiffs' motion should be granted.

## ARGUMENT

### I. Plaintiffs have standing and there is no bar to injunctive relief.

#### A. Plaintiffs have standing.

Plaintiffs have both organizational standing and associational standing. Under both theories, "a plaintiff establishes standing by demonstrating (1) a concrete and particularized injury that is actual or imminent; (2) fairly traceable to the challenged conduct; and (3) likely to be redressed by a favorable judicial decision." *Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*, 407 F. Supp. 3d 524, 530 (D. Md. 2019) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)) (quotation marks omitted). "For organizational standing, the organization suffers an injury-in-fact when 'a defendant's actions impede its efforts to carry out its mission.'" *Id.* (quoting *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012)). For associational standing, the organization "must demonstrate that (1) 'one or more of its members would have standing to sue as an individual'; (2) 'the interests it

seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* (quoting *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Only one Plaintiff need establish standing. *See id.* (quoting *Bostic v. Schaefer*, 760 F.3d 352, 370-71 (4th Cir. 2014)).

When "plaintiffs bring a pre-enforcement challenge under the First Amendment, unique standing considerations tilt dramatically toward a finding of standing." *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 836 (9th Cir. 2024) (cleaned up). "'[S]tanding requirements are somewhat relaxed in First Amendment cases,' particularly regarding the injury-in-fact requirement." *Edgar v. Coats*, 454 F. Supp. 3d 502, 525 (D. Md. 2020), *aff'd sub nom. Edgar v. Haines*, 2 F.4th 298 (4th Cir. 2021) (quoting *Davison v. Randall*, 912 F.3d 666, 678 (4th Cir. 2019)). That is because "a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Id.* (quotation marks and citation omitted).

***Injury-in-fact.*** An injury-in-fact is an injury that is both "concrete and particularized" and "actual or imminent," not "conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and citation omitted). To be concrete, an injury "must actually exist," that is, it must be "'real,' and not 'abstract.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016), as revised (May 24, 2016). To be particularized, it "must affect the plaintiff in a personal and individual way." *Id.* Plaintiffs' alleged injuries are both concrete and particularized.

Plaintiffs have shown that their "beliefs insist that worship be open to all who wish to join" and that their "religious practices depend on communal worship." Am. Compl. ¶ 119; *see also id.* ¶¶ 95, 97, 101, 102, 113. They allege that DHS's new policy "creates a constant threat of federal officers surveilling and carrying out enforcement actions against worshippers," *id.* ¶ 126, which "immediately chilled worship and fellowship," ¶ 110, and is presently "deterring some congregants

from attending," ¶ 98. And they allege that the policy is reducing "avenue[s] to speak to and hear from God," ¶ 120, impeding Plaintiffs' ability to "[f]ully and meaningfully" practice their faith, ¶ 121, forcing all Plaintiffs to "either violate their core religious belief in welcoming all to worship" or violate other core religious beliefs "by not placing others in harm's way," ¶ 127, and creating an "incredibly disruptive" atmosphere even for those congregants who do attend, ¶ 128; *see also* ¶ 131 and Ex. 50, Carter Decl. ¶ 56, PYM-000631.

These injuries show that DHS's new policy "has chilled individual congregants from attending worship services" and caused "a concrete, demonstrable decrease in attendance at those worship activities," which is enough to satisfy the injury-in-fact requirement. *See Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989). So Plaintiffs have made "a 'sufficient showing of self-censorship which occurs when a claimant is chilled from exercising his right to free expression,'" *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 187 (4th Cir. 2021) (quoting *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Put another way, DHS's new policy has "'an objectively reasonable chilling effect' on the exercise of [Plaintiffs'] rights." *People for the Ethical Treatment of Animals, Inc. v. Stein*, 737 F. App'x 122, 129 (4th Cir. 2018) (quoting *Cooksey v. Futrell*, 721 F.3d 226, 229 (4th Cir. 2013)). The chilling effect Plaintiffs allege has an "objective manifestation," *see Bond v. United States*, 742 F. App'x 735, 737 (4th Cir. 2018) (citation omitted), and is not only "*likely* to deter a person of ordinary firmness from the exercise" of their rights, *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011) (quotation marks and citations omitted), but is already doing just that.

