# Exhibit 1

PYM-000001

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the
Religious Society of Friends,** *et al.*,

    Plaintiffs,

**v.**

**U.S. Department of Homeland
Security,** *et al.*,

    Defendants.

Civil Case No. _____

## DECLARATION OF MICHAEL LEVI

I, Michael Levi, declare under penalty of perjury, under 28 U.S.C. § 1746, that
the following is true and correct:

### My knowledge of the Quaker faith

1. I am a member of Adelphi Friends Meeting of the Religious Society of
Friends, located in Adelphi, Maryland.

2. I have been attending Adelphi Friends Meeting since the mid 1990s.

3. I became a member of the meeting around 2004.

4. I am currently a member of two committees: the Ministry and Worship
Committee and the Change Group.

1

PTM-000002

5. I have served in various roles in Adelphi Friends Meeting in the past, including Clerk, Assistant Clerk, Treasurer, Assistant Treasurer, and as a member and often clerk of various other committees.

6. In addition to my thirty-plus years of worship, I have studied the Quaker faith extensively.

7. Over the years, I have taught a class on the core tenets of Quaker faith and practice between fifteen and twenty times. I have taught the class at Adelphi Friends Meeting, at a Friends School, and at the Friends General Conference—a yearly gathering of different Quaker groups and meetings.

8. There are four main branches of Quakerism: the liberal branch, the conservative branch, the Friends United Meeting, and the Evangelical Friends.

9. Adelphi Friends Meeting falls under the liberal branch. The name is not reflective of any political ideology.

10. The liberal branch of the Quaker faith has two distinguishing features. First, worship is unprogrammed, meaning that services are not conducted by any preacher or religious leader. Second, we have a diverse theological understanding. Although Quakerism came out of the Christian tradition, the liberal branch recognizes that many Friends do not consider themselves Christians.

11. Because the Quaker faith is not controlled or determined by any earthly authority, my understanding of the faith may differ from the understanding

PYM-000003

of others. That being said, what follows is a description of the faith that I believe generally holds true in the liberal branch of Quakerism.

## Core tenets of the faith

12.   There are four core insights into what it means to be a Quaker: encounter, worship, discernment, and testimony.

### Encounter

13. Quakers believe that humans can and do experience God directly—known as "encounter."

14. We have no human who directs our spiritual development. There is no creed, no catechism, and no canonical statement of belief.

15. We believe that, at any given time, any given person may experience the divine. And that person may receive a message that is intended to be shared broadly.

16. Put another way, everyone who enters the door to a meeting house may be a source of divine revelation.

17. We believe that different life experiences lead people to hear and understand the Spirit of God in somewhat different ways. So having a diversity and richness of human experience gives us a richer, fuller understanding of how God is speaking to us individually and as a community.

18. It is essential for our spiritual development to be able to hear God's word, no matter who it comes from.

PTM-000004

**Worship**

19. Quakers have developed practices that encourage that encounter—known as "worship."

20. In our scheduled, regular worship, we gather—generally in the Meeting House—and sit in expectant waiting.

21. To some, it might look like we are sitting silently, not doing anything. In fact, there is a great deal happening that is not visible or audible. Every person is quieting their mind and emotions, making space for God to enter.

22. For some, God enters and delivers a message that is personal.

23. For some, God enters and delivers a message that is intended to be shared with the rest of the worshippers. When someone receives that kind of message, they stand and speak, sharing that message with the rest of the Meeting. That is called vocal ministry.

24. Vocal ministry can come from anyone, no matter their background or how long they have been a worshipping Quaker.

25. The communal aspect of worship is central to the exercise of the Quaker faith. There are meetings that people refer to as "gathered meetings." In a gathered meeting, there is a feeling among everyone in the room that we are truly together in that moment. It just happens—there is a deep spiritual bond and a love for everyone in the meeting that spring from our communal togetherness. At the end of a gathered meeting, it is obvious to everyone in the room that something special has happened.

4

PYM-000005

## Discernment

26. Third, we have developed practices to help understand that encounter—known as "discernment."

27. Discernment is the process of interpreting God's will and making decisions. Such decisions may be personal or may be for the sake of the community.

28. In any kind of meeting, we make space for God to enter. For example, whatever the topic being discussed, we regularly pause for silent worship.

29. Our religious exercise is not limited to our regularly scheduled worship meetings. Because of discernment, our meetings for decision making are acts of worship too. That is because during our decision making, God is present. We call these "Meetings for Worship for the Conduct of Business." Our decision-making process is an attempt to determine how the presence of the divine is guiding the community.

## Testimony

30. Quakers are led to a particular way of living—known as "testimony."

31. Quakers believe in continuing revelation. That means that God has not finished speaking to humans. We do not believe that God is changing, instead we believe that because humans are developing, the way that God speaks to us changes to meet us where we are.

32. As a result, some of our testimonies have changed over time. For example, Quakers used to refuse to use honorifics or titles and would also refuse to remove their hats.

PTM-000006

33. Some testimonies remain consistent. For example, Quakers are well-known for our peace testimony; most Friends oppose all war, for any reason. Most would describe themselves as pacifists.

34. Some Quakers use the acronym SPICES to help explain some core beliefs of Quaker testimony. SPICES stands for simplicity, peace, integrity, community, equality (both social and spiritual), and stewardship. SPICES is a way to help understand the development of the Quaker faith. It is not a creed or a set of rules for the faith going forward.

35. Community is very important to Quakers. Community stretches globally and is not limited to members of the Quaker faith.

36. We believe that living our values requires us, among other things, to be truthful at all times.

### My worship at Adelphi Friends Meeting

37. I regularly attend weekly worship at the Adelphi Friends Meeting House.

38. I appreciate that the Meeting offers a Zoom option, especially for members who are house-bound or unable to physically attend. Sometimes I attend remotely. But attending worship in the Meeting House is a much more powerful religious experience.

39. Our weekly worship meeting starts with approximately 10 minutes of singing hymns together. The hymns have long been one of my favorite parts of the weekly worship meeting.

PTM-000007

40. After we finish singing the hymns, we settle into worship. In worship, we sit facing the center of the room. We sit silently, allowing space for God to enter. When someone is moved to share vocal ministry, they share it aloud and then we return to sitting silently.

41. It can be difficult to enter the state of mind that I need to receive messages from God. It requires bringing my mind to a place of stillness.

42. When I am able to still my mind, I enter a state that is hard to describe, but there is a sense of being untethered or weightless.

43. When I quiet my mind in worship, it gives me energy and replenishes me.

44. Sometimes, the state of worship goes far beyond mere replenishment. In those moments, I am not alone. There is at least one additional presence with me, the presence of God. Sometimes, in addition to the presence of God, I feel the spiritual presence of the others who are physically in the room with me.

45. In silent worship, I often receive insights that I have not had before. I see things in a new way. Sometimes I have hope for, or understanding of, a problem that seemed intractable. Often I have a profound feeling of love, hope, warmth, and kindness.

46. I frequently feel the presence of God during worship, but I do not frequently engage in vocal ministry. I engage in vocal ministry when I feel that I have received a message that isn't just for me, but is intended to be shared with others.

PYM-000008

47. Sometimes I have sat down after delivering vocal ministry and not remembered what I said. In those moments, I feel like I was a simple conduit or channel for a message from God.

48. Vocal ministry from others affects my worship. When I listen to others deliver messages, the messages will often send me down a new path of thought, evoke a new feeling, or offer me insight.

49. Those who are sitting quietly and do not engage in vocal ministry are actively participating in our communal worship. Speaking is just one expression of worship. Sitting quietly in Quaker worship is not a passive silence. Sitting quietly is part of the centering and the communion that we are sharing, which is, to me, more important than the messages.

50. The worship portion of our weekly services usually lasts about an hour, although depending on the circumstances, it can go longer.

51. I am frequently surprised that the time for worship is over because it has passed so quickly.

52. After worship, we share "joys and concerns." This is a time for personal sharing, including requests to the community to hold someone in the Light—the Quaker version of praying for somebody.

53. After sharing joys and concerns, the person who is serving as the clerk for that specific meeting for worship ends the worship and people begin to shake hands and greet one another.  This is followed by announcements. As part of the announcements, the clerk of the Outreach and Fellowship

8

PYM-000009

committee tells everyone that the Meeting always makes available at least one person to speak with anyone, especially newcomers, to explain Quaker worship. The clerk of the Hospitality committee also announces the weekly potluck that immediately follows worship. And recently children have begun to share what they learned that day in First Day School—the Quaker equivalent of Sunday School.

### Adelphi Meeting's community interactions

54. In addition to being open to all, Adelphi Friends Meeting and its members engage directly with our local community in a host of ways.

55. The Meeting House has an annual Strawberry Festival. The festival includes a used-clothing sale, household goods, games, food, and more. Many members of our local community who are not Quakers and who do not attend our Meeting attend the festival.

56. Unofficial community engagement by members of Adelphi Friends Meeting is supported by the Meeting and our members. These various community engagements often result in non-Members learning about our Meeting.

57. For example, members of Adelphi Friends Meeting have volunteered at the local public school over the years.

58. Likewise, a Member of the Meeting is from Kenya. Through learning about that Member's background and work, a group of Members worked to raise money for a Kenyan village.

PYM-000010

### The importance of worship with all comers, including immigrants

59. Because Quaker worship is rooted in a communal experience, restrictions on who attends is a significant harm to our religious experience.

60. Our worship is open to all comers—no matter their status. We firmly believe that one's life experience affects how one hears the spirit and what conclusions one might draw. So a diversity of worshippers allows us to experience God in a broader, more encompassing way.

61. Members who are Christ-centered deeply believe in Jesus's admonitions to welcome the stranger and to love thy neighbor.

62. I am aware that being welcoming of others and having an open door is core to religious traditions spanning centuries and continents.

63. Welcoming anybody and everybody is a core religious belief of mine.

64. The importance of welcoming immigrants to our worship is not simply a theoretical value. Over the years, we have had a large number of immigrants come to worship. For example, significant numbers of people from Kenya and Burundi have worshipped at Adelphi Friends Meeting.

65. Our Meeting has been enriched by the presence of these immigrants. We have had experiences that we would certainly not have had if immigrants did not join us for worship.

66. Having immigrants worship with us has made an enormous difference to who we are as individuals and as community.

FYM-000011

67. Dissuading immigrant members of our community from attending worship seriously harms Adelphi Friends Meeting, its members, and anyone who attends worship. It lessens our ability to hear God and what God is trying to tell us.

68. I believe that the threat of immigration enforcement at houses of worship, including the Adelphi Friends Meeting House, dissuades people from attending. That greatly harms our worship.

69. Government enforcement actions that stops people from entering our meeting house—or scares them from doing so—affects us personally, viscerally, emotionally, and theologically.

70. Knowing that immigration enforcement could happen at our Meeting House, I will not be as encouraging of immigrants joining us for worship. As much as their presence would be a benefit to my religious experience (and to Adelphi Friends Meeting broadly), I do not feel comfortable knowing that their attendance could bring them severe personal harm—regardless of their legal status, into which I would never inquire.

71. The threat of immigration enforcement presents additional harms to our worship.

72. We believe deeply in peace and many Quakers are pacifists. As an example, many Quakers do not take the decision to call the police lightly because it means calling an armed person to intervene.

PYM-000012

73. Having armed law-enforcement officers inside or outside of our house of
    worship would hamper our ability to connect to God. It would be distracting
    and threatening. And for many, including me, the mere threat of that
    presence would be enough to harm our religious practice.

Silver Spring, Maryland
January 25, 2025

Michael Levi

# Exhibit 2

PYM-000013

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*, Plaintiffs, **v.** **U.S. Department of Homeland Security,** *et al.*, Defendants. | **Civil Case No. 8:25-cv-243 TDC** |

**DECLARATION OF NOAH MERRILL**

I, Noah Merrill, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

**The history and structure of New England Yearly Meeting of the Religious Society of Friends**

1. New England Yearly Meeting is the formal and legal association of local Quaker congregations in the six New England states: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.

2. New England Yearly Meeting is located at:

   901 Pleasant St.

   Worcester, MA 01602

3. A Yearly Meeting in the Quaker religion is an association, a yearly gathering, and the way of describing Quakers within a certain region.

1

PYM-000014

4.  New England Yearly Meeting is the oldest Yearly Meeting in the world. It has met continuously since 1661.

5.  New England Yearly Meeting comprises 63 local congregations—called monthly meetings—across New England. The monthly meetings range from rural to urban, and everything in between.

6.  Monthly meetings are the basic organizational unit in the Quaker religion. Generally, monthly meetings have been incorporated, have bylaws, own a meeting house, and have their own budget. Most community-based activities happen at monthly meetings.

7.  Many of our monthly meetings own their meeting houses, but not all do. Some monthly meetings rent the space they use for worship. Some monthly meetings share the physical space of another house of worship, like a church or a temple. I believe that it would be difficult for law enforcement to determine whether these houses of worship are being used at any given time for Quaker worship or for other worship.

8.  To be a monthly meeting in the Religious Society of Friends, a meeting must be recognized by a quarterly or yearly meeting.

9.  Quarterly meetings are gatherings of monthly meetings in a specific geographic area.

10. Quarterly meetings gather 3-4 times a year for worship and to make decisions about issues that concern the monthly meetings in the region.

11. Quarterly meetings are sometimes individual legal entities, most often they are not.

12. Quarterly meetings are formally and legally a constituent and subsidiary part of the Yearly Meeting.

PYM-000015

13. The Yearly Meeting is the highest organizational body (judicatory) in the Religious Society of Friends. There is no wider organization to which a Yearly Meeting answers, though yearly meetings globally are in contact with one another.

14. The Yearly Meeting gathers yearly for worship and to make decisions about issues that affect the constituent quarterly and monthly meetings.

15. The Yearly Meeting is legally incorporated, both as a church and a 501(c)(3).

16. Monthly meetings are the heart of the Quaker community, but legally and practically the Yearly Meeting exercises a degree of control over monthly meetings.

17. With rare exceptions, every one of New England Yearly Meeting's constituent monthly meetings sends an annual report to New England Yearly Meeting and, depending on the contents of the report, New England Yearly Meeting will work with the monthly meeting to determine its best path forward.

18. If there is a potential legal issue at a monthly meeting, the meeting would contact New England Yearly Meeting to intervene or assist.

19. New England Yearly Meeting acts on behalf of monthly meetings for legal purposes. If, for example, someone made a bequest to a monthly meeting that an estate was not honoring, New England Yearly Meeting would take appropriate action on behalf of the monthly meeting.

20. New England Yearly Meeting does not manage the budgets of its monthly meetings. But if a monthly meeting closes down, generally the monthly meeting's assets transfer to New England Yearly Meeting.

21. Monthly meetings fund New England Yearly Meeting. Approximately 2/3 of the budget of New England Yearly Meeting comes from monthly meetings.

3

PYM-000016

22. Because so much of New England Yearly Meeting's budget comes from monthly meetings, a loss of members would harm the monthly meetings and New England Yearly Meeting.

23. New England Yearly Meeting is not its own church in the same way that a monthly meeting is. But New England Yearly Meeting gathers annually for worship, fellowship, advocacy, and decision-making about the development of the Quaker faith in New England.

24. When we meet annually, we understand the Yearly Meeting to be its own worshipping body. As part of that worshipping body, the Yearly Meeting has its own clerk and those who guide New England Yearly Meeting's religious development and service in the world.

25. New England Yearly Meeting emphasizes that all Quakers in New England are a part of our community. The annual gathering is attended by members of monthly meetings throughout New England and others interested in exploring or developing ties with the Quaker faith.

26. Our annual gathering is open to anyone who wants to attend. It is generally understood that nonmembers will likely not play a substantial role in decision making at the annual gathering. But they are welcome to attend and to worship.

27. New England Yearly Meeting would never turn anyone away from our annual gathering based on their immigration status, and we do not ask about immigration status.

28. Because Quakers believe that any and every person can experience God directly in a way that should be shared with others, we encourage and welcome people from all walks of life.

4

PYM-000017

29. New England Yearly Meeting, like Quakers generally, understand ourselves as a global community.

30. The Quaker faith has a strong tie to Central and South America. We have attendees at New England Yearly Meeting's annual gathering for whom Spanish is their first language, both residents of the United States and visitors from several Latin American countries. So we provide interpretive services at large meetings, including our annual gathering.

31. The Quaker faith also has a strong tie to Africa. New England Yearly Meeting has a monthly meeting that consists of members of the African Diaspora.

**My role in the New England Yearly Meeting and my faith**

32. I am the Yearly Meeting Secretary of New England Yearly Meeting. The position is roughly equivalent to that of Executive Director for the organization.

33. As Yearly Meeting Secretary, I serve as the legal agent and representative of New England Yearly Meeting.

34. The position of Yearly Meeting Secretary answers to the Permanent Board of New England Yearly Meeting.

35. The Yearly Meeting Secretary directly supervises 9 staff members.

36. I have been in my position for 12 years.

37. I have been employed in various positions in the Quaker faith since 2003.

38. I grew up a Quaker and am an active member in the Religious Society of Friends.

39. I have been recognized as a Recorded Minister. In the Quaker faith, a Recorded Minister is one in whom the community has recognized certain sustained gifts and expects to be able to interpret the Quaker faith to the wider world.

5

40. I believe that any immigration-enforcement action, or the threat of immigration enforcement, at a Quaker house of worship would cause serious harm to the religious exercise of New England Yearly Meeting and its member monthly meetings.

41. I do not recall ever seeing a gun in a Quaker meeting, and Quakers have held a religious commitment against violence in all forms for more than 350 years.

42. I understand the immigration-enforcement officers generally are armed.

43. I believe that the presence of armed officers at a meeting would cause significant harm to our religious exercise.

44. If I knew that immigration enforcement could happen at a monthly meeting, at any of our worship events throughout the year, or at our annual gathering, I would not be as encouraging of any immigrant joining us for worship. As much as their presence would benefit our religious experience, I would not feel comfortable knowing that their attendance could subject them to armed federal officers.

Newfane, Vermont
February 3, 2025

Noah Merrill

# Exhibit 3

PYM-000020

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,

                  Plaintiffs,

**v.**

**U.S. Department of Homeland Security,** *et al.*,

                  Defendants.

Civil Case No. _____

## DECLARATION OF RUBY STEIGERWALD

I, Ruby Jane Steigerwald, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.  I am a member of the Adelphi Friends Meeting, located in Adelphi, Maryland.

2.  I have been attending the Adelphi Meeting since approximately 2015.

3.  I previously attended and was a member of the Twin Cities Friends Meeting in Minneapolis-St. Paul, Minnesota, where I was an attender and member for 16 years.

4.  I also attended the Monteverde Friends Meeting in Monteverde, Puntarenas Province, Costa Rica, for one-and-a-half years, from 1997 to 1999.

1

FYM-000021

5.  I am currently Co-Clerk of the Children's Religious Education Committee and a member of the Climate Action Working Group within the Peace and Social Concerns Committee at the Adelphi Meeting.

6.  While a member of the Twin Cities Friends Meeting, I was a member of the First Day School Committee, which covers children's religious education. I was also the Clerk of Meeting. I also served on the El Salvador Committee of the Northern Yearly Meeting, whose purpose is to foster a relationship between El Salvador Yearly Meeting and Northern Yearly Meeting, including youth exchange programs and supporting a Quaker school in El Salvador.

7.  I am a retired teacher. Throughout most of my professional career, I worked with the children of immigrants. I also taught English as a Second Language courses to adults.

### My worship at the Adelphi Friends Meeting

8.  I regularly attend weekly worship at the Adelphi Friends Meeting House.

9.  Our weekly worship meeting begins with about 15 minutes of singing hymns.

10. We then begin worship, which lasts about an hour. Children join for the first 20 minutes of that time.

11. Worship consists of sitting in silence and waiting to hear the voice of God. We sometimes refer to this process as seeking the inner light, inner voice, or the Christ within.

PYM-000022

12. After worship, we share "Joys and Concerns," during which people have the opportunity to talk about things happening in their life or to share thoughts or feelings that may not rise to the level of something to be shared during worship.

13. During Joys and Concerns, we hold each other in the light.

14. Thereafter, we exchange greetings by shaking hands or hugging those around us, and newcomers introduce themselves.

15. The meeting concludes by breaking bread together.

16. Joys and Concerns, greeting one another, and breaking bread together are important aspects of our religious exercise because it is important to our religious experience to know the other people who are a part of the Adelphi Meeting.

17. The Adelphi Friends Meeting offers remote participation in weekly worship via Zoom.

18. While it is important because it allows people who are ill, who have mobility issues, or who live far away from the meeting house to access worship, I prefer to worship in person.

19. We worship in community, and it is harder for me to feel that communal connection when worshipping via Zoom.

### The Testimony of Equality

20. The Friends have a set of values, known as Testimonies, that inform how we live and how we worship.

3

PYM-000023

21. One of the Testimonies is Equality. The Testimony of Equality means that we see that of God in all people.

22. That Testimony of Equality means that we value and worship without regard to a person's background, immigration status, or how they arrived in this country.

### Engagement with the community

23. The Adelphi Meeting engages with our community in a number of ways.

24. Because the Adelphi Meeting is located in an area with a large population of Hispanic people and Spanish-speakers, we include Spanish-language materials about Quakerism in the foyer of the meeting house.

25. We also translate important social-justice related committee minutes into Spanish and publish them on our website.

26. In the past, we have hung a large banner in front of our meeting house welcoming immigrants in our community. The banner, citing Leviticus 19:33-34, said, "Do not mistreat strangers. Treat them as citizens. Love them as yourself."

27. We have regularly supported immigrant families settling in our community, including families from Afghanistan, Burundi, Kenya, and Nicaragua, many of whom were refugees and escaping civil unrest. Some of these families joined our meeting for worship.

28. We also open our meeting house and grounds to the community.

4

FYM-000024

29.  For example, the Adelphi Meeting is a member of the Adelphi Neighborhood Association, and the Association holds its meetings in our meeting house.

30.  We built a playground on our grounds and ensure that it is open to families and children in our community, regardless of whether they attend or are members of the Adelphi Meeting.

31.  We also hold an annual event, the Strawberry Festival, which is open to all members of the local community, regardless of whether they are members of the Adelphi Meeting.

**The importance of communal worship with all-comers, including immigrants**

32.  Communal worship is a core aspect of my faith and religious exercise, and restrictions on communal worship would negatively affect my religious exercise and ability to practice my faith.

33.  We believe that everyone has their own connection to spirit, or access to the divine.

34.  Having as many people attend our meetings as possible is an important aspect of worship, because every individual who attends presents an opportunity for God to speak to us through them.

35.  When we have a deep spiritual experience, it is because we have all sensed something and been in the same spiritual presence together, which can only happen through communal participation in worship.

PYM-000025

36. Radical inclusivity, including inclusivity of people from different backgrounds and cultures, is also an important aspect of our religious worship, because it allows access to the divine through the most sources possible.

37. The specter or actual presence of armed law enforcement officers coming near or inside our meeting house during worship is very disturbing and would be incredibly disruptive and traumatic.

38. I believe that it may lead some members of our community to refrain from attending weekly worship in person, particularly Latino members and people with children.

39. If some people cease attending weekly worship, it would negatively affect the ability of our attenders and members to gather together for communal worship.

40. If some people cease attending weekly worship, my own ability to worship will be diminished.

41. If I were permitted to worship only with those with lawful immigration status, it would not only negatively affect my ability to worship with all-comers, but it would infringe my religious beliefs otherwise, including the Testimony of Equality.

42. The Friends are anti-violence and a peace church. We do not take up arms. And we stand in the power that removes the occasion of violence and war.

6

PYM-000026

43. The presence of armed law enforcement officers near or inside our meeting house would undermine our ability to remove the occasion of violence, because it would create the opportunity for conflict and violence that go against our pacifist values.

44. The presence of armed law enforcement officers in our meeting house would also disrupt our worship in other ways, including by disrupting our ability to engage in the quiet reflection that is necessary to access the divine.

Washington, D.C.
January 25, 2025

Ruby Jane Steigerwald

7

# Exhibit 4

PYM-000027

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the
Religious Society of Friends,** *et al.*,

         Plaintiffs,

**v.**

**U.S. Department of Homeland
Security,** *et al.*,

         Defendants.

Civil Case No. _____

## DECLARATION OF RONI J. KINGSLEY

I, Roni J. Kingsley, declare under penalty of perjury, under 28 U.S.C. § 1746,
that the following is true and correct:

1. I am Clerk of the Richmond Friends Meeting, located in Richmond, Virginia.

2. The Richmond Monthly Meeting is a congregation of the Religious Society of
   Friends.

3. It is part of the Baltimore Yearly Meeting, a regional Meeting of the
   Religious Society of Friends. The Baltimore Yearly Meeting has existed for
   more than 300 years.

4. I began attending the Richmond Friends Meeting in 1989 and became a
   member around 2000.

FYM-000028

5.  I have served as Clerk of the Richmond Friends Meeting since 2024. I served as Assistant Clerk from 2022-23.

6.  I have been part of a number of committees in my time as an attendee and member of the Richmond Meeting, including the Peace and Social Concerns, Building and Grounds, Care and Counsel, Technical Support, Nominating, and Ministry and Worship Committees. Some committees require membership, some do not.

### Richmond Friends Meeting and worship

7.  I regularly attend weekly worship at the Richmond Friends Meeting House.

8.  The weekly worship meetings take place every Sunday, one at 9:30 a.m. and one at 11:00 a.m. Our meetings are open and anyone may attend.

9.  The Richmond Friends Meeting congregation has roughly 225 regular attendees and members.

10. Richmond Friends Meeting is made up of attendees and members. Attendees are any people who attend our meetings. Members are people who have gone through the formal process of becoming a member of Richmond Friends Meeting and thereby the broader Religious Society of Friends.

11. An attendee can become a member by making a written request to the Clerk of Meeting who will then pass the request to the Care and Counsel Committee. This committee forms an ad hoc committee called a clearness committee. Members of the clearness committee meet, sit, and discuss

2

PYM-000029

membership with the interested individual. If everyone feels clear following this process, the decision goes to the full Care and Counsel Committee which will make a recommendation for membership to the entire Richmond Friends Meeting at a monthly business meeting. Typically, approval is "held over" until the following month's business meeting to give people from meeting the opportunity to speak with the individual should they wish to.

12. The Richmond Friends Meeting is nonhierarchical. That means there is no clergy that leads worship, decides religious doctrine, or determines the content of any meeting for worship. Instead, we gather in silence for worship.

13. At meetings for worship, we gather in silence for a period of Spirit-led waiting worship that lasts one hour. A member of the Care and Counsel Committee is at the open door to greet people, especially newcomers. People find places to sit, and all benches face the middle. A member of the Ministry and Worship Committee sits on "facing bench" (a bench near the front of the room). This person will initiate and end worship as well as guide announcements after worship. There is no program of content planned in advance. If someone is moved to share a message, they rise and do so. This is called vocal ministry. Vocal ministry can take the form of giving a message, saying a prayer, singing a song, or asking the meeting to join them in song. When they are finished, they sit back down.

RFM-000030

14. Individuals typically only share once during a meeting. People are asked not to respond to each other during meeting, but sometimes a thread or theme develops throughout a meeting. Some times there are no messages during a meeting. An hour of silence is not uncommon.

15. At the end of the hour, there is a shaking of hands initiated by the person on facing bench, which signals the end of worship.

16. On the third Sunday of every month, worship includes the business of Richmond Friends Meeting. It is referred to as Meeting for Worship with Attention to Business

17. On weeks where worship with attention to business takes place, the meeting hears recommendations from its committees about actions that the meeting may take and attends to perfunctory matters, like budgeting.

**Richmond Friends Meeting's decision making process**

18. Richmond Friends Meeting seeks unity in our decision-making. We seek unity as a body, we do not vote. Decision-making is undertaken by the whole body, and it does not matter how long someone has been attending meeting. Nor does it matter whether they are an attendee or a member.

19. It is the Clerk's job to help the meeting consider the business before it. The Clerk does not control the conversation. Instead, the Clerk helps to guide consideration of the matters at hand.

20. The Clerk must get a sense of the unity and then test whether the meeting has come to unity during discernment.

**Richmond Friends Meeting's immigrant community interactions**

PYM-000031

21. In addition to being open to all, the Richmond Friends Meeting and its members engage directly with our local community in a host of ways.

22. Richmond Friends Meeting House hosts English classes for refugees and immigrants.

23. Richmond Friends Meeting House specifically makes the meeting house available to the community and for people that need space.

24. Being open to all is part of our ministry and core to our religious beliefs.

25. As part of our ministry, Richmond Friends Meeting House has supported immigrant women through programming and financial assistance, including sewing courses and helping to purchase sewing machines.

26. Unofficial community engagement is encouraged at the Richmond Friends Meeting as well, and members try to live through their values in the community, not just during meetings.

27. As an expression of living our faith through values in the community, attendees and members of the Richmond Friends Meeting have volunteered to drive people to immigration appointments, meet immigrants as they arrive at bus stations, and sponsor new immigrant families when they arrive in Richmond in partnership with Catholic Charities.

### The importance of meeting with all-comers

28. Richmond Friends Meeting is open to all-comers. It does not matter if it is someone's very first meeting or if they have been coming for decades. The doors are open, physically and metaphorically, to all at Richmond Friends Meeting. That is part of how we practice our faith.

PYM-000032

29. At Richmond Friends Meeting, we give testimony to our spiritual lives by the way we live. Quakerism is not about what you believe, it's how you live. Our testimonies (Simplicity, Peace, Integrity, Community, Equality, and Stewardship of the Environment) are how we live our faith: personal, family life, in the community, and in the world.

30. Richmond Friends Meeting is rooted in communal experience. When someone speaks during meeting, it is similar to when a pastor speaks to a congregation, and it's to be taken the same way. It is ministry given to the congregation.

31. At Richmond Friends Meeting, the form of worship is "waiting worship." Everyone is collectively waiting together on Spirit. Our worship is not solitary, there is an understanding that we are gathered as a body. The meeting is not 50 distinct people sitting on their individual cushions. There is a spiritual connectedness to it. Even at a meeting where there might not be a message, there is a sense of togetherness with every single person in the room.

**Effects of ICE Enforcement at Richmond Friends Meeting and the presence of armed immigration officers**

32. Any immigration enforcement action during our meetings would seriously harm Richmond Friends Meeting and its members.

33. Already, the threat of armed immigration officers has begun to have an impact on our meeting. At the suggestion that ICE could begin enforcement in or near a meeting, an attendee asked whether we would need to start

6

PTM-000033

locking our doors during meetings. Closing off the meeting to the public is something we have never done before because it interferes with our religious commitment to communal worship.

34. The knowledge that ICE agents can interrupt our worship is also already making our members less likely to attend. A member of color expressed concern that he could be mistaken for being undocumented and feared the idea of enforcement actions in or around the meeting. We have other attendees of color who are less comfortable at meeting now that armed immigration officers can operate in or around the meeting.

35. The method of worship at Richmond Friends Meeting, open worship, works only because everyone is in a circle together. The doors are open, there's a greeter at the doorway to welcome people in. All of that is part of the spiritual hospitality that we want to have. The idea of the presence of law enforcement—or the threat of that presence—goes against that.

36. Pacifism is deeply ingrained in the Quaker faith and is the ideal that brought so many people to the doors of Richmond Friends Meeting. Our pacifism is much more than a surface level opposition to war. Pacifism is deeper and broader than that. For us, it includes inward peace and peace at home.

37. Knowingly putting a person in harm's way or risking their involvement in a violent encounter violates my religious beliefs. Having weapons or armed people in or around the meeting is inconceivable and contrary to our faith.

FYM-000034

38. In our manner of waiting worship, we sit quietly, release distractions, and settle into an inner stillness that leads to Spirit-led listening. For this reason, too, having weapons or armed people in or around the meetings is inconceivable and contrary to our faith. Even the idea of there being weapons at meeting is distressing enough to make it very difficult to engage in waiting worship and will discourage attendance.

Henrico County, Virginia
January 26, 2025

Roni J. Kingsley

# Exhibit 5

PYM-000035

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.,*

Plaintiffs,

**v.**

**U.S. Department of Homeland Security,** *et al.,*

Defendants.

Civil Case No. _____

## DECLARATION OF FRANCIE MARBURY

I, Francie Marbury, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am Member of the Putney Friends Meeting, located in Putney, Vermont.

2. The Putney Friends Meeting is a Worship Group of the Religious Society of Friends.

3. It is part of the New England Yearly Meeting, a regional Meeting of the Religious Society of Friends.

4. I began attending the Putney Friends Meeting over 20 years ago.

5. I served as Clerk of the Putney Friends Meeting from 2006 to 2011, and again from 2022 to 2024.

1

PYM-000036

6. I have been part of a number of committees in my time as an attendee and member of the Putney Meeting, including the Social Justice Committee and the Childcare and First Day School Committee. Some committees require membership, some do not.

### Putney Friends Meeting and worship

7. I regularly attend weekly worship at the Putney Friends Meeting House.

8. The weekly worship meetings take place every Sunday, one at 8:30 a.m. and one at 10:30 a.m. At 10:00 a.m. we have intergenerational singing in between the two worship sessions. Our meetings are open and anyone may attend.

9. The Putney Friends Meeting congregation has approximately 100 regular attendees and members.

10. Putney Friends Meeting is made up of attendees and members. Attendees are any people who attend our meetings. Members are people who have gone through the formal process of becoming a member of Putney Friends Meeting and the broader Religious Society of Friends.

11. Attendees can become members by submitting a requestor for membership and consulting with a clearness committee. Following meetings with a clearness committee, the committee will make a recommendation to the full meeting on an individual's membership, where a decision is made.

12. The Putney Friends Meeting is nonhierarchical. That means there is no pastor that leads worship, decides religious doctrine, or determines the

PFM-000037

content of any meeting for worship. Instead, we gather in silence for worship.

13. At meetings for worship, the doors are opened to allow people in. People sit down in the worship room where the seating is arranged in a circular manner. We gather in silence for a period of worship that lasts one hour. There is no content planned in advance. If someone is moved to share a message, they rise and do so. When they are finished, they sit back down.

14. On the third Sunday of every month, the Putney Friends Meeting includes attention to business as part of the weekly worship, at 12:00 p.m.

15. On weeks where worship with attention to business takes place, the meeting hears recommendations from its committees about actions that the meeting may take and attends to perfunctory matters, like budgeting.

### Putney Friends Meeting decision making process

16. Putney Friends Meeting seeks unity in our decision-making. We seek unity as a body, we do not vote. Decision-making is undertaken by the whole body, and it does not matter how long someone has been attending meeting. Nor does it matter whether they are an attendee or a member.

17. It is the Clerk's job to help the meeting consider the business before it. The Clerk does not control the conversation. Instead, the Clerk helps to guide consideration of the matters at hand.

18. The Clerk must get a sense of the unity and then test whether the meeting has come to unity during a decision-making.

PFM-000038

### Putney Friends Meeting's immigrant community interactions

19. In addition to being open to all, the Putney Friends Meeting and its members engage directly with our local community in a host of ways.

20. Putney Friends Meeting has a focus on welcoming the community.

21. Putney Friends Meeting has hosted fundraising events for community organizations. Such events include holding a silent auction and dinner to raise funds for the non-profit organization the Community Asylum Seekers Project.

22. Attendees of Putney Friends Meeting have also raised money for the non-profit organization Ethiopian Community Development Counsel.

23. Putney Friends Meeting has also supported applications for grants from the Bodine-Rustin Fund for Support and Action three times. Funds from the grant go towards supporting LGBTQ members of the community, including asylum seekers.

24. For the last few months, the Social Justice Committee of Putney Friends Meeting has maintained a peace vigil in the Putney Common for two Saturdays a month.

25. As part of our ministry, Putney Friends Meeting has supported the local immigrant and asylum community. This includes individuals from Putney Friends Meeting volunteering with the Community Asylum Seekers Project and the Ethiopian Community Development Counsel. Individuals that

PFM-000039

volunteer with these nonprofit organizations report back to Putney Friends Meeting on their progress.

26. This ministry has a long history of caring for the immigrant community. In the 1980s, Putney Friends Meeting was involved in supporting a local migrant family, and efforts to support the Putney immigrant community go even further back, including welcoming Southeast Asian immigrant families moving to the area.

27. Interactions with the community outside Putney Friends Meeting is a way that people learn about, and sometimes explore, the Quaker faith.

### The importance of meeting with all-comers

28. Putney Friends Meeting is open to all-comers. It does not matter if it is someone's very first meeting or if they have been coming for decades. The doors are open, physically and metaphorically, to all at Putney Friends Meeting.

29. At Putney Friends Meeting, we give testimony to our spiritual lives by the way we live. Quakerism is not about what you believe, it's how you live. The testimonies are how we live our faith: personal, family life, in the community, and in the world.

30. Putney Friends Meeting is rooted in our shared experience and unity. Instead of having a pastor, our worship involves attendees speaking during meeting. We believe that everyone has spirit within them, regardless of race, status, or background.

31. When we worship, we worship together and are all joined in the room. That is why we refer to it as finding unity within the group.

## Effects of ICE enforcement at Putney Friends Meeting and the presence of armed immigration officers

32. Putney Friends Meeting has never had to deal with immigration-enforcement operations before. Immigration enforcement would deeply impact worship. People would be scared of armed immigration officers sitting in the parking lot waiting for people to come out. The presence of armed officers would not only cause some people not to come to meeting, but it would force others to make decisions regarding how to deal with it. Some people would leave the meeting over it, some people would rather not be involved. Regardless, people should not have to make these choices regarding their faith.

33. Pacifism is deeply ingrained in the Quaker faith generally and Putney Friends Meeting specifically. Our pacifism is much more than a surface level opposition to war. Pacifism is deeper and broader than that. For us, it includes inward peace and peace at home. The very idea of there being weapons or armed people in or around the meeting is inconceivable, we've never even discussed having a no-weapons policy. Even the idea of there being weapons at meeting is totally distressing.

Putney, Vermont
January 25, 2025

Francie Marbury

# Exhibit 6

PYM-000041

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*, | |
| Plaintiffs, | |
| **v.** | |
| **U.S. Department of Homeland Security,** *et al.*, | **Civil Case No. 8:25-cv-243 TDC** |
| Defendants. | |

## DECLARATION OF CHRISTIE DUNCAN-TESSMER

I, Christie Duncan-Tessmer, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

### The history and structure of Philadelphia Yearly Meeting of the Religious Society of Friends

1. Philadelphia Yearly Meeting is a formal and legal association of local Quaker congregations in Pennsylvania, Delaware, Southern New Jersey, and the Eastern Shore of Maryland.

2. Philadelphia Yearly Meeting is located at:

   1515 Cherry Street

   Philadelphia, PA 19102

3. The Yearly Meeting is legally incorporated as a church and a 501(c)(3).

4. A Yearly Meeting in the Quaker religion is an association, a yearly gathering, and the way of describing Quakers within a certain region.

1

PYM-000042

5.  Philadelphia Yearly Meeting has met continuously since 1682.

6.  Philadelphia Yearly Meeting played a central role in the history of the freedom of religious exercise in this country. Philadelphia Yearly Meeting started the year after William Penn established Pennsylvania. As a Quaker, Penn was all too familiar with the religious discrimination that Quakers faced in England and other colonies, including Massachusetts.

7.  In 1701, Penn established the Charter of Privileges, which guaranteed freedom of worship in Pennsylvania. The Charter of Privileges became one of the foundations of the protections for religious freedom in the First Amendment to the United States Constitution.

8.  In 1804, the Friends built the Arch Street Meeting House on land granted by William Penn to the Friends. Philadelphia Yearly Meeting owns Arch Street Meeting House, the largest in the world, which is the location of a local congregation (monthly meeting) and Philadelphia Yearly Meeting's gathering of members.

9.  Philadelphia Yearly Meeting gathers at Arch Street Meeting House two times yearly for worship and to make decisions about issues that affect the constituent quarterly and monthly meetings.

10. Because of size constraints at Arch Street Meeting House, Philadelphia Yearly meeting has its primary annual gathering on a college campus.

11. Monthly meetings are the heart of the Quaker community. Legally and practically, they are the constituent parts that make up the Yearly Meeting.

12. Many of our monthly meetings own their meeting houses, but not all do. Some monthly meetings rent the space they use for worship. At least one monthly meeting meets in a

PYM-000043

Protestant building. I believe that it would be difficult for law enforcement to determine whether these buildings are being used at any given time for Quaker worship or for other worship.

13. All Philadelphia Yearly Meeting's constituent monthly meetings are asked to send an annual report, called the State of the Meeting, to Philadelphia Yearly Meeting. A committee of Philadelphia Yearly Meeting reads the reports, complies them into a single report, and reports on them at our annual gathering in the summer.

14. In the past, when an issue of concern arises in a State of the Meeting report, the committee contacts the monthly meeting to offer it support and guidance.

15. Monthly meetings fund Philadelphia Yearly Meeting. Approximately 1/4 of the budget of Philadelphia Yearly Meeting comes from monthly meetings.

16. A loss of members would harm the monthly meetings and Philadelphia Yearly Meeting.

17. Philadelphia Yearly Meeting does not have its own congregation in the same way that a monthly meeting does. Rather, Philadelphia Yearly Meeting is the interconnection of Friends from across all the meetings into larger community to support and care for one another and the community as a whole.  It gathers three times annually for worship, fellowship, advocacy, and decision-making about the development of the Quaker faith (called "sessions"). It also gathers Friends and meetings together throughout the year in a variety of programs, communications channels and gathering for mutual spiritual and practical support and growth.

18. When we meet, the Yearly Meeting has its own clerk and the community as a whole guides Philadelphia Yearly Meeting's religious development and service in the world.

3

PYM-000044

19. Philadelphia Yearly Meeting's gatherings are attended by members and attenders of monthly meetings throughout Philadelphia and others interested in exploring or developing ties with the Quaker faith.

20. Our gatherings are open to anyone who wants to attend. Some events at the gatherings are geared toward the public in addition to our members. I know of times at past gatherings in which non-Quakers attended those events then decided to stay for our worship sessions. We did not know the immigration status of those attendees, and we would never ask.

21. Philadelphia Yearly Meeting would never turn anyone away from our gatherings based on their immigration status, and we do not ask about immigration status.

22. Because Quakers believe that any and every person can experience God directly in a way that should be shared with others, we encourage and welcome people from all walks of life.

23. In 2014, Philadelphia Yearly Meeting adopted a series of strategic directions that reflect this belief and highlight our connections to immigrant populations.

24. The first strategic direction is connecting:

> We will share among us the wisdom, creativity, and resources of our meetings and Friends, so they may resonate throughout the whole community and allow us to thrive in relationship with the Divine. Individuals and meetings will give time, gifts, and experience in service, and in turn receive new insight, grounding, and friendships, directly and indirectly enriching their meetings and their own spiritual lives.

> We will connect Friends across the geography of PYM and with Friends from the wider world, in order to carry our concerns together. We will do this in a manner that allows everyone to participate in the life of the community.

25. Another strategic direction is belonging:

PYM-000045

Because we are all interconnected, we seek to increase a sense of belonging to an extended family of Friends. To be effective and whole, we need each other. Our personal experience of being a Friend is deepened by worshipping, discerning business, and sharing community beyond our home meetings. Friends of all ages, locations, and interests will have ways of entering the community and will feel glad they've participated.

We will look courageously into the roots of inequity in our culture, be willing to see and feel the pain it can cause and choose to do whatever is necessary to take risks and to change. We will dismantle imposed barriers in our yearly and monthly meeting structures and activities, which impede our experience of God within our communities and within ourselves. We seek to make the congregations inside of our meetinghouses reflect the beauty and diversity of the world outside of them.

26. Although Quakers generally do not proselytize, it is essential to encourage others for whom this path is meaningful to join us.

27. Philadelphia Yearly Meeting engages with the non-Quaker community in various ways. For example, there are groups within Philadelphia Yearly Meeting—called collaboratives—that work with people outside the Quaker community to address issues including the Middle East as well as racial and environmental justice. That work brings Philadelphia Yearly Meeting members into relationships with people from all walks of life who then learn about our faith.

28. Philadelphia Yearly Meeting, like Quakers generally, understand ourselves as a global community.

29. The global connection is not hypothetical or theoretical. Friends World Committee for Consultation conducts a worldwide Quaker census every decade (of which Philadelphia Yearly Meeting was a part). There are Quakers in 87 different countries.

30. Our beliefs, combined with the global nature of the Quaker faith, brings us into close relationship with immigrant populations.

5

PYM-000046

31. For example, one of our monthly meetings developed a close relationship with a family of East Africans who are Quaker and lived in a refugee camp in Syria before relocating to the United States. The family began its own Quaker congregation, which is not a part of Philadelphia Yearly Meeting, but meets in the meeting house of the monthly meeting that is part of Philadelphia Yearly Meeting.

32. Another Philadelphia Yearly Meeting monthly meeting is located in an area with a high immigrant population. That monthly meeting is very involved in the local community, including through working with organizations made up of immigrants. The monthly meeting does not inquire as to anyone's immigration status.

33. Our extensive work in our communities—especially with those most in need—is a way that people learn about, and become interested in, the Quaker faith.

**My role in the Philadelphia Yearly Meeting and my faith**

34. I am the General Secretary of Philadelphia Yearly Meeting. The position is roughly equivalent to that of Executive Director for the organization.

35. As General Secretary, I serve as the legal agent and representative of Philadelphia Yearly Meeting.

36. The position of General Secretary answers to councils, which together function like a Board of Directors.

37. Philadelphia Yearly Meeting has 25 full- or part-time staff.

38. I have been in my position for 10 years.

39. I have been employed in various positions in the Quaker faith since 1997.

40. I am an active member in the Religious Society of Friends through my membership at Chestnut Hill Friends monthly meeting.

41. I started attending Chestnut Hill Friends in 1995 and became a member in 1999.

42. A core part of my Quaker beliefs is that we must be open and welcoming to anyone who wants to join us in worship. I believe that a broader representation of lived experience—including those of immigrants, regardless of their legal status—is critical to exercise of my faith.

43. I believe that any immigration-enforcement action, or the threat of immigration enforcement, at a Quaker house of worship would cause serious harm to the religious exercise of Philadelphia Yearly Meeting and its member monthly meetings.

44. Quakers have held a religious commitment against violence in all forms as a founding principle of the faith.

45. I have never seen a weapon in a Quaker meeting. The presence of a weapon in a Quaker meeting would be absolutely unacceptable.

46. I understand the immigration-enforcement officers generally are armed.

47. I believe that the presence of armed officers at a meeting would cause significant harm to our religious exercise.

48. If I knew that immigration enforcement could happen at a monthly meeting, at any of our worship events throughout the year, or at our annual gathering, I would not be as encouraging of any immigrant joining us for worship. As much as their presence would benefit our religious experience, I would not feel comfortable knowing that their attendance could subject them to armed federal officers.

Philadelphia, Pennsylvania
February 3, 2025

Christie Duncan-Tessmer

7

# Exhibit 7

PYM-000050

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,

        Plaintiffs,

**v.**

**U.S. Department of Homeland Security,** *et al.*,

        Defendants.

Civil Case No. 8:25-cv-243 TDC

## DECLARATION OF SARAH GILLOOLY

I, Sarah Gillooly, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

**The history and structure of Baltimore Yearly Meeting of the Religious Society of Friends**

1. Baltimore Yearly Meeting of the Religious Society of Friends, Inc., is the association of the members of 43 local Quaker congregations—Monthly Meetings—in Maryland, Pennsylvania, Virginia, West Virginia, and Washington, D.C.

2. Baltimore Yearly Meeting is located at:

   17100 Quaker Lane

   Sandy Spring, MD 20912

3. Baltimore Yearly Meeting is a church and legally incorporated 501(c)(3) nonprofit organization.

1

BYM-000051

4. Baltimore Yearly Meeting has met continuously (except for a single year during the influenza pandemic) since 1672. It is the third oldest Yearly Meeting in the world.

5. A Yearly Meeting in the Quaker religion is an association, a yearly gathering, and a way of describing Quakers within a certain region.

6. The Yearly Meeting is the highest organizational body in the Religious Society of Friends.

7. Monthly meetings are the heart and basic organizational unit in the Quaker religion. Generally, monthly meetings have their own governing instruments and budgets and own or rent a meeting house. Most community-based activities happen at monthly meetings.

8. Many of our monthly meetings own their meeting houses, but not all do. Some monthly meetings rent the space they use for worship. At least two monthly meetings meet inside Protestant churches. I believe that it would be difficult for law enforcement to determine whether the church was being used at any given time for Quaker worship or for Protestant worship.

9. To be a monthly meeting in the Religious Society of Friends, a meeting must be recognized by the yearly meeting.

10. Quarterly meetings are gatherings of monthly meetings. They gather 3-4 times a year for worship and to make decisions about issues that concern the monthly meetings in the region. Many, but not all, monthly meetings in Baltimore Yearly Meeting are members of a quarterly meeting.

11. Baltimore Yearly Meeting is composed of an estimated 5,558 members from its 43 constituent Monthly Meetings, as well as several informal worshipping communities.

2

BYM-000052

12. Monthly meetings within Baltimore Yearly Meeting are guided by a common faith and practice.

13. Baltimore Yearly Meeting instructs its monthly meetings on minimum requirements to be recognized as a monthly meeting and retains the authority to discontinue a monthly meeting.

14. Each constituent monthly meeting sends an annual report to Baltimore Yearly Meeting on the spiritual state of the meeting.  These reports are published for the information of all monthly meetings and are also summarized in the annual gathering. Baltimore Yearly Meeting will offer spiritual and practical support to monthly meetings based on the content of those reports.

15. Baltimore Yearly Meeting does not manage the budget of its monthly meetings. If a monthly meeting closes down, generally the monthly meeting's assets transfer to Baltimore Yearly Meeting.

16. Monthly meetings fund Baltimore Yearly Meeting in part. Approximately 1/6 of the budget of Baltimore Yearly Meeting comes from monthly meetings in the form of apportionment. These payments are made according to guidelines set by the yearly meeting, but each monthly meeting discerns the final amount.

17. A loss of members would harm the monthly meetings and Baltimore Yearly Meeting. Losing members would mean financial loss in addition to loss of spiritual and denominational unity.

18. Baltimore Yearly Meeting gathers four times per year for worship, fellowship, and decision-making about the development of the Quaker faith in our region.

19. We understand those gatherings to be gathered meetings for worship.

3

BYM-000053

20. When we meet, we understand the Yearly Meeting to be its own worshipping body. As part of the worshipping body, Baltimore Yearly Meeting has its own clerk and those who guide its religious development and service in the world.

21. Baltimore Yearly Meeting emphasizes that all Quakers in its region are part of our community. Its gatherings are attended by the members of its constituent monthly meetings and others who are not official members but are active participants in our worshipping body.

22. All are welcome to attend Baltimore Yearly Meeting's gatherings. Baltimore Yearly Meeting would never turn anyone away, and we do not ask about immigration status.

23. It is generally understood that individuals not active in a monthly meeting will likely not play a substantial role in decision-making at Baltimore Yearly Meeting's gatherings, but all are welcome to attend and to worship.

24. Because we believe that anyone can experience God directly, and that such experiences is to be shared with others, our faith requires us to welcome anyone who wants to join.

25. We understand ourselves to be part of a worldwide body of Quakers.

26. Some of Baltimore Yearly Meeting's constituent monthly meetings are located in areas with large populations of immigrants.

27. Some monthly meetings of Baltimore Yearly Meeting have a substantial number of active members or attenders who are immigrants, particularly African immigrants.

28. The Quakers have a long tradition of hosting people who come from places where there is ongoing violence or civil unrest. Our hospitality is an exercise of our faith. Our hospitality does not turn on someone's legal status.

4

BYM-000054

29. An important aspect of our faith in Baltimore Yearly Meeting is the practice of "intervisitation"—the spiritual practice of visiting Quakers from different parts of the world and different branches of Quakerism.

30. Practicing intervisitation is an important means of building and maintaining our relationship with our coreligionists across theological and geographical differences, as our Quaker faith requires.

31. As part of that effort, I and other members of Baltimore Yearly Meeting have attended events hosted by Evangelical Quakers, many of whom are Spanish-speaking.

32. In 2023, I was part of a delegation of Quakers to Kenya for a worldwide gathering with coreligionists.

**My role in the Baltimore Yearly Meeting and my faith**

33. I am General Secretary of Baltimore Yearly Meeting. The position is roughly equivalent to that of Executive Director for the organization.

34. As General Secretary, I serve as the legal agent and representative of Baltimore Yearly Meeting.

35. The position of General Secretary ultimately answers to the Trustees of Baltimore Yearly Meeting.

36. The General Secretary directly supervises approximately 12 staff members. Baltimore Yearly Meeting also employs approximately 150 seasonal workers in the four summer camps that it operates, which serve approximately 500 children.

37. I have been in my position for 3 1/2 years.

38. I am an active member of the Religious Society of Friends and a member of Adelphi Friends Meeting in Adelphi, Maryland.

5

BYM-000055

39. I will complete my seminary education in Spring 2025 and am in the process to be recognized as a Recorded Minister.

40. I also volunteer part-time as a Quaker chaplain at a local hospital in Washington, D.C.

41. I believe that any immigration-enforcement action at a Quaker meeting house or at any place where a meeting for worship is occurring would cause serious harm to the religious exercise of Baltimore Yearly Meeting and its members in its constituent monthly meetings. And I believe that the threat of immigration-enforcement actions at a Quaker meeting house or at any place where a meeting for worship is occurring causes serious harm to the religious exercise of Baltimore Yearly Meeting and its members in its constituent monthly meetings.

42. Knowing that immigration enforcement can happen at a monthly meeting, annual gathering, or other worship event, my ability be a servant-leader to these meetings is hampered, and I cannot be as encouraging of immigrants joining us for worship. As much as their presence would benefit our religious experience, I do not feel comfortable knowing that their attendance could subject them to armed federal officers.

43. Knowingly putting a person in harm's way or subjecting them to the possibility of a violent encounter would violate my religious beliefs.

44. I believe that threatened or actual immigration-enforcement action near or inside a Quaker meeting house or at any place where a meeting for worship is occurring may lead some to refrain from attending worship services.

45. Quakers have held a religious commitment against taking up arms for more than 350 years. I do not recall ever seeing a gun, or a weapon of any kind,  in a Quaker meeting.

PTM-000056

46. The presence of armed law enforcement officers in or near a meeting house would cause significant harm. It would cause immediate and lasting disruption to our ability to worship.

47. I believe that the Department of Homeland Security's new immigration-enforcement policy burdens our ability to continue the spiritual practice of intervisitation.

Washington, D.C.
February 3, 2025

Sarah Gillooly

7

# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.,*

Plaintiffs,

v.

**U.S. Department of Homeland Security,** *et al.,*

Defendants.

Civil Case No. _____

## DECLARATION OF ROBIN MOHR

I, Robin Mohr, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am Clerk of the Green Street Meeting, located in Philadelphia, Pennsylvania.

2. Green Street Meeting is a Monthly Meeting. It is one of the seven Monthly Meetings that constitute the Philadelphia Quarterly Meeting, and it is part of the Philadelphia Yearly Meeting.

3. I have attended Green Street Meeting since 2011 and became a member in 2012.

4. I have served as Clerk of the Nominating Committee and Clerk of the Children's Religious Education Committee and been a member of the

1

Property Committee and Hospitality Committee at the Green Street
Meeting.

5.  And I am an attender and participant at annual sessions of Philadelphia
Yearly Meeting.

6.  I previously attended and was a member of the San Francisco Monthly
Meeting, which I attended from 1995 to 2011.

7.  While a member of the San Francisco Monthly Meeting, I was a member of
the Ministry and Oversight Committee, Children's Religious Education
Committee, News Committee, and Hospitality Committee.

8.  From 2011 until 2024, I was formerly the Executive Secretary of the Friends
World Committee for Consultation, Section of the Americas, which fosters
fellowship among all the branches of the Religious Society of Friends.

9.  I am also a speaker, writer, and movement leader within the Religious
Society of Friends. I speak and write about the sustainability of the
denomination, how our modern practice builds on our traditional practices,
and building bridges among different branches of Friends and across
differences of theology, language, geography, and cultural and racial
divisions.

## Relationship between Green Street Meeting and Philadelphia Yearly Meeting

10. Green Street Meeting is one of the member monthly meetings that makes
up Philadelphia Yearly Meeting.

11. Members of Green Street Meeting have been staff members or volunteers with different committees of the Philadelphia Yearly Meeting.

12. The Philadelphia Yearly Meeting provides programming support to the Green Street Meeting, including spiritual formation programs and sessions for dealing with the business of the Philadelphia Yearly Meeting.

13. The Philadelphia Yearly Meeting also provides financial support to the Green Street Meeting, including for the education of children, for members experiencing economic hardships, and for those suffering for conscience's sake, including money to support the family of a Friend who has been imprisoned for conscience-related reasons.

14. Green Street Meeting makes a financial contribution every year to the Philadelphia Yearly Meeting.

### My worship at the Green Street Meeting

15. I regularly attend weekly worship at the Green Street Meeting.

16. Worship is held in expectant waiting on the movement of the Holy Spirit.

17. It begins with people gathering in silence to listen for God speaking to us. When we stop talking, we can hear more clearly.

18. If someone feels moved by the Holy Spirit to minister out loud, they may be moved to rise and speak.

19. Our worship is called "unprogrammed worship," because there is no plan for who will speak, or when. There may be messages for anyone in the room.

20. After worship concludes, we share food, which is an important part of our spiritual practice of community.

21. The Green Street Meeting offers remote participation in weekly worship via Zoom.

22. While it is important because it allows people who are not able to attend in person to participate in weekly worship, I have a much deeper and more profound experience when members are gathered together physically.

## The importance of communal worship with all-comers, including immigrants

23. Communal worship is a core aspect of my faith and religious exercise, and restrictions on communal worship would negatively affect my religious exercise and ability to practice my faith.

24. Quakers have traditionally gathered together in person.

25. We believe that God is speaking all the time. We prepare ourselves to listen better when we gather together.

26. There is something in the spiritual nature of human beings coming together that enables us to listen better to the Holy Spirit speaking to us.

27. We believe in the ability of all people to minister.

28. Openness to all people who come through our doors is part of the Christian witness and our Quaker witness. We believe that all people are able to channel the Holy Spirit and to minister to our community.

29. Because everyone receives messages of the Holy Spirit in a different way, having as many people attend our meetings as possible allows for more

people listening, and more opportunities to grasp messages of the Holy Spirit from others.

30. Hearing from people who have different experiences and understandings of the Holy Spirit enriches our practice.

31. The Quakers have a long tradition of welcoming immigrants and refugees in our communities. Supporting the stranger in our midst is part of our religious practice.

32. Green Street Meeting has focused on ensuring that it is an open and welcoming community, including for members of the immigrant community. Among other things, we welcome people at the door before worship, invite visitors and new attenders to introduce themselves, share food together after worship, and ensure that our religious education and other materials reflect a diversity of faces, voices, and languages.

33. The threat or presence of armed law enforcement officers coming near or inside our meeting house during worship would disrupt the peaceful practice of our religion.

34. I believe that the threat or presence of armed law enforcement officers coming near or inside our meeting house may deter people from attending worship.

35. The Green Street Meeting has members who are immigrants. Some of them have shared their fear of immigration enforcement, even though they are U.S. citizens.

36. If some people cease attending weekly worship, it would negatively affect the ability of our attenders and members to gather together for communal worship.

37. If some people cease attending weekly worship, my own ability to worship will be diminished.

38. We are traditionally and currently opposed to the use of armed violence for any purpose.

39. Many Quakers have chosen our denomination because of our commitment to peace and nonviolence, and because they understand that Quaker meetings are a place of peace and nonviolence.

40. The threat or presence of armed law enforcement officers in or near our meeting house would be a violation of our space.

41. The threat or presence of armed law enforcement officers coming near or inside our meeting house during worship would also make it more difficult to center and listen to the word of God inside our hearts.

Philadelphia, Pennsylvania
January 26, 2025

Robin Mohr

6

# Exhibit 9

# Memorandum



LRT 40/4-P

| Subject | Date |
|---|---|
| Sector Policy Regarding Entry Into Places of Worship, Schools and Private Residences | January 21, 1993 |

| To | From |
|---|---|
| All Sector Employees<br>Laredo Sector | Jose E. Garza<br>Chief Patrol Agent<br>Laredo, Texas |

This memorandum is to ensure that all Sector employees are fully aware of Sector policy regarding entry into places of worship, schools and private residences.

Places of worship will not be entered for the purpose of apprehending illegal aliens even if in hot pursuit unless an Assistant Chief or above has authorized it.

Schools will not be entered to arrest illegal aliens even if in hot pursuit. The only exception is to pick up the children of an alien in custody for the purposes of maintaining family unity after an Assistant Chief or above has authorized it.

Private residences will not be entered to arrest illegal aliens even if in hot pursuit unless permission has been given by the owners and a Supervisory Agent or above has authorized it.

# Exhibit 10

Westlaw.

70 No. 10 INTERREL 322                                                        Page 1
70 NO. 10 Interpreter Releases 322
**(Cite as: 70 NO. 10 Interpreter Releases 322)**

Interpreter Releases
March 15, 1993

**\*322 COURT ENJOINS EL PASO BORDER PATROL FROM HARASSING HISPANICS AT LOCAL
SCHOOL**

Copyright © 1993 Federal Publications Inc.

A federal court has enjoined El Paso Border Patrol agents from stopping or detaining individuals solely because they look Hispanic. Murillo v. Musegades, EP-92-CA-319-B (W.D. Tex. Dec. 4, 1992). Senior U.S. District Judge Lucius D. Bunton, III found that residents of the Bowie High School District in El \*323 Paso, Texas were being harassed primarily because they looked Hispanic.

The plaintiffs, U.S. citizens and residents of El Paso, Texas are all of Hispanic descent. They include students, graduates and staff of Bowie High School. Because Bowie High School is located right next to the U.S.-Mexico border, many undocumented aliens enter the U.S. through the high school grounds. The Border Patrol has had a regular, consistent and prominent presence on the campus, arresting people illegally entering the U.S. from Mexico.

Prompted by complaints from students, teachers and residents of the Bowie High School District alleging physical and verbal abuses by Border Patrol agents, Bowie principal Paul Strezlin sought to put an end to the Border Patrol's activities on the campus. He told Dale Musegades, the El Paso Border Patrol sector chief, about instances of individuals being stopped and questioned about their citizenship and in some cases frisked, searched or detained by Border Patrol agents. Mr. Musegades was unresponsive, and claimed there was no problem at the high school. [FN22]

In May 1992, Civil Rights Commission hearings were held in El Paso airing the public outcry of alleged Border Patrol abuses. In October 1992, the Superintendent of the El Paso Independent School District and Mr. Musegades reached a "Gentlemens' Agreement." This agreement, however, only provided that reports of abuses of students on the Bowie High School campus were to be directed to the Superintendent's office.

In October 1992, the plaintiffs filed this class action lawsuit, seeking to enjoin the Border Patrol from violating their civil rights. Named as defendants were Mr. Musegades, the INS, and at least 13 unidentified Border Patrol agents.

In his December 4 opinion, Judge Bunton criticized Mr. Musegades for his failure to remedy the alleged violations. Judge Bunton observed that the system for reporting and investigating alleged abuses was ineffective because victims of abuse were often discouraged from filing complaints by the governmental officers, personnel and complaint structure. This system does not provide any methods for addressing or prohibiting future abuses, he noted. Judge Bunton also found that the El Paso Border Patrol was not in compliance with an INS El Paso office guideline prohibiting law **enforcement activities** at **schools** except where prior approval had been granted.

Judge Bunton found that in many instances the Border Patrol agents did not have a reasonable suspicion of either alienage or illegal alienage when they stopped individuals. Plaintiffs' mere appearance of being of Hispanic descent was the "overriding reason" for their harassment, the judge concluded. Condemning the Border Patrol's discriminatory practices, Judge Bunton observed (emphasis in original; citations omitted):

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The [INA] allows an INS Agent to question a person, believed to be an alien, about his or her "right to be or to remain in the United States." 8 USC § 1357(a)(1). The statutory provision is limited by the Fourth Amendment. An INS Agent may not question any individual as to his or her right to be or to remain in the United States unless the INS Agent has a reasonable suspicion, based on specific articulable facts involving more than mere ethnic appearance, that the individual is an alien.

Judge Bunton held that the plaintiffs' Fourth and Fifth Amendment rights had been violated. He noted that the government's strong interest in enforcing immigration laws did not outweigh the rights of U.S. citizens and permanent residents to be free from unreasonable searches and seizures. "Respect for plaintiffs' constitutional rights is of paramount importance; otherwise, the vast majority of the population within the Bowie High School District, which is Hispanic, will continue to be subject to illegal stops, questioning, detentions, frisks, arrests, searches, and further abuses by the El Paso Border Patrol," he said. He pointed out that the Border Patrol has other means of patrolling the border area near the school without infringing on plaintiffs' constitutional rights.

Judge Bunton enjoined El Paso Border Patrol agents from stopping, detaining, and questioning individuals about their right to be or to remain in the U.S. unless the agents had "a reasonable suspicion, based on specific articulable facts involving more than the mere appearance of the individual being of Hispanic descent" that the person is either illegally in *324 the U.S. or is guilty of violating U.S. immigration laws. Judge Bunton also noted that the injunction did not extend to stops, detentions, and questioning during other legally authorized law enforcement functions, such as inspections or checkpoint activity, where reasonable suspicion is not required.

The plaintiffs were represented by Barbara Hines, Lee J. Teran, and Robert F. Greenblum of the Lawyers' Committee for Civil Rights Under Law of Texas, and El Paso attorney Albert Armendariz, Jr.

For more on the Fourth Amendment rights of aliens generally, see Chiao, "Fourth Amendment Limits On Immigration Law Enforcement," 93-2 Immigration Briefings (Feb. 1993).

[FN22]. The Texas Observer, Dec. 11, 1992, at 6. See also El Paso Herald-Post, Dec. 4, 1992, at A1, col. 1; The Dallas Morning News, Dec. 4, 1992, at 22B, col. 1.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 11

# Memorandum

HQ 807-P

| Subject | Date |
|---|---|
| Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies. | MAY 17 1993 |

| To | From |
|---|---|
| District Directors<br>Chief Patrol Agents | Office of Operations |

## POLICY:

It is a policy of the Service to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies.

## PROCEDURES:

Enforcement operations which are likely to involve apprehensions on the premises of schools, places of worship, or at funerals or other religious ceremonies require advance written approval by the District Director or Chief Patrol Agent. Such actions are reportable under Operations Instructions (OI) 103.1(g) pertaining to reporting of incidents and unusual matters. Approval of an operation by a field office manager does not substitute for required headquarters authorizations for actions requiring such approval, e.g., 511 cases.

The Assistant District Directors, OIC, or Deputy Chief Patrol Agent, may approve inspections of records; preliminary investigative activities related to a specific individual or individuals which will not entail contact with the person under investigation; and similar activities at such locations when apprehensions will not be made.

For purposes of this policy, the term "schools" includes pre-schools; primary, secondary, and post-secondary schools (including colleges and universities); and other institutions of learning such as vocational or trade schools. "Places of worship" includes such institutions as churches, temples, and synagogues. "Other religious ceremonies" include grave site ceremonies and rosaries. The requirement for advance approval of operations in such locations should not be construed as tolerance for violations of the law by or on the premises of such institutions.

In determining the appropriateness of a proposed action, District Directors and Chief Patrol Agents shall consider the following:

EXHIBIT "E"

5

Page 2
District Directors
Chief Patrol Agents

The availability of alternative measures which would achieve
the enforcement objective (e.g., making the arrest off the
premises);

The importance of the enforcement objective in the context of
Service priorities;

Measures which can be taken to minimize the impact on
operation of the school or place of worship;

Whether the action has been requested or approved by managers
of the institution involved.

Exceptions to this policy, e.g., local agreements to cover a
specific situation or institution, must be approved in writing by
the Associate Commissioner for Enforcement. Headquarters may also
direct exceptions in such unusual situations as a declared national
emergency by Presidential Executive Order or National Security
Council directive, e.g., a mass alien influx or alien registration
action.

When situations arise that do not permit written authorization
prior to entry onto the premises of schools or places of worship,
officers are expected to exercise good judgement concerning the
appropriate action to take. Some situations will require the
officer to proceed; in other instances entry onto the premises will
not be appropriate. If exigent circumstances require a deviation
from this policy, the matter must be reported immediately by the
District Director or Chief Patrol Agent to the appropriate
Assistant Commissioner. All field office managers must ensure that
enforcement officers are well versed in and able to apply the
criteria for exigent circumstances stated in the Service manual on
*The Law of Arrest, Search, and Seizure for Immigration Officers*
(M-69). Reports should explain the exigency requiring the
officer's action, any steps which were taken to secure supervisory
authorization in the absence of written approval (e.g., oral
approval from supervisor), the seriousness of the suspected
violation, whether the facility was in operation (e.g., were
classes in session), and other pertinent facts.

Where operations covered by this policy are planned in advance, the
general practice for Border Patrol officers requires that the
operation will be conducted in plain clothes. However, under
exigent circumstances, one of the factors that officers should
consider is the likelihood that they will be identified as law
enforcement officers; in such instances, the absence of a uniform
may mitigate against continuing a pursuit.

6

PTM-000069

Page 3
District Directors
Chief Patrol Agents

This directive does not affect the scope of authority of Service officers under the Immigration and Nationality Act, but is directed to the operational implementation of such authority.   The requirement for approval in advance of such operations and actions on such premises should not be construed as an indication of tolerance for any violations of the law by anyone at or in charge of a school or a place of worship.   This directive is an internal statement of procedure which does not confer any benefits upon nor impose any requirements upon anyone other than Service officers as a part of a uniform exercise of delegated authority.

James A. Puleo
Acting Associate Commissioner

Enclosure

7

# Exhibit 12

Westlaw.

70 No. 25 INTERREL 870                                                        Page 1
70 NO. 25 Interpreter Releases 870
**(Cite as: 70 NO. 25 Interpreter Releases 870)**

Interpreter Releases
July 2, 1993

**\*870** INS SETS NEW STANDARDS FOR **ENFORCEMENT ACTIVITIES** AT **SCHOOLS**, RELIGIOUS
PLACES

Copyright © 1993 Federal Publications Inc.

"It is a policy of the Service to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies." That is a new enforcement standard set forth in a recent internal INS memorandum.

The memo, signed by Acting Associate Commissioner for Operations James A. Puleo, was issued on May 17, 1993. It is reproduced in Appendix II of this Release.

The memo first states that enforcement operations that are likely to involve apprehensions at schools, places of worship, or at funerals or other religious ceremonies must be approved in advance by the district director or chief patrol agent. Assistant district directors or deputy chief patrol agents may approve inspections of records, preliminary investigative activities related to a specific individual or individuals that will not entail contact with the person under investigation, and similar activities at such locations when apprehensions will not be made.

In determining the appropriateness of a particular action, the memo continues, district directors and chief patrol agents are to consider: (1) the availability of alternative measures that would achieve the enforcement objective; (2) the importance of the enforcement objective in the context of INS priorities; (3) measures that can be taken to minimize the impact on the operation of the school or place of worship; and (4) whether the action has been requested or approved by the management of the institution involved.

Exceptions to the policy must be approved by the INS Associate Commissioner for Enforcement. Also, INS headquarters might make exceptions in unusual situations, such as during a declared national emergency.

The memo adds that in situations that do not permit written authorization before entering schools or places of worship, "officers are expected to exercise good judgment concerning the appropriate action to take." The officer must report all exigent circumstances that mandated deviation from the set policy.

Finally, the memo notes that where operations covered by the new policy are planned in advance, the general practice for Border Patrol officers requires that the operation be conducted in plain clothes. However, in exigent circumstances the officers should consider the likelihood that they will be identified as law enforcement officers, because in such circumstances the absence of a uniform might mitigate against continuing a pursuit.

INS **enforcement activities** at **schools** and places of worship have always been controversial. Last December, for example, a federal judge enjoined Border Patrol agents from "harassing" residents of a school district in Texas merely because the residents were Hispanic. Murillo v. Musegades, 809 F.2d 487 (W.D. Tex. 1992). [FN31] Also, in 1988 controversy erupted in California after the INS arrested several undocumented aliens during a Roman Catholic mass. [FN32]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ISM-000071

70 No. 25 INTERREL 870                                                                                          Page 2
70 NO. 25 Interpreter Releases 870
**(Cite as: 70 NO. 25 Interpreter Releases 870)**

[FN31]. See 70 Interpreter Releases 322 (Mar. 15, 1993).

[FN32]. Los Angeles Times, Sept. 29, 1988, at 38, col. 1; Sept. 30, 1988, at 2, col. 1.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 13

04/20/2004 TUE 16:49 FAX 9157824333        US BORDER PATROL SEQ/CPA +++ DMN              ☒001



**Department of Homeland Security**
Bureau of Customs and Border Protection
*U.S. Border Patrol*

### EPT 50/19.1.5

*Office of the Chief*
*U.S. Border Patrol Sector Headquarters*
*8901 Montana Avenue*
*El Paso, Texas 79925-1212*

APR 2 0 2004

| | |
|---|---|
| **MEMORANDUM FOR:** | PATROL AGENTS IN CHARGE AND UNIT SUPERVISORS EL PASO SECTOR |
| **FROM:** | Luis E. Barker **Chief Patrol Agent** El Paso Sector |
| **SUBJECT:** | Enforcement Activities at Schools, Places of Worship, and at Funeral or Other Religious Ceremonies |

Attached for your information are two policy memorandums sent to the field on June 20, 2001. Reiterate this policy relating to enforcement activities at schools, places of worship, funerals, or other religious ceremonies. Additionally, accompanying these memorandums is a directive issued by my office, in which I instruct all PAICs and Unit Supervisors to strictly adhere to the guidelines given in these two policy memorandums.

Please ensure that every agent understands this policy and complies with it. Agents should be aware of the locations that fall within the purview of these instructions to avoid any inadvertent or perceived violation of the policy.

Please distribute copies of these memorandums to every agent. You are directed to forward to Assistant Chief Patrol Agent (ACPA) Manuel Flores, Sr., a roster of your agents showing that they have received this material.

Should there be any questions, please contact ACPA Flores at (915) 834-8304.

Attachments



| | Date | | Initial | Date |
|---|---|---|---|---|
| D1 | | D11 | | |
| D2 | | D12 | | |
| D3 | | D13 | | |
| D4 | | D14 | | |
| D5 | | D15 | | |
| D6 | | D16 | | |
| D7 | | D17 | | |
| D8 | | D18 | | |
| D9 | | D19 | | |
| D10 | | D20 | | |





**U.S. Department of Justice**
Immigration and Naturalization Service

EPT 50/19.1.5

*U.S. Border Patrol Sector Headquarters*
*8901 Montana Avenue*
*El Paso, Texas 79925-1212*

**JUN 2 0** 2001

MEMORANDUM FOR ALL PATROL AGENTS IN CHARGE AND UNIT SUPERVISORS
EL PASO SECTOR

FROM:       Luis E. Barker
            Chief Patrol Agent
            El Paso Sector

SUBJECT:    Enforcement Activities at Schools, Places of Worship, or at Funeral or Other
            Religious Ceremonies.

        Attached for your information are two policy memorandums relating to enforcement
activities at schools, places of worship, funerals or other religious ceremonies. It is the policy of
the Service, and this Sector, to attempt to avoid apprehension of persons and to tightly control
investigative operations on the premises of schools, places of worship, funerals and other
religious ceremonies. All agents should be cognizant of the issues contained in these two memos
and be sensitive to the areas identified.

        As stated in the memo, this policy does not affect the scope of authority of Service
officers, but is directed to the operational implementation of such authority. The requirement for
approval in advance of such operations and actions on such premises should not be construed as
an indication of tolerance for any violation of the law by anyone at, or in charge of a school or
place of worship. All Patrol Agents in Charge, and Unit Supervisors should make sure their
agents understand that they should not conduct operations in these areas and should enter these
premises only in the most exigent of circumstances.

Memorandum for All Patro... gents in Charge and Unit Supervisors          Page 2
Subject:  Enforcement Activities at Schools, Places, of Worship, or at Funerals or Other
          Religious Ceremonies.

Please provide a roster of your agents to ACPA David Ham showing that they have received
a copy of these memos and that they have read and understand the contents. It is extremely
important in this era of increased interest in our activities on the border by a variety of special
interest groups that we understand and comply with this policy. If you have any questions
concerning this policy, please contact ACPA David Ham at (915) 834-8304.

Attachments

3/15/01  FRI 10:12 FAX 214 7877434        CRODDP              →→→ EPT BP                ⓘ002



**U.S. Department of Justice**
Immigration and Naturalization Service

COR 50/19.1.5

*Central Region*
*7701 N. Stemmons Freeway*
*Dallas, Texas 75247*

June 14, 2001

MEMORANDUM FOR DISTRICT DIRECTORS
                CHIEF PATROL AGENTS
                CENTRAL REGION

FROM:        Robert A. Wallis
             Acting Regional Director
             Central Region

SUBJECT:     Enforcement Activities at Schools, Places of Worship, or at Funerals or Other
             Religious Ceremonies.

It is the policy of the Service to attempt to avoid apprehension of persons and to tightly
control investigative operations on the premises of schools, places of worship, funerals and other
religious ceremonies.

On May 17, 1993, Acting Associate Commissioner for Operations, James A. Puleo, issued a
memorandum outlining the Service's policy on excludable areas for enforcement activities. The
memo first states that enforcement operations that are likely to involve apprehensions at schools,
places of worship, or at funerals or other religious ceremonies must be approved in advance by
the District Director or Chief Patrol Agent. The Assistant District Directors or Deputy Chief
Patrol Agents may approve inspections of records; preliminary investigative activities relating to
a specific individual or individuals which will not entail contact with the person under
investigation; and similar activities at such locations when apprehensions will not be made.

For the purposes of this policy, the term "schools" includes preschools; primary, secondary,
and post-secondary schools (including colleges and universities); and other institutions of
learning such as vocational or trade schools. "Places of worship" includes such institutions as
churches, temples, and synagogues. "Other religious ceremonies" include gravesite ceremonies
and rosaries. The requirement for advance approval of operations in such locations should not be
construed as tolerance for violations of the law by or on the premises of such institutions.

Page 1 of 2

15-N-000076

8/15/01   FRI 10:13 FAX 214 7877434          CRODDP                →→→ EPT BP                ☑003

)

Memorandum for District Directors and Chief Patrol Agents                    Page 2 of 2
Subject:  Enforcement activities at schools, places of worship, or at funerals or other religious
          ceremonies.


In determining the appropriateness of a proposed action, District Directors and Chief Patrol
Agents are to consider:  (1) the availability of alternative measures that would achieve the
enforcement objective; (2) the importance of the enforcement objective in the context of INS
priorities; (3) measures that can be taken to minimize the impact on the operation of the school
or place of worship; and (4) whether the action has been requested or approved by the
management of the institution involved.

Michael A. Pearson, Executive Associate Commissioner for Field Operations, must approve
exceptions to the policy.  Also, INS headquarters might make exceptions in unusual situations,
such as during a declared national emergency.

The memo added that situations that do not permit written authorization before entering
schools or places of worship, "officers are expected to exercise good judgement concerning the
appropriate action to take."  The officer must report all exigent circumstances that mandated
deviation from the set policy.

Finally, the memo noted that where operations covered by the policy are planned in advance,
the general practice for Border Patrol Agents requires that the operation be conducted in plain
clothes.  However, in exigent circumstances the agents should consider the likelihood that they
will be identified as law enforcement officers, because in such circumstances the absence of a
uniform might mitigate against a pursuit.

This directive does not affect the scope of authority of Service officers under the Immigration
and Nationality Act, but is directed to the operational implementation of such authority.  The
requirement for approval in advance of such operations and actions on such premises should not
be construed as an indication of tolerance for any violation of the law by anyone at, or in charge
of a school or place of worship.  This directive is an internal statement of procedure, which does
not confer any benefits upon nor impose any requirement upon anyone other than Service
officers as a part of a uniform exercise of delegated authority

Should you have any questions regarding this procedure, please call Robert E. Jolicoeur,
Deputy Assistant Regional Director, Detention and Removal, at (214) 905-8337.

# Immigration Information

**onlineplus**

INSERTS PLUS/U.S. Border Patrol Handbook/Chapter 5: Arrest and Search

<u>Chapter 5: Arrest and Search</u>

| | |
|---|---|
| **5.1** | <u>Law Enforcement Activities at Schools and Places of Worship</u> |
| **5.2** | <u>Seizure of Conveyances</u> |
| **5.3** | <u>Civil Rights in Law Enforcement</u> |
| **5.4** | <u>Approach and Techniques</u> |
| **5.5** | <u>Handling Persons in Custody and Official Government Data Systems</u> |
| **5.6** | <u>Post-arrest Procedures</u> |

## References:

8 USC Sections 1324 and 1357
18 USC Sections 981 and 982
Immigration and Nationality Act: Sections <u>274</u> and <u>287</u>
8 CFR Sections <u>274</u> and Part <u>287</u>
28 CFR Part 9

*Officers' Handbook* (<u>M-68</u>), *Asset Forfeiture Office Manual on Conveyance Seizures, The Law of Search and Seizure for Immigration Officers* (<u>M-69</u>), *Administrative Manual*, sections <u>5.2.101</u> and <u>3.2.209</u>; *Protective Measures for PC's* (Policy Memorandum)

Note: Border Patrol policies prior to the establishment of the Homeland Security Agency remain in effect pending any revision created by the CBP.

## 5.1     Law Enforcement Activities at Schools and Places of Worship

(a) Authority. Border Patrol Agents may interrogate, without warrant, any alien or person believed to be an alien regarding the person's right to be in or remain in the United States. However, 8 USC Section 1357 allows agents to question persons who are believed to be in the United States illegally is limited by the Fourth Amendment. The Bureau of Customs and Border Protection (CBP) has placed further limitations on the exercise of this authority with regard to schools and places of worship.

INS#usbp-chap5

(b) Protection for Schools and Places of Worship. CBP Policy requires written approval from the Chief Patrol Agent or the Deputy Chief Patrol Agent prior to any enforcement related activities at schools or places of worship (see Appendix 5-1 currently the INS policy memorandum dated May 17, 1993 which discusses enforcement activities at schools and places of worship, or at funerals or other religious services.

(1)    Schools. The Federal Courts have established that the public interest is served when students and their teachers are free from undue interference from law enforcement officers. In order to ensure that there is no perception of undue interference, the CBP refers to the INS policy dated March 7, 2002 (see Appendix 5-2), any enforcement operation that involves the targeting of foreign students and/or schools that are authorized to accept foreign students for enrollment shall be reported to Headquarters prior to conducting such an operation.

(2) Places of Worship. Similar considerations apply to places of worship. The first amendment of the Constitution ensures the free practice of religion and the separation of church and State. Enforcement activity near places of worship may be construed as the Government's intrusion into a person's free expression of his or her faith. Furthermore, it may be seen as a state-sanctioned infringement of or hindrance to a particular religion and implied support of another.

(A) Because schools and places of worship are *accessible to the public*, they are areas that a Border Patrol Agent may enter. However, the consequences of such entry must be considered. Often the CBP and the public are better served by an agent's careful approach and ability to use alternative enforcement techniques.

(B) Exceptions. There are exceptions to the general avoidance of enforcement activities at schools and places of worship. These are cases when all other avenues have been exhausted, or when the safety of officers or the public is at risk. In such a situation, the Border Patrol Agent is to notify his her immediate supervisor as soon as possible.

(C) These restrictions apply only to enforcement activities. The agents will, in the course of their duties, enter schools or places of worship for the purpose of public relations, canine demonstrations, career fairs, and other community functions.

## 5.2 Seizure of Conveyances

(a) <u>Authority</u>. 8 USC Section 1324(b) authorizes Border Patrol Agents to seize for forfeiture any conveyance, including any vehicle, vessel, or aircraft used in the committing a violation of 8 USC Section 1324(a) unless the conveyance is established by the owner to have been unlawfully in the possession of a person other than the owner in violation of criminal laws (see <u>8 CFR Section 274.5(b)(2)</u>) or the conveyance was used in an act to which the owner was not privy did not consent, and the owner took all reasonable steps to prevent illegal use of the conveyance (see <u>8 CFR Section 274.5(c)(3)</u>).

# Exhibit 14



*Office of Investigations*

**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

### DEC 2 6 2007

| | |
|---|---|
| **MEMORANDUM FOR:** | All Assistant Directors |
| | All Special Agents in Charge |
| | All Deputy Assistant Directors |
| | |
| **FROM:** | Marcy M. Forman |
| | Director, Office of Investigations |
| | |
| **SUBJECT:** | Enforcement Actions at Schools |

The presence of our law enforcement agents conducting investigative activity at schools, or in venues where children's activities occur, has always been a point of particular sensitivity, especially given the public's interest in ICE's mission. Accordingly, it is important to emphasize that great care and forethought be applied before undertaking any investigative or enforcement type action at or near schools, other institutions of education, and *venues* generally where children and their families may be present.

Accordingly, the following policy is immediately effective.

When an enforcement action or investigative activity includes possibility of detention or questioning of subjects at the above listed sites, the first line supervisor shall generate a request memorandum seeking approval from the Special Agent in Charge. The memorandum must be reviewed and approved by the Special Agent in Charge prior to the anticipated activity and notification must be made to the appropriate Headquarters Operations Manager.

This policy does not apply to cases or investigations involving situations where no enforcement activity is contemplated, such as requesting information from school officials, retrieving records, or otherwise routine non-enforcement activity. This policy also does not apply to terrorism-related investigations, cases of public safety or other cases that can be articulated. However, when time and circumstances permit, offices are required to provide appropriate notice to Headquarters of any enforcement action at any of the above listed sensitive locations.

All employees should be cognizant of the sensitivity of engaging in arrests or other enforcement activities at areas where children are present, such as educational institutions. Exercising common sense and good judgment will prevent situations that would negatively impact our ability to protect the safety and security of the Homeland.

A formal Directive is currently being drafted. This memorandum will serve as the interim policy regarding enforcement activities at schools. Your cooperation in implementing this policy is appreciated.

www.ice.gov

REL0000024903

# Exhibit 15

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)

*Office of the Assistant Secretary*

U.S. **Department of Homeland Security**
425 I Street, NW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

July 3, 2008

MEMORANDUM FOR:    All Field Office Directors
                                 All Special Agents in Charge

FROM:                        Julie L. Myers
                         Assistant Secretary

SUBJECT:             <u>Field Guidance on Enforcement Actions or Investigative Activities
At or Near Sensitive Community Locations</u>

ICE personnel should refrain from conducting enforcement actions or investigative activities at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies, except in limited circumstances as set forth within this memorandum. Such restraint strikes a balance between our law enforcement responsibilities and the public's confidence in the way ICE executes its mission.

Precedent for this approach is clear. Under Immigration and Naturalization Service (INS) Policy HQ 807-P, <u>Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies</u> (May 17, 1993), law enforcement personnel were directed to:

> *"[A]ttempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies."*

ICE policies are in place to ensure that our personnel conduct enforcement operations in a manner that is safe and respectful of all persons. This policy was recently reinforced in a December 26, 2007 Memorandum from Marcy M. Forman, Director, Office of Investigations, entitled <u>Enforcement Actions at Schools</u>. This field guidance clearly states that ICE views these actions with particular sensitivity:

> *"[I]t is important to emphasize that great care and forethought be applied before undertaking any investigative or enforcement type action at or near schools, other institutions of education, and venues generally where children and their families may be present."*

Policies governing ICE Office of Detention and Removal (DRO) Fugitive Operations Teams have similarly discouraged enforcement actions in these sensitive locations. Furthermore, all of our enforcement actions have been, and should continue to be, thoroughly planned, reviewed, and approved by senior field office personnel so that both the public's safety and our national security are guaranteed.

REL0000024902

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)

FYM-000081

SUBJECT: Field Guidance on Enforcement Actions or Investigative Activities At or Near
Sensitive Community Locations
Page 2

While ICE policies and procedures do not specifically preclude enforcement actions or
investigative activities at the aforementioned locations, the direction of INS HQ807-P remains in
effect.

Consistent with these policies, including INS HQ807-P, there may be specific situations
requiring ICE personnel to act at or near sensitive locations. Such situations would include those
involving terrorism-related investigations, matters of public safety, or actions where no
enforcement activity is involved, such as requesting information from school officials, retrieving
records, or otherwise routine, non-enforcement activity. Any such case must be raised to the
appropriate Headquarters program office prior to any action or, in exigent circumstances, as soon
as practicable. Moreover, personnel are reminded to be cognizant of the impact of their activity,
exercise good judgment and act with an appropriate level of compassion in light of the location
while exercising their authority in such circumstances.

This policy should not be construed as an indication of tolerance for any violations of the law by
anyone at or in charge of any of these sensitive locations. A formal ICE Policy Directive
providing policy and procedures for these enforcement actions and/or investigative activities will
be issued in the near future.

REL0000024902

# Exhibit 16

Policy Number: 10029.2
FEA Number: 306-112-002b

U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration and Customs Enforcement**

OCT 2 4 2011

MEMORANDUM FOR:    Field Office Directors
                   Special Agents in Charge
                   Chief Counsel

FROM:              John Morton
                   Director

SUBJECT:           Enforcement Actions at or Focused on Sensitive Locations

Purpose

This memorandum sets forth Immigration and Customs Enforcement (ICE) policy regarding certain enforcement actions by ICE officers and agents at or focused on sensitive locations. This policy is designed to ensure that these enforcement actions do not occur at nor are focused on sensitive locations such as schools and churches unless (a) exigent circumstances exist, (b) other law enforcement actions have led officers to a sensitive location as described in the *"Exceptions to the General Rule"* section of this policy memorandum, or (c) prior approval is obtained. This policy supersedes all prior agency policy on this subject.[1]

Definitions

The enforcement actions covered by this policy are (1) arrests; (2) interviews; (3) searches; and (4) for purposes of immigration enforcement only, surveillance. Actions not covered by this policy include actions such as obtaining records, documents and similar materials from officials or employees, providing notice to officials or employees, serving subpoenas, engaging in Student and Exchange Visitor Program (SEVP) compliance and certification visits, or participating in official functions or community meetings.

The sensitive locations covered by this policy include, but are not limited to, the following:

---

[1] Memorandum from Julie L. Myers, Assistant Secretary, U.S. Immigration and Customs Enforcement, "Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations" 10029.1 (July 3, 2008); Memorandum from Marcy M. Forman, Director, Office of Investigations, "Enforcement Actions at Schools" (December 26, 2007); Memorandum from James A. Puleo, Immigration and Naturalization Service (INS) Acting Associate Commissioner, "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" HQ 807-P (May 17, 1993). This policy does not supersede the requirements regarding arrests at sensitive locations put forth in the Violence Against Women Act, see Memorandum from John P. Torres, Director Office of Detention and Removal Operations and Marcy M. Forman, Director, Office of Investigations, "Interim Guidance Relating to Officer Procedure Following Enactment of VAWA 2005 (January 22, 2007).

- schools (including pre-schools, primary schools, secondary schools, post-secondary schools up to and including colleges and universities, and other institutions of learning such as vocational or trade schools);
- hospitals;
- churches, synagogues, mosques or other institutions of worship, such as buildings rented for the purpose of religious services;
- the site of a funeral, wedding, or other public religious ceremony; and
- a site during the occurrence of a public demonstration, such as a march, rally or parade.

This is not an exclusive list, and ICE officers and agents shall consult with their supervisors if the location of a planned enforcement operation could reasonably be viewed as being at or near a sensitive location. Supervisors should take extra care when assessing whether a planned enforcement action could reasonably be viewed as causing significant disruption to the normal operations of the sensitive location. ICE employees should also exercise caution. For example, particular care should be exercised with any organization assisting children, pregnant women, victims of crime or abuse, or individuals with significant mental or physical disabilities.

<u>Agency Policy</u>

*General Rule*

Any planned enforcement action at or focused on a sensitive location covered by this policy must have prior approval of one of the following officials: the Assistant Director of Operations, Homeland Security Investigations (HSI); the Executive Associate Director (EAD) of HSI; the Assistant Director for Field Operations, Enforcement and Removal Operations (ERO); or the EAD of ERO. This includes planned enforcement actions at or focused on a sensitive location which is part of a joint case led by another law enforcement agency. ICE will give special consideration to requests for enforcement actions at or near sensitive locations if the only known address of a target is at or near a sensitive location (e.g., a target's only known address is next to a church or across the street from a school).

*Exceptions to the General Rule*

This policy is meant to ensure that ICE officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations and make substantial efforts to avoid unnecessarily alarming local communities. <u>The policy is not intended to categorically prohibit lawful enforcement operations when there is an immediate need for enforcement action as outlined below.</u> ICE officers and agents may carry out an enforcement action covered by this policy without prior approval from headquarters when one of the following exigent circumstances exists:

- the enforcement action involves a national security or terrorism matter;
- there is an imminent risk of death, violence, or physical harm to any person or property;

Enforcement Actions at or Focused on Sensitive Locations
Page 3

- the enforcement action involves the immediate arrest or pursuit of a dangerous felon, terrorist suspect, or any other individual(s) that present an imminent danger to public safety; or
- there is an imminent risk of destruction of evidence material to an ongoing criminal case.

When proceeding with an enforcement action under these extraordinary circumstances, officers and agents must conduct themselves as discretely as possible, consistent with officer and public safety, and make every effort to limit the time at or focused on the sensitive location.

If, in the course of a planned or unplanned enforcement action that is not initiated at or focused on a sensitive location, ICE officers or agents are subsequently led to or near a sensitive location, barring an exigent need for an enforcement action, as provided above, such officers or agents must conduct themselves in a discrete manner, maintain surveillance if no threat to officer safety exists and immediately consult their supervisor prior to taking other enforcement action(s).

Dissemination

Each Field Office Director, Special Agent in Charge, and Chief Counsel shall ensure that the employees under his or her supervision receive a copy of this policy and adhere to its provisions.

Training

Each Field Office Director, Special Agent in Charge, and Chief Counsel shall ensure that the employees under his or her supervision are trained (both online and in-person/classroom) annually on enforcement actions at or focused on sensitive locations.

No Private Right of Action

Nothing in this memorandum is intended to and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

This memorandum provides management guidance to ICE officers exercising discretionary law enforcement functions, and does not affect the statutory authority of ICE officers and agents, nor is it intended to condone violations of federal law at sensitive locations.

# Exhibit 17



U.S. Customs and
Border Protection

**JAN 1 8 2013**

Deputy Commissioner

MEMORANDUM FOR:    See Distribution

FROM:              David V. Aguilar
                   Deputy Commissioner

SUBJECT:           U.S. Customs and Border Protection Enforcement Actions at or
                   Near Certain Community Locations

The presence of U.S. Customs and Border Protection (CBP) Officers and Agents conducting enforcement activities at or near schools, places of worship, and certain other community locations has been a sensitive issue. Accordingly, careful consideration and planning must be undertaken, as outlined herein, in relation to enforcement actions conducted at or near these establishments.

The following establishments should be considered to be within the context of this policy:

- schools, including pre-schools, primary schools, secondary schools, post-secondary schools, vocational or trade schools, and colleges and universities;
- places of worship, including places where funerals, weddings, or other public religious ceremonies are taking place;
- community centers; and
- hospitals.

CBP personnel should consult their supervisors for guidance when an enforcement action is being contemplated or planned at or near a location not specifically listed above but that may be similar in nature, description, or function. In assessing the appropriateness of a proposed action, supervisors should consider alternative measures that could achieve the enforcement objective without causing significant disruption to the normal activities or operations at the identified location, including the importance of the enforcement objective in furthering CBP's mission.

When CBP enforcement actions or investigative activities are likely to lead to an apprehension at or near such locations, written approval by the Chief Patrol Agent, Director of Field Operations, Director of Air and Marine Operations or the Internal Affairs Special Agent in Charge is required. The Deputy to these offices may approve the inspection of records, preliminary investigative activities, and similar activities at these locations where apprehensions are not likely to be made.

This policy does not summarily preclude enforcement actions at the listed locations. When situations arise that call for enforcement actions at or near the above-mentioned establishments without prior written approval, Agents and Officers are expected to exercise sound judgment and

U.S. Customs and Border Protection Enforcement Action at or
Near Certain Community Locations
Page 2

common sense while taking appropriate action. Exigent circumstances, including matters related
to national security, terrorism, or public safety, requiring an Agent or Officer to enter these
establishments, must be reported immediately through the respective chain of command, as
applicable.

This policy does not limit or otherwise apply to CBP operations that are conducted at or near the
international border (including the functional equivalent of the border), or CBP operations that
bear nexus to the border including, for example, but not limited to smuggling interdiction efforts
that result in transportation to a hospital, custodial monitoring of injured aliens in CBP custody
that require hospitalization, or a controlled delivery from the border that concludes in close
proximity of one of the aforementioned locations.

This CBP policy guidance memorandum, which may be modified, superseded, or rescinded by
CBP at any time without notice, is not intended to, does not, and may not be relied upon to
create, any right or benefit, substantive or procedural, for any party.


Distribution:    Assistant Commissioner, Office of Air and Marine
                 Assistant Commissioner, Office of Field Operations
                 Assistant Commissioner, Office of Internal Affairs
                 Chief, Office of Border Patrol
                 Chief Counsel

# Exhibit 18

## United States Senate

WASHINGTON, DC 20510

October 17, 2017

The Honorable Elaine Duke
Acting Secretary of Homeland Security
U.S. Department of Homeland Security
3801 Nebraska Avenue NW
Washington, DC 20528

Dear Acting Secretary Duke:

We write to share our growing concerns over reports of violations of U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) policies on enforcement actions at sensitive locations. We ask that your Department clarify its policies on sensitive locations and provide basic statistical data on compliance with them.

As you know, your Department has longstanding policies that prohibit enforcement actions at or near sensitive locations. In 2011, the then-ICE Director issued a memorandum, *Enforcement Actions at or Focused on Sensitive Locations,* that prohibits enforcement actions at or focused on a sensitive location unless exigent circumstances exist or prior approval is obtained.[1] Enforcement actions include arrests, interviews, searches, and immigration enforcement-related surveillance at or near locations such as hospitals, schools and places of worship, and sites used for religious ceremonies or public demonstrations. In 2013, the then-CBP Deputy Commissioner issued a similar memo, *U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations.*[2] Later, ICE and CBP issued FAQs to further clarify the types of locations that are considered "sensitive" to cover locations such as licensed daycares, school bus stops, accredited health clinics and urgent care facilities.[3] The memos direct ICE and CBP officers and agents to follow these orders at all times, with the exception of cases where prior approval was obtained or under exigent circumstances.

However, since President Trump's issuance of Executive Order 13768, *Enhancing Public Safety in the Interior of the United States*, and Executive Order 13767, *Border Security and Immigration Enforcement Improvements,* we have heard reports of CBP and ICE agents apprehending undocumented immigrants in sensitive locations and other critical sites that provide basic services. Agents have reportedly arrested a father while he dropped off his children at school, a domestic

---

[1] *Enforcement Actions at or Focused on Sensitive Locations,* U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, October 24, 2011, https://www.ice.gov/doclib/ero-outreach/pdf/10029.2-policy.pdf.
[2] *U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations,* U.S. CUSTOMS AND BORDER PROTECTION, January 18, 2013, http://foiarr.cbp.gov/streamingWord.asp?i=1251.
[3] *FAQ on Sensitive Locations and Courthouse Arrests,* U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, https://www.ice.gov/ero/enforcement/sensitive-loc; *Sensitive Locations FAQs,* U.S. CUSTOMS AND BORDER PROTECTION, https://www.cbp.gov/border-security/sensitive-locations-faqs.

**United States Senate**

WASHINGTON, DC 20510

violence victim at a courthouse, and a group of men exiting a church shelter, among others.[4] These reports have generated fear in immigrant communities, leading some families to cancel medical appointments or not send their children to school.[5] Reports of instances that seem to violate the sensitive locations policy make it difficult for educators, health care providers, and program administrators to be able to assure families that their locations remain safe from immigration enforcement actions.

Most recently, we have been alarmed by the reported apprehension of Irma Francisca Quinones Alamillo and Oscar Enrique Sanchez Islas in May 2017.[6] According to the National Immigrant Justice Center, Mr. Sanchez Islas and Ms. Quinones Alamillo took their two-month-old baby to a hospital for pyloric stenosis, a serious condition that causes infants to vomit and lose weight. At the hospital, they were allegedly apprehended by a Border Patrol agent and later taken away for fingerprinting and booking.[7]

If these reports are true, they constitute an apparent breach of ICE and CBP rules, as well as the trust that our communities put in your Department. Given our concerns, we ask that you provide answers to the following questions within 30 days.

SENSITIVE LOCATIONS STATISTICS AND POLICY

- Please provide the following ICE and CBP statistics on enforcement actions at or focused on sensitive locations, by year. *(For ICE, please provide statistics from the policy's inception date of October 2011 to the present. For CBP, please provide statistics from the policy's inception date of January 2013 to the present.)*
    - Number and location of enforcement actions at or focused on sensitive locations. Please note the actions that received prior approval or involved an exigent circumstance.
    - Number of recorded violations of the sensitive locations policy.
- Who, if anyone, monitors compliance with the sensitive locations policy?
- How are complaints about violations of the sensitive locations policy typically reported? Who investigates these complaints?
- What is the standard procedure when an ICE or CBP officer or agent violates the sensitive locations policy?

---

[4] Jade Hernandez, *Undocumented dad taken by ICE while dropping kids off at school*, ABC 7, March 3, 2017, http://abc7.com/1782230/; Marty Schladen, *ICE detains alleged domestic violence victim*, EL PASO TIMES, February 15, 2017, http://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/; Nick Iannelli, *ICE raid near Fairfax Co. church raises questions*, WTOP, February 17, 2017, http://wtop.com/fairfax-county/2017/02/alexandria-ice-raid-near-church-raises-questions/slide/1/.

[5] Moriah Balingit and Emma Brown, *'Your child is safe': Schools address deportation fears among immigrant families*, WASHINGTON POST, March 19, 2017, https://www.washingtonpost.com/local/education/your-child-is-safe-schools-address-deportation-fears-among-immigrant-families/2017/03/19/5f8877ae-09be-11e7-93dc-00f9bdd74ed1_story.html?utm_term=.2dce921ccc3d.

[6] John Burnett, *Border Patrol Arrests Parents While Infant Awaits Serious Operation*, NPR, September 20, 2017, http://www.npr.org/2017/09/20/552339976/border-patrol-arrests-parents-while-infant-awaits-serious-operation.

[7] Heidi Altman, *Parents Take Sick Baby To Emergency Room – And Face Deportation For It*, NATIONAL IMMIGRANT JUSTICE CENTER, September 20, 2017, https://immigrantjustice.org/staff/blog/parents-take-sick-baby-emergency-room-and-face-deportation-it.

**United States Senate**

WASHINGTON, DC 20510

- What training do ICE and CBP officers receive on the sensitive locations policy? How often do they receive this training? Who conducts the training?
- As part of the Department's outreach program with local organizations, does the Department enlist help from hospitals, schools, or other institutions defined as sensitive locations to report undocumented immigrants who appear on their premises?

IRMA FRANCISCA QUINONES ALAMILLO & OSCAR ENRIQUE SANCHEZ ISLAS' CASE

- Did the Border Patrol agents seek and receive supervisory approval to question these parents at the hospital? Was this questioning an "enforcement action"?
- Did agents violate CBP's sensitive locations policy when they apprehended Irma Francisca Quinones Alamillo and Oscar Enrique Sanchez Islas at the hospital? If so, what are the ramifications?
- Was the option, reported in the *New York Times* two years ago, of obtaining "short-term visas or so-called humanitarian parole to travel beyond [checkpoints]"[8] available and communicated to the parents?
- After reviewing the incident, do you believe that CBP should have done anything differently?
- In 2013, then-CBP Deputy Commissioner David Aguilar wrote that enforcement actions are generally prohibited "at or near" sensitive locations. How does the CBP define "near"? For instance, would the parking lot of a hospital be considered "near" a sensitive location?
- In the same memo, Mr. Aguilar writes that the sensitive locations policy "does not limit or otherwise apply to CBP operations that are conducted at or near the international border." How does CBP define "near the international border"? Does the Rio Grande Valley hospital, where a Border Patrol agent apprehended Mr. Sanchez Islas and Ms. Quinones Alamillo, fall under this definition?

We look forward to your timely response, and urge the Department to monitor and enforce compliance with ICE and CBP sensitive locations policy.

Sincerely,

Richard Blumenthal
United States Senate

Patrick Leahy
United States Senate

Edward J. Markey
United States Senate

Chris Van Hollen
United States Senate

---

[8] Manny Fernandez, *Checkpoints Isolate Many Immigrants in Texas' Rio Grande Valley,* NEW YORK TIMES, November 22, 2015, https://www.nytimes.com/2015/11/23/us/checkpoints-isolate-many-immigrants-in-texas-rio-grande-valley.html.

# United States Senate

## WASHINGTON, DC 20510

Kirsten Gillibrand
United States Senate

Cory A. Booker
United States Senate

Tim Kaine
United States Senate

Tammy Duckworth
United States Senate

Elizabeth Warren
United States Senate

Dianne Feinstein
United States Senate

Sheldon Whitehouse
United States Senate

Al Franken
United States Senate

Catherine Cortez Masto
United States Senate

Bernard Sanders
United States Senate

Robert Menendez
United States Senate

Jeffrey A. Merkley
United States Senate

Richard J. Durbin
United States Senate

Kamala D. Harris
United States Senate

Tom Udall
United States Senate

Ron Wyden
United States Senate

cc: CBP Acting Commissioner McAleenan
ICE Acting Director Homan
DHS Inspector General Roth

# Exhibit 19



**United States Government Accountability Office**

Report to Congressional Requesters

**July 2021**

# IMMIGRATION ENFORCEMENT

# Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations



**GAO-21-487**

# GAO@100
# Highlights

Highlights of GAO-21-487, a report to congressional requesters

July 2021

# IMMIGRATION ENFORCEMENT

## Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations

## Why GAO Did This Study

In recent years, some U.S. citizens have claimed that they were mistakenly detained or removed by ICE and held by CBP on administrative immigration charges. Such charges are based on civil violations of U.S. immigration law, but these charges are not applicable to U.S. citizens.

GAO was asked to review issues related to U.S. citizens detained by ICE or held by CBP on administrative immigration charges. This report examines (1) the extent to which ICE and CBP have developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers and agents encounter; (2) ICE and CBP data on U.S. citizens detained by ICE or held by CBP on administrative immigration charges; and (3) the extent to which ICE has developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers identify for detainers. GAO analyzed DHS documents and record-level enforcement data, and interviewed DHS officials at headquarters and in the field.

## What GAO Recommends

GAO recommends that ICE (1) update its training materials to reflect ICE policies regarding potential U.S. citizens, and (2) systematically collect and maintain electronic data of its encounters with individuals for whom there is evidence of potential U.S. citizenship. DHS concurred with the recommendations.

View GAO-21-487. For more information, contact Rebecca Gambler at (202) 512-8777 or gamblerr@gao.gov.

## What GAO Found

Department of Homeland Security's (DHS) U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) have policies and procedures for investigating citizenship, but some ICE guidance is inconsistent. Specifically, ICE policy requires officers to interview individuals claiming U.S. citizenship in the presence of, or in consultation with, a supervisor, but its training materials direct officers to end questioning if the officer believes the individual and the evidence suggests the individual is a U.S. citizen—without consulting a supervisor. By making its training materials consistent with ICE policy, ICE would have more assurance that all encounters with potential U.S. citizens receive appropriate supervisory review.

Further, while ICE policy requires officers to document citizenship investigations in ICE data systems, it does not require officers to update the citizenship field after identifying evidence that an individual may be a U.S. citizen. As a result, ICE does not know the extent to which its officers are taking enforcement actions against individuals who could be U.S. citizens. By systematically collecting and maintaining electronic data, ICE would have better insight into its officers' enforcement of administrative immigration law.

Available data indicate ICE and CBP took enforcement actions against some U.S. citizens. For example, available ICE data indicate that ICE arrested 674, detained 121, and removed 70 potential U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020 (March 2020).

**U.S. Immigration and Customs Enforcement (ICE) Enforcement Actions Against Potential U.S. Citizens from Fiscal Years 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of ICE data. | GAO-21-487

ICE has policies and procedures for investigating citizenship of individuals for detainers. Detainers are notices from ICE to other law enforcement agencies that articulate probable cause for removability. They also request for such agencies to inform DHS of a removable individual's pending release date and to maintain custody for up to 48 hours to allow DHS to assume custody. ICE officers are, to the extent feasible, to interview individuals in the custody of another law enforcement agency to aid in assessing the individuals' potential citizenship prior to issuing detainers. Available ICE data indicate ICE issued detainers for at least 895 potential U.S. citizens from fiscal year 2015 through the second quarter of 2020 and cancelled about 74 percent of those detainers.

_____ **United States Government Accountability Office**

# Contents

Letter                                                                                            1

                        Background                                                                6
                        ICE and CBP Have Policies and Procedures for Investigating
                            Citizenship, but Some ICE Guidance Is Inconsistent                    11
                        Available Data Indicate ICE and CBP Took Enforcement Actions
                            Against Some U.S. Citizens                                            18
                        ICE Has Policies and Procedures for Investigating Citizenship for
                            Detainers and Issued Detainers for a Small Number of Potential
                            U.S. Citizens                                                         36
                        Conclusions                                                               42
                        Recommendations for Executive Action                                      43
                        Agency Comments and Our Evaluation                                        43

Appendix I              Objectives, Scope, and Methodology                                        46

Appendix II             Department of Homeland Security (DHS) Complaint Data                      54

Appendix III            Data on Department of Homeland Security's
                        (DHS) Detention and Holding of U.S. Citizens                              60

Appendix IV             Comments from the Department of Homeland Security                         83

Appendix V              GAO Contact and Staff Acknowledgments                                     86

Tables

                        Table 1: Selected Department of Homeland Security (DHS)
                            Components' Roles in Immigration Enforcement                          9
                        Table 2: U.S. Immigration and Customs Enforcement (ICE)
                            Enforcement and Removal Operations (ERO) Arrests of
                            Individuals for Whom ERO Data Indicate Potential U.S.
                            Citizenship and Individuals with Unknown Citizenship from
                            Fiscal Year 2015 through 2020 Quarter 2 (March 2020)                  22

Table 3: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Detentions
of Individuals for Whom ERO Data Indicate Potential U.S.
Citizenship and Individuals with Unknown Citizenship from
Fiscal Year 2015 through 2020 Quarter 2 (March 2020)          23

Table 4: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Releases of
Individuals for Whom ERO Data Indicate Potential U.S.
Citizenship and Individuals with Unknown Citizenship from
ICE Detention Facilities from Fiscal Year 2015 through
2020 Quarter 2 (March 2020)                                   24

Table 5: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations Removals (ERO)
of Individuals for Whom ERO Data Indicate Potential U.S.
Citizenship and Individuals with Unknown Citizenship from
Fiscal Year 2015 through 2020 Quarter 2 (March 2020)         24

Table 6: U.S. Border Patrol (Border Patrol) Arrests of U.S.
Citizens and Individuals with Unknown Citizenship from
Fiscal Year 2015 through 2020 Quarter 2 (March 2020)         33

Table 7: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operation (ERO) Detainers
Issued for Individuals for Whom ERO Data Indicate
Potential U.S. Citizenship and Individuals with Unknown
Citizenship from Fiscal Year 2015 through 2020 Quarter 2
(March 2020)                                                 39

Table 8: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Detainers
for Individuals for Whom ERO Data Indicate Potential U.S.
Citizenship by Age from Fiscal Year 2015 through 2020
Quarter 2 (March 2020)                                       41

Table 9: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Detainers
Issued for Individuals for Whom ERO Data Indicate
Potential U.S. Citizenship by Cancellation Reason from
Fiscal Year 2015 through 2020 Quarter 2 (March 2020)         42

Table 10: U.S. Department of Homeland Security (DHS) Office of
the Inspector General (OIG) Number of Complaints
Received Related to Individuals Claiming to be U.S.
Citizens Subject to Enforcement Actions by DHS from
Fiscal Year 2015 through 2020 Quarter 2 (March 2020)         55

Table 11: U.S. Department of Homeland Security (DHS) Office of
the Inspector General (OIG) Complaints Received

Related to Individuals Claiming to be U.S. Citizens
Subject to Enforcement Actions by DHS from Fiscal Year
2015 through 2020 Quarter 2 (March 2020)    56

Table 12: U.S. Department of Homeland Security (DHS) Office for
Civil Rights and Civil Liberties (CRCL) Number of
Complaints Received Related to Individuals Claiming to
be U.S. Citizens Subject to Enforcement Actions by DHS
from Fiscal Year 2015 through 2020 Quarter 2 (March
2020)    57

Table 13: U.S. Department of Homeland Security (DHS) Office for
Civil Rights and Civil Liberties (CRCL) Complaints
Received Related to Individuals Claiming to be U.S.
Citizens Subject to Enforcement Actions by DHS from
Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    58

Table 14: U.S. Department of Homeland Security (DHS) Office for
Civil Rights and Civil Liberties (CRCL) Records Initiated
from Media Reports Related to Individuals Claiming to be
U.S. Citizens Subject to Enforcement Actions by DHS
from Fiscal Year 2015 through 2020 Quarter 2 (March
2020)    59

Table 15: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Arrests of
Individuals for Whom ERO Data Indicate Potential U.S.
Citizenship by Criminal History from Fiscal Year 2015
through 2020 Quarter 2 (March 2020)    61

Table 16: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Detentions
of Individuals for Whom ERO Data Indicate Potential U.S.
Citizenship by Criminal History from Fiscal Year 2015
through 2020 Quarter 2 (March 2020)    62

Table 17: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Detentions
of Individuals for Whom ERO Data Indicate Potential U.S.
Citizenship by Release Reason from Fiscal Year 2015
through 2020 Quarter 2 (March 2020)    64

Table 18: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Releases of
Individuals for Whom ERO Data Indicate Potential U.S.
Citizenship by Criminal History from Fiscal Year 2015
through 2020 Quarter 2 (March 2020)    64

Table 19: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Releases of

Individuals for Whom ERO Data Indicate Potential U.S.
Citizenship by Release Reason from Fiscal Year 2015
through 2020 Quarter 2 (March 2020)    66

Table 20: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Removals
of Individuals for Whom ERO Data Indicate Potential U.S.
Citizenship by Criminal History from Fiscal Year 2015
through 2020 Quarter 2 (March 2020)    66

Table 21: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Removals
of Individuals for Whom ERO Data Indicate Potential U.S.
Citizenship by Case Status from Fiscal Year 2015 through
2020 Quarter 2 (March 2020)    68

Table 22: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Detainers
Issued for Individuals for Whom ERO Data Indicate
Potential U.S. Citizenship by Criminal History from Fiscal
Year 2015 through 2020 Quarter 2 (March 2020)    69

Table 23: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Detainers
Issued for Individuals for Whom ERO Data Indicate
Potential U.S. Citizenship by Detention Facility Type from
Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    71

Table 24: U.S. Customs and Border Protection (CBP) Office of
Field Operations (OFO) Admissibility Referrals of U.S.
Citizens for Secondary Inspection from Fiscal Year 2015
through 2020 Quarter 2 (March 2020)    73

Table 25: U.S. Customs and Border Protection (CBP) Office of
Field Operations (OFO) Admissibility Referrals of U.S.
Citizens for Secondary Inspection by Gender from Fiscal
Year 2015 through 2020 Quarter 2 (March 2020)    74

Table 26: U.S. Customs and Border Protection (CBP) Office of
Field Operations (OFO) Admissibility Referrals of U.S.
Citizens for Secondary Inspection by Age from Fiscal
Year 2015 through 2020 Quarter 2 (March 2020)    74

Table 27: U.S. Customs and Border Protection (CBP) Office of
Field Operations (OFO) Admissibility Referrals of U.S.
Citizens for Secondary Inspection by Field Office and
Preclearance Operations Locations from Fiscal Year 2015
through 2020 Quarter 2 (March 2020)    75

Table 28: U.S. Customs and Border Protection Office of Field
Operations (OFO) Enforcement Actions Processed for

U.S. Citizens from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    76

Table 29: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    77

Table 30: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    77

Table 31: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Field Office and Preclearance Operations Locations from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    78

Table 32: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Time in Custody from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    79

Table 33: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    79

Table 34: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    80

Table 35: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    80

Table 36: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Border Patrol Sector from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    81

Table 37: U.S. Border Patrol (Border Patrol) Arrests by Time in Custody from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)    82

Figures

Figure 1: U.S. Immigration and Customs Enforcement (ICE) Procedures for Investigating Potential U.S. Citizenship of Individuals Officers Encounter    12

Figure 2: U.S. Customs and Border Protection (CBP) Procedures
for Investigating the Citizenship of Individuals Officers
and Agents Encounter                                                      16

Figure 3: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Arrests,
Detentions, Releases, and Removals of Individuals for
Whom ERO Data Indicate Potential U.S. Citizenship from
Fiscal Year 2015 through 2020 Quarter 2 (March 2020)          19

Figure 4: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Arrests,
Detentions, Releases, and Removals of Individuals for
Whom ERO Data Indicate Potential U.S. Citizenship by
Gender from Fiscal Year 2015 through 2020 Quarter 2
(March 2020)                                                               20

Figure 5: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Arrests,
Detentions, Releases, and Removals of Individuals for
Whom ERO Data Indicate Potential U.S. Citizenship by
Age Group from Fiscal Year 2015 through 2020 Quarter
2 (March 2020)                                                            21

Figure 6: U.S. Customs and Border Protection (CBP) Office of
Field Operations (OFO) Admissibility Referrals of U.S.
Citizens for Secondary Inspection from Fiscal Year 2015
through 2020 Quarter 2 (March 2020)                              26

Figure 7: U.S. Customs and Border Protection (CBP) Office of
Field Operations (OFO) Admissibility Referrals of U.S.
Citizens for Secondary Inspection by Gender from Fiscal
Year 2015 through 2020 Quarter 2 (March 2020)              27

Figure 8: U.S. Customs and Border Protection (CBP) Office of
Field Operations (OFO) Admissibility Referrals of U.S.
Citizens for Secondary Inspection by Age from Fiscal
Year 2015 through 2020 Quarter 2 (March 2020)              28

Figure 9: U.S. Customs and Border Protection Office of Field
Operations (OFO) Enforcement Actions Processed for
U.S. Citizens from Fiscal Year 2015 through 2020
Quarter 2 (March 2020)                                                  29

Figure 10: U.S. Customs and Border Protection Office of Field
Operations (OFO) Enforcement Actions Processed for
U.S. Citizens by Gender from Fiscal Year 2015 through
2020 Quarter 2 (March 2020)                                          30

Figure 11: U.S. Customs and Border Protection Office of Field
Operations (OFO) Enforcement Actions Processed for

U.S. Citizens by Age from Fiscal Year 2015 through 2020
Quarter 2 (March 2020)                                              31

Figure 12: U.S. Border Patrol (Border Patrol) Arrests of U.S.
Citizens from Fiscal Year 2015 through 2020 Quarter 2
(March 2020)                                                        32

Figure 13: U.S. Border Patrol (Border Patrol) Arrests of U.S.
Citizens by Gender from Fiscal Year 2015 through 2020
Quarter 2 (March 2020)                                              34

Figure 14: U.S. Border Patrol (Border Patrol) Arrests of U.S.
Citizens by Age from Fiscal Year 2015 through 2020
Quarter 2 (March 2020)                                              35

Figure 15: U.S. Immigration and Customs Enforcement (ICE)
Procedures for Investigating Potential U.S. Citizenship of
Individuals Prior to or After Issuing a Detainer                    38

Figure 16: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Detainers
for Individuals for Whom ERO Data Indicate Potential
U.S. Citizenship by Gender from Fiscal Year 2015
through 2020 Quarter 2 (March 2020)                                 40

Figure 17: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Detentions
of Individuals for Whom ERO Data Indicate Potential U.S.
Citizenship by Location of Detention from Fiscal Year
2015 through 2020 Quarter 2 (March 2020)                            63

Figure 18: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Releases
of Individuals for Whom ERO Data Indicate Potential U.S.
Citizenship by Location of Detention from Fiscal Year
2015 through 2020 Quarter 2 (March 2020)                            65

Figure 19: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Removals
of Individuals for Whom ERO Data Indicate Potential U.S.
Citizenship by Location of Removal from Fiscal Year
2015 through 2020 Quarter 2 (March 2020)                            67

Figure 20: U.S. Immigration and Customs Enforcement (ICE)
Enforcement and Removal Operations (ERO) Detainers
Issued for Individuals for Whom ERO Data Indicate
Potential U.S. Citizenship by Location from Fiscal Year
2015 through 2020 Quarter 2 (March 2020)                            70

Figure 21: Citizenship of Individuals Identified in Immigration
Status Checks by U.S. Immigration and Customs

---

**Abbreviations**

| | |
|---|---|
| Border Patrol | U.S. Border Patrol |
| CBP | U.S. Customs and Border Protection |
| CRCL | Office for Civil Rights and Civil Liberties |
| DHS | Department of Homeland Security |
| ERO | Enforcement and Removal Operations |
| ICE | U.S. Immigration and Customs Enforcement |
| OFO | Office of Field Operations |
| OIG | Office of Inspector General |
| OPLA | Office of the Principal Legal Advisor |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

 **U.S. GOVERNMENT ACCOUNTABILITY OFFICE**
*A Century of Non-Partisan Fact-Based Work*

441 G St. N.W.
Washington, DC 20548

July 20, 2021

Congressional Requesters

In recent years, some U.S. citizens have claimed that they were mistakenly subject to immigration detainers,[1] detained, or removed by the Department of Homeland Security's (DHS) U.S. Immigration and Customs Enforcement (ICE) on administrative immigration charges.[2] Additionally, some U.S. citizens have claimed they were held for long periods of time at or between U.S. ports of entry by DHS's U.S. Customs and Border Protection (CBP) and, in some instances, were incorrectly identified as removable foreign nationals, resulting in their transfer to ICE custody pending an immigration court hearing.[3]

ICE has the authority to take enforcement actions, such as issuing detainers for, arresting, detaining, litigating administrative immigration charges against, and removing certain removable foreign nationals.[4] CBP is responsible for enforcing travel requirements at or between official ports of entry where individuals, including U.S. citizens, must present

---

[1]A detainer is a notice from ICE to a federal, state, local, or tribal law enforcement agency, which articulates probable cause for removability. It also requests for such agency to inform DHS of a pending release date for a removable foreign national and to maintain custody of the individual for up to 48 hours to allow DHS to assume custody.

[2]We use the term "administrative immigration charges" to refer to allegations of removability typically included in a Notice to Appear in immigration court or an expedited removal order. Such allegations are based on civil violations of U.S. immigration law, which would render a charged foreign national statutorily inadmissible or deportable and therefore subject to removal from the United States. See 8 U.S.C. §§ 1182, 1227, 1229, 1229a.

[3]A "foreign national" in this report is synonymous with the term "alien" in the Immigration and Nationality Act, i.e., a person who is not a citizen or national of the United States. See 8 U.S.C. § 1101(a)(3), (a)(22). A foreign national in the United States may be removable on statutory grounds of inadmissibility, Immigration and Nationality Act § 212(a), 8 U.S.C. § 1182(a), if they have no prior lawful admission; or deportability, Immigration and Nationality Act § 237, 8 U.S.C. § 1227, if they were previously lawfully admitted. See 8 U.S.C. § 1229a(e)(2). The lawfulness of a prior admission may be at issue in removal proceedings. See 8 U.S.C. §§ 1182(a)(6)(C)(i) (inadmissibility for having fraudulently obtained admission into the United States), 1227(a)(1)(A) (deportability for having been inadmissible at the time of entry).

[4]6 U.S.C. §§ 251, 252, 452, 542. See also Name Change from the Bureau of Immigration and Customs Enforcement to U.S. Immigration and Customs Enforcement, and the Bureau of Customs and Border Protection to U.S. Customs and Border Protection, 72 Fed. Reg. 20131 (Apr. 23, 2007).



## U.S. GOVERNMENT ACCOUNTABILITY OFFICE
*A Century of Non-Partisan Fact-Based Work*

**441 G St. N.W.**
**Washington, DC 20548**

July 20, 2021

Congressional Requesters

In recent years, some U.S. citizens have claimed that they were mistakenly subject to immigration detainers,[1] detained, or removed by the Department of Homeland Security's (DHS) U.S. Immigration and Customs Enforcement (ICE) on administrative immigration charges.[2] Additionally, some U.S. citizens have claimed they were held for long periods of time at or between U.S. ports of entry by DHS's U.S. Customs and Border Protection (CBP) and, in some instances, were incorrectly identified as removable foreign nationals, resulting in their transfer to ICE custody pending an immigration court hearing.[3]

ICE has the authority to take enforcement actions, such as issuing detainers for, arresting, detaining, litigating administrative immigration charges against, and removing certain removable foreign nationals.[4] CBP is responsible for enforcing travel requirements at or between official ports of entry where individuals, including U.S. citizens, must present

---

[1]A detainer is a notice from ICE to a federal, state, local, or tribal law enforcement agency, which articulates probable cause for removability. It also requests for such agency to inform DHS of a pending release date for a removable foreign national and to maintain custody of the individual for up to 48 hours to allow DHS to assume custody.

[2]We use the term "administrative immigration charges" to refer to allegations of removability typically included in a Notice to Appear in immigration court or an expedited removal order. Such allegations are based on civil violations of U.S. immigration law, which would render a charged foreign national statutorily inadmissible or deportable and therefore subject to removal from the United States. See 8 U.S.C. §§ 1182, 1227, 1229, 1229a.

[3]A "foreign national" in this report is synonymous with the term "alien" in the Immigration and Nationality Act, i.e., a person who is not a citizen or national of the United States. See 8 U.S.C. § 1101(a)(3), (a)(22). A foreign national in the United States may be removable on statutory grounds of inadmissibility, Immigration and Nationality Act § 212(a), 8 U.S.C. § 1182(a), if they have no prior lawful admission; or deportability, Immigration and Nationality Act § 237, 8 U.S.C. § 1227, if they were previously lawfully admitted. See 8 U.S.C. § 1229a(e)(2). The lawfulness of a prior admission may be at issue in removal proceedings. See 8 U.S.C. §§ 1182(a)(6)(C)(i) (inadmissibility for having fraudulently obtained admission into the United States), 1227(a)(1)(A) (deportability for having been inadmissible at the time of entry).

[4]8 U.S.C. §§ 251, 252, 452, 542. See also Name Change from the Bureau of Immigration and Customs Enforcement to U.S. Immigration and Customs Enforcement, and the Bureau of Customs and Border Protection to U.S. Customs and Border Protection, 72 Fed. Reg. 20131 (Apr. 23, 2007).

PYM-000102

valid travel documents permitting their entry or admission into the country.[5] U.S. citizens, however, are not subject to administrative immigration enforcement and removal processes, which are only applicable to potentially removable foreign nationals.[6]

Ascertaining an individual's potential U.S. citizenship can be challenging given the intricacy of U.S. immigration law, as well as the often complex facts and circumstances related to immigration and citizenship status. An individual's citizenship status may depend on one or more of the following: (1) their place of birth either within or outside the United States; (2) citizenship of their parent(s) at birth or prior to the individual turning 18, depending on the specific scenario; (3) physical presence in the United States of U.S. citizen parent(s) prior to individual's birth; (4) whether the individual has served or is currently serving in the U.S. military; (5) whether the individual seeking naturalized citizenship is in lawful permanent resident status for the requisite period, and meets other criteria; (6) whether the individual's naturalization application is granted, they pass the exam, and are sworn in as a U.S. citizen; and (7) the outcome of any proceedings for revocation of naturalization in federal court, among the many other factors that may bear on an individual's citizenship status. These factors must be assessed against the statutory criteria applicable to the particular situation.[7]

In executing their immigration authorities, ICE and CBP officers and agents are required to investigate claims or indicia (signs or indications) of U.S. citizenship prior to conducting an immigration enforcement action, such as arresting an individual on administrative immigration charges. Sometimes DHS officials are not able to easily verify an individual's citizenship. This may be due to various factors, such as lack of readily available documentation (such as a birth certificate or passport), or the individual is a dual citizen traveling on a foreign passport. Additionally, not

---

[5]6 U.S.C. § 211.

[6]For the purposes of this report, we intend the term "U.S. citizen" to refer to anyone of U.S. nationality, whether U.S. citizen or noncitizen national. For example, those born to non-U.S. citizen parents in a U.S. outlaying possession—American Samoa and Swains Islands—on or after the date of formal acquisition of such possession. According to U.S. immigration law, such noncitizen nationals are not subject to administrative immigration enforcement and removal processes given their U.S. nationality. See 8 U.S.C. §§ 1101(a)(22) (defining "national of the United States"), (a)(29) (definition of "outlaying possessions of the United States"), 1408 (situations in which an individual is a U.S. national but not a citizen at birth).

[7]See, generally, 8 U.S.C. ch. 12, subch. III (Nationality and Naturalization).

PYM-000103

all individuals who may potentially be U.S. citizens are aware of their citizenship status, and there have been some instances of foreign nationals making false claims to U.S. citizenship in attempts to avoid detention or removal from the United States.

You asked us to review issues related to U.S. citizens detained by ICE or held by CBP on administrative immigration charges. This report discusses (1) the extent to which ICE and CBP have developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers and agents encounter; (2) what ICE and CBP data indicate about the number and characteristics of U.S. citizens detained by ICE or held by CBP on administrative immigration charges in the last 5 fiscal years; and (3) the extent to which ICE has developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers identify for detainers.

To address these objectives, we interviewed DHS officials, including those from DHS's Office of Strategy, Policy, and Plans; Office of Inspector General (OIG); and Office for Civil Rights and Civil Liberties (CRCL). We also interviewed officials from ICE's Enforcement and Removal Operations (ERO) directorate, Homeland Security Investigations directorate, Office of the Principal Legal Advisor (OPLA), Law Enforcement Support Center, and Pacific Enforcement Response Center. Additionally, we interviewed officials from CBP's Office of the Commissioner and Office of Chief Counsel; CBP's Office of Field Operations (OFO) Enforcement Programs Division and Planning, Program Analysis, and Evaluation Directorate; and U.S. Border Patrol's (Border Patrol) Law Enforcement Operations Directorate and Strategic Planning and Analysis Directorate.

Further, we interviewed selected field officials from ICE and CBP in June and July 2020. Specifically, we met with ERO officials from ICE's Buffalo, Los Angeles, and Philadelphia field offices; OFO officials from the Detroit, Laredo, and San Francisco field offices; and Border Patrol officials from the Miami, Rio Grande Valley, San Diego, and Spokane sectors. To select the ERO locations for interviews, we reviewed publicly available ERO data on the number of arrests by field office from fiscal year 2015 through fiscal year 2016 and the number of detainers issued from fiscal year 2015 through February 2017—the most recent data publicly available at the time of our review. To select the OFO locations for interviews, we reviewed publicly available OFO data on the number of inadmissible foreign nationals OFO inspected from fiscal year 2015 through the first quarter of fiscal year 2019—the most recent data publicly

FYM-000104

available at the time. To select the Border Patrol locations for interviews, we reviewed available Border Patrol data on the arrests of removable foreign nationals from fiscal year 2015 through fiscal year 2019—the most recent data publicly available at the time.

For all of these selections, we included a range of low, medium, and high enforcement action field offices and sectors, as well as a variety of geographic locations. The information we obtained from our interviews with field officials are not generalizable to all ICE, OFO, or Border Patrol operations. However, they provided us the opportunity to learn more about how ICE and CBP officers and agents implement policies and procedures for investigating the citizenship of individuals they encounter and how they document these investigations.

To address the first objective, we reviewed ICE and CBP policy documents, training materials, processing guides, and other guidance documents in effect from October 2015 through March 2020. We compared ICE and CBP policies and procedures with processes described by officials we interviewed, as well as with DHS, ICE, and CBP data we collected. We compared ICE policies and procedures and training materials to *Standards for Internal Control in the Federal Government* and determined the control activities component of internal control—the actions management establishes to achieve objectives and respond to risks—and the information and communication activities component of internal control—that management should use quality information to achieve objectives—were significant to this objective.[8] We assessed ICE's policy documents and training materials related to investigating, elevating, and documenting claims or indicia of the potential U.S. citizenship of individuals ICE officers encounter. We also assessed the availability and reliability of ICE data for fiscal year 2015 through the second quarter of fiscal year 2020 (March 2020). We took these steps to determine whether the policy documents and training materials were able to help ICE meet its immigration enforcement objectives, respond to risks related to taking enforcement actions against U.S. citizens, and meet DHS's information sharing needs.

To address the second objective, we analyzed record-level ICE data related to arrests, detentions, releases, and removals as well as record-level inspection and arrest data from OFO and Border Patrol. We

---

[8]GAO, *Standards for Internal Control in the Federal Government,* GAO-14-704G (Washington, D.C.: September 2014).

collected data for fiscal year 2015 through the second quarter of fiscal year 2020—the most recent data available at the time of our review. We analyzed the record-level data to describe the numbers and characteristics, including the age and gender, of U.S. citizens ICE, OFO, and Border Patrol arrested, detained, released, or removed. In addition, we analyzed the record-level data to determine the number of arrests, detentions, releases, and removals by ICE field office; admissibility referrals[9] and enforcement actions[10] by OFO field office; and arrests by Border Patrol sector.

To assess the reliability of the ICE, OFO, and Border Patrol data, we (1) performed electronic testing for obvious errors in accuracy and completeness; (2) reviewed existing information about the data and the systems that produced them, such as relevant training materials for the officers and agents who use them; and (3) discussed data entry issues and data limitations with the respective officials. We determined that the data were sufficiently reliable for the purposes of reporting a baseline number of arrests, detentions, releases, and removals of potential U.S. citizens by ICE, admissibility referrals and enforcement actions against U.S. citizens by OFO, and arrests of U.S. citizens by Border Patrol.

To address the third objective, we reviewed ICE policy documents, training materials, and other guidance documents in effect from October 2015 through March 2020. We compared ICE's documented policies and procedures with the processes described by ICE officials we interviewed. We also analyzed available record-level ICE data for detainers issued from fiscal year 2015 through the second quarter of fiscal year 2020—the most recent data available at the time of our review—to describe the numbers and characteristics, including the age and gender, of individuals for whom ICE data indicate potential U.S. citizenship and ICE issued a detainer. To assess the reliability of ICE's data, we (1) performed electronic testing for obvious errors in accuracy and completeness; (2)

---

[9]OFO officers conduct immigration and customs inspections of every individual presenting themselves for entry into the United States at U.S. ports of entry. If officers cannot admit, or permit entry of, an individual into the country based on the primary inspection, they are to refer the individual to secondary inspection—sometimes known as an admissibility referral—where OFO continues the immigration inspection and investigates any potential issues.

[10]When officers determine individuals are inadmissible to the United States, they may take custody of these individuals to pursue immigration enforcement and removal actions against them, including charging administrative immigration violations; or, if appropriate, they may arrest individuals, including U.S. citizens, in furtherance of criminal investigation and potential prosecution where there is probable cause that they committed a crime.

PTM-000106

reviewed existing information about the data and the systems that produced them, such as relevant training materials for the ICE officers who use them; and (3) discussed data entry issues and data limitations with ICE officials. We determined that the ICE data were sufficiently reliable for the purposes of reporting a baseline number of detainers ICE issued for potential U.S. citizens.

For more information about our scope and methodology, see appendix I.

We conducted this performance audit from February 2020 to July 2021 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## Pathways to U.S. Citizenship

According to the Citizenship Clause of the Fourteenth Amendment to the United States Constitution, a U.S. citizen is any person who is born or naturalized in, and subject to the jurisdiction of, the United States.[11] The Immigration and Nationality Act describes the various ways in which an individual may obtain U.S. citizenship at birth; through naturalization, whereby U.S. nationality is conferred upon a person after birth, by any means (typically involving application and exam); or acquisition or derivation of citizenship from U.S. citizen parent(s).[12]

Individuals are U.S. citizens at birth either by being born in the United States or through other circumstances involving the citizenship status of one or both of their parents and other factors. For example, the following individuals acquire U.S. citizenship at birth:

• Individuals born in the United States;[13]

---

[11] U.S. CONST. amend. XIV, § 1, cl. 1.

[12] 8 U.S.C. §§ 1101(a)(23), 1401-1409, 1421-1459.

[13] 8 U.S.C. § 1401(a).

PYM-000107

- Individuals born outside of the United States to U.S. citizen parents, one of whom having resided in the United States before the individual's birth;[14]

- Individuals born outside of the United States to one U.S. citizen parent, the other parent being either a noncitizen U.S. national or foreign national, subject to respective statutory criteria;[15] and

- Individuals born in American Samoa or Swains Island with one U.S. citizen parent who was continuously physically present in the United States, American Samoa or Swains Island for one year at any time prior to the individual's birth.[16]

Additionally, individuals who are noncitizens (i.e. foreign nationals) at birth may later obtain U.S. citizenship in various statutorily defined ways. Individuals of foreign nationality may become U.S. citizens through naturalization, which typically involves: (1) approval of a request for classification as an immigrant or qualifying nonimmigrant, (2) obtaining lawful permanent resident status, and (3) meeting continuous physical presence, good moral character, and other applicable eligibility requirements as part of the naturalization application and examination process.[17] Special provisions of the Immigration and Nationality Act also authorize the naturalization of current and recently discharged members of the U.S. Armed Forces.[18] In general, a lawful permanent resident child currently under 18 years old who was born outside of the United States

---

[14] See id. § 1401(c).

[15] Id. at § 1401(d), (g).

[16] Id. at § 1401(e).

[17] See, e.g., 8 U.S.C. §§ 1101(a)(15)(K), (T), (U), 1151-1160, 1181, 1184, 1186a, 1186b, 1251-1260, 1427.

[18] 8 U.S.C. §§ 1439-40, 1443a. Qualifying military service includes active or reserve service in the U.S. Army, Navy, Marine Corps, Air Force, Coast Guard, or service in a National Guard unit. A person who has served honorably in the U.S. Armed Forces for 1 year during peacetime may be eligible to apply for naturalization. Service is considered honorable when the quality of the member's service generally has met the standards of acceptable conduct and performance of duty for military personnel. The Department of Defense determines if a service member meets the qualifying service requirement. In addition, during designated periods of hostilities, such as World War I and World War II and the current global war on terrorism, members of the U.S. Armed Forces who serve honorably in an active duty status, or as members of the Selected Reserve of the Ready Reserve, are eligible to apply for naturalization without meeting any minimum required period of service. The spouse of a member of the U.S. Armed Forces may be eligible for expedited naturalization, and such member's child(ren) may be eligible to naturalize or automatically obtain citizenship. 8 U.S.C. §§ 1430-31.

automatically becomes a U.S. citizen when at least one parent is a U.S. citizen by birth or naturalization, and the child is residing in the United States in the legal and physical custody of the citizen parent.[19] Another scenario in which a child may obtain citizenship after birth is when a citizen parent applies for naturalization on behalf of a child born outside the United States who has not acquired citizenship automatically.[20]

## Federal Agencies' Roles and Responsibilities for Administrative Immigration Enforcement

Within DHS, ICE's ERO and CBP's OFO and Border Patrol, are responsible for identifying and arresting removable foreign nationals.[21] OFO and Border Patrol may transfer removable foreign nationals to ERO, which is also responsible for detaining and removing foreign nationals determined to be in the United States in violation of U.S. immigration law. ICE and CBP are to investigate and verify the citizenship of individuals their agents and officers encounter to ensure DHS appropriately applies U.S. laws related to immigration to foreign nationals—and does not take administrative immigration and removal actions against U.S. citizens.

Additionally, DHS's Office of Inspector General (OIG) and Office for Civil Rights and Civil Liberties (CRCL) receive and investigate complaints made by or on behalf of individuals claiming to be U.S. citizens who have been subject to administrative immigration and removal actions. We provide additional details on the complaints OIG and CRCL receive in appendix II.

---

[19]See 8 U.S.C. § 1431(a). Subsection (a) applies to a child adopted by a U.S. citizen parent if the child satisfies requirements of § 1101(b)(1) regarding adopted children. Id. at § 1431(b). Subsection (a)(3) is satisfied for a lawful permanent resident child in legal and physical custody of a citizen parent who is: (1) stationed and residing abroad as a U.S. government employee, or residing abroad and married to a U.S. government employee stationed abroad; or (2) stationed and residing abroad as a member of the U.S. military, or authorized to accompany and reside abroad with a member of the U.S. military pursuant to the member's official orders and is accompanying and residing abroad with such member in martial union. See id. § 1431(c).

[20]8 U.S.C. § 1433. If the citizen parent has died during the preceding five years, a citizen grandparent or citizen legal guardian may apply for naturalization on behalf of the child. A certificate of citizenship will be issued for the child once all criteria are satisfactorily demonstrated.

[21]ICE's Homeland Security Investigations also conducts worksite enforcement operations, including arresting workers who are not authorized to work in the United States and employers who knowingly hire them, among other law enforcement operations. While Homeland Security Investigations agents are to investigate the citizenship of individuals that they encounter during these operations, officials stated that they generally refer to ERO any individuals that make a claim or have indicia of U.S. citizenship that they cannot immediately ascertain.

Table 1 highlights DHS components' roles in immigration enforcement.

**Table 1: Selected Department of Homeland Security (DHS) Components' Roles in Immigration Enforcement**

| Agency | Role |
|---|---|
| U.S. Immigration and Customs Enforcement (ICE) | ICE's Enforcement and Removal Operations (ERO) conducts civil immigration enforcement actions, which includes administrative arrests, detentions, and removals. |
| | ICE has the authority to take enforcement actions, such as issuing detainers for, arresting, detaining, litigating administrative immigration charges against, and removing certain removable foreign nationals. U.S. citizens are not subject to administrative immigration enforcement and removal processes, which are only applicable to removable foreign nationals. When ERO officers encounter an individual claiming to be a U.S. citizen, or the officers identify indicia of potential citizenship, the officers are to notify and conduct joint citizenship investigations with ICE's Office of the Principal Legal Advisor's Field Locations. The Office of the Principal Legal Advisor is responsible for litigating charges of removability against, and claims of relief or protection from removal made by, foreign nationals whose removal cases are adjudicated by the immigration courts. |
| U.S. Customs and Border Protection's (CBP) Office of Field Operations (OFO) and U.S. Border Patrol (Border Patrol) | CBP is responsible for conducting immigration and customs inspections at ports of entry and securing the U.S. border between ports of entry. |
| | • OFO officers inspect all individuals seeking entry at ports of entry, and as appropriate, they may arrest, initiate administrative removal proceedings against, order the expedited removal or otherwise permit return of, or enforce existing final removal orders for, removable foreign nationals who arrive at U.S. ports of entry. |
| | • Border Patrol agents interdict, and as appropriate, they may arrest, initiate administrative removal proceedings against, order expedited removal or otherwise permit return of, or enforce existing final removal orders for, removable foreign nationals between U.S. ports of entry and within a reasonable distance (defined as 100 air miles inland) from the U.S. international border. |
| | CBP may hold individuals at short-term holding facilities for general processing and to determine the next appropriate course of action, such as continued detention, or release (typically on a conditional basis) pending proceedings, or removal from the United States. CBP's authority to enforce the Immigration and Nationality Act against U.S. citizens is typically limited to enforcing travel controls, such as inspection processes (to include passport checks) at official ports of entry, and stopping vehicles to confirm lawful immigration status or U.S. nationality/citizenship at designated immigration checkpoints close to the border. Otherwise, U.S. citizens are generally not subject to immigration enforcement at or between U.S. ports of entry. CBP officials said OFO and Border Patrol field officials may consult with CBP's Office of Chief Counsel when agents and officers are unable to verify an individual's citizenship. |
| DHS's Office of Inspector General (OIG) and Office for Civil Rights and Civil Liberties (CRCL) | The OIG and CRCL receive and investigate complaints made by or on behalf of U.S. citizens claiming to have been the target of a detainer or detained by ICE or held by CBP on administrative immigration charges, among other types of complaint investigations. |

Source: GAO analysis of DHS information. | GAO-21-487

Investigating claims or indicia of U.S. citizenship can be complex and challenging, according to ICE officials. In conducting such investigations, ICE and CBP officers, agents, and OPLA attorneys may, among other steps, check federal law enforcement databases for biometric and biographical information, interview the individuals and their family

PYM-000110

members for relevant information, and collect any relevant documents. Additionally, officers and agents may search DHS's U.S. Citizenship and Immigration Services' and the Department of State's databases for information relevant to citizenship analysis. ICE and CBP officials also said they may contact state or local offices (such as foreign, state, or county vital records offices) to verify relevant information, such as birth, marriage, or death information. ICE and CBP officers and agents are to document encounters with individuals—both U.S. citizens and foreign nationals—in their respective agency data systems and in the individual's paper Alien file (A-file) as appropriate, including individuals' claims to citizenship and the results of subsequent investigations.[22]

By policy, ICE and CBP officers and agents are to consider the specific characteristics of each individual's case to ensure that ICE and CBP do not take administrative immigration and removal actions against U.S. citizens. However, ICE and CBP officials said that the various pathways to U.S. citizenship can sometimes make it difficult to verify whether an individual is a U.S. citizen. For example, ICE and CBP officials stated that they sometimes encounter individuals who are unaware that they have a potential claim to U.S. citizenship, and ICE and CBP officers and agents will initiate investigations into their potential citizenship based on the information they collect during the encounter. Further, ICE and CBP officials stated that some U.S. citizens engage in deception by claiming to be foreign nationals because they believe they can avoid criminal prosecution if they are removed from the United States.

---

[22]The A-file is a paper file that serves as the central record of all of a foreign national's immigration-related applications, petitions, and any other relevant documentation.

# ICE and CBP Have Policies and Procedures for Investigating Citizenship, but Some ICE Guidance Is Inconsistent

## ICE Has a Policy for Investigating Potential U.S. Citizenship, but Its Training Materials Are Inconsistent with Its Policy and It Does Not Systematically Track Encounters

In recognizing the challenges in ascertaining potential U.S. citizenship of individuals its officers encounter, ICE developed its 2015 policy titled *Investigating the Potential U.S. Citizenship of Individuals Encountered by ICE*. It states that it is ICE policy to carefully and expeditiously investigate and analyze the potential U.S. citizenship of individuals ICE encounters. The policy provides a list of potential indicia of U.S. citizenship for officers to consider, including:

- information suggesting the individual was born in the United States;

- information suggesting one or more of the individual's parents, grandparents, or foreign-born siblings are U.S. citizens;

- information suggesting the individual was adopted by a U.S. citizen;

- the individual has served in the U.S. Armed Forces; and

- an application for naturalization or a U.S. passport for the individual has been filed and is pending.

Further, the policy provides guidance for officers on the procedures to investigate, elevate, and document claims or indicia of U.S. citizenship, even if individuals do not make claims. Figure 1 describes these procedures.

**Figure 1: U.S. Immigration and Customs Enforcement (ICE) Procedures for Investigating Potential U.S. Citizenship of Individuals Officers Encounter**

**Claim or indicia[a]**

Individual in ICE Enforcement and Removal Operations (ERO) custody or whom ERO officer encounters claims U.S. citizenship or officer discovers indicia of citizenship.

**Factual examination**

ERO conducts a factual examination by:

• checking all available Department of Homeland Security and other law enforcement data systems,

• reviewing the individual's Alien-file and other documents, and

• interviewing the individual, among other steps.[b]

**Memorandum**

ERO and local ICE attorneys jointly prepare a memorandum assessing the claim or indicia and recommend a course of action for headquarters to review.

**Headquarters review**

Headquarters reviews the memorandum and responds to the field with a decision on the recommendation.

**Course of action**

Is there probative evidence, or is there uncertainty about whether the evidence is probative of U.S. citizenship?[c]

**No**
ERO may arrest and process the individual for removal.

**Yes**
Is the individual in ERO custody?

**Yes**
ERO immediately releases the individual.[d]

ERO officers inform the individual how to attempt to obtain proof of U.S. citizenship.

**No**
ERO does not arrest the individual.

**Documenting investigations and results**

ERO officers and attorneys document the findings of the investigations in their respective databases and place a copy of the memorandum in the individual's Alien-file.

Source: GAO analysis of ICE policy. | GAO-21-487

[a]Potential indicia of citizenship include but are not limited to: evidence that the individual was born in the United States; information suggesting that one or more of the individual's parents, grandparents, or foreign-born siblings are or were U.S. citizens; and the individual has served in the U.S. Armed Forces.

[b]All interviews with individuals claiming U.S. citizenship or for whom there are indicia of citizenship are to be conducted by an officer in the presence of, or in consultation with, a supervisor.

[c]According to ICE, probative evidence of U.S. citizenship means that the evidence tends to show that the individual may be a U.S. citizen. U.S. citizenship need not be shown by a preponderance of the evidence for ICE to find that there is some probative evidence of U.S. citizenship.

[d]It is not necessary for ICE to wait to release the individual if there is probative evidence of U.S. citizenship. ICE may also release the individual on non-detained removal proceedings to allow it more

time to conclusively resolve the individual's citizenship status. It may do so if it has reasons to believe that the individual is a foreign national in the United States in violation of immigration law.

**Conducting interviews and notifying supervisors.** ICE trains ERO officers on how to conduct interviews while investigating potential U.S. citizenship during academy training. For example, ICE's academy training materials specify that ERO officers are to ask: (1) the country the individual is a citizen or national of; (2) the country the individual's parents are citizens or nationals of; (3) where the individual was born; (4) where the individual's parents were born; (5) whether either of the individual's parents naturalized in the United States; and (6) whether there is any reason to believe that the individual may be a citizen or national of the United States.

However, as of May 2021, ICE's academy training materials contain guidance regarding when its officers are to notify supervisors of encounters with potential U.S. citizens that are inconsistent with its 2015 policy. As shown in Figure 1, ICE's policy requires ERO officers to interview the individual claiming U.S. citizenship or with potential indicia of citizenship in the presence of, or in consultation with, a supervisor. Conversely, ICE's 2020 academy training materials direct ERO officers to terminate the questioning of an individual who makes a claim to U.S. citizenship if the ERO officer believes the individual and the evidence suggests the individual is a U.S. citizen—without consulting a supervisor, as required by the 2015 policy.

Headquarters officials stated that ERO's Training Division is responsible for conducting annual reviews of academy training materials to ensure that they support ERO policy, but acknowledged the guidance in ICE's 2020 training materials is inconsistent with its 2015 policy. *Standards for Internal Control in the Federal Government* states that management should design control activities that provide the right training tools to achieve operational success.[23] By making its training materials regarding encounters with potential U.S. citizens consistent with ICE policy, ICE would have more assurance that all encounters with individuals who claim U.S. citizenship receive appropriate supervisory review.

**Documenting the course of action in agency data systems.** As shown in Figure 1, after ERO and ICE OPLA headquarters provide a decision on the field's recommended course of action following the investigation of an individual's claim or indicia of citizenship, ICE's policy requires ERO

---

[23]GAO-14-704G.

officers and local attorneys to notate the decision in their respective data systems and place a copy of the memorandum and headquarters' custody decision in the individual's A-file. However, ICE's policy does not ensure reliable electronic data on the individuals ICE arrested, detained, or removed but for whom ICE later identified probative evidence of U.S. citizenship. This is because the policy does not require ERO officers to update the citizenship field in the individual's electronic record specifically after identifying probative evidence that an individual may be a U.S. citizen.[24] Rather, ERO officers are instructed (but not required) to include all countries a person claims citizenship to in the narrative comments section, according to ICE officials. As a result, ICE does not know the extent to which its ERO officers are taking enforcement actions against individuals for whom it identifies probative evidence of U.S. citizenship. For example, ICE headquarters officials acknowledged that ERO has arrested, detained, and removed individuals for whom it later identified probative evidence of U.S. citizenship; however, they could not state how often this occurs because ICE does not systematically collect and maintain this data.

According to ICE headquarters officials, ICE does not systematically collect and maintain electronic data on encounters with individuals for whom ICE identifies probative evidence of U.S. citizenship because it is not required to do so by Congress. Additionally, officials stated ICE's process for revising its 2015 policy to specify how officers are to update the record of an individual for whom ICE identifies probative evidence of U.S. citizenship in agency data systems would be an administrative burden for headquarters. However, officials stated that if officers do not update the citizenship field, ICE or CBP officials attempting to investigate the same individual at a later date would not be able to easily recognize ICE's identification of probative evidence of U.S. citizenship in ICE's electronic records because the narrative comments section can be several pages long.[25] Additionally, officials agreed that updating the citizenship field would help headquarters to identify trends and additional

---

[24]According to ICE, probative evidence of U.S. citizenship means that the evidence tends to show that the individual may be a U.S. citizen. U.S. citizenship need not be shown by a preponderance of the evidence for ICE to find that there is some probative evidence of U.S. citizenship.

[25]According to CBP officials, CBP agents and officers may also search and review ICE records when investigating individuals' citizenship claims to support their own enforcement decisions for the individuals that they encounter. As such, CBP risks apprehending U.S. citizens on administrative immigration charges if ICE's citizenship information is inaccurate or incomplete.

training needs for officers related to U.S. citizens, which it currently does not do.

As stated previously, ICE has the authority to take enforcement actions, such as arresting, detaining, and removing certain removable foreign nationals. U.S. citizens, however, are not subject to administrative immigration enforcement and removal processes. Further, *Standards for Internal Control in the Federal Government* state that management should use quality information to make informed decisions and evaluate the entity's performance in achieving key objectives and addressing risks.[26] Quality information is appropriate, current, complete, accurate, accessible, and provided on a timely basis. In doing so, management should identify the information requirements needed to achieve objectives and address risks, and should consider the expectations of both internal and external users. Additionally, these standards state that management should internally and externally communicate the necessary quality information to enable personnel to perform key roles in achieving objectives and address related risks.

By systematically collecting and maintaining electronic data on encounters with individuals for whom ICE identifies probative evidence of U.S. citizenship, ICE would have better insight into its officers' enforcement of administrative immigration law and more assurance that its officers are following ICE policy. ICE would also be able to determine how often it has arrested, detained, and removed individuals for whom it identified probative evidence of U.S. citizenship and identify additional training needs for its officers to ensure they do not take immigration enforcement actions against U.S. citizens in the future. Such data could also help ensure that CBP has the quality information that it needs in order to make admissibility decisions regarding individuals who may be U.S. citizens, if CBP encounters them in the future.

## CBP Has Policies and Procedures for Investigating Citizenship

CBP has policies and procedures for investigating potential U.S. citizenship of the individuals its officers and agents encounter. CBP instructs OFO officers and Border Patrol agents on these procedures at their respective basic training academies. Among other things, CBP provides information on its procedures for how to ascertain citizenship, document claims to U.S. citizenship, and charge foreign nationals with administrative immigration violations, as applicable. For example, during OFO's *Nationality Law* and Border Patrol's *Administrative Law* training

---

[26]GAO-14-704G.

courses, CBP instructs officers and agents about the potential pathways to U.S. citizenship under the Immigration and Nationality Act and how to assess the potential U.S. citizenship of the individuals that they inspect. Figure 2 describes CBP's procedures for investigating the citizenship of individuals its officers and agents encounter.

**Figure 2: U.S. Customs and Border Protection (CBP) Procedures for Investigating the Citizenship of Individuals Officers and Agents Encounter**

**Determine admissibility**
CBP officers and agents interview the individual and review identification documents to ascertain an individual's citizenship and admissibility into the United States.[a]

**Process for arrest**
CBP officers and agents process the individual determined to be potentially removable for arrest and complete required checks in federal electronic databases to verify identity and country of citizenship.[b]

**Complete charging documents**
CBP officers and agents complete charging documents to process the individual for removal, including a sworn statement.[c]

**Unverifiable indicia or claim of U.S. citizenship**
Refer individual's case to an immigration judge for review.

**No indicia or claim of U.S. citizenship**
Charge individual as a foreign national for removal.

Source: GAO analysis of CBP policies and procedures. | GAO-21-487

[a]CBP officers and agents may also run database checks to verify an individual's citizenship and admissibility, depending on the circumstances of the encounter. CBP officers and agents are to admit individuals whom they ascertain to be U.S. citizens or otherwise admissible into the United States or release them at any point during processing.

[b]According to CBP officials, CBP officers and agents may also contact other agencies, such as state-level vital statistics, to verify an individual's identity and citizenship.

[c]The sworn statement details an individual's identity, noncitizenship, inadmissibility, and any claims to potential U.S. citizenship.

To begin an inspection, OFO's *Introduction to Passenger Processing* and Border Patrol's *Interview Techniques* training materials instruct officers and agents to directly question the individual about citizenship and examine available identification documents to assess the individual's citizenship and admissibility. OFO and Border Patrol officials stated that the specific questions officers and agents may ask vary depending on the circumstances of the encounter. For example, officers and agents may not ask a foreign national with valid documentation for permanent residence in the United States any additional questions regarding the individual's potential U.S. citizenship because the individual already has a documented legal status. Additionally, OFO and Border Patrol academy training guidance, *Introduction to Passenger Processing* and *Radio Operations* respectively, instruct officers and agents to conduct record checks for the individual in federal electronic databases to search for citizenship information or to verify the information the individual provided.

When officers and agents cannot verify an individual's citizenship and admissibility after an initial evaluation, OFO and Border Patrol field officials said they conduct a more extensive evaluation, which may include further questioning, additional electronic records checks, and coordination with other agencies, such as state vital records agencies to obtain birth records. OFO's *Secondary Passenger Processing* training outlines these procedures for officers. Similarly, Border Patrol academy's 2019 *e3 Processing Training Guide Book* directs agents to conduct biographic and biometric database searches as part of these evaluations.

For individuals they identify as likely removable foreign nationals, including individuals whose claims to U.S. citizenship that CBP cannot verify, OFO and Border Patrol academy training materials direct officers and agents to conduct sworn statements. The sworn statements are to detail an individual's biographic information and document the circumstances of the encounter and evidence of an individual's removability before processing the individual on administrative immigration charges. Officers and agents place these sworn statements in individuals' A-files, which are used as evidence during removal proceedings. The sworn statement is generally the last opportunity for an officer or agent to identify indicia of potential U.S. citizenship or for the individual to make a claim to U.S. citizenship prior to removal proceedings.

OFO's 2019 *Adverse Action Trainee Guide* and Border Patrol's 2019 *e3 Processing Training Guide Book* direct officers and agents to include various elements in the sworn statement, including an individual's identity, noncitizenship, and inadmissibility. Additionally, the guidance directs them to tailor the questions they ask to the circumstances of the individual case to establish these required elements. OFO's 2019 guide specifies that the sworn statements include the following:

- **Identity.** The individual's name, aliases, date and place of birth, and other biographical data associated with the individual.

- **Noncitizenship.** The citizenship, nationality, and residence of the individual, as well as any potential claims to possible U.S. citizenship;

- **Inadmissibility.** The specific facts of the case and suspected grounds of inadmissibility that apply to the case.

In addition, OFO's 2019 guide states that during the sworn statement, officers are to investigate indicia of potential U.S. citizenship derived from the individual's parents by asking questions about the parents' citizenship

and about the individual's and the individual's parents' previous residence in the United States, if applicable.[27] As shown above in figure 2, if officers and agents are unable to verify an individual's citizenship during sworn statement proceedings, they are to send the individual to an immigration judge for review of the removal order.

## Available Data Indicate ICE and CBP Took Enforcement Actions Against Some U.S. Citizens

Available data indicate ICE and CBP took enforcement actions against some U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020 (March 2020). However, the data that ICE and CBP collect and maintain on their encounters with individuals do not allow us or the agencies to determine how many U.S. citizens they detained or held on administrative immigration charges. As stated previously, ICE officers are not required to update the citizenship field when ICE identifies probative evidence that individuals may be U.S. citizens. As a result, there may be additional individuals who could be U.S. citizens that ICE arrested, detained, released, or removed that we were unable to identify in the available data. Additionally, CBP data do not specify whether the enforcement actions taken against U.S. citizens were for administrative immigration charges or other types of charges.

## Available Data Indicate ERO Took Enforcement Actions Against a Small Number of Potential U.S. Citizens

According to available ERO data, ERO arrested, detained, released, and removed a small number of individuals for whom ERO data indicate potential U.S. citizenship from fiscal year 2015 through the second quarter of fiscal year 2020. These enforcement actions represent less than 1 percent of all ERO enforcement actions during this timeframe (see figure 3). ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

---

[27]OFO's guidance also requires that officers document some of the same biographic information on the Form I-213 *Record of Deportable/Inadmissible Alien* that would assist officers to identity indicia of U.S. citizenship, including the individual's date and place of birth, citizenship, address, immigration record, and the names, citizenship, and addresses of the individual's parents.

**Figure 3: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Arrests, Detentions, Releases, and Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of ICE data. | GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Additionally, according to available ERO data, individuals for whom ERO data indicate potential U.S. citizenship and whom ERO arrested, detained, released, and removed were mostly males (see figure 4) and individuals ages 19 to 45 (see figure 5).

**Figure 4: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Arrests, Detentions, Releases, and Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of ICE data. | GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

**Figure 5: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Arrests, Detentions, Releases, and Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Age Group from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of ICE data. | GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

**Arrests**

According to available ERO arrest data, from fiscal year 2015 through the second quarter of fiscal year 2020 ERO made at least 674 arrests of individuals for whom ERO data indicate potential U.S. citizenship (less than 1 percent of all ERO arrests during that period). Additionally, data

PYM-000122

indicate ERO made at least 72 arrests of individuals with unknown citizenship during the same period (see table 2).[28]

**Table 2: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Arrests of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal Year | U.S. citizens | Individuals with unknown citizenship | All other individuals |
|---|---|---|---|
| 2015 | 169 | 4 | 119,599 |
| 2016 | 94 | 13 | 109,997 |
| 2017 | 70 | 26 | 143,374 |
| 2018 | 153 | 10 | 158,418 |
| 2019 | 138 | 17 | 142,944 |
| 2020 Q1-2 | 50 | 2 | 66,207 |
| **Total** | **674** | **72** | **740,539** |

Source: GAO analysis of ICE data. | GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Detentions

According to available ERO detention data, from fiscal year 2015 through the second quarter of fiscal year 2020 ERO booked at least 121 individuals for whom ERO data indicate potential U.S. citizenship into immigration detention facilities (less than 1 percent of all individuals booked into immigration detention facilities during that period). Additionally, data indicate ERO booked at least 148 individuals with unknown citizenship into immigration detention facilities during the same period (see table 3).

---

[28]Individuals with unknown citizenship include individuals in ERO's data system with a value of "unknown" or who were missing a citizenship value in the fields for citizenship and country of birth, when applicable. We provide the numbers for individuals with unknown citizenship because ICE did not verify whether they are potential U.S. citizens.

**Table 3: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detentions of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal Year | U.S. citizens | Individuals with unknown citizenship | All other individuals |
|---|---|---|---|
| 2015 | 37 | 31 | 307,274 |
| 2016 | 17 | 19 | 352,846 |
| 2017 | 21 | 28 | 323,542 |
| 2018 | 19 | 29 | 396,400 |
| 2019 | 20 | 30 | 510,804 |
| 2020 Q1-2 | 7 | 11 | 135,818 |
| **Total** | **121** | **148** | **2,026,684** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

According to available ERO detention data, CBP apprehended and transferred to ICE at least 24 of the 121 (approximately 20 percent) individuals for whom ICE data indicate potential U.S. citizenship and whom ERO booked into immigration detention facilities from fiscal year 2015 through the second quarter of fiscal year 2020.

## Releases

According to available ERO release data, from fiscal year 2015 through the second quarter of fiscal year 2020 ERO released at least 46 individuals for whom ERO data indicate potential U.S. citizenship from immigration detention facilities (less than 1 percent of all releases during that period). Additionally, data indicate ERO released at least 59 individuals with unknown citizenship from immigration detention facilities. See table 4.

**Table 4: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Releases of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from ICE Detention Facilities from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal Year | U.S. citizens | Individuals with unknown citizenship | All other individuals |
|---|---|---|---|
| 2015 | 11 | 9 | 95,246 |
| 2016 | 9 | 7 | 143,154 |
| 2017 | 10 | 10 | 122,625 |
| 2018 | 6 | 13 | 167,984 |
| 2019 | 7 | 15 | 263,241 |
| 2020 Q1-2 | 3 | 5 | 44,206 |
| **Total** | **46** | **59** | **836,456** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

## Removals

According to available ERO removal data, from fiscal year 2015 through the second quarter of fiscal year 2020 ERO removed at least 70 individuals for whom ERO data indicate potential U.S. citizenship from the United States (less than 1 percent of all individuals ICE removed during that period). Additionally, data indicate ICE removed at least 42 individuals with unknown citizenship. See table 5.

**Table 5: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations Removals (ERO) of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal Year | U.S. citizens | Individuals with unknown citizenship | All other individuals |
|---|---|---|---|
| 2015 | 2 | 19 | 235,392 |
| 2016 | 2 | 6 | 240,247 |
| 2017 | 15 | 3 | 226,101 |
| 2018 | 21 | 3 | 256,061 |
| 2019 | 21 | 10 | 267,227 |
| 2020 Q1-2 | 9 | 1 | 133,484 |
| **Total** | **70** | **42** | **1,358,512** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an

enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

According to available ERO removal data, CBP apprehended and transferred to ICE at least 48 of the 70 (approximately 69 percent) individuals for whom ERO data indicate potential U.S. citizenship and whom ERO removed from fiscal year 2015 through the second quarter of fiscal year 2020.

We provide additional details on ICE data in appendix III.

## Available Data Do Not Indicate Whether CBP Held U.S. Citizens on Administrative Immigration Charges

Available OFO and Border Patrol data provide the number of occurrences when CBP held and arrested U.S. citizens as well as the characteristics of those individuals; however, the data do not allow us or CBP to identify whether CBP processed those U.S. citizens on administrative immigration charges.

### Data Do Not Indicate Whether OFO Held U.S. Citizens on Administrative Immigration Charges

OFO's data systems do not maintain data in a manner that would allow us or OFO to identify whether officers held and processed U.S. citizens on administrative immigration charges. As previously discussed, OFO inspects all individuals entering the country through ports of entry and may hold U.S. citizens as part of inspection processes, as needed, to determine compliance with U.S. law, and make arrests of U.S. citizens suspected to be involved in criminal activity, such as the smuggling of contraband. However, OFO officials stated that only specific data system processing pathways are relevant to individuals officers identify as U.S. citizens. Further, OFO officials said if officers first process an individual as a foreign national but later identify the individual as a U.S. citizen, they are to update the processing pathway so that it reflects the individual is a U.S. citizen.[29] As such, the data do not allow us or OFO to identify if officers mistakenly held U.S. citizens as foreign nationals on administrative immigration charges, which OFO officials stated officers would document in electronic inspection or case file narratives.

Available OFO data indicate that officers referred U.S. citizens to secondary inspection for admissibility reasons on 6,255,077 occasions

---

[29]A processing pathway refers to the steps officers take to process an individual in OFO's data system after making an admissibility decision.

from fiscal year 2015 through the second quarter of fiscal year 2020.[30]
See figure 6.

**Figure 6: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of OFO data  |  GAO-21-487

Note: Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S. citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

OFO data indicate that the U.S. citizens whom OFO referred for secondary inspection for admissibility reasons were most often males (see figure 7) and individuals ages 31 or older (see figure 8).

---

[30]Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S. citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

**Figure 7: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of OFO data.  |  GAO-21-487

Notes: Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S. citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

Of referral records for U.S. citizens, 9,866 were missing the individuals' gender (4,472 referrals in fiscal year 2015; 3,884 referrals in fiscal year 2016; and 1,510 referrals in fiscal year 2017).

**Figure 8: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of OFO data. | GAO-21-487

Notes: Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S. citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

Of referral records for U.S. citizens, five were missing the individuals' ages (one referral in fiscal year 2019 and four referrals in fiscal year 2020 through quarter 2).

Further, when officers determine individuals are inadmissible or have potential travel or trade violations, among other reasons, they are to arrest these individuals to pursue enforcement actions against them, including charging them with administrative immigration violations, or to facilitate other civil enforcement action or criminal investigation and

potential prosecution.[31] Available OFO data indicate that OFO held U.S. citizens and processed them for various types of enforcement actions on 16,560 occasions from fiscal year 2015 through the second quarter of fiscal year 2020 (see figure 9).[32]

**Figure 9: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of OFO data  |  GAO-21-487

Note: Enforcement actions records include enforcement actions related to administrative immigration violations and criminal offenses, among others.

Additionally, OFO data indicate that enforcement actions OFO processed against U.S. citizens most often involved males (see figure 10) and individuals ages 19 to 30 (see figure 11).

[31]CBP may temporarily hold juvenile U.S. citizens for the purpose of transferring them to the custody of a U.S. citizen relative or state or local agency if, for example, they are traveling with their foreign national parents who are being held for immigration violations. Additionally, CBP may arrest U.S. citizens for federal criminal violations, such as narcotics smuggling.

[32]OFO officials stated that officers enter the reason for holding and/or charges in narrative fields and on the appropriate processing forms. As such, the available data does not specify whether U.S. citizens were charged with administrative immigration violations.

**Figure 10: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of OFO data. | GAO-21-487

Notes: Enforcement actions records include enforcement actions related to administrative immigration violations and criminal offenses, among others.

Of enforcement action records for U.S. citizens, 80 did not indicate either a male or female gender for the individuals (seven in fiscal year 2016; 14 in fiscal year 2017; 18 in fiscal year 2018; 16 in fiscal year 2019; and 25 in fiscal year 2020 through quarter 2).



**Figure 11: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

Source: GAO analysis of OFO data. | GAO-21-487

Notes: Enforcement actions records include enforcement actions related to administrative immigration violations and criminal offenses, among others.

Of enforcement action records for U.S. citizens, two were missing the individuals' age (one in fiscal year 2017 and one in fiscal year 2020 through quarter 2).

We provide additional details on OFO data in appendix III.

## Data Do Not Indicate Whether Border Patrol Held U.S. Citizens on Administrative Immigration Charges

Border Patrol's data system does not maintain data in a manner that would allow us or Border Patrol to identify whether agents held and processed U.S. citizens on administrative immigration charges. Border Patrol officials stated that data system controls prevent agents from processing individuals they enter as U.S. citizens on administrative immigration charges by restricting certain processing pathways. Further, if agents first process an individual as a foreign national but later identify

PYM-000132

the individual as a U.S. citizen and update the citizenship field, the system no longer allows the agent to process the individual on administrative immigration charges. As such, the data do not allow us or Border Patrol to identify if agents mistakenly held U.S. citizens as foreign nationals, which Border Patrol officials stated agents would document in electronic case file narratives.

Similar to OFO, Border Patrol may hold U.S. citizens that its agents encounter between ports of entry, as needed to determine compliance with U.S. law, and make arrests of U.S. citizens suspected to be involved in criminal activity, such as the smuggling of contraband. Available data indicate Border Patrol made 85,423 arrests of U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020. See figure 12.

**Figure 12: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Note: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such as smuggling of contraband.

Additionally, available data indicate Border Patrol made 44 arrests of individuals with unknown or missing citizenship information during that period (see table 6).

**Table 6: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal year | Arrests of U.S. citizens | Arrests of individuals with unknown citizenship |
|---|---|---|
| 2015 | 16,588 | 14 |
| 2016 | 16,241 | 9 |
| 2017 | 14,210 | 9 |
| 2018 | 15,045 | 6 |
| 2019 | 15,514 | 5 |
| 2020 Q1-2 | 7,825 | 1 |
| **Total** | **85,423** | **44** |

Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Note: Arrests include all arrests of U.S. citizens and individuals with unknown citizenship, including arrests related to criminal violations, such as smuggling of contraband.

Available data also indicate Border Patrol's arrests of U.S. citizens were mostly of males (see figure 13) and individuals ages 19 to 45 (see figure 14).

**Figure 13: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Notes: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such as smuggling of contraband.

Of arrest records for U.S. citizens, 322 did not indicate either a male or a female gender (94 in fiscal year 2015; 67 in fiscal year 2016, 55 in fiscal year 2017; 52 in fiscal year 2018; 43 in fiscal year 2019; and 11 in fiscal year 2020 through quarter 2).



**Figure 14: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Notes: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such as smuggling of contraband.

Of arrest records for U.S. citizens, 109 were missing the individuals' age (28 in fiscal year 2015; 18 in fiscal year 2016; 18 in fiscal year 2017; 15 in fiscal year 2018; 28 in fiscal year 2019; and 2 in fiscal year 2020 through quarter 2).

We provide additional details on Border Patrol data in appendix III.

# ICE Has Policies and Procedures for Investigating Citizenship for Detainers and Issued Detainers for a Small Number of Potential U.S. Citizens

## ICE Has Policies and Procedures for Investigating Potential U.S. Citizenship

ICE has two policies that describe steps ERO officers are to take to investigate citizenship when contemplating lodging a detainer or after issuing a detainer.[33] First, the procedures for investigating, elevating, and documenting claims and indicia described in ICE's 2015 policy also apply to officers issuing detainers. According to the 2015 policy, ERO officers are, to the extent feasible, to interview the individual in custody of another law enforcement agency to aid in assessing any claims or indicia of potential U.S. citizenship.[34] Additionally, ICE's 2017 policy titled *Issuance of Immigration Detainers by ICE Immigration Officers* requires ERO officers to establish probable cause that the individual is a removable foreign national prior to issuing a detainer.[35] The 2017 policy also requires

---

[33]ERO becomes aware that an individual in a local, state, federal, or tribal law enforcement agency's custody may be a potentially removable foreign national by various means. For example, a law enforcement agency may request that ICE conduct an immigration status review for an individual in its custody, which prompts ICE officials to search federal immigration records for the individual. Additionally, ERO officers, through ICE's Criminal Alien Program, or co-located at a state or local law enforcement facility, may identify and arrest removable foreign nationals in another law enforcement agency's custody.

[34]Officials also stated that there are limited permissible circumstances in which officers might not interview individuals prior to issuing detainers, including if the individuals have prior removal orders with no prior claims to U.S. citizenship or if the individuals are too intoxicated to respond.

[35]ERO officers may not issue a detainer based on the initiation of an investigation to determine whether the individual is removable—and may not establish probable cause of removability—solely based on evidence of foreign birth or the absence of records in federal databases.

PTM-000137

ERO officers to issue all detainers with a *Warrant for Arrest of Alien* or a *Warrant of Removal/Deportation*.[36]

Figure 15 describes ICE procedures for investigating any claims or indicia of potential U.S. citizenship prior to or after issuing a detainer, as described in ICE policy.

---

[36]Per section 236 and 287 of the Immigration and Nationality Act and part 287 of Title 8, Code of Federal Regulations, immigration officers may issue a *Warrant of Arrest of Alien* to another law enforcement agency if they have determined there is probable cause to believe the individual is removable from the United States. ERO officers may also issue a *Warrant of Removal/Deportation* if the individual has a final order of removal/deportation from an immigration judge in exclusion, removal, or deportation proceedings, a designated official, the Board of Immigration Appeals, or a U.S. District or Magistrate Court judge pursuant to certain provisions of the Immigration and Nationality Act.

GAO-21-487  Immigration Enforcement

**Figure 15: U.S. Immigration and Customs Enforcement (ICE) Procedures for Investigating Potential U.S. Citizenship of Individuals Prior to or After Issuing a Detainer**

Source: GAO analysis of ICE policy. | GAO-21-487

Notes: A detainer is a notice from ICE to a federal, state, local, or tribal law enforcement agency which articulates probable cause for removability. It also requests for such agency to inform DHS of a pending release date for a removable foreign national and to maintain custody of the individual for up to 48 hours to allow DHS to assume custody.

According to ICE policy, probable cause may be supported by (1) a final order of removal against the individual; (2) the pendency of ongoing removal proceedings against the individual; (3) biometric confirmation of the individual's identity and a records match in federal databases that affirmatively indicate the individual is removable; or (4) statements made voluntarily by the individual to an ICE

officer or other reliable evidence that indicate the individual lacks lawful immigration status or is removable.

[a]Potential indicia of citizenship include but are not limited to: evidence that the individual was born in the United States; information suggesting that one or more of the individual's parents, grandparents, or foreign-born siblings are or were U.S. citizens; and the individual has served in the U.S. Armed Forces.

[b]All interviews with individuals claiming U.S. citizenship or for whom there are indicia of citizenship are to be conducted by an officer in the presence of or in consultation with a supervisor.

[c]According to ICE, probative evidence of U.S. citizenship means that the evidence tends to show that the individual may be a U.S. citizen. U.S. citizenship need not be shown by a preponderance of the evidence for ICE to find that there is some probative evidence of U.S. citizenship.

[d]It is not necessary for ICE to wait to cancel the detainer if there is probative evidence of U.S. citizenship.

## Available Data Indicate ERO Issued Detainers for At Least 895 Potential U.S. Citizens

According to ERO detainer data, from fiscal year 2015 through the second quarter of fiscal year 2020 ERO issued detainers for at least 895 individuals for whom ERO data indicate potential U.S. citizenship and for at least 1,841 individuals with unknown citizenship (less than 1 percent of all detainers issued).[37] See table 7.

**Table 7: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operation (ERO) Detainers Issued for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship and Individuals with Unknown Citizenship from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal Year | U.S. citizens | Individuals with unknown citizenship | All other individuals |
|---|---|---|---|
| 2015 | 146 | 363 | 96,383 |
| 2016 | 140 | 308 | 85,578 |
| 2017 | 196 | 388 | 141,772 |
| 2018 | 192 | 429 | 176,526 |
| 2019 | 145 | 242 | 165,100 |
| 2020 Q1-2 | 76 | 111 | 64,379 |
| **Total** | **895** | **1,841** | **729,738** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

[37]As stated previously, ERO officers entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO issued the detainer. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

FYM-000140

According to ERO detainer data, individuals for whom ERO data indicate potential U.S. citizenship and whom ERO issued detainers were mostly males (figure 16) and individuals ages 19 to 45 (table 8).

**Figure 16: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of ICE data. | GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Of detainer records for potential U.S. citizens, three records in fiscal year 2019 were missing individuals' gender.

**Table 8: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Age | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| 0 to 7 | 0 | 0 | 0 | 1 | 0 | 0 | **1** |
| 8 to 13 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| 14 to 18 | 7 | 2 | 5 | 10 | 3 | 2 | **29** |
| 19 to 30 | 67 | 62 | 98 | 83 | 55 | 31 | **396** |
| 31 to 45 | 53 | 62 | 66 | 65 | 55 | 30 | **331** |
| 46 and up | 18 | 14 | 27 | 33 | 32 | 13 | **137** |
| **Total:** | **146** | **140** | **196** | **192** | **145** | **76** | **895** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Of detainer records for potential U.S. citizens, one record in fiscal year 2015 was missing the individual's date of birth.

Finally, available data indicate that ERO cancelled at least 665 of the 895 detainers for individuals for whom ERO data indicate potential U.S. citizenship (approximately 74 percent). Table 9 provides information on the reasons ICE indicated it cancelled these detainers and the number of detainers not cancelled from fiscal year 2015 to the second quarter of fiscal year 2020.[38]

---

[38]ICE guidance does not specify which cancellation reason to select if ICE identifies probative evidence that an individual may be a U.S. citizen. Further, the data does not indicate when specifically ICE cancelled the detainer, such as after investigating a claim to citizenship.

**Table 9: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers Issued for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Cancellation Reason from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Cancellation reason | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Detainers cancelled by ICE | | | | | | | |
| Not subject to deportation | 6 | 14 | 53 | 84 | 59 | 29 | **245** |
| Booked into detention | 12 | 6 | 23 | 23 | 15 | 6 | **85** |
| Case closed | 1 | 1 | 5 | 2 | 3 | 0 | **12** |
| Detainer declined by law enforcement agency | 4 | 0 | 1 | 5 | 2 | 3 | **15** |
| Cancelled[a] | 14 | 31 | 47 | 43 | 29 | 17 | **181** |
| Prosecutorial discretion | 0 | 0 | 0 | 0 | 1 | 0 | **1** |
| Transferred | 0 | 1 | 1 | 2 | 0 | 0 | **4** |
| U.S. citizen interviewed[b] | 37 | 60 | 25 | 0 | 0 | 0 | **122** |
| **Total cancelled** | **74** | **113** | **155** | **159** | **109** | **55** | **665** |
| Detainers not cancelled by ICE | | | | | | | |
| **Total not cancelled** | **72** | **27** | **41** | **33** | **36** | **21** | **230** |

Source: GAO analysis of ICE data. | GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

[a]ICE's guidance for cancelling detainers states that officers are to use "Cancelled" only when the individual's case falls outside of the other provided reasons.

[b]ICE stopped using the U.S. citizen interviewed detainer cancellation reason after fiscal year 2017.

We provide additional details on ICE data in appendix III.

# Conclusions

ICE and CBP have developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers and agents encounter. However, ICE's officer training materials contain guidance for notifying supervisors of encounters with potential U.S. citizens that are inconsistent with ICE policy. By making its training materials consistent with its policy, ICE would have more assurance that all encounters with individuals who claim U.S. citizenship receive appropriate supervisory review. Moreover, while ICE policy directs officers and attorneys to document the course of action that results from investigations into potential U.S. citizenship in individuals' electronic records, officers are not required to update the citizenship field if ICE identifies probative evidence that individuals may be U.S. citizens. As a

result, ICE does not know the extent to which its officers are encountering and taking enforcement actions against individuals who could be U.S. citizens.

## Recommendations for Executive Action

We are making the following two recommendations to ICE.

1.  The Director of ICE should update ICE's training materials to reflect ICE policies requiring officers to consult supervisors during encounters with potential U.S. citizens. (Recommendation 1)

2.  The Director of ICE should systematically collect and maintain electronic data on its encounters with individuals for whom there is probative evidence of U.S. citizenship. (Recommendation 2)

## Agency Comments and Our Evaluation

We provided a draft of this report to DHS for review and comment. DHS provided formal, written comments, which are reproduced in full in appendix IV. DHS also provided technical comments to our draft report, which we incorporated, as appropriate.

DHS concurred with our two recommendations and described actions planned or underway to address them. For example, in response to our recommendation that ICE update its training materials to reflect ICE policies requiring officers to consult supervisors during encounters with potential U.S. citizens, ICE described the changes it made in June 2021 to its training materials for ERO officer trainings and requested that we consider the recommendation resolved and closed. We reviewed the revised training materials and found that the revisions are positive steps. However, to fully address the intent of our recommendation, ICE should ensure that its training materials reflect ICE's policy that officers are to interview all individuals claiming U.S. citizenship or with potential indicia of citizenship in the presence of, or in consultation with, a supervisor. Regarding our recommendation that ICE systematically collect and maintain electronic data on its encounters with individuals for whom there is probative evidence of U.S. citizenship, ICE stated that it will analyze the processes and systems used to collect such information and update user guides and standard operating procedures to reflect new data collection requirements.

We are sending copies of this report to the appropriate congressional committees and the Secretary of Homeland Security. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-8777 or gamblerr@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff members who made key contributions to this report are listed in appendix V.

Rebecca Gambler
Director, Homeland Security and Justice

*List of Requesters*

The Honorable Jerrold Nadler
Chairman
Committee on the Judiciary
House of Representatives

The Honorable Zoe Lofgren
Chairperson
Subcommittee on Immigration and Citizenship
Committee on the Judiciary
House of Representatives

The Honorable David N. Ciciline
House of Representatives

The Honorable Steve Cohen
House of Representatives

The Honorable Val Demings
House of Representatives

The Honorable Sylvia R. Garcia
House of Representatives

The Honorable Pramila Jayapal
House of Representatives

The Honorable Ted W. Lieu
House of Representatives

The Honorable Eric Swalwell
House of Representatives

# Appendix I: Objectives, Scope, and Methodology

This report examines (1) the extent to which U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) have developed and implemented policies and procedures for investigating potential U.S. citizenship of individuals its officers and agents encounter, (2) what ICE and CBP data indicate about the number and characteristics of U.S. citizens detained by ICE or held by CBP on administrative immigration charges in the last 5 fiscal years,[1] and (3) the extent to which ICE has developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers identify for immigration detainers.[2]

To address these three objectives, we interviewed Department of Homeland Security (DHS) officials, including those from DHS's Office of Strategy, Policy, and Plans; Office of Inspector General (OIG); and Office for Civil Rights and Civil Liberties (CRCL). We also interviewed officials from ICE's Enforcement and Removal Operations (ERO) directorate (including Field Operations and Law Enforcement Systems and Analysis), Homeland Security Investigations directorate, Office of the Principal Legal Advisor (OPLA), Law Enforcement Support Center, and Pacific Enforcement Response Center. Further, we interviewed officials from CBP's Office of the Commissioner and Office of Chief Counsel; CBP's Office of Field Operations (OFO) Admissibility and Passenger Programs Directorate (including the Enforcement Programs Division) and OFO's Planning, Program Analysis, and Evaluation Directorate; and Border Patrol's Law Enforcement Operations Directorate and Strategic Planning and Analysis Directorate.

In addition, we interviewed selected field officials from ICE and CBP in June and July 2020. Specifically, we met with ERO officials from ICE's Buffalo, Los Angeles, and Philadelphia field offices; OFO officials from the Detroit, Laredo, and San Francisco field offices; and Border Patrol officials from the Miami, Rio Grande Valley, San Diego, and Spokane sectors. To select the ERO locations for interviews, we reviewed publicly

---

[1]We use the term "administrative immigration charges" to refer to allegations of removability typically included in a Notice to Appear in immigration court or an expedited removal order. Such allegations are based on civil violations of U.S. immigration law, which would render a charged foreign national statutorily inadmissible or deportable and therefore subject to removal from the United States.

[2]A detainer is a notice from ICE to a federal, state, local, or tribal law enforcement agency, which articulates probable cause for removability. It also requests for such agency to inform DHS of a pending release date for a removable foreign national and to maintain custody of the individual for up to 48 hours to allow DHS to assume custody.

available ERO data on the number of arrests by field office from fiscal year 2015 through fiscal year 2016 and the number of detainers issued from fiscal year 2015 through February 2017—the most recent data publicly available at the time. To select the OFO locations for interviews, we reviewed publicly available OFO data on the number of inadmissible foreign nationals OFO inspected from fiscal year 2015 through the first quarter of fiscal year 2019—the most recent data publicly available at the time. To select the Border Patrol locations for interviews, we reviewed publicly available Border Patrol data on the arrests of removable foreign nationals from fiscal year 2015 through fiscal year 2019—the most recent data publicly available at the time.

For all of these selections, we included a range of low, medium, and high enforcement action field offices and sectors, as well as a variety of geographic locations. The information we obtained from interviews with field officials are not generalizable to all ICE, OFO, or Border Patrol operations; however, they provided us the opportunity to learn more about how ICE and CBP officers and agents implement policies and procedures for investigating the citizenship of individuals they encounter and how they document these investigations.

Additionally, we interviewed individuals from Northwestern University's Deportation Clinic and Syracuse University's Transactional Resource Access Clearinghouse Immigration, which are research entities that conduct similar work analyzing immigration enforcement issues and data, to gather their perspectives based on their work.

To assess the extent to which ICE and CBP have developed and implemented policies and procedures to investigate the potential U.S. citizenship of the individuals their officers and agents encounter, we reviewed ICE and CBP policy documents, training materials, processing guides, and other guidance documents in effect from October 2015 through March 2020. For example, we reviewed ICE's 2015 policy titled *Investigating the Potential U.S. Citizenship of Individuals Encountered by ICE* and CBP officer and Border Patrol agent basic training academy materials on how officers and agents are to investigate citizenship and process individuals for removal, among other documents.[3] We compared ICE and CBP policies and procedures with processes described by

---

[3]U.S. Immigration and Customs Enforcement, *Investigating the Potential U.S. Citizenship of Individuals Encountered by ICE* (November 2015).

officials we interviewed, as well as with DHS, ICE, and CBP data we
collected.

Specifically, we analyzed data from DHS's OIG and CRCL related to
complaints these offices received by or on the behalf of individuals
claiming to be U.S. citizens who were held, detained, or subject to
detainers by DHS to aid in this comparison. To collect OIG and CRCL
complaint data, we provided OIG and CRCL with key words for searches
to identify potentially relevant records they received from fiscal year 2015
through the second quarter of fiscal year 2020.[4] We requested that OIG
and CRCL withhold records, which were unnecessary for our work,
related to individuals seeking immigration relief as victims of domestic
abuse, human trafficking, or other qualifying crimes, and whose
information is generally to be kept confidential.[5] OIG withheld three such
complaint records and CRCL withheld 11 that are not included in our
analysis and reporting.

To determine which of the complaints we received were relevant to our
review, we further analyzed each complaint record's narrative for
information related to individuals claiming to be U.S. citizens who were
detained, removed, subject to a detainer by ICE, or held for administrative
immigration reasons by OFO or Border Patrol. Because OIG and CRCL
sometimes receive the same complaints, receive the same complaint
more than once, and also share complaints with one another, we also
identified and removed duplicate records based on record-level details
(such as the individual's name, the date the complaint was received, and
narrative details) within and across the records we received from OIG and
CRCL. This allowed us to report on numbers of complaints we identified
as received by the respective offices and combined across offices.
Because our identification of relevant complaints was based on key word
searches, there may be additional relevant complaints that we were
unable to identify and include in the report; however, we worked with the
OIG and CRCL to develop a list of terms likely to identify complaints in
our scope. We determined these data were sufficiently reliable to identify
a baseline number of relevant complaints.

---

[4]For example, we used key words and terms such as "citizenship claim," "United States
citizen," "parent is a citizen," "naturalized citizen," "detained by ICE," "detained by CBP,"
and "detainer" to identify relevant complaints.

[5]8 U.S.C. § 1367.

We compared ICE policies and procedures and training materials to
*Standards for Internal Control in the Federal Government*.[6] We
determined the control activities component of internal control—the
actions management establishes to achieve objectives and respond to
risks—was significant to this objective. We assessed ICE's policy
documents, training materials, and processing guides related to
investigating, elevating, and documenting claims or indicia of the potential
U.S. citizenship of individuals ICE officers encounter to determine
whether they were capable of achieving ICE's immigration enforcement
objectives and responding to risks related to taking enforcement actions
against U.S. citizens. Further, we determined the information and
communication activities component of internal controls—that
management should use quality information to achieve objectives—was
significant to this objective.[7] We assessed ICE's policy documents and
training materials for investigating, elevating, and documenting claims or
indicia of the potential U.S. citizenship of individuals ICE officers
encounter and the availability and reliability of ICE's arrest, detention,
release, and removal data from fiscal year 2015 through the second
quarter of 2020. We took these steps to determine whether the policy
documents and training materials were able to help ICE meet its
immigration enforcement objectives, respond to risks related to taking
enforcement actions against U.S. citizens, and meet DHS's information
sharing needs.

To describe what ICE and CBP data indicate about the numbers and
characteristics of U.S. citizens detained by ICE or held by CBP on
administrative immigration charges, we reviewed and analyzed record-
level ICE data related to arrests, detentions, releases, and removals as
well as record-level inspection and arrest data from OFO and Border
Patrol. We collected data for fiscal year 2015 through the second quarter
of fiscal year 2020 (March 2020)—the most recent data available at the
time of our review. We also collected and analyzed record-level data
related to OPLA investigations of potential U.S. citizenship of individuals
that ICE encountered, arrested, detained, removed, issued a detainer, or
released. However, we did not include this data in the report because,
after reviewing our draft report, ICE informed us that the data it provided
for our analysis were incomplete. In addition, we assessed record-level
data related to electronic investigations ICE conducted into the citizenship

---

[6]GAO, *Standards for Internal Control in the Federal Government,* GAO-14-704G
(Washington, D.C.: September 2014).

[7]GAO-14-704G.

of individuals in another law enforcement agency's custody or that ICE officers encountered from fiscal year 2015 through the second quarter of fiscal year 2020. The record-level data we analyzed are current as of the date ICE, Border Patrol, and OFO provided it to us; the respective agency or component may have subsequently updated the data. Specifically, we received ICE arrest, detention, removal, and release data in September 2020; OPLA investigation data in August 2020; ICE electronic investigation data in August 2020; OFO data in July 2020 with supplemental inspections data received in November 2020; and Border Patrol data in July 2020.

We analyzed the record-level data to describe the numbers and characteristics, including the age and gender, of U.S. citizens involved in an arrest, detention, release, removal, or admissibility referral in the case of OFO. In addition, we analyzed the record-level data to determine the number of arrests, detentions, and removals by ICE field office; admissibility referrals[8] and enforcement actions[9] by OFO field office; and arrests by Border Patrol sector. We used number of arrests (or detentions, releases, removals, referrals, investigations) rather than the number of U.S. citizens (or individuals with unknown citizenship) as the unit of analysis because an individual may have been involved in an enforcement action or referred for a secondary admissibility inspection multiple times in the same year.

**ICE data.** To assess the reliability of all of ICE's data, we (1) performed electronic testing for obvious errors in accuracy and completeness; (2) reviewed existing information about the data and the systems that produced them, such as relevant training materials for the ICE officers

---

[8]OFO officers conduct immigration and customs inspections of every individual presenting themselves for entry into the United States at U.S. ports of entry. If officers cannot admit, or permit entry of, an individual into the country based on the primary inspection, they are to refer the individual to secondary inspection—sometimes known as an admissibility referral—where OFO continues the immigration inspection and investigates any potential issues.

[9]When officers determine individuals are inadmissible to the United States, they may take custody of these individuals to pursue immigration enforcement and removal actions against them, including charging administrative immigration violations; or, if appropriate, they may arrest individuals, including U.S. citizens, in furtherance of criminal investigation and potential prosecution where there is probable cause that they committed a crime. CBP may temporarily hold juvenile U.S. citizens for the purpose of transferring them to the custody of a U.S. citizen relative or state or local agency if, for example, they are traveling with their foreign national parents who are being held for immigration violations. Additionally, CBP may arrest U.S. citizens for federal criminal violations, such as narcotics smuggling.

who use them; and (3) discussed data entry issues and data limitations with ICE officials. According to ICE headquarters officials, ICE officers are not required to update the country of citizenship field in its data systems when ICE identifies probative evidence of U.S. citizenship for individuals originally processed as foreign nationals; therefore, we described relevant ICE data using modifiers such as "at least" and "approximately" because there may be additional individuals who could be U.S. citizens that we were unable to identify. Additionally, for the individuals for whom ICE data indicate potential U.S. citizenship that we report, officials said ICE entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ICE took an enforcement action. ICE's data do not indicate when ICE entered "United States" in these fields in its data system. We determined that the ICE data were sufficiently reliable for the purposes of reporting a baseline number of potential U.S. citizens arrested, detained, released, and removed by ICE.

**OFO data.** We limited our review of OFO admissibility inspection referral and enforcement action data to records OFO identified as involving U.S. citizens due to the large volume of admissibility referrals and enforcement actions taken against individuals with a citizenship other than the United States over the review period. We report admissibility referral data that includes referrals of U.S. citizens for all types of admissibility reasons in our analysis because OFO officials stated officers do not consistently enter specific admissibility referral reasons in the related data field. Similarly, we report enforcement action data that includes all enforcement actions for U.S. citizens because the enforcement action data does not provide the reason OFO held or charged an individual. To assess the reliability of OFO's data, we (1) performed electronic testing for obvious errors in accuracy and completeness; (2) reviewed existing information about the data and the systems that produced them, such as relevant training materials for the OFO officers who use them; and (3) discussed data entry issues and data limitations with OFO officials. We determined that the OFO data were sufficiently reliable for the purposes of reporting the numbers of referrals to secondary inspection for admissibility reasons and enforcement actions processed against U.S. citizens for all types of reasons.

**Border Patrol data.** We limited our review of Border Patrol arrest data to records Border Patrol identified as involving U.S. citizens or individuals with unknown citizenship due to the large volume of Border Patrol arrests

of individuals with a citizenship other than the United States over the review period. We report Border Patrol arrest data that includes all arrests of U.S. citizens because Border Patrol officials stated that the data system does not record if agents mistakenly processed U.S. citizens on administrative immigration violations.[10] We calculated time in custody for the U.S. citizens arrested by Border Patrol by subtracting the initial book-in date from the final book-out date. To assess the reliability of Border Patrol's data, we (1) performed electronic testing, for obvious errors in accuracy and completeness; (2) reviewed existing information about the data and the systems that produced them, such as relevant training materials for the Border Patrol agents who use them; and (3) discussed data entry issues and data limitations with Border Patrol officials. We determined that the Border Patrol data were sufficiently reliable for the purposes of reporting the number of arrests of U.S. citizens.

To determine the extent to which ICE has developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers identify for detainers—we reviewed ICE policy documents, training materials, and other guidance documents in effect from October 2015 through March 2020. For example, we reviewed ICE's 2015 policy previously described and ICE's 2017 policy titled *Issuance of Immigration Detainers by ICE Immigration Officers*.[11] We compared ICE policies and procedures with the processes described by ICE officials we interviewed.

We also analyzed available record-level ICE data for detainers issued from fiscal year 2015 through the second quarter of fiscal year 2020—the most recent data available at the time of our review—to describe the numbers and characteristics, including the age and gender, of individuals for whom ICE data indicate potential U.S. citizenship and for whom ICE issued a detainer. In addition, we analyzed the record-level data to determine the number of detainers by the ICE field office and the number of detainers ICE cancelled. The record-level detainer data we analyzed are current as of September 2020, when ICE provided it to us; ICE may have subsequently updated the data.

---

[10]Border Patrol may hold U.S. citizens that its agents encounter between ports of entry, as needed to determine compliance with U.S. law, and make arrests of U.S. citizens suspected to be involved in criminal activity, such as the smuggling of contraband.

[11]U.S. Immigration and Customs Enforcement, *Issuance of Immigration Detainers by ICE Immigration Officers* (March 2017).

**Appendix I: Objectives, Scope, and Methodology**

To assess the reliability of ICE's data, we (1) performed electronic testing for obvious errors in accuracy and completeness; (2) reviewed existing information about the data and the systems that produced them, such as relevant training materials for the ICE officers who use them; and (3) discussed data entry issues and data limitations with ICE officials. Because ICE officers are not required to update the country of citizenship field in its data systems when ICE identifies probative evidence of U.S. citizenship for individuals originally processed as foreign nationals, we described ICE detainer data using modifiers such as "at least" and "approximately" because of possible missing information. Additionally, ICE's data do not indicate when ICE entered "United States" in the fields for citizenship and country of birth in its data system, which may have occurred after ICE issued the detainers. We determined that the ICE data were sufficiently reliable for the purposes of reporting a baseline number of detainers that ICE issued and cancelled for potential U.S. citizens.

We conducted this performance audit from February 2020 to July 2021 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: Department of Homeland Security (DHS) Complaint Data

The following provides information about the complaints the DHS Office of Inspector General (OIG) and Office for Civil Rights and Civil Liberties (CRCL) received made by or on the behalf of individuals claiming to be U.S. citizens who were detained or the target of immigration detainers by U.S. Immigration and Customs Enforcement (ICE) from fiscal year 2015 through the second quarter of fiscal year 2020 (March 2020).[1] In addition, it includes information about the complaints the OIG and CRCL received made by or on behalf of U.S. citizens who claiming to be U.S. citizens who were held for administrative immigration reasons by U.S. Customs and Border Protection's (CBP) Office of Field Operations (OFO) and U.S. Border Patrol (Border Patrol) during the same period.[2] The OIG and CRCL receive and investigate these types of complaints against ICE and CBP, among others concerning DHS.[3]

## OIG Complaints

The following tables contain information about the complaints the OIG received made by or on the behalf of individuals claiming to be U.S. citizens who were detained or the target of detainers by ICE or held by Border Patrol or OFO for administrative immigration reasons from fiscal year 2015 through the second quarter of fiscal year 2020.

Available OIG complaint data indicate the OIG received 130 complaints made by or on the behalf of individuals claiming to be U.S. citizens who were detained or the target of detainers by ICE or held by CBP for

[1]A detainer is a notice from ICE to a federal, state, local, or tribal law enforcement agency, which articulates probable cause for removability. It also requests for such agency to inform DHS of a pending release date for a removable foreign national and to maintain custody of the individual for up to 48 hours to allow DHS to assume custody.

[2]We use the term "administrative immigration charges" to refer to allegations of removability typically included in a Notice to Appear in immigration court or an expedited removal order. Such allegations are based on civil violations of U.S. immigration law, which would render a charged foreign national statutorily inadmissible or deportable and therefore subject to removal from the United States. See 8 U.S.C. §§ 1182, 1227, 1229, 1229a.

[3]We did not independently investigate or verify the claims made in these complaints. Forty-six of the complaints we collected and identified as relevant appeared in both the OIG and CRCL data. To collect OIG and CRCL complaint data, we provided OIG and CRCL with key words for searches to identify potentially relevant records they received from fiscal year 2015 through the second quarter of fiscal year 2020. We analyzed each complaint record's narrative for information related to individuals claiming to be U.S. citizens who were detained, removed, subject to a detainer by ICE, or held for administrative immigration reasons by OFO or Border Patrol. For more information about how we collected these complaints, see appendix I.

administrative immigration reasons from fiscal year 2015 through the
second quarter of fiscal year 2020. See table 10.

**Table 10: U.S. Department of Homeland Security (DHS) Office of the Inspector
General (OIG) Number of Complaints Received Related to Individuals Claiming to
be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015
through 2020 Quarter 2 (March 2020)**

| Fiscal year | Complaints received |
|---|---|
| 2015 | 37[a] |
| 2016 | 31[b] |
| 2017 | 17 |
| 2018 | 19[c] |
| 2019 | 22 |
| 2020 Q1-2 | 9 |
| **Total** | **130[d]** |

Source: GAO analysis of OIG data.  |  GAO-21-487

Note: Enforcement actions by DHS include U.S. Immigration and Customs Enforcement (ICE)
detention and targeting of individuals for detainers and U.S. Customs and Border Protection (CBP)
holding of individuals for administrative immigration reasons.

[a]One individual's complaint was received in fiscal year 2015 and fiscal year 2019 and is included in
both years in the table.

[b]Two individuals' complaints were received in fiscal year 2016 and fiscal year 2017 and are included
in both years in the tables. One individual's complaint was received in fiscal year 2015 and fiscal year
2019 and is included in both years in the table.

[c]One individual's complaint was received in fiscal year 2018 and fiscal year 2019 and is included in
both years in the table.

[d]Column totals do not equal total overall number of complaints due to duplicate complaints received in
more than one fiscal year.

In addition, available OIG complaint data indicate the majority of
complaints OIG received were made by or on the behalf of individuals
claiming to be U.S. citizens who were detained by ICE (see table 11).

**Table 11: U.S. Department of Homeland Security (DHS) Office of the Inspector General (OIG) Complaints Received Related to Individuals Claiming to be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Type of enforcement action | Number of complaints received |
|---|---|
| Detained by U.S. Immigration and Customs Enforcement (ICE) | 105[a] |
| Target of detainer by ICE | 15 |
| In removal proceedings or processed for removal by ICE | 3 |
| Held by U.S. Customs and Border Protection (CBP) | 3 |
| Held by CBP's Office of Field Operations (OFO) | 15 |
| Held by CBP's U.S. Border Patrol (Border Patrol) | 7 |
| Subject of detainer by unspecified DHS agency | 1 |
| **Total** | **130[b]** |

Source: GAO analysis of OIG data.  |  GAO-21-487

Note: Enforcement actions by DHS include ICE detention and targeting of individuals for detainers and CBP holding of individuals for administrative immigration reasons.

[a]Eight complaints that allege ICE detained U.S. citizens also allege that CBP took administrative immigration enforcement actions, including: three that CBP held U.S. citizens; three that OFO held U.S. citizens; and two that Border Patrol held U.S. citizens. These complaints are included in both types of enforcement actions in the table. Additionally, 12 complaints that allege ICE detained US. citizens also allege that ICE took additional enforcement actions, including 11 that ICE targeted U.S. citizens for a detainer and one that ICE put the U.S. citizen in removal proceedings or processed the U.S. citizen for removal. These complaints are included in both types of enforcement actions in the table.

[b]Column totals do not equal total overall number of complaints due to complaints that alleged more than one type of enforcement action.

Further, available OIG complaint data also indicate that the OIG received five additional records that CRCL officials initiated based on their review of media reports, which are not included in the tables above. Four of these records were from individuals claiming to be U.S. citizens who were detained by ICE, three of whom also claim ICE targeted them for detainers. One record was from an individual claiming to be a U.S. citizen who was held by OFO for administrative immigration reasons.

Appendix II: Department of Homeland Security
(DHS) Complaint Data

## CRCL Complaints

The following tables contain information about the complaints CRCL received made by or on the behalf of individuals claiming to be U.S. citizens who were detained or the target of detainers by ICE or held by Border Patrol or OFO for administrative immigration reasons from fiscal year 2015 through the second quarter of fiscal year 2020.

Available CRCL complaint data indicate that CRCL received 74 complaints made by or on the behalf of individuals claiming to be U.S. citizens who were detained or targets of detainers by ICE or held by CBP for administrative immigration reasons from fiscal year 2015 through the second quarter of fiscal year 2020. See table 12.

Table 12: U.S. Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL) Number of Complaints Received Related to Individuals Claiming to be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)

| Fiscal year | Complaints received |
|---|---|
| 2015 | 10 |
| 2016 | 12 |
| 2017 | 19[a] |
| 2018 | 20 |
| 2019 | 13 |
| 2020 Q1-2 | 3 |
| **Total** | **74[b]** |

Source: GAO analysis of CRCL data. | GAO-21-487

Note: Enforcement actions by DHS include U.S. Immigration and Customs Enforcement (ICE) detention and targeting of individuals for detainers and U.S. Customs and Border Protection (CBP) holding of individuals for administrative immigration reasons.

[a]Two individuals' complaints received in fiscal year 2017 were received again in fiscal year 2018 and are included in both years in the table.

[b]Column totals do not equal total overall number of complaints due to duplicate complaints received in more than one fiscal year.

In addition, available CRCL complaint data indicate complaints CRCL received were most often made by or on the behalf of individuals claiming to be U.S. citizens who were detained by ICE (see table 13).

**Table 13: U.S. Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL) Complaints Received Related to Individuals Claiming to be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Type of enforcement action | Number of complaints received |
|---|---|
| Detained by U.S. Immigration and Customs Enforcement (ICE) | 49[a] |
| Target of detainers by ICE | 7[b] |
| Held by U.S. Customs and Border Protection (CBP) | 3 |
| Held by CBP's Office of Field Operations (OFO) | 21 |
| Held by CBP's U.S. Border Patrol (Border Patrol) | 5 |
| **Total** | **74[c]** |

Source: GAO analysis of CRCL data. | GAO-21-487

Note: Enforcement actions by DHS include ICE detention and targeting of individuals for detainers and CBP holding of individuals for administrative immigration reasons.

[a]Five complaints that allege ICE detained U.S. citizens also allege that CBP took enforcement actions, including two that OFO held U.S. citizens, one that Border Patrol held a U.S. citizen, and two that did not specify the CBP component that held U.S. citizens. These complaints are included in both types of enforcement actions in the table.

[b]One complaint that alleges ICE targeted a U.S. citizen for a detainer also alleges that OFO held a U.S. citizen. This complaint is included in both types of enforcement actions in the table. Five complaints that allege ICE detained U.S. citizens also allege that ICE targeted U.S. citizens for detainers. These complaints are included in both types of enforcement actions in the table.

[c]Column totals do not equal total overall number of complaints due to complaints that alleged more than one type of enforcement action.

Further, available CRCL complaint data indicate that CRCL also initiated 14 additional records based on media reports that CRCL officials reviewed (see table 14).

**Table 14: U.S. Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL) Records Initiated from Media Reports Related to Individuals Claiming to be U.S. Citizens Subject to Enforcement Actions by DHS from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Type of enforcement action | Number of records initiated |
|---|---|
| Detained by U.S. Immigration and Customs Enforcement (ICE) | 12[a] |
| Target of detainers by ICE | 8[b] |
| Held by U.S. Customs and Border Protection's (CBP) Office of Field Operations (OFO) | 2 |
| Held by CBP's U.S. Border Patrol (Border Patrol) | 1 |
| **Total** | **14[c]** |

Source: GAO analysis of CRCL data. | GAO-21-487

Note: Enforcement actions by DHS include ICE detention and targeting of U.S. citizens for detainers and CBP holding of U.S. citizens for administrative immigration reasons.

[a]Two complaints that allege ICE detained U.S. citizens also allege that CBP took enforcement actions against U.S. citizens, including one that OFO held U.S. citizens and one that Border Patrol held U.S. citizens. These complaints are included in both types of enforcement actions in the table.

[b]Seven complaints that allege ICE detained individuals also allege that ICE targeted U.S. citizens in detainers. These complaints are included in both types of enforcement actions in the table.

[c]Column totals do not equal total overall number of complaints due to complaints that alleged more than one type of enforcement action.

# Appendix III: Data on Department of Homeland Security's (DHS) Detention and Holding of U.S. Citizens

The following provides information about the detention and holding of U.S. citizens by U.S. Immigration and Customs Enforcement's (ICE) Enforcement and Removal Operations (ERO) and U.S. Customs and Border Protection's (CBP) Office of Field Operations (OFO) and U.S. Border Patrol (Border Patrol) from fiscal year 2015 through the second quarter of fiscal year 2020 (March 2020). It also provides information about immigration status inquiries that ERO conducted during the same timeframe.

## ICE Enforcement Actions Against Potential U.S. Citizens

The following tables contain information on the individuals for whom ERO data indicate potential U.S. citizenship and whom ERO arrested, detained, released, and removed from fiscal year 2015 through the second quarter of fiscal year 2020. ERO officers are not required to update the citizenship field when ERO identifies probative evidence that individuals may be U.S. citizens.[1] As a result, there may be additional individuals who could be U.S. citizens whom ERO arrested, detained, released, or removed that we were unable to identify in the available data. Additionally, ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

### Arrests

According to available ERO arrest data, the majority of individuals for whom ERO data indicate potential U.S. citizenship and whom ERO arrested had a criminal or immigration history (see table 15).

[1]According to ICE, probative evidence of U.S. citizenship means that the evidence tends to show that the individual may be a U.S. citizen. U.S. citizenship need not be shown by a preponderance of the evidence for ICE to find that there is some probative evidence of U.S. citizenship.

**Appendix III: Data on Department of Homeland Security's (DHS) Detention and Holding of U.S. Citizens**

**Table 15: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Arrests of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Criminal history | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Convicted criminal | 23 | 17 | 16 | 32 | 19 | 8 | **115** |
| Other immigration violator | 146 | 77 | 54 | 106 | 109 | 42 | **534** |
| Pending criminal charges | 0 | 0 | 0 | 15 | 10 | 0 | **25** |
| **Total** | **169** | **94** | **70** | **153** | **138** | **50** | **674** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

For the purposes of this report and our presentation of ICE data, we refer to individuals with criminal convictions known to ICE as "convicted criminals" and individuals without criminal convictions known to ICE as "other immigration violators." According to ICE officials, administrative arrests of other immigration violators includes those who have been charged but not convicted of a crime as well as those with no prior criminal history. We use ICE's determination of criminality for our analysis.

According to ICE, ICE officers electronically request and retrieve criminal history information about an individual from the FBI's National Crime Information Center database, which maintains a repository of federal and state criminal history information, and other sources.

## Detentions

According to available ERO detention data, more than half of the individuals for whom ERO data indicate potential U.S. citizenship and whom ERO booked into immigration detention facilities had a criminal or immigration history (see table 16).

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

**Table 16: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detentions of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Criminal history | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Convicted criminal | 23 | 4 | 10 | 14 | 13 | 4 | 68 |
| Other immigration violator | 14 | 13 | 11 | 1 | 5 | 2 | 46 |
| Pending criminal charges | 0 | 0 | 0 | 4 | 2 | 1 | 7 |
| **Total** | **37** | **17** | **21** | **19** | **20** | **7** | **121** |

Source: GAO analysis of ICE data. | GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

For the purposes of this report and our presentation of ICE data, we refer to individuals with criminal convictions known to ICE as "convicted criminals" and individuals without criminal convictions known to ICE as "other immigration violators." According to ICE officials, administrative arrests of other immigration violators includes those who have been charged but not convicted of a crime as well as those with no prior criminal history. We use ICE's determination of criminality for our analysis.

According to ICE, ICE officers electronically request and retrieve criminal history information about an individual from the FBI's National Crime Information Center database, which maintains a repository of federal and state criminal history information, and other sources.

Individuals for whom ERO data indicate potential U.S. citizenship and whom ERO booked into immigration detention facilities were most often detained in the Los Angeles and Phoenix areas of responsibility (see figure 17).[2]

[2]ERO operates across 24 areas of responsibility nationwide.

**Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens**

**Figure 17: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detentions of
Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Location of Detention from Fiscal Year 2015 through
2020 Quarter 2 (March 2020)**



Source: GAO analysis of ICE data. | GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when
applicable, in its data system at some point during or after completing investigations of any claims or
indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an
enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in
its data system.

According to available ERO detention data, about half of all individuals for
whom ERO data indicate potential U.S. citizenship and whom ERO
booked into immigration detention facilities were released when their
immigration proceedings were terminated by ICE (see table 17).

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

**Table 17: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detentions of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Release Reason from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Release reason | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Order of recognizance | 3 | 4 | 2 | 2 | 2 | 2 | 15 |
| Proceedings terminated | 20 | 5 | 10 | 9 | 9 | 5 | 58 |
| Prosecutorial discretion | 7 | 3 | 7 | 4 | 3 | 0 | 24 |
| Removed | 1 | 2 | 0 | 1 | 2 | 0 | 6 |
| All others[a] | 6 | 3 | 2 | 3 | 4 | 0 | 18 |
| **Total** | **37** | **17** | **21** | **19** | **20** | **7** | **121** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

[a]Other release reasons include "Bonded Out," "Order of Supervision," "Paroled," "Transferred," "U.S. Marshals or Other Agency," and "Withdrawal." Additionally, of release records for U.S. citizens, one record in 2015 was missing the individual's release reason.

**Releases**

According to available ERO release data, most individuals for whom ERO data indicate potential U.S. citizenship and whom ERO released from immigration detention facilities had a criminal or immigration history (see table 18).

**Table 18: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Releases of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Criminal history | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Convicted criminal | 3 | 0 | 4 | 3 | 3 | 2 | 15 |
| Other immigration violator | 8 | 9 | 6 | 0 | 4 | 1 | 28 |
| Pending criminal charges | 0 | 0 | 0 | 3 | 0 | 0 | 3 |
| **Total** | **11** | **9** | **10** | **6** | **7** | **3** | **46** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

PYM-000165

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

For the purposes of this report and our presentation of ICE data, we refer to individuals with criminal convictions known to ICE as "convicted criminals" and individuals without criminal convictions known to ICE as "other immigration violators." According to ICE officials, administrative arrests of other immigration violators includes those who have been charged but not convicted of a crime as well as those with no prior criminal history. We use ICE's determination of criminality for our analysis.

According to ICE, ICE officers electronically request and retrieve criminal history information about an individual from the FBI's National Crime Information Center database, which maintains a repository of federal and state criminal history information, and other sources.

According to available ERO release data, individuals for whom ERO data indicate potential U.S. citizenship and whom ERO released were most often released in the Los Angeles, Phoenix, and San Antonio areas of responsibility (see figure 18).

**Figure 18: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Releases of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Location of Detention from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of ICE data. | GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

Further, according to available ERO release data, more than half of all
individuals for whom ERO data indicate potential U.S. citizenship and
whom ERO released from immigration detention facilities were released
on prosecutorial discretion (see table 19).

**Table 19: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Releases of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Release Reason from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Release reason | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Bonded out | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Order of recognizance | 3 | 4 | 2 | 1 | 2 | 3 | 15 |
| Order of supervision | 0 | 1 | 1 | 0 | 0 | 0 | 2 |
| Paroled | 0 | 0 | 0 | 1 | 2 | 0 | 3 |
| Prosecutorial discretion | 7 | 3 | 7 | 4 | 3 | 0 | 24 |
| **Total** | **11** | **9** | **10** | **6** | **7** | **3** | **46** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when
applicable, in its data system at some point during or after completing investigations of any claims or
indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an
enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in
its data system.

## Removals

According to available ERO removal data, most individuals for whom
ERO data indicate potential U.S. citizenship and whom ERO removed
from the United States had a criminal or immigration history (see table
20).

**Table 20: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Criminal history | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Convicted criminal | 2 | 1 | 6 | 13 | 10 | 4 | 36 |
| Other immigration violator | 0 | 0 | 0 | 8 | 11 | 5 | 24 |
| Non-criminal | 0 | 1 | 9 | 0 | 0 | 0 | 10 |
| **Total** | **2** | **2** | **15** | **21** | **21** | **9** | **70** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when
applicable, in its data system at some point during or after completing investigations of any claims or
indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an
enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in
its data system.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

For the purposes of this report and our presentation of ICE data, we refer to individuals with criminal convictions known to ICE as "convicted criminals" and individuals without criminal convictions known to ICE as "other immigration violators." According to ICE officials, administrative arrests of other immigration violators includes those who have been charged but not convicted of a crime as well as those with no prior criminal history. We use ICE's determination of criminality for our analysis.

According to ICE, ICE officers electronically request and retrieve criminal history information about an individual from the FBI's National Crime Information Center database, which maintains a repository of federal and state criminal history information, and other sources.

Individuals for whom ERO data indicate potential U.S. citizenship and whom ERO removed were most often removed from the San Diego area of responsibility (see figure 19).

Figure 19: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Location of Removal from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)



Source: GAO analysis of ICE data. | GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

Additionally, according to available ERO removal data, most individuals for whom ERO data indicate potential U.S. citizenship and whom ERO removed from the United States had a case status that indicated they were removed due to inadmissibility or deportability (see table 21).

**Table 21: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Removals of Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Case Status from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Case status | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Withdrawal permitted | 0 | 0 | 0 | 1 | 3 | 0 | **4** |
| Voluntary departure confirmed | 0 | 0 | 2 | 1 | 2 | 2 | **7** |
| Removed - deportability | 0 | 0 | 3 | 6 | 4 | 2 | **15** |
| Removed – inadmissibility | 2 | 2 | 10 | 13 | 9 | 5 | **41** |
| Voluntary return | 0 | 0 | 0 | 0 | 3 | 0 | **3** |
| **Total** | **2** | **2** | **15** | **21** | **21** | **9** | **70** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Note: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

## ICE Immigration Detainers

The following tables contain information on individuals for whom ERO data indicate potential U.S. citizenship and whom ERO officers issued immigration detainers for from fiscal year 2015 through the second quarter of fiscal year 2020.[3] According to available ERO detainer data, most individuals for whom ERO data indicate potential U.S. citizenship and whom ERO issued detainers for had a criminal history (see table 22).

---

[3]A detainer is a notice from ICE to a federal, state, local, or tribal law enforcement agencies which articulates probable cause for removability. It also requests for such agency to inform DHS of a pending release date for a removable foreign national and to maintain custody of the foreign national for up to 48 hours to allow DHS to assume custody.

**Table 22: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers Issued for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Criminal History from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Criminal history | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Convicted criminal | 78 | 119 | 173 | 173 | 71 | 36 | **650** |
| Other immigration violator | 68 | 21 | 23 | 19 | 14 | 11 | **156** |
| Pending criminal charges | 0 | 0 | 0 | 0 | 60 | 29 | **89** |
| **Total** | **146** | **140** | **196** | **192** | **145** | **76** | **895** |

Source: GAO analysis of ICE data. | GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

For the purposes of this report and our presentation of ICE data, we refer to individuals with criminal convictions known to ICE as "convicted criminals" and individuals without criminal convictions known to ICE as "other immigration violators." According to ICE officials, administrative arrests of other immigration violators includes those who have been charged but not convicted of a crime as well as those with no prior criminal history. We use ICE's determination of criminality for our analysis.

According to ICE, ICE officers electronically request and retrieve criminal history information about an individual from the FBI's National Crime Information Center database, which maintains a repository of federal and state criminal history information, and other sources.

Further, according to available ERO detainer data, ERO issued detainers for individuals for whom ERO data indicate potential U.S. citizenship in the Dallas and Los Angeles areas of responsibility the most often (see figure 20).

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

**Figure 20: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers Issued for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Location from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**



Source: GAO analysis of ICE data. | GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Of detainer records for potential U.S. citizens, 10 were missing the area of responsibility where ICE issued the detainer (five in fiscal year 2015; four in fiscal year 2018; and one in fiscal year 2019)

Additionally, according to available ERO detainer data, most individuals for whom ERO data indicate potential U.S. citizenship and whom ICE issued detainers were located in county and state detention facilities (see table 23).

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

**Table 23: U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Detainers Issued for Individuals for Whom ERO Data Indicate Potential U.S. Citizenship by Detention Facility Type from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Detention facility type | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| County facility | 86 | 71 | 128 | 127 | 92 | 44 | **548** |
| Federal facility | 9 | 11 | 18 | 16 | 30 | 9 | **93** |
| Local facility | 13 | 6 | 14 | 13 | 5 | 4 | **55** |
| State facility | 27 | 34 | 31 | 29 | 17 | 17 | **155** |
| All others | 11 | 18 | 5 | 7 | 1 | 2 | **44** |
| **Total** | **146** | **140** | **196** | **192** | **145** | **76** | **895** |

Source: GAO analysis of ICE data.  |  GAO-21-487

Notes: ERO entered a value of "United States" in the fields for citizenship and country of birth, when applicable, in its data system at some point during or after completing investigations of any claims or indicia of potential U.S. citizenship for these individuals, which may have occurred after ERO took an enforcement action. ERO's data do not indicate when ERO entered "United States" in these fields in its data system.

Of detainer records for potential U.S. citizens, one record in 2015 was missing the individual's detention facility type.

# Immigration Status Inquires

ICE conducts immigration status inquiries on individuals in the custody of local, state, federal, and tribal law enforcement agencies upon their request or after otherwise identifying these individuals as potentially removable foreign nationals. ICE data indicate that it conducted 1,662,238 immigration status checks from fiscal year 2015 through the second quarter of fiscal year 2020. Of those 1,662,238 status checks, ICE identified that the individual was a U.S. citizen on 788,331 occasions (see figure 21).

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens



**Figure 21: Citizenship of Individuals Identified in Immigration Status Checks by U.S. Immigration and Customs Enforcement (ICE) from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

Source: GAO analysis of OPLA data. | GAO-21-487

# U.S. Citizens Held and Arrested by CBP

The following tables contain additional information on U.S. citizens arrested and held by OFO and Border Patrol from fiscal year 2015 through the second quarter of fiscal year 2020.

## OFO Admissibility Referrals of U.S. Citizens

OFO inspects all individuals entering the country through ports of entry and may hold U.S. citizens as part of inspection processes, as needed, to determine compliance with U.S. law, and make arrests of U.S. citizens suspected to be involved in criminal activity, such as the smuggling of contraband. OFO officers conduct immigration and customs inspections of every individual presenting themselves for entry into the United States at U.S. ports of entry. If officers cannot admit, or permit entry of, an individual into the country based on primary inspection, they are to refer the individual to secondary inspection—sometimes known as an admissibility referral—where OFO continues the immigration inspection and investigates any potential issues. Available OFO data on admissibility referrals to secondary inspection indicate OFO officers made referrals of

PYM-000173

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

U.S. citizens to secondary inspection for admissibility reasons on
6,255,077 occasions from fiscal year 2015 through the second quarter of
fiscal year 2020.[4] See table 24.

**Table 24: U.S. Customs and Border Protection (CBP) Office of Field Operations
(OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection from Fiscal
Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal year | Referrals for secondary inspection |
|---|---|
| 2015 | 831,231 |
| 2016 | 934,460 |
| 2017 | 1,072,690 |
| 2018 | 1,380,308 |
| 2019 | 1,364,471 |
| 2020 Q1-2 | 671,917 |
| **Total** | **6,255,077** |

Source: GAO analysis of OFO data.  |  GAO-21-487

Note: Referrals to secondary inspection for admissibility reasons include referrals related to potential
administrative immigration violations and criminal violations, which CBP would consider in deciding
whether to permit admission of an individual into the United States. Individuals identified as U.S.
citizens are permitted to enter the United States, but may be subject to criminal enforcement
processes.

Additionally, available OFO data on admissibility referrals to secondary
inspection indicate that OFO officers made more referrals of male U.S.
citizens than of female U.S. citizens for admissibility reasons during the
same time period (see table 25).

---

[4]Referrals to secondary inspection for admissibility reasons include referrals related to
potential administrative immigration violations and criminal violations, which CBP would
consider in deciding whether to permit admission of an individual into the United States.
Individuals identified as U.S. citizens are permitted to enter the United States, but may be
subject to criminal enforcement processes.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

**Table 25: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal year | Admissibility referrals for secondary inspection | | |
|---|---|---|---|
| | Male | Female | Other or not disclosed |
| 2015 | 520,867 | 305,672 | 220 |
| 2016 | 588,785 | 341,365 | 426 |
| 2017 | 658,838 | 395,977 | 16,365 |
| 2018 | 819,945 | 536,156 | 24,207 |
| 2019 | 813,951 | 528,102 | 22,418 |
| 2020 Q1-2 | 396,875 | 265,048 | 9,994 |
| **Total** | **3,799,261** | **2,372,320** | **73,630** |

Source: GAO analysis of OFO data.  |  GAO-21-487

Notes: Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S. citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

Of referral records for U.S. citizens, 9,866 were missing the individuals' gender (4,472 referrals in fiscal year 2015; 3,884 referrals in fiscal year 2016; and 1,510 in fiscal year 2017).

Further, available OFO data on admissibility referrals to secondary inspection indicate that OFO officers consistently made referrals of U.S. citizens aged 46 and older more than any other age group from fiscal year 2015 through the second quarter of fiscal year 2020 (see table 26).

**Table 26: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Age group | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| 0-7 | 48,174 | 51,211 | 58,826 | 81,178 | 78,790 | 37,272 | **355,451** |
| 8-13 | 42,672 | 45,662 | 53,801 | 75,127 | 72,902 | 32,556 | **322,720** |
| 14-18 | 58,134 | 65,006 | 72,595 | 93,854 | 92,369 | 45,313 | **427,271** |
| 19-30 | 213,061 | 248,904 | 276,932 | 338,518 | 330,444 | 167,853 | **1,575,712** |
| 31-45 | 211,923 | 241,918 | 275,798 | 348,608 | 345,045 | 165,016 | **1,588,308** |
| 46 and older | 257,267 | 281,759 | 334,738 | 443,023 | 444,920 | 223,903 | **1,985,610** |
| **Total** | **831,231** | **934,460** | **1,072,690** | **1,380,308** | **1,364,471** | **671,917** | **6,255,077** |

Source: GAO analysis of OFO data.  |  GAO-21-487

Notes: Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S.

**Appendix III: Data on Department of Homeland Security's (DHS) Detention and Holding of U.S. Citizens**

citizens are permitted to enter the United States, but may be subject to criminal enforcement processes.

Of referral records for U.S. citizens, five were missing the individuals' ages (one referral in fiscal year 2019 and four referrals in fiscal year 2020 through quarter 2).

Available OFO data on admissibility referrals to secondary inspection also indicate that the San Diego Field Office area of responsibility made the most admissibility referrals to secondary admissibility inspection for U.S. citizens (see table 27).

**Table 27: U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) Admissibility Referrals of U.S. Citizens for Secondary Inspection by Field Office and Preclearance Operations Locations from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Field office and preclearance operations | Number of referrals of U.S. citizens | Percentage of referrals of U.S. citizens |
|---|---|---|
| Atlanta | 18,658 | 0.3 |
| Baltimore | 50,266 | 0.8 |
| Boston | 112,867 | 1.8 |
| Buffalo | 268,254 | 4.3 |
| Chicago | 82,341 | 1.3 |
| Detroit | 173,578 | 2.8 |
| El Paso | 606,191 | 9.7 |
| Houston | 128,215 | 2.1 |
| Laredo | 1,085,296 | 17.4 |
| Los Angeles | 53,582 | 0.9 |
| Miami | 225,740 | 3.6 |
| New Orleans | 1,515 | 0.0 |
| New York | 480,697 | 7.7 |
| Portland | 13,164 | 0.2 |
| Preclearance | 104,741 | 1.7 |
| San Diego | 2,012,420 | 32.2 |
| San Francisco | 90,725 | 1.5 |
| San Juan | 11,169 | 0.2 |
| Seattle | 206,239 | 3.3 |
| Tampa | 18,482 | 0.3 |
| Tucson | 510,937 | 8.2 |
| **Total** | **6,255,077** | **100** |

Source: GAO analysis of OFO data. | GAO-21-487

Notes: Referrals to secondary inspection for admissibility reasons include referrals related to potential administrative immigration violations and criminal violations, which CBP would consider in deciding whether to permit admission of an individual into the United States. Individuals identified as U.S.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

citizens are permitted to enter the United States, but may be subject to criminal enforcement
processes.

Of admissibility referral records for U.S. citizens, one referral record from headquarters (Washington,
D.C.) is included in the Baltimore Field Office.

## OFO Enforcement Actions for U.S. Citizens

When officers determine individuals are inadmissible or have potential travel or trade violations, among other reasons, they are to arrest these individuals to pursue enforcement actions against them, including charging them with administrative immigration violations or to facilitate other civil enforcement action or criminal investigation and potential prosecution.[5] Available OFO enforcement action data indicate that OFO held U.S. citizens and processed them for various types of enforcement actions on 16,560 occasions from fiscal year 2015 through the second quarter of fiscal year 2020.[6] See table 28.

**Table 28: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal year | Enforcement actions processed for U.S. citizens |
|---|---|
| 2015 | 1,679 |
| 2016 | 2,126 |
| 2017 | 2,554 |
| 2018 | 3,080 |
| 2019 | 3,784 |
| 2020 Q1-2 | 3,337 |
| **Total** | **16,560** |

Source: GAO analysis of OFO data.  |  GAO-21-487

Note: Enforcement actions records include enforcement actions related to administrative immigration
violations and criminal offenses, among others.

---

[5]CBP may temporarily hold juvenile U.S. citizens for the purpose of transferring them to
the custody of a U.S. citizen relative or state or local agency if, for example, they are
traveling with their foreign national parents who are being held for immigration violations.
Additionally, CBP may arrest U.S. citizens for federal criminal violations, such as narcotics
smuggling.

[6]OFO officials stated that officers enter the reason for holding and/or charges in narrative
fields and on the appropriate processing forms. As such, the available data does not
specify whether U.S. citizens were charged with administrative immigration violations.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

Additionally, available OFO enforcement action data indicate that the
enforcement actions OFO processed against U.S. citizens most often
involved males during the same time period (see table 29).

**Table 29: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal Year | Enforcement actions processed for U.S. citizens | | |
|---|---|---|---|
| | Male | Female | Other or not disclosed |
| 2015 | 1,174 | 505 | 0 |
| 2016 | 1,458 | 661 | 7 |
| 2017 | 1,659 | 881 | 14 |
| 2018 | 1,964 | 1,098 | 18 |
| 2019 | 2,347 | 1,421 | 16 |
| 2020 Q1-2 | 2,035 | 1,277 | 25 |
| **Total** | **10,637** | **5,843** | **80** |

Source: GAO analysis of OFO data. | GAO-21-487

Note: Enforcement actions records include enforcement actions related to administrative immigration
violations and criminal offenses, among others.

Available OFO enforcement action data also indicate that the
enforcement actions processed against U.S. citizens most often involved
individuals ages 19 to 30 (see table 30).

**Table 30: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Age Group | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| 0-7 | 25 | 61 | 117 | 124 | 167 | 181 | **675** |
| 8-13 | 17 | 69 | 176 | 217 | 367 | 213 | **1,059** |
| 14-18 | 66 | 96 | 182 | 226 | 318 | 225 | **1,113** |
| 19-30 | 524 | 699 | 826 | 1,127 | 1,293 | 1,126 | **5,595** |
| 31-45 | 538 | 619 | 737 | 805 | 954 | 804 | **4,457** |
| 46 and older | 509 | 582 | 515 | 581 | 685 | 787 | **3,659** |
| **Total** | **1,679** | **2,126** | **2,554** | **3,080** | **3,784** | **3,337** | **16,560** |

Source: GAO analysis of OFO data. | GAO-21-487

Notes: Enforcement actions records include enforcement actions related to administrative immigration
violations and criminal offenses, among others.

Of enforcement action records for U.S. citizens, two were missing the individuals' age (one in fiscal
year 2017 and one in fiscal year 2020 through quarter 2).

**Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens**

Further, available OFO enforcement action data indicate that the San
Diego Field Office area of responsibility processed the most enforcement
actions against U.S. citizens (see table 31).

**Table 31: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S.
Citizens by Field Office and Preclearance Operations Locations from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Field office and preclearance locations | Number of enforcement actions | Percentage of total enforcement actions |
|---|---|---|
| Atlanta | 42 | 0.3 |
| Baltimore | 61 | 0.4 |
| Boston | 219 | 1.3 |
| Buffalo | 1,141 | 6.9 |
| Chicago | 19 | 0.1 |
| Detroit | 667 | 4.0 |
| El Paso | 1,163 | 7.0 |
| Houston | 830 | 5.0 |
| Laredo | 2,822 | 17.0 |
| Los Angeles | 40 | 0.2 |
| Miami | 3,196 | 19.3 |
| New Orleans | 0 | 0.0 |
| New York | 145 | 0.9 |
| Portland | 21 | 0.1 |
| Preclearance | 314 | 1.9 |
| San Diego | 3,433 | 20.7 |
| San Francisco | 37 | 0.2 |
| San Juan | 2 | 0.0 |
| Seattle | 219 | 1.3 |
| Tampa | 289 | 1.8 |
| Tucson | 1,900 | 11.5 |
| **Total** | **16,560** | **100** |

Source: GAO analysis of OFO data.  |  GAO-21-487

Note: Enforcement actions records include enforcement actions related to administrative immigration
violations and criminal offenses, among others.

Finally, for most enforcement actions, OFO held U.S. citizens for less
than 24 hours (see table 32).

Appendix III: Data on Department of Homeland Security's (DHS) Detention and Holding of U.S. Citizens

**Table 32: U.S. Customs and Border Protection Office of Field Operations (OFO) Enforcement Actions Processed for U.S. Citizens by Time in Custody from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Time in custody | Number of enforcement actions | Percentage of total enforcement actions |
|---|---|---|
| Not specified | 340 | 2.1 |
| Less than 24 hours | 14,884 | 89.9 |
| 24 to less than 48 hours | 782 | 4.7 |
| 48 to less than 72 hours | 268 | 1.6 |
| 72 to less than 96 hours | 102 | 0.6 |
| 96 to less than 120 hours | 52 | 0.3 |
| 120 to less than 144 hours | 16 | 0.1 |
| 144 hours to less than 1 week | 21 | 0.1 |
| 1 week and greater | 95 | 0.6 |
| **Total** | **16,560** | **100** |

Source: GAO analysis of OFO data.  |  GAO-21-487

Note: Enforcement actions records include enforcement actions related to administrative immigration violations and criminal offenses, among others.

## Border Patrol Arrests of U.S. Citizens

Similar to OFO, Border Patrol may hold U.S. citizens that its agents encounter between ports of entry, as needed to determine compliance with U.S. law, and make arrests of U.S. citizens suspected to be involved in criminal activity, such as the smuggling of contraband. Available Border Patrol data indicate Border Patrol made 85,423 arrests of U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020. See table 33.

**Table 33: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal year | Arrests of U.S. citizens |
|---|---|
| 2015 | 16,588 |
| 2016 | 16,241 |
| 2017 | 14,210 |
| 2018 | 15,045 |
| 2019 | 15,514 |
| 2020 Q1-2 | 7,825 |
| **Total** | **85,423** |

Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Note: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such as smuggling of contraband.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

Additionally, Border Patrol data indicate Border Patrol made more than
double of the amount of arrests of male U.S. citizens than of female U.S.
citizens during the same period (see table 34).

**Table 34: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Gender from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Fiscal Year | | | Arrests of U.S. citizens |
|---|---|---|---|
| | Male | Female | Other or not disclosed |
| 2015 | 11,692 | 4,802 | 94 |
| 2016 | 11,311 | 4,863 | 67 |
| 2017 | 10,076 | 4,079 | 55 |
| 2018 | 10,369 | 4,624 | 52 |
| 2019 | 10,454 | 5,017 | 43 |
| 2020 Q1-2 | 5,415 | 2,399 | 11 |
| **Total** | **59,317** | **25,784** | **322** |

Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Note: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such
as smuggling of contraband.

Available Border Patrol data also indicate that arrests of U.S. citizens
most often involved individuals ages 19 to 30 (see table 35).

**Table 35: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Age from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Age group | Fiscal year 2015 | Fiscal year 2016 | Fiscal year 2017 | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 quarters 1 and 2 | Total |
|---|---|---|---|---|---|---|---|
| Not specified | 28 | 18 | 18 | 15 | 28 | 2 | **109** |
| 0-7 | 232 | 245 | 189 | 142 | 386 | 124 | **1,318** |
| 8-13 | 174 | 255 | 226 | 142 | 607 | 203 | **1,607** |
| 14-18 | 1,334 | 1,343 | 1,237 | 1,542 | 1,646 | 904 | **8,006** |
| 19-30 | 7,751 | 7,888 | 6,893 | 7,175 | 7,242 | 3,739 | **40,688** |
| 31-45 | 4,543 | 4,364 | 3,807 | 4,075 | 3,931 | 2,042 | **22,762** |
| 46 and older | 2,526 | 2,128 | 1,840 | 1,954 | 1,674 | 811 | **10,933** |
| **Total** | **16,588** | **16,241** | **14,210** | **15,045** | **15,514** | **7,825** | **85,423** |

Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Note: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such
as smuggling of contraband.

Appendix III: Data on Department of Homeland
Security's (DHS) Detention and Holding of U.S.
Citizens

Further, available Border Patrol data indicate that arrests of U.S. citizens
occurred in Rio Grande Valley Sector in Texas most often (see table 36).

**Table 36: U.S. Border Patrol (Border Patrol) Arrests of U.S. Citizens by Border Patrol Sector from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Sector | Number of arrests of U.S. citizens | Percentage of total arrests |
|---|---|---|
| Big Bend | 10,391 | 12.2 |
| Blaine | 146 | 0.2 |
| Buffalo | 74 | 0.1 |
| Del Rio | 4,687 | 5.5 |
| Detroit | 402 | 0.5 |
| El Centro | 4,739 | 5.6 |
| El Paso | 6,869 | 8.0 |
| Grand Forks | 97 | 0.1 |
| Houlton | 56 | 0.1 |
| Havre | 48 | 0.1 |
| Laredo | 10,697 | 12.5 |
| Miami | 107 | 0.1 |
| New Orleans | 323 | 0.4 |
| Rio Grande Valley | 19,556 | 22.9 |
| Ramey | 72 | 0.1 |
| San Diego | 11,041 | 12.9 |
| Spokane | 99 | 0.1 |
| Swanton | 603 | 0.7 |
| Tucson | 10,068 | 11.8 |
| Yuma | 5,348 | 6.3 |
| **Total** | **85,423** | **100** |

Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Note: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such as smuggling of contraband.

Finally, available data indicate that Border Patrol held U.S. citizens for
less than 24 hours in approximately 83 percent of arrests and less than
48 hours in about 92 percent of arrests (see table 37).

**Appendix III: Data on Department of Homeland Security's (DHS) Detention and Holding of U.S. Citizens**

**Table 37: U.S. Border Patrol (Border Patrol) Arrests by Time in Custody from Fiscal Year 2015 through 2020 Quarter 2 (March 2020)**

| Time in custody[a] | Total | Percent of total |
|---|---|---|
| Not specified | 1,128 | 1.3 |
| Less than 24 hours | 71,099 | 83.2 |
| 24 to less than 48 hours | 7,528 | 8.8 |
| 48 to less than 72 hours | 2,968 | 3.5 |
| 72 to less than 96 hours | 1,143 | 1.3 |
| 96 to less than 120 hours | 533 | 0.6 |
| 120 to less than 144 hours | 219 | 0.3 |
| 144 hours to less than 1 week | 121 | 0.1 |
| 1 week and greater | 684 | 0.8 |
| **Total** | **85,423** | **100** |

Source: GAO analysis of Border Patrol data.  |  GAO-21-487

Note: Arrests include all arrests of U.S. citizens, including arrests related to criminal violations, such as smuggling of contraband.

[a]We calculated time in custody by subtracting the initial book-in date from the final book-out date.

# Appendix IV: Comments from the Department of Homeland Security



U.S. Department of Homeland Security
Washington, DC 20528

**Homeland Security**

June 30, 2021

Rebecca Gambler
Director, Homeland Security and Justice
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Re:   Management Response to Draft Report GAO-21-487, "IMMIGRATION
      ENFORCEMENT: Actions Needed to Better Track Cases Involving U.S.
      Citizenship Investigations"

Dear Ms. Gambler:

Thank you for the opportunity to comment on this draft report. The U.S. Department of
Homeland Security (DHS or the Department) appreciates the U.S. Government
Accountability Office's (GAO) work in planning and conducting its review and issuing this
report.

The Department is pleased to note GAO's recognition that the U.S. Immigration and
Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) have policies
and procedures for investigating the potential U.S. citizenship of individuals its offices and
agents encounter. It is also important to note, however, that U.S. citizenship law is complex,
and an individuals' U.S. citizenship may not always be easily ascertained. ICE and CBP
handle potential claims to U.S. citizenship with the utmost care and highest priority, pursuant
to the Immigration and Nationality Act of 1952, codified under Title 8 of the United States
Code, which governs immigration to, and citizenship, in the United States. Specifically, the
Act sets forth the parameters for U.S. citizenship by virtue of birth in the United States,
naturalization, derivation of citizenship through a parent who has been naturalized, or
acquisition of citizenship from a U.S. citizen parent.

On November 10, 2015, for example, ICE issued Directive 16001.2 – "Investigating the
Potential U.S. Citizenship of Individuals Encountered by ICE," which updated previous
guidance, dated November 19, 2009, on reporting and investigating claims to U.S.
citizenship. This updated directive established an agency-wide policy for ensuring ICE
officers, agents, and attorneys immediately investigate any potential claims to U.S.
citizenship and analyze any evidence presented by the individual or family member.

**Appendix IV: Comments from the Department
of Homeland Security**

ICE does not have legal authority to arrest and/or detain a U.S. citizen for a civil
administrative immigration violation. Nevertheless, while performing their duties, ICE
officers and agents may encounter individuals who are not certain of their citizenship status,
who may claim to be a U.S. citizen, or who may not know they are U.S. citizens. During
these encounters, for instance, ICE officers and agents may observe or note some indicia
warranting further examination to determine whether these individuals potentially have U.S.
citizenship. Accordingly, ICE evaluates the articulable facts of every individual encountered
to determine whether to detain, arrest, or lodge an immigration detainer against the
individual based upon those facts. However, these encounters can be complicated by an
individual's lack of knowledge of the necessary details regarding, among other things: their
citizenship status, the citizenship and immigration status of their parents and grandparents; or
their periods of physical presence in the United States.

Family members may also be unwilling to provide information when contacted, or
conflicting records or falsified documentation may also be a factor, which contribute to U.S.
citizenship inquiries often requiring extensive investigation and substantive legal research
and analysis due to the complexity of citizenship and nationality law.

Additionally, changes in citizenship law or decisions by the Board of Immigration Appeals
or the U.S. Courts of Appeals can affect the analysis of whether an individual has a viable
claim to U.S. citizenship, including changes in law that might occur after ICE has reviewed a
citizenship claim and undertaken a certain course of action.

ICE and CBP remain committed to not only investigating and analyzing claims of U.S.
citizenship when encountering individuals making a claim to U.S. citizenship, but also when
certain indicia of potential U.S. citizenship are present in a case, even if the individual does
not affirmatively make a claim to U.S. citizenship expeditiously.

The draft report contained two recommendations with which the Department concurs.
Attached, find our detailed response to each recommendation. DHS previously submitted
technical comments addressing accuracy, contextual, and other issues under a separate cover
for GAO's consideration.

Again, thank you for the opportunity to review and comment on this draft report. Please feel
free to contact me if you have any questions. We look forward to working with you again in
the future.

Sincerely,

JIM H CRUMPACKER  Digitally signed by JIM H
CRUMPACKER
Date: 2021.06.30 07:39:00 -04'00'

JIM H. CRUMPACKER, CIA, CFE
Director
Departmental GAO-OIG Liaison Office

Attachment

2

**Appendix IV: Comments from the Department
of Homeland Security**

**Attachment:  Management Response to Recommendations
Contained in GAO-21-487**

GAO recommended the Director of ICE:

**Recommendation 1:**  Update ICE's training materials to reflect ICE policies requiring officers to consult supervisors during encounters with potential U.S. citizens.

**Response:**  Concur.  The ICE Enforcement and Removal Operations (ERO) Academy made updates to the Basic Immigration Enforcement Training Program.  Specifically, ERO added a student note to the "Creating a Scratch I-213" course, which stated, "what to do if a subject claims to be a U.S. citizen, or indicia exists of potential U.S. citizenship, will be discussed further in upcoming Encounter Subjects in Law Enforcement Custody and Field Operations Overview courses."  The focus of this section is to make it clear that U.S. citizens shall not be arrested, detained, or subject to detainers.  ICE ERO also added additional references to ICE Directive 16001.2 within the "Encounter Subjects in Law Enforcement Custody" course. These courses were updated on June 9, 2021, and documentation attesting to the completion of the following updates was provided to GAO under a separate cover on June 21, 2021:

- Scratch I-213 lesson plan;
- Scratch I-213 student guide; and
- Encounter Subjects in Law Enforcement Custody lesson plan.

DHS requests that GAO consider this recommendation resolved and closed, as implemented.

**Recommendation 2:**  Systematically collect and maintain electronic data on its encounters with individuals for whom there is probative evidence of U.S. citizenship.

**Response:**  Concur.  ICE ERO, the Office of the Principal Legal Advisor, and others, as appropriate, will analyze the processes and the systems used when processing a noncitizen and capturing information about citizenship when there is evidence in a case that suggests a credible claim to U.S. citizenship.  Further, the ICE Office of the Principal Legal Advisor, ERO Field Operations, and the Law Enforcement Systems and Analysis Divisions are internally working together to appropriately define the requirements, and ICE ERO will update system user guides and standard operating procedures to reflect new guidance for ICE ERO officers to systematically collect and maintain this data electronically.  Estimated Completion Date:  June 30, 2022.

3

# Appendix V: GAO Contact and Staff Acknowledgments

## GAO Contact

Rebecca Gambler at (202) 512-8777, gamblerr@gao.gov

## Staff Acknowledgements

In addition to the contact named above, Meg Ullengren (Assistant Director), Nasreen Badat, Michele Fejfar, Eric Hauswirth, Stephanie Heiken (Analyst-in-Charge), Kelsey Kestenbaum, Claire Liu, Jeffrey Love, Sasan J. "Jon" Najmi, and Minette Richardson made key contributions to this report.

(104073)

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. |
| | Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. |
| | Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet: Website: https://www.gao.gov/about/what-gao-does/fraudnet Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

# Exhibit 20



**U.S. Department of Homeland Security**
Washington, DC 20528

*Secretary*

October 27, 2021

MEMORANDUM TO:   Tae D. Johnson
                 Acting Director
                 U.S. Immigration and Customs Enforcement

                 Troy A. Miller
                 Acting Commissioner
                 U.S. Customs and Border Protection

                 Ur M. Jaddou
                 Director
                 U.S. Citizenship and Immigration Services

                 Robert Silvers
                 Under Secretary
                 Office of Strategy, Policy, and Plans

                 Katherine Culliton-González
                 Officer for Civil Rights and Civil Liberties
                 Office of Civil Rights and Civil Liberties

                 Lynn Parker Dupree
                 Chief Privacy Officer
                 Privacy Office

FROM:            Alejandro N. Mayorkas
                 Secretary

SUBJECT:         **Guidelines for Enforcement Actions in or Near Protected Areas**

This memorandum provides guidance for ICE and CBP enforcement actions in or near areas that require special protection. It is effective immediately.

This memorandum supersedes and rescinds John Morton's memorandum entitled, "Enforcement Actions at or Focused on Sensitive Locations" (number 10029.2, dated October 24, 2011), and David Aguilar's memorandum entitled, "U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations" (dated January 18, 2013).

1

PYM-000189

## I.    Foundational Principle

In our pursuit of justice, including in the execution of our enforcement responsibilities, we impact people's lives and advance our country's well-being in the most fundamental ways. It is because of the profound impact of our work that we must consider so many different factors before we decide to act. This can make our work very difficult. It is also one of the reasons why our work is noble.

When we conduct an enforcement action – whether it is an arrest, search, service of a subpoena, or other action – we need to consider many factors, including the location in which we are conducting the action and its impact on other people and broader societal interests. For example, if we take an action at an emergency shelter, it is possible that noncitizens, including children, will be hesitant to visit the shelter and receive needed food and water, urgent medical attention, or other humanitarian care.

To the fullest extent possible, we should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities. Such a location is referred to as a "protected area."

This principle is fundamental. We can accomplish our enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more. Adherence to this principle is one bedrock of our stature as public servants.

## II.    Protected Areas

Whether an area is a "protected area" requires us to understand the activities that take place there, the importance of those activities to the well-being of people and the communities of which they are a part, and the impact an enforcement action would have on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there. It is a determination that requires the exercise of judgment.

The following are some examples of a protected area. The list is not complete. It includes only examples:

- A school, such as a pre-school, primary or secondary school, vocational or trade school, or college or university.

- A medical or mental healthcare facility, such as a hospital, doctor's office, health clinic, vaccination or testing site, urgent care center, site that serves pregnant individuals, or community health center.

- A place of worship or religious study, whether in a structure dedicated to activities of faith (such as a church or religious school) or a temporary facility or location where such activities are taking place.

- A place where children gather, such as a playground, recreation center, childcare center, before- or after-school care center, foster care facility, group home for children, or school bus stop.

- A social services establishment, such as a crisis center, domestic violence shelter, victims services center, child advocacy center, supervised visitation center, family justice center, community-based organization, facility that serves disabled persons, homeless shelter, drug or alcohol counseling and treatment facility, or food bank or pantry or other establishment distributing food or other essentials of life to people in need.

- A place where disaster or emergency response and relief is being provided, such as along evacuation routes, where shelter or emergency supplies, food, or water are being distributed, or registration for disaster-related assistance or family reunification is underway.

- A place where a funeral, graveside ceremony, rosary, wedding, or other religious or civil ceremonies or observances occur.

- A place where there is an ongoing parade, demonstration, or rally.

We need to consider the fact that an enforcement action taken near – and not necessarily in – the protected area can have the same restraining impact on an individual's access to the protected area itself. If indeed that would be the case, then, to the fullest extent possible, we should not take the enforcement action near the protected area. There is no bright-line definition of what constitutes "near." A variety of factors can be informative, such as proximity to the protected area, visibility from the protected area, and people's behavioral patterns in and around the protected area. The determination requires an analysis of the facts and the exercise of judgment.

The fundamental question is whether our enforcement action would restrain people from accessing the protected area to receive essential services or engage in essential activities. Our obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area thus applies at all times and is not limited by hours or days of operation.

Whether an enforcement action can be taken in or near a courthouse is addressed separately in the April 27, 2021 Memorandum from Tae Johnson, ICE Acting Director, and Troy Miller, CBP Acting Commissioner, entitled "Civil Immigration Enforcement Actions in or Near Courthouses," which remains in effect.

## III.    Exceptions and Limitation on Scope

The foundational principle of this guidance is that, to the fullest extent possible, we should not take an enforcement action in or near a protected area. The phrase "to the fullest extent possible" recognizes that there might be limited circumstances under which an enforcement action needs to be taken in or near a protected area. The following are some examples of such limited circumstances:

3

- The enforcement action involves a national security threat.

- There is an imminent risk of death, violence, or physical harm to a person.

- The enforcement action involves the hot pursuit of an individual who poses a public safety threat.

- The enforcement action involves the hot pursuit of a personally observed border-crosser.

- There is an imminent risk that evidence material to a criminal case will be destroyed.

- A safe alternative location does not exist.

This list is not complete. It includes only examples. Here again, the exercise of judgment is required.

Absent exigent circumstances, an Agent or Officer must seek prior approval from their Agency's headquarters, or as you otherwise delegate, before taking an enforcement action in or near a protected area. If the enforcement action is taken due to exigent circumstances and prior approval was therefore not obtained, Agency headquarters (or your delegate) should be consulted post-action. To the fullest extent possible, any enforcement action in or near a protected area should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area.

Enforcement actions that are within the scope of this guidance include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance. This guidance does not apply to matters in which enforcement activity is not contemplated. As just one example, it does not apply to an Agent's or Officer's participation in an official function or community meeting.

This guidance does not limit an agency's or employee's statutory authority, and we do not tolerate violations of law in or near a protected area.

## IV.    Training and Reporting

Please ensure that all employees for whom this guidance is relevant receive the needed training. Each of your respective agencies and offices should participate in the preparation of the training materials.

Any enforcement action taken in or near a protected area must be fully documented in your Agency's Privacy Act-compliant electronic system of record in a manner that can be searched and validated. The documentation should include, for example, identification of the protected area; the reason(s) why the enforcement action was taken there; whether or not prior approval was obtained and, if not, why not; the notification to headquarters (or headquarters' delegate) that occurred after an action was taken without prior approval; a situational report of what

FYM-000192

occurred during and immediately after the enforcement action; and, any additional information that would assist in evaluating the effectiveness of this guidance in achieving our law enforcement and humanitarian objectives.

## V.    Statement of No Private Right Conferred

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

# Exhibit 21

FYM-000193

# Immigration Enforcement at Sensitive Locations

*April 18, 2022*
Fiscal Year 2020 Report to Congress



*U.S. Immigration and Customs Enforcement*

# Message from the Acting Director

April 18, 2022

I am pleased to present the following report, "Immigration Enforcement at Sensitive Locations," which has been prepared by U.S. Immigration and Customs Enforcement (ICE).



This report was compiled pursuant to direction in House Report 116-180 and Senate Report 116-125, which accompany the Fiscal Year 2020 Department of Homeland Security Appropriations Act (P.L. 116-93).

Pursuant to congressional guidelines, this report is being provided to the following Members of Congress:

> The Honorable Lucille Roybal-Allard
> Chairwoman, House Appropriations Subcommittee on Homeland Security
>
> The Honorable Chuck Fleischmann
> Ranking Member, House Appropriations Subcommittee on Homeland Security
>
> The Honorable Chris Murphy
> Chair, Senate Appropriations Subcommittee on Homeland Security
>
> The Honorable Shelley Moore Capito
> Ranking Member, Senate Appropriations Subcommittee on Homeland Security

Inquiries related to this report may be directed to the ICE Office of Congressional Relations at (202) 732-4200.

Sincerely,

Tae D. Johnson
Acting Director
U.S. Immigration and Customs Enforcement

i



# Immigration Enforcement at Sensitive Locations

# Table of Contents

I.     Legislative Language ...................................................................................................1

II.    Background .................................................................................................................2
       A. Enforcement Actions Near Sensitive Locations ..................................................2
       B. Enforcement Actions Against Victims and Witnesses .........................................3

III.   Analysis/Discussion ...................................................................................................5
       A. Enforcement Actions Inside Courthouses ...........................................................5
       B. ICE-wide Training ...............................................................................................5
       C. ERO Officer Training ..........................................................................................5
       D. Special Agent Training ........................................................................................5
       E. Steps Taken by ICE .............................................................................................6

Appendices ..........................................................................................................................7
       Appendix A:  Abbreviations ........................................................................................7
       Appendix B:  ICE Policy No. 10029.2, Enforcement Actions at or Focused on Sensitive
            Locations .........................................................................................................8
       Appendix C:  ICE Directive 11072.1, Civil Immigration Enforcement Actions Inside
            Courthouses ...................................................................................................11
       Appendix D:  ICE Policy No. 10076.1, Prosecutorial Discretion:  Certain Victims,
            Witnesses, and Plaintiffs ...............................................................................15
       Appendix E:  ICE Policy No. 10036.1, Interim Guidance Relating to Officer Procedure
            Following Enactment of VAWA 2005 ...........................................................18
       Appendix F: DHS Directive No. 002-02, Implementation of Section 1367 Information
            Provisions ......................................................................................................23
       Appendix G:  Implementation of Section 1367 Information Provisions .......................27
       Appendix H:  Guidelines for Enforcement Actions In or Near Protected Areas ...........43
       Appendix I:  Arrests at Sensitive Locations ...............................................................48
            1. List of U.S. Immigration and Customs Enforcement (ICE) Enforcement and
               Removal Operations (ERO) Arrests at Sensitive Locations from October 1, 2018,
               through October 31, 2020 .............................................................................48
            2. List of ICE Homeland Security Investigations Arrests at Sensitive Locations
               October 1, 2017, through October 31, 2020 .................................................49

PYM-000196

# I.    Legislative Language

This report was compiled in response to direction in House Report 116-180 and Senate Report 116-125, which accompany the Fiscal Year 2020 Department of Homeland Security (DHS) Appropriations Act (P.L. 116-93).

House Report 116-180 states:

> *Immigration Enforcement at Sensitive Locations.*—Further, within 180 days of the date of enactment of this Act, ICE is directed, in collaboration with other DHS entities as needed, to provide a public report on enforcement actions at sensitive locations since October 1, 2017. The report shall include the total number of enforcement actions at sensitive locations, broken down by field office; type of sensitive location; whether prior approval was given; what type of exigent circumstances existed, if any; and the number of non-targeted individuals who were also apprehended. It should also contain information on the number of enforcement actions occurring at courthouses and bus stops[1] for each field office, including the number of individuals apprehended at each location, broken down by targeted and non-targeted individuals.

Senate Report 116-125 states:

> *Training.*—The Committee directs ICE to provide its officers with guidance and training for engaging with victims of crime and witnesses of crime and to clarify policy guidance on enforcement actions in or near sensitive locations, including courthouses, in order to minimize any effect that immigration enforcement may have on the willingness and ability of victims and witnesses to pursue justice. The Committee directs ICE not later than 180 days after the date of enactment of this act to report on steps taken to minimize the effect immigration enforcement activity has on victims of crime and witnesses of crime and to provide monthly notifications to the Committee on enforcement actions that take place in or near sensitive locations, including courthouses.

---

[1] U.S. Immigration and Customs Enforcement's (ICE) Sensitive Locations policy does not include bus stops or courthouses, and as such, ICE is unable to report on this information.  Please see Policy Memorandum 10029.2, *Enforcement Actions at or Focused on Sensitive Locations* (Appendix B), for additional information.

# II.   Background

ICE law enforcement personnel put their lives on the line every day to protect our Nation and to secure its borders.  The safety of the ICE workforce, those encountered during their duties, and the public, is paramount.  Although ICE policy generally discourages enforcement action focused on sensitive locations, in the complex environment of law enforcement, such an enforcement action may be necessary in certain rare instances.

## A.   Enforcement Actions Near Sensitive Locations

On October 24, 2011, ICE issued Policy Memorandum 10029.2, *Enforcement Actions at or Focused on Sensitive Locations* (Appendix B).  While this memorandum was superseded on October 27, 2021, by the *Guidelines for Enforcement Actions in or Near Protected Areas* issued by Secretary Mayorkas, it was in effect during the review period.  ICE Policy 10029.2 provided that enforcement actions at or focused on sensitive locations, such as schools, hospitals, and places of worship, may have taken place only when prior approval was obtained from an appropriate supervisory official; when other law enforcement actions had led officers to a sensitive location; or when exigent circumstances necessitated immediate action without supervisory approval.  Additionally, ICE seeks to mitigate any potential enforcement impacts on sensitive locations; however, in many urban settings, a sensitive location may exist within the general vicinity of a planned enforcement action (e.g., a place of worship located on the same block as an apartment complex where a suspect resides), although such enforcement actions are not focused on the sensitive location itself.  Because of this operational reality, while ICE is able to report on the extremely limited number of enforcement actions that occur at sensitive locations, it is not feasible to track every enforcement action that may occur anywhere in the vicinity of a sensitive location.  In 2018, ICE Enforcement and Removal Operations (ERO) created a mechanism to record enforcement actions that were likely to take place at or near a sensitive location.  This record is used for internal tracking purposes only and is not considered a system of record.

In ICE's system of record, a landmark location is captured for each arrest.  Landmark locations are predetermined sites within each area of responsibility and are managed (and named) by the individual ERO offices.  Officers choose the site nearest a landmark location to where the arrest occurred.  In many cases, these are local jails or police stations.  In some instances, they are counties.  The office conducting the arrest chooses the location that works best for it operationally and loads the information into the Enforcement Integrated Database Arrest Guide for Law Enforcement administrative portal.  ICE also may capture the actual address of where an arrest was made (street, city, and zip code) but this is not mandatory.  Until recently, ICE has not tracked individual sensitive location statistics in databases.  Nothing in the system designates a landmark or an address as a "sensitive location," making it difficult to generate statistics for these types of arrests.

ICE also notes that courthouses and bus stops were not considered sensitive locations under agency policy during FY 2020, and as a result, ICE's system does not track such arrests.  On

2

April 27, 2021, ICE and U.S. Customs and Border Protection (CBP) jointly issued interim guidance on conducting enforcement actions in or near courthouses entitled, *Civil Immigration Enforcement Actions in or near Courthouses*. This interim guidance supersedes and revokes ICE Directive 11072.1, *Civil Immigration Enforcement Actions Inside Courthouses* (Appendix C), issued on January 10, 2018. The interim guidance applies to any civil immigration enforcement action in or near a courthouse that involves an enforcement encounter between ICE or CBP personnel and an individual in or near the courthouse. The interim guidance balances the importance of preserving access to courts and the fair administration of justice with legitimate civil immigration enforcement interests.

## B.   Enforcement Actions Against Victims and Witnesses

ICE has several policies in place that govern the exercise of prosecutorial discretion with regard to victims and witnesses of crimes, as well as to family members and friends who may be accompanying a target of a planned enforcement action to a courthouse. To avoid deterring individuals from reporting crimes or pursuing actions to assert their civil and other legal rights, ICE officers, special agents, and attorneys are required to exercise all appropriate discretion on a case-by-case basis when making detention and enforcement decisions in the cases of victims of crime, witnesses to crime, and individuals pursuing legitimate civil rights complaints. ICE Policy No. 10076.1, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs* (June 17, 2011) (Appendix D).

Furthermore, ICE Directive 11072.1 states that noncitizens encountered during a civil immigration enforcement action inside a courthouse, such as family members or friends accompanying the target noncitizen to court appearances or serving as a witness in a proceeding, will not be subject to civil immigration enforcement action, absent special circumstances—such as where the individual poses a threat to public safety or interferes with ICE's planned enforcement actions. As is the case with all law enforcement, ICE officers and agents are trained to evaluate complex enforcement decisions and to consider the facts of each individual case when determining appropriate action.

Although Title 8 of U.S. Code (U.S.C.) § 1229(e) does not prohibit arrests of noncitizens at sensitive locations or courthouses, noncitizens arrested and issued notices to appear at locations specified in 8 U.S.C. § 1229(e)(2)[2] must be treated with extra care. First, the officer is required to certify the enforcement action's compliance with the restrictions in 8 U.S.C. § 1367, given that noncitizens at certain locations identified in 8 U.S.C. § 1229(e)(2) may be crime victims endowed with certain rights and ultimately could benefit from immigration benefits specific to noncitizen crime victims. ICE adheres to DHS Directive 002-02, Revision No. 00.1, "Implementation of Section 1367 Information Provisions" (issued November 7, 2013; revised April 29, 2019), and its accompanying DHS Instruction 002-02-001, Revision No. 00.1, "Implementation of Section 1367 Information Provisions" (issued November 7, 2013; revised May 28, 2019), which require DHS employees to complete a certification of compliance with the restrictions on disclosure in 8 U.S.C. § 1367.

---

[2] Locations specified in 8 U.S.C. 1229(e)(2) include domestic violence shelters, victim services providers, and courthouses if the noncitizen is appearing in connection with a protection order case, child custody case, or another case relating to domestic violence, sexual assault, trafficking, etc.

FYM-000199

Additionally, ICE Policy 10036.1, *Interim Guidance Relating to Officer Procedure Following Enactment of VAWA [Violence Against Women Act] 2005* (January 22, 2007) (Appendix E) includes guidance on enforcement actions against noncitizen crime victims at courthouses when the noncitizen is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, human trafficking, or stalking in which the noncitizen has been battered or subject to extreme cruelty, or if the noncitizen may be eligible for T or U nonimmigrant status.

Please see Appendix F for a list of ICE ERO arrests at sensitive locations from October 1, 2018, through October 31, 2020, and a list of ICE Homeland Security Investigations (HSI) arrests from October 1, 2017, through August 21, 2020.

PYM-000200

# III.  Analysis/Discussion

## A.  Enforcement Actions Inside Courthouses

While it was in effect, ICE Directive 11072.1, *Civil Immigration Enforcement Actions Inside Courthouses*, applied only to civil immigration enforcement actions, and was consistent with pre-existing procedures for the planning, execution, documentation, and approval of such enforcement actions.  Noncitizens subject to planned civil immigration enforcement action inside a courthouse include individuals with criminal convictions, gang members, national security or public safety threats, noncitizens ordered removed from the United States but who have failed to depart, and noncitizens who have re-entered the country illegally after being removed.  Other noncitizens encountered inside a courthouse, such as family members or witnesses to a proceeding, will not be subject to civil immigration enforcement action, absent special circumstances, such as where they pose a threat to public safety or interfere with ICE's enforcement actions.

## B.  ICE-wide Training

All ICE personnel who, through the course of their work, encounter noncitizen victims of crime or who have access to information covered by 8 U.S.C. § 1367, must complete training, *Noncitizen Victims of Crime: Immigration Benefits and Confidentiality Provisions*.  Courthouses are specified locations for purposes of 8 U.S.C. § 1367.  This training includes instructions about compliance with 8 U.S.C. § 1229(e) and is available throughout DHS's virtual learning platforms.

## C.  ERO Officer Training

The Basic Immigration Enforcement Training Program (BIETP) is the basic training for ICE ERO officers.  BIETP is taught by ICE and Federal Law Enforcement Training Centers (FLETC) personnel.  BIETP includes a block of instruction from the FLETC Behavioral Science Division covering victim and witness response.

## D.  Special Agent Training

ICE HSI special agents, who are focused primarily on criminal investigations, attend the Criminal Investigator Training Program (CITP) and Homeland Security Investigations Special Agent Training (HSISAT) programs, which comprise a two-part basic training program at FLETC.  CITP and HSISAT include several blocks of instruction related to interviewing suspects, witnesses, and victims.

During HSISAT, trainees undergo an interviewing lab related to various investigative and programmatic areas, which include human trafficking.  Trainees are provided the opportunity to practice interviewing suspects and nonsuspects (victims and witnesses) in order to build strong

PYM-000201

interviewing skills in conducting a successful investigation.  Additionally, HSI Special Agents, victim assistance specialists, and Office of the Principal Legal Advisor attorneys may attend the Advanced Human Trafficking Training coordinated by the HSI Academy.

The instruction covers the Victims' Rights and Restitution Act of 1990 (VRRA) and the Crime Victims' Right Act of 2004 (CVRA).  This lesson plan is used for several agencies and may be requested through FLETC.

In particular, the fourth Enabling Performance Objective of the CITP "Interviewing for Criminal Investigators" class specifically details requirements that HSI Special Agents must follow under VRRA and CVRA.

## E.    Additional Steps Taken by ICE

ICE has taken several steps to minimize the effect that immigration enforcement activity has on both victims and witnesses of crimes.   As noted above, on October 27, 2021, DHS released a new Department-wide policy entitled, *Guidelines for Enforcement Actions in or Near Protected Areas*.  This new policy states that, "to the fullest extent possible, [DHS] should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities."  This new policy supersedes and rescinds the ICE memorandum entitled, *Enforcement Actions at or Focused on Sensitive Locations* (ICE Directive No. 10029.2, dated October 24, 2011), and the CBP memorandum entitled, *U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations* (dated January 18, 2013).  The April 27, 2021, joint ICE and CBP memorandum entitled, *Civil Immigration Enforcement Actions in or Near Courthouses*, remains in effect.  ICE records enforcement locations in the Activity Analysis and Reporting Tool.  Enforcement locations include residences, worksites, traffic stops effectuated by ICE, courthouses, protected areas, prison/jail, or other as specified.  This information is collected as part of the evaluation process when determining whether to take enforcement action on a particular noncitizen.

PYM-000202

# Appendices

## Appendix A:  Abbreviations

| Abbreviation | Definition |
|---|---|
| BIETP | Basic Immigration Enforcement Training Program |
| CBP | U.S. Customs and Border Protection |
| CITP | Criminal Investigator Training Program |
| CVRA | Crime Victims' Right Act of 2004 |
| DHS | Department of Homeland Security |
| ERO | Enforcement and Removal Operations |
| FLETC | Federal Law Enforcement Training Centers |
| HSI | Homeland Security Investigations |
| HSISAT | Homeland Security Investigations Special Agent Training |
| ICE | U.S. Immigration and Customs Enforcement |
| U.S.C. | United States Code |
| VAWA | Violence Against Women Act |
| VRRA | Victims' Rights and Restitution Act of 1990 |

# Appendix B: ICE Policy No. 10029.2, Enforcement Actions at or Focused on Sensitive Locations

Policy Number: 10029.2
FEA Number: 306-112-002b

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536


U.S. Immigration
and Customs
Enforcement

OCT 2 4 2011

MEMORANDUM FOR:    Field Office Directors
                   Special Agents in Charge
                   Chief Counsel

FROM:              John Morton
                   Director

SUBJECT:           Enforcement Actions at or Focused on Sensitive Locations

Purpose

This memorandum sets forth Immigration and Customs Enforcement (ICE) policy regarding certain enforcement actions by ICE officers and agents at or focused on sensitive locations. This policy is designed to ensure that these enforcement actions do not occur at nor are focused on sensitive locations such as schools and churches unless (a) exigent circumstances exist, (b) other law enforcement actions have led officers to a sensitive location as described in the *"Exceptions to the General Rule"* section of this policy memorandum, or (c) prior approval is obtained. This policy supersedes all prior agency policy on this subject.[1]

Definitions

The enforcement actions covered by this policy are (1) arrests; (2) interviews; (3) searches; and (4) for purposes of immigration enforcement only, surveillance. Actions not covered by this policy include actions such as obtaining records, documents and similar materials from officials or employees, providing notice to officials or employees, serving subpoenas, engaging in Student and Exchange Visitor Program (SEVP) compliance and certification visits, or participating in official functions or community meetings.

The sensitive locations covered by this policy include, but are not limited to, the following:

---

[1] Memorandum from Julie L. Myers, Assistant Secretary, U.S. Immigration and Customs Enforcement, "Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations" 10029.1 (July 3, 2008); Memorandum from Marcy M. Forman, Director, Office of Investigations, "Enforcement Actions at Schools" (December 26, 2007); Memorandum from James A. Puleo, Immigration and Naturalization Service (INS) Acting Associate Commissioner, "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" HQ 807-P (May 17, 1993). This policy does not supersede the requirements regarding arrests at sensitive locations put forth in the Violence Against Women Act, see Memorandum from John P. Torres, Director Office of Detention and Removal Operations and Marcy M. Forman, Director, Office of Investigations, "Interim Guidance Relating to Officer Procedure Following Enactment of VAWA 2005 (January 22, 2007).

www.ice.gov

8

Enforcement Actions at or Focused on Sensitive Locations
Page 2

- schools (including pre-schools, primary schools, secondary schools, post-secondary schools up to and including colleges and universities, and other institutions of learning such as vocational or trade schools);
- hospitals;
- churches, synagogues, mosques or other institutions of worship, such as buildings rented for the purpose of religious services;
- the site of a funeral, wedding, or other public religious ceremony; and
- a site during the occurrence of a public demonstration, such as a march, rally or parade.

This is not an exclusive list, and ICE officers and agents shall consult with their supervisors if the location of a planned enforcement operation could reasonably be viewed as being at or near a sensitive location. Supervisors should take extra care when assessing whether a planned enforcement action could reasonably be viewed as causing significant disruption to the normal operations of the sensitive location. ICE employees should also exercise caution. For example, particular care should be exercised with any organization assisting children, pregnant women, victims of crime or abuse, or individuals with significant mental or physical disabilities.

Agency Policy

*General Rule*

Any planned enforcement action at or focused on a sensitive location covered by this policy must have prior approval of one of the following officials: the Assistant Director of Operations, Homeland Security Investigations (HSI); the Executive Associate Director (EAD) of HSI; the Assistant Director for Field Operations, Enforcement and Removal Operations (ERO); or the EAD of ERO. This includes planned enforcement actions at or focused on a sensitive location which is part of a joint case led by another law enforcement agency. ICE will give special consideration to requests for enforcement actions at or near sensitive locations if the only known address of a target is at or near a sensitive location (e.g., a target's only known address is next to a church or across the street from a school).

*Exceptions to the General Rule*

This policy is meant to ensure that ICE officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations and make substantial efforts to avoid unnecessarily alarming local communities. The policy is not intended to categorically prohibit lawful enforcement operations when there is an immediate need for enforcement action as outlined below. ICE officers and agents may carry out an enforcement action covered by this policy without prior approval from headquarters when one of the following exigent circumstances exists:

- the enforcement action involves a national security or terrorism matter;
- there is an imminent risk of death, violence, or physical harm to any person or property;

Enforcement Actions at or Focused on Sensitive Locations
Page 3

- the enforcement action involves the immediate arrest or pursuit of a dangerous felon, terrorist suspect, or any other individual(s) that present an imminent danger to public safety; or
- there is an imminent risk of destruction of evidence material to an ongoing criminal case.

When proceeding with an enforcement action under these extraordinary circumstances, officers and agents must conduct themselves as discretely as possible, consistent with officer and public safety, and make every effort to limit the time at or focused on the sensitive location.

If, in the course of a planned or unplanned enforcement action that is not initiated at or focused on a sensitive location, ICE officers or agents are subsequently led to or near a sensitive location, barring an exigent need for an enforcement action, as provided above, such officers or agents must conduct themselves in a discrete manner, maintain surveillance if no threat to officer safety exists and immediately consult their supervisor prior to taking other enforcement action(s).

Dissemination

Each Field Office Director, Special Agent in Charge, and Chief Counsel shall ensure that the employees under his or her supervision receive a copy of this policy and adhere to its provisions.

Training

Each Field Office Director, Special Agent in Charge, and Chief Counsel shall ensure that the employees under his or her supervision are trained (both online and in-person/classroom) annually on enforcement actions at or focused on sensitive locations.

No Private Right of Action

Nothing in this memorandum is intended to and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

This memorandum provides management guidance to ICE officers exercising discretionary law enforcement functions, and does not affect the statutory authority of ICE officers and agents, nor is it intended to condone violations of federal law at sensitive locations.

# Appendix C:  ICE Directive 11072.1, Civil Immigration Enforcement Actions Inside Courthouses

## U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

**Directive Number 11072.1:**    Civil Immigration Enforcement Actions Inside Courthouses

| | |
|---|---|
| **Issue Date:** | January 10, 2018 |
| **Effective Date:** | January 10, 2018 |
| **Superseded:** | None |
| **Federal Enterprise Architecture Number:** | 306-112-002b |

1.  **Purpose/Background.** This Directive sets forth U.S. Immigration and Customs Enforcement (ICE) policy regarding civil immigration enforcement actions inside federal, state, and local courthouses. Individuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband. Accordingly, civil immigration enforcement actions taken inside courthouses can reduce safety risks to the public, targeted alien(s), and ICE officers and agents. When practicable, ICE officers and agents will conduct enforcement actions discreetly to minimize their impact on court proceedings.

    Federal, state, and local law enforcement officials routinely engage in enforcement activity in courthouses throughout the country because many individuals appearing in courthouses for one matter are wanted for unrelated criminal or civil violations. ICE's enforcement activities in these same courthouses are wholly consistent with longstanding law enforcement practices, nationwide. And, courthouse arrests are often necessitated by the unwillingness of jurisdictions to cooperate with ICE in the transfer of custody of aliens from their prisons and jails.

2.  **Policy.** ICE civil immigration enforcement actions inside courthouses include actions against specific, targeted aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed, when ICE officers or agents have information that leads them to believe the targeted aliens are present at that specific location.

    Aliens encountered during a civil immigration enforcement action inside a courthouse, such as family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding, will not be subject to civil immigration enforcement action, absent special circumstances, such as where the individual poses a threat to public safety or interferes with ICE's enforcement actions.[1]

---

[1] ICE officers and agents will make enforcement determinations on a case-by-case basis in accordance with federal law and consistent with U.S. Department of Homeland Security (DHS) policy.  *See* Memorandum from John Kelly, Secretary of Homeland Security, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017), Memorandum from John Kelly, Secretary of Homeland Security, *Implementing the President's Border Security and Immigration Enforcement Improvements Policies* (Feb. 20, 2017).

Civil Immigration Enforcement Actions Inside Courthouses                                    1

ICE officers and agents should generally avoid enforcement actions in courthouses, or areas within courthouses that are dedicated to non-criminal (e.g., family court, small claims court) proceedings. In those instances in which an enforcement action in the above situations is operationally necessary, the approval of the respective Field Office Director (FOD), Special Agent in Charge (SAC), or his or her designee is required.

Civil immigration enforcement actions inside courthouses should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits.

Planned civil immigration enforcement actions inside courthouses will be documented and approved consistent with current operational plans and field operations worksheet procedures. Enforcement and Removal Operations (ERO) and Homeland Security Investigations (HSI) may issue additional procedural guidance on reporting and documentation requirements; such reporting and documentation shall not impose unduly restrictive requirements that operate to hamper or frustrate enforcement efforts.

As with any planned enforcement action, ICE officers and agents should exercise sound judgment when enforcing federal law and make substantial efforts to avoid unnecessarily alarming the public. ICE officers and agents will make every effort to limit their time at courthouses while conducting civil immigration enforcement actions.

This policy does not apply to criminal immigration enforcement actions inside courthouses, nor does it prohibit civil immigration enforcement actions inside courthouses.

**3.** **Definition** The following definitions apply for the purposes of this Directive only.

**3.1.** **Civil immigration enforcement action.** Action taken by an ICE officer or agent to apprehend, arrest, interview, or search an alien in connection with enforcement of administrative immigration violations.

**4.** **Responsibilities.**

**4.1.** The **Executive Associate Directors** for ERO and HSI are responsible for ensuring compliance with the provisions of this Directive within his or her program office.

**4.2.** **ERO FODs** and **HSI SACs** are responsible for:

1) Providing guidance to officers and agents on the approval process and procedures for civil immigration enforcement actions at courthouses in their area of responsibility beyond those outlined in this Directive; and

2) Ensuring civil immigration enforcement actions at courthouses are properly documented and reported, as prescribed in Section 5.1 of this Directive.

---

Civil Immigration Enforcement Actions Inside Courthouses                                          2

**4.3.**   **ICE Officers and Agents** are responsible for complying with the provisions of this Directive and properly documenting and reporting civil immigration enforcement actions at courthouses, as prescribed in Section 5.1 of this Directive.[2]

**5.**   **Procedures/Requirements.**

**5.1.**   **Reporting Requirements.**

　　1)  ICE officers and agents will document the physical address of planned civil immigration enforcement actions in accordance with standard procedures for completing operational plans, noting that the target address is a courthouse.[3]

　　2)  Unless otherwise directed by leadership, there will be no additional reporting requirements in effect for this Directive.

**6.**   **Recordkeeping.** ICE maintains records generated pursuant to this policy, specifically the Field Operations Worksheets (FOW) and Enforcement Operation Plan (EOP). ERO will maintain the FOW in accordance with the Fugitive Operations schedule DAA-0567-2015-0016. HSI will maintain EOPs in accordance with the Comprehensive Records Schedule N1-36-86-1/161.3. The EOPs will be maintained within the Investigative Case Files.

**7.**   **Authorities/References.**

**7.1.**   DHS Directive 034-06, *Department Reporting Requirements*, October 23, 2015.

**7.2.**   DHS Instruction 034-06-001, Rev. 1, *Department Reporting Requirements*, March 28, 2017.

**8.**   **Attachments.** None.

**9.**   **No Private Right.** This document provides only internal ICE policy guidance, which may be modified, rescinded, or superseded at any time without notice. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigative prerogatives of ICE.

---

[2] *See also* ICE Directive No. 10036.1, *Interim Guidance Relating to Officer Procedure Following Enactment of VAWA 2005* (Jan. 22, 2007), for additional requirements regarding civil immigration enforcement actions against certain victims and witnesses conducted at courthouses.
[3] ERO will use the Field Operations Worksheet and HSI will use the Enforcement Operation Plan.

Civil Immigration Enforcement Actions Inside Courthouses                                             3

Thomas D. Homan
Deputy Director and
Senior Official Performing the Duties of the Director
**U.S. Immigration and Customs Enforcement**

## Appendix D:  ICE Policy No. 10076.1, Prosecutorial Discretion:  Certain Victims, Witnesses, and Plaintiffs

Policy Number: 10076.1
FEA Number: 306-112-002b

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C.  20536

JUN 17 2011



**U.S. Immigration
and Customs
Enforcement**

MEMORANDUM FOR:       All Field Office Directors
                      All Special Agents in Charge
                      All Chief Counsel

FROM:                 John Morton
                      Director

SUBJECT:              Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs

Purpose:

This memorandum sets forth agency policy regarding the exercise of prosecutorial discretion in removal cases involving the victims and witnesses of crime, including domestic violence, and individuals involved in non-frivolous efforts related to the protection of their civil rights and liberties.  In these cases, ICE officers, special agents, and attorneys should exercise all appropriate prosecutorial discretion to minimize any effect that immigration enforcement may have on the willingness and ability of victims, witnesses, and plaintiffs to call police and pursue justice.  This memorandum builds on prior guidance on the handling of cases involving T and U visas and the exercise of prosecutorial discretion.[1]

Discussion:

Absent special circumstances or aggravating factors, it is against ICE policy to initiate removal proceedings against an individual known to be the immediate victim or witness to a crime.  In practice, the vast majority of state and local law enforcement agencies do not generally arrest victims or witnesses of crime as part of an investigation.  However, ICE regularly hears concerns that in some instances a state or local law enforcement officer may arrest and book multiple people at the scene of alleged domestic violence.  In these cases, an arrested victim or witness of domestic violence may be booked and fingerprinted and, through the operation of the Secure

---

[1] For a thorough explanation of prosecutorial discretion, see the following: Memorandum from Peter S. Vincent, Principal Legal Advisor, Guidance Regarding U Nonimmigrant Status (U visa) Applicants in Removal Proceedings or with Final Orders of Deportation or Removal (Sept. 25, 2009); Memorandum from William J. Howard, Principal Legal Advisor, VAWA 2005 Amendments to Immigration and Nationality Act and 8 U.S.C. § 1367 (Feb. 1, 2007); Memorandum from Julie L. Myers, Assistant Secretary of ICE, Prosecutorial and Custody Discretion (Nov. 7, 2007); Memorandum from William J. Howard, Principal Legal Advisor, Prosecutorial Discretion (Oct. 24, 2005); Memorandum from Doris Meissner, Commissioner, Immigration and Naturalization Service, Exercising Prosecutorial Discretion (Nov. 17, 2000).

www.ice.gov

Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs
Page 2

Communities program or another ICE enforcement program, may come to the attention of ICE. Absent special circumstances, it is similarly against ICE policy to remove individuals in the midst of a legitimate effort to protect their civil rights or civil liberties.

To avoid deterring individuals from reporting crimes and from pursuing actions to protect their civil rights, ICE officers, special agents, and attorneys are reminded to exercise all appropriate discretion on a case-by-case basis when making detention and enforcement decisions in the cases of victims of crime, witnesses to crime, and individuals pursuing legitimate civil rights complaints. Particular attention should be paid to:

- victims of domestic violence, human trafficking, or other serious crimes;
- witnesses involved in pending criminal investigations or prosecutions;
- plaintiffs in non-frivolous lawsuits regarding civil rights or liberties violations; and
- individuals engaging in a protected activity related to civil or other rights (for example, union organizing or complaining to authorities about employment discrimination or housing conditions) who may be in a non-frivolous dispute with an employer, landlord, or contractor.

In deciding whether or not to exercise discretion, ICE officers, agents, and attorneys should consider all serious adverse factors. Those factors include national security concerns or evidence the alien has a serious criminal history, is involved in a serious crime, or poses a threat to public safety. Other adverse factors include evidence the alien is a human rights violator or has engaged in significant immigration fraud. In the absence of these or other serious adverse factors, exercising favorable discretion, such as release from detention and deferral or a stay of removal generally, will be appropriate. Discretion may also take different forms and extend to decisions to place or withdraw a detainer, to issue a Notice to Appear, to detain or release an alien, to grant a stay or deferral of removal, to seek termination of proceedings, or to join a motion to administratively close a case.

In addition to exercising prosecutorial discretion on a case-by-case basis in these scenarios, ICE officers, agents, and attorneys are reminded of the existing provisions of the Trafficking Victims Protection Act (TVPA),[2] its subsequent reauthorization,[3] and the Violence Against Women Act (VAWA).[4] These provide several protections for the victims of crime and include specific provisions for victims of domestic violence, victims of certain other crimes,[5] and victims of human trafficking.

Victims of domestic violence who are the child, parent, or current/former spouse of a U.S. citizen or permanent resident may be able to self-petition for permanent residency.[6] A U nonimmigrant visa provides legal status for the victims of substantial mental or physical abuse as

---

[2] Pub. L. No. 106-386, §§101-113, 114 Stat. 1464, 1466 (codified as amended in scattered sections of the U.S.C.).
[3] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 1464, 1491 (codified as amended in scattered sections of the U.S.C.).
[4] Pub. L. No. 106-386, §§1001-1603, 114 Stat. 1464, 1491 (codified as amended in scattered sections of the U.S.C.).
[5] For a list of the qualifying crimes, see INA §101(a)(15)(U)(iii).
[6] *See* INA §101(a)(51).

Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs
Page 3

a result of domestic violence, sexual assault, trafficking, and other certain crimes.[7]  A T nonimmigrant visa provides legal status to victims of severe forms of trafficking who assist law enforcement in the investigation and/or prosecution of human trafficking cases.[8]  ICE has important existing guidance regarding the exercise of discretion in these cases that remains in effect.  Please review it and apply as appropriate.[9]

Please also be advised that a flag now exists in the Central Index System (CIS) to identify those victims of domestic violence, trafficking, or other crimes who already have filed for, or have been granted, victim-based immigration relief.  These cases are reflected with a Class of Admission Code "384."  When officers or agents see this flag, they are encouraged to contact the local ICE Office of Chief Counsel, especially in light of the confidentiality provisions set forth at 8 U.S.C. § 1367.

<u>No Private Right of Action</u>

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

---

[7] *See* INA §101(a)(15)(U).
[8] *See* INA §101(a)(15)(T).
[9] *See* Memorandum from John P. Torres, Director, Office of Detention and Removal Operations and Marcy M. Forman, Director, Office of Investigations, Interim Guidance Relating to Officers Procedure Following Enactment of VAWA 2005 (Jan. 22, 2007).

# Appendix E: ICE Policy No. 10036.1, Interim Guidance Relating to Officer Procedure Following Enactment of VAWA 2005

U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

JAN 2 2 2007

MEMORANDUM FOR:     Field Office Directors and Special Agents in Charge

FROM:     Director John P. Torres
          Office of Detention and Removal Operations

          Director Marcy M. Forman
          Office of Investigations

SUBJECT:     Interim Guidance Relating to Officer Procedure Following
             Enactment of VAWA 2005.

Purpose

The Violence Against Women and Department of Justice Reauthorization Act of 2005 (VAWA 2005), which became effective on January 5, 2006, expanded various protections for aliens seeking immigration benefits as crime victims and amended various sections of the Immigration and Nationality Act (INA). As a result, operational units of U.S. Immigration and Customs Enforcement (ICE) will be required to follow new procedures when taking certain actions in cases involving aliens eligible to apply for VAWA benefits or T or U nonimmigrant status. This interim guidance explains how VAWA 2005 affects the current operating procedures of the Office of Investigations (OI) and the Office of Detention and Removal Operations (DRO).

Background

Congress passed the Violence Against Women Act (VAWA) of 1994 as a response to growing concerns over gender-related violence. VAWA provides that abused spouses, children, and parents of U.S. citizens or lawful permanent residents can "self-petition" to obtain lawful permanent residence. These provisions allow certain battered aliens to file for an immigrant visa in order to seek safety and independence from the abuser without the abuser's permission.

Congress subsequently passed the Victims of Trafficking and Violence Protection Act of 2000, which reauthorized the VAWA provisions of 1994 and created two new nonimmigrant categories: T status and U status. T nonimmigrant status is available to victims of "severe forms of trafficking" who are physically present in the United States or a port of entry as a result of that trafficking. U nonimmigrant status is available to aliens who have "suffered substantial physical or mental abuse" as a result of certain criminal acts. Victims eligible for VAWA benefits or T or U nonimmigrant status may seek benefits through separate applications submitted to the Vermont Service Center of U.S. Citizenship and Immigration

www.ice.gov

18

SUBJECT: VAWA GUIDANCE
Page 2

Services (USCIS). This memorandum provides interim guidance concerning the expanded confidentiality protections of the VAWA 2005 and the legislation's requirement that ICE issue a certificate of compliance in certain circumstances.

Discussion

A. Definition of "VAWA Self-Petitioner"

VAWA 2005 added INA § 101(a)(51), which defines "VAWA self-petitioner" as an alien, or a child of the alien, who qualifies for relief under several provisions of the Act and generally requires that the victim be abused, battered, or subjected to human trafficking or severe mental or physical abuse. A self-petition allows the victim the opportunity to adjust status without the abuser's assistance. ICE employees should become familiar with the categories of VAWA self-petitioners and the many ways in which battered victims may adjust their status. For purposes of this interim guidance, if an officer believes there is any credible evidence that the alien may be eligible for VAWA benefits or T or U nonimmigrant status, the requirements of 8 U.S.C. § 1367, described below, must be followed along with standard operating procedure.

B. Use of Information from Prohibited Sources and Confidentiality

Section 1367(a) of Title 8 of the United States Code, as amended by VAWA 2005, prevents ICE employees from making an adverse determination of admissibility or deportability of an alien using information furnished *solely* by certain people associated with the battery or extreme cruelty, such as the abuser or a member of the abuser's family living in the same household as the victim. For purposes of this interim guidance, an adverse determination of admissibility or deportability would include placing an alien in removal proceedings or making civil arrests relating to an alien's violation of the immigration laws. Section 1367(a) also generally prohibits ICE employees from disclosing any information about a VAWA, T, or U beneficiary to anyone, especially those who might use the information to the alien's detriment, *i.e.*, an abuser who may wish to have the victim removed from the United States.

Information provided *solely* by prohibited sources must be independently corroborated. Examples of prohibited sources include: the abuser in the case of a VAWA petitioner, the human trafficker in the case of a T status applicant, or the perpetrator of substantial physical or mental abuse in the case of a U status applicant. In such cases, ICE employees cannot rely solely on these sources when making an adverse determination of admissibility or deportability. This prohibition is important to note because ICE officers sometimes receive information from upset or disgruntled spouses, abusers, traffickers, or family members. An arrest based on such information would not violate § 1367 if, according to existing standard operating procedures, the ICE officer independently verifies the information (*e.g.*, through an immigration database) prior to making the arrest. To avoid a possible violation of § 1367, ICE officers must verify the information provided from these prohibited sources. For example, if the abuser husband calls ICE and states that his alien wife is in the United States after being ordered removed, ICE must independently verify the prior removal and note such corroboration on Form I-213 (Record of Inadmissible/Deportable Alien).

19

SUBJECT: VAWA GUIDANCE
Page 3

Section 1367 does not prevent ICE officers from making arrests of aliens believed to be in the United States illegally if the information provided by a prohibited source is independently verified. Likewise, § 1367 does not prevent ICE officers from arresting aliens who have applied for benefits under VAWA or the T or U nonimmigrant categories. Instead, § 1367 prevents ICE officers from making adverse determinations of admissibility or deportability based on information provided "solely" by a prohibited source. Simply stated, ICE officers must independently verify information and check databases at their disposal to determine the existence of any pending victim-based applications for immigration benefits. ICE officers are also reminded to consider the sources of their information and be aware that there is a possibility that the caller may be involved in an abusive or violent relationship with the alien who is the subject of the call. Accordingly, if the source of the independently verifiable information is likely an abuser or someone acting in the abuser's capacity, the ICE officer should consider using prosecutorial discretion.

This interim guidance also reminds ICE employees that they are generally prohibited from "permit[ing] use by or disclosure to anyone (other than a sworn officer or employee of [DHS])" of any information which relates to an alien who is the beneficiary of an application for relief under victim based benefits (VAWA, T or U nonimmigrant status).[1] If ICE employees know that an alien has sought such victim-based benefits, they are generally prohibited from disclosing any information to a third party. In enacting this nondisclosure provision, Congress sought to prevent, with limited exceptions, disclosure of *any information* relating to beneficiaries of applications for VAWA benefits (battered spouses or children) or for T or U nonimmigrant status, including the fact that they have applied for benefits. The disclosure of certain information is permitted in limited circumstances. Those circumstances include disclosure for legitimate law enforcement purposes, statistical purposes, and benefit granting or public benefit purposes. *See* 8 U.S.C. § 1367(b) (listing exceptions to general nondisclosure rule). In short, ICE employees must not reveal any information concerning an alien's T, U, or VAWA application unless an exception to the general nondisclosure requirement applies. The nondisclosure limitation ends when the application for relief is denied and all opportunities for appeal of the denial have been exhausted.

C. Sensitive Location Certificate of Compliance Requirement

VAWA 2005 added new INA § 239(e), which requires the completion of a certificate of compliance in certain cases. INA § 239(e) states, in relevant part:

(1) In general
In cases where an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified in paragraph (2), the Notice to Appear shall include a statement that the provisions of section 384 of the IIRIRA of 1996 (8 U.S.C. § 1367) have been complied with.

(2) Locations

---

[1] For additional information concerning the non-disclosure of information relating to VAWA beneficiaries, please see *Memorandum of Paul W. Virtue, INS Acting Executive Associate Commissioner, Non-Disclosure and Other Prohibitions Relating to Battered Aliens: IIRIRA § 384,* May 5, 1997.

SUBJECT: VAWA GUIDANCE
Page 4

The locations specified in this paragraph are as follows:
(A) At a domestic violence shelter, a rape crisis center, supervised visitation center, family justice center, a victim services, or victim services provider, or a community-based organization.[2]
(B) At a courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of section 101(a)(15) of this title [8 U.S.C. § 1101(a)(15)].

This provision applies to all apprehensions occurring on or after February 5, 2006.

Section 239(e) requires ICE to certify that the agency has independently verified the inadmissibility or deportability of an alien that was encountered at these specified sensitive locations. In practical terms, when ICE officers encounter aliens at these sensitive locations and ultimately issue a Notice To Appear, the officers must ensure that they have independently verified the inadmissibility or deportability of that alien and must not permit any unauthorized disclosure of information about the alien.

The file must bear information adequately alerting the officer or agent who is preparing the NTA that the INA 239(e) certification requirement could be implicated. Moreover, in complying with 8 U.S.C. § 1367, the file must bear sufficient information to permit the issuing officer or agent to make a reliable assessment that, in fact, the prohibited source and nondisclosure provisions of § 1367 have been complied with. Accordingly, ICE officers or agents must record on the Form I-213 whether the alien was encountered at a sensitive location, whether information related to the alien's admissibility or deportability was supplied by a prohibited source, whether and how such information was independently verified, and an acknowledgement that, if applicable, the nondisclosure requirements have been complied with.

The certificate of compliance requirements reflects congressional intent that ICE proceed cautiously when making an arrest or otherwise physically encountering an alien at one of the sensitive locations without objective evidence that the alien is in the United States in violation of the immigration laws and that victims of battery, abuse, trafficking, and extreme cruelty be protected. In this regard, ICE officers encountering such individuals are to verify information through use of all databases at their disposal, including CLAIMS. For INA § 239(e) purposes,

---

[2] A community based organization means an organization that:
   (A) focuses primarily on domestic violence, dating violence, sexual assault, or stalking;
   (B) has established a specialized culturally specific program that addresses domestic violence, dating violence, sexual assault, or stalking;
   (C) has a primary focus on underserved populations (and includes representatives of these populations) and domestic violence, dating violence, sexual assault, or stalking; or
   (D) obtains expertise, or shows demonstrated capacity to work effectively, on domestic violence, dating violence, sexual assault, and stalking through collaboration.

*See* 42 U.S.C. § 13925(a)(3) (2006).

SUBJECT: VAWA GUIDANCE
Page 5

ICE officers must then issue a certificate of compliance if the alien was encountered at a sensitive location and ICE issued a Notice To Appear. The certificate of compliance must be completed by an officer or agent authorized to issue Notices To Appear after reviewing the information contained on the I-213 and confirming the prohibited source information was independently verified. *See* 8 C.F.R. § 239.1 (2006). The certificate may simply state: "I certify that, to the best of my knowledge and belief, section 384 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. § 1367) has been complied with." The certificate of compliance language may be typed or printed on the NTA. Failure to complete a certificate of compliance may subject the officer and ICE to civil penalties and disciplinary action for violating 8 U.S.C. § 1367.

ICE officers are discouraged from making arrests at these sensitive locations absent clear evidence that the alien is not entitled to victim-based benefits. Aliens encountered at rape crisis centers, domestic violence centers, or any of the sensitive locations noted in INA § 239(e) are likely to be genuine VAWA self-petitioners. While INA § 239(e) does not prohibit arrests of aliens at sensitive locations, it is clear that Congress intended that cases of aliens arrested at such locations be handled properly given that they may ultimately benefit from VAWA's provisions. ICE officers should consider prosecutorial discretion in cases of aliens encountered at sensitive locations unless exigent circumstances exist. Examples of exigent circumstances include criminal activity, fraud, terrorism, or where there are extraordinary reasons for arresting aliens at sensitive locations.

If an officer is unsure whether a particular personal encounter or apprehension requires a certification of compliance under INA § 239(e), the officer should consult the local Office of Chief Counsel (OCC). If time does not permit, the officer should consult his or her immediate supervisor for assistance.

Questions about the information provided in this memorandum may be directed to the local OCC or to the Enforcement Law Division (202-514-2895). Specific victim assistance questions may be directed to Susan Shriner, ICE Victim-Witness Coordinator, at 202-616-8737.

## Appendix F: DHS Directive No. 002-02, Implementation of Section 1367 Information Provisions

**Department of Homeland Security**
**DHS Directives System**
**Directive Number: 002-02**
**Revision Number: 00.1**
**Issue Date: 11/01/2013**
*Incorporating Change 1, 04/29/2019*
*Approved by Chip Fulghum, Acting Under Secretary for Management*

# IMPLEMENTATION OF SECTION 1367
# INFORMATION PROVISIONS

## I.   Purpose

This directive establishes a single Department of Homeland Security (DHS) policy regarding the implementation of Title 8, United States Code (U.S.C.), Section 1367,(Violence Against Women Act (VAWA) confidentiality provisions) and provides guidance as instructed by 8 U.S.C. 1367(d), as amended by the Violence Against Women Reauthorization Act of 2013, Public Law 113-4, section 810.

## II.   Scope

This directive applies throughout DHS, particularly those employees who work with applicants for victim-based immigration relief or who have access to protected information, such as United States Citizenship and Immigration Service (USCIS), Immigration and Customs Enforcement (ICE), and Customs and Border Protection (CBP).

## III.  Authorities

A.     Public Law 101-649, "Immigration and Nationality Act" (INA) Section 101(a)(51), as codified in 8 U.S.C. Section 1101(a)(51)

B.     Public Law 103-322, "Violence Against Women Act (VAWA) of 1994"

C.     Public Law 106-386,"Victims of Trafficking and Violence Protection Act of 2000." (VTVPA)

D.     Public Law 109-162, "Violence Against Women and Department of Justice Reauthorization Act of 2005," Section 817, "VAWA Confidentiality Nondisclosure." (VAWA 2005)

E.     Public Law 113-4, "Violence Against Women Reauthorization Act of 2013," Section 810, "Disclosure of Information for National Security Purposes."  (VAWA 2013)

1

Directive # 002-02
Revision # 00.1

Google Chrome (2)

F.   Section 239(e) of the Immigration and Nationality Act (INA) (8 U.S.C. 1229(e)), "Certification of compliance with restrictions on disclosure"

G.   Section 240A(b)(2) of the Immigration and Nationality Act (INA) (8 U.S.C. 1229(b)), "Cancellation of removal; adjustment of status"

H.   Title 8, U.S.C., Section 1367, "Penalties for disclosure of information" (originally enacted as Section 384 of the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996 (IIRIRA))

I.   Title 42, United States Code, Section 13925(a)(4), "Definitions and grant provisions" (as redesignated and amended by Section 3 of VAWA 2013), Public Law 113-4

J.   Delegation 19004, Delegation of Authority to Implement Section 1367 Information

K.   Instruction 002-02-001, Implementation of Section 1367 Information Provisions

L.   DHS Privacy Incident Handling Guidance (Jan. 26, 2012)

## IV.  Responsibilities

All responsible parties listed below are to help ensure compliance with applicable policies and procedures set forth in this Directive.

A.   The *Chief Privacy Officer* is the senior official within the Department with primary responsibility for privacy compliance and policy.

B.   The *Officer for Civil Rights and Civil Liberties (CRCL)* directs and oversees the implementation of the integration of civil rights and civil liberties across the Department and has the delegated authority to issue this Directive and Instruction.

C.   The *General Counsel* is responsible for ensuring legal compliance and has final authority and responsibility for legal policy determinations within the Department and its Components.

D.   The *Component Heads* with any Section 1367 information that might be shared will implement and execute all applicable policies and procedures set forth in this directive, and will develop any necessary implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other Instruction, or national or departmental policy.

2

Directive # 002-02
Revision # 00

E.    The **_Council on Combating Violence Against Women_** works to ensure policies and practices for combating violence again women and children are consistent Department-wide. By identifying opportunities to build consensus on challenging issues across Components, sharing best practices, and coordinating efforts Department-wide, the Council supports the Department's missions of effectively administering the laws preventing violence against women and children. The Council collects information on a quarterly basis and conduct after-action reviews on cases where exceptions have been applied to disclose information and where enforcement actions have been taken at sensitive locations. The Council is also responsible for assisting in developing all implementing policies that are created by Components.

F.    The **_Federal Law Enforcement Training Center (FLETC)_** ensures the computer-based training module, _Alien Victims of Crimes: Immigration Benefits and Confidentiality Protections, VAWA: Confidentiality and Immigration Relief,_ is available to all Components through their Learning Management Systems and provides assistance to keep the training updated and current, as necessary.

# V.   Policy and Training Requirements

_Policy_: The policy is comprised of three confidentiality requirements:

A.    All DHS officers and employees are generally prohibited from permitting use by or disclosure to anyone other than a sworn officer or employee of DHS, Department of State (DOS), or Department of Justice (DOJ) of any information relating to a beneficiary of a pending or approved application for victim-based immigration benefits, including a battered spouse waiver, VAWA self-petition, VAWA cancellation of removal or suspension of deportation case, or T or U nonimmigrant status, including the fact that they have applied for such benefits. There are certain exceptions to the general nondisclosure requirement, such as information to be used solely for a legitimate national security purpose in a manner that protects the confidentiality of such information. (Please note that different procedures apply for the disclosure of information to national security officials and can be found at Instruction 215-01-001, Disclosure of Section 1367 Information to National Security Officials for National Security Purposes).

B.    Adverse determinations of admissibility or deportability against an alien are not made using information furnished solely by prohibited sources associated with the battery or extreme cruelty, sexual assault, human trafficking or substantial physical or mental abuse, regardless of whether the alien has applied for VAWA benefits, or a T or U visa. For more information on what qualifies as a VAWA benefit, refer to Instruction 002-02-001, Implementation of Section 1367 Provisions. If a DHS employee receives adverse information about a victim of domestic violence, sexual assault, human trafficking or an enumerated crime from a prohibited source, DHS employees should treat the information as

3

Directive # 002-02
Revision # 00.1

inherently suspect and exercise all appropriate prosecutorial discretion with respect to pursuing the adverse information.  Further, DHS employees receiving information solely from a prohibited source do not take action on that information unless there is an independent source of corroboration.

C.      DHS employees complete a certification of compliance in cases where enforcement actions leading to a removal proceeding are taken at sensitive locations, as required by INA 239(e) (8 U.S.C. 1229(e)).  The certification includes the Notice to Appear, which affirms compliance with the Section 1367 Information and prohibited source provisions.

**Component requirements**:  Components with access to Section 1367 Information that might be shared with those outside of the DHS develop any necessary implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other instruction, or national or departmental policy.  Components coordinate with the Council in the development of implementing policy.  Moreover, any Component with access to Section 1367 information creates ways to identify those individuals protected by Section 1367 confidentiality, such as through a Central Index System (CIS) database check, and develops safeguards to protect this information in the relevant systems.

**Training requirement**:  All DHS employees who, through the course of their work may come into contact with victim applicants or have access to information covered by 8 U.S.C. 1367 complete the *Alien Victims of Crimes:  Immigration Benefits and Confidentiality Protections,* ~~VAWA: Confidentiality and Immigration Relief,~~ which is currently on Component's Learning Management Systems (LMS).  The VAWA Training was developed by the Federal Law Enforcement Training Center (FLETC) in collaboration with subject-matter experts from several DHS Components, including USCIS, ICE, and CBP.  No later than 180 days after the enactment of this policy, and on an annual basis thereafter, the Component Heads, or his or her delegates, of CIS OMB, CRCL, USCIS, ICE, and CBP report to the Review Committee the rate of compliance for this training.

# VI.  Questions

Address any questions or concerns regarding this Directive to CRCL.

Chris Cummiskey
Acting Under Secretary for Management

Date

4

Directive # 002-02
Revision # 00.1

## Appendix G: DHS Directive 002-02-001, Implementation of Section 1367 Information Provisions

Department of Homeland Security
DHS Directives System
Instruction Number: 002-02-001
Revision Number: 00.1
**Issue Date: 11/07/2013**
*Incorporating Change 1, 05/28/2019*
*Approved by Cameron Quinn, Officer for Civil Rights and Civil Liberties*

## IMPLEMENTATION OF SECTION 1367 INFORMATION PROVISIONS

### I. Purpose

This Instruction implements the Department of Homeland Security (DHS) Directive 002-02, Implementation of Section 1367 Information Provisions. In Section 810 of the Violence Against Women Reauthorization Act of 2013, Pub. L. 113-4, 127 Stat. 54 (2013). Congress amended Title 8, United States Code (U.S.C.), Section 1367, to require that the Attorney General, the Secretary of State and the Secretary of Homeland Security provide guidance consistent with the amendments it made to subsections (a) and (b) of 8 U.S.C. § 1367. See 8 U.S.C. § 1367(d). This Instruction provides guidance as instructed by 8 U.S.C. 1367(d), as amended by Section 810 of the Violence Against Women Reauthorization Act of 2013, and DHS Directive 002-02.

### II. Scope

This instruction applies throughout DHS, particularly those employees who work with applicants for victim-based immigration relief or who have access to protected information, such as United States Citizenship and Immigration Service (USCIS), Immigration and Customs Enforcement (ICE), and Customs and Border Protection (CBP).

### III. References

    A.    Public Law 103-322, "Violence Against Women Act (VAWA) of 1994"

    B.    Public Law 106-386,"Victims of Trafficking and Violence Protection Act of 2000." (VTVPA)

    C.    Public Law 109-162, "Violence Against Women and Department of Justice Reauthorization Act of 2005," Section 817, "VAWA Confidentiality Nondisclosure."(VAWA 2005)

    D.    Public Law 113-4, "Violence Against Women Reauthorization Act of 2013," Section 810, "Disclosure of Information for National Security Purposes." (VAWA 2013)

1

Instruction # 002-02-001
Revision # 00.1

E.    Title 8, U.S.C., Section 1367, "Penalties for disclosure of information" (originally enacted as Section 384 of the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996 (IIRIRA))

F.    Title 42, U.S.C., Section 13925(a)(4), "Definitions and grant provisions" (as redesignated and amended by Section 3 of VAWA 2013)

G.    Section 101(a)(51) of the Immigration and Nationality Act (INA) (8 U.S.C. 1101(a)(51))

H.    Section 239(e) of the Immigration and Nationality Act (8 U.S.C. 1229(e)), "Certification of compliance with restrictions on disclosure"

I.    Section 240A(b)(2) of the Immigration and Nationality Act (INA) (8 U.S.C. 1229(b)), "Cancellation of removal; adjustment of status"

J.    DHS Privacy Incident Handling Guidance (Jan. 26, 2012)

K.    Delegation 19004, Delegation of Authority to Implement Section 1367 Information

L.    Directive 002-02, Implementation of Section 1367 Information Provisions

## IV.  Definitions

A.    *U Nonimmigrant Status*:  U nonimmigrant status for victims of criminal activity designated in INA §101(a)(15)(U) (qualifying crimes) who have suffered substantial mental or physical abuse as a result of being a victim of criminal activity, possess information concerning the crime, and have been helpful, are being helpful, or are likely to be helpful to law enforcement and government officials in the investigation or prosecution of the criminal activity.  U status allows victims to remain in the United States for up to four years (or longer if a limited exception applies), receive work authorization, and, if certain conditions are met, apply for adjustment of status to that of a lawful permanent resident (LPR).

B.    *T Nonimmigrant Visa*:  T nonimmigrant status for victims of a severe form of trafficking in persons, as defined in section 103 of the TVPA of 2000, who are physically present in the United States on account of trafficking and who have complied with any reasonable requests for assistance in a law enforcement investigation or prosecution (with limited exceptions).  See INA 101(a)(15)(T).  T status allows victims of human trafficking to remain in the United States for up to four years (or longer if a limited exception applies), receive work authorization, and, if certain conditions are met, apply for adjustment of status to that of an LPR.

2

C.    **_VAWA Self-Petition(er)_**:  Under VAWA, as amended, certain persons who have been battered or subjected to extreme cruelty by a qualifying relative may self-petition, allowing them to remain in the United States, apply for LPR status as an approved VAWA self-petitioner, and eventually apply for naturalization.  VAWA self-petitioners include:  the spouse, child or parent of an abusive U.S. citizen; the spouse or child of an abusive LPR; the conditional resident spouse or child of an abusive U.S. citizen or LPR; the spouse or child of an alien eligible for relief under the Cuban Adjustment Act, the Haitian Refugee Immigration Fairness Act, or the Nicaraguan Adjustment and Central American Relief Act; and the spouse or child eligible for suspension of deportation or cancellation of removal due to abuse by a U.S. citizen or LPR.  See INA 101(a)(51) (defining "VAWA self-petitioner").

D.    **_VAWA Cancellation_**:  Victims of domestic violence who are in removal proceedings may be eligible to apply for relief with the immigration court in the form of VAWA cancellation of removal.  See INA 240A(b)(2) (prescribing eligibility requirements).

E.    **_Sensitive Location_**:  Locations specified in INA § 239(e)(2), where if an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified below, the Notice to Appear (NTA) shall include a statement that the provisions of 8 U.S.C. 1367 have been complied with.  The locations specified include: domestic violence shelter, rape crisis center, supervised visitation center, family justice center, a victim services, or victim services provider, or a community-based organization.

Sensitive locations can also include a courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of section 101(a)(15) [8 U.S.C. § 1101(a)(15)].

F.    **_Section 1367 Information_**:

1.    Any information relating to aliens who are seeking or have been approved for immigrant status as battered spouses, children and parents under provisions of the Violence Against Women Act (VAWA), as victims of a severe form of human trafficking who generally are cooperating with law enforcement authorities, or as aliens who have suffered substantial physical or mental abuse and are cooperating with law enforcement authorities.  This definition includes records or other information that do not specifically identify the individual as an applicant or beneficiary of the T Visa, U Visa, or VAWA protections.

3

Instruction # 002-02-001
Revision # 00

2.    Section 1367 covers information relating to beneficiaries of applications for a number of immigration benefits, not just the Form I-360 VAWA self-petition.  For the purpose of this guidance if an alien is the beneficiary of a pending or approved application for one or more of the victim-based benefits described below, the requirements of 8 U.S.C. 1367 will be followed:

a.    VAWA self-petitioner, which incorporates the following applications or petitions:

(1)    I-360 Self-petition - self-petitioners under INA sec. 204

(2)    I-751 Hardship waiver - battered spouse hardship waiver

(3)    VAWA CAA - abused Cuban Adjustment Act applicants

(4)    VAWA HRIFA - abused Haitian Refugee Immigration Fairness Act applicants

(5)    VAWA NACARA - abused Nicaraguan Adjustment and Central American Relief Act applicants

(6)    VAWA Suspension of Deportation

b.    VAWA Cancellation of Removal applicants under INA 240A(b)(2)

c.    I-914 T Nonimmigrant Status - victim of a severe form of trafficking in persons under INA 101(a)(15)(T)

d.    I-918 U Nonimmigrant Status - victim of certain serious criminal activity under INA 101(a)(15)(U).

## V.   Responsibilities

All responsible parties listed below are to help ensure compliance with applicable policies and procedures set forth in this instruction.

A.    The *__Chief Privacy Officer__* is the senior official within the Department with primary responsibility for privacy compliance and policy.

4

Instruction # 002-02-001
Revision # 00

30

B.    The ***Officer for Civil Rights and Civil Liberties*** directs and oversees the implementation of the integration of civil rights and civil liberties across the Department, serving as the foundational DHS organization through which all Department-wide civil rights and civil liberties activities are overseen, defined, and measured.  The Officer for Civil Rights and Civil Liberties has the delegated authority from the Secretary to provide this single DHS policy on the implementation of Title 8, U.S.C., Section 1367 (VAWA/T/U confidentiality provisions).

C.    The ***General Counsel*** is responsible for ensuring legal compliance and has final authority and responsibility for legal policy determinations within the Department and its Components.

D.    The ***Component Heads*** with any Section 1367 information that might be shared implement and execute all applicable policies and procedures set forth in this instruction, and develop any necessary implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other instruction, or national or departmental policy.

E.    The ***Council on Combating Violence Against Women*** works to ensure that policies and practices for combating violence against women and children are consistent Department-wide.  By identifying opportunities to build consensus on challenging issues across Components, sharing best practices, and coordinating efforts Department-wide, the Council supports the Department's missions of effectively administering the laws preventing violence against women and children.  The Council collects information on a quarterly basis and conducts after-action reviews on cases where exceptions have been applied to disclose information and where enforcement actions have been taken at sensitive locations.  The Council is also responsible for assisting in developing all implementing policy that are created by Components.

F.    The ***Federal Law Enforcement Training Center (FLETC)*** serves as an interagency law enforcement training organization for 91 federal agencies and partner organizations.  It provides training to state, local, rural, tribal, territorial, and international law enforcement agencies.  FLETC ensures the computer-based training module, *Alien Victims of Crimes:  Immigration Benefits and Confidentiality Protections, ~~VAWA: Confidentiality and Immigration Relief,~~* is available to all Components through their Learning Management Systems and provides assistance to keep the training updated and current, as necessary.

5

Instruction # 002-02-001
Revision # 00.1

## VI.  Policy and Requirements

A.  *Policy*:

1.  **Disclosure of Protected Information Generally Prohibited.**

a.  This guidance serves as a reminder that all DHS officers and employees are generally prohibited from permitting use by or disclosure to anyone other than: a sworn officer or employee of DHS, the Department of State (DOS); or the Department of Justice (DOJ) of any information relating to a beneficiary of a pending or approved application for victim-based immigration benefits. This includes a battered spouse or child hardship waiver, VAWA self-petition, VAWA cancellation of removal or suspension of deportation case, or T or U nonimmigrant status, including the fact that they have applied for such benefits. Information that cannot be disclosed includes information about an individual contained in a DHS database as well as information that has not yet been included in a database, such as the location of a beneficiary.

b.  The nondisclosure requirement does not apply to disclosures of protected information within DHS or to DOJ or DOS for legitimate agency purposes.

c.  The nondisclosure provision provides protection as soon as a DHS employee has reason to believe that the alien may be the beneficiary of a pending or approved victim-based application or petition, and the limitation ends when the application for relief is denied and all opportunities for appeal of the denial have been exhausted.

d.  Exceptions:  There are specified exceptions to the general nondisclosure requirement allowing for disclosure of protected information in limited circumstances.

Statutory Exceptions.  The statute prescribes eight (8) exceptions to the general nondisclosure requirement:

(1)  For the disclosure of information in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under 13 U.S.C. section 8. This exception allows for the furnishing of tabulations and other statistical material that do not disclose the information reported by, or on behalf of, any particular respondent, and the making of special statistical compilations and surveys,

6

Instruction # 002-02-001
Revision # 00

32

for Federal, State, or local government agencies or "other public and private persons and agencies" – provided that no information furnished is "used to the detriment of any respondent or other person to whom such information relates."

(2)    For the disclosure of information to law enforcement officials to be used solely for a legitimate law enforcement purpose.  However, the authority to exercise this exception is subject to the Secretary's discretion.

(3)    In connection with judicial review of a Federal agency or court determination in a manner that protects the confidentiality of such information.  Please note, defense counsel in state cases may sometimes attempt to make the entire A-file discoverable; however, the entire file is not discoverable in its entirety under this exception.

(4)    If all the battered individuals in the case are adults and they have all waived the nondisclosure restrictions.

(5)    For the disclosure of information to Federal, State, and local public and private agencies providing benefits, to be used solely in making determinations of eligibility for public benefits under 8 U.S.C. section 1641(c).

(6)    For the disclosure to the Chairmen and Ranking Members of the Senate and House of Representatives Committees on the Judiciary, for the exercise of congressional oversight authority, "information on closed cases under this section in a manner that protects the confidentiality of such information and that omits personally identifying information (including locational information about individuals)."

(7)    For purposes of communicating, with the "prior written consent of the alien involved," with nonprofit, nongovernmental victims' services providers "for the sole purpose of assisting victims in obtaining victim services." The victim services providers receiving such referrals are bound by the nondisclosure requirements of Section 1367. Recall that Section 101(i) of the INA (8 U.S.C. section 1101(i)) mandates that DHS provide T nonimmigrants with a referral to an NGO "that would advise the alien regarding the alien's options while in the United States and the resources available to the alien."

7

Instruction # 002-02-001
Revision # 00

(8)    The disclosure of information to national security officials to be used solely for a legitimate national security purpose in a manner that protects the confidentiality of such information. (Please note that different procedures apply for the disclosure of information to national security officials and can be found at Instruction 215-01-001, Disclosure of Section 1367 Information to National Security Officials for National Security Purposes.

For instances where an official is uncertain whether an exception applies or where questions exist about a particular exception, local counsel's office should be consulted.

e.    Nonstatutory Exceptions.  In addition to the enumerated statutory exceptions, there may be instances in which disclosure of protected information is mandated by court order or constitutional requirements.  For example, disclosure may be required in a federal, state, or local criminal proceeding for purposes of complying with constitutional obligations to provide exculpatory and impeachment material that is relevant either to guilt or punishment of a criminal defendant in a federal criminal proceeding ("Brady" material) or that bears upon the credibility of a prosecution witness ("Giglio" material).  If DOJ or a state or local prosecutor requests protected information that is not subject to disclosure under one of the statutory exceptions and that will be disclosed to a court or another agency (other than DOS), please consult DHS counsel.  DHS counsel are consulted if a Member of Congress not described in the congressional oversight exception in Section 1367(b)(6) is requesting protected information pursuant to his or her congressional oversight authority.

f.    Notification of Unauthorized Disclosures:  In the event that any Component (1) discloses Section 1367 information in a manner inconsistent with the provisions above or (2) is informed by the recipient of Section 1367 information that the recipient has disclosed that information in an unauthorized manner, the Component Head for that Component (1) notifies the Chief Privacy Officer and the Officer for Civil Rights and Civil Liberties as soon as is practicable, but in no event later than twenty-four hours after discovery of the unauthorized disclosure, and (2) satisfies the requirements of the DHS Privacy Incident Handling Guidance.

8

Instruction # 002-02-001
Revision # 00

2.    **Use of Information from Prohibited Sources**:

a.    Section 1367 also prohibits DHS officers and employees from making an adverse determination of admissibility or deportability against an alien using information furnished solely by a prohibited source associated with the battery or extreme cruelty, sexual assault, human trafficking or substantial physical or mental abuse, regardless of whether the alien has applied for VAWA benefits, or a T or U nonimmigrant status.

b.    Prohibited Sources. The following are prohibited sources for purposes of this guidance:

(1)    A spouse or parent who battered the alien or subjected the alien to extreme cruelty,

(2)    A member of the spouse's or parent's family residing in the same household as the abusive spouse or parent,

(3)    A spouse or parent who battered the alien's child or subjected the alien's child to extreme cruelty (unless the alien actively participated in the battery or extreme cruelty),

(4)    A member of the spouse's or parent's family residing in the same household as the alien who has battered the alien's child or subjected the alien's child to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty),

(5)    In the case of an alien who is applying for a U visa, the perpetrator of the substantial physical or mental abuse and the criminal activity, and

(6)    In the case of an alien who is applying for a T visa, Continued Presence, or immigration relief as a VAWA self-petitioner, the trafficker or perpetrator.

9

Instruction # 002-02-001
Revision # 00

c.    This prohibited source restriction does not apply to an alien who has been convicted of a crime listed in INA section 237(a)(2). Such crimes include:  crime involving moral turpitude, aggravated felony, human trafficking, failure to register as a sex offender under 18 U.S.C. section 2250, certain controlled substance violations, certain firearms offenses, and certain domestic violence, child abuse, stalking, protection order violation offenses.  Consultation with counsel to determine if this exception applies is recommended before making a determination whether this exception applies.

d.    The lack of a pending or approved VAWA self-petition does not necessarily mean that the prohibited source provisions do not apply and that the alien is not a victim of battery or extreme cruelty. Similarly, although the prohibited source prohibition with respect to T or U nonimmigrant status applies only to applicants for such relief, the victim might be in the process of preparing an application. Accordingly, whenever a DHS officer or employee receives adverse information from a spouse, family member of a spouse, or unknown private individual, the employee will check the Central Index System (CIS) for the COA "384" flag.  Employees will be sensitive to the fact that the alien at issue may be a victim and that a victim-abuser dynamic may be at play.

e.    Receipt of Information from a Prohibited Source

(1)    There are a number of ways DHS employees might receive "tips" from an abuser or an abuser's family, such as:  calling ICE to report the victim as illegal, a "landlord" (who may actually be a human trafficker) calling ICE to report that his "tenants" are undocumented, or providing information to USCIS rebutting the basis for the victim's application.  When a DHS employee receives adverse information about a victim of domestic violence, sexual assault, human trafficking or an enumerated crime from a prohibited source, DHS employees treats the information as inherently suspect.  In deciding whether to pursue an investigation or enforcement action, DHS employees should consider all serious adverse factors.  These factors include: national security concerns; evidence the alien has a serious criminal history; is involved in a serious crime; poses a threat to public safety (in fact, if the alien has been convicted of a crime listed in INA 237(a)(2); the prohibited source protections do not apply at all).  Other adverse factors include evidence the alien is a human rights violator or has engaged in significant immigration fraud.  In the absence of these or other serious adverse factors, exercising favorable

10

discretion, such as not pursuing allegations of fraud from a prohibited source, is appropriate.

(2)    An assertion of fraud by the prohibited source, such as an accusation that the marriage is fraudulent, ordinarily will not serve as the sole basis for adverse action. Abusers often claim their marriage is fraudulent in order to exact revenge or exert further control over the victim.

f.    Corroborating Information Furnished Solely By Prohibited Source: If a DHS employee receives information solely from a prohibited source that he or she wishes to corroborate and take action on, the DHS employee finds an independent source for the information and adheres to the following procedures:

(1)    DHS employees document in the A-file specifically what information they received, from whom they received the information, and what adverse factors about the alien exist to justify pursuing action in the case;

(2)    The above information is presented to the DHS employee's immediate supervisor for review and approval;

(3)    If the supervisor determines it is appropriate to pursue action in the case and authorizes such action, the responsible Component shares details about the action with the section 1367 information and Victim Safety Provisions Review Committee (the "Review Committee") on a quarterly basis, but always after such action is taken;

(4)    The Review Committee is a subcommittee of the DHS Council for Combating Violence Against Women and Girls and consists of subject matter representatives from DHS Policy, CRCL, CIS OMB, ICE, CBP, USCIS and OGC. The Review Committee reviews the information to help ensure compliance with this policy.

3.    **Sensitive Location Certification of Compliance Requirement**:

a.    In general, in cases where an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified in subparagraph b below, the Notice to Appear includes a statement that the provisions of 8 U.S.C. section 1367 have been complied with.

11

Instruction # 002-02-001
Revision # 00

b.    Locations requiring certification in accordance with INA section 239(e) are:

    (1)    A domestic violence shelter, a rape crisis center, supervised visitation center, family justice center, a victim services provider, or a community-based organization.

    (2)    A courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, human trafficking, or stalking in which the alien has been battered or subject to extreme cruelty, or if the alien may be eligible for T or U nonimmigrant status.

c.    DHS officers and employees comply with the section 239(e) certification requirement even if the alien has not applied for or does not intend to apply for a victim-based application or petition.

d.    Section 239(e) requires the relevant DHS agency to certify that the agency has independently verified the inadmissibility or deportability of an alien who was encountered at these sensitive locations.

Accordingly, before issuing an Notice to Appear (NTA) (with the requisite section 239(e) certification of compliance with 8 U.S.C. section 1367) to an alien against whom an enforcement action leading to a removal proceeding was taken at a sensitive location, DHS employees record on the Form I-213:  (1) the sensitive location at which the enforcement action was taken; (2) whether information related to the alien's admissibility or deportability was supplied by a prohibited source; (3) whether and to what extent such information was independently verified; and (4) an acknowledgement of compliance with the nondisclosure requirements.

e.    The certification of compliance is completed by an officer or agent authorized to issue NTAs after reviewing the information contained in the I-213 and confirming that all section 1367 provisions and policy were followed.

    (1)    If a DHS employee suspects that the provisions and relevant policy were not followed, the employee immediately brings the issue to the attention of his or her immediate supervisor rather than issuing the NTA.

12

(2)    If the provisions and policies appear to have been followed, the DHS officer or agent should type or print the following on the NTA, "I certify that, to the best of my knowledge and belief, I have complied with the provisions of 8 U.S.C. § 1367."

(3)    Knowingly making a false certification of compliance may subject the officer or employee to civil penalties and/or disciplinary action under 8 U.S.C. § 1367(c). For more information, see Section VII, Penalties, below.

f.    Aliens encountered at sensitive locations may be beneficiaries of pending or approved applications for benefits. DHS officers encountering individuals at such locations and considering an enforcement action verify, to the fullest extent reasonably practicable, whether a particular alien is a victim who falls within the protection of the section 1367 provisions.

(1)    While INA 239(e) does not prohibit arrests of aliens at sensitive locations, it is clear that Congress intended that arrests of aliens at such locations to be handled properly given that they may ultimately benefit from VAWA's provisions.

(2)    DHS officers and employees are strongly encouraged to exercise prosecutorial discretion favorably in cases of aliens encountered at the sensitive locations, unless other exigent circumstances exist, including terrorism or other extraordinary reasons for arresting aliens at a sensitive location.

g.    If a DHS employee is unsure whether a particular personal encounter or apprehension requires a certification of compliance under INA section 239(e), the employee consults with his supervisory chain and, if authorized in accordance with the office's or Component's protocols, the relevant counsel's office and/or the Office for Civil Rights and Civil Liberties (CRCL).

B.    **Component requirements**: With regard to the above Section 1 (Disclosure of Protected Information Generally Prohibited), Section 2 (Use of Information from Prohibited Sources), and Section 3 (Sensitive Location Certification of Compliance Requirement), Components will meet the following requirements, when applicable.

13

Instruction # 002-02-001
Revision # 00

1.      Requirement to Create Implementing Policy:  Any Component with access to Section 1367 information that might be shared with those outside of the Department develops any necessary implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other instruction, or national or departmental policy.  Components coordinate with the Council in the development of implementing policy.

2.      Requirement to Identify Those Protected:  Components establish, to the fullest extent reasonably practicable, means of identifying individuals protected by Section 1367 confidentiality and will take steps to develop safeguards to protect this information in the relevant systems.  One such way to help identify most, though not all, of those protected is through a Central Index System (CIS) database check.

   a.      CIS database check:  For any cases where it is suspected that an alien is an applicant for a benefit protected by section 1367, a DHS employee consults the Central Index System (CIS) database to verify whether an alien has a pending or approved application or petition covered by section 1367.

   b.      CIS contains a class of admission (COA) code "384" (signifying section 384 of IIRIRA) that was created to alert DHS personnel that the individual is protected by section 1367.  Information about the location, status, or other identifying information of any individual with the code "384" may not be released outside of DHS, DOJ, or DOS unless one or more of the exceptions applies or the individual has been denied relief and has exhausted all opportunities for appeal.

      (1)      When an individual files a VAWA self-petition (Form I-360), T nonimmigrant application (Form I-914, Form I-914 Supplement A), or U nonimmigrant petition (Form I-918, Form I-918 Supplement A) with USCIS, the COA in CIS will be updated to "384."

14

Instruction # 002-02-001
Revision # 00

40

(2)    Aliens granted these victim-based immigration benefits remain protected by Section 1367 and the COA will likely be changed from CIS from "384". Any following COA in CIS is an indication that the individual was granted a form of relief that is covered by Section 1367 and the confidentiality provisions apply: T-1, T-2, T-3, T-4, T-5, U-1, U-2, U-3, U-4, U-5, B11, B12, B16, B17, B20, B21, B22, B23, B24, B25, B26, B27, B28, B29, B31, B32, B33, B36, B37, B38, BX1, BX2, BX3, BX6, BX7, BX8, IB0, IB1, IB2, IB3, IB4, IB5, IB6, IB7, IB8, ST0, ST6, ST7, ST8, ST9, SU0, SU6, SU7, SU8, SU9, Z14.

C.    _Training requirement_: All DHS employees who, through the course of their work, may come into contact with victims or have access to information covered by 8 U.S.C. section 1367 are required to complete the computer-based training module, *Alien Victims of Crimes: Immigration Benefits and Confidentiality Protections,* ~~VAWA: Confidentiality and Immigration Relief,~~, which is currently on the Component's Learning Management Systems (LMS). The VAWA Training was developed by the Federal Law Enforcement Training Center (FLETC) in collaboration with subject-matter experts from several DHS components, including USCIS, ICE and CBP. No later than 180 days after the enactment of this policy, and on an annual basis thereafter, Component Heads, or his or her delegates, of CIS OMB, CRCL, USCIS, ICE and CBP report to the Review Committee the rate of compliance for this training. FLETC ensures the training module is available to all Components through their LMS and provides assistance to keep the training updated and current, as necessary.

D.    **Penalties**: The law provides for civil penalties and/or disciplinary action for certain violations of 8 U.S.C. section 1367 and INA section 239(e): "Anyone who willfully uses, publishes, or permits information to be disclosed in violation of [8 U.S.C. section 1367] or who knowingly makes a false certification under section 239(e) of the [INA] shall be subject to appropriate disciplinary action and subject to a civil money penalty of not more than $5,000 for each such violation." 8 U.S.C. section 1367(c).

Violations of Section 1367 could give rise to serious, even life-threatening, dangers to victims and their family members. Violations compromise the trust victims have in the efficacy of services that exist to help them and, importantly, may unwittingly aid perpetrators retaliate against, harm or manipulate victims and their family members, and elude or undermine criminal prosecutions.

15

Instruction # 002-02-001
Revision # 00.1

## VII. Questions and Reporting

A.    To report any suspected violations of 8 U.S.C. section 1367 or INA section 239(e) or this policy instruction, please contact the Office for Civil Rights and Civil Liberties:

1.    *E-mail:* CRCLCompliance@hq.dhs.gov
2.    *Telephone:* 202-401-1474
3.    *Fax:* 202-401-4708
4.    *U.S. Postal Mail:*
      U.S. Department of Homeland Security
      Office for Civil Rights and Civil Liberties
      Compliance Branch
      245 Murray Lane, SW
      Building 410, Mail Stop #0190
      Washington, D.C. 20528

B.    Address any questions or concerns regarding this Instruction to CRCL.

<br>

_____                    11/7/13
Megan Mack                                          Date
Officer for Civil Rights and Civil Liberties

16

Instruction # 002-02-001
Revision # 00

# Appendix H:  Guidelines for Enforcement Actions In or Near Protected Areas



Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528

**Homeland Security**

October 27, 2021

MEMORANDUM TO:     Tae D. Johnson
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   Troy A. Miller
                   Acting Commissioner
                   U.S. Customs and Border Protection

                   Ur M. Jaddou
                   Director
                   U.S. Citizenship and Immigration Services

                   Robert Silvers
                   Under Secretary
                   Office of Strategy, Policy, and Plans

                   Katherine Culliton-González
                   Officer for Civil Rights and Civil Liberties
                   Office of Civil Rights and Civil Liberties

                   Lynn Parker Dupree
                   Chief Privacy Officer
                   Privacy Office

FROM:              Alejandro N. Mayorkas
                   Secretary

SUBJECT:           **Guidelines for Enforcement Actions in or Near Protected Areas**

This memorandum provides guidance for ICE and CBP enforcement actions in or near areas that require special protection.  It is effective immediately.

This memorandum supersedes and rescinds John Morton's memorandum entitled, "Enforcement Actions at or Focused on Sensitive Locations" (number 10029.2, dated October 24, 2011), and David Aguilar's memorandum entitled, "U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations" (dated January 18, 2013).

1

43

PYM-000239

## I.    Foundational Principle

In our pursuit of justice, including in the execution of our enforcement responsibilities, we impact people's lives and advance our country's well-being in the most fundamental ways. It is because of the profound impact of our work that we must consider so many different factors before we decide to act. This can make our work very difficult. It is also one of the reasons why our work is noble.

When we conduct an enforcement action – whether it is an arrest, search, service of a subpoena, or other action – we need to consider many factors, including the location in which we are conducting the action and its impact on other people and broader societal interests. For example, if we take an action at an emergency shelter, it is possible that noncitizens, including children, will be hesitant to visit the shelter and receive needed food and water, urgent medical attention, or other humanitarian care.

To the fullest extent possible, we should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities. Such a location is referred to as a "protected area."

This principle is fundamental. We can accomplish our enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more. Adherence to this principle is one bedrock of our stature as public servants.

## II.    Protected Areas

Whether an area is a "protected area" requires us to understand the activities that take place there, the importance of those activities to the well-being of people and the communities of which they are a part, and the impact an enforcement action would have on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there. It is a determination that requires the exercise of judgment.

The following are some examples of a protected area. The list is not complete. It includes only examples:

- A school, such as a pre-school, primary or secondary school, vocational or trade school, or college or university.

- A medical or mental healthcare facility, such as a hospital, doctor's office, health clinic, vaccination or testing site, urgent care center, site that serves pregnant individuals, or community health center.

- A place of worship or religious study, whether in a structure dedicated to activities of faith (such as a church or religious school) or a temporary facility or location where such activities are taking place.

2

- A place where children gather, such as a playground, recreation center, childcare center, before- or after-school care center, foster care facility, group home for children, or school bus stop.

- A social services establishment, such as a crisis center, domestic violence shelter, victims services center, child advocacy center, supervised visitation center, family justice center, community-based organization, facility that serves disabled persons, homeless shelter, drug or alcohol counseling and treatment facility, or food bank or pantry or other establishment distributing food or other essentials of life to people in need.

- A place where disaster or emergency response and relief is being provided, such as along evacuation routes, where shelter or emergency supplies, food, or water are being distributed, or registration for disaster-related assistance or family reunification is underway.

- A place where a funeral, graveside ceremony, rosary, wedding, or other religious or civil ceremonies or observances occur.

- A place where there is an ongoing parade, demonstration, or rally.

We need to consider the fact that an enforcement action taken near – and not necessarily in – the protected area can have the same restraining impact on an individual's access to the protected area itself. If indeed that would be the case, then, to the fullest extent possible, we should not take the enforcement action near the protected area. There is no bright-line definition of what constitutes "near." A variety of factors can be informative, such as proximity to the protected area, visibility from the protected area, and people's behavioral patterns in and around the protected area. The determination requires an analysis of the facts and the exercise of judgment.

The fundamental question is whether our enforcement action would restrain people from accessing the protected area to receive essential services or engage in essential activities. Our obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area thus applies at all times and is not limited by hours or days of operation.

Whether an enforcement action can be taken in or near a courthouse is addressed separately in the April 27, 2021 Memorandum from Tae Johnson, ICE Acting Director, and Troy Miller, CBP Acting Commissioner, entitled "Civil Immigration Enforcement Actions in or Near Courthouses," which remains in effect.

### III.    Exceptions and Limitation on Scope

The foundational principle of this guidance is that, to the fullest extent possible, we should not take an enforcement action in or near a protected area. The phrase "to the fullest extent possible" recognizes that there might be limited circumstances under which an enforcement action needs to be taken in or near a protected area. The following are some examples of such limited circumstances:

3

PTM-000241

- The enforcement action involves a national security threat.

- There is an imminent risk of death, violence, or physical harm to a person.

- The enforcement action involves the hot pursuit of an individual who poses a public safety threat.

- The enforcement action involves the hot pursuit of a personally observed border-crosser.

- There is an imminent risk that evidence material to a criminal case will be destroyed.

- A safe alternative location does not exist.

This list is not complete. It includes only examples. Here again, the exercise of judgment is required.

Absent exigent circumstances, an Agent or Officer must seek prior approval from their Agency's headquarters, or as you otherwise delegate, before taking an enforcement action in or near a protected area. If the enforcement action is taken due to exigent circumstances and prior approval was therefore not obtained, Agency headquarters (or your delegate) should be consulted post-action. To the fullest extent possible, any enforcement action in or near a protected area should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area.

Enforcement actions that are within the scope of this guidance include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance. This guidance does not apply to matters in which enforcement activity is not contemplated. As just one example, it does not apply to an Agent's or Officer's participation in an official function or community meeting.

This guidance does not limit an agency's or employee's statutory authority, and we do not tolerate violations of law in or near a protected area.

## IV.    Training and Reporting

Please ensure that all employees for whom this guidance is relevant receive the needed training. Each of your respective agencies and offices should participate in the preparation of the training materials.

Any enforcement action taken in or near a protected area must be fully documented in your Agency's Privacy Act-compliant electronic system of record in a manner that can be searched and validated. The documentation should include, for example, identification of the protected area; the reason(s) why the enforcement action was taken there; whether or not prior approval was obtained and, if not, why not; the notification to headquarters (or headquarters' delegate) that occurred after an action was taken without prior approval; a situational report of what

4

PYM-000242

occurred during and immediately after the enforcement action; and, any additional information that would assist in evaluating the effectiveness of this guidance in achieving our law enforcement and humanitarian objectives.

## V.    Statement of No Private Right Conferred

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

5

PYM-000243

# Appendix I:  Arrests at Sensitive Locations

## 1.  List of U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Arrests at Sensitive Locations from October 1, 2018, through October 31, 2020[3]

| Type | Date | Sensitive Location | City | State | Field Office | Circumstances if Exigent |
|---|---|---|---|---|---|---|
| Exigent | 10/1/2018 | At School | Raleigh | NC | Atlanta | ICE officers or agents subsequently were led to a sensitive location. |
| Exigent | 4/24/2019 | At School | Pleasanton | TX | San Antonio | ICE officers or agents subsequently were led to a sensitive location. |
| Planned[4] | 7/8/2019 | Near Place of Worship | Los Angeles | CA | Los Angeles | N/A |
| Planned | 7/8/2019 | Near Place of Worship | Denver | CA | Denver | N/A |
| Planned | 7/9/2019 | Near School | Bell Gardens | CA | Los Angeles | N/A |
| Planned | 7/9/2019 | Near School | South Gate | CA | Los Angeles | N/A |
| Planned | 7/9/2019 | Near School | El Monte | CA | Los Angeles | N/A |
| Planned | 7/25/2019 | Near School | Moreno Valley | CA | Los Angeles | N/A |
| Planned | 8/29/2019 | Near School | Panorama City | CA | Los Angeles | N/A |
| Planned | 9/21/2019 | Near Place of Worship | Pasadena | CA | Los Angeles | N/A |
| Planned | 9/23/2019 | Near School | Los Angeles | CA | Los Angeles | N/A |
| Planned | 9/25/2019 | Near School | Pico Rivera | CA | Los Angeles | N/A |
| Planned | 10/27/2019 | Near School | Los Angeles | CA | Los Angeles | N/A |
| Planned | 11/26/2019 | Near School | Garden grove | CA | Los Angeles | N/A |

---

[3] In October 2018, ERO created a mechanism to record enforcement actions manually that were likely to take place at or near a sensitive location.  This record is used for internal tracking purposes only and is not considered a system of record.  Data for 2017 and earlier are not available.

[4] Planned operations are anticipated operations that may or may not have been executed.

| Type | Date | Sensitive Location | City | State | Field Office | Circumstances if Exigent |
|------|------|-------------------|------|-------|--------------|--------------------------|
| Planned | 12/30/2019 | Near Place of Worship | Los Angeles | CA | Los Angeles | N/A |
| Planned | 1/16/2020 | Near School | Carson | CA | Los Angeles | N/A |
| Planned | 1/26/2020 | Near Place of Worship | Los Angeles | CA | Los Angeles | N/A |
| Planned | 1/27/2020 | Near School | Hawthorne | CA | Los Angeles | N/A |
| Planned | 2/3/2020 | Near School | Los Angeles | CA | Los Angeles | N/A |
| Planned | 2/5/2020 | Near School | Albuquerque | NM | El Paso | N/A |
| Planned | 2/25/2020 | Near Place of Worship | Los Angeles | CA | Los Angeles | N/A |
| Planned | 2/25/2020 | Near Place of Worship | Bell Gardens | CA | Los Angeles | N/A |
| Planned | 2/28/2020 | Near School | Los Angeles | CA | Los Angeles | N/A |
| Planned | 3/5/2020 | Near School | Paramount | CA | Los Angeles | N/A |
| Planned | 3/16/2020 | Near School | Bell Gardens | CA | Los Angeles | N/A |
| Planned | 5/8/2020 | Near Place of Worship | Los Angeles | CA | Los Angeles | N/A |
| Exigent | 7/8/2020 | Near School | Washington | DC | Baltimore | ICE officers or agents subsequently were led to a sensitive location. |
| Planned | 7/21/2020 | Near School | Gillette | WY | Denver | N/A |
| Planned | 7/27/2020 | Near Place of Worship | Midland | TX | El Paso | N/A |

**2. List of ICE Homeland Security Investigations Arrests at Sensitive Locations October 1, 2017, through October 31, 2020**

| Type | Date | Sensitive Location | City | State | Description of Noncitizen | Description of Action |
|------|------|-------------------|------|-------|---------------------------|-----------------------|
| Planned | 10/13/2017 | Church | Scranton | PA | U.S. citizen | Search Warrant |
| Planned | 10/24/2017 | University | High Point | NC | International Student | Administrative Arrest |

| Type | Date | Sensitive Location | City | State | Description of Noncitizen | Description of Action |
|---|---|---|---|---|---|---|
| Planned | 10/31/2017 | Church (Alleged Residence) | Cleveland | OH | N/A | Federal Search Warrant for Child Exploitation |
| Planned | 12/5/2017 | University | San Marcos | TX | Child Pornography | Student |
| Planned | 12/18/2017 | Church | Walterboro | SC | U.S. citizen | State search and arrest warrants – Child Exploitation/Sexual Assault |
| Planned | 2/9/2018 | University | Saratoga Springs | NY | U.S. citizen | Conduct Interviews |
| Planned- | 2/13/2018 | School | Tarpon Springs | FL | Student (Citizenship Unknown) | Interview – Child Exploitation |
| Planned | 2/13/2018 | School | Wesley Chapel | FL | Employee (Citizenship Unknown) | Consent search of computer – Child Exploitation |
| Planned | 2/16/2018 | School | Stevenson | MD | Juvenile | Interview for Document and Benefit Fraud Task Force Investigation |
| Planned | 3/7/2018 | School | Starkville | MS | NA | Federal Search Warrant – Immigration Fraud |
| Planned | 3/29/2018 | Hospital | Washington | DC | Adult | Arrest for Possession of Child Pornography |
| Planned | 4/10/2018 | University | West Liberty | WV | Student | Administrative Arrest |
| Planned | 4/25/2018 | Technical Community College (School) | Pittsburgh | PA | Naturalized U.S. citizen | Conduct interviews |
| Planned | 6/7/2018 | Hospital | Salt Lake City | UT | N/A | Federal Search Warrant for Identification Theft and Illegal Hiring of Noncitizens |
| Planned | 8/1/2018 | Licensed family childcare home | Honolulu | HI | Owner (Citizenship unknown) | Search Warrant – Child Exploitation |
| Planned | 8/22/2018 | Church | Boise | ID | Noncitizen | Criminal Search Warrant – Federal Smuggling/ Counterfeit Offenses |
| Exigent | 10/23/2018 | Church | Olathe | KS | Citizen and national of Nigeria | Administrative Arrest |
| Planned | 11/7/2018 | Church | Starkville | MS | Lawful Permanent Resident (LPR) from Mexico | Federal Search Warrant – Financial Fraud |
| Planned | 11/29/2018 | School | Cooperstown | NY | U.S. citizen | Search Warrant |

PYM-000246

| Type | Date | Sensitive Location | City | State | Description of Noncitizen | Description of Action |
|---|---|---|---|---|---|---|
| Planned | 1/16/2019 | University | Edwardsville | IL | N/A | Search Warrant – U.S. export laws |
| Planned | 2/25/2019 | Islamic Center | Pittsburg | PA | Iraqi citizen | Conduct interviews |
| Planned | 3/12/2019 | High School | Woodbury | MN | N/A | Federal Search Warrant – Threats, Murder for Hire |
| Exigent | 5/30/2019 | High School | Pittsburgh | PA | U.S. citizen | Conduct interviews |
| Planned | 10/23/2019 | Learning Center | San Diego | CA | N/A | Wire/Mail Fraud |
| Planned | 10/28/2019 | High School | | KS | N/A | Seizure of electronic devices – child exploitation |
| Planned | 12/5/2019 | University | Pittsburgh | PA | Student | Conduct Interviews |
| Planned | 1/14/2020 | School | Grand Island | NE | Student | Criminal Search Warrant – Child Exploitation |
| Planned | 1/29/2020 | Church | Van Nuys | CA | Pastor | Criminal Search Warrant – Visa/Marriage Fraud |
| Planned | 1/29/2020 | Church | Van Nuys | CA | Pastor | Visa/Marriage Fraud |
| Planned | 2/5/2020 | Courthouse | Central Islip | NY | Bloods Gang Member – U.S. citizen | Criminal Arrest Warrant – Federal Narcotics and Firearms Offenses |
| Planned | 3/3/2020 | Day Care | Gilroy | CA | N/A | Search Warrant related to Child Pornography |
| Planned | 3/6/2020 | University | Buffalo | NY | Student | Conduct interviews |
| Planned | 3/6/2020 | University | High Point | NC | F-1 Student - Chinese National - Visa canceled for drug conviction | Admin Arrest after F-1 Visa canceled |
| Planned | 3/10/2020 | School | Anza | CA | Faculty and Staff of School | Criminal Search Warrant – Visa Fraud/Labor Trafficking |
| Planned | 3/10/2020 | School | Anza | CA | Visa Fraud, Labor Trafficking | Criminal Search Warrant – Visa Fraud/Labor Trafficking |
| Planned | 4/24/2020 | School | Pasadena | CA | Visa Fraud | Planned |
| Planned | 6/4/2020 | Iowa National Guard (recruitment office) | Mount Pleasant | IA | N/A | Planned – Iowa National Guard (recruitment office) |
| Planned | 8/6/2020 | Church | Denison | TX | N/A | Search Warrant |
| Planned | 8/21/2020 | Church | Denison | TX | N/A | Search Warrant |

51

# Exhibit 22

PYM-000247

 An official website of the United States government

Here's how you know



**Official websites use .gov**

A **.gov** website belongs to an official government organization in the United States.

**Secure .gov websites use HTTPS**

A **lock** ( 🔒 ) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

 **U.S. Immigration and Customs Enforcement**

Call <u>1-866-DHS-2-ICE</u>
Report Crime

ICE      WHO WE ARE      ENFORCEMENT AND REMOVAL OPERATIONS

# Protected Areas and Courthouse Arrests

**Webpage under construction**

This page contains information that is outdated. It is being revised in accordance with new policy guidance as of Jan. 21, 2025.

PYM-000248

# Protected Areas Enforcement Actions

The Department of Homeland Security (DHS) issued a memorandum — _Guidelines for Enforcement Actions In or Near Protected Areas_ — instructing officers to refrain from taking enforcement actions at or near locations or protected areas in October 2021. This policy is part of DHS's effort to avoid restricting people's access to essential services or engagement in essential activities.

# Protected Areas

Protected areas are locations that provide essential services or activities. When determining if a location is a protected area, DHS considers the activities that take place there, the importance of those activities to the well-being of people and the communities of which they are a part and the impact an enforcement action would have on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there. It is a determination that requires the exercise of judgment.

Examples of protected areas include, but are not limited to:

- Schools
- Medical or mental healthcare facilities
- Places of worship or religious studies
- Places where children gather
- Social services establishments
- Places where disaster or emergency response/relief is provided
- Places where funerals, graveside ceremonies, rosaries, weddings, or other religious or civil ceremonies or observances occur

PYM-000249

# Enforcement Actions Within the Scope of the Protected Areas Memorandum

Enforcement actions that are within the scope of this guidance include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, the service of charging documents or subpoenas, interviews and immigration enforcement surveillance.

# Exceptions and Limitations on Scope

There might be limited circumstances under which an enforcement action needs to be taken in or near a protected area. The following are some examples of such limited circumstances:

- The enforcement action involves a national security threat
- There is an imminent risk of death, violence, or physical harm to a person
- The enforcement action involves the hot pursuit of an individual who poses a public safety threat
- The enforcement action involves the hot pursuit of a personally observed border crosser
- There is an imminent risk that evidence material to a criminal case will be destroyed
- A safe alternative location — a location deemed safe for DHS personnel, the subject of the enforcement action, and the public — does not exist

The memorandum does not limit ICE's or employee's statutory authority, and DHS does not tolerate violations of law in or near a protected area.

Absent exigent circumstances, DHS officers and agents must seek prior approval from their agency's headquarters or an authorized delegate before taking an enforcement action in or near a protected area. To the fullest extent possible, any

PTM-000250

enforcement actions in or near a protected area should be taken in a non-public area, outside of public view, and to eliminate or minimize the chance that the enforcement action will prevent people from accessing the protected area.

If DHS officers and agents take enforcement actions that are believed to be in violation of the protected areas policy, a complaint may be filed through one of the following channels:

## ICE

(888) 351-4024
ERO Contact Form
Website

## CBP

(877) 227-5511
Website

## Office of the Inspector General

(800) 323-8603
Website

## DHS Office for Civil Rights and Civil Liberties

(866) 644-8360
CRCLCompliance@hq.dhs.gov

# Courthouses

Courthouses do not fall under ICE policies concerning enforcement actions in or near protected areas. To clarify policy on civil immigration enforcement actions related to courthouses, in April 2021, ICE and CBP jointly issued a memorandum — *Civil Immigration Enforcement Actions In or Near Courthouses*.

# Courthouse Enforcement Actions

The *Civil Immigration Enforcement Actions In or Near Courthouses* provides ICE and CBP officers with guidance as to when and how civil immigration law enforcement action can be executed in or near a courthouse so as not to unnecessarily impinge upon the core principle of preserving access to justice.

# Courthouses

To uphold the rule of law, DHS ensures that courthouses are open to all people — regardless of citizenship. As a result, this memorandum provides guidance on when and how civil immigration law enforcement actions may be executed in or near a courthouse.

This memorandum does not apply to criminal immigration enforcement actions. A courthouse includes any municipal, county, state, federal, tribal, or territorial courthouse, including immigration courts. "Near" the courthouse means in the close vicinity of the courthouse, including the entrance and exit of a courthouse, and in adjoining or related areas such as an adjacent parking lot or

transportation point (such as a bus stop right outside a courthouse). It does not include adjacent buildings or houses that are not part of the courthouse or otherwise are not used for court-related business.

# When Enforcement Actions May Be Taken

Civil immigration law enforcement actions at courthouses will only be executed in limited circumstances against public safety threats. Namely, civil immigration enforcement actions may be taken in or near courthouses if:

- It involves a national security threat
- There is imminent risk of death, violence, or physical harm to any person
- It involves the pursuit of an individual who poses a threat to public safety
- There is an imminent risk of destruction of evidence material to a criminal case

In the absence of a hot pursuit, a civil immigration enforcement action may be taken in or near a courthouse against individuals who pose threats to public safety if:

- It is necessary to act in or near the courthouse because a safe alternative location does not exist or would be too difficult to achieve the enforcement action at such a location
- The action has been approved in advance by a Field Office Director, Special Agent in Charge, Chief Patrol Agent, or Port Director approval in advance of the enforcement action

As this is but a partial summary, the visitor is recommended to view the policy at the link provided above.

## ADDRESS

— 

📍 500 12th St SW
Washington, DC 20536

📱 Report Crimes: Call 1-866-DHS-2-ICE

## RELATED INFORMATION

— 

Enforcement and Removal Operations

## DHS MEMO

— 

DHS Guidance for Enforcement Action at Protected Areas

**About Us**                    **Immigration Enforcement**

**Combating Transnational Crime**                    **Newsroom**

f   X   ▶️   👓

📷 in ✉ 🔊


U.S. Immigration
and Customs
Enforcement

**ICE Contact Center**

 ICE.gov

**An official website of the <u>U.S. Department of Homeland Security</u>**

<u>About ICE</u>

<u>Accessibility</u>

<u>FOIA Requests</u>

<u>Privacy Policy</u>

<u>DHS.gov</u>

<u>Archive</u>

<u>No FEAR Act Data</u>

<u>Site Links</u>

<u>Performance Reports</u>

<u>Inspector General</u>

<u>The White House</u>

<u>DHS Components</u>

<u>USA.gov</u>

# National Terrorism Advisory System

# Exhibit 23



_The independent source for health policy research, polling, and news._

# Understanding the U.S. Immigrant Experience: The 2023 KFF/LA Times Survey of Immigrants

**Shannon Schumacher** (https://www.kff.org/person/shannon-schumacher/),

**Liz Hamel** (https://www.kff.org/person/liz-hamel/),

**Samantha Artiga** (https://www.kff.org/person/samantha-artiga/),

**Drishti Pillai** (https://www.kff.org/person/drishti-pillai/),

**Ashley Kirzinger** (https://www.kff.org/person/ashley-kirzinger/),

**Audrey Kearney** (https://www.kff.org/person/audrey-kearney/),

**Marley Presiado** (https://www.kff.org/person/marley-presiado/), Ana Gonzalez-Barrera, and

**Mollyann Brodie** (https://www.kff.org/person/mollyann-brodie/)

Published: Sep 17, 2023

## Overview

The Survey of Immigrants, a partnership between KFF and _The Los Angeles Times_, takes an in-depth look at the experiences of immigrants, a diverse group that makes up 16% of the U.S. adult population. Immigrants play an important role in the nation's workforce and culture, and they also face unique experiences and struggles in their communities, workplaces, and health care settings. Nonetheless, they overwhelmingly express optimism about their futures in the U.S. and have high hopes for their children.

The survey is the largest nationally representative survey focused on immigrants, interviewing 3,358 immigrant adults in 10 languages. The results provide a deep understanding of immigrants' experiences, reflecting their varied countries of origin and histories, immigration statuses, racial

1/30/25, 5:22 PM                    Understanding the U.S. Immigrant Experience: The 2023 KFF/LA Times Survey of Immigrants - Findings - 10217 | KFF

Case 8:25-cv-00243-TDC     Document 49-2     Filed 02/11/25     Page 277 of 405
PTM-000257

and ethnic identities, and socioeconomic backgrounds. In addition to the survey, KFF and *The Los Angeles Times* also conducted 13 focus groups with immigrant adults across the country.

**Other KFF reports from the survey:**

Health and Health Care Experiences of Immigrants (https://www.kff.org/racial-equity-and-health-policy/issue-brief/health-and-health-care-experiences-of-immigrants-the-2023-kff-la-times-survey-of-immigrants)

Political Preferences and Views on U.S. Immigration Policy Among Immigrants in the U.S. (https://www.kff.org/racial-equity-and-health-policy/poll-finding/political-preferences-and-views-on-us-immigration-policy-among-immigrants-in-the-us/)

Understanding the Diversity in the Asian Immigrant Experience in the U.S.: The 2023 KFF/LA Times Survey of Immigrants (https://www.kff.org/racial-equity-and-health-policy/poll-finding/understanding-the-diversity-in-the-asian-immigrant-experience/)

Most Hispanic Immigrants Say Their Lives Are Better In The U.S. But Face Financial And Health Care Challenges: The 2023 KFF/LA Times Survey of Immigrants (https://www.kff.org/racial-equity-and-health-policy/poll-finding/most-hispanic-immigrants-say-lives-are-better-in-the-us/)

Five Key Facts About Immigrants' Understanding of U.S. Immigration Laws, Including Public Charge (https://www.kff.org/racial-equity-and-health-policy/poll-finding/five-key-facts-about-immigrants-understanding-of-u-s-immigration-laws-including-public-charge/)

Five Key Facts About Immigrants with Limited English Proficiency (https://www.kff.org/racial-equity-and-health-policy/issue-brief/five-key-facts-about-immigrants-with-limited-english-proficiency/)

Five Key Facts About Black Immigrants' Experiences in the United States (https://www.kff.org/racial-equity-and-health-policy/issue-brief/five-key-facts-about-black-immigrants-experiences-in-the-united-states/)

**Explore *The Los Angeles Times'* "Immigrant Dreams (https://www.latimes.com/world-nation/story/2023-09-17/immigrant-dreams-immigration-poll-latimes-kff)" project:**

In an increasingly pessimistic era, immigrants espouse a hallmark American trait — optimism (https://www.latimes.com/world-nation/story/2023-09-17/immigration-poll-american-immigrants-more-optimistic), published Sept. 17, 2023

Ten languages, thousands of phone calls: Accurately polling immigrants posed unprecedented challenges (https://www.latimes.com/world-nation/story/2023-09-17/immigration-poll-how-kff-latimes-surveyed-thousands), published Sept. 17, 2023

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 278 of 405
PTM-000258

Column: We need immigrants more than ever. They keep hope in this country alive
(https://www.latimes.com/california/story/2023-09-17/immigrant-optimism-american-dream-essay), published
Sept. 17, 2023

Receiving food stamps won't kill your green card chances. How 'public charge' works
(https://www.latimes.com/california/story/2023-09-17/what-you-need-to-know-about-public-charge), published
Sept. 17, 2023

Immigration scams are rampant. Here's how to avoid getting taken (https://www.latimes.com/world-
nation/story/2023-09-17/immigration-scams-are-rampant-how-to-avoid), published Sept. 17, 2023

We asked immigrants across the country these questions. See how your answers line up
(https://www.latimes.com/projects/immigrant-dreams-KFF-poll-quiz-compare-results/), published Sept. 17,
2023

Black immigrants face more discrimination in the U.S. The source is sometimes surprising
(https://www.latimes.com/world-nation/story/2023-09-21/jamaican-immigrant-new-york-struggles-among-black-
americans), published Sept. 21, 2023

Low wages, lousy shifts, little room for advancement: Immigrant workers describe on-the-job
discrimination (https://www.latimes.com/world-nation/story/2023-10-19/immigrant-workers-report-high-leves-
of-discrimination-on-the-job), published Oct. 19, 2023

'Everything's like a gamble': U.S. immigration policies leave lives in limbo
(https://www.latimes.com/world-nation/story/2023-11-30/u-s-immigration-policies-leave-lives-in-limbo),
published Nov. 30, 2023

Column: Are immigrants better off in Texas or California? It's complicated
(https://www.latimes.com/california/story/2023-11-30/column-are-immigrants-better-off-in-texas-or-california-its-
complicated), published Nov. 30, 2023

Column: Could immigrants be America's new swing voter group
(https://www.latimes.com/politics/story/2023-11-30/la-immigrant-dreams-politics-poll-latimes-kff), published
Nov. 30, 2023

Medi-Cal will soon be open to all, 'papers or no papers.' She wants her neighbors to know
(https://www.latimes.com/california/story/2023-12-24/medi-cal-will-soon-be-open-to-all-papers-or-no-papers-she-
wants-her-neighbors-to-know), published Dec. 24, 2023

**Acknowledgements:**

KFF would like to thank the Association of Asian Pacific Community Health Organizations, the Black Alliance for Just Immigration, Dr. May Sudhinaraset, the National Immigration Law Center, the National Resource Center for Refugees, Immigrants, and Migrants, and UnidosUS for their invaluable inputs, insights, and suggestions throughout the planning, fielding, and dissemination of this survey project.

## Findings

## Executive Summary

The Survey of Immigrants, conducted by KFF in partnership with the Los Angeles Times during Spring 2023, examines the diversity of the U.S. immigrant experience. It is the largest and most representative survey of immigrants living in the U.S. to date. With its sample size of 3,358 immigrant adults, the survey provides a deep understanding of immigrant experiences, reflecting their varied countries of origin and histories, citizenship and immigration statuses, racial and ethnic identities, and social and economic circumstances. KFF also conducted focus groups with immigrants from an array of backgrounds, which expand upon information from the survey (see Methodology (https://www.kff.org/report-section/understanding-the-u-s-immigrant-experience-the-2023-kff-la-times-survey-of-immigrants-methodology) for more details).

This report provides an overview of immigrants' reasons for coming to the U.S.; their successes and challenges; their experiences at work, in their communities, in health care settings, and at home; as well as their outlook on the future. Recognizing the diversity within the immigrant population, the report examines variations in the experiences of different groups of immigrants, including by immigration status, income, race and ethnicity, English proficiency, and other factors. Given that this report includes a focus on experiences with discrimination and unfair treatment, data by race and ethnicity are often shown rather than by country of birth. A companion report (https://www.kff.org/racial-equity-and-health-policy/issue-brief/health-and-health-care-experiences-of-immigrants-the-2023-kff-la-times-survey-of-immigrants) provides information on immigrants' health coverage, access to, and use of care, and further reports will provide additional details for other subgroups within the immigrant population, including more data by country of origin.

## Key takeaways from this report include:

- **Most immigrants – regardless of where they came from or how long they've been in the U.S. – say they came to the U.S. for more opportunities for themselves and their children.**

Case 8:25-cv-00243-TDC     Document 49-2     Filed 02/11/25     Page 280 of 405
PYM-000260

The predominant reasons immigrants say they came to the U.S. are for better work and educational opportunities, a better future for their children, and more rights and freedoms. Smaller but still sizeable shares cite other factors such as joining family members or escaping unsafe or violent conditions.

- **Overall, a majority of immigrants say their financial situation (78%), educational opportunities (79%), employment situation (75%), and safety (65%) are better as a result of moving to the U.S.** A large majority (77%) say their own standard of living is better than that of their parents, higher than the share of U.S.-born adults who say the same (51%)[1],and most (60%) believe their children's standard of living will be better than theirs is now. Three in four immigrants say they would choose to come to the U.S. again if given the chance, and six in ten say they plan to stay in the U.S. However, about one in five (19%) say they want to move back to the country they were born in or to another country, while an additional one in five (21%) say they are not sure.

- **Despite an improved situation relative to their countries of birth, many immigrants report facing serious challenges, including high levels of workplace and other discrimination, difficulties making ends meet, and confusion and fears related to U.S. immigration laws and policies.** These challenges are more pronounced among some groups of immigrants, including those who live in lower-income households, Black and Hispanic immigrants, those who are likely undocumented, and those with limited English proficiency. Given the intersectional nature of these factors, some immigrants face compounding challenges across them.

- **Most immigrants are employed, and about half of all working immigrants say they have experienced discrimination in the workplace, such as being given less pay or fewer opportunities for advancement than people born in the U.S., not being paid for all their hours worked, or being threatened or harassed**. In addition, about a quarter of all immigrants, rising to three in ten of those with college degrees, say they are overqualified for their jobs, a potential indication that they had to take a step back in their careers when coming to the U.S. or lacked career advancement opportunities in the U.S.

- **About a third (34%) of immigrants say they have been criticized or insulted for speaking a language other than English since moving to the U.S., and a similar share (33%) say they have been told they should "go back to where you came from."** About four in ten (38%) immigrants say they have ever received worse treatment than people born in the U.S. in a store or restaurant, in interactions with the police, or when buying or renting a home. Some immigrants also report being treated unfairly in health care settings. Among immigrants who have received health care in the U.S., one in four say they have been treated differently or unfairly by a doctor or other health care provider because of their racial or ethnic background, their accent or how well they speak English, or their insurance status or ability to pay for care.

- **Immigrants who are Black or Hispanic report disproportionate levels of discrimination at work, in their communities, and in health care settings.** Over half of employed Black (56%) and Hispanic (55%) immigrants say they have faced discrimination at work, and roughly half of college-educated Black (53%) and Hispanic (46%) immigrant workers say they are overqualified for their jobs. Nearly four in ten (38%) Black immigrants say they have been treated unfairly by the police and more than four in ten (45%) say they have been told to "go back to where you came from." In addition, nearly four in ten (38%) Black immigrants say they have been treated differently or unfairly by a health care provider. Among Hispanic immigrants, four in ten (42%) say they have been criticized or insulted for speaking a language other than English.

PYM-000261

- **Even with high levels of employment, one third of immigrants report problems affording basic needs like food, housing, and health care.** This share rises to four in ten among parents and about half of immigrants living in lower income households (those with annual incomes under $40,000). In addition, one in four lower income immigrants say they have difficulty paying their bills each month, while an additional 47% say they are "just able to pay their bills each month."

- **Among likely undocumented immigrants, seven in ten say they worry they or a family member may be detained or deported, and four in ten say they have avoided things such as talking to the police, applying for a job, or traveling because they didn't want to draw attention to their or a family member's immigration status.** However, these concerns are not limited to those who are likely undocumented. Among all immigrants regardless of their own immigration status, nearly half (45%) say they don't have enough information to understand how U.S. immigration laws affect them and their families, and one in four (26%) say they worry they or a family member could be detained or deported. Confusion and lack of information extend to public charge rules. About three quarters of all immigrants, rising to nine in ten among likely undocumented immigrants, say they are not sure whether use of public assistance for food, housing, or health care can affect an immigrant's ability to get a green card or incorrectly believe that use of this assistance will negatively affect the ability to get a green card.

- **About half of all immigrants have limited English proficiency, and about half among this group say they have faced language barriers in a variety of settings and interactions.** About half (53%) of immigrants with limited English proficiency say that difficulty speaking or understanding English has ever made it hard for them to do at least one of the following: get health care services (31%); receive services in stores or restaurants (30%); get or keep a job (29%); apply for government financial help with food, housing, or health coverage (25%); report a crime or get help from the police (22%). In addition, one-quarter of parents with limited English proficiency say they have had difficulty communicating with their children's school (24%). Working immigrants with limited English proficiency also are more likely to report workplace discrimination compared to those who speak English very well (55% vs. 41%).

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 282 of 405
PYM-000262

## Who Are U.S. Immigrants?

The KFF/LA Times Survey of Immigrants is a probability-based survey that is representative of the adult immigrant population in the U.S. based on known demographic data from federal surveys (see Methodology (https://www.kff.org/report-section/understanding-the-u-s-immigrant-experience-the-2023-kff-la-times-survey-of-immigrants-methodology) for more information on sampling and weighting). For the purposes of this project, immigrant adults are defined as individuals ages 18 and over who live in the U.S. but were born outside the U.S. or its territories.

According to 2021 federal data, immigrants make up 16% of the U.S. adult population (ages 18+). About four in ten immigrant adults identify as Hispanic (44%), over a quarter are Asian (27%), and smaller shares are White (17%), Black (8%), or report multiple races (3%). The top six countries of origin among adult immigrants in the U.S. are Mexico (24%), India (6%), China (5%), the Philippines (5%), El Salvador (3%), and Vietnam (3%) although immigrants hail from countries across the world.

The immigrant adult population largely mirrors the U.S.-born adult population in terms of gender. While similar shares of U.S.-born and immigrant adults have a college degree, immigrant adults are substantially more likely than U.S.-born adults to have less than a high school education. About four in ten (40%) immigrants are parents of a child under 18 living in their household, and a quarter (https://www.kff.org/racial-equity-and-health-policy/fact-sheet/health-coverage-and-care-of-immigrants/) (25%) of children in the U.S. have an immigrant parent.

Slightly less than half (47%) of immigrant adults report having limited English proficiency, meaning they speak English less than very well. Regardless of ability to speak English, a large majority (83%) of immigrants say they speak a language other than English at home, including about four in ten (43%) who speak Spanish at home.

A majority (55%) of U.S. adult immigrants are naturalized citizens. The remaining share are noncitizens, including lawfully present and undocumented immigrants. KFF analysis based on federal

Case 8:25-cv-00243-TDC          Document 49-2          Filed 02/11/25          Page 283 of 405

PTM-000263

data estimates that 60% of noncitizens are lawfully present and 40% are undocumented.[2]

See Appendix Table 1 for a table of key demographics about the U.S. adult immigrant population compared to the U.S.-born adult population.

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 284 of 405
PYM-000264

## Key Terms Used In This Report

**Limited English Proficiency**: Immigrants are classified as having Limited English Proficiency if they self-identify as speaking English less than "very well."

**Immigration Status:** Immigrants are classified by their self-reported immigration status as follows:

- **Naturalized Citizen**: Immigrants who said they are a U.S. citizen.

- **Green Card or Valid Visa**: Immigrants who said they are not a U.S. citizen, but currently have a green card (lawful permanent status) or a valid work or student visa.

- **Likely Undocumented Immigrant**: Immigrants who said they are not a U.S. citizen and do not currently have a green card (lawful permanent status) or a valid work or student visa. These immigrants are classified as "likely undocumented" since they have not affirmatively identified themselves as undocumented.

**Race and Ethnicity:** Data are reported for four racial and ethnic categories: Hispanic, Black, Asian, and White based on respondents' self-reported racial and ethnic identity. Persons of Hispanic origin may be of any race but are categorized as Hispanic for this analysis; other groups are non-Hispanic. Results for individuals in other groups are included in the total but not shown separately due to sample size restrictions. Given that this report includes a focus on experiences with discrimination and unfair treatment, we often show data by race and ethnicity rather than country of birth. Given variation of experiences within these broad racial and ethnic categories, further reports will provide additional details for subgroups within racial and ethnic groups, including more data by country of origin.

**Educational Attainment:** These data are based on the highest level of education completed in the U.S. and/or in other countries as self-reported by the respondent. The response categories offered were: did not graduate high school, high school graduate with a diploma, some college (including an associate degree), university degree (bachelor's degree), and post-graduate degree (such as Master's, PhD, MD, JD).

PYM-000265

**Country of Birth**: "Country of birth" is classified based on respondents' answer to the question "In what country were you born?" In some cases, countries are grouped into larger regions. See Appendix Table 2 for a list of regional groupings.

## Why Do Immigrants Come to The U.S. And How Do They Feel About Their Life in the U.S.?

**Immigrants cite both push and pull factors as reasons for coming to the U.S.** For most immigrants, their major reasons for coming to the U.S. are aspirational, such as seeking better economic and job opportunities (75% say this is a major reason they came to the U.S.), a better future for their children (68%), and for better educational opportunities (62%). Half of immigrants say a major reason they or their family came to the U.S. was to have more rights and freedoms, including about three-quarters of immigrants from Central America (73%). Smaller but sizeable shares say other factors such as joining family members (42%) or escaping unsafe or violent conditions (31%) were major reasons they came. The share who cites escaping unsafe conditions as a major reason for coming to the U.S. rises to about half of likely undocumented immigrants (51%) and about six in ten (59%) immigrants from Central America.

[https://datawrapper.dwcdn.net/c6T5A](https://datawrapper.dwcdn.net/c6T5A) (https://datawrapper.dwcdn.net/c6T5A)

```
window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-
height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in
event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if
(iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-
height'][chartId] + 'px'; } } } } });
```

Case 8:25-cv-00243-TDC     Document 49-2     Filed 02/11/25     Page 286 of 405
PYM-000266

**In Their Own Words: Reasons for Coming to the U.S. from Focus Group Participants**

*Stories focus group participants told of why they came to the U.S. reflect the survey responses. While many pointed to economic and educational opportunities, some described leaving harsh economic and unsafe conditions in their home countries.*

"I came to the U.S. hoping that my children will have better educational opportunity." – 58-year-old Vietnamese immigrant woman in California

"[My husband] came here, and I followed him. So, he came, and I came with the kids afterwards…so we could have a better life. It's not easy…we wanted to have…better opportunities for our children, for ourselves." – 46-year-old Ghanian immigrant woman in New Jersey

"The thing is that there are more opportunities, and the standard of living is much better. We can make ends meet even through manual labor. That is not possible in Vietnam." – 33-year-old Vietnamese immigrant man in Texas

"Then, my mom had to make a decision because the gangs took control of her place. They started asking for rent, extorting her life. If she didn't pay the extortion, the rent, they were going to take me, or my siblings, or her. …since I was the oldest, she brought me, making the sacrifice of leaving behind my two siblings." – 25-year-old Salvadorian immigrant man in California

"Actually, it wasn't my decision to come. I left when I was 13 years old, fleeing from my country because I had a death threat, along with my eight-year-old sister. I didn't want to come." – 20-year-old Honduran immigrant woman in California

"Because of the earthquake, you know, I lost my house, and I wanted to go to a country with more opportunities and I came here." – 30-year-old Haitian immigrant man in Florida

Case 8:25-cv-00243-TDC     Document 49-2     Filed 02/11/25     Page 287 of 405
PYM-000267

**Most immigrants say moving to the U.S. has provided them more opportunities and improved their quality of life.** When the survey asked immigrants to describe in their own words the best thing that has come from moving to the U.S., many similar themes arise: better opportunities, a better life in general, or a better future for their children are top mentions, as are education and work opportunities.

### In Their Own Words: The Best Thing That Has Come From Moving To The U.S.

*In a few words, what is the best thing that has come from you moving to the U.S.?*

"Educational opportunities, economic opportunities, political and human rights, housing, food and basic needs, neighborhood safety, lower crime rates"- 28 year old Mexican immigrant woman in Nebraska

"Best education for my kids. Professional job. Healthy environment. Good system. The opportunities everywhere!" – 67-year-old Nepalese immigrant man in Maryland

"Better job, education, and economic opportunities" – 48-year-old Indian immigrant woman in North Carolina

"Education and improved quality of life in terms of obtaining basic needs" – 39-year-old Dominican immigrant woman in New Jersey

"Stability, freedom, better finance[s], having the opportunity to have a family" – 32-year-old Venezuelan immigrant man in New York

"Educational and employment opportunities for myself and my children" – 60-year-old Filipino immigrant woman in California

**Most immigrants feel that moving to the U.S. has made them better off in terms of educational opportunities (79%), their financial situation (78%), their employment situation (75%), and their safety (65%).** Safety stands out as an area where somewhat fewer -- though still a majority--immigrants say they're better off, particularly among White and Asian immigrants. A bare majority (54%) of Asian immigrants and fewer than half (42%) of White

immigrants say their safety is better as a result of moving to the U.S., while about one in five in both groups (17% of Asian immigrants and 21% of White immigrants) say they are less safe as a result of coming to the U.S.

https://datawrapper.dwcdn.net/82yH1 (https://datawrapper.dwcdn.net/82yH1)

window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if (iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-height'][chartId] + 'px'; } } } } });

**In Their Own Words: Safety Concerns In The U.S. From Focus Group Participants**

*In focus groups, some participants pointed to concerns about guns, drugs, and safety in the U.S., particularly in their children's schools.*

"Sometimes when you see on the television and they're talking about shooting and these types of things. In Ghana we don't have that—it's safe, you walk around, you're free." – 38-year-old Ghanian immigrant woman in New Jersey

"I take my kids to school because, really, you have to go to school. But if I could have them at home and homeschool them, I'd do it. I wouldn't let them go because I don't feel safe anymore." – 51-year-old Salvadorian immigrant man in California

"I'm from Mexico, and over there, you have to struggle to get a gun. Here, you can buy a gun like you're buying candy at Walmart or somewhere." – 37-year-old Mexican immigrant man in Texas

"Because in my children's school, there are a lot of drugs found in its restrooms. …There is so much temptation for drugs here. It is not that safe." – 49-year-old Vietnamese immigrant woman in Texas

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 289 of 405
PYM-000269

**Most immigrants say they are better off compared with their parents at their age, and most are optimistic about their children's future.** When asked about their standard of living, three quarters (77%) of immigrants say their standard of living is better than their parents' was at their age. This is substantially higher than the share of U.S.-born adults who say the same (51%). Many expect an even better future for their children. Six in ten immigrants believe their children's standard of living will be better than theirs is now, with much smaller shares saying they think it will be worse (13%) or about the same (17%). Most immigrant parents also have positive feelings about the education their children are receiving**.** About three in four (73%) immigrant parents rate their child's school as either "excellent" (35%) or "good" (38%), with a further one-sixth (17%) saying the school is "fair," and 3% give it a "poor" rating.

[https://datawrapper.dwcdn.net/d80K3](https://datawrapper.dwcdn.net/d80K3) (https://datawrapper.dwcdn.net/d80K3)

```
window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-
height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in
event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if
(iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-
height'][chartId] + 'px'; } } } } });
```

**In Their Own Words: Hopes For Their Children's Future From Focus Group Participants**

*In focus groups, many participants described hopes and dreams for their children's futures, which often center on improved educational and job opportunities. Some pointed to sacrifices they were making in their own lives for the future benefit of the children.*

"I am old, so I came here for my children. That is the thing– We must pay dearly for it when we first came here, but since then, we have seen that life here is wonderful." – 59-year-old Vietnamese immigrant man in California

"I want my daughter to achieve what I couldn't…I want her to be better, so she doesn't have to go through what I went through" – 32-year-old Mexican immigrant woman in California

"…I will not change anything for my kids or for myself. I think it didn't work out like I expected to do, but I don't regret it because my kids have the better chance to have a better education system." – 42-year-old Ghanian immigrant woman in California

"These children, they were born there; they have the opportunity; they get the opportunity, they go to school for free; they get food when they get food; they don't have these problems. I can say yes, their lives are better than before the life I had." – 48-year-old Haitian immigrant woman in Florida

## How Are Immigrants Faring Economically?

**Like many U.S. adults overall, immigrants' biggest concerns relate to making ends meet: the economy, paying bills, and other financial concerns.** When asked in the survey to name the biggest concern facing them and their families in their own words, about one-third of immigrants gave answers related to financial stability or other economic concerns. No other concern rose to the level of financial concerns, though other common concerns mentioned include health and medical issues, safety, work and employment issues, and immigration status.

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 291 of 405
PTM-000271

**In Their Own Words: Biggest Concerns Facing Immigrant Families Are Economic**

*In a few words, what is the biggest concern facing you and your family right now?*

"Low income, hard to survive as day to day cost of living is going up" – 65 year old Colombian immigrant man in Texas

"There are a lot of expenses. Groceries and gas prices are at a high price. It gets overwhelming with all the bills and trying to save money in this economy right now." – 50-year-old Pakistani immigrant man in California

"High prices for rents and new homes" – 55-year-old Congolese immigrant man in Florida

"Retirement-- will I need to keep working until I die?" – 64-year-old Dutch immigrant man in Colorado

"Biggest concern is with the inflation. It's hard to keep up with buying groceries, gas paying the bills paying the mortgage and trying to live paycheck to paycheck worrying about if you're gonna be able to afford paying the next bill." – 35-year-old Mexican immigrant man in Nevada

"The house payment. The interest. Everything is really expensive. The food and the university for my son." – 51-year-old Mexican immigrant woman in California

**One in three immigrants report difficulty paying for basic needs.** About one in three immigrants (34%) say their household has fallen behind in paying for at least one of the following necessities in the past 12 months: utilities or other bills (22%), health care (20%), food (17%), or housing (17%). The share who reports problems paying for these necessities rises to about half among immigrants who have annual household incomes of less than $40,000 (47%). The shares who report facing these financial challenges are also larger among immigrants who are likely undocumented (51%), Black (50%), or Hispanic (43%), largely because they are more likely to be low income. Additionally, four in ten immigrant parents report problems paying for basic needs.

https://datawrapper.dwcdn.net/wglvW (https://datawrapper.dwcdn.net/wglvW)

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 292 of 405
FYM-000272

```
window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-
height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in
event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if
(iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-
height'][chartId] + 'px'; } } } } });
```

**Beyond having trouble affording basic needs, a sizeable share of immigrants report they are just able to or have difficulties paying monthly bills.** Nearly half (47%) of immigrants overall say they can pay their monthly bills and have money left over each month, while four in ten (37%) say they are just able to pay their bills and about one in six (15%) say they have difficulty paying their bills each month. Affordability of monthly bills varies widely by income as well as race and ethnicity. For example, only about a quarter (27%) of lower income immigrants say they have money left over after paying monthly bills compared with eight in ten (80%) of those with at least $90,000 in annual income. About six in ten immigrants who are White or Asian say they have money left over after paying their bills each month compared with four in ten Hispanic immigrants and one-third (32%) of Black immigrants, reflecting lower incomes among these groups.

https://datawrapper.dwcdn.net/z5Qgz (https://datawrapper.dwcdn.net/z5Qgz)

```
window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-
height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in
event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if
(iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-
height'][chartId] + 'px'; } } } } });
```

**Despite these financial struggles, close to half of immigrants say they send money to relatives or friends in their country of birth at least occasionally**. Overall, about one in three (35%) immigrants say they send money occasionally or when they are able. Much smaller shares report sending either small (8%) or large (2%) shares of money on a regular basis, and overall, most immigrants (55%) do not send money to relatives or family outside the U.S.

**Similar shares of immigrants report sending money to their birth country regardless of their own financial struggles.** About half (49%) of those who have difficulty paying their bills each month say they send money at least occasionally, as do 44% of those who say they just pay their bills and the same share of those who have money left over after paying monthly bills. Two-thirds (65%) of Black immigrants say they send money to their birth country at least occasionally, while about half (52%) of Hispanic immigrants and four in ten Asian immigrants (42%) report sending money. A much smaller share (24%) of White immigrants say they send money to the country where they were born.

https://datawrapper.dwcdn.net/5QIeW (https://datawrapper.dwcdn.net/5QIeW)

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 293 of 405
PYM-000273

window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if (iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-height'][chartId] + 'px'; } } } } });

## What Are Immigrants' Experiences In The Workplace?

**Two-thirds of immigrants say they are currently employed, including nearly seven in ten of those under age 30, about three quarters of those between the ages of 30-64, and a quarter of those ages 65 and over.** The remaining third include a mix of students, retirees, homemakers, and few (6%) unemployed immigrants. A quarter of working immigrants say they are self-employed or the owner of a business, rising to one-third (34%) of White working immigrants and nearly three in ten (27%) Hispanic working immigrants. Jobs in construction, sales, health care, and production are the most commonly reported jobs among working immigrants. KFF analysis of federal data (https://www.kff.org/racial-equity-and-health-policy/issue-brief/employment-among-immigrants-and-implications-for-health-and-health-care/) shows that immigrants are more likely to be employed in construction, agricultural, and service jobs than are U.S.-born citizen workers.

**About a quarter of working immigrants feel they are overqualified for their job, rising to half of college-educated Black and Hispanic immigrants.** A majority of working immigrants overall (68%) say they have the appropriate level of education and skills for their job, while about a quarter (27%) say they are overqualified, having more education and skills than the job requires. Just 4% say they are underqualified, having less education and skills than their job requires. In an indication that some immigrants are unable to obtain the same types of roles they were educated and trained for in the countries they came from, the share who feel overqualified for their current job rises to 31% among immigrants with college degrees. It is even higher among college-educated Black (53%) and Hispanic (46%) immigrants.

## https://datawrapper.dwcdn.net/cqf4O (https://datawrapper.dwcdn.net/cqf4O)

window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if (iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-height'][chartId] + 'px'; } } } } });

Case 8:25-cv-00243-TDC     Document 49-2     Filed 02/11/25     Page 294 of 405
PTM-000274

**In Their Own Words: Work Experiences From Focus Group Participants**

*In focus groups, many immigrants expressed a desire to work and willingness to work in industries like construction, agriculture, and the service sector, which are often physically demanding. Some also described taking jobs that required less skills and education compared to those they held in their country of birth.*

"We are the ones that work on the farms. We are the ones that cannot call out. We are the ones that even if our kids are sick, we can't call our boss and say I can't make it to work." – 38-year-old Nigerian immigrant woman in New Jersey

"Yes, we have to put our effort in. It is more demanding. My hands and feet are sore. In exchange, I have a satisfactory level of income." – 49-year-old Vietnamese immigrant woman in Texas

"…in Mexico, I was a preschool teacher. Being undocumented, obviously, you can't work in the area you studied in, so now, I do cleaning." – 36-year-old Mexican immigrant woman in Texas

"I used to work a white-collar job, now I do manual labor. My major used to hurt my mind, now it's my arms and legs." – 41-year-old Vietnamese immigrant woman in Texas

"My job entails picking up trash and cleaning toilets. I don't like doing that. Who likes cleaning toilets? Who likes picking up other people's trash, right? I don't like it, but I'm in this job out of necessity." – 20-year-old Honduran immigrant woman in California

"I only had [one] job back in Vietnam. Here I need to do four: a nanny, a maid, a house cleaner and a main job." – 41-year-old Vietnamese immigrant woman in Texas

"The work in the field is hard. When it's hot out, it gets up to 100 or 104. People work with grapes, so they pick the grapes. They work in the sun. There's no air…. Snakes come out. Whatever

1/30/25, 5:22 PM    Understanding the U.S. Immigrant Experience: The 2023 KFF/LA Times Survey of Immigrants - Findings - 10217 | KFF

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 295 of 405

PTM-000275

comes out, you just keep picking with the machine. Snakes, mice, whatever. So, it's hard. It's hard." – 32-year-old Mexican immigrant woman in California

**Overall, about half of employed immigrants report working jobs that pay them by the hour (52%), one third say they are paid by salary (32%), and 15% report being paid by the job.** However, these shares vary by income, immigration status, educational attainment, and race and ethnicity. Compared to immigrants with higher incomes, immigrants with lower incomes are more likely to be paid by the hour (63% of immigrants with annual household incomes of less than $40,000) or by the job (24%) than receive a salary (13%). Immigrants who are likely undocumented (30%) are about twice as likely as those with a green card or visa (14%) or naturalized citizens (12%) to report being paid by the job, and about half as likely to report being paid by salary (17%, 32%, and 36%, respectively). Immigrants with a college degree are more than three times as likely as those without a college degree to hold salaried jobs, (57% vs. 16%). Black and Hispanic immigrants are more likely to report working hourly jobs (69% and 60% respectively) than their White (42%) and Asian (40%) counterparts. Conversely, among those who are employed, almost half of Asian immigrants and more than four in ten White immigrants report being paid by salary compared with a quarter or fewer Black and Hispanic immigrants.

https://datawrapper.dwcdn.net/92XgN (https://datawrapper.dwcdn.net/92XgN)

window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if (iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-height'][chartId] + 'px'; } } } } });

**About half of working immigrants report experiencing discrimination at work.** About half (47%) of all working immigrants say they have ever been treated differently or unfairly at work in at least one of five ways asked about on the survey, most commonly being given fewer opportunities for advancement (32%) and being paid less (29%) compared to people born in the U.S. About one in five working immigrants say they have not been paid for all their hours or overtime (22%) or have been given undesirable shifts or less control over their work hours than someone born in the U.S. doing the same job (17%). About one in ten (12%) say they have been harassed or threatened by someone in their workplace because they are an immigrant.

**Highlighting the intersectional impacts of race, ethnicity, and immigration status, reports of workplace discrimination are higher among immigrant workers of color and likely undocumented immigrants.** Majorities of Black (56%) and Hispanic (55%) immigrant workers report experiencing at least one form of workplace discrimination asked about. More than four in ten (44%) Asian immigrant workers also report experiencing workplace discrimination compared

to three in ten (31%) White immigrant workers. About two-thirds (68%) of likely undocumented working immigrants report experiencing at least one form of unfair treatment in the workplace, with about half of this group saying they have been paid less or had fewer opportunities for advancement than people born in the U.S. for doing the same job. Undocumented immigrant workers often face even greater __employment challenges (https://www.kff.org/racial-equity-and-health-policy/issue-brief/employment-among-immigrants-and-implications-for-health-and-health-care/)__ due to lack of work authorization, which increases risk of potential workplace abuses, __violations (https://www.epi.org/publication/federal-labor-standards-enforcement-in-agriculture-data-reveal-the-biggest-violators-and-raise-new-questions-about-how-to-improve-and-target-efforts-to-protect-farmworkers/?mc_cid=28c0cb58c0&mc_eid=85f0a96990)__ of wage and hour laws, and poor working as well as living conditions.

**Limited English proficiency is also associated with higher levels of reported workplace discrimination.** A majority (55%) of working immigrants who speak English less than very well (rising to 61% of Hispanic immigrants with limited English proficiency) report experiencing at least one form of workplace discrimination. In particular, immigrants with limited English proficiency are more likely than those who are English proficient to say they were given fewer opportunities for promotions or raises (38% vs. 27%) or were paid less than people born in the U.S. for doing the same job (34% vs. 24%).

https://datawrapper.dwcdn.net/pbzN2 (https://datawrapper.dwcdn.net/pbzN2)

window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if (iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-height'][chartId] + 'px'; } } } } });

## Do Immigrants Feel Welcome In The U.S.?

**Most immigrants feel welcome in their neighborhoods.** Overall, two-thirds of immigrants say most people in their neighborhoods are welcoming to immigrants. Just 7% say people in their neighborhood are not welcoming, while one in four say they are "not sure" whether immigrants are welcome in their neighborhood. When it comes to the treatment of immigrants in the state in which they live, about six in ten immigrants say they feel people in their state are welcoming to immigrants, but 15% say their state is not welcoming and another one in four say they are "not sure." When asked about whether they think most people are welcoming to immigrants outside of the state in which they live, about half (48%) of immigrants say they are "not sure" about this, which could reflect lack of experiences in other places.

https://datawrapper.dwcdn.net/h1bZO (https://datawrapper.dwcdn.net/h1bZO)

```
window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-
height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in
event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if
(iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-
height'][chartId] + 'px'; } } } } });
```

**Immigrants in Texas are much less likely than those in California to feel their state is
welcoming to immigrants.** Immigrants living in California and Texas, the two most populous
states for immigrants, are about equally likely to say immigrants are welcome in their
neighborhood. However, immigrants living in California are about 30 percentage points more
likely than are immigrants living in Texas to say they feel people in their *state* are welcoming to
immigrants (70% vs. 39%). Further, immigrants in Texas are more than three times as likely as
those in California to say they feel their state is *not* welcoming to immigrants (31% vs. 8%).

## https://datawrapper.dwcdn.net/4DANC (https://datawrapper.dwcdn.net/4DANC)

```
window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-
height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in
event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if
(iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-
height'][chartId] + 'px'; } } } } });
```

## What Are Immigrants' Experiences With Discrimination And Unfair Treatment In The Community?

**Despite feeling welcome in their neighborhoods, many immigrants report experiencing
discrimination and unfair treatment in social and police interactions**. About four in ten (38%)
immigrants say they have ever received worse treatment than people born in the U.S. in at least
one of the following places: in a store or restaurant (27%), in interactions with the police (21%), or
when buying or renting a home (17%). In addition, about a third (34%) of immigrants say that
since moving to the U.S., they have been criticized or insulted for speaking a language other than
English, and a similar share (33%) say they have been told they should "go back to where you
came from."

**Reports of discrimination and unfair treatment are more prevalent among people of color
compared to White immigrants, illustrating the combined impacts of racism and anti-
immigrant discrimination.** For example, about one-third of immigrants who are Black (35%) or
Hispanic (31%) and about a quarter (27%) of Asian immigrants say they have ever received worse
treatment than people born in the U.S. in a store or restaurant, all higher than the share among
White immigrants (16%). Notably, four in ten (38%) Black immigrants say they have ever received
worse treatment than people born in the U.S. in interactions with the police, and almost half

Case 8:25-cv-00243-TDC     Document 49-2     Filed 02/11/25     Page 298 of 405
PYM-000278

(45%) say they have been told they should "go back to where you came from." Among Hispanic immigrants, about four in ten (42%) say they have been criticized or insulted for speaking a language other than English.

## https://datawrapper.dwcdn.net/biG9p (https://datawrapper.dwcdn.net/biG9p)

window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if (iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-height'][chartId] + 'px'; } } } } });

## https://datawrapper.dwcdn.net/PLW8S (https://datawrapper.dwcdn.net/PLW8S)

window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if (iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-height'][chartId] + 'px'; } } } } });

1/30/25, 5:22 PM      Understanding the U.S. Immigrant Experience: The 2023 KFF/LA Times Survey of Immigrants - Findings - 10217 | KFF

Case 8:25-cv-00243-TDC     Document 49-2     Filed 02/11/25     Page 299 of 405

PYM-000279

### In Their Own Words: Experiences With Discrimination In The Community From Focus Group Participants

*In focus groups, many immigrants shared their experiences with discrimination in the community.*

"Sometimes, when you talk, the way some people will laugh. They'll laugh at you, you say one word, they'll be laughing, laughing, laughing. …I'm so very ashamed. I'm so ashamed, so you don't want to talk." – 46-year-old Ghanian immigrant woman in New Jersey

"I speak English, but obviously, I don't speak it fluently. I have my accent, and you can tell that I'm Mexican. I've seen people make faces at me or whatnot." – 37-year-old Mexican immigrant man in Texas

"We have our business around the corner. I left the house one day to go pick up my daughter, and my husband called me. There was a White guy yelling at my husband 'Get out of my country.' I said, 'Tell him that it's your country, too.'" – 36-year-old Mexican immigrant woman in California

"The guy was like…you guys should go back to your country. He used different words for us. Then he called the cops, and when the cops came, they didn't listen to us. I was like, this is unfair. You could have listened to both sides." – 38-year-old Nigerian immigrant woman in New Jersey

"But my son when he first came here, he did not know English. When he went to school, his classmates said, 'You do not study well, you should go back to your country.'" – 54-year-old Vietnamese immigrant woman in California

**One in four immigrants report being treated unfairly by a health care provider.** In addition to discrimination at work and in community settings, a sizeable share of immigrants say they have been treated unfairly by a doctor or health care provider since coming to the U.S. Overall, among immigrants who have received health care in the U.S., one in four (rising to nearly four in ten Black immigrants) say they have been treated differently or unfairly by a doctor or other health care provider because of their racial or ethnic background, their accent or how well they speak English, or their insurance status or ability to pay for care. For more details about immigrants'

1/30/25, 5:22 PM　　　　Understanding the U.S. Immigrant Experience: The 2023 KFF/LA Times Survey of Immigrants - Findings - 10217 | KFF

Case 8:25-cv-00243-TDC　　Document 49-2　　Filed 02/11/25　　Page 300 of 405
PYM-000280

health and health care experiences, read the companion report here. (https://www.kff.org/racial-equity-and-health-policy/issue-brief/health-and-health-care-experiences-of-immigrants-the-2023-kff-la-times-survey-of-immigrants)

https://datawrapper.dwcdn.net/fsRPE (https://datawrapper.dwcdn.net/fsRPE)

window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if (iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-height'][chartId] + 'px'; } } } } });

## What Language Barriers Do Immigrants With Limited English Proficiency Face?

**Over half of immigrants with limited English proficiency report language barriers in a variety of settings and interactions.** Overall, about half of all immigrants have limited English proficiency, meaning they speak English less than very well. Among this group, about half (53%) say that difficulty speaking or understanding English has ever made it hard for them to do at least one of the following: receive services in stores or restaurants (30%); get health care services (31%); get or keep a job (29%); apply for government assistance with food, housing, or health coverage (25%); or get help from the police (22%).

**Language barriers are amplified among those with lower levels of educational attainment as well as those with lower incomes.** Among immigrants with limited English proficiency, those who do not have a college degree are more likely to report experiencing at least one of these difficulties than those who have a college degree (57% vs. 39%). Similarly, lower income immigrants (household incomes less than $40,000) with limited English proficiency are more likely to report facing language barriers compared to their counterparts with incomes of $90,000 or more (61% vs. 38%).

https://datawrapper.dwcdn.net/EJU81 (https://datawrapper.dwcdn.net/EJU81)

window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if (iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-height'][chartId] + 'px'; } } } } });

**Immigrant parents with limited English proficiency also face challenges communicating with their children's school or teacher.** Among immigrant parents with limited English proficiency (52% of all immigrant parents), about one in four (24%) say difficulty speaking or

understanding English has made it hard for them to communicate with their child's school or teacher.

## How Do Confusion And Worries About Immigration Laws And Status Affect Immigrants' Daily Lives?

**About seven in ten (69%) immigrants who are likely undocumented worry they or a family member may be detained or deported.** However, worries about detention or deportation are not limited to those who are likely undocumented. About one in three immigrants who have a green card or other valid visa say they worry about this, as do about one in ten (12%) immigrants who are naturalized U.S. citizens.

**Some immigrants report avoiding certain activities due to concerns about immigration status.** Fourteen percent of immigrants overall, rising to 42% of those who are likely undocumented, say they have avoided things such as talking to the police, applying for a job, or traveling because they didn't want to draw attention to their or a family member's immigration status. In addition, 8% of all immigrants say they have avoided applying for a government program that helps pay for food, housing, or health care because of concerns about immigration status, including 27% of those who are likely undocumented.

## https://datawrapper.dwcdn.net/Ykw0G (https://datawrapper.dwcdn.net/Ykw0G)

window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if (iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-height'][chartId] + 'px'; } } } } });

**More than four in ten (45%) immigrants overall say they don't have enough information about U.S. immigration policy to understand how it affects them and their family.** Lack of immigration-related knowledge is strongly related to one's immigration status. Nearly seven in ten (69%) immigrants who are likely undocumented say they don't have enough information, while immigrants with a valid green card or visa are split, with one half saying they have enough information and the other half saying they do not. Being a naturalized U.S. citizen doesn't completely diminish immigrants' confusion about U.S. immigration policy, as nearly four in ten (39%) immigrants who are naturalized citizens also say they don't have enough information. Beyond immigration status, the groups who are more likely to say they do not have enough information to understand how immigration policy affects them and their families include immigrants with limited English proficiency, those who have been in the U.S. for fewer than five years, have lower household incomes, and/or have lower levels of education.

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 302 of 405
PTM-000282

[https://datawrapper.dwcdn.net/qI9u1](https://datawrapper.dwcdn.net/qI9u1) (https://datawrapper.dwcdn.net/qI9u1)

```
window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-
height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in
event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if
(iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-
height'][chartId] + 'px'; } } } } });
```

**Across immigrants, there is a general lack of knowledge about public charge rules.** Under longstanding U.S. policy, federal officials can deny an individual entry to the U.S. or adjustment to lawful permanent status (a green card) if they determine the individual is a "public charge (https://www.kff.org/racial-equity-and-health-policy/issue-brief/2022-changes-to-the-public-charge-inadmissibility-rule-and-the-implications-for-health-care/)" based on their likelihood of becoming primarily dependent on the government for subsistence. In 2019, the Trump Administration made changes to public charge policy that newly considered the use of previously excluded noncash assistance programs for health care, food, and housing in public charge determinations. This policy was rescinded by the Biden Administration (https://www.federalregister.gov/documents/2022/09/09/2022-18867/public-charge-ground-of-inadmissibility) in 2021, meaning that the use of noncash benefits, including assistance for health care, food, and housing, is not considered (https://www.uscis.gov/green-card/green-card-processes-and-procedures/public-charge/public-charge-resources) for public charge tests, except for long-term institutionalization at government expense. The survey suggests that many immigrants remain confused about public charge rules. Six in ten immigrants say they are "not sure" whether use of public programs that help pay for health care, housing or food can decrease one's chances for green card approval and another 16% incorrectly believe this to be the case. Among immigrants who are likely undocumented, nine in ten are either unsure (68%) or incorrectly believe use of these types of public programs will decrease their chances for green card approval (22%).

[https://datawrapper.dwcdn.net/FQKY1](https://datawrapper.dwcdn.net/FQKY1) (https://datawrapper.dwcdn.net/FQKY1)

```
window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-
height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in
event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if
(iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-
height'][chartId] + 'px'; } } } } });
```

## What Are Immigrants Plans And Hopes For The Future?

**Six in ten immigrants say they plan to stay in the U.S.** However, about one in five immigrants say they want to move back to the country they were born in (12%) or to another country (7%), and about one in five (21%) say they are not sure. The desire to stay in the U.S. varies by immigration status as well as by race and ethnicity. Nearly two in three immigrants who are naturalized citizens say they plan to stay in the country, compared to about half of immigrants

who have a green card or valid visa (54%) or immigrants who are likely undocumented (52%). Black immigrants are somewhat more likely than immigrants from other racial or ethnic backgrounds to say they plan to leave the U.S. (28%). This includes 17% who say they want to move back to their country of birth and 11% who say they want to move to a different country.

https://datawrapper.dwcdn.net/ejt4Y (https://datawrapper.dwcdn.net/ejt4Y)

```
window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-
height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in
event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if
(iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-
height'][chartId] + 'px'; } } } } });
```

**Three in four immigrants say they would choose to come to the U.S. again.** Asked what they would do if given the chance to go back in time knowing what they know now, three in four immigrants (75%) say they would choose to come to the U.S. again, including large shares across ages, educational attainment, income, immigration status, and race and ethnicity. While most immigrants share this sentiment, overall, about one in ten (8%) immigrants say they would not choose to move to the U.S. and about one in five (17%) say they are not sure whether they would choose to move to the U.S.

https://datawrapper.dwcdn.net/jxcuD (https://datawrapper.dwcdn.net/jxcuD)

```
window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-
height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in
event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if
(iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-
height'][chartId] + 'px'; } } } } });
```

PYM-000284

**In Their Own Words: Focus Group Participants Say They Would Choose To Come To The U.S. Again**

*In focus groups, many participants said that despite the challenges they face in the U.S., life is better here than in their country of birth. When asked whether they would choose to come again, many said yes and pointed to how they have more opportunities for themselves and their children to have a better standard of living.*

"So I will not change anything for my kids or for myself. I think it didn't work out like I expected to do but I don't regret it because my kids have the better chance to have a better education system"-42-year-old Ghanian immigrant woman in California

"I can say from my experience, it was really hard. God made everything right now because I have my papers. But I agreed to stay here for my children, so that they have a better life tomorrow. Because home is worse." – 48-year-old Haitian immigrant woman in Florida

"Of course, I would still come to America. When I compare my current state with that of my old neighbors, who are my age as well, this place is a far cry from it." – 40-year-old Vietnamese immigrant man in Texas

"We're happy because we have a better life, even though we always miss our homeland. But it's better." – 35-year-old Mexican immigrant man in California

"I can say that America gives me many options, many opportunities, so far I like it. The only thing I don't like is how the bills are here, they come fast when you make a small amount of money many times it goes through the bill." – 30-year-old Haitian immigrant man in Florida

Case 8:25-cv-00243-TDC     Document 49-2     Filed 02/11/25     Page 305 of 405

PTM-000285

# Conclusion

Immigrants represent a significant and growing share of the U.S. population, contributing to their communities and to the nation's culture and economy. Immigrants come to the U.S. largely seeking better opportunities and lives for themselves and their children, often leaving impoverished and sometimes dangerous conditions in their country of birth. For many, this dream has been realized despite ongoing challenges they face in the U.S.

Many immigrants recognize work as a key element to achieving their goals and are willing to fill physically demanding, lower paid jobs, for which some feel they are overqualified. Immigrants are disproportionately employed in agricultural, construction, and service jobs that are often essential for our nation's infrastructure and operations.

Despite high rates of employment and, for many, an improved situation relative to their county of birth, many immigrants face serious challenges in the U.S. Finances are a top challenge and concern, with many having difficulty making ends meet and paying for basic needs. Moreover, although most immigrants feel welcome in their neighborhood, many face discrimination and unfair treatment on the job, in their communities, and while seeking health care. Fears of detention and deportation are a concern for immigrants across immigration statuses, sometimes affecting daily lives and interactions, particularly among those who are likely undocumented.

Some immigrants face more challenges than others, reflecting the diversity of the immigrant experience and the compounding impacts of intersectional factors such as immigration status, race and ethnicity, and income. Black and Hispanic immigrants, likely undocumented immigrants, immigrants with limited English proficiency, and lower income immigrants face disproportionate challenges given the impacts of racism, fears and uncertainties related to immigration status, language barriers, and financial challenges. Many immigrants lack sufficient information to understand how U.S. immigration laws and policies impact them and their families. This confusion and lack of certainty contributes to some immigrants avoiding accessing assistance programs that could ease financial challenges and facilitate access to health care for themselves and their children, who are often U.S.-born.

As the immigrant population in the U.S. continues to grow, recognizing their contributions and challenges of immigrants and addressing their diverse needs will be important for improving the nation's overall health and economic prosperity.

---

Case 8:25-cv-00243-TDC        Document 49-2        Filed 02/11/25        Page 306 of 405
PYM-000286

# Methodology

The *KFF/LA Times Survey of Immigrants* is a partnership survey conducted by KFF and the LA Times examining the U.S. immigrant experience.

The survey was conducted April 10-June 12, 2023, online, by telephone, and by mail among a nationally representative sample of 3,358 immigrants, defined as adults living in the U.S. who were born outside the U.S. and its territories. Respondents had the option to complete the survey in one of ten languages: English ($n$=2,435), Spanish ($n$=627), Chinese ($n$=171), Korean ($n$=52), Vietnamese ($n$=22), Portuguese ($n$=16), Haitian-Creole ($n$=13), Arabic ($n$=9), French ($n$=9), and Tagalog ($n$=4). These languages were chosen as they are most commonly spoken by immigrant adults from countries of focus for the survey with limited English proficiency (LEP), based on the 2021 American Community Survey (2021).

Teams from KFF and The Los Angeles Times worked together to develop the questionnaire and both organizations contributed financing for the survey. KFF researchers analyzed the data, and each organization bears the sole responsibility for the work that appears under its name. Sampling, data collection, weighting, and tabulation were managed by SSRS of Glenn Mills, Pennsylvania in collaboration with public opinion researchers at KFF.

Respondents were reached through one of three sampling modes: an address-based sample (ABS) ($n$=2,661); a random digit dial telephone (RDD) sample of prepaid (pay-as-you go) cell phone numbers ($n$=565); and callbacks to telephone numbers that that were previously randomly sampled for RDD surveys and were identified as speaking a language other than English or Spanish ($n$=132). Respondents from all three samples were asked to specify their country of birth and qualified for the survey if they were born outside of the U.S.

Project design was informed by a pilot study conducted from January 31-March 14, 2022 among a sample of 1,089 immigrants in collaboration with SSRS. Prior to fielding the pilot study, KFF and SSRS conducted interviews with experts who had previous experience surveying immigrants. These conversations informed decisions on sampling, modes of data collection, recruitment strategies, and languages of interviews. The pilot test measured incidence of immigrant households across four different sample types and offered a short survey in 8 different languages both online and on the telephone. Based on the results of the pilot test, the following recruitment and data collection protocol was implemented:

**Sampling strategy and interview modes:**
The ABS was divided into areas (strata), defined by Census tract, based on the incidence of immigrants among the population overall and by countries of origin. Within each stratum, the sample was further divided into addresses that were flagged by Marketing Systems Group (MSG)

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 307 of 405
PYM-000287

as possibly occupied by foreign-born adults and unflagged addresses. To increase the likelihood of reaching immigrant adults, strata with higher incidence of immigrant households overall, and of immigrants from certain countries of origin were oversampled.

Households in the ABS were invited to participate through multiple mail invitations: 1) an initial letter in English with a short paragraph of instructions in each of the 10 survey languages on the back; 2) a reminder postcard in English plus up to two additional languages; 3) a follow-up letter accompanied by hardcopy questionnaires in English and one additional language; and 4) a final reminder including short messages in all 10 languages. For mailings 2 and 3, additional languages were chosen by using flags to identify the language other than English likely spoken at home. Invitation letters requested the household member ages 18 or older who was born outside of the U.S. with the most recent birthday to complete the survey in one of three ways: by going online, dialing into a toll-free number, or returning the completed paper questionnaire. In addition, interviewers attempted outbound calls to telephone numbers that were matched to sampled addresses. ABS respondents completed the survey online ($n$=2,087), over the phone ($n$=105), or by mail on paper ($n$=469). The random sample of addresses was provided by MSG.

The RDD sample of prepaid (pay-as-you-go) cell phone numbers was obtained through MSG. The prepaid cell phone component was disproportionately stratified to effectively reach immigrants from different countries based on county-level information. To increase the likelihood of reaching immigrant adults, counties with higher incidence of immigrants overall, and of certain countries of origin were oversampled.

The callback sample included 132 respondents who were reached by calling back telephone numbers that were previously randomly sampled for SSRS RDD surveys within two years and coded by interviewers as non-English or non-Spanish speaking.  as having respondents speaking languages other than English or Spanish.

**Incentives:**
Initial mailings to the ABS sample included $2 as part of the invitation package, and respondents received a $10 incentive if they completed the survey in the first two weeks after the initial mailing. In order to increase participation among under-represented groups, the incentive increased to $20 for those who did not respond within the first two weeks. ABS phone respondents received this incentive via a check received by mail, paper respondents received a Visa gift card by mail, and web respondents received an electronic gift card incentive. Respondents in both phone samples received a $25 incentive via a check received by mail.

**Questionnaire design and translation:**
In addition to collaboration between KFF and the LA Times, input from organizations and individuals that directly serve or have expertise in issues facing immigrant populations helped shaped the questionnaire. These community representatives were offered a modest honorarium for their time and effort to review questionnaire drafts, provide input, attend meetings, and offer their expertise on dissemination of findings.

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 308 of 405
PTM-000288

After the content of the questionnaire was largely finalized, SSRS conducted a telephone pretest in English and adjustments were made to the questionnaire. Following the English pretest, Research Support Services Inc. (RSS) translated the survey instrument from English into the nine languages outlined above and performed cognitive testing through qualitative interviews in all languages including English. The results of the cognitive testing were used to adjust questionnaire wording in all languages including English to ensure comprehension and cohesiveness across languages and modes of interview. As a final check on translation and its overlay into the web and CATI program, translators from Cetra Language Solution reviewed each question, as it appears in the program, and provided feedback. The questionnaire was revised and finalized based on this feedback.

**Data quality checks:**
A series of data quality checks were run on the final data. The online questionnaire included two questions designed to establish that respondents were paying attention and cases were monitored for data quality. Fifteen cases were removed from the data because they failed two or more quality checks, failed both attention check questions, or skipped over 50% of survey questions. An additional 67 interviews were removed after deemed ineligible by SSRS researchers (they were not U.S. immigrants).

**Weighting:**
The combined sample was weighted to adjust for the sampling design and to match the characteristics of the U.S. adult immigrant population, based on data from the Census Bureau's 2021 American Community Survey (ACS). Weighting was done separately for each of 11 groups defined by country or region of origin (Mexico, China, Other East/Southeast Asia, South Asia, Europe, Central America, South America, Caribbean, Middle East/North Africa, Sub-Sahara Africa, all others). The samples were weighted by sex, age, education, race/ethnicity, census region, number of adults in the household, presence of children in the household, home ownership, time living in the U.S., English proficiency, and U.S. citizenship. The overall sample was also weighted to match the share of U.S. adult immigrants from each country/region of origin group. The weights take into account differences in the probability of selection for each of the three sample types. This includes adjustment for the sample design and geographic stratification, and within household probability of selection. Subgroup analysis includes data checks to ensure that the weighted demographics of subgroups are within reasonable range from benchmarks whenever possible.

The margin of sampling error including the design effect for the full sample is plus or minus 2 percentage points. Numbers of respondents and margins of sampling error for key subgroups are shown in the table below. For results based on other subgroups, the margin of sampling error may be higher. Sample sizes and margins of sampling error for other subgroups are available by request. Sampling error is only one of many potential sources of error and there may be other unmeasured error in this or any other public opinion poll. KFF public opinion and survey research is a charter member of the <u>Transparency Initiative (http://www.aapor.org/Transparency_Initiative.htm)</u> of the American Association for Public Opinion Research.

PTM-000289

| Group | N (unweighted) | M.O.S.E. |
|---|---|---|
| Total | 3,358 | ± 2 percentage points |
| **Race/Ethnicity** | | |
| Black immigrants | 274 | ± 8 percentage points |
| Hispanic immigrants | 1,207 | ± 4 percentage points |
| Asian immigrants | 1,318 | ± 4 percentage points |
| White immigrants | 495 | ± 6 percentage points |
| **Immigration Status** | | |
| Naturalized citizen | 2,134 | ± 3 percentage points |
| Green card or valid visa holder | 819 | ± 5 percentage points |
| Likely undocumented | 372 | ± 6 percentage points |
| **English Proficiency** | | |
| Speaks English only or "very well" | 1,713 | ± 3 percentage points |
| Speaks English "less than very well" | 1,635 | ± 3 percentage points |

**Focus group methodology:**

As part of this project, KFF conducted 13 focus groups with immigrant adults across the country to help inform survey questionnaire development, provide deeper insights into the experiences of immigrant groups that had a smaller sample size in the survey, and to provide a richer understanding of some of the survey findings.

Two rounds of focus groups were completed. The first round of 6 groups was conducted between September-October 2022 virtually among participants living across the country who are Hispanic immigrants (conducted in Spanish), Asian (excluding Chinese) immigrants (conducted in English), or Chinese immigrants (conducted in Mandarin Chinese). The groups were separated by gender, lasted 90 minutes, and included 5-7 participants each.

The second round of groups were conducted in-person between May-June 2023 in Los Angeles, CA and Fresno, CA with Hispanic immigrants conducted in Spanish; and in Houston, TX and Irvine, CA with Vietnamese immigrants conducted in Vietnamese. In addition, virtual groups were

conducted among participants living in the Texas border region (Hispanic immigrants), the Miami, FL region (Haitian immigrants), and nationally (Black immigrants from sub-Saharan Africa). Groups were mixed gender, lasted between 90 minutes and two hours, and were conducted in English, Spanish, Vietnamese, and Haitian-Creole with 5-8 participants each.

For each group, participants were chosen based on the following criteria: Must be at least 18 years of age and have been born outside of the U.S. and its territories; for groups conducted in languages other than English, must speak English "less than very well" and be able to speak conversationally in the group's language (i.e., Spanish). In addition, groups were chosen to represent a mix of household composition, including at least some participants who are parents; a mix of household income levels, with a preference for recruiting lower income participants; a mix of health insurance types; and a mix of immigration statuses. Goodwin Simon Strategic Research (GSSR) recruited and hosted the first round of focus groups. PerryUndem recruited and hosted the second round of focus groups. The screener questionnaire and discussion guides were developed by researchers at KFF in consultation with the firms who recruited and hosted the groups. Groups were audio and video recorded with participants' permission. Each participant was given $150-$175 after participating.

---

# Appendix

## https://datawrapper.dwcdn.net/pP3oV (https://datawrapper.dwcdn.net/pP3oV)

window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if (iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-height'][chartId] + 'px'; } } } } });

## https://datawrapper.dwcdn.net/3HMhC (https://datawrapper.dwcdn.net/3HMhC)

window.addEventListener('message', function(event) { if (typeof event.data['datawrapper-height'] !== 'undefined') { var iframes = document.querySelectorAll('iframe'); for (var chartId in event.data['datawrapper-height']) { for (var i=0; i<iframes.length; i++) { if (iframes[i].contentWindow === event.source) { iframes[i].style.height = event.data['datawrapper-height'][chartId] + 'px'; } } } } });

---

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 311 of 405
PTM-000291

# Endnotes

## Findings

1. Supplemental to the Survey of Immigrants, KFF also conducted a representative survey of 1,049 U.S.-born adults. to compare the immigrant and native-born experience. KFF/LA Times Survey of Immigrants: U.S. Born Adult Comparison (June 29 – July 9, 2023).

   ← Return to text

2. The estimate of the total number of noncitizens in the US is based on the 2021 American Community Survey (ACS) 1-year Public Use Microdata Sample (PUMS). The ACS data do not directly indicate whether an immigrant is lawfully present or not. We draw on the methods underlying the 2013 analysis by the State Health Access Data Assistance Center (SHADAC) and the recommendations made by Van Hook et. al.[1] (https://www.kff.org/medicaid/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/view/footnotes/#footnote-508802-1),[2] (https://www.kff.org/medicaid/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/view/footnotes/#footnote-508802-2) This approach uses the Survey of Income and Program Participation (SIPP) to develop a model that predicts immigration status; it then applies the model to ACS, controlling to state-level estimates of total undocumented population from Pew Research Center. For more detail on the immigration imputation used in this analysis, see the Technical Appendix B (https://www.kff.org/report-section/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid-technical-appendix-b-immigration-status-imputation).

   ← Return to text

## GET THE LATEST ON HEALTH POLICY
### Sign Up For Email Alerts

Enter email address...

SIGN UP ›

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 312 of 405

PTM-000292



© 2025 KFF

Powered by WordPress VIP

CITATIONS AND REPRINTS    PRIVACY POLICY

KFF Headquarters: 185 Berry St., Suite 2000, San Francisco, CA 94107 | Phone 650-854-9400

Washington Offices and Barbara Jordan Conference Center: 1330 G Street, NW, Washington, DC 20005 | Phone 202-347-5270

www.kff.org | Email Alerts: kff.org/email | facebook.com/KFF | twitter.com/kff

**The independent source for health policy research, polling, and news,** *KFF is a nonprofit organization based in San Francisco, California.*

# Exhibit 24



≡Q **The Fresno Bee**

Log In | **Subscribe**

**LIMITED-TIME OFFER**   **$5 for 3 months**   Rediscover the power of local news.   **SAVE NOW**

CALIFORNIA

# He's a U.S. citizen, but ICE detained him and tried to deport him. Now he's getting $150k

By **Yesenia Amaro**
Updated December 14, 2022 8:00 AM | 💬



Brian Bukle

   Only have a minute? Listen instead
Powered by **Trinity Audio**
00:00                1.0x      03:42

U.S. Immigration and Customs Enforcement will pay Brian Bukle $150,000 under a
settlement over the U.S. citizen's unlawful arrest and detention in 2020.

The Asian Americans Advancing Justice-Asian Law Caucus and the ACLU Foundation of Northern California in late 2021 filed a lawsuit against ICE over Bukle's wrongful arrest. Months before the lawsuit was filed, a government report had found the need for ICE to better train its officers to verify people's citizenship.

**TOP VIDEOS**



Bukle is a resident of Corona in Riverside County.

Bukle, who was 62 at the time the lawsuit was filed, spent 36 days at the Mesa Verde ICE Processing Facility in Bakersfield in the midst of a COVID-19 outbreak before the government acknowledged his U.S. citizenship. According to the lawsuit, an immigration judge later threw out his deportation case.

Bukle said he doesn't want anyone else to experience what he went through.

"Cases like mine are important because it helps agencies like ICE realize that what they are doing is completely wrong and helps others who are harmed by ICE know that there are people out there who care about their rights and will fight alongside them," Bukle told The Bee in a statement through a communications person.

An ICE spokesperson on Tuesday said the agency doesn't "comment on ongoing or pending litigation and outcomes."

California Department of Corrections and Rehabilitation officials transferred Bukle into ICE's custody in mid-2020 when two G4S Secure Solutions guards arrived to pick him up. The same civil rights organizations in early 2021 also sued ICE over what they described as an "illegal practice" of using private security guards to arrest people.

Case 8:25-cv-00243-TDC   Document 49-2   Filed 02/11/25   Page 316 of 405

PYM-000295

Under a settlement this summer, ICE was banned from using private contractors to arrest immigrants.

Minju Cho, a staff attorney at ACLU of Northern California, said Bukle's lawsuit "exposed how ICE continually violates people's civil rights," and how it works closely with the California prison system.

"We are pleased that Mr. Bukle prevailed in his claims against ICE, but we are mindful that no amount of money can give someone back the time they lost while wrongfully detained," Cho told The Bee in a statement. "No amount of money can undo the trauma that a person experiences in immigration detention."

Bukle's case, Cho said, also shows "how ICE transfers amplify racism within the criminal legal system and immigration system." Bukle is a Black immigrant from the British Virgin Islands and derived U.S. citizenship from both of his naturalized parents.

"We know that Black immigrants like Mr. Bukle are significantly more likely to be targeted for deportation: in the U.S., 7% of noncitizens are Black, but they make up 20% of those facing deportation after interactions with the criminal legal system, according to Black Alliance for Just Immigration," Cho said.

X

Bukle said he's now trying to heal and rebuild his life. He hopes the settlement will provide some support for him and his family to move on.

"This is about making sure no one else is unjustly denied their basic rights and separated from their families just because of where they were born," he said.

Ultimately, Cho said, the double punishment of immigrants and refugees must end.

"In a national movement for immigrant justice, Mr. Bukle's courage has inspired many people to organize together and call on their elected leaders to uphold our values of justice and equality," she said.

This story was originally published December 13, 2022 at 1:42 PM.

## 📨 News Alerts

Get major news fast with an alert sent to your e-mail inbox.

| | SIGN UP |
|---|---|

By submitting, I agree to the Privacy Policy and Terms of Service.

## RELATED STORIES FROM FRESNO BEE

LOCAL

**After serving his prison time in California, ICE arrested a US citizen, damage claim says**

December 09, 2020 5:57 PM

CALIFORNIA

**U.S. citizen spent 36 days in San Joaquin Valley immigration lockup. Now, ICE is being sued**

November 22, 2021 8:50 AM



**Yesenia Amaro**
The Fresno Bee
🐦 f ✉ 📞 559-441-6144

Yesenia Amaro covers immigration and diverse communities for The Fresno Bee. She previously worked for the Phnom Penh Post in Cambodia and the Las Vegas Review-Journal in Nevada. She recently received the 2018

X

# Exhibit 25

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 319 of 405
PYM-000502

RELIGION

# Trump won't ban immigration arrests at churches. Now clergy are weighing how to resist

![Interior of a church with two figures silhouetted at the entrance]

1 of 6 | The Rev. W. J. Mark Knutson, right, walks with Juan Francisco Aguirre-Velasquez at the Augustana Lutheran Church on Thursday, Jan. 9, 2025, in Portland, Oregon. Aguirre-Velasquez, originally from El Salvador, sought sanctuary at the church to avoid deportation in 2014. (AP Photo)    Read More



Ad : (0:13)

BY GIOVANNA DELL'ORTO, LUIS ANDRES HENAO AND DEEPA BHARATH

Updated 2:26 PM EST, January 23, 2025

Numerous faith leaders across the U.S. say the immigration crackdown launched by President Donald Trump's new administration has sown fear within their migrant-friendly congregations. They are pondering ways to resist even in the face of warnings that houses of worship are not off-limits for arrests.

In Portland, Oregon, the Rev. W.J. Mark Knutson, said he plans to offer undocumented migrants sanctuary at Augustana Lutheran Church anyway — just as he did in 2014. A man from El Salvador, wanted for re-entering the United States illegally, took shelter in the church for nearly three months, sleeping under the altar the first few nights.





**Healthcare Virtual Assistant Company of 2024 MEDVA is proud to be named Healthcare Virtual Assistant Compan...**

 MEDVA    MEDVA                    Learn

AP SETS THE STANDARD FOR POLITICAL REPORTING.    DONATE
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

During the first Trump administration, that commitment included sheltering an immigrant from deportation while he went through a successful process to obtain a visa.

**RELATED STORIES**

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 321 of 405



Haitian migrants in Springfield, Ohio, turn to faith amid deportation fears



Migrants left stranded in troubled resort as Mexico disperses them far from US border



Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 322 of 405
PTM-000305



**Americans want action on border security but are divided on mass deportations**

"Our work now is bigger than simply opening the door of the church for one or two people to stay," Hynicka said. "Sanctuary has to be a value that we extend to one another through our policies, through the laws we enact."



A sign reading "Augustana is a Sanctuary" is displayed on a door at the Augustana Lutheran Church, Thursday, Jan. 9, 2025, in Portland, Oregon. (AP Photo/Jenny Kane)

Other clergy ministering to undocumented migrants were less specific, though they vow and even expand — their support following this week's announcement that federal immi could make arrests at churches, schools and hospitals, ending existing policies that prote spaces from enforcement.

1/30/25, 5:17 PM
Trump won't ban immigration arrests at churches. Now, clergy are weighing how to resist | AP News

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 323 of 405

The Rev. Joseph Dutan, pastor of St. Paul the Apostle church in the New York City borough of Queens, said some of his congregation members were so frightened by the Trump-ordered moves that they worried attending Mass would be risky.

"More than scary, it's sad," Dutan said. "I feel very bad for my people because they have a lot of fear in their heart."



Rev. W. J. Mark Knutson, left, listens as Juan Francisco Aguirre-Velasquez gives an interview at the Augustana Lutheran Church, Thursday, Jan. 9, 2025, in Portland, Oregon. Aguirre-Velasquez, originally from El Salvador, sought sanctuary in the church to avoid deportation ir    Read More

Another pastor in Queens, the Rev. Manuel Rodriguez of Our Lady of Sorrows Catholic church, said many of his 17,000 parishioners are undocumented and have children who attend the parish's school.

"We have children who are shaking literally and crying," Rodriguez said. "They know that at any time their mom, their dad, could be arrested and they could come back from school, and they could be gone."

"Undocumented people go to church every week to pray that they can make ends meet, so they can pay the rent for their families," he said. "People are trying to survive, and this is just putting them through hell."

A New York City mosque, Masjid Ansaru-Deen in the Bronx, has opened its door to migra to some, said Imam Omar Niass. He said many are from his homeland of Senegal.

"I cannot leave anyone, Muslim or non-Muslim, to sleep on the street," he said.

Citing his faith, Niass said he's not worried about the policy change.

"If Trump wants to close houses of worship, but God isn't pleased, then he won't be able said.

1/30/25, 5:17 PM    Trump won't ban immigration arrests at churches. Now, clergy are weighing how to resist | AP News
Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 324 of 405
PYM1-000307

Catholic Bishop Mark Seitz of El Paso, Texas, from his diocese along the U.S.-Mexico border, decried the new policy.



A painting with the word "sanctuary" on it is displayed on the doors of the Augustana Lutheran Church on Thursday, Jan. 9, 2025, in Portland, Ore. (AP Photo/Jenny Kane)
Read More

The end of the sensitive locations policy "strikes fear into the heart of our community, cynically layering a blanket of anxiety on families when they are worshipping God, seeking healthcare and dropping off and picking up children at school," said Seitz in a statement.

In response, he said, his diocese "will continue to educate our faithful on their rights, provide legal services and work with our community leaders to mitigate the damage of indiscriminate immigration enforcement."

Seitz, who leads the migration committee of the U.S. Conference of Catholic Bishops, joined the leaders of the Catholic Health Association of the United States and Catholic Charities USA in a statement Thursday lamenting the policy change.

"We are already witnessing reticence among immigrants to engage in daily life, including sending children to school and attending religious services," the statement said. "Turning places of care, healing, and solace into places of fear and uncertainty for those in need, while endangering the trust between pa educators and the people they serve, will not make our communities safer."

1/30/25, 5:17 PM                    Trump won't ban immigration arrests at churches. Now, clergy are weighing how to resist | AP News

Case 8:25-cv-00243-TDC          Document 49-2          Filed 02/11/25          Page 325 of 405



A painting with the word "sanctuary" on it is displayed on the doors of the Augustana Lutheran Church on Thursday, Jan. 9, 2025, in Portland, Ore. (AP Photo/Jenny Kane)                                                                                                                            Read More

Bishop Ebli De La Rosa, who oversees Church of God of Prophecy congregations in nine southeastern states, said the new policies could leave his churches devastated. Of 52 pastors who serve in the churches he oversees, 28 are undocumented, as are about half of the 5,000 church members, he said.

"Some of these pastors who have been in this country more than 15 or 20 years," De La Rosa added. "They do the important, everyday work in their neighborhoods."

Pastor Maria Elena Montalvo, who leads Grace Evangelical Lutheran Church in the Los A[...] said she and her community are facing intense anxiety in the wake of the policy change.

The church, in a predominantly working-class Latino neighborhood, has served as a sanc[...] immigrants, refugees and asylum seekers for the past seven years, since Montalvo becam[...] the congregation drew attention for housing Muslim asylum seekers from Mauritania in its basement.

Case 8:25-cv-00243-TDC     Document 49-2     Filed 02/11/25     Page 326 of 405

Montalvo said she is passionate about helping immigrants and refugees because she was once in their shoes. She emigrated from Mexico in 1989.

"People are afraid to go to work, to school, to live their lives freely because they are afraid of being arrested or deported," she said.

Montalvo's recites her favorite Bible verse from Gospel of Matthew, where Jesus tells his followers to welcome the stranger and care for the marginalized.

"I recite that verse every day," Montalvo said. "It really resonates with me."

Elsewhere in greater Los Angeles, the Rev. Canon Jaime Edwards-Acton is co-chairing the Sanctuary Task Force at the Episcopal diocese.

Recent discussions addressed how to equip migrants with information about their rights and teach them how to react if they encounter immigration officials.

"We don't have a full-fledged game plan yet," Edwards-Acton said. "We are waiting and watching to see how much of the rhetoric actually becomes reality."

But there is action already, he said: One church administrator has been making grocery runs for a congregant who is afraid to step outside their home.

David Hollenbach, a Jesuit priest and Georgetown University professor with expertise in religion, politics and humanitarian crises, said there is a long tradition in Christianity and other faiths that religious communities can be sanctuaries for people in grave need.

"To violate that is also a very serious issue," said Hollenbach. "Jesus was himself a refugee. And so it's not surprising that you find in the teachings of Jesus repeated calls to respect the needs of those who are migrants and strangers in our midst."

Among Christian evangelical leaders, who represent some of Trump's most loyal supporters, there were nuanced reactions.

The Rev. Robert Jeffress, a longtime Trump supporter and pastor of Dallas' First Baptist Church, said the outcry from some faith leaders was misplaced.

"There's no such thing as a sanctuary that's immune from the laws of our land," he said. "If there is an illegal activity on any square inch of America, the authorities have a right to go in."

Jeffress added, however, "I doubt churches are going to be the first line of attack."

Brent Leatherwood, president of the Ethics and Religious Liberty Commission of the Southern Baptist Convention, said the move "leads to more questions and confusion than anything."

The commission is the public policy arm of the nation's largest Protestant denomination — a conservative body in which support for Trump is strong.

"President Trump is right to fix our broken immigration system ... but it must be done so without turning churches into wards of the state or expecting pastors to ask for papers of people coming through their doors," Leatherwood said in a statement.

"The unintended impact of this change will be that many law-abiding immigrants will be fearful to attend our churches."

⊗

AP Religion Team journalists Peter Smith, Mariam Fam and Holly Meyer contributed, as d
Claire Rush in Portland, Oregon.

1/30/25, 5:17 PM     Trump won't ban immigration arrests at churches. Now, clergy are weighing how to resist | AP News

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 327 of 405

———

Associated Press religion coverage receives support through the AP's collaboration with The Conversation US, with funding from Lilly Endowment Inc. The AP is solely responsible for this content.



**LUIS ANDRES HENAO**

Henao is a multimedia reporter on the AP's Global Religion team. He focuses on features and has reported for the AP from Alaska, Antarctica and the Amazon.

X  ◎  ✉



**DEEPA BHARATH**

Bharath is a reporter with AP's Global Religion team. She is based in Los Angeles.

X  ✉



# Exhibit 26

*Democracy Dies in Darkness*

**Immigration**

# Trump officials issue quotas to ICE officers to ramp up arrests

The administration wants to increase the number of arrests from a few hundred per day to at least 1,200 to 1,500, increasing the chances that non-criminals will be detained.

Updated January 26, 2025

🎧 5 min    ↱    🔖    🗨 4819

By Nick Miroff and Maria Sacchetti

U.S. Immigration and Customs Enforcement officials have been directed by Trump officials to aggressively ramp up the number of people they arrest, from a few hundred per day to at least 1,200 to 1,500, because the president has been disappointed with the results of his mass deportation campaign so far, according to four people with knowledge of the briefings.

The quotas were outlined Saturday in a call with senior ICE officials, who were told that each of the agency's field offices should make 75 arrests per day and managers would be held accountable for missing those targets. The four people spoke on the condition of anonymity to disclose internal briefings.

The orders significantly increase the chance that officers will engage in more indiscriminate enforcement tactics or face accusations of civil rights violations as they strain to meet quotas, according to current and former ICE officials.



Podcast episode

Trump's deportation campaign has

The Trump administration's plan to rapidly ramp up deportations.

Play now  26 min                    Follow on

PTM-000312

White House has said repeatedly that ICE would conduct raids, and its officers would prioritize immigrants with criminal records and who are gang members. But the quotas issued this weekend would place ICE officers under more pressure to seize a wider range of potential deportees to avoid reprimand, including immigrants who have not committed crimes.

Neither ICE nor Homan responded to requests for comment. After an earlier version of this article was published, White House press secretary Karoline Leavitt said in an email that, "your story is false," but did not reply when asked for specifics.

Homan told ABC News in an interview broadcast Sunday that the administration is "in the beginning stages" of its mass deportation plan, and while public safety threats and national security threats are a priority, "as that aperture opens, there'll be more arrests nationwide."

ICE announced in a statement Sunday that agents "began conducting enhanced targeted operations today in Chicago," with help from other federal agencies, including the FBI. Acting Homeland Security secretary Benjamine C. Huffman last week revoked a directive that had essentially barred ICE from arresting immigrants in or around sensitive areas such as schools, hospitals and churches.

Later Sunday, Homan appeared on a streaming service with Phil McGraw, the television doctor known as Dr. Phil, to emphasize that ICE is searching for specific immigrants who have committed crimes.

"Sweeps don't occur anywhere," Homan told McGraw, whose MeritTV said they were inside the ICE Command Center in Chicago.

> **How Donald Trump's deportation crackdown could unfold**
>
> The Washington Post examined which groups of immigrants could be at higher risk of deportation under the second Trump administration, and what logistical and financial obstacles stand in the way.

An ICE official who was not authorized to discuss the quota said the agency's list of criminal suspects was sufficiently long, so officers would be able to continue prioritizing public safety and national security threats to meet quotas.

Last year, ICE told lawmakers there were about 670,000 immigrants on its caseload who had criminal convictions or faced criminal charges. Some are serving sentences in jails and prisons.

But Paul Hunker, a former ICE chief counsel in Dallas, said arresting serious offenders takes time, staff and planning — more time than quotas might allow.

"Quotas will lead to ICE officers focusing less attention than they ought to on the most dangerous noncitizens," said Hunker, who, as the agency's chief counsel in Dallas, oversaw offices in North Texas and Oklahoma from 2003 through January 2024.

"I've just never heard of that," he said, referring to the quotas.

The agency manages a docket of about 7.8 million people who potentially face deportation, but many of them have pending claims in the U.S. immigration system or a form of provisional residency status. ICE's caseload more than doubled during Joe Biden's presidency amid record numbers of illegal border crossings.

ICE officers deployed aggressively during President Donald Trump's first week in office, boosting the number of immigrants taken into custody from fewer than 400 on Tuesday to nearly 600 on Friday. The number declined to 286 on Saturday, according to ICE.

Trump's supporters and others have pointed out that those totals will not yield the "millions" of deportations the president has promised.

Trump made a similar promise during his first term and came up far short, reaching a peak of about 267,000 during the 2019 fiscal year. The Biden administration deported 271,000 in fiscal year 2024, the highest annual total in a decade. Trump has long had little patience for explanations of why his goals are not realistic.

ICE officers have been told for years that indiscriminate roundups are unsafe and counterproductive, because they spread panic throughout immigrant communities and produce significant public backlash. ICE and the White House did not immediately respond to requests for comment.

Trump officials have told ICE the president expects arrest operations to proceed around-the-clock and that officers should cancel personal leave, according to the four people briefed on the directives.

ICE has about 5,500 officers nationwide working on immigration enforcement, a staffing level that has remained roughly flat for the past decade. The Trump administration took steps to supplement those numbers by deputizing officers and agents at the Justice Department to investigate immigration violations and make arrests, enlisting personnel from the FBI, U.S. Marshals, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms and Explosives and the Federal Bureau of Prisons.

**Trump presidency**

Follow live updates on the Trump administration. We're tracking Trump's progress on campaign promises and his picks for key administration roles.

Trump also and Security Investigations division to focus on immigration enforcement. The agency is DHS's investigative division for counterterrorism, drug smuggling, human trafficking cases, child exploitation and other crimes.

"Mobilizing these law enforcement officials will help fulfill President Trump's promise to the American people to carry out mass deportations," Huffman said in a statement. "For decades, efforts to find and apprehend illegal aliens have not been given proper resources. This is a major step in fixing that problem."

Former ICE officials, speaking on the condition of anonymity to describe the work of Homeland Security Investigations, said reassigning special agents to carry out civil immigration enforcement will mean they devote less time to probing serious crimes.

# Exhibit 27



🖶 Print    ⊗ Close

# Trump DHS repeals key Mayorkas memo limiting ICE agents, orders parole review

By Adam Shaw, Bill Melugin

Published January 21, 2025

Fox News

**EXCLUSIVE**: The Department of Homeland Security (DHS) on Monday issued memos to repeal limits on Immigration and Customs Enforcement (ICE) agents imposed by former DHS Secretary Alejandro Mayorkas -- and order a review of the use of humanitarian parole to admit migrants.

The first memo, a draft of which was reviewed by Fox News, rescinds a 2021 memo by Mayorkas, which provided an expanded list of areas that are "protected areas" where ICE could not engage in immigration enforcement. It said the policy was designed to make sure enforcement did not limit "people's access to essential services or engagement in essential activities."

Those areas include schools, universities, healthcare facilities, places of worship, "places where children gather," social service establishments, food banks, religious or civil ceremonies and disaster or emergency response and relief centers.

"In our pursuit of justice, including in the execution of our enforcement responsibilities, we impact people's lives and advance our country's well-being in the most fundamental ways. As a result, when conducting an enforcement action, ICE and CBP agents and officers must first examine and consider the impact of where actions might possibly take place, their effect on people, and broader societal interests," Mayorkas said in a statement at the time.

**'NATIONAL EMERGENCY': TRUMP DECLARES AMBITIOUS ILLEGAL IMMIGRATION CRACKDOWN IN INAUGURAL ADDRESS**



President Trump presents the second executive order during the inaugural parade inside Capital One Arena on the inauguration day of his second presidential term, in Washington, D.C., on Jan. 20, 2025. (REUTERS/Carlos Barria)

The memo issued Monday rescinded that guidance and said that common sense should be used instead.

"Going forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense," the new memo said. "It is not necessary, however, for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced."

ICE agents who spoke to Fox News said they believe that rescinding the Mayorkas order is going to free them up to go after more illegal immigrants, because illegal immigrants have until now been able to hide near schools and churches and avoid arrest.

**TRUMP TO DEPLOY MILITARY TO BORDER, END BIDEN PAROLE POLICIES IN FLURRY OF DAY 1 EXECUTIVE ORDERS**

A separate memo, also reviewed by Fox, focuses on the use of humanitarian parole, which was used broadly by the Biden administration to allow hundreds of thousands of migrants to enter the U.S., including nearly 1.5 million via the CBP One app and parole processes for nationals from Cuba, Haiti, Nicaragua and Venezuela (CHNV.) The administration also launched parole programs for nationals from Ukraine and Afghanistan.

The memo notes that the statute demands the authority be used on a "case by case basis," something that Republican critics claim the administration has abused. It emphasizes that parole is "a limited use authority, applicable only in a very narrow set of

circumstances."



ICE agents conduct an enforcement operation in the U.S. interior on June 2, 2022. (Immigration and Customs Enforcement)

It also claims that "it has been repeatedly abused by the Executive Branch over the past several decades in ways that are blatantly inconsistent with the statute."

**CLICK HERE FOR MORE IMMIGRATION COVERAGE**

"Most important, the parole statute does not authorize categorical parole programs that make aliens presumptively eligible on the basis of some set of broadly applicable criteria," it says.

The memo directs the heads of (ICE) and Customs and Border Protection (CBP) to compile a list of instructions, policies and procedures related to parole, review them, and formulate a plan to phase out any that are not in accord with the statute.

They will then provide a report to the DHS secretary, while also pausing, modifying or ending any programs that they believe were not enacted properly, and that they can do in a way that is consistent with statutes, regulations and court orders.

The memos came just hours after Trump signed a slew of 10 border-related executive orders, including orders deploying the military to the border, ending Biden's parole programs and ending birthright citizenship for children of illegal immigrants.

**CLICK HERE TO GET THE FOX NEWS APP**

The orders also declare a national emergency, and order the resumption of construction of the wall at the southern border.

"All illegal entry will immediately be halted," Trump said moments after being inaugurated. "And we will begin the process of returning millions and millions of criminal aliens back to the places from which they came."

Adam Shaw is a politics reporter for Fox News Digital, primarily covering immigration and border security.

He can be reached at adam.shaw2@fox.com or on Twitter.

Print    Close

---

**URL**
https://www.foxnews.com/politics/trump-dhs-repeals-key-mayorkas-memo-limiting-ice-agents-orders-review-parole-use

---

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.Do Not Sell my Personal Information - New Terms of Use - FAQ

# Exhibit 28



# What Do Quakers Believe?

There are two fundamental aspects to **Quaker faith**. First, Friends believe that all people are capable of directly experiencing the divine nature of the universe—which is known by many names, God or the Holy Spirit or simply Spirit being among the most common. You don't need a priest or any other kind of spiritual intercessor; you don't need to perform any kind of ritual. When you need to hear from God, you will. When Spirit has a message for you to share, you should share it.

That leads us to the second key principle, our belief in continued revelation. In the Hebrew Bible and the New Testament, we read many stories of God communicating directly with

people. Friends believe God's revelations have never stopped, and that God might reach out to any one of us at any time. When Quakers come together to meet for silent worship, we participate in a shared space in which we strive to become better able, and help each other become better able, to recognize such divine messages.



*"The more that I grow in my knowledge of what God is to me, the more I realize that my life is prayer, that I am in general a prayerful person."*

**More questions:**

**Do Quakers believe in God?**

**Are Quakers Christian?**

**What is the "Inner Light"?**

# How Do Quakers Worship?



*"Usually, meditation is very hard for me; I have a very active ADHD brain… and just being present on my own is hard. But being in that silence, I felt so comfortable, so calm, so held."*

**NEW: Are Quaker meetings inclusive?**

Quakers can, and sometimes do, meet for worship just about anywhere; in keeping with the words of Jesus, "where two or three are gathered together in my name, there am I in the midst of them."

Most Quaker communities, or **meetings**, though, are likely to come together for worship at a meetinghouse. (Some Quaker meetings with a more explicitly Christian orientation might call themselves a "Friends Church," but they're basically meetinghouses.)

At least once a week, the members of a meeting will **gather for silent worship**.

# How Do Quakers Live?

George Fox, whose visions helped shape the Society in its early days, offered Friends some crucial advice on **how to live**:

Case 8:25-cv-00243-TDC    Document 49-21    Filed 02/11/25    Page 340 of 405

"Be patterns, be examples in all countries, places, islands, nations wherever you come," he wrote; "that your carriage and life may preach among all sorts of people, and to them; then you will come to walk cheerfully over the world, answering that of God in everyone; whereby in them you may be a blessing, and make the witness of God in them to bless you."



**More Questions:**

**Are Quakers LGBTQ+-affirming?**

**How do Quakers practice simplicity?**

**Why are Quakers pacifists?**

*Look to the Light*

Follow a weekly series of short messages on Quaker spirituality, here at Quaker.org or through the *Friends Journal* newsletter.

# The Quaker Story



The History of George Fox

*"Quakerism exists because of George Fox,
and I think Fox would be gratified that his
message still resonates with people."*

## More Quaker History:

**Mahala Ashley Dickerson**

**William Penn**

**Bayard Rustin**

**Paul Robeson**

**Jean Toomer**

**The Quaker movement began in 17th-century England.** Frustrated by the spiritual
shortcomings they perceived in the Church of England and other Protestant
denominations, early Friends such as **George Fox** set out to revive "primitive Christianity"
by going back to the roots of Jesus' teachings around non-violence, simple living, God's
concern for the marginalized, and everyone's capacity for immediate and equal access to
God's Spirit.

Though they named themselves the Religious Society of Friends, opponents mocked
them as "Quakers," for the way their bodies often shook when they were overcome with
spiritual energy. Embracing the insult and making it their own, the Quakers became one
of the most distinctive religious movements in modern Western culture.



Meet Friends from many different backgrounds, discussing the core questions of Quaker faith.

To see more videos, follow us on YouTube or visit the QuakerSpeak website.





## Following a Spirit-Led Call for Acti...



## Frequently Asked Questions Abou...



## Glossary of Common Quaker Terms





photo: QuakerSpeak

1409

# Exhibit 29

 An official website of the United States government

**Official websites use .gov**

A **.gov** website belongs to an official government organization in the United States.

 **Secure .gov websites use HTTPS**

A **lock** ( 🔒 ) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

🌐 **En Español**   ⬜ **Contact Us**   🔗 **Quick Links**

U.S. Immigration and Customs Enforcement

Search

**Call 1-866-DHS-2-ICE**      Report Crime

ICE      WHO WE ARE      ENFORCEMENT AND REMOVAL OPERATIONS

## Protected Areas and Courthouse Arrests

# DHS Directive *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025)

The Department of Homeland Security (DHS) issued a directive — *Enforcement Actions in or Near Protected Areas* — on Jan. 20, 2025, for U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP), superseding and rescinding DHS's Oct. 27, 2021, memorandum of the same title, which determined that certain locations require special protection from enforcement of U.S. immigration laws.

The Jan. 20, 2025, DHS *Enforcement Actions in or Near Protected Areas* directive recognizes that "officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location. Going forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense."

# ICE Directive *Enforcement Actions in or Near Courthouses* (Jan. 21, 2025)

On Jan. 21, 2025, ICE issued interim guidance, *Enforcement Actions in or Near Protected Areas*. Under this interim guidance, ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses when they have credible information that leads them to believe the targeted alien(s) is or will be present at a specific location, and where such action is not precluded by laws imposed by the jurisdiction in which the civil immigration enforcement action will take place.

ICE officers or agents must coordinate with the relevant local ICE Office of the Principal Legal Advisor (OPLA) office before conducting civil immigration enforcement actions in or near courthouses to determine whether jurisdiction-specific legal limitations apply.

Civil immigration enforcement actions in or near courthouses should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and use the court building's non-public entrances and exits.

When practicable, ICE officers and agents will conduct civil immigration enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings.

ICE officers and agents should generally avoid enforcement actions in or near courthouses, or areas within courthouses that are wholly dedicated to non-criminal proceedings — examples include family court and small claims courts. When an enforcement action in the above situations is operationally necessary, the approval of the respective Field Office Director, Special Agent in Charge, or his or her designee is required prior to conducting the enforcement action.

The guidance also outlines responsibilities of the Field Office Director and the Special Agent in Charge.

For purposes of the ICE *Interim Guidance: Civil Immigration Enforcement Actions in or Near Courthouses*, a civil immigration enforcement action is any action taken by an ICE officer or agent to apprehend, arrest, interview, or search an alien in connection with enforcement of administrative immigration violations. This policy does not apply to criminal immigration enforcement inside courthouses.

Updated: 01/28/2025

## ADDRESS

📍 500 12th St SW
Washington, DC
20536

📱 Report    1-866-
Crimes:    DHS-2-
Call    ICE

## RELATED INFORMATION

Enforcement and Removal Operations

**About Us**

**Combating Transnational Crime**

**Immigration Enforcement**

**Newsroom**

    




U.S. Immigration and Customs Enforcement

## ICE Contact Center

Report suspicious activity: 1-866-DHS-2-ICE


ICE.gov
**An official website of the U.S. Department of Homeland Security**

About ICE

Accessibility

FOIA Requests

Privacy Policy

DHS.gov

Archive

No FEAR Act Data

Site Links

Performance Reports

Inspector General

The White House

DHS Components

USA.gov

**National Terrorism Advisory System**

# Exhibit 30

1/30/25, 4:58 PM Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole | Homeland Security

Case 8:25-cv-00243-TDC Document 49-2 Filed 02/11/25 Page 350 of 405
PTM-000529



U.S. Department of Homeland Security

# Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole

**Release Date:** January 21, 2025

WASHINGTON – Yesterday, Acting Department of Homeland Security Secretary Benjamine Huffman issued two directives essential to ending the invasion of the US southern border and empower law enforcement to protect Americans.

The first directive rescinds the Biden Administration's guidelines for Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) enforcement actions that thwart law enforcement in or near so-called "sensitive" areas. The second directive ends the broad abuse of humanitarian parole and returns the program to a case-by-case basis. ICE and CBP will phase out any parole programs that are not in accordance with the law. The following statement is attributable to a DHS Spokesperson:

*"This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murders and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.*

*"The Biden-Harris Administration abused the humanitarian parole program to indiscriminately allow 1.5 million migrants to enter our country. This was all stopped on day one of the Trump Administration. This action will return the humanitarian parole program to its original purpose of looking at migrants on a case-by-case basis."*

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)    IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)    CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)
IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

Last Updated: 01/21/2025

# Exhibit 31

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 352 of 405
PTM-000530

## NEWS

*Search our site...*

JANUARY 23, 2025

# MAYOR RAS J. BARAKA'S STATEMENT ON ICE RAID ON NEWARK BUSINESS ESTABLISHMENT

← *Back to News overview*

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 353 of 405

PTM-000531



"Today, U.S. Immigration and Customs Enforcement (ICE) agents raided a local establishment in the City of Newark, detaining undocumented residents as well as citizens, without producing a warrant. One of the detainees is a U.S. military veteran who suffered the indignity of having the legitimacy of his military documentation questioned. This egregious act is in plain violation of the Fourth Amendment of the U.S. Constitution, which guarantees 'the right of the people be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures....'

"Newark will not stand by idly while people are being unlawfully terrorized. I will be holding a press conference in alliance with partners ready and willing to defend and protect civil and human rights. Details to come."

POST WRITTEN BY

**City of Newark, NJ**

---

## CONTACT INFORMATION

City Hall
920 Mayor Kenneth
A. Gibson Blvd
Newark, NJ 07102

(973) 733-4311
(973) 928-1238
4311newark@Ci.Newark.Nj.Us

## HELPFUL LINKS

Community
Departments
News
Events
City Council
Employee Directory
Newark 4311

## QUICK LINKS

Business Registration
Payments
Knowledge Base
Jobs
Phone Numbers

## DEPARTMENTS

Administration
Central Purchasing
Communications
Economic & Housing Development
Engineering
→ View all

## INNOVATION

Newark Nextdoor
NewarkConnect App IPhone
NewarkConnect App Android
Data Dashboard
Newark

# CITY OF NEWARK

:NTS  ∨      NEWS     EVENTS      FORMS      MAYOR  ∨      CONTACT  ∨

# NEWARK

# Exhibit 32

# National Association of Evangelicals Responds to New Executive Orders

**JANUARY 22, 2025 | PRESS RELEASE**



PYM-000535

**As President Donald Trump begins his second term, the National Association of Evangelicals (NAE) pledges to pray for him and all elected officials, asking that God would give them the wisdom and grace to lead well. The NAE also commits to collaborating with the new administration on shared priorities and to challenge policies that do not promote human flourishing.**

"President Trump has articulated an ambitious agenda. We appreciate steps he is taking to restore conscience protections, uphold parents' rights to guide the upbringing of their children, and withdraw controversial gender identity policies. We also urge his administration to reinstate vital protections for the sanctity of human life in all government programs," said **Walter Kim, president of the National Association of Evangelicals.** "As evangelicals we believe that every human life from conception to death is created in God's image and therefore holds immeasurable worth. This includes the unborn, the very young, those living in poverty or with disabilities, refugees, immigrants and other vulnerable groups. We call on the president to take seriously the responsibility to safeguard human rights and protect the sanctity of life in all its stages."

While the NAE has underlined long supported proposals to strengthen border security and uphold the rule of law, some of the administration's immigration proposals go beyond border security, including policies that risk leading to family separation and a near-total ban on resettlement of refugees who are thoroughly vetted.

"It is heartbreaking to learn of refugees who have lost everything, who have gone through an extensive screening process, and even have tickets purchased to travel to the United States but are now being told that they are not welcome here," **Kim said**. "The greatness of the American humanitarian spirit finds beautiful expression in our proud heritage of life-saving refugee resettlement in partnership with churches and volunteers."

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 358 of 405
PTM-000536

Before the presidential elections, the NAE and other evangelical leaders wrote to both major candidates urging them to pursue immigration policies that prioritize human dignity, border security and family unity. After the election the NAE joined a statement calling for continued American leadership in responding to the crisis of global displacement that currently impacts more than 100 million people made in God's image, including many persecuted Christians.

The administration's announced campaign of mass deportations threatens to disrupt the lives of many peaceful, productive members of our churches and communities. The withdrawal of guidance protecting houses of worship, schools and health facilities from immigration enforcement is troubling. Even the announcement of this policy has caused fear, deterring some from attending church. Likewise, if immigrants are deterred from attending school or seeking medical care, the whole community suffers.

Since 2009, the NAE has advocated for secure borders along with a sound, equitable process toward earned legal status for undocumented individuals who qualify and for policies that do not uproot mixed-status families and tear parents away from their children.

"Healthy, intact families are a tremendous asset to any community," **Kim said**. "In light of the many stresses and challenges faced by American families, we should celebrate the strong family ties that so many immigrants have maintained even as many work long hours to support their children and strengthen our economy."

"Immigrant believers are bringing new vitality to our churches and communities. We celebrate the rich racial and ethnic diversity in the United States and the ways that it strengthens and enriches our nation," **Kim added.** "We lament the continued existence of racism and racial injustice within the Church and in society, and we resolve to pursue healing and reconciliation."

In addition, the administration's decision to halt international development assistance for at least 90 days will harm vulnerable families and communities abroad, while undermining national security. The NAE urges the administration to pursue more circumspect paths to evaluate assistance programs without adversely disrupting them.

FYM-000537

"While we support some of the administration's actions and disagree with others, the NAE calls on all Americans to pray regularly for President Trump, his administration, and for all our leaders," **Kim said.** "We seek God's best for our nation and the world. We are ready to work with President Trump on issues of mutual concern and remain committed to challenging policies that fail to promote human flourishing."

# Exhibit 33

Case 8:25-cv-00243-TDC     Document 49-2     Filed 02/11/25     Page 361 of 405
PTM-000338

**The New York Times**

https://www.nytimes.com/2025/01/30/us/immigrant-communities-hiding-ice.html

# Immigrant Communities in Hiding: 'People Think ICE Is Everywhere'

Schools, churches and shops are feeling the chilling effect of the fear of deportation. One minister said fewer congregants were showing up for services.

▶ **Listen to this article · 9:14 min**  Learn more

  

**By Miriam Jordan, Hamed Aleaziz and Heather Knight**

Miriam Jordan reported from Los Angeles, Hamed Aleaziz from Washington and Heather Knight from San Francisco.

Jan. 30, 2025

At a barbershop in Los Angeles, only one of the 10 chairs was occupied on what would ordinarily be a busy evening. In San Francisco, a middle school student's erroneous information about seeing an immigration officer on a city bus prompted the school district to send parents a warning.

In Chicago, a mistaken report that immigration agents showed up at a school set off panic that rippled across the country. At a church in Charlotte, N.C., more than a third of the usual congregants were absent from a recent evening service.

Hotlines set up by advocates for immigrants to report enforcement activity have experienced a spike in calls.

"The hysteria is out of control," said Patrick Garcia, executive director of Embrace All Latino Voices, a group in Charlotte, N.C.

After taking office last week, the Trump administration began highlighting what it has characterized as a new and more aggressive effort to target illegal immigration and deliver on a key campaign pledge to carry out mass deportations. So far, the enforcement efforts have been primarily individual arrests, rather than sweeps of factories, farms or other large-scale sites. Immigration and Customs Enforcement has reported on social media more than 5,000 arrests in around a week's time.

An estimated 14 million undocumented immigrants live in the United States, according to demographers and other experts. The number includes people with no legal status as well as people who have some form of temporary status that is being contested in court or has been threatened with termination by the Trump administration.

Arresting and deporting even a small share of the population with no status or contested status is all but impossible. But stirring anxiety and uncertainty among those millions of people appears to be far easier, stoked by sharp rhetoric from Mr. Trump and his top aides and fed by news footage of federal agents massing in communities from Seattle to New York.

Case 8:25-cv-00243-TDC     Document 49-2     Filed 02/11/25     Page 363 of 405



"It hasn't been as bad as this since Covid-19," said James Kang, left, the owner of First Bargain, a grocery store in Los Angeles. "My customers are staying home."  Mark Abramson for The New York Times

Even schools, churches and hospitals, places long considered insulated from immigration enforcement, have become fair game after the Department of Homeland Security's recent announcement that such locations were not off limits to agents.

Denver Public Schools recorded a decline in attendance of 10 percent or more over the last week at some schools that have a large number of students from migrant families. An undocumented woman named Martha, 60, said she had stopped volunteering as a crossing guard and cafeteria worker at the school in her neighborhood in nearby Aurora, Colo., as raid rumors swirled. "My kids are grown up now, but they still need their mother by their side, and my biggest fear is that I will be picked up and taken away from them," she said.

Thomas D. Homan, Mr. Trump's border czar, said that allowing immigration agents to have access to sensitive sites gave them the ability to pursue targets wherever they want, in line with other law enforcement agencies.

"It's not like we're walking in and arresting everybody in the building, so the institution shouldn't be afraid. The criminal alien should be afraid," Mr. Homan said in an interview.

In San Francisco, Karen Rodriguez rushed to pick up her 7-year-old son from school after parents were notified by a worker there that ICE agents had been spotted in the area. "Fear is definitely a feeling we all have," said Ms. Rodriguez, a 30-year-old Colombian. She said that she, her husband and their son had crossed the border and were planning to apply for asylum.

Most undocumented immigrants have been in the country at least a decade. They work in large numbers in construction, agriculture and other sectors, and they often have children who were born in the United States. Many have felt that if they stayed out of trouble with the police, they would be relatively safe here.

No more.

Even in Los Angeles and San Francisco, cities that have passed laws to protect their immigrant communities, people are altering their routines.

At the Park Plaza Barber Shop in Los Angeles, there was only one customer at 5:15 p.m. on Tuesday. Ordinarily, most or all 10 chairs would be occupied, with more patrons waiting, said the owner, José Anguino. But in a neighborhood flush with immigrants, many were lying low, he said.

"Everyone is terrified, and they don't want to spend money because they don't know what could be coming," said José Anguino, who owns Park Plaza Barber Shop in Los Angeles. Mark Abramson for The New York Times

"Everyone is terrified, and they don't want to spend money because they don't know what could be coming," said Mr. Anguino, who has owned the business for three decades.

Next door, at First Bargain, which sells an array of Mexican foods, just a handful of customers roamed the aisles. Sales have dropped about 30 percent since last week, said James Kang, the owner of the supermarket.

"It hasn't been as bad as this since Covid-19," he said. "My customers are staying home."

Across the country, in Charlotte, N.C., Apolo Santos, the pastor of an Assembly of God Church, which ministers to the area's fast-growing Brazilian community, said that his congregants were scared when President Trump was last in office, "but not with this intensity."

"People think ICE is everywhere," he said, which is hurting church attendance.

"Stay alert if you're heading toward Gastonia," said a message in Portuguese in a WhatsApp group on Wednesday, relaying a supposed sighting on a road to that North Carolina town.

And Mr. Garcia, of Embrace All Latino Voices, the advocacy group, said that some people were starting to talk about returning to their home countries.

Self-deportation, or the idea that undocumented people will just leave, has been promoted by proponents of highly restrictive immigration policies to achieve attrition through enforcement.

Indeed, Mr. Homan, the border czar, said he hoped people would decide to abandon the country.

"It'd be wiser for people that are in the country illegally to simply go home and come back the right way. Absolutely," he said.

John Sandweg, a senior Homeland Security official in the Obama administration, said the strategy was clear. "The administration is creating a climate of fear as part of a self-deportation plan," he said.

Details about the arrests have been extremely limited, making it difficult to assess the extent to which the recent operations have been more expansive than the day-to-day enforcement efforts by ICE.

To calm nerves and debunk misinformation on TikTok, other social media platforms and in tabloids, the consulate of Mexico in Los Angeles, home to the largest Mexican population in the United States, released a video this week.

"We see no evidence of massive raids, of people arrested randomly in the streets or of operations in churches or schools," Carlos González Gutiérrez, the consul general, said in the two-minute video posted on Facebook, Instagram and X.



Agents detaining two immigrants at a Home Depot parking lot in Tucson, Ariz., earlier this week.  Rebecca Noble/Reuters

He explained that 17 Mexican men who had "prior history with law enforcement" had been detained last weekend, a number that is not atypical.

"For now, there is no reason for you to refrain from your usual activities," Mr. Gutiérrez said.

Yet the specter of federal agents and the spigot of rumors on social media have created anxiety that can be hard to allay. The erroneous report by a middle school student in San Francisco of seeing an ICE agent on a public bus took on a life of its own.

A screen shot of a text message sent by a social worker at the school to colleagues said ICE agents "were in a black car, had dogs and entered the 29 bus. They introduced themselves as ICE. Then, they questioned passengers and detained several adults and school-age children."

An Instagram post by a popular local photographer included a similar account that was shared more than 9,000 times. The school district sent an email to families warning them that agents might be in the vicinity of the bus route.

But there was no ICE action on any bus that day, according to the city's police chief, William Scott, who said he had confirmed that with Homeland Security. He said the student most likely saw police officers board the same bus to look for a lost child and mistook them for ICE agents.

The next day, a rumor spread that ICE agents had entered five downtown office buildings searching for janitors to deport. That, too, was shared widely on social media. Hundreds of janitors failed to report for their shifts that night, according to Olga Miranda, president of the local janitors' union.

It turned out that the agents were in two of those buildings with an arrest warrant and were not targeting janitors, she said.

Lorena Melgarejo, who takes calls on a hotline for Faith in Action Bay Area, a social justice group in Northern California, said that there have been "ghost sightings" of ICE agents everywhere.

"There are so many that it's almost impossible to follow them," she said.

She has been telling people to call immediately if they witness a raid firsthand, but otherwise to double-check first. Her advice is that people remain vigilant while keeping up their routines — attending doctor's appointments, sending children to school and showing up for work.

"We cannot be frozen by fear already," she said. "It's only been days!"

Tim Arango contributed reporting from Denver.

**Miriam Jordan** reports from a grass roots perspective on immigrants and their impact on the demographics, society and economy of the United States. More about Miriam Jordan

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy. More about Hamed Aleaziz

**Heather Knight** is a reporter in San Francisco, leading The Times's coverage of the Bay Area and Northern California. More about Heather Knight

We are sending copies of this report to the appropriate congressional committees and the Secretary of Homeland Security. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-8777 or gamblerr@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff members who made key contributions to this report are listed in appendix V.

Rebecca Gambler
Director, Homeland Security and Justice

FYM-000188



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

October 27, 2021

MEMORANDUM TO:    Tae D. Johnson
                  Acting Director
                  U.S. Immigration and Customs Enforcement

                  Troy A. Miller
                  Acting Commissioner
                  U.S. Customs and Border Protection

                  Ur M. Jaddou
                  Director
                  U.S. Citizenship and Immigration Services

                  Robert Silvers
                  Under Secretary
                  Office of Strategy, Policy, and Plans

                  Katherine Culliton-González
                  Officer for Civil Rights and Civil Liberties
                  Office of Civil Rights and Civil Liberties

                  Lynn Parker Dupree
                  Chief Privacy Officer
                  Privacy Office

FROM:             Alejandro N. Mayorkas
                  Secretary

SUBJECT:          **Guidelines for Enforcement Actions in or Near Protected Areas**

---

This memorandum provides guidance for ICE and CBP enforcement actions in or near areas that require special protection. It is effective immediately.

This memorandum supersedes and rescinds John Morton's memorandum entitled, "Enforcement Actions at or Focused on Sensitive Locations" (number 10029.2, dated October 24, 2011), and David Aguilar's memorandum entitled, "U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations" (dated January 18, 2013).

1

# Immigration Enforcement at Sensitive Locations

*April 18, 2022*
Fiscal Year 2020 Report to Congress



*U.S. Immigration and Customs Enforcement*

FYM-000195



# Immigration Enforcement at Sensitive Locations

# Table of Contents

I.    Legislative Language ...................................................................................................1

II.   Background .................................................................................................................2
      A.  Enforcement Actions Near Sensitive Locations ......................................................2
      B.  Enforcement Actions Against Victims and Witnesses ............................................3

III.  Analysis/Discussion ....................................................................................................5
      A.  Enforcement Actions Inside Courthouses................................................................5
      B.  ICE-wide Training .................................................................................................5
      C.  ERO Officer Training .............................................................................................5
      D.  Special Agent Training ...........................................................................................5
      E.  Steps Taken by ICE ...............................................................................................6

Appendices ...........................................................................................................................7
      Appendix A:  Abbreviations ..........................................................................................7
      Appendix B:  ICE Policy No. 10029.2, Enforcement Actions at or Focused on Sensitive
             Locations ............................................................................................................8
      Appendix C:  ICE Directive 11072.1, Civil Immigration Enforcement Actions Inside
             Courthouses ......................................................................................................11
      Appendix D:  ICE Policy No. 10076.1, Prosecutorial Discretion:  Certain Victims,
             Witnesses, and Plaintiffs ..................................................................................15
      Appendix E:  ICE Policy No. 10036.1, Interim Guidance Relating to Officer Procedure
             Following Enactment of VAWA 2005 ...............................................................18
      Appendix F: DHS Directive No. 002-02, Implementation of Section 1367 Information
             Provisions .........................................................................................................23
      Appendix G:  Implementation of Section 1367 Information Provisions .......................27
      Appendix H:  Guidelines for Enforcement Actions In or Near Protected Areas ..........43
      Appendix I:  Arrests at Sensitive Locations .................................................................48
             1. List of U.S. Immigration and Customs Enforcement (ICE) Enforcement and
                Removal Operations (ERO) Arrests at Sensitive Locations from October 1, 2018,
                through October 31, 2020 ...............................................................................48
             2. List of ICE Homeland Security Investigations Arrests at Sensitive Locations
                October 1, 2017, through October 31, 2020 .....................................................49

## Appendix F: DHS Directive No. 002-02, Implementation of Section 1367 Information Provisions

Department of Homeland Security
DHS Directives System
Directive Number: 002-02
Revision Number: 00.1
**Issue Date: 11/01/2013**
*Incorporating Change 1, 04/29/2019*
*Approved by Chip Fulghum, Acting Under Secretary for Management*

# IMPLEMENTATION OF SECTION 1367
# INFORMATION PROVISIONS

## I.    Purpose

This directive establishes a single Department of Homeland Security (DHS) policy regarding the implementation of Title 8, United States Code (U.S.C.), Section 1367,(Violence Against Women Act (VAWA) confidentiality provisions) and provides guidance as instructed by 8 U.S.C. 1367(d), as amended by the Violence Against Women Reauthorization Act of 2013, Public Law 113-4, section 810.

## II.   Scope

This directive applies throughout DHS, particularly those employees who work with applicants for victim-based immigration relief or who have access to protected information, such as United States Citizenship and Immigration Service (USCIS), Immigration and Customs Enforcement (ICE), and Customs and Border Protection (CBP).

## III.  Authorities

A.    Public Law 101-649, "Immigration and Nationality Act" (INA) Section 101(a)(51), as codified in 8 U.S.C. Section 1101(a)(51)

B.    Public Law 103-322, "Violence Against Women Act (VAWA) of 1994"

C.    Public Law 106-386,"Victims of Trafficking and Violence Protection Act of 2000." (VTVPA)

D.    Public Law 109-162, "Violence Against Women and Department of Justice Reauthorization Act of 2005," Section 817, "VAWA Confidentiality Nondisclosure." (VAWA 2005)

E.    Public Law 113-4, "Violence Against Women Reauthorization Act of 2013," Section 810, "Disclosure of Information for National Security Purposes." (VAWA 2013)

1

Directive # 002-02
Revision # 00 1

Google Chrome (2)

PYM-000219

F.    Section 239(e) of the Immigration and Nationality Act (INA) (8 U.S.C. 1229(e)), "Certification of compliance with restrictions on disclosure"

G.    Section 240A(b)(2) of the Immigration and Nationality Act (INA) (8 U.S.C. 1229(b)), "Cancellation of removal; adjustment of status"

H.    Title 8, U.S.C., Section 1367, "Penalties for disclosure of information" (originally enacted as Section 384 of the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996 (IIRIRA))

I.    Title 42, United States Code, Section 13925(a)(4), "Definitions and grant provisions" (as redesignated and amended by Section 3 of VAWA 2013), Public Law 113-4

J.    Delegation 19004, Delegation of Authority to Implement Section 1367 Information

K.    Instruction 002-02-001, Implementation of Section 1367 Information Provisions

L.    DHS Privacy Incident Handling Guidance (Jan. 26, 2012)

## IV.  Responsibilities

All responsible parties listed below are to help ensure compliance with applicable policies and procedures set forth in this Directive.

A.    The *Chief Privacy Officer* is the senior official within the Department with primary responsibility for privacy compliance and policy.

B.    The *Officer for Civil Rights and Civil Liberties (CRCL)* directs and oversees the implementation of the integration of civil rights and civil liberties across the Department and has the delegated authority to issue this Directive and Instruction.

C.    The *General Counsel* is responsible for ensuring legal compliance and has final authority and responsibility for legal policy determinations within the Department and its Components.

D.    The *Component Heads* with any Section 1367 information that might be shared will implement and execute all applicable policies and procedures set forth in this directive, and will develop any necessary implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other Instruction, or national or departmental policy.

2

Directive # 002-02
Revision # 00

PYM-000220

E.      The *__Council on Combating Violence Against Women__* works to ensure policies and practices for combating violence again women and children are consistent Department-wide.  By identifying opportunities to build consensus on challenging issues across Components, sharing best practices, and coordinating efforts Department-wide, the Council supports the Department's missions of effectively administering the laws preventing violence against women and children.  The Council collects information on a quarterly basis and conduct after-action reviews on cases where exceptions have been applied to disclose information and where enforcement actions have been taken at sensitive locations.  The Council is also responsible for assisting in developing all implementing policies that are created by Components.

F.      The *__Federal Law Enforcement Training Center (FLETC)__* ensures the computer-based training module, *Alien Victims of Crimes:  Immigration Benefits and Confidentiality Protections, VAWA: Confidentiality and Immigration Relief,* is available to all Components through their Learning Management Systems and provides assistance to keep the training updated and current, as necessary.

## V.    Policy and Training Requirements

*Policy:*  The policy is comprised of three confidentiality requirements:

A.      All DHS officers and employees are generally prohibited from permitting use by or disclosure to anyone other than a sworn officer or employee of DHS, Department of State (DOS), or Department of Justice (DOJ) of any information relating to a beneficiary of a pending or approved application for victim-based immigration benefits, including a battered spouse waiver, VAWA self-petition, VAWA cancellation of removal or suspension of deportation case, or T or U nonimmigrant status, including the fact that they have applied for such benefits.  There are certain exceptions to the general nondisclosure requirement, such as information to be used solely for a legitimate national security purpose in a manner that protects the confidentiality of such information.  (Please note that different procedures apply for the disclosure of information to national security officials and can be found at Instruction 215-01-001, Disclosure of Section 1367 Information to National Security Officials for National Security Purposes).

B.      Adverse determinations of admissibility or deportability against an alien are not made using information furnished solely by prohibited sources associated with the battery or extreme cruelty, sexual assault, human trafficking or substantial physical or mental abuse, regardless of whether the alien has applied for VAWA benefits, or a T or U visa.  For more information on what qualifies as a VAWA benefit, refer to Instruction 002-02-001, Implementation of Section 1367 Provisions.  If a DHS employee receives adverse information about a victim of domestic violence, sexual assault, human trafficking or an enumerated crime from a prohibited source, DHS employees should treat the information as

3

Directive # 002-02
Revision # 00 1

inherently suspect and exercise all appropriate prosecutorial discretion with respect to pursuing the adverse information. Further, DHS employees receiving information solely from a prohibited source do not take action on that information unless there is an independent source of corroboration.

C.       DHS employees complete a certification of compliance in cases where enforcement actions leading to a removal proceeding are taken at sensitive locations, as required by INA 239(e) (8 U.S.C. 1229(e)). The certification includes the Notice to Appear, which affirms compliance with the Section 1367 Information and prohibited source provisions.

***Component requirements***:  Components with access to Section 1367 Information that might be shared with those outside of the DHS develop any necessary implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other instruction, or national or departmental policy. Components coordinate with the Council in the development of implementing policy. Moreover, any Component with access to Section 1367 Information creates ways to identify those individuals protected by Section 1367 confidentiality, such as through a Central Index System (CIS) database check, and develops safeguards to protect this information in the relevant systems.

***Training requirement***:  All DHS employees who, through the course of their work may come into contact with victim applicants or have access to information covered by 8 U.S.C. 1367 complete the *Alien Victims of Crimes:  Immigration Benefits and Confidentiality Protections, VAWA: Confidentiality and Immigration Relief,* which is currently on Component's Learning Management Systems (LMS). The VAWA Training was developed by the Federal Law Enforcement Training Center (FLETC) in collaboration with subject-matter experts from several DHS Components, including USCIS, ICE, and CBP. No later than 180 days after the enactment of this policy, and on an annual basis thereafter, the Component Heads, or his or her delegates, of CIS OMB, CRCL, USCIS, ICE, and CBP report to the Review Committee the rate of compliance for this training.

# VI.  Questions

Address any questions or concerns regarding this Directive to CRCL.


_____                    _____
Chris Cummiskey                                          Date
Acting Under Secretary for Management


4

Directive # 002-02
Revision # 00.1

FYM-000222

# Appendix G:  DHS Directive 002-02-001, Implementation of Section 1367 Information Provisions

Department of Homeland Security
DHS Directives System
Instruction Number: 002-02-001
Revision Number: 00.1
**Issue Date: 11/07/2013**
*Incorporating Change 1, 05/28/2019*
*Approved by Cameron Quinn, Officer for Civil Rights and Civil Liberties*

## IMPLEMENTATION OF SECTION 1367 INFORMATION PROVISIONS

## I.   Purpose

This Instruction implements the Department of Homeland Security (DHS) Directive 002-02, Implementation of Section 1367 Information Provisions.  In Section 810 of the Violence Against Women Reauthorization Act of 2013, Pub. L. 113-4, 127 Stat. 54 (2013), Congress amended Title 8, United States Code (U.S.C.), Section 1367, to require that the Attorney General, the Secretary of State and the Secretary of Homeland Security provide guidance consistent with the amendments it made to subsections (a) and (b) of 8 U.S.C. § 1367. See 8 U.S.C. § 1367(d).  This Instruction provides guidance as instructed by 8 U.S.C. 1367(d), as amended by Section 810 of the Violence Against Women Reauthorization Act of 2013, and DHS Directive 002-02.

## II.   Scope

This instruction applies throughout DHS, particularly those employees who work with applicants for victim-based immigration relief or who have access to protected information, such as United States Citizenship and Immigration Service (USCIS), Immigration and Customs Enforcement (ICE), and Customs and Border Protection (CBP).

## III.   References

A.     Public Law 103-322, "Violence Against Women Act (VAWA) of 1994"

B.     Public Law 106-386,"Victims of Trafficking and Violence Protection Act of 2000." (VTVPA)

C.     Public Law 109-162, "Violence Against Women and Department of Justice Reauthorization Act of 2005," Section 817, "VAWA Confidentiality Nondisclosure."(VAWA 2005)

D.     Public Law 113-4, "Violence Against Women Reauthorization Act of 2013," Section 810, "Disclosure of Information for National Security Purposes."  (VAWA 2013)

1

Instruction # 002-02-001
Revision # 00.1

E.    Title 8, U.S.C., Section 1367, "Penalties for disclosure of information" (originally enacted as Section 384 of the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996 (IIRIRA))

F.    Title 42, U.S.C., Section 13925(a)(4), "Definitions and grant provisions" (as redesignated and amended by Section 3 of VAWA 2013)

G.    Section 101(a)(51) of the Immigration and Nationality Act (INA) (8 U.S.C. 1101(a)(51))

H.    Section 239(e) of the Immigration and Nationality Act (8 U.S.C. 1229(e)), "Certification of compliance with restrictions on disclosure"

I.    Section 240A(b)(2) of the Immigration and Nationality Act (INA) (8 U.S.C. 1229(b)), "Cancellation of removal; adjustment of status"

J.    DHS Privacy Incident Handling Guidance (Jan. 26, 2012)

K.    Delegation 19004, Delegation of Authority to Implement Section 1367 Information

L.    Directive 002-02, Implementation of Section 1367 Information Provisions

## IV.  Definitions

A.    **U Nonimmigrant Status**:  U nonimmigrant status for victims of criminal activity designated in INA §101(a)(15)(U) (qualifying crimes) who have suffered substantial mental or physical abuse as a result of being a victim of criminal activity, possess information concerning the crime, and have been helpful, are being helpful, or are likely to be helpful to law enforcement and government officials in the investigation or prosecution of the criminal activity.  U status allows victims to remain in the United States for up to four years (or longer if a limited exception applies), receive work authorization, and, if certain conditions are met, apply for adjustment of status to that of a lawful permanent resident (LPR).

B.    **T Nonimmigrant Visa**:  T nonimmigrant status for victims of a severe form of trafficking in persons, as defined in section 103 of the TVPA of 2000, who are physically present in the United States on account of trafficking and who have complied with any reasonable requests for assistance in a law enforcement investigation or prosecution (with limited exceptions).  See INA 101(a)(15)(T).  T status allows victims of human trafficking to remain in the United States for up to four years (or longer if a limited exception applies), receive work authorization, and, if certain conditions are met, apply for adjustment of status to that of an LPR.

2

Instruction # 002-02-001
Revision # 00

FYM1-000224

C.   **VAWA Self-Petition(er)**:  Under VAWA, as amended, certain persons who have been battered or subjected to extreme cruelty by a qualifying relative may self-petition, allowing them to remain in the United States, apply for LPR status as an approved VAWA self-petitioner, and eventually apply for naturalization.  VAWA self-petitioners include:  the spouse, child or parent of an abusive U.S. citizen; the spouse or child of an abusive LPR; the conditional resident spouse or child of an abusive U.S. citizen or LPR; the spouse or child of an alien eligible for relief under the Cuban Adjustment Act, the Haitian Refugee Immigration Fairness Act, or the Nicaraguan Adjustment and Central American Relief Act; and the spouse or child eligible for suspension of deportation or cancellation of removal due to abuse by a U.S. citizen or LPR.  See INA 101(a)(51) (defining "VAWA self-petitioner").

D.   **VAWA Cancellation**:  Victims of domestic violence who are in removal proceedings may be eligible to apply for relief with the immigration court in the form of VAWA cancellation of removal.  See INA 240A(b)(2) (prescribing eligibility requirements).

E.   **Sensitive Location**:  Locations specified in INA § 239(e)(2), where if an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified below, the Notice to Appear (NTA) shall include a statement that the provisions of 8 U.S.C. 1367 have been complied with.  The locations specified include: domestic violence shelter, rape crisis center, supervised visitation center, family justice center, a victim services, or victim services provider, or a community-based organization.

Sensitive locations can also include a courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of section 101(a)(15) [8 U.S.C. § 1101(a)(15)].

F.   **Section 1367 Information**:

  1.   Any information relating to aliens who are seeking or have been approved for immigrant status as battered spouses, children and parents under provisions of the Violence Against Women Act (VAWA), as victims of a severe form of human trafficking who generally are cooperating with law enforcement authorities, or as aliens who have suffered substantial physical or mental abuse and are cooperating with law enforcement authorities.  This definition includes records or other information that do not specifically identify the individual as an applicant or beneficiary of the T Visa, U Visa, or VAWA protections.

Instruction # 002-02-001
Revision # 00

2.    Section 1367 covers information relating to beneficiaries of applications for a number of immigration benefits, not just the Form I-360 VAWA self-petition.  For the purpose of this guidance if an alien is the beneficiary of a pending or approved application for one or more of the victim-based benefits described below, the requirements of 8 U.S.C. 1367 will be followed:

a.    VAWA self-petitioner, which incorporates the following applications or petitions:

(1)    I-360 Self-petition - self-petitioners under INA sec. 204

(2)    I-751 Hardship waiver - battered spouse hardship waiver

(3)    VAWA CAA - abused Cuban Adjustment Act applicants

(4)    VAWA HRIFA - abused Haitian Refugee Immigration Fairness Act applicants

(5)    VAWA NACARA - abused Nicaraguan Adjustment and Central American Relief Act applicants

(6)    VAWA Suspension of Deportation

b.    VAWA Cancellation of Removal applicants under INA 240A(b)(2)

c.    I-914 T Nonimmigrant Status - victim of a severe form of trafficking in persons under INA 101(a)(15)(T)

d.    I-918 U Nonimmigrant Status - victim of certain serious criminal activity under INA 101(a)(15)(U).

## V.   Responsibilities

All responsible parties listed below are to help ensure compliance with applicable policies and procedures set forth in this instruction.

A.    The **_Chief Privacy Officer_** is the senior official within the Department with primary responsibility for privacy compliance and policy.

4

Instruction # 002-02-001
Revision # 00

PYM-000226

B.     The **_Officer for Civil Rights and Civil Liberties_** directs and oversees the implementation of the integration of civil rights and civil liberties across the Department, serving as the foundational DHS organization through which all Department-wide civil rights and civil liberties activities are overseen, defined, and measured.  The Officer for Civil Rights and Civil Liberties has the delegated authority from the Secretary to provide this single DHS policy on the implementation of Title 8, U.S.C., Section 1367 (VAWA/T/U confidentiality provisions).

C.     The **_General Counsel_** is responsible for ensuring legal compliance and has final authority and responsibility for legal policy determinations within the Department and its Components.

D.     The **_Component Heads_** with any Section 1367 information that might be shared implement and execute all applicable policies and procedures set forth in this instruction, and develop any necessary implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other instruction, or national or departmental policy.

E.     The **_Council on Combating Violence Against Women_** works to ensure that policies and practices for combating violence against women and children are consistent Department-wide.  By identifying opportunities to build consensus on challenging issues across Components, sharing best practices, and coordinating efforts Department-wide, the Council supports the Department's missions of effectively administering the laws preventing violence against women and children.  The Council collects information on a quarterly basis and conducts after-action reviews on cases where exceptions have been applied to disclose information and where enforcement actions have been taken at sensitive locations.  The Council is also responsible for assisting in developing all implementing policy that are created by Components.

F.     The **_Federal Law Enforcement Training Center (FLETC)_** serves as an interagency law enforcement training organization for 91 federal agencies and partner organizations.  It provides training to state, local, rural, tribal, territorial, and international law enforcement agencies.  FLETC ensures the computer-based training module, *Alien Victims of Crimes:  Immigration Benefits and Confidentiality Protections, VAWA: Confidentiality and Immigration Relief,* is available to all Components through their Learning Management Systems and provides assistance to keep the training updated and current, as necessary.

Instruction # 002-02-001
Revision # 00. 1

## VI.  Policy and Requirements

A.   *Policy*.

1.   **Disclosure of Protected Information Generally Prohibited**.

a.    This guidance serves as a reminder that all DHS officers and employees are generally prohibited from permitting use by or disclosure to anyone other than: a sworn officer or employee of DHS, the Department of State (DOS); or the Department of Justice (DOJ) of any information relating to a beneficiary of a pending or approved application for victim-based immigration benefits. This includes a battered spouse or child hardship waiver, VAWA self-petition, VAWA cancellation of removal or suspension of deportation case, or T or U nonimmigrant status, including the fact that they have applied for such benefits. Information that cannot be disclosed includes information about an individual contained in a DHS database as well as information that has not yet been included in a database, such as the location of a beneficiary.

b.    The nondisclosure requirement does not apply to disclosures of protected information within DHS or to DOJ or DOS for legitimate agency purposes.

c.    The nondisclosure provision provides protection as soon as a DHS employee has reason to believe that the alien may be the beneficiary of a pending or approved victim-based application or petition, and the limitation ends when the application for relief is denied and all opportunities for appeal of the denial have been exhausted.

d.    Exceptions:  There are specified exceptions to the general nondisclosure requirement allowing for disclosure of protected information in limited circumstances.

Statutory Exceptions.  The statute prescribes eight (8) exceptions to the general nondisclosure requirement:

(1)    For the disclosure of information in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under 13 U.S.C. section 8. This exception allows for the furnishing of tabulations and other statistical material that do not disclose the information reported by, or on behalf of, any particular respondent, and the making of special statistical compilations and surveys,

6

Instruction # 002-02-001
Revision # 00

PYM1-000228

for Federal, State, or local government agencies or "other public and private persons and agencies" – provided that no information furnished is "used to the detriment of any respondent or other person to whom such information relates."

(2)    For the disclosure of information to law enforcement officials to be used solely for a legitimate law enforcement purpose.  However, the authority to exercise this exception is subject to the Secretary's discretion.

(3)    In connection with judicial review of a Federal agency or court determination in a manner that protects the confidentiality of such information.  Please note, defense counsel in state cases may sometimes attempt to make the entire A-file discoverable; however, the entire file is not discoverable in its entirety under this exception.

(4)    If all the battered individuals in the case are adults and they have all waived the nondisclosure restrictions.

(5)    For the disclosure of information to Federal, State, and local public and private agencies providing benefits, to be used solely in making determinations of eligibility for public benefits under 8 U.S.C. section 1641(c).

(6)    For the disclosure to the Chairmen and Ranking Members of the Senate and House of Representatives Committees on the Judiciary, for the exercise of congressional oversight authority, "information on closed cases under this section in a manner that protects the confidentiality of such information and that omits personally identifying information (including locational information about individuals)."

(7)    For purposes of communicating, with the "prior written consent of the alien involved," with nonprofit, nongovernmental victims' services providers "for the sole purpose of assisting victims in obtaining victim services." The victim services providers receiving such referrals are bound by the nondisclosure requirements of Section 1367. Recall that Section 101(i) of the INA (8 U.S.C. section 1101(i)) mandates that DHS provide T nonimmigrants with a referral to an NGO "that would advise the alien regarding the alien's options while in the United States and the resources available to the alien."

7

Instruction # 002-02-001
Revision # 00

33

(8)    The disclosure of information to national security officials to be used solely for a legitimate national security purpose in a manner that protects the confidentiality of such information. (Please note that different procedures apply for the disclosure of information to national security officials and can be found at Instruction 215-01-001, Disclosure of Section 1367 Information to National Security Officials for National Security Purposes.

For instances where an official is uncertain whether an exception applies or where questions exist about a particular exception, local counsel's office should be consulted.

e.    Nonstatutory Exceptions. In addition to the enumerated statutory exceptions, there may be instances in which disclosure of protected information is mandated by court order or constitutional requirements. For example, disclosure may be required in a federal, state, or local criminal proceeding for purposes of complying with constitutional obligations to provide exculpatory and impeachment material that is relevant either to guilt or punishment of a criminal defendant in a federal criminal proceeding ("Brady" material) or that bears upon the credibility of a prosecution witness ("Giglio" material). If DOJ or a state or local prosecutor requests protected information that is not subject to disclosure under one of the statutory exceptions and that will be disclosed to a court or another agency (other than DOS), please consult DHS counsel. DHS counsel are consulted if a Member of Congress not described in the congressional oversight exception in Section 1367(b)(6) is requesting protected information pursuant to his or her congressional oversight authority.

f.    Notification of Unauthorized Disclosures: In the event that any Component (1) discloses Section 1367 information in a manner inconsistent with the provisions above or (2) is informed by the recipient of Section 1367 information that the recipient has disclosed that information in an unauthorized manner, the Component Head for that Component (1) notifies the Chief Privacy Officer and the Officer for Civil Rights and Civil Liberties as soon as is practicable, but in no event later than twenty-four hours after discovery of the unauthorized disclosure, and (2) satisfies the requirements of the DHS Privacy Incident Handling Guidance.

8

Instruction # 002-02-001
Revision # 00

2.    **Use of Information from Prohibited Sources**:

a.    Section 1367 also prohibits DHS officers and employees from making an adverse determination of admissibility or deportability against an alien using information furnished solely by a prohibited source associated with the battery or extreme cruelty, sexual assault, human trafficking or substantial physical or mental abuse, regardless of whether the alien has applied for VAWA benefits, or a T or U nonimmigrant status.

b.    Prohibited Sources.  The following are prohibited sources for purposes of this guidance:

(1)    A spouse or parent who battered the alien or subjected the alien to extreme cruelty,

(2)    A member of the spouse's or parent's family residing in the same household as the abusive spouse or parent,

(3)    A spouse or parent who battered the alien's child or subjected the alien's child to extreme cruelty (unless the alien actively participated in the battery or extreme cruelty),

(4)    A member of the spouse's or parent's family residing in the same household as the alien who has battered the alien's child or subjected the alien's child to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty),

(5)    In the case of an alien who is applying for a U visa, the perpetrator of the substantial physical or mental abuse and the criminal activity, and

(6)    In the case of an alien who is applying for a T visa, Continued Presence, or immigration relief as a VAWA self-petitioner, the trafficker or perpetrator.

9

Instruction # 002-02-001
Revision # 00

PYM-000231

c.      This prohibited source restriction does not apply to an alien who has been convicted of a crime listed in INA section 237(a)(2). Such crimes include:  crime involving moral turpitude, aggravated felony, human trafficking, failure to register as a sex offender under 18 U.S.C. section 2250, certain controlled substance violations, certain firearms offenses, and certain domestic violence, child abuse, stalking, protection order violation offenses.  Consultation with counsel to determine if this exception applies is recommended before making a determination whether this exception applies.

d.      The lack of a pending or approved VAWA self-petition does not necessarily mean that the prohibited source provisions do not apply and that the alien is not a victim of battery or extreme cruelty. Similarly, although the prohibited source prohibition with respect to T or U nonimmigrant status applies only to applicants for such relief, the victim might be in the process of preparing an application. Accordingly, whenever a DHS officer or employee receives adverse information from a spouse, family member of a spouse, or unknown private individual, the employee will check the Central Index System (CIS) for the COA "384" flag.  Employees will be sensitive to the fact that the alien at issue may be a victim and that a victim-abuser dynamic may be at play.

e.      Receipt of Information from a Prohibited Source

    (1)      There are a number of ways DHS employees might receive "tips" from an abuser or an abuser's family, such as:  calling ICE to report the victim as illegal, a "landlord" (who may actually be a human trafficker) calling ICE to report that his "tenants" are undocumented, or providing information to USCIS rebutting the basis for the victim's application.  When a DHS employee receives adverse information about a victim of domestic violence, sexual assault, human trafficking or an enumerated crime from a prohibited source, DHS employees treats the information as inherently suspect.  In deciding whether to pursue an investigation or enforcement action, DHS employees should consider all serious adverse factors.  These factors include: national security concerns; evidence the alien has a serious criminal history; is involved in a serious crime; poses a threat to public safety (in fact, if the alien has been convicted of a crime listed in INA 237(a)(2); the prohibited source protections do not apply at all).  Other adverse factors include evidence the alien is a human rights violator or has engaged in significant immigration fraud.  In the absence of these or other serious adverse factors, exercising favorable

10

discretion, such as not pursuing allegations of fraud from a prohibited source, is appropriate.

(2)    An assertion of fraud by the prohibited source, such as an accusation that the marriage is fraudulent, ordinarily will not serve as the sole basis for adverse action.  Abusers often claim their marriage is fraudulent in order to exact revenge or exert further control over the victim.

f.    Corroborating Information Furnished Solely By Prohibited Source:  If a DHS employee receives information solely from a prohibited source that he or she wishes to corroborate and take action on, the DHS employee finds an independent source for the information and adheres to the following procedures:

(1)    DHS employees document in the A-file specifically what information they received, from whom they received the information, and what adverse factors about the alien exist to justify pursuing action in the case;

(2)    The above information is presented to the DHS employee's immediate supervisor for review and approval;

(3)    If the supervisor determines it is appropriate to pursue action in the case and authorizes such action, the responsible Component shares details about the action with the section 1367 information and Victim Safety Provisions Review Committee (the "Review Committee") on a quarterly basis, but always _after_ such action is taken;

(4)    The Review Committee is a subcommittee of the DHS Council for Combating Violence Against Women and Girls and consists of subject matter representatives from DHS Policy, CRCL, CIS OMB, ICE, CBP, USCIS and OGC.  The Review Committee reviews the information to help ensure compliance with this policy.

3.    **Sensitive Location Certification of Compliance Requirement**:

a.    In general, in cases where an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified in subparagraph b below, the Notice to Appear includes a statement that the provisions of 8 U.S.C. section 1367 have been complied with.

11

Instruction # 002-02-001
Revision # 00

b.    Locations requiring certification in accordance with INA section 239(e) are:

(1)    A domestic violence shelter, a rape crisis center, supervised visitation center, family justice center, a victim services provider, or a community-based organization.

(2)    A courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, human trafficking, or stalking in which the alien has been battered or subject to extreme cruelty, or if the alien may be eligible for T or U nonimmigrant status.

c.    DHS officers and employees comply with the section 239(e) certification requirement even if the alien has not applied for or does not intend to apply for a victim-based application or petition.

d.    Section 239(e) requires the relevant DHS agency to certify that the agency has independently verified the inadmissibility or deportability of an alien who was encountered at these sensitive locations.

Accordingly, before issuing an Notice to Appear (NTA) (with the requisite section 239(e) certification of compliance with 8 U.S.C. section 1367) to an alien against whom an enforcement action leading to a removal proceeding was taken at a sensitive location, DHS employees record on the Form I-213:  (1) the sensitive location at which the enforcement action was taken; (2) whether information related to the alien's admissibility or deportability was supplied by a prohibited source; (3) whether and to what extent such information was independently verified; and (4) an acknowledgement of compliance with the nondisclosure requirements.

e.    The certification of compliance is completed by an officer or agent authorized to issue NTAs after reviewing the information contained in the I-213 and confirming that all section 1367 provisions and policy were followed.

(1)    If a DHS employee suspects that the provisions and relevant policy were not followed, the employee immediately brings the issue to the attention of his or her immediate supervisor rather than issuing the NTA.

12

Instruction # 002-02-001
Revision # 00

(2)    If the provisions and policies appear to have been followed, the DHS officer or agent should type or print the following on the NTA, "I certify that, to the best of my knowledge and belief, I have complied with the provisions of 8 U.S.C. § 1367."

(3)    Knowingly making a false certification of compliance may subject the officer or employee to civil penalties and/or disciplinary action under 8 U.S.C. § 1367(c). For more information, see Section VII, Penalties, below.

f.    Aliens encountered at sensitive locations may be beneficiaries of pending or approved applications for benefits. DHS officers encountering individuals at such locations and considering an enforcement action verify, to the fullest extent reasonably practicable, whether a particular alien is a victim who falls within the protection of the section 1367 provisions.

(1)    While INA 239(e) does not prohibit arrests of aliens at sensitive locations, it is clear that Congress intended that arrests of aliens at such locations to be handled properly given that they may ultimately benefit from VAWA's provisions.

(2)    DHS officers and employees are strongly encouraged to exercise prosecutorial discretion favorably in cases of aliens encountered at the sensitive locations, unless other exigent circumstances exist, including terrorism or other extraordinary reasons for arresting aliens at a sensitive location.

g.    If a DHS employee is unsure whether a particular personal encounter or apprehension requires a certification of compliance under INA section 239(e), the employee consults with his supervisory chain and, if authorized in accordance with the office's or Component's protocols, the relevant counsel's office and/or the Office for Civil Rights and Civil Liberties (CRCL).

B.    **Component requirements**: With regard to the above Section 1 (Disclosure of Protected Information Generally Prohibited), Section 2 (Use of Information from Prohibited Sources), and Section 3 (Sensitive Location Certification of Compliance Requirement), Components will meet the following requirements, when applicable.

13

Instruction # 002-02-001
Revision # 00

PTM-000235

1.    Requirement to Create Implementing Policy:  Any Component with access to Section 1367 information that might be shared with those outside of the Department develops any necessary implementing instructions or other policy guidance to the extent permitted by and consistent with their authorities and any restrictions imposed by statute, executive order, presidential or other instruction, or national or departmental policy.  Components coordinate with the Council in the development of implementing policy.

2.    Requirement to Identify Those Protected:  Components establish, to the fullest extent reasonably practicable, means of identifying individuals protected by Section 1367 confidentiality and will take steps to develop safeguards to protect this information in the relevant systems.  One such way to help identify most, though not all, of those protected is through a Central Index System (CIS) database check.

    a.    CIS database check:  For any cases where it is suspected that an alien is an applicant for a benefit protected by section 1367, a DHS employee consults the Central Index System (CIS) database to verify whether an alien has a pending or approved application or petition covered by section 1367.

    b.    CIS contains a class of admission (COA) code "384" (signifying section 384 of IIRIRA) that was created to alert DHS personnel that the individual is protected by section 1367.  Information about the location, status, or other identifying information of any individual with the code "384" may not be released outside of DHS, DOJ, or DOS unless one or more of the exceptions applies or the individual has been denied relief and has exhausted all opportunities for appeal.

        (1)    When an individual files a VAWA self-petition (Form I-360), T nonimmigrant application (Form I-914, Form I-914 Supplement A), or U nonimmigrant petition (Form I-918, Form I-918 Supplement A) with USCIS, the COA in CIS will be updated to "384."

14

Instruction # 002-02-001
Revision # 00

(2)    Aliens granted these victim-based immigration
benefits remain protected by Section 1367 and the COA will
likely be changed from "384". Any following COA in CIS is
an indication that the individual was granted a form of relief
that is covered by Section 1367 and the confidentiality
provisions apply: T-1, T-2, T-3, T-4, T-5, U-1, U-2, U-3, U-4,
U-5, B11, B12, B16, B17, B20, B21, B22, B23, B24, B25,
B26, B27, B28, B29, B31, B32, B33, B36, B37, B38, BX1,
BX2, BX3, BX6, BX7, BX8, IB0, IB1, IB2, IB3, IB4, IB5, IB6,
IB7, IB8, ST0, ST6, ST7, ST8, ST9, SU0, SU6, SU7, SU8,
SU9, Z14.

C.    **_Training requirement_**: All DHS employees who, through the course of
their work, may come into contact with victims or have access to information
covered by 8 U.S.C. section 1367 are required to complete the computer-based
training module, _Alien Victims of Crimes: Immigration Benefits and
Confidentiality Protections,_ ~~VAWA: Confidentiality and Immigration Relief,~~, which
is currently on the Component's Learning Management Systems (LMS). The
VAWA Training was developed by the Federal Law Enforcement Training Center
(FLETC) in collaboration with subject-matter experts from several DHS
components, including USCIS, ICE and CBP. No later than 180 days after the
enactment of this policy, and on an annual basis thereafter, Component Heads,
or his or her delegates, of CIS OMB, CRCL, USCIS, ICE and CBP report to the
Review Committee the rate of compliance for this training. FLETC ensures the
training module is available to all Components through their LMS and provides
assistance to keep the training updated and current, as necessary.

D.    **_Penalties_**: The law provides for civil penalties and/or disciplinary action
for certain violations of 8 U.S.C. section 1367 and INA section 239(e): "Anyone
who willfully uses, publishes, or permits information to be disclosed in violation of
[8 U.S.C. section 1367] or who knowingly makes a false certification under
section 239(e) of the [INA] shall be subject to appropriate disciplinary action and
subject to a civil money penalty of not more than $5,000 for each such violation."
8 U.S.C. section 1367(c).

Violations of Section 1367 could give rise to serious, even life-threatening,
dangers to victims and their family members. Violations compromise the trust
victims have in the efficacy of services that exist to help them and, importantly,
may unwittingly aid perpetrators retaliate against, harm or manipulate victims and
their family members, and elude or undermine criminal prosecutions.

15

PYM-000237

## VII. Questions and Reporting

A.    To report any suspected violations of 8 U.S.C. section 1367 or INA section 239(e) or this policy instruction, please contact the Office for Civil Rights and Civil Liberties:

1.    *E-mail:* CRCLCompliance@hq.dhs.gov
2.    *Telephone:* 202-401-1474
3.    *Fax:* 202-401-4708
4.    *U.S. Postal Mail:*
      U.S. Department of Homeland Security
      Office for Civil Rights and Civil Liberties
      Compliance Branch
      245 Murray Lane, SW
      Building 410, Mail Stop #0190
      Washington, D.C. 20528

B.    Address any questions or concerns regarding this Instruction to CRCL.

_____          _____
Megan Mack                                        11/7/13
Officer for Civil Rights and Civil Liberties         Date

16

Instruction # 002-02-001
Revision # 00

# Appendix H:  Guidelines for Enforcement Actions In or Near Protected Areas



Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528

**Homeland Security**

October 27, 2021

MEMORANDUM TO:    Tae D. Johnson
Acting Director
U.S. Immigration and Customs Enforcement

Troy A. Miller
Acting Commissioner
U.S. Customs and Border Protection

Ur M. Jaddou
Director
U.S. Citizenship and Immigration Services

Robert Silvers
Under Secretary
Office of Strategy, Policy, and Plans

Katherine Culliton-González
Officer for Civil Rights and Civil Liberties
Office of Civil Rights and Civil Liberties

Lynn Parker Dupree
Chief Privacy Officer
Privacy Office

FROM:    Alejandro N. Mayorkas
Secretary

SUBJECT:    **Guidelines for Enforcement Actions in or Near Protected Areas**

This memorandum provides guidance for ICE and CBP enforcement actions in or near areas that require special protection.  It is effective immediately.

This memorandum supersedes and rescinds John Morton's memorandum entitled, "Enforcement Actions at or Focused on Sensitive Locations" (number 10029.2, dated October 24, 2011), and David Aguilar's memorandum entitled, "U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations" (dated January 18, 2013).

1

FYM-000239

## I.     Foundational Principle

In our pursuit of justice, including in the execution of our enforcement responsibilities, we impact people's lives and advance our country's well-being in the most fundamental ways. It is because of the profound impact of our work that we must consider so many different factors before we decide to act. This can make our work very difficult. It is also one of the reasons why our work is noble.

When we conduct an enforcement action – whether it is an arrest, search, service of a subpoena, or other action – we need to consider many factors, including the location in which we are conducting the action and its impact on other people and broader societal interests. For example, if we take an action at an emergency shelter, it is possible that noncitizens, including children, will be hesitant to visit the shelter and receive needed food and water, urgent medical attention, or other humanitarian care.

To the fullest extent possible, we should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities. Such a location is referred to as a "protected area."

This principle is fundamental. We can accomplish our enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more. Adherence to this principle is one bedrock of our stature as public servants.

## II.     Protected Areas

Whether an area is a "protected area" requires us to understand the activities that take place there, the importance of those activities to the well-being of people and the communities of which they are a part, and the impact an enforcement action would have on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there. It is a determination that requires the exercise of judgment.

The following are some examples of a protected area. The list is not complete. It includes only examples:

- A school, such as a pre-school, primary or secondary school, vocational or trade school, or college or university.

- A medical or mental healthcare facility, such as a hospital, doctor's office, health clinic, vaccination or testing site, urgent care center, site that serves pregnant individuals, or community health center.

- A place of worship or religious study, whether in a structure dedicated to activities of faith (such as a church or religious school) or a temporary facility or location where such activities are taking place.

2

- A place where children gather, such as a playground, recreation center, childcare center, before- or after-school care center, foster care facility, group home for children, or school bus stop.

- A social services establishment, such as a crisis center, domestic violence shelter, victims services center, child advocacy center, supervised visitation center, family justice center, community-based organization, facility that serves disabled persons, homeless shelter, drug or alcohol counseling and treatment facility, or food bank or pantry or other establishment distributing food or other essentials of life to people in need.

- A place where disaster or emergency response and relief is being provided, such as along evacuation routes, where shelter or emergency supplies, food, or water are being distributed, or registration for disaster-related assistance or family reunification is underway.

- A place where a funeral, graveside ceremony, rosary, wedding, or other religious or civil ceremonies or observances occur.

- A place where there is an ongoing parade, demonstration, or rally.

We need to consider the fact that an enforcement action taken near – and not necessarily in – the protected area can have the same restraining impact on an individual's access to the protected area itself. If indeed that would be the case, then, to the fullest extent possible, we should not take the enforcement action near the protected area. There is no bright-line definition of what constitutes "near." A variety of factors can be informative, such as proximity to the protected area, visibility from the protected area, and people's behavioral patterns in and around the protected area. The determination requires an analysis of the facts and the exercise of judgment.

The fundamental question is whether our enforcement action would restrain people from accessing the protected area to receive essential services or engage in essential activities. Our obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area thus applies at all times and is not limited by hours or days of operation.

Whether an enforcement action can be taken in or near a courthouse is addressed separately in the April 27, 2021 Memorandum from Tae Johnson, ICE Acting Director, and Troy Miller, CBP Acting Commissioner, entitled "Civil Immigration Enforcement Actions in or Near Courthouses," which remains in effect.

III.    Exceptions and Limitation on Scope

The foundational principle of this guidance is that, to the fullest extent possible, we should not take an enforcement action in or near a protected area. The phrase "to the fullest extent possible" recognizes that there might be limited circumstances under which an enforcement action needs to be taken in or near a protected area. The following are some examples of such limited circumstances:

3

PYM-000241

- The enforcement action involves a national security threat.

- There is an imminent risk of death, violence, or physical harm to a person.

- The enforcement action involves the hot pursuit of an individual who poses a public safety threat.

- The enforcement action involves the hot pursuit of a personally observed border-crosser.

- There is an imminent risk that evidence material to a criminal case will be destroyed.

- A safe alternative location does not exist.

This list is not complete. It includes only examples. Here again, the exercise of judgment is required.

Absent exigent circumstances, an Agent or Officer must seek prior approval from their Agency's headquarters, or as you otherwise delegate, before taking an enforcement action in or near a protected area. If the enforcement action is taken due to exigent circumstances and prior approval was therefore not obtained, Agency headquarters (or your delegate) should be consulted post-action. To the fullest extent possible, any enforcement action in or near a protected area should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area.

Enforcement actions that are within the scope of this guidance include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance. This guidance does not apply to matters in which enforcement activity is not contemplated. As just one example, it does not apply to an Agent's or Officer's participation in an official function or community meeting.

This guidance does not limit an agency's or employee's statutory authority, and we do not tolerate violations of law in or near a protected area.

## IV.    Training and Reporting

Please ensure that all employees for whom this guidance is relevant receive the needed training. Each of your respective agencies and offices should participate in the preparation of the training materials.

Any enforcement action taken in or near a protected area must be fully documented in your Agency's Privacy Act-compliant electronic system of record in a manner that can be searched and validated. The documentation should include, for example, identification of the protected area; the reason(s) why the enforcement action was taken there; whether or not prior approval was obtained and, if not, why not; the notification to headquarters (or headquarters' delegate) that occurred after an action was taken without prior approval; a situational report of what

4

PYM-000242

occurred during and immediately after the enforcement action; and, any additional information that would assist in evaluating the effectiveness of this guidance in achieving our law enforcement and humanitarian objectives.

## V.    Statement of No Private Right Conferred

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

5


 **Official websites use .gov**
A **.gov** website belongs to an official government organization
in the United States.

🔒 **Secure .gov websites use HTTPS**
A **lock** ( 🔒 ) or **https://** means you've safely connected to the
.gov website. Share sensitive information only on official,
secure websites.



Call **1-866-DHS-2-ICE**

Report Crime

ICE    WHO WE ARE    ENFORCEMENT AND REMOVAL OPERATIONS

# Protected Areas and Courthouse Arrests

## Webpage under construction

This page contains information that is outdated. It is being revised
in accordance with new policy guidance as of Jan. 21, 2025.

Case 8:25-cv-00243-TDC     Document 49-2     Filed 02/11/25     Page 400 of 405
PTM-000256



*The independent source for health policy research, polling, and news.*

# Understanding the U.S. Immigrant Experience: The 2023 KFF/LA Times Survey of Immigrants

**Shannon Schumacher** (https://www.kff.org/person/shannon-schumacher/),

**Liz Hamel** (https://www.kff.org/person/liz-hamel/),

**Samantha Artiga** (https://www.kff.org/person/samantha-artiga/),

**Drishti Pillai** (https://www.kff.org/person/drishti-pillai/),

**Ashley Kirzinger** (https://www.kff.org/person/ashley-kirzinger/),

**Audrey Kearney** (https://www.kff.org/person/audrey-kearney/),

**Marley Presiado** (https://www.kff.org/person/marley-presiado/), Ana Gonzalez-Barrera, and

**Mollyann Brodie** (https://www.kff.org/person/mollyann-brodie/)

**Published: Sep 17, 2023**

## Overview

The Survey of Immigrants, a partnership between KFF and *The Los Angeles Times*, takes an in-depth look at the experiences of immigrants, a diverse group that makes up 16% of the U.S. adult population. Immigrants play an important role in the nation's workforce and culture, and they also face unique experiences and struggles in their communities, workplaces, and health care settings. Nonetheless, they overwhelmingly express optimism about their futures in the U.S. and have high hopes for their children.

The survey is the largest nationally representative survey focused on immigrants, interviewing 3,358 immigrant adults in 10 languages. The results provide a deep understanding of immigrants' experiences, reflecting their varied countries of origin and histories, immigration statuses, racial

White House has said, for example, that ICE would not conduct raids and its officers would prioritize immigrants with criminal records and who are gang members. But the quotas issued this weekend would place ICE officers under more pressure to seize a wider range of potential deportees to avoid reprimand, including immigrants who have not committed crimes.

Neither ICE nor Homan responded to requests for comment. After an earlier version of this article was published, White House press secretary Karoline Leavitt said in an email that, "your story is false," but did not reply when asked for specifics.

Homan told ABC News in an interview broadcast Sunday that the administration is "in the beginning stages" of its mass deportation plan, and while public safety threats and national security threats are a priority, "as that aperture opens, there'll be more arrests nationwide."

ICE announced in a statement Sunday that agents "began conducting enhanced targeted operations today in Chicago," with help from other federal agencies, including the FBI. Acting Homeland Security secretary Benjamine C. Huffman last week revoked a directive that had essentially barred ICE from arresting immigrants in or around sensitive areas such as schools, hospitals and churches.

Later Sunday, Homan appeared on a streaming service with Phil McGraw, the television doctor known as Dr. Phil, to emphasize that ICE is searching for specific immigrants who have committed crimes.

"Sweeps don't occur anywhere," Homan told McGraw, whose MeritTV said they were inside the ICE Command Center in Chicago.

**How Donald Trump's deportation crackdown could unfold**

The Washington Post examined which groups of immigrants could be at higher risk of deportation under the second Trump administration, and what logistical and financial obstacles stand in the way.

An ICE official who was not authorized to discuss the quota said the agency's list of criminal suspects was sufficiently long, so officers would be able to continue prioritizing public safety and national security threats to meet quotas.

Last year, ICE told lawmakers there were about 670,000 immigrants on its caseload who had criminal convictions or faced criminal charges. Some are serving sentences in jails and prisons.

But Paul Hunker, a former ICE chief counsel in Dallas, said arresting serious offenders takes time, staff and planning — more time than quotas might allow.

"Quotas will never be a reason to arrest or detain people who are not dangerous noncitizens," said Hunker, who, as the agency's chief counsel in Dallas, oversaw offices in North Texas and Oklahoma from 2003 through January 2024.

"I've just never heard of that," he said, referring to the quotas.

The agency manages a docket of about 7.8 million people who potentially face deportation, but many of them have pending claims in the U.S. immigration system or a form of provisional residency status. ICE's caseload more than doubled during Joe Biden's presidency amid record numbers of illegal border crossings.

ICE officers deployed aggressively during President Donald Trump's first week in office, boosting the number of immigrants taken into custody from fewer than 400 on Tuesday to nearly 600 on Friday. The number declined to 286 on Saturday, according to ICE.

Trump's supporters and others have pointed out that those totals will not yield the "millions" of deportations the president has promised.

Trump made a similar promise during his first term and came up far short, reaching a peak of about 267,000 during the 2019 fiscal year. The Biden administration deported 271,000 in fiscal year 2024, the highest annual total in a decade. Trump has long had little patience for explanations of why his goals are not realistic.

ICE officers have been told for years that indiscriminate roundups are unsafe and counterproductive, because they spread panic throughout immigrant communities and produce significant public backlash. ICE and the White House did not immediately respond to requests for comment.

Trump officials have told ICE the president expects arrest operations to proceed around-the-clock and that officers should cancel personal leave, according to the four people briefed on the directives.

ICE has about 5,500 officers nationwide working on immigration enforcement, a staffing level that has remained roughly flat for the past decade. The Trump administration took steps to supplement those numbers by deputizing officers and agents at the Justice Department to investigate immigration violations and make arrests, enlisting personnel from the FBI, U.S. Marshals, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms and Explosives and the Federal Bureau of Prisons.

**Trump presidency**

Follow live updates on the Trump administration. We're tracking Trump's progress on campaign promises and his picks for key administration roles.

Case 8:25-cv-00243-TDC    Document 49-2    Filed 02/11/25    Page 403 of 405
PTM-000315



 Print     Close

# Trump DHS repeals key Mayorkas memo limiting ICE agents, orders parole review

By Adam Shaw, Bill Melugin

Published January 21, 2025

Fox News

**EXCLUSIVE**: The Department of Homeland Security (DHS) on Monday issued memos to repeal limits on Immigration and Customs Enforcement (ICE) agents imposed by former DHS Secretary Alejandro Mayorkas -- and order a review of the use of humanitarian parole to admit migrants.

The first memo, a draft of which was reviewed by Fox News, rescinds a 2021 memo by Mayorkas, which provided an expanded list of areas that are "protected areas" where ICE could not engage in immigration enforcement. It said the policy was designed to make sure enforcement did not limit "people's access to essential services or engagement in essential activities."

Those areas include schools, universities, healthcare facilities, places of worship, "places where children gather," social service establishments, food banks, religious or civil ceremonies and disaster or emergency response and relief centers.

"In our pursuit of justice, including in the execution of our enforcement responsibilities, we impact people's lives and advance our country's well-being in the most fundamental ways. As a result, when conducting an enforcement action, ICE and CBP agents and officers must first examine and consider the impact of where actions might possibly take place, their effect on people, and broader societal interests," Mayorkas said in a statement at the time.

**'NATIONAL EMERGENCY': TRUMP DECLARES AMBITIOUS ILLEGAL IMMIGRATION CRACKDOWN IN INAUGURAL ADDRESS**



President Trump presents the second executive order during the inaugural parade inside Capital One Arena on the inauguration day of his second presidential term, in Washington, D.C., on Jan. 20, 2025. (REUTERS/Carlos Barria)

The memo issued Monday rescinded that guidance and said that common sense should be used instead.

"Going forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense," the new memo said. "It is not necessary, however, for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced."

ICE agents who spoke to Fox News said they believe that rescinding the Mayorkas order is going to free them up to go after more illegal immigrants, because illegal immigrants have until now been able to hide near schools and churches and avoid arrest.

**TRUMP TO DEPLOY MILITARY TO BORDER, END BIDEN PAROLE POLICIES IN FLURRY OF DAY 1 EXECUTIVE ORDERS**

A separate memo, also reviewed by Fox, focuses on the use of humanitarian parole, which was used broadly by the Biden administration to allow hundreds of thousands of migrants to enter the U.S., including nearly 1.5 million via the CBP One app and parole processes for nationals from Cuba, Haiti, Nicaragua and Venezuela (CHNV.) The administration also launched parole programs for nationals from Ukraine and Afghanistan.

The memo notes that the statute demands the authority be used on a "case by case basis," something that Republican critics claim the administration has abused. It emphasizes that parole is "a limited use authority, applicable only in a very narrow set of

PYM-000516

circumstances."



ICE agents conduct an enforcement operation in the U.S. interior on June 2, 2022. (Immigration and Customs Enforcement)

It also claims that "it has been repeatedly abused by the Executive Branch over the past several decades in ways that are blatantly inconsistent with the statute."

**CLICK HERE FOR MORE IMMIGRATION COVERAGE**

"Most important, the parole statute does not authorize categorical parole programs that make aliens presumptively eligible on the basis of some set of broadly applicable criteria," it says.

The memo directs the heads of (ICE) and Customs and Border Protection (CBP) to compile a list of instructions, policies and procedures related to parole, review them, and formulate a plan to phase out any that are not in accord with the statute.

They will then provide a report to the DHS secretary, while also pausing, modifying or ending any programs that they believe were not enacted properly, and that they can do in a way that is consistent with statutes, regulations and court orders.

The memos came just hours after Trump signed a slew of 10 border-related executive orders, including orders deploying the military to the border, ending Biden's parole programs and ending birthright citizenship for children of illegal immigrants.

**CLICK HERE TO GET THE FOX NEWS APP**

The orders also declare a national emergency, and order the resumption of construction of the wall at the southern border.

"All illegal entry will immediately be halted," Trump said moments after being inaugurated. "And we will begin the process of returning millions and millions of criminal aliens back to the places from which they came."

Adam Shaw is a politics reporter for Fox News Digital, primarily covering immigration and border security.

He can be reached at adam.shaw2@fox.com or on Twitter.

       Print     ⊗ Close

---

**URL**
https://www.foxnews.com/politics/trump-dhs-repeals-key-mayorkas-memo-limiting-ice-agents-orders-review-parole-use

---

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.Do Not Sell my Personal Information - New Terms of Use - FAQ

**The New York Times**

https://www.nytimes.com/2025/01/30/us/immigrant-communities-hiding-ice.html

# Immigrant Communities in Hiding: 'People Think ICE Is Everywhere'

Schools, churches and shops are feeling the chilling effect of the fear of deportation. One minister said fewer congregants were showing up for services.

 ▶ **Listen to this article · 9:14 min** Learn more

  

**By Miriam Jordan, Hamed Aleaziz and Heather Knight**

Miriam Jordan reported from Los Angeles, Hamed Aleaziz from Washington and Heather Knight from San Francisco.

Jan. 30, 2025

At a barbershop in Los Angeles, only one of the 10 chairs was occupied on what would ordinarily be a busy evening. In San Francisco, a middle school student's erroneous information about seeing an immigration officer on a city bus prompted the school district to send parents a warning.

In Chicago, a mistaken report that immigration agents showed up at a school set off panic that rippled across the country. At a church in Charlotte, N.C., more than a third of the usual congregants were absent from a recent evening service.

Hotlines set up by advocates for immigrants to report enforcement activity have experienced a spike in calls.

"The hysteria is out of control," said Patrick Garcia, executive director of Embrace All Latino Voices, a group in Charlotte, N.C.