Instead of acknowledging Plaintiffs' allegations, DHS ignores them or mischaracterizes them to argue that Plaintiffs seek redress for "a completely speculative deterrent effect." Resp. at 7. For example, DHS argues that Plaintiffs' allegations imply that members of the Sikh Gurdwara "*may*

choose to not attend." *Id.* at 17. But DHS omits that Plaintiffs alleged, among other things, that "DHS's new policy *is also reducing* Gurdwara attendance." Ex. 47, Shergill Decl. ¶ 28, PYM-000602. Likewise, DHS argues that Plaintiffs contend a chilling effect "will result" in a substantial burden by reducing congregants. Resp. at 7 (citing Am. Compl. ¶ 125). But Plaintiffs alleged—in the present tense—that DHS's new policy substantially burdens their religious exercise "by reducing the number and diversity of worshippers." Am. Compl. ¶ 125.

Based on these mischaracterizations, DHS argues that Plaintiffs impermissibly allege a chilling effect that is (1) caused by mere "speculation about a possible policy change" or (2) arises merely from their knowledge "that a governmental agency was engaged in certain activities" or fear that "the agency might in the future take some other and additional action" detrimental to the claimant. Resp. at 8 (citing *Laird v. Tatum*, 408 U.S. 1, 11 (1972)). But Plaintiffs do not speculate about hypothetical harms to come. And they do not merely object to a government policy with which they disagree. They have alleged a "chilling effect" that has resulted in "concrete harm[s] . . . apart from the 'chill' itself," *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984).

Nor do Plaintiffs' injuries rely on a "speculative chain of possibilities," Resp. at 10 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). ICE agents are already carrying out enforcement activities at houses of worship specifically because of DHS's policy change. Am. Compl. ¶ 90. That enforcement is taking place near Plaintiffs' congregations. *See, e.g.*, Ex. 34, Billal Rahman, *ICE Strikes During Church Service to Arrest Migrant,* Newsweek (Jan. 30, 2025), https://tinyurl.com/y82np8vn, PYM-000347-360 (describing an ICE arrest at a church 15 minutes away from where Plaintiff CBF is located). And Plaintiffs and their members are already being injured by depressed attendance, Am. Compl. ¶¶ 98, 110-11; by distress during

worship, *id.* ¶¶ 96, 105, 112, 128-31; and by being forced to choose between two core religious beliefs—welcoming all to worship versus not putting someone in harm's way, *id.* ¶¶ 95, 106, 126-27. These are real, concrete, and cognizable injuries-in-fact.

Finally, DHS asserts that *United States v. Texas*, 599 U.S. 670, 678 (2023), "made clear that parties challenging immigration enforcement priorities lack an Article III injury because such lawsuits 'run up against the Executive's Article II authority to enforce federal law.'" Resp. at 11 (quoting *id.*). Not so. That holding is specific to "lawsuits alleging that the Executive Branch has made an insufficient number of arrests or brought an insufficient number of prosecutions." *Texas*, 599 U.S. at 678 (2023). Plaintiffs do not challenge "immigration enforcement priorities" as a matter of public policy or preference. They challenge a DHS policy that violates their constitutional and statutory rights. DHS provides no authority to support its argument that "the Supreme Court's rationale" precluding challenges to reduced enforcement "is equally applicable to claims alleging injury from the Government's authority to enforce the Nation's immigration laws in a more aggressive manner." Resp. at 11-12. We are aware of none.

***Causation.*** To establish causation, a plaintiff "must show that the challenged action is in part responsible for frustrating" their exercise of rights. *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 283 (4th Cir. 2018) (internal quotation marks and citation omitted). Causation does not require that the challenged action "be the sole or even immediate cause of the injury." *Id.* at 284 (citing *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)). And when causation depends (in part) on the actions of a third party, the question is whether the third party "'will likely react in predictable ways' that in turn will likely injure the plaintiffs.'" *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 383 (2024) (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)).

As a result of DHS's new policy, Plaintiffs and their members are experiencing, among other things, reduced attendance. Am. Compl. ¶¶ 98, 110-12. The Court does not need to consider a "speculative chain of attenuated possibilities," Resp. at 13, to explain why—Plaintiffs have shown that people are not attending houses of worship out of fear caused by DHS's new policy.[1] Am. Compl. ¶¶ 98, 110-12; Ex. 48, Hayes Decl. ¶¶ 20-21, PYM-000607-608. Causation is clear.

DHS argues that Plaintiffs cannot demonstrate that their injuries are fairly traceable to the 2025 Policy because those injuries are "tied to the decisions of unnamed individuals—members and even nonmembers—who might be chilled from attending their services." Resp. at 12. First, the government "cannot hide behind the behavior of third parties" when its own agents are responsible for a third party's actions. *See Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 367 (3d Cir. 2014). Second, Defendants' unlawful action need not be "the very last step in the chain of causation," *Bennett*, 520 U.S. at 168-69, and concurrent causation does not disprove standing, *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013). Whether an individual congregant's fear drives them to avoid a house of worship does not "supplant" the 2025 Policy in the chain of causation. *See id.* Plaintiffs have clearly established that DHS's policy is "at least in part responsible" for their injuries, *see id.*, and that is enough.

***Redressability.*** Causation and redressability "are often flip sides of the same coin"—"[i]f a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." *FDA*, 602 U.S. at 380-81. Should the Court provide the relief Plaintiffs seek, ICE agents' ability to engage in immigration-enforcement activities at or near houses of worship will be sufficiently

---

[1] Plaintiffs need not prove that "all aliens and other nonmember individuals" would be deterred from attending worship services, Resp. at 13, to establish causation. The loss of any number of congregants diminishes and burdens Plaintiffs' and their members' religious exercise and ability to associate to engage in religious worship.

7

constrained. The risk of enforcement action at meeting houses, churches, and gurdwaras will not deter people from worshipping at those sacred spaces; Plaintiffs' religious exercise will not be burdened by a constant threat of federal officers surveilling and carrying out enforcement actions against worshippers; and Plaintiffs will once again be free to encourage all to join without contradicting their faith. There is far more than "a likelihood that the injury 'will be redressed by a favorable decision,'" which is all that courts require. *See Benham*, 635 F.3d at 134.

*Associational standing.* For the reasons described above, Plaintiffs have shown that at least one of their members would have standing to sue. DHS does not contest the other requirements for associational standing. Plaintiffs seek to vindicate their and their members' ability to engage in communal religious worship and exercise—interests that are the very core of and undoubtedly germane to Plaintiffs' purpose as religious organizations. And because Plaintiffs seek declaratory and injunctive relief only, the participation of individual members is not necessary to resolution of the lawsuit. *See Nat'l Fed'n of the Blind*, 566 F. Supp. 3d at 395-96 (citing *Hosp. Council of W. Pa. v. Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991)).

### B. Section 1252(f)(1) does not bar injunctive relief.

DHS argues that this Court does not have jurisdiction to grant Plaintiffs' requested relief, Resp. at 14-15, because only the Supreme Court has "jurisdiction or authority to enjoin or restrain the operation" of Part IV (8 U.S.C. §§ 1221-31) of the Immigration and Nationality Act "other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1).

But Plaintiffs do not challenge DHS's enforcement or implementation of Sections 1221-31. They challenge DHS's general standards for enforcement, including warrantless entry to publicly accessible areas, which arise under 8 C.F.R. § 287.8(f). *See id.* § 287.8(f)(4) (stating the power of officers to enter any place "to which the general public has access" to "question any person whom

the officer believes to be an alien"); Am. Compl. ¶¶ 157, 157 n.2. That regulation was promulgated "to implement section 503 of the Immigration Act of 1990 (IMMACT), Public Law No. 101-649 (8 U.S.C. § 1357)." Enhancing the Enforcement Authority of Immigration Officers, 59 Fed. Reg. 42406-01, 42406 (Aug. 17, 1994) (codified at 8 C.F.R. pts. 242, 247). DHS acknowledges that Section 1357 is not covered by Section 1252's jurisdictional bar but does so only in a passing footnote, quoting a part of the statute not at issue here. Resp. at 14 n.2.

Despite Plaintiffs' challenge arising under a regulation that is not a part of Section 1252(f)(1)'s jurisdictional bar, DHS argues that Plaintiffs' proposed injunction would restrain actions that DHS believes it can take to "enforce, implement, or otherwise carry out" parts of the INA, specifically Sections 1226 and 1231, which are covered by the jurisdictional bar. *See* Resp. at 14. But Section 1252(f)(1) "does not encompass an injunction against statutes it does not cross-reference." *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 209 (5th Cir. 2024). And to the extent the injunction Plaintiffs seek could in some way affect the operation of Sections 1226 and 1331, the "injunction would, at most, have only a 'collateral effect on the operation'" of those covered statutes. *See id.* at 210 (internal citation omitted); *see also Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 627-28 (9th Cir. 2024) (*Aleman-Gonzalez* left collateral-effect rule intact). That is because Section 1226 focuses primarily on processes after the Attorney General issues a warrant— including detention, release, bond, and parole. 8 U.S.C. § 1226. And Section 1231 outlines the policies for the Attorney General to follow when someone has been ordered removed. *Id.* § 1231. Neither statute addresses where DHS agents can conduct enforcement.

Under DHS's reading of Section 1252(f)(1), even U.S. citizens would be unable to challenge plainly unconstitutional policies. Assume, for example, that DHS issued a policy allowing its agents to enter private homes without judicial warrants to seek out and arrest immigrants. Under

DHS's reading of Section 1252(f)(1), no homeowner of any citizenship or immigration status could challenge the policy, and no court could enjoin it—despite the clear Fourth Amendment violation. That is because the only challenge that could ever be brought outside of the Supreme Court would be by "an individual alien" in her own immigration proceedings. 8 U.S.C. § 1252(f)(1). That result, required by DHS's reading of Section 1252(f)(1), simply doesn't make sense.

## II.  Plaintiffs have satisfied the standard for a preliminary injunction.

### C.  Plaintiffs have shown a likelihood of success on the merits.

Plaintiffs have shown that DHS's new policy interferes with their rights to expressive association, *see* Br. at 15-17, and substantially burdens their religious exercise, *see id.* at 19-23. In response, DHS misstates both the law and Plaintiffs' allegations. DHS then fails to even attempt to show that the new policy satisfies heightened scrutiny.

**1.** DHS argues that only "direct and substantial" burdens on expressive association can support a First Amendment claim. Resp. at 20 (quoting *El Ali v. Barr*, 473 F. Supp. 3d 479, 524 (D. Md. 2020)). That is not the standard. *See El Ali*, 473 F. Supp. 3d at 524 ("significant" interference can also support a claim); *see also* Br. at 15-16. Government interference does not need to be direct because "the First Amendment protects the right of expressive association against both 'heavy-handed frontal attacks, but also from being stifled by more subtle government interference.'" *Pathfinder Fund v. Agency for Int'l Dev.*, 746 F. Supp. 192, 195 (D.D.C. 1990) (quoting *Lyng v. Int'l Union*, 485 U.S. 360, 367 n.5 (1988)).

As Plaintiffs have shown, *see* Br. at 16-17, the chilling effects of DHS's new policy are significant and are actively causing harm. DHS ignores those arguments and contends that because Plaintiffs have not shown that they have been forced to identify their congregants or that they have previously been subjects of immigration-enforcement operations, the alleged harm of specific

enforcement is speculative. Resp. at 22. But "[w]hat the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." *Rutan v. Repub. Party of Ill.*, 497 U.S. 62, 77-78 (1990).

In response to Plaintiffs' showing that DHS's policy will interfere with Plaintiffs' leadership and organization, *see* Br. at 17, DHS argues that the policy does not force Plaintiffs to accept members they do not want. Resp. at 22. But forcing a group to accept members is not the *only* way for government to interfere with an organization's internal structure and affairs. *See, e.g.*, *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc*., No. 05-2164, 2007 WL 852521, at *4 (D. Kan. Mar. 16, 2007) (requiring production of internal documents could interfere with an organization's internal activities). DHS then points to cases in which incidental burdens caused by the government's managing *its own* "internal affairs" did not amount to First Amendment violations. Resp. at 22-23 (quoting *Bowen v. Roy*, 476 U.S. 693, 699-700 (1986)). But DHS's new policy does not manage the government's "internal affairs"—it directs federal agents in how they interact with houses of worship. And in doing so, it significantly affects how Plaintiffs can manage their own internal affairs and organization.

**2.** DHS's response to Plaintiffs' RFRA arguments repeats the same errors. First, DHS argues that Plaintiffs cannot show a substantial burden because deterred attendance is mere speculation. Resp. at 17-18. But DHS cherry-picks quotes from Plaintiffs' brief and ignores the allegations and declarations (cited in Plaintiffs' brief) that show that the harms are already happening. *See* Br. at 21-23. Second, DHS argues that its new policy is an "exercise of the Government's internal affairs." Resp. at 17. As just explained, a policy that outlines limits on law enforcement interactions with the public is not the government managing internal affairs. Finally, DHS argues that its new policy "does not directly coerce Plaintiffs' members because it does not expressly issue any

11

commands or prohibitions to them." *Id*. at 16-17. But putting claimants to a choice that will violate their religious beliefs either way is a direct and substantial burden. *See Burwell v. Hobby Lobby*, 573 U.S. 682, 720-23 (2014). DHS's new policy puts Plaintiffs to that choice too. Br. at 21.

**3.** Because Plaintiffs made their requisite showing under both the First Amendment and RFRA, DHS must satisfy exacting and strict scrutiny, respectively. Plaintiffs' motion showed why DHS cannot. Br. at 23-25. In response, DHS does not even attempt to satisfy either standard. *See* Resp. at 18-19, 23. DHS argues that it cannot defend its policy until there is "a particular application" (i.e., specific immigration enforcement) to Plaintiffs. *Id.* at 18. But Plaintiffs have challenged the policy itself, not "a particular application" of it. On that score, DHS has not satisfied heightened scrutiny.

### D.  Plaintiffs have satisfied the remaining requirements for a preliminary injunction.

Plaintiffs' motion explains why there is irreparable harm and why both the balance of equities and public interest favor an injunction. Br. at 25-28. Yet again, DHS mischaracterizes Plaintiffs' claims and alleged injuries.

As explained in Plaintiffs' opening brief, even short-term injuries to First Amendment and RFRA rights are irreparable harms. *Id.* at 25-26. DHS does not address that point. Instead, DHS summarily states that Plaintiffs cannot show *any* harm because their allegations "are based on the subjective fears of their members and other worshippers." Resp. at 24. Again, Plaintiffs' injuries are not speculative. DHS's policy has directly caused, among other things, a reduction in turnout that is currently harming Plaintiffs' First Amendment rights of expressive association and substantially burdening their religious exercise. *See supra* pp. 3-4.

DHS relies on the same mischaracterization of Plaintiffs' claims to argue that in the balance of the equities and public interest, there is nothing to weigh on Plaintiffs' side of the scale. Resp.

at 25. DHS puts on its side of the scale the public interest in enforcement of immigration laws and the "balance [of] many factors" that must be performed by the Executive. *Id.* But Plaintiffs don't challenge DHS's policy because it is unwise or bad policy. They challenge it because it is violating their core rights to religious association and exercise. And on that score, the First Amendment and RFRA have already "struck the balance for us," *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 196 (2012).

### III. Nationwide relief is appropriate.

Plaintiffs request that, if the Court rules in Plaintiffs' favor on the First Amendment, it issue a national injunction requiring DHS to rely on a judicial warrant or exigent circumstances to conduct immigration enforcement at houses of worship. DHS objects to the scope and substance of Plaintiffs' proposed injunction. But DHS fails to engage with Plaintiffs' allegations and arguments that show why a national injunction is "necessary to afford relief to the prevailing party," *Va. Soc'y for Hum. Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001).

Plaintiffs' injuries are not based on a "speculative fear of possible immigration enforcement at their houses of worship." *See* Resp. at 28. They allege ongoing injury not only in the form of reduced attendance by existing congregants, but also by being unable to welcome all who wish to join, whether for worship or ministry, and by reduced attendance of nonmembers. *See* Am. Compl. ¶¶ 94-95, 104, 106. Many Plaintiff houses of worship are in areas with high immigrant populations, *see, e.g.*, *id.* ¶¶ 57, 61-63, that are subject to immigration authorities' escalating campaign against those it believes may be undocumented, *see, e.g.*, *id.* ¶ 92 (noting that ICE agents conducting a warrantless raid in New Jersey recently detained a U.S. citizen). Those communities' fear of attending houses of worship, created by the 2025 Policy, cannot be assuaged by the knowledge that Plaintiffs received a limited injunction and ICE agents are expected to steer clear of Plaintiffs'

specific sacred spaces. So an injunction limited to Plaintiffs would not fully remedy the alleged harms.

What's more, as Plaintiffs explain in their opening brief, "DHS is not equipped to distinguish houses of worship that are members of Plaintiffs' organizations from those that are not." Br. at 29. DHS insists that creating a list of all Plaintiffs' houses of worship would make a limited injunction workable. Resp. at 30. Yet even if individual agents would reference a list of almost 1,700 houses of worship across 37 states (not counting the District of Columbia and Puerto Rico) before initiating any enforcement action, there is no reason to think potential worshippers would know which houses of worship made the cut and which didn't. *See, e.g.*, Ex. 56, Baltimore Banner, PYM-000677 (In the wake of false reports of ICE arrests, a Pastor "needed to convince parishioners to return.").

DHS also argues that nationwide relief would constrain "the exercise of law enforcement discretion," Resp. at 26, which "is exercised on a case-by-case basis," *id.* at 29. But "federal officials do not possess discretion to violate constitutional rights or federal statutes," *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) (quotation omitted), either on a case-by-case basis or through implementation of a broad policy.

Finally, DHS argues that any relief should be limited to a return to the 2021 policy, insisting—as it did during the January 31 status conference—that the new policy is a "modest change." Resp. at 1, 28, 30. That is both wrong and beside the point.

Under the previous policy, enforcement at a protected area required either prior supervisory approval or the existence of exigent circumstances. Ex. 20, Mayorkas Memo, PYM-000191. That policy did not provide an exhaustive list of exigent circumstances but did include examples illustrating the contours of the kinds of circumstances that would qualify. *Id.* at PYM-000190-91.

The 2025 Policy removed any mention of either requirement, deferring to agents' discretion and common sense without giving any guidance whatever on what those terms mean.

In all events, the differences between the 2021 policy and DHS's new policy do not matter. Plaintiffs are challenging the new policy and seek to enjoin it. Plaintiffs have shown that the new policy violates their rights under the First Amendment and RFRA, so the government must satisfy exacting and strict scrutiny, respectively. Plaintiffs suggested a way in which DHS could likely satisfy those standards—through a judicial warrant or exigent circumstances, Br. at 19, 24-25— and DHS has not even asserted that Plaintiffs' proposal fails under the applicable standards. If DHS wants to return to the prior policy, then *DHS* must show that the prior policy satisfies those standards. It cannot. The prior policy allowed for supervisor approval before enforcement at houses of worship. That may or may not have satisfied heightened scrutiny in 2021. But with Defendant Secretary Noem calling immigrants "dirt bags" and ICE receiving daily calls from the administration expressing disappointment that agents aren't arresting more people, the prior requirement for supervisor approval would provide cold comfort to Plaintiffs.

Put simply, because Plaintiffs have shown that the 2025 Policy violates their constitutional and statutory rights, however DHS directs immigration-enforcement operations at houses of worship going forward must satisfy heightened scrutiny. DHS cannot simply return to its previous policy to avoid that requirement.

## CONCLUSION

For these reasons, the Court should grant the motion and enjoin the government from carrying out immigration-enforcement operations at houses of worship until the Court can further consider the merits.

February 10, 2025

Respectfully submitted,

 /s/ Alethea Anne Swift
Alethea Anne Swift (Bar No. 30829)
Bradley Girard[+]
Sarah Goetz*
Andrew Bookbinder*
J. Sterling Moore*
Audrey Wiggins*
Skye Perryman*

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
aswift@democracyforward.org
bgirard@democracyforward.org
sgoetz@democracyforward.org
abookbinder@democracyforward.org
smoore@democracyforward.org
awiggins@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs*

[+] *Application for full admission pending*
*Admitted* pro hac vice

**CERTIFICATE OF SERVICE**

I, Alethea Anne Swift, hereby certify that I today filed the foregoing document with the Clerk of Court for the United States District Court for the District of Maryland, Southern Division, by using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users who have appeared in this case.

/s/ Alethea Anne Swift
*Counsel for Plaintiffs*