# Exhibit 34

Newsweek SUBSCRIBE FOR $1 Login

# ICE Strikes During Church Service to Arrest Migrant

Published Jan 30, 2025 at 6:53 AM EST

By Billal Rahman
Live News Reporter
FOLLOW

24

A man was arrested by Immigration and Customs Enforcement (ICE) officers outside a church in Georgia while his family was inside during the service.

Newsweek SUBSCRIBE FOR $1

## Why It Matters

The Department of Homeland Security released a memo that reversed the Biden administration's policy of prohibiting U.S. Immigration and Customs Enforcement (ICE) agents from operating in or near schools, churches, and other "sensitive locations."

In a statement regarding the policy shift, a DHS spokesperson said that "criminals will no longer be able to hide in America's schools and churches to avoid arrest."

A U.S. Immigration and Customs Enforcement (ICE) officer looks on during an operation in Escondido, California.
**GREGORY BULL/AP**

Trump made immigration a central theme of his successful presidential campaign. Americans largely support immigration reform overall but disagree about how policies such as deportations should be carried out.

Newsweek SUBSCRIBE FOR $1

*New York Times* and Ipsos from January 2 to 10 found that 55 percent of voters strongly or somewhat supported such plans. Eighty-eight percent supported "deporting immigrants who are here illegally and have criminal records."

Large majorities of both Democrats and Republicans agreed that the immigration system is broken.

## What To Know

Kenia Colindres told Channel 2 that her husband, Wilson Rogelio Velasquez Cruz, was arrested during service at Iglesia Fuente de Vida in Tucker.

READ MORE ICE

ICE Agents' Morale 'Extremely High' Amid Surge in Raids

Donald Trump May Slash TSA To Pay For ICE Deportations: Report

How Many Migrants Have Been Arrested or Deported in Trump's First Week?

ICE Raids New York City

Colindres told local news that she, her husband and three children were in the church when her husband received a call during the service, but chose not to answer it. Moments later, his immigration GPS ankle monitor began alarming. Worried about the disturbance, she advised him to step outside to check it. As soon as he did, ICE officers were waiting to take him into custody, according to WSBTV.

Colindres spoke with her husband on Monday, and he informed her that he could not appeal his case to a judge. He also told her he was being transferred to Stewart Detention Center before his deportation.

*Newsweek* understands Velasquez Cruz is currently in Stewart Detention Center.

Colindres said she doesn't know if she and her kids will be deported, too. According to NBC News, about 5,500 children were separated from their parents under the first Trump administration.

PYM-000350

Newsweek SUBSCRIBE FOR $1

asylum upon reaching the U.S. border.

Upon his arrival, Velasquez Cruz was fitted with an immigration GPS ankle monitor, a condition determined by ICE on a case-by-case basis. However, authorities have not yet revealed why he was required to wear it.

Velasquez Cruz held a five-year work permit and was employed at a tire shop, according to his wife.

Colindres claims that her husband has never been in legal trouble and is a devoted follower of faith. She is now concerned about their future, as Velasquez Cruz was the sole provider for their family while she stayed home to look after their children.

The ICE policy requiring agents to obtain prior approval before making arrests in sensitive locations was introduced in 2011 through a memo from then-Director John Morton. This policy remained in effect throughout the first Trump administration and continued under the Biden administration.

Under the policy, ICE agents were permitted to enter sensitive locations, such as schools, churches, and hospitals, only under specific circumstances.

These included addressing national security or terrorism threats, apprehending dangerous felons, preventing imminent risks of death or injury, or safeguarding evidence in a criminal investigation from being destroyed.

Agents were required to secure approval from their superiors before carrying out arrests in these sensitive locations.

## What People Are Saying

**David Hoag, president of the Council for Christian Colleges & Universities (CCCU), told *Newsweek*:** "The Council for Christian Colleges & Universities is dedicated to collaborating with the Trump administration to promote the safety and protection of religious freedom, especially on college campuses. While we agree that safety of all Americans is paramount, generating apprehension about attending church services stands as an obstacle to religious liberty and threatens long-standing and deeply valued religious traditions that are vital to Christian colleges and universities. The CCCU proudly acknowledges churches as sacred spaces for worship and asks the Trump administration to respect the religious freedom of sensitive spaces, including houses of worship, both in and outside Christian institutions."

empowers the brave men and women in CBP [Customs and Border Protection] and ICE to enforce our immigration laws and catch criminal aliens—including murders and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement and instead trusts them to use common sense."

## What Happens Next

It is expected that Velasquez Cruz will be deported by the Trump administration, although it remains to be seen for what specific crime or violation of immigration laws.

Fairness
Meter

Newsweek Is Committed To Journalism That's Factual And Fair.

Hold Us Accountable And Submit Your Rating Of This Article On The Meter.

Fair
Mostly Fair Left leaning
Mostly Fair Right leaning
Unfair Left leaning
Unfair Right leaning

Click On Meter
To Rate This Article

Request Reprint & Licensing

Submit Correction

View Editorial & AI Guidelines

RELATED PODCASTS

# Exhibit 35

Immigration

# ICE Says 'Sorry' After Detaining US Citizens for Speaking Spanish: Report

## "My sister, in English, explained that not only are they American citizens, but that they are from Puerto Rico, they were born in Puerto Rico"

**Allison Walker** / **Published** Jan 29 2025, 6:16 PM EST



A Puerto Rican family, all U.S. citizens, was wrongfully detained by ICE in Milwaukee after speaking Spanish.

A Puerto Rican family, including a toddler, was taken into custody by Immigration and Customs Enforcement (ICE) in Milwaukee after being overheard speaking Spanish; this incident is the latest in a surge of racial profiling concerns amid Trump's immigration crackdown.

The family, all U.S. citizens, were transported to a detention center before officials acknowledged their mistake and issued an apology.

The mother, grandmother, and young child had been shopping when authorities approached and detained them. They were not allowed to clarify their status until they were already in custody, according to Telemundo Puerto Rico.

PYM-000363

EXCLUSIVA
inmigracion
TM TELEVISIÓN, TELEMUNDO
DÍA A DÍA
View more on Instagram
833 likes
Add a comment...

"My sister, in English, explained that not only are they American citizens, but that they are from Puerto Rico. They were born in Puerto Rico," a family

surrounding the situation.

Upon presenting official documents, the officials reportedly softened their stance. "I'm so sorry," one officer said, according to the family's account. Despite the apology, the family was allegedly left stranded and had to arrange their own transportation home.

Instagram users reacted to Méndez's post with frustration.

(PHOTO: INSTAGRAM)

"At what store? Why didn't he give that information here? So you're shopping with a Birth Certificate on top of it?!... What is that!" One user questioned.

Another expressed disappointment in the political climate, commenting, "Thank you... What a shame that the people keep voting for colors and not values... it's going to get worse."



The situation gained traction after journalist Adrian Carrasquillo discussed the case on X, writing, "Another PUERTO RICAN family detained, a man tells Telemundo his sister, mother-in-law, & a child were taken by ICE in Milwaukee & driven to [a] facility where his sister explained that they're US CITIZENS. ICE response to this flagrant violation? 'Sorry.'"

Attorneys nationwide are now speaking out to educate immigrants and Black Indigenous People of Color about their rights when confronted by ICE, including the right to remain silent, the right to legal representation, and the

secure and on hand.

RELATED

- ICE Sets Target Of Raiding Three Cities A Week And Detaining Up to 1,500 Migrants a Day

- Schools in Los Angeles Distribute 'Know Your Rights' Cards to Help Immigrant Students 'Assert Constitutional Rights'

© 2025 Latin Times. All rights reserved. Do not reproduce without permission.

TAGS: ICE, Immigration, Donald Trump, Wisconsin

TRENDING

Trump To Sign Executive Order To Pull Federal Funding From Schools That Teach 'Critical Race Theory'

Man Arrested by ICE Feet Away From His Family at a Georgia Church Allegedly Had a Work Permit

Mexican Authorities Are Busing Migrants Deported From The U.S. Away From The Border

# Exhibit 36



PYM-000371

Pulse
DIGITAL MAGAZINE FOR NURSES IN THE SOUTHEAST

AJC News

Subscribe Log In

Metro Atlanta | Georgia News | Legislature | National & World News | Business

GEORGIA NEWS

# 'We're not hurting anybody,' says wife of immigrant taken from Georgia church

He was one of at least 20 apprehensions by U.S. Immigration and Customs Enforcement in Atlanta on Sunday, according to one estimate

Kenia Velásquez speaks with her husband, Wilson Velásquez, who is in ICE custody in Atlanta on Monday, January 27, 2025. Following their call, Kenia learned that her husband has no right to a hearing before a judge and will be transferred to Stewart Detention Center for deportation. (Miguel Martinez/ AJC)

By Lautaro Grinspan and Alia Pharr

Jan 27, 2025

  

Nearly every week since they settled in metro Atlanta about two years ago, Kenia and Wilson Velásquez attended church service together on Sundays alongside their three children, ages 7, 9, and 13.

This past Sunday, the first since Donald Trump returned to the White House, only part of the family returned home from church. Wilson Velásquez, 36, was arrested by immigration authorities around midday, just as the sermon inside Iglesia Fuente de Vida in Tucker was nearing its end.

"Our youngest, the 7-year-old, hasn't stopped crying," Kenia Velásquez, 34, told The Atlanta Journal-Constitution on Monday, in Spanish. "He says that he wants his dad. He asks why he isn't here."

Explore ICE makes arrests in metro Atlanta, announces 'targeted operations' here and elsewhere



Walter Valladares, an asylum-seeker from Honduras, was detained by ICE. Video: MG News, ICE, Valladares family Sources: ICE, International Rescue Committee

More

Wilson Velásquez's arrest was one of at least 20 apprehensions by U.S. Immigration and Customs Enforcement in Atlanta on Sunday, according to estimates by Mario Guevara, a Spanish-language reporter well-connected with local immigrant communities.

In a statement, an agency spokesperson said the arrests were part of "enhanced targeted operations" that aimed to "enforce U.S. immigration law and preserve public safety and national security by keeping potentially dangerous criminal aliens out of our communities."

**Sign up for latest news on state and local politics and elections**

Type your email address here...

Get the Latest Updates!

By signing up, I agree to the **Privacy Policy** and **Visitor Agreement**

Nationwide, 956 immigrants were arrested on Sunday, according to an ICE post on social media.

The first sign something was off for the Velásquez family came when Wilson's ankle monitor — which federal officials placed on him at the border — began beeping. To avoid disrupting the service, Wilson shuffled out of the church where immigration agents were waiting for him.

After receiving a distressed text message from her husband, Kenia says she ran outside to try to help. By the time she came out, Wilson was in handcuffs in the backseat of a law enforcement vehicle.

Kenia says all color had drained from his face, and that he looked panicked. An ICE agent gave her the family's car keys, which were on Wilson. Then, she watched as her husband was driven away. She says she still isn't sure where he is being detained, or what will happen next.

**Explore** Donald Trump's immigration crackdown has ripple effects across Georgia

"Forgive me if I cry, I just feel so upset. If I had Trump in front of me, I would hug him and I would tell him to take pity on Hispanic people," she said.



Credit: Miguel Martinez-Jimenez

Kenia Velásquez fell to her knees and pray after finding out that her husband, Wilson Velásquez, who is in ICE custody, has no right to a hearing before a judge and will be transferred to Stewart Detention Center for his deportation. (Miguel Martinez/ AJC)

Advertisement



The Velásquez family crossed the border illegally as a unit in September 2022. They were released and allowed to pursue an asylum case inside the country. Kenia says they fled their home country of Honduras because they'd been threatened by gangs.

Once they reached Atlanta, where relatives had already moved, Kenia says the family kept up with their periodic check-in appointments at Atlanta's ICE field office on Ted Turner Drive. Wilson made sure to charge his ankle monitor every night, to remain trackable to authorities and avoid immigration detention.

Last year, Wilson received a U.S. work permit, a benefit for which unauthorized migrants are eligible after six months of filing an asylum application. According to Kenia, Wilson worked at a tire shop and provided for the family while she stayed home with the children. His arrest is a threat to the family's livelihood.

"I couldn't fall asleep last night because I'm so worried," she said. "Rent is due soon and we don't have enough to make the payment. He was the one who worked."

"My husband is a hardworking man. I don't understand why they came looking for him," she added. "We're not hurting anybody. We're good people. Humble."

After a phone call with Wilson Monday afternoon, Kenia said her husband has no right to a hearing before a judge and will be transferred to Stewart Detention Center for deportation.

Explore AJC poll: Most Georgia voters reject mass deportations

**They want raids 'to be known'**

Mario Guevara's phone began ringing at about 6 a.m. Sunday.

A well-known Spanish-language media personality, the Tucker-based Guevara has more than a million followers on social media networks. For more than a decade, he has tracked ICE through immigrant-heavy Atlanta suburbs, initially for the now-defunct newspaper El Mundo Hispanico and now for his own brand, MGNews.

Callers told Guevara on Sunday before sunrise that officers were in their neighborhoods, wearing vests that said HSI or DHS for the federal Department of Homeland Security. Later, the calls came from people who said a relative had been arrested.

Guevera said he had names of 20 people whom immigration officers had detained in metro Atlanta by about 10 p.m. Sunday.

Advertisement

Nine were Honduran, four Salvadoran, three Guatemalan, three Mexican and one Colombian, said Guevara. He thinks it is likely that others were arrested from countries that don't speak Spanish, but their families wouldn't have called him.

All of the people on Guevara's list were asylum seekers with ankle monitors. Relatives told Guevara they had been going to all their immigration appointments, but administrative orders had been issued for their deportation. Thirteen had valid work permits, Guevara said. All had entered the United States between 2021 and 2023, he said.

Guevara also heard from two women whom ICE visited but did not arrest because they were alone with children. One, in Norcross, was alone with a baby about three or four months old, Guevara said. Both women also had ankle monitors, he said.

Explore How much does illegal immigration cost Georgians? Here's what we know

Credit: Miguel Martinez-Jimenez

The Vision in Power Church in Tucker is seen empty on Monday, January 27, 2025. The church has approximately seventy members. The community is reacting to ICE's recent arrest of a member outside the church the previous Sunday. (Miguel Martinez/ AJC)

The families seemed to be in shock, Guevara said. Immigration officers had banged loudly at their doors and yelled, "Police." Many peeked from windows and waited in helpless fear before eventually opening the doors, Guevara said.

Advertisement

After the first calls came in Sunday, Guevara quickly got in his car. He drove to an apartment complex in Norcross where agents had been seen, but they weren't there anymore. At another complex in Doraville, he saw ICE officers leading a detained man into their vehicle.

Guevara followed the agents' car. His sense of alarm increased when it stopped at a Publix — but five minutes later, the agents came out with snacks, Guevara said.

Then Guevara followed them to Lilburn, where the agents lost him. He left the neighborhood but went back about 15 minutes later.

"I had a presentiment," Guevara said in Spanish.

He saw a man being arrested whom he later learned was a Honduran immigrant. Guevara recorded the arrest live on Facebook. Later, as Guevara drove down Buford Highway looking for federal agents, Luis Ortiz, the pastor at the Velásquezes' church, called to recount what had happened.

Advertisement

The scope of Sunday's raids was not unprecedented, Guevara said. President Barack Obama's administration still holds the record for deportations and some days under his leadership were similar, Guevara said. But then, immigration agents were detaining families together, including children, he said.

This time, Guevara said, more agencies seemed to be involved, including the Federal Bureau of Investigation and the U.S. Marshal. Officers also seemed to behave differently when he stood in front of them, openly recording.

"They were calm," he said. "They seemed comfortable. Before, they had a low profile."

Compared to Obama-era raids, Guevara said, Sunday seemed to be about attracting attention.

"Today there's more noise because of social networks," he said. "(President) Trump is making more noise too, more of a racket. He wants this to be known."

Advertisement

Family members that Guevara followed up with Monday morning had still not heard from their detained relatives.

Among the flurry of immigration reforms announced by the Trump administration last week was an expansion of a policy dubbed "expedited removal," which subjects people who are in the country unlawfully to a streamlined and expedited removal process if fewer than two years have passed since they crossed the border.

"They could be on airplanes back to their home countries," Guevara said.

Another change has allowed immigration agents to conduct arrests in schools, churches and hospitals — places previously deemed largely off-limits.

So many people told Guevara they planned to keep their children home Monday that, at midnight, he posted a video to Facebook urging immigrants to send their kids to school. They might be safer there than home, he said. And Guevara, a Salvadoran immigrant with legal status, thought of his own children.

Advertisement

"It's better the kids don't see you when you are arrested, for their emotional safety," he said.



Credit: Miguel Martinez-Jimenez

Kenia Velásquez speaks with her husband, Wilson Velásquez, who is in ICE custody in Atlanta on Monday, January 27, 2025. Following their call, Kenia learned that her husband has no right to a hearing before a judge and will be transferred to Stewart Detention Center for deportation. (Miguel Martinez/ AJC)

PYM-000381

For Kenia Velásquez, her husband's arrest came as she was still reeling from another blow to her family from immigration enforcement.

Roughly two months ago, her brother was deported back to Honduras. He had tried to enter the country at the end of 2023 with his then-pregnant wife. Border authorities let her in, but he was detained. He remained in detention for a year before being sent back.

Although a potential return to Honduras fills her with dread, Kenia said she would follow Wilson should he be deported — a sign that voluntary departures could follow official removals.

Advertisement

"We would leave the U.S. the same way we came in, all five of us," Kenia said. "I'm not going to stay in this country by myself, if they're deporting people and everybody is afraid."

Credit: Miguel Martinez/AJC

Kenia Valasquez fell to her knees and pray after finding out that her husband, Wilson Valasquez, who is in ICE custody, has no right to a hearing before a judge and will be transferred to Stewart Detention Center for his deportation. (Miguel Martinez/AJC)



Credit: Miguel Martinez-Jimenez

Kenia Valasquez fell to her knees and pray after finding out that her husband, Wilson Valasquez, who is in ICE custody, has no right to a hearing before a judge and will be transferred to Stewart Detention Center for his deportation. (Miguel Martinez/ AJC)

Credit: Miguel Martinez/AJC

Kenia Valasquez speaks with her husband, Wilson Valasquez, who is in ICE custody in Atlanta on Monday, January 27, 2025. Following their call, Colindres learned that her husband has no right to a hearing before a judge and will be transferred to Stewart Detention Center for deportation. (Miguel Martinez/ AJC)

Credit: Miguel Martinez-Jimenez

Kenia Valasquez speaks with her husband, Wilson Valasquez, who is in ICE custody in Atlanta on Monday, January 27, 2025. Following their call, Colindres learned that her husband has no right to a hearing before a judge and will be transferred to Stewart Detention Center for deportation. (Miguel Martinez/ AJC)

Advertisement

Credit: Miguel Martinez-Jimenez

Kenia Valasquez speaks with her husband, Wilson Valasquez, who is in ICE custody in Atlanta on Monday, January 27, 2025. Following their call, Colindres learned that her husband has no right to a hearing before a judge and will be transferred to Stewart Detention Center for deportation. (Miguel Martinez/ AJC)



Credit: Miguel Martinez/AJC

Kenia Valasquez speaks with her husband, Wilson Valasquez, who is in ICE custody in Atlanta on Monday, January 27, 2025. Following their call, Colindres learned that her husband has no right to a hearing before a judge and will be transferred to Stewart Detention Center for deportation. (Miguel Martinez/ AJC)

Credit: Miguel Martinez-Jimenez

Kenia Valasquez speaks with her husband, Wilson Rodriguez, who is in ICE custody in Atlanta on Monday, January 27, 2025. Following their call, Colindres learned that her husband has no right to a hearing before a judge and will be transferred to Stewart Detention Center for deportation. (Miguel Martinez/ AJC)



Credit: Miguel Martinez-Jimenez

The Vision in Power Church in Tucker is seen empty on Monday, January 27, 2025. The church has approximately seventy members. The community is reacting to ICE's recent arrest of a member outside the church the previous Sunday. (Miguel Martinez/ AJC)



Credit: Miguel Martinez-Jimenez

Kenia Valasquez fell to her knees and prayed after finding out that her husband, Wilson Valasquez, who is in ICE custody, has no right to a hearing before a judge and will be transferred to Stewart Detention Center for his deportation. (Miguel Martinez/AJC)

Advertisement

## About the Authors

**Lautaro Grinspan**

Lautaro Grinspan is an immigration reporter at The Atlanta-Journal Constitution.

**Alia Pharr**

Alia Pharr covers taxation and infrastructure in metro Atlanta.

## More Stories

**Keep Reading**

# Exhibit 37

Los Angeles Times

BUSINESS

# Column: Inside the Bakersfield raids that showed how Trump's immigration policies will sow chaos

Immigrants get information about their constitutional rights after a presentation by a consortium of attorneys, organizations, and community experts at the Robert F. Kennedy High School Auditorium in Delano, Calif. (Tomas Ovalle / For The Times)

**By Michael Hiltzik**
Business Columnist | X Follow

Jan. 22, 2025 3 AM PT

On Jan. 7, the phones of immigration advocates in Bakersfield began lighting up with calls from immigrant farmworkers. The messages said the U.S. Border Patrol was

conducting an indiscriminate dragnet in the area, pulling over vehicles presumed to be carrying immigrants to work and taking dozens into custody.

To the advocates, this didn't seem right. The Border Patrol — a unit of U.S. Customs and Border Protection — had not been seen operating in anyone's memory in Bakersfield, some 300 miles from the patrol's California offices in El Centro, a few miles from the Mexican border.

Although there are two detention centers in Bakersfield run by ICE — Immigration and Customs Enforcement — none of the detainees could be found in either one. The Border Patrol, a sister agency of ICE, staged its raids not at ICE installations, but out of a parking lot at a facility of the Interior Department, which has nothing to do with immigration or border security.

*There's a lot of fear, a lot of anxiety for everyone with an undocumented loved one, which is a significant portion of the Latino community in Kern County.*

**— Antonio De Loera-Brust, UFW**

The Border Patrol eventually asserted that it had conducted a four-day "targeted enforcement" operation aimed at undocumented immigrants with criminal records, ultimately detaining 78 individuals mostly for crimes such as drug trafficking, burglary and child abuse.

It's fair to say that almost no one familiar with the immigration ecosystem in Kern County, where Bakersfield is located — not immigration lawyers, United Farm Workers officials or employers — believes a word of this. The UFW and other sources estimate that some 200 people were detained in just the first two days, and 1,000 in all may have been detained and released.

Rather than "targeted" enforcement, the Border Patrol conducted "random stops of vehicles exclusively founded on racial profiling of individuals," Ambar Tovar, director of legal services for the UFW Foundation, told me.

The officers raid locations where they knew they would find farmworkers gathering — such as at a Home Depot, where immigrant laborers come to seek day work, and along California Route 99, the highway traveled by immigrant farmworkers heading to their jobs. At some spots, where they were asked to show warrants naming targeted individuals, the officers simply drove away without answering.

ADVERTISEMENT

"They definitely seemed to be targeting agricultural workers and day laborers," said Casey Creamer, president of California Citrus Mutual, the trade association for citrus growers.

BUSINESS

**Column: Julie Su would be a perfect Labor secretary. That's why Big Business hates her**

April 24, 2023

Creamer said there have been no indications that immigrants in Kern County were responsible for a wave of violent crime, the ostensible justification for the raids.

"The people who got targeted get up to go to work at 5 or 6 a.m.," he said. "They work hard and then go home to their families. That's incompatible with violent crime. Drug dealers aren't going out to harvest citrus."

One aspect of these raids elicits broad agreement: Their effect was to sow fear. "It's had a very chilling effect on the whole community," said Antonio De Loera-Brust, a spokesman for the UFW. "There's a lot of fear, a lot of anxiety for everyone with an undocumented loved one, which is a significant portion of the Latino community in Kern County."

Creamer estimates that about 25% of immigrant workers in the area stayed home from work in the first day of the raids, and 75% afterward. That continued until Jan. 10, when word spread that the Border Patrol had left the county and gone back to El Centro.

Until then, he said, "the raids sent shock waves through the entire Central Valley," the breadbasket of California and of the entire country. At the Mercado Latino Tianguis outside Bakersfield, a popular shopping spot for the Latino community, customers all but disappeared during the raids and about one-third of the businesses closed.

The Border Patrol didn't respond to my request for further information about the raids.

It's hard to overestimate the impact that raids like these could have on California agriculture, which, like other states, is highly dependent on immigrant labor. The raids occurred as the harvesting of California oranges, mandarins and lemons was entering a peak period for fresh fruit. California accounts for about 90% of the domestic supply of oranges, mandarins, lemons and grapefruit.

About 20% of the estimated 24,000 citrus farm employees in California work in Kern County, Creamer says. In this case, he adds, the immediate impact was muted because the raids occurred over only four days and the schedule of citrus harvesting can be somewhat flexible.



BUSINESS

**Column: The ugly historical roots of the GOP's sadistic migrant transports**

Sept. 19, 2022

Yet "in the small farming towns outside Bakersfield, at gas stations and in the miles and miles of fields, everyone seemed to know about the arrests," my colleagues Rachel Uranga and Andrea Castillo reported, "sowing fear among migrant families, many of whom had children or spouses that were born here" and consequently are American citizens.

Pupils from immigrant families stayed home from school. About 1 million children in California — 10% of the school-age population — have least one undocumented immigrant parent and about 115,000 are themselves undocumented.

The Homeland Security Department hasn't disclosed who authorized the raids and why they took place. Although they were launched before Donald Trump's presidential inauguration, they impressed many as a harbinger of attacks on immigrants to come during his administration. They hint at Trump's preoccupation with illegal immigration.

The raids caught the community's elected representatives flat-footed.

"I have received numerous calls from constituents expressing fear for their families' safety, and I do not support inciting concern," Rep. David Valadao (R-Hanford), said in a statement issued the Monday after the raids ended. "We can all agree known criminals should be expelled from the United States, but it is crucial that future operations are communicated clearly to avoid causing any further alarm among our farmworkers."

Gregory Bovino, chief of the Border Patrol's El Centro sector, boasted on social media about what he called "Operation Return to Sender," stating that 60 agents had been deployed in marked and unmarked vehicles. Bovino further asserted that his sector's

"responsibility" stretches from the Mexican border north to the California-Oregon state line.

That's true, up to a point. The Border Patrol claims the right to stage warrantless searches within 100 air miles of any external boundary of the U.S., including national boundaries and shorelines. That's a zone in which two-thirds of the U.S. population lives, encompassing all of Florida, Hawaii, Maine, New Hampshire and Michigan; most of New York and more than half of California, including all its major cities.

The Border Patrol claims jurisdiction over more U.S. territory than most people know. (ACLU)

What struck immigrant advocates about the raids was the sheer thuggishness of the operation, which dovetailed neatly with the uncompromosing rhetoric about immigration sounded by Trump during his campaign and in his inaugural speech Monday.

Agents transported detainees from Bakersfield to El Centro, a drive that can take as long as six hours, instead of processing them locally, where they would be available for local legal advice and representation. Detainees said they were released in El Centro without transportation home.

BUSINESS

**Column: The Nazi roots of the Trump-Vance smear of Haitian immigrants**

Sept. 17, 2024

Two UFW members were pressured into signing a form attesting to their voluntary departure from the U.S., then shipped over the border from El Centro to Mexicali, De Loera-Brust says.

"That effectively waived their rights to a hearing or due process or legal representation, and allowed the Border Patrol to dump them in Mexicali," he said. "At that point, there's not much we can do. By the time we got our members a lawyer, they were already in Mexico and there was no case for our lawyers to argue."

The union says neither individual had a criminal history or an outstanding criminal warrant. "They were undocumented, but they were otherwise completely law-abiding, hardworking folks, the primary breadwinners for their families, leaving behind undocumented spouses and U.S. citizen children who were born in this country," De Loera-Brust said.

Agents in an unmarked car pulled over Ernesto Campos, the owner of a Bakersfield gardening service who was naturalized as a U.S. citizen more than 10 years ago. According to a video Campos shot on the scene and that was aired on Bakersfield TV station KGET, the agents demanded that Campos' passenger, an undocumented employee step out of the truck. Campos informed them that the passenger already had an asylum hearing scheduled. Campos shut off his engine and gave the agents his driver's license.

Nevertheless, according to an exchange captured on the video, an agent slashed Campos' truck tires, which can be seen deflated on the video. When Campos asked why the agent had immobilized his vehicle, the agent replied, "I'm not going to argue with you, bro. You did what you did, I did what I did." He verified that Campos was a U.S. citizen, but he was arrested on suspicion of "alien smuggling." Campos was released about four hours later. The border Patrol didn't respond to my request to identify the agent and explain his conduct.

---

## Latest from Michael Hiltzik ›

Column: OpenAI accuses China of stealing its content, the same accusation that authors have made against OpenAI

Column: The population exodus from antiabortion states is underway and may be picking up steam

Column: A CIA 'assessment' revives the fact-free claim that COVID started in a Chinese lab

## More to Read

**Immigration arrests in churches? Some clergy say not so fast**

Jan. 29, 2025

**Community groups set up strike teams to respond to Trump's mass deportation plans**

Jan. 25, 2025

**'Scare tactic': Bonta slams Trump move targeting local officials over immigration**

Jan. 22, 2025


Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 42 of 353
PYM-000401

**Michael Hiltzik**

Pulitzer Prize-winning journalist Michael Hiltzik has written for the Los Angeles Times for more than 40 years. His business column appears in print every Sunday and Wednesday, and occasionally on other days. Hiltzik and colleague Chuck Philips shared the 1999 Pulitzer Prize for articles exposing corruption in the entertainment industry. His seventh book, “Iron Empires: Robber Barons, Railroads, and the Making of Modern America,” was published in 2020. His forthcoming book, “The Golden State,” is a history of California. Follow him on X at twitter.com/hiltzikm and on Facebook at facebook.com/hiltzik.

---

Copyright © 2025, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

# Exhibit 38

SEARCH

# FAQs

*These Frequently Asked Questions are based on content originally published online by Friends General Conference (https://www.fgcquaker.org/explore/faqs-about-quakers) (link is external).*

## Questions

### Quaker Beliefs

What do Quakers believe? (#believe?)

Are Quakers Christian? (#Christian)

It sounds like Quakers can believe anything they like—is that so? (#Anything?)

Do Quakers believe in heaven and hell? (#Afterlife)

Do Quakers read the Bible? (#Bible)

### Quaker Worship

What happens in Quaker worship—is it really silent? (#worship?)

How do Quakers practice baptism and communion? (#Sacraments)

Can I attend Quaker meeting? (#Attend?)

What should I wear to Quaker meeting? (#dress)

## Quakers Engaging with the World

What are Quaker "testimonies"? (#testimonies)

Do I have to be a pacifist to be a Quaker? (#pacifism)

What do Quakers think about science? (#science)

## Quaker Practices

How do Quakers live today? (#today?)

How do Quaker meetings make decisions? (#decisions)

What does the pastor do in a Quaker meeting? When there isn't a pastor, how do Quakers get organized without a formal leader? (#pastoring)

How do Quakers get married? (#weddings)

How do Quakers celebrate Christmas? (#Christmas)

How do I become a member? (#membership)

## Quakers Throughout the World

Are all Quakers alike? (#alike?)

What’s the difference between a Quaker meeting and Quaker church? (#unprogrammed)

How many Quakers are there? (#numbers)

Where is the Quaker “central office”? (#organization)

## Quaker History

How did the Quaker movement begin? (#start)

Why are you called “Quakers” or "Friends"? (#name)

Are Quakers the same as the Amish? As Shakers? (#amish)

Do Quakers own Quaker Oats? (#oats)

# Answers

## What do Quakers believe?

We believe that every person is loved and can be guided by God. Broadly speaking, we affirm that "there is that of God in everyone." Everyone is known by God and can know God in a direct relationship. We are called to attend to this relationship and to be guided by it. Quakers use many names and metaphors to describe the Divine. Some of them include: God, the Light, Christ, Spirit, the Guide, the Seed, the Life, and the Inward Teacher. [back to top (#FAQtop)]

## Are Quakers Christian?

The Quaker way has deep Christian roots that form our understanding of God, our faith, and our practices. Many Quakers in New England consider themselves Christian, and some do not identify in that way. Today, we draw spiritual nourishment from our Christian roots and strive to follow the example of Jesus. Many Quakers also draw spiritual sustenance from wisdom reflected in the diversity of our world's religious traditions. [back to top (#FAQtop)]

## It sounds like Quakers can believe anything they like—is that so?

Quakers invite the Word of God to be written on our hearts, rather than as words on paper—and so we have no formal creed as a test for belonging. This does not mean we have no theology. Indeed, many Friends are actively engaged in theological exploration, both in academia and the wider world. As in the first years of our movement, today we affirm the danger that written words can become lifeless and harmful if misinterpreted or applied outside of the Spirit that inspired them. We also believe that if we are sincerely open to the Divine Will, we will be guided by a Wisdom that is more compelling than our own more superficial thoughts and feelings. This may mean that we find ourselves led in directions or receiving understandings that we may not have chosen. Following such guidance is

not always easy. This is why being an active part of a faith community is essential to Quakers, why we turn to each other for worshipful help in making important choices, and why we value deeply the reflections and stories of Friends who have lived faithful lives before us. [back to top (#FAQtop)]

## Do Quakers believe in heaven and hell?

The emphasis of a Quaker's life is on the presence of the sacred in present time—on experiencing and following the leadings of the Light in our lives today. "Hell" is a present reality for so many in our world, and "Heaven" is in this place, every day. Quakers believe that the world of justice, love, and joy we yearn for is available here and now, and also still being born. We are called to participate in helping this world arrive. [back to top (#FAQtop)]

## Do Quakers read the Bible?

Quakers in New England have long turned to the Hebrew and Christian scriptures for inspiration, insight, and guidance. These texts offer moving testimony to the search to know God and live faithful lives throughout millennia. For generations, Quakers have found in the Bible a shared vocabulary for the inward landscape, a way of communicating their spiritual journey and experience. Friends are informed by Biblical scholarship that offers perspective on the creation of the Bible and the understanding we have of it today. We believe that consistency with our understanding of the witness of Scripture offers a helpful guide as we seek to discern and test our leadings today. We seek to read scripture in the spirit of worship, seeking the deeper Truth and fresh guidance the stories might hold for our lives together today, trusting always that we can be led by the Spirit into new understandings. We also value the religious writings of many traditions, and are nourished by other sources of wisdom, including personal prayer, worshipful community discernment, and the lived witness of faithful people, past and present. [back to top (#FAQtop)]

## What happens in Quaker worship—is it really silent?

The most common practice of Quaker worship in New England is based on silent waiting, where we expect to come into the presence of God. Often we refer to this practice as *waiting worship*. In the living silence, we listen for the still, small voice that comes from God through the Inward Light.  Worshiping together in this expectation brings the community together in love and faithfulness, and can lead to lives transformed.

During waiting worship, any person—of any age or background—may feel inspired to give vocal ministry (speak out of the silence). After the person speaks the message, the silence resumes. Such messages may be offered several times during a meeting for worship, or the whole period of worship may be silent. Someone will signal the close of worship by shaking hands with another person, then everyone shakes hands with those seated nearby. [back to top (#FAQtop)]

## How do Quakers practice baptism and communion?

For Quakers, sacraments are traditionally understood as inward, spiritual experiences. Friends have described entering into the spiritual reality of communion with God in the experience of meeting for worship, and of baptism in the Holy Spirit. We don't have a custom of performing outward sacramental ceremonies. [back to top (#FAQtop)]

## Can I attend a Quaker meeting?

Yes! You are welcome to attend Quaker meetings for worship. There are Quakers of all ages, religious backgrounds, races and ethnicities, sexual orientations, gender identities, abilities, and classes. All who come seeking to share this journey are welcome. [back to top (#FAQtop)]

## What should I wear to Quaker meeting?

Dress comfortably. In general, Quakers wear everyday clothes to meeting. This may range from what you would wear at work in an office to jeans and a t-shirt. You are

welcome to join us for worship as you are! [back to top (#FAQtop)]

## What are Quaker "testimonies"?

Quakers find that attending to the Light Within influences the ways we act in our personal lives, as well as the world we seek to help build. Some Friends will refer to the Quaker "testimonies" associated with the relatively modern acronym SPICE (Simplicity, Peace, Integrity, Community, Equality). This may have a place in teaching and describes some broad categories into which our beliefs find expression; however, they may more accurately be called *witness*. Our one Testimony is to the transforming power of God at work in our lives. [back to top (#FAQtop)]

## Do I have to be a pacifist to be a Quaker?

Seeking to live in peace has always been a very important sign of how Quakers are guided by the Spirit. We all wrestle with our understanding of what God requires of us. We are asked to consider if we are called to be pacifists, but this determination is left to the individual and his or her conscience. For many, it has meant a commitment to nonviolence and conscientious objection to participating in war. Some Quakers, however, have served in the military. Quaker institutions, such as local meetings (congregations), generally hold to a pacifist position as a group. [back to top (#FAQtop)]

## What do Quakers think about science?

Friends in New England find great compatibility in our longing for spiritual understanding and in our desire to understand the workings of the natural world. Many Quakers have been leaders in science, including some whose contributions have been recognized with the Nobel Prize in their field. We celebrate the wonder of evolution, and we stand in awe of the diversity and complexity of Creation. We believe that scientific and technological endeavors must be guided by ethics and responsibility to humanity and all life, and grounded in humility and love.

Many Friends feel called to help protect and heal the world that we are blessed to inhabit. [back to top (#FAQtop)]

## How do Quakers live today?

There are Quakers of all ages, religious backgrounds, races and ethnicities, education, sexual orientations, gender identities, abilities, and classes. Modern Quakers generally blend in with the larger culture, rather than adopting the distinctive dress and patterns of speech associated with Quakers of earlier centuries.

Quakers try to live and act in ways that are consistent with the divine harmony that we seek in worship. Whatever our employment, activities or circumstances, we hope that our lives demonstrate an authenticity and integrity between word and action. [back to top (#FAQtop)]

## How do Quaker meetings make decisions?

The local meeting (congregation) regularly (often monthly) holds a *meeting for worship with attention to business*. This is also sometimes referred to as *corporate discernment*. Anyone who is part of the meeting may attend. Decisions are made without voting; instead, the participants consider the matter together, offer perspectives arising from prayer and reflection, and listen deeply for a sense of spiritual unity. When the clerk recognizes that unity has been reached, it is called the *sense of the meeting*. If those present agree with the clerk's expression of that sense, then the decision is recorded in the minutes. [back to top (#FAQtop)]

## What does a pastor do a Quaker meeting? When there isn't a pastor, how do Quakers get organized without a formal leader?

Quakers believe that we all share responsibility for the practical spiritual work of caring for our faith community. Some of our meetings employ a pastor to support

the sharing of the spiritual gifts given through each one of us. A pastor may sometimes bring a prepared message as part of worship, help organize religious education, and may regularly visit those in need of special care or counsel. Quaker meetings function by appointing members to offices (volunteer positions) and committees, which take care of things like religious education for adults and children, visiting the sick, planning special events, having the meeting house roof repaired—all the many things that any congregation needs.

A person is appointed as *clerk*, a volunteer office responsible for helping the meeting discern how the Spirit is leading us as a community. The clerk chairs business meetings and handles many communications. When the clerk's term expires, a new clerk is appointed. [back to top (#FAQtop)]

## How do Quakers get married?

During a special meeting for worship, the couple stand and face each other, then make very simple promises, giving themselves and taking each other in marriage. Marriage is understood as a spiritual covenant, affirmed by the couple in the presence of God and witnessed by all those gathered. The couple signs a special certificate of marriage containing the words of their promises, then after the close of the meeting for worship, everyone present signs the certificate as a witness. Often the clerk or a pastor signs the legal marriage license. [back to top (#FAQtop)]

## How do Quakers celebrate Christmas?

In modern times, most Quakers celebrate a low-key Christmas, and sometimes Easter, as part of our larger culture. However, traditionally, Quakers did not celebrate any religious holidays out of a desire to live as if every day is a "holy day." [back to top (#FAQtop)]

## How do I become a member?

You become a member by joining a local meeting. Quakers encourage newcomers to spend some time getting familiar with the Quaker tradition and with the

community before making up their minds to formally join. You may spend anywhere from a few months to a few years as an *attender*, participating in worship and other meeting activities before you feel ready to make a commitment. The first step toward membership is to write a letter to the clerk of the meeting expressing your wish to join formally. The clerk or a member of the appropriate meeting committee will be pleased to explain the membership process to you, but they may wait for you to take the first step, since Quakers place great respect in the motivation to join coming from the person seeking membership. Once you are welcomed into membership in your monthly (local) meeting, you are also considered a member of your quarterly (regional) meeting, of New England Yearly Meeting of Friends, and all organizations with which NEYM is affiliated. [back to top (#FAQtop)]

## Are all Quakers alike?

The Quaker movement has grown and diverged into several different branches over more than three and one-half centuries. Friends in New England reflect this diversity, being the first yearly meeting in the world and being connected to fellowships of Friends worldwide. In some groups of Quakers globally, pastors are much more common, worship is more structured, beliefs are more theologically conservative (in a traditional Protestant sense) and place greater emphasis on the authority of the Bible relative to the immediate guidance of the Holy Spirit. In others, worldview and theology are more liberal, worship is grounded in silent waiting and greater emphasis is placed on individual experience. A third stream seeks to conserve and steward the tradition of earlier generations of Friends, with expectant waiting worship, Christ-centered theology, an emphasis on the nurture and exercise of spiritual gifts, and a deep commitment to the discernment of the community as primary. New England Yearly Meeting embraces much of the diversity described above. We are affiliated with three umbrella organizations, Friends General Conference (https://neym.org/learn/fgcquaker.org), Friends United Meeting (http://www.fum.org/) (link is external), and Friends World Committee for

Consultation (http://www.fwccamericas.org/) (link is external), each of which encompasses significant diversity of theology, practice, and geography. [back to top (#FAQtop)]

## What's the difference between a Quaker meeting and a Quaker church?

We traditionally call our congregations *meetings*. It is also common, especially in congregations served by a pastor, to hear a local meeting also referred to as a church. [back to top (#FAQtop)]

## How many Quakers are there?

In 2012 there were approximately 377,055 adult members of Quaker meetings in the world, with about 87,000 in the United States. This includes all the various branches of the Religious Society of Friends. All of the branches are represented in the United States. In other parts of the world, Friends who practice silent worship (and rarely have pastors) are most common in Europe and in former colonies of Britain; Friends with prepared worship services (and frequently pastors) are most common in Africa and South America. [back to top (#FAQtop)]

## Where is the Quaker “central office”?

You could say that it is everywhere and nowhere. There are many Quaker organizations with different functions and which relate to different parts of the larger Quaker movement. A few of the better known examples in the United States include:  American Friends Service Committee (http://www.afsc.org/) (link is external) (which puts Quaker values into action by operating advocacy, development, and peacebuilding programs throughout the world), Friends Committee on National Legislation (http://www.fcnl.org/) (link is external) (which lobbies in Washington, D.C. on behalf of Quaker values and in the public interest), Friends Council on Education (http://www.friendscouncil.org/) (link is external) (which works in support of Friends schools), Quaker Voluntary Service

(http://www.quakervoluntaryservice.org/) (link is external) (which offers year-long service opportunities for young adults in a Quaker context) and a great many others, including schools and colleges, peace and justice programs, retreat centers, services for the aging, and more. Each of these is an independent organization, but there is much collaboration and interconnection.

Friends World Committee for Consultation (http://www.fwccworld.org/) (link is external) is a worldwide organization, headquartered in London, that promotes fellowship and interchange among the various branches of Quakers, but it does not speak on behalf of all Quakers or have authority over them. Some of the Quaker branches have their own "umbrella organizations," including Friends General Conference (http://fgcquaker.org/) (link is external), Friends United Meeting (http://www.fum.org/) (link is external), and Evangelical Friends Church International (http://www.evangelicalfriends.org/) (link is external).

Quaker congregations are affiliated in larger regional bodies called yearly meetings, which serve as the highest denominational body which engages in corporate discernment with authority over constituent congregations. There are 33 yearly meetings in the United States. New England Yearly Meeting of Friends was the first yearly meeting in the world, having been gathered for business in 1661. [back to top (#FAQtop)]

## How did the Quaker movement begin?

It began during a period of much religious upheaval in England during the mid-1600s, as people questioned the established church and sought new ways to understand Christianity. The emerging faith community gathered around the leadership of George Fox and others who encouraged people to be guided by a direct, firsthand encounter with the Spirit. These Quakers were seeking an authentic return to "primitive Christianity," as practiced by the followers of Jesus in the first century. [back to top (#FAQtop)]

## Why are you called “Quakers” or "Friends"?

The term “Quaker” arose as a popular nickname used to ridicule this new religious group when it emerged in 17th-century England. It arose from the perception that, when experiencing the power of the Holy Spirit, some Friends physically shook and trembled in meeting for worship. Since the term was so widely recognized, some of us began using it informally, so people would know what we were talking about.

The term "Friend" was taken by the leaders of the early Quaker movement to reflect their aspiration to seek and follow divine guidance, drawing on Jesus' words in John 15:15: "You are my *friends* if you do what I command you. I do not call you servants any longer, because the servants do not know what the master is doing; but I have called you *friends*, because I have made known to you everything that I have heard from my Father."

Formally, we call ourselves the Religious Society of Friends. Today, we use “Friend” and “Quaker” interchangeably. [back to top (#FAQtop)]

## Are Quakers the same as the Amish?  As Shakers?

Quaker and Amish are both traditional *peace churches*, drawing their guidance from the nonviolent teachings of Jesus. While we have historically supported one another, we are otherwise distinct and trace our origins to separate roots in England (Quakers) and Switzerland (Amish). Today, the majority of Friends no longer practice “plain dress,” as do the Amish.

The primary overlap between Quakers and Shakers is that they have rhyming names. The Shaker hymn *Simple Gifts* is a Quaker favorite. [back to top (#FAQtop)]

## Do Quakers own Quaker Oats?

No. Quaker Oats is simply a brand name, like the motor oil and other products that carry the Quaker name. The use of the word "Quaker" is based on traditional

perceptions of Quakers as responsible and trustworthy, a reputation we hope may be borne out in our lives today. [back to top (#FAQtop)]

# Exhibit 39

NEWS > IMMIGRATION

# Chicago church stops hosting in-person Spanish services amid fears of mass deportations from Trump administration



Pastor and community activist Emma Lozano helps lead a virtual service online from the empty sanctuary at Lincoln Methodist Church in Pilsen on Dec. 29, 2024. (Brian Cassella/Chicago Tribune)



By LAURA RODRÍGUEZ PRESA | larodriguez@chicagotribune.com |
Chicago Tribune
PUBLISHED: January 2, 2025 at 5:00 AM CST

The church pews where Francisca Lino and her family had sat for services every Sunday are now empty. Though she once sought sanctuary in the Chicago church to avoid deportation, this time "not even that holy space feels safe," she said.

Instead, Lino, a mother of six and wife of a U.S. citizen, plans to gather her family in front of a computer to watch a Spanish-language service at Lincoln United Methodist Church virtually every Sunday from now on.

Pastor and community activist Emma Lozano helps lead a virtual service from the empty sanctuary at Lincoln United Methodist Church in Pilsen on Dec. 29, 2024. (Brian Cassella/Chicago Tribune)

"My family and I are tired of this," said Lino, whose Christmas was once again overshadowed by the uncertainty of her and her family's future in the country.

After the threats from the incoming Trump administration that Chicago will be the epicenter of mass deportations, Emma Lozano, an activist and pastor at Lincoln United Methodist, decided to move its Spanish services online as the church prepares to protect its undocumented immigrant community. The services in English will remain in-person.

The Pilsen church, Lozano said, has been vandalized and attacked by right-wing extremists in the past.

“We must take their threats seriously and prepare for the worst,” Lozano said.

That fear is beginning to settle in amid the immigrant community in the Chicago area. Advocates and local leaders warn that mass deportations could affect undocumented, mixed-status and new migrant families alike. Even if that is the case, the Mexican community is expected to experience the most deportations, according to Chicago political leaders and immigration advocates. That’s because they make up the largest group of immigrants in the country.

“They’re coming to our schools, they’re coming to our hospital, they’re coming to our churches and sanctuaries on Sundays,” former congressman Luis Gutierrez said at a December news conference at City Hall, where he and other leaders submitted a letter to Mayor Brandon Johnson to ask for the community’s protection. “… They’ve done it before and they’ll do it again. No one is safe.”

President-elect Donald Trump plans to rescind a longstanding policy within Immigration and Customs Enforcement that prevents unauthorized arrests of undocumented immigrants in schools, hospitals and places of worship, according to reports.

The news of the plan alarmed Lozano because her church is also the headquarters of Centro Sin Fronteras, a nonprofit pro-immigrant-rights organization that has represented many immigrants at risk of deportation, including Lino.

Many members of Lincoln United Methodist are also mixed-status families that come together not only to pray but to support each other as they fight deportation.



Vehicles drive past Lincoln United Methodist Church on Dec. 22, 2024. The church holds two services on Sundays, an English-language service in the morning and a mostly Spanish one in the afternoon. But with President-elect Donald Trump's mass deportation threats, the afternoon service has moved to an online worship service. (Armando L. Sanchez/Chicago Tribune)

"Our worship service is going to be virtual now because we are not going to be set up so that they can come into our church and separate the children from their families," Lozano said.

Lino, who took sanctuary at a Humboldt Park church in 2017 to avoid deportation during Trump's first term, has a scheduled check-in with immigration authorities Feb. 13, just weeks after Trump takes office again.

She said her deepest fear is that she will not be able to avoid deportation this time. Now a grandmother of eight, Lino spends time with her family and does not watch the news.

"I try not to think about it," she said. "We are tired of hiding and living this way, of hiding from the world."

Lino has no criminal record and has lived and worked in this country for nearly 25 years, said her lawyer, Chris Bergin. She was arrested while crossing the southern border in 1999 and deported back to Mexico. She crossed the border again in 2001 and settled in Bolingbrook, where she married her husband the same year.

Lino then applied for legal residency through her husband. She received a work permit and a Social Security number. However, Lino was arrested in 2005 during an interview with immigration authorities because although she admitted to her initial arrest, her application did not include the information, Bergin said.

Since then, Lino has been in deportation proceedings but has been allowed to remain in the country by meeting with ICE agents annually.

However, at her first check-in under the Trump administration in 2017, she was told she needed to attend her check-in with a flight ticket to Mexico in hand.

"I'm afraid this time, I will have to say goodbye to my family. But I hope that the Trump administration keeps their word that only criminals are deported," Lino said.



Incoming U.S. "border czar" Tom Homan talks to state troopers and National Guardsmen taking part in Operation Lone Star at a facility on the U.S.-Mexico border on Nov. 26, 2024, in Eagle Pass, Texas. (Eric Gay/AP)

During a brief visit to Chicago in early December, Tom Homan, Trump's so-called border czar, told a group of Illinois Republicans that ICE intended to target the deportation of criminals regardless of Mayor Johnson's support for immigrants. But what will be considered criminal is unknown. Homan also said the administration will verify the status of asylum-seekers.

Though Trump also threatened to stop federal funding to sanctuary cities such as Chicago, both Johnson and Gov. JB Pritzker vowed to protect the immigrant community.

But the blurred line lies between who and what is considered a criminal and who is not, Lozano said.

"We've seen what Trump is capable of. He had a first round and knew how to attack better this time."

While advocates believe mass deportations would mostly affect Mexican families because they make up the largest group of the 11 million immigrants in the U.S. without legal permission, Bergin said every immigrant is at risk, even those with an asylum case or temporary protected status and those who have Deferred Action for Childhood Arrivals status.

"We should hope and pray for the best but prepare for the worst with the incoming Trump administration," Bergin said.

Several pro-immigrant organizations throughout the city have begun to plan "know your rights" workshops and distribute resources advising community members on how to prepare for possible deportations.

"Don't open the door and don't sign anything," Gutierrez said. Bergin also advised that those who are here without documentation prepare a power of attorney to protect their children, money and property.

Erendira Rendon, vice president of immigrant justice for The Resurrection Project, said her legal team is preparing to take on more deportation cases when the Trump administration takes over. In the meantime, the team is working with the Illinois Venezuela Alliance to process as many applications as possible for asylum and temporary protected status.



Pastor and community activist Emma Lozano helps lead a virtual service from the empty sanctuary on Dec. 29, 2024, at Lincoln United Methodist Church in Pilsen. (Brian Cassella/Chicago Tribune)

The Chicago area's Venezuelan community, made up mostly of the approximately 50,000 migrants who have arrived from the southern U.S. border in the last two years, "are worried and fearful," said Jose Balboa, president of the alliance. In recent weeks, after Homan's visit, the organization has gotten an increasing number of calls from migrants seeking support and guidance.

"Many are afraid to stay in the shelters, parents afraid to take their children to school and others wonder if they should go to work," said Balboa, who also sought asylum in the U.S. from Venezuela.

Balboa considers the new migrants at a higher risk of being deported because most are registered in some way with the immigration department, either having filed an asylum case or waiting for a court visit. That means that upon attending their interview with immigration, their applications for asylum, and refugee status or Temporary Protection Status, can be easily denied when Trump takes office, he said.

"Unlike those who are undocumented, the federal government has a way of tracing the new migrants," Balboa said.

In mid-December, nearly 200 new migrants gathered in a prayer circle in Little Village, said pastor Matt De Mateo. He said faith leaders are in conversations about the role the churches can have in protecting people from deportation.

PFAM_000422

In a statement, Brandon Lee of the The Illinois Coalition for Immigrant and Refugee Rights said that organization is preparing for Chicago and Illinois to be targeted by creating a plan to connect community members to local rapid-response teams.

Everything about how the mass deportations will take place in Chicago or across the country, however, remains unclear. Still, many are preparing, urging each other to rise above the fear.

"We must prepare but we must not hide," said Dolores Castañeda, a Little Village mother and community leader who has worked alongside undocumented immigrants for many years. For many longtime families in the country without legal permission, the threats of deportation are nothing new, she said.

The average undocumented person has been in the country for more than 15 years, and many have learned to live with the fear, she said. There are more than half a million undocumented people in Illinois, according to the latest research, though the number could vary because many go under the radar.

During a march Dec. 18, more than a dozen immigrants marched from the Little Village Arch to St. Agnes of Bohemia Catholic Church as a way to raise awareness in the community of the possible deportations and urge immigrants to stay alert.

For Belesda Toledo, a mother of four, marching was something she did for herself.

"It made me feel strong and in community," she said. "I'm afraid, but I also have faith that God is with us and he protects our future, whatever it may be."

Toledo arrived in Chicago two decades ago from Guerrero, Mexico. Her four children are U.S. citizens. She said she and her children are active participants at the church and she cleans houses from time to time.

"I'm not a criminal; the father of my children works to make sure our children go to school and have everything we didn't have," Toledo said.

She said she agrees that those who have committed crimes should be deported. She said that if the administration creates a vetting process that could also consider the contributions many, including her and her husband, have made to the country, then they could have an opportunity to stay here lawfully.

While Toledo has no plans to stop living her normal life, including going to church at St. Agnes of Bohemia every Sunday, she said things could change come Jan. 20, when Trump takes office.

"I have faith that we will be able to stay," she said.

Pastor Cecilia Garcia stands inside Lincoln United Methodist Church on Dec. 22, 2024. (Armando L. Sanchez/Chicago Tribune)

In the meantime, at Lincoln United Methodist in Pilsen, the pews will remain empty and the church quiet.

During the first virtual service the Sunday before Christmas, pastor Cecilia Garcia cried. Her husband was deported nearly a decade ago and the feeling of uncertainty and fear felt familiar, she said.

"It's happening again and we don't know how many families will be affected."

*larodriguez@chicagotribune.com*

**TRENDING NATIONALLY**

# Exhibit 40

PYM-000425

# Attorney General's Manual

*on the*

# Administrative Procedure Act

WM. W. GAUNT & SONS, INC.
Holmes Beach, Florida 33510

*1973*

Wm. W. Gaunt & Sons, Inc.
Reprint Edition

This is an unabridged republication of the first edition published in 1947

Library of Congress Catalog Card Number
72-97700

International Standard Book Number
912004-11-4

Published by
Wm. W. Gaunt & Sons, Inc.
3011 Gulf Drive, Holmes Beach, Florida 33510

Printed in the United States of America
by
Jones Offset, Inc., Bradenton Beach, Florida 33510

# Attorney General's Manual

*on the*

# Administrative Procedure Act

Prepared by the

United States Department of Justice

TOM C. CLARK
Attorney General

1947

PYM-000428

TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION | 5 |
| Note Concerning Manner of Citation of Legislative Material | 8 |
| I—FUNDAMENTAL CONCEPTS | 9 |
| a. Basic Purposes of the Administrative Procedure Act | 9 |
| b. Coverage of the Administrative Procedure Act | 9 |
| c. Distinction between Rule Making and Adjudication | 12 |
| II—SECTION 3, PUBLIC INFORMATION | 17 |
| Agencies Subject to Section 3 | 17 |
| Exceptions to Requirements of Section 3 | 17 |
| (1) Any function of the United States requiring secrecy in the public interest | 17 |
| (2) Any matter relating solely to the internal management of an agency | 18 |
| Effective Date—Prospective Operation | 18 |
| SECTION 3 (a)—RULES | 19 |
| Separate Statement | 19 |
| Description of Organization | 19 |
| Statement of Procedures | 20 |
| Substantive Rules | 22 |
| Section 3 (b)—Opinions and Orders | 23 |
| Section 3 (c)—Public Records | 24 |
| III—SECTION 4, RULE MAKING | 26 |
| Exceptions | |
| (1) Any military, naval, or foreign affairs function of the United States | 26 |
| (2) Any matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts | 27 |
| Public Property | 27 |
| Loans | 27 |
| Grants | 27 |
| Benefits | 28 |
| Contracts | 28 |
| Section 4(a)—Notice | 28 |
| Contents of notice | 28 |
| Section 4(a) and (b) applicable only to substantive rules | 30 |
| Omission of notice and public procedure for good cause | 30 |
| Section 4 (b)—Procedures | 31 |
| Informal rule making | 31 |
| Formal rule making | 32 |
| Publication of procedures | 35 |
| Section 4 (c)—Effective Dates | 35 |
| Section 4 (d)—Petitions | 38 |
| IV—SECTION 5, ADJUDICATION | 40 |
| General Scope of Formal Procedural Requirements | 40 |
| Exempted adjudications | 43 |
| Section 5(a)—Notice | 46 |
| Responsive pleading | 47 |
| Section 5(b)—Procedure | 47 |
| Section 5(c)—Separation of Functions | 50 |
| Exceptions | 50 |
| Hearing officers | 53 |
| The agency | 56 |
| Section 5(d)—Declaratory Orders | 59 |
| V—SECTION 6, ANCILLARY MATTERS | 61 |
| Governing definitions | 61 |
| Section 6(a)—Appearance | 61 |
| Formal appearance | 61 |
| Informal appearance | 63 |
| Practice before Agencies | 65 |

| | Page |
|---|---|
| Section 6(b)—Investigations | 66 |
| Section 6(c)—Subpenas | 67 |
| Section 6(d)—Denials | 69 |
| VI—SECTION 7, HEARINGS | 71 |
| Section 7(a)—Presiding Officers | 71 |
| Section 7(b)—Hearing Powers | 74 |
| Section 7(c)—Evidence | 75 |
| Burden of proof | 75 |
| Evidence | 75 |
| Presentation of evidence | 77 |
| Section 7(d)—Record | 79 |
| Record | 79 |
| Official notice | 79 |
| VII—SECTION 8, DECISIONS | 81 |
| Section 8(a)—Who Decides | 81 |
| Appeals and review | 83 |
| Section 8(b)—Submittals and Decisions | 85 |
| Decisions | 86 |
| Appeals to superior agency | 87 |
| VIII—SECTION 9, SANCTIONS AND POWERS | 88 |
| Section 9(a)—Sanctions | 88 |
| Section 9(b)—Licenses | 89 |
| Applications for licenses | 89 |
| Suspension or revocation of licenses | 90 |
| Renewal of licenses | 91 |
| IX—SECTION 10, JUDICIAL REVIEW | 93 |
| Scope of Section 10 | 94 |
| Section 10(a)—Right of Review | 95 |
| Section 10(b)—Form and Venue of Action | 96 |
| Form of Action | 97 |
| Venue | 98 |
| Review in enforcement proceedings | 99 |
| Section 10(c)—Reviewable Acts | 101 |
| Section 10(d)—Interim Relief | 105 |
| Section 10(e)—Scope of Review | 107 |
| Appendix A—Text of Administrative Procedure Act | 111 |
| Appendix B—Attorney General's letter of Oct. 19, 1945 | 128 |

## INTRODUCTION

June 11, 1946, the date on which the Administrative Procedure Act was approved by President Truman, is notable in the history of the governmental process. The Act sets a pattern designed to achieve relative uniformity in the administrative machinery of the Federal Government. It effectuates needed reforms in the administrative process and at the same time preserves the effectiveness of the laws which are enforced by the administrative agencies of the Government. The members of the Seventy-Ninth Congress who worked so assiduously on the McCarran-Sumners-Walter bill showed statesmanship and wisdom in dealing with the difficult problems thus presented.

The Department of Justice played an active role in the development of the Administrative Procedure Act. In 1938, at a time when there was criticism of Federal administrative agencies, Homer Cummings, as Attorney General, suggested to the late President Roosevelt that the Department of Justice be authorized to conduct a full inquiry into the administrative process. In response to this suggestion, President Roosevelt requested Attorney General Cummings to appoint a committee to make a thorough study of existing administrative procedures and to submit whatever recommendations were deemed advisable. For this purpose the Attorney General appointed a committee of eminent lawyers, jurists, scholars and administrators.

For a period of two years this committee, known as the Attorney General's Committee on Administrative Procedure, devoted itself to the study of the administrative process. Its work culminated in the issuance of 27 monographs on the operations of the more important Government agencies it had investigated, as well as in a Final Report to the President and to the Congress. This Final Report is a landmark in the field of administrative law. In fact, the main origins of the present Administrative Procedure Act may be found in that Report, and in the so-called majority and minority recommendations submitted by the Committee. These recommendations were the subject of extensive hearings held before a subcommittee of the Senate Committee on the Judiciary in 1941.

There was a lull in legislative activities in the field of administrative law during the next few years by reason of the impact of war. But when Congress in 1945 resumed consideration of legislation in this field, the Chairmen of both the Senate and House Committees on the Judiciary called upon this Department for its assistance. The invitation was accepted, and the task was assigned to the Office of the Assistant Solicitor General. For many months the members of that Office assisted in the drafting and revision of the bill (S. 7) which developed into the Administrative Procedure Act.

Finally, in a letter dated October 19, 1945, to the Chairmen of both Committees on the Judiciary, I endorsed S. 7 as revised. I concluded that "The bill appears to offer a hopeful prospect of achieving reasonable uniformity and fairness in administrative procedures without at the same time interfering unduly with the efficient and economical operation of the Government." Sen. Rep. 752, 79th Cong., 1st sess., pp. 37-38. The bill then moved in regular course through both Committees with a few minor modifications (H.R. Rep. 1980, 79th Cong., 2nd sess., p. 57). It was subsequently adopted by both Houses of Congress without a dissenting vote.

After the Administrative Procedure Act was signed by President Truman on June 11, 1946, it became evident that a major phase of our work had just begun. Government agencies were calling upon us for advice on the meaning of various provisions of the Act. We endeavored to furnish that advice promptly and in detail to every agency which consulted us. At length I decided that we could offer a definite service by preparing a general analysis of the provisions of the Act in the light of our experience. This manual is the result of that effort. It does not purport to be exhaustive. It was intended primarily as a guide to the agencies in adjusting their procedures to the requirements of the Act.

George T. Washington, the Assistant Solicitor General, was assigned the tasks I have just described—both the rendition of advice to the agencies and the preparation of the manual. He had assisted in drafting the Act and was familiar with the administrative problems of the agencies. Two members of his staff, Robert Ginnane and David Reich, took the major burden of the work, under the supervision and direction of Mr. Washington and myself. The manner in which the task has been carried out has my full approval.

While the manual was intended originally for distribution only to Government agencies, public demand for it has been so great that I have decided to make it generally available. I trust that it will prove helpful to those who find a need for it.

A word of explanation as to the manner in which the manual is arranged should be helpful. It has been prepared mainly on a section by section analysis of the Act. Each of the major sections is treated in a separate chapter. There has been no separate treatment of section 11, covering the appointment of examiners, since the Civil Service Commission is entrusted with the responsibilities under that section and is presently engaged in working out the necessary requirements, assisted by an Advisory Committee of experts designated by the Commission. No chapter as such is being devoted to either section 2 (definitions) or to section 12 (construction and effect) for the reason that by themselves they have little meaning except in connection with the functional aspects of the Act. However, there is a separate chapter on two important phases of section 2, namely, the coverage of the Act and the fundamental distinction between rule making and adjudication.

Tom C. Clark
Attorney General

August 27, 1947

NOTE CONCERNING MANNER OF CITATION OF LEGISLATIVE MATERIAL

*The legislative history of the Administrative Procedure Act really begins with the Final Report of the Attorney General's Committee on Administrative Procedure (cited hereinafter as Final Report). This Report led to the introduction in Congress of the so-called majority and minority bills, respectively designated as S. 675 and S. 674, 77th Cong., 1st sess. These bills, together with S. 918, formed the basis for the extensive and valuable hearings held in 1941 before a subcommittee of the Senate Committee on the Judiciary (cited hereinafter as Senate Hearings (1941)). In 1945, the House Committee on the Judiciary held brief hearings (cited hereinafter as House Hearings (1945)) on various administrative procedure bills, of which H.R. 1203, 79th Cong., 1st sess., was the precursor of the present Act. Also in June 1945, the Senate Committee on the Judiciary issued a comparative print, with comments, which is an essential part of the legislative history. The Committee reports on the Act are Sen. Rep. 752, 79th Cong., 1st sess. (cited hereinafter as Sen. Rep.). and H.R. Rep. 1980, 79th Cong., 2nd sess. (cited hereinafter as H.R. Rep.). In October 1945, the Attorney General, at the request of the Senate Committee on the Judiciary, submitted a letter, with memorandum attached, setting forth the understanding of the Department of Justice as to the purpose and meaning of the various provisions of the bill (S. 7). This letter and memorandum constitute Appendix B of the Senate Committee Report and have been printed as Appendix B to this manual.*

*There may be obtained from the Government Printing Office Sen. Doc. No. 248, 79th Cong., 2nd sess., entitled "Administrative Procedure Act—Legislative History" (cited hereinafter as Sen. Doc.), which contains the Senate and House debates on the Administrative Procedure Act, together with all the documents mentioned above, except the Final Report of the Attorney General's Committee on Administrative Procedure and the Senate Hearings (1941). Wherever appropriate, there will be two citations, one to the particular report or hearing in which the legislative material appears, the other a parenthetical reference to the corresponding page in the Senate Document.*

# I

## FUNDAMENTAL CONCEPTS

a. *Basic Purposes of the Administrative Procedure Act*

The Administrative Procedure Act may be said to have four basic purposes:

1. To require agencies to keep the public currently informed of their organization, procedures and rules (sec. 3).

2. To provide for public participation in the rule making process (sec. 4).

3. To prescribe uniform standards for the conduct of formal rule making (sec. 4(b) and adjudicatory proceedings (sec. 5), i.e., proceedings which are required by statute to be made on the record after opportunity for an agency hearing (secs. 7 and 8).

4. To restate the law of judicial review (sec. 10).

b. *Coverage of the Administrative Procedure Act*

The Administrative Procedure Act applies, with certain exceptions to be discussed, to every agency and authority of the Government. Section 2(a) of the Act reads, in part, as follows:

> "Agency" means each authority (whether or not within or subject to review by another agency) of the Government of the United States other than Congress, the courts, or the governments of the possessions, Territories, or the District of Columbia. Nothing in this Act shall be construed to repeal delegations of authority as provided by law.

It will be seen from the above that agency is defined as each authority of the Government of the United States, whether or not within or subject to review by another agency. This definition was adopted in recognition of the fact that the Government is divided not only into departments, commissions, and offices, but that these agencies, in turn, are further subdivided into constituent units which may have all the attributes of an agency insofar as rule making and adjudication are concerned.[1] For example, the Federal Security Agency is composed of many

---

1 The legislative history of section 2(a) illustrates clearly the broad scope of the term "agency." In the Senate Comparative Print of June 1945, the term agency was explained as follows (p. 2): "It is necessary to define agency as 'authority' rather than by name or form, because of the present system of including one agency within another or of authorizing internal boards or 'divisions' to have final authority. 'Authority' means any officer or board, whether within another agency or not, which by law has authority to take final and binding action with or without appeal to some superior administrative authority. Thus, 'divisions' of the Interstate Commerce Commission and the judicial officers of the Department of Agriculture would be 'agencies' within this definition." (Sen. Doc. p. 13). And in the Senate Report the following appears at page 10: "The word 'authority' is advisedly used as meaning whatever persons are vested with powers to act (rather than the mere form of agency organization such as department, commission, board, or bureau) because the real authorities may be some subordinate or semidependent person or persons within such form of organization." (Sen. Doc. p. 196). See also H.R. Rep. p. 19 (Sen. Doc. p. 253).

authorities which, while subject to the overall supervision of that agency, are generally independent in the exercise of their functions. Thus, the Social Security Administration within the Federal Security Agency is in complete charge of the Unemployment Compensation provisions of the Social Security Act. By virtue of the definition contained in section 2(a) of the Administrative Procedure Act, the Social Security Administration is an agency, as is its parent organization, the Federal Security Agency.

The Administrative Procedure Act applies to every authority of the Government of the United States other than Congress, the courts, the governments of the possessions, Territories, and the District of Columbia (sec. 2(a)). The term "courts" is not limited to constitutional courts, but includes the Tax Court, the Court of Customs and Patent Appeals, the Court of Claims, and similar courts. Sen. Rep. p. 38 (Sen. Doc. p. 408).

While the Administrative Procedure Act covers generally all agencies of the United States, certain agencies and certain functions are specifically exempted from all the requirements of the Act with the exception of the public information requirements of section 3. Section 2(a) states, in part: "Except as to the requirements of section 3, there shall be excluded from the operation of this Act (1) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them, (2) courts martial and military commissions, (3) military or naval authority exercised in the field in time of war or in occupied territory, or (4) functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947, and the functions conferred by the following statutes: Selective Training and Service Act of 1940; Contract Settlement Act of 1944; Surplus Property Act of 1944; Sugar Control Extension Act of 1947;[2] Veterans' Emergency Housing Act[3] of 1946; and the Housing and Rent Act of 1947.[4]"

It will be helpful to consider each of these exceptions separately:

(1) "agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them." This definition is intended to embrace such agencies as the National Railroad Adjustment Board, composed

2 This exception was added by Public Law 30, 80th Cong., 1st sess.
3 This exception was added by Public Laws 663 and 719, 79th Cong., 2d sess.
4 This exception was added by Public Law 129, 80th Cong., 1st sess.

of representatives of employers and employees. In addition, it includes agencies which have a tripartite composition in that they are composed of representatives of industry, labor and the public, such as the Railroad Retirement Board and special fact finding boards. H.R. Rep. p. 19 (Sen. Doc. p. 253); 92 Cong. Rec. 2152, 5649 (Sen. Doc. pp. 307, 355). The exemption, it will be seen, is not limited to boards which convene only occasionally, with per diem compensation, to determine, arbitrate or mediate particular disputes, but also includes similar boards or agencies composed wholly or partly of full-time paid officers of the Federal Government.

(2) "courts martial and military commissions."

(3) "military or naval authority exercised in the field in time of war or in occupied territory."

(4) "functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947, and the functions conferred by the following statutes: Selective Training and Service Act of 1940; Contract Settlement Act of 1944; Surplus Property Act of 1944; Sugar Control Extension Act of 1947; Veterans' Emergency Housing Act of 1946; and the Housing and Rent Act of 1947." The functions thus exempted on the ground of their temporary nature may be classified, as to their termination, as follows:

(a) "On the termination of present hostilities"—A considerable number of statutes authorizing wartime programs and controls limit the duration of these functions by such phrases as "in time of war", "for the duration of the war", "upon cessation of hostilities as proclaimed by the President", "upon the termination of the unlimited national emergency proclaimed by the President on May 27, 1941", etc. It is clear from the legislative history of section 2(a) that the exemption is not to be limited to functions derived from statutes which provide for expiration "on the termination of present hostilities" *sic*, but rather extends to all functions which are limited as to duration by phrases such as those quoted above. House Hearings (1945) pp. 36-37 (Sen. Doc. pp. 82-83); 92 Cong. Rec., 5649 (Sen. Doc. p. 355). It is also clear that this exemption for temporary war functions is in no way affected by the circumstance that they may be continued in existence for a considerable period of time after combat operations have ceased. It is well established that statutes authorizing such temporary agencies and functions remain

in effect until a formal state of peace is restored or some earlier termination date is made effective by appropriate governmental action. See *Hamilton* v. *Kentucky Distilleries Co.*, 251 U. S. 146 (1919); and the Attorney General's letter to the President, dated September 1, 1945, in H.R. Doc. 282, 79th Cong., 1st sess., p. 49. The conclusion that the exemption is not measured by the duration of actual combat operations is confirmed by the fact that this Act, containing the exemption, did not become law until June 11, 1946.

(b) "Within any fixed period thereafter (after the termination of present hostilities)"—This phrase provides exemption for functions which terminate, for example, "six months after the termination of the unlimited national emergency proclaimed by the President on May 27, 1941." It is unnecessary to repeat the discussion under (a), *supra*, as the meaning of the phrase "termination of present hostilities."

(c) "On or before July 1, 1947"—This encompasses such functions as expire on or before that date.

(d) The functions conferred by the Selective Training and Service Act of 1940, the Contract Settlement Act of 1944, the Surplus Property Act of 1944, the Veterans' Emergency Housing Act of 1946, the Sugar Control Extension Act of 1947 and the Housing and Rent Act of 1947 are specifically exempted, regardless of their expiration date. Thus the War Assets Administration, insofar as its functions are derived from the Surplus Property Act, is not subject to the provision of the Act, with the exception of section 3.

The foregoing agencies and functions have been specifically exempted from all the provisions of the Act with the exception of section 3. This means, in effect, that the rule making provisions of section 4, the adjudication provisions of section 5, and the judicial review provisions of section 10 are not applicable to them. These broad exceptions, accordingly, must be borne in mind in connection with the discussion of the other sections of the Act. Specific exceptions to various sections will be noted in the discussion of such sections.

c.—*Distinction Between Rule Making and Adjudication*

The Administrative Procedure Act prescribes radically different procedures for rule making and adjudication. Accordingly, the proper classification of agency proceedings as rule making or adjudication is of fundamental importance.

"Rule" and "rule making", and "order" and "adjudication" are defined in section 2 as follows:

(c) *Rule and rule making.* "Rule" means the whole or any part of any agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of any agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, cost, or accounting, or practices bearing upon any of the foregoing. "Rule making" means agency process for the formulation, amendment, or repeal of a rule.

(d) *Order and adjudication.* "Order" means the whole or any part of the final disposition (whether affirmative, negative, injunctive, or declaratory in form) of any agency in any matter other than rule making but including licensing. "Adjudication" means agency process for the formulation of an order.

(e) *License and licensing.* "License" includes the whole or part of any agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission. "Licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license.

Since the definition of adjudication is largely a residual one, i.e., "other than rule making but including licensing", it is logical to determine first the scope of rule making. The definition of rule is not limited to substantive rules, but embraces interpretative, organizational and procedural rules as well.[5] Of particular importance is the fact that "rule" includes agency statements not only of general applicability but also those of particular applicability applying either to a class or to a single person. In either case, they must be of *future effect*, implementing or prescribing future law. Accordingly, the approval of a corporate reorganization by the Securities and Exchange Commission, the prescription of future rates for a single named utility by the Federal Power Commission, and similar agency actions, although applicable only to named persons, constitute rule making. H.R. Rep. p. 49, fn. 1 (Sen. Doc. p. 283).

As applied to the various proceedings of Federal agencies, the definitions of "rule" and "rule making", and "order" and "adjudication" leave many questions as to whether particular proceedings are rule making or adjudication. For example, the question arises whether agency action on certain types of applications is to be deemed rule making or licensing (adjudication), in view of the fact that there is apparent overlapping between the defini-

[5] Note that section 4 (apart from 4(d)) is applicable only to substantive rules, i.e., rules issued pursuant to statutory authority to implement statutory policy, as by fixing rates or defining standards.

tion of "rule" in section 2(c) and of "license" in section 2(e). Thus, "rule" includes the "approval * * * for the future * * *", and "license" is defined to include "any agency permit, certificate, approval * * * or other form of permission."

An obvious principle of construction is that agency proceedings which fall within one of the specific categories of section 2(c), e.g., determining rates for the future, must be regarded as rule making, rather than as coming under the general and residual definition of adjudication. Furthermore, the listing of specific subjects in section 2 (c) as rule making is not intended to be exclusive. It is illustrative only. H.R. Rep. 20 (Sen. Doc. p. 254). Thus, in determining whether agency action on a particular type of application is "rule making", the purposes of the statute involved and the considerations which the agency is required to weigh in granting or withholding its approval will be relevant; if the factors governing such approval are the same, for example, as the agency would be required to apply in approving a recapitalization or reorganization (clearly rule making), this circumstance would tend to support the conclusion that agency action on such an application is rule making.

More broadly, the entire Act is based upon a dichotomy between rule making and adjudication. Examination of the legislative history of the definitions and of the differences in the required procedures for rule making and for adjudication discloses highly practical concepts of rule making and adjudication. Rule making is agency action which regulates the future conduct of either groups of persons or a single person; it is essentially legislative in nature, not only because it operates in the future but also because it is primarily concerned with policy considerations. The object of the rule making proceeding is the implementation or prescription of law or policy for the future, rather than the evaluation of a respondent's past conduct. Typically, the issues relate not to the evidentiary facts, as to which the veracity and demeanor of witnesses would often be important, but rather to the policy-making conclusions to be drawn from the facts. Senate Hearings (1941) pp. 657, 1298, 1451. Conversely, adjudication is concerned with the determination of past and present rights and liabilities. Normally, there is involved a decision as to whether past conduct was unlawful, so that the proceeding is characterized by an accusatory flavor and may result in disciplinary action. Or, it may involve the determination of a person's right to bene-

PYM-000440

fits under existing law so that the issues relate to whether he is within the established category of persons entitled to such benefits. In such proceedings, the issues of fact are often sharply controverted. Sen. Rep. p. 39 (Sen. Doc. p. 225); 92 Cong. Rec. 5648 (Sen. Doc. p. 353).

Not only were the draftsmen and proponents of the bill aware of this realistic distinction between rule making and adjudication, but they shaped the entire Act around it. Even in formal rule making proceedings subject to sections 7 and 8, the Act leaves the hearing officer entirely free to consult with any other member of the agency's staff. In fact, the intermediate decision may be made by the agency itself or by a responsible officer other than the hearing officer. This reflects the fact that the purpose of the rule making proceeding is to determine policy. Policy is not made in Federal agencies by individual hearing examiners; rather it is formulated by the agency heads relying heavily upon the the expert staffs which have been hired for that purpose. And so the Act recognizes that in rule making the intermediate decisions will be more useful to the parties in advising them of the real issues in the case if such decisions reflect the views of the agency heads or of their responsible officers who assist them in determining policy. In sharp contrast is the procedure required in cases of adjudication subject to section 5(c). There the hearing officer who presides at the hearing and observes the witnesses must personally prepare the initial or recommended decision required by section 8. Also, in such adjudicatory cases, the agency officers who performed investigative or prosecuting functions in that or a factually related case may not participate in the making of decisions. These requirements reflect the characteristics of adjudication discussed above.

The foregoing discussion indicates that the residual definition of "adjudication" in section 2(d) was intended to include such proceedings as the following:

1. Proceedings instituted by the Federal Trade Commission and the National Labor Relations Board leading to the issuance of orders to cease and desist from unfair methods of competition or unfair labor practices, respectively.
2. The determination of claims for money, such as compensation claims under the Longshoremen's and Harbor Workers' Compensation Act, and claims under Title II (Old Age and Survivors' Insurance) of the Social Security Act.

Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 84 of 353
PYM-000441

3. Reparation proceedings in which the agency determines whether a shipper or other consumer is entitled to damages arising out of the alleged *past* unreasonableness of rates.
4. The determination of individual claims for benefits, such as grants-in-aid and subsidies.
5. Licensing proceedings, including the grant, denial, renewal, revocation, suspension, etc. of, for example, radio broadcasting licenses, certificates of public convenience and necessity, airman certificates, and the like.

## II

### SECTION 3—PUBLIC INFORMATION

The purpose of section 3 is to assist the public in dealing with administrative agencies by requiring agencies to make their administrative materials available in precise and current form. Section 3 should be construed broadly in the light of this purpose so as to make such material most useful to the public. The public information requirements of section 3 do not supersede the Federal Register Act (44 U.S.C. 301 *et seq.*). They are to be integrated with the existing program for publication of material in the Federal Register and the Code of Federal Regulations. The Federal Register Regulations (11 F.R. 9833) govern the manner in which documents are to be prepared prior to submission to the Division of the Federal Register. All materials issued under section 3(a) of the Act will be included in the Code of Federal Regulations and should be prepared accordingly. The Division of the Federal Register is prepared to offer assistance to the agencies in this respect.

### AGENCIES SUBJECT TO SECTION 3

This section, unlike the other provisions of the Act, is applicable to all agencies of the United States, excluding Congress, the courts, and the governments of the Territories, possessions, and the District of Columbia. Every agency, whether or not it has rule making or adjudicating functions, must comply with this section. Section 2(a), defining agencies, states specifically that even the exemption for the functions enumerated in the last sentence of that section does not extend to section 3. Accordingly, agencies performing temporary war functions must comply with this section.

### EXCEPTIONS TO REQUIREMENTS OF SECTION 3

Two exceptions have been made to section 3, namely:

"(1) *Any function of the United States requiring secrecy in the public interest.*" This would include the confidential operations of any agency, such as the confidential operations of the Federal Bureau of Investigation and the Secret Service and, in general, those aspects of any agency's law enforcement procedures the disclosure of which would reduce the utility of such

procedures. It is not restricted, however, to investigatory functions. The Comptroller of the Currency, for example, may have occasion to issue rules to national banks under such circumstances that the public interest precludes publicity.

It should be noted that the exception is made only "to the extent" that the function requires secrecy in the public interest. Such a determination must be made by the agency concerned. To the extent that the function does not require such secrecy, the publication requirements apply. Thus, the War Department obviously is not required to publish confidential matters of military organization and operation, but it would be required to publish the organization and procedure applicable to the ordinary civil functions of the Corps of Engineers.

"(2) *Any matter relating solely to the internal management of an agency.*" This exception is in line with the spirit of the public information requirements of section 3. If a matter is solely the concern of the agency proper, and therefore does not affect the members of the public to any extent, there is no requirement for publication under section 3. Thus, an agency's internal personnel and budget procedures need not be published (e.g., rules as to leaves of absence, vacation, travel, etc.). However, in case of doubt as to whether a matter is or is not one of internal management, it is suggested that the matter be published in the Federal Register, assuming it does not require secrecy in the public interest.

"Internal management of an agency" should not be construed as intra-agency only; it includes functions of internal Federal management, such as most of the functions of the Bureau of the Budget, and interdepartmental committees which are established by the President for the handling of internal management problems.

It should be understood that the following discussion of the requirements of section 3 is not applicable to the above italicized functions since they are expressly exempted from the section.

EFFECTIVE DATE—PROSPECTIVE OPERATION

Section 3, which took effect on September 11, 1946, is prospective in operation. 92nd Cong. Rec. 5650 (Sen. Doc. p. 357). It has no application to materials issued prior to that date. To the extent that an agency's procedures and organization had been published theretofore in the Federal Register (for example,

formal rules of practice), it was not necessary to republish them. Appropriate citations were frequently made to such previously published materials. Under section 3(a)(3), publication in the Federal Register is required of substantive rules (and statements of general policy and interpretations formulated and adopted by the agency for the guidance of the public) issued on and after September 11, 1946.

The Federal Register of September 11, 1946, Part II, appearing in four sections and containing 966 pages, contains the material prepared by Government agencies in initial compliance with section 3.

### SECTION 3(a)—RULES

Section 3(a) directs each agency to "separately state and currently publish in the Federal Register" its organization, procedures and substantive rules.

### SEPARATE STATEMENT

The three classes of material—organizational, procedural, and substantive rules—must be published in the Federal Register under separate and appropriate headings. Such separate statement, however, should not be carried to so logical an extreme as to inconvenience the public. For example, if an agency grants public benefits, it would be proper to include in the substantive rules relative to those benefits a statement as to the form to be used in applying for such benefits and the place of filing; however, the same procedural information must also be set forth or referred to in the separate statement of the agency's procedure. This may be accomplished by inserting in the procedural statement a notation to the effect that the procedure for obtaining public benefits may be found at a designated part of the substantive rules relative to such benefits.

### DESCRIPTION OF ORGANIZATION

Section 3(a)(1) requires that every agency shall separately state and currently publish in the Federal Register "(1) descriptions of its central and field organization including delegations by the agency of final authority and the established places at which, and methods whereby, the public may secure information or make submittals or requests." It is only delegations of *final* authority

PYM-000445

which need be listed. In this connection, it should be noted that there is no requirement to list in the rules the names of specific individuals to whom power is delegated, unless such specific designation is otherwise required by law, nor is there any requirement that isolated instances of delegation made on an *ad hoc* basis be published. Senate Hearings (1941) p. 1329. However, the agency should list by title the offices or officers to whom definite delegations of final authority have been made (e.g., Claims Division of the Department of Justice, or Regional Director of the War Assets Administration). Under this subsection, it may be advisable also for agencies to state specifically the powers which may be exercised by persons serving in an "acting" capacity.

An agency's central organization should be described by listing its divisions and principal subdivisions and the functions of each. Field organizations should be described by listing the location of such offices, together with a statement of their functions. For example, if certain field offices have authority to issue interpretative or advisory opinions, this should be specified together with a statement as to whether such opinions are subject to review or confirmation by the agency's central or other office. In general, there should be a statement of the information which may be obtained from, and the applications or requests which may be filed with, the different field offices. In view of the last sentence of section 3(a), it is important that each agency state clearly the types of applications, etc., if any, which it requires to be filed with designated agency offices.

## STATEMENT OF PROCEDURES

Section 3(a)(2) provides that every agency shall separately state and currently publish in the Federal Register "(2) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal or informal procedures available as well as forms and instructions as to the scope and contents of all papers, reports, or examinations." This subsection is primarily concerned with the procedures by which an agency discharges its public functions —such as rule making, adjudication, and the administration of loan, grant and benefit programs. No categorical statement can be made as to the manner in which each agency should describe

"the general course and method by which its functions are channeled and determined."

Section 3 does not require an agency to "freeze" its procedures, nor does it force the adoption of procedures more formal than those previously prevailing. An agency need not invent procedures where it has no reason to establish any procedures. Senate Hearings (1941) p. 1337. However, the agency must, in accordance with section 3, keep the public currently informed of changes in the actual procedures available. Of course, the published procedures of the agency may provide (subject to applicable law) for emergency or exceptional cases.

Where there is an established procedure for the handling of certain functions, the routing of and responsibility for such functions may be stated with reasonable particularity. Some functions, however, may be exercised so seldom that it will not be practicable to prescribe a definite routine. In such cases, the published information should at least include a statement of the office to which inquiries may be directed.

In brief, section 3 (a) (2) requires an agency to disclose in general terms, designed to be realistically informative to the public, the manner in which its functions are channeled and determined. In this connection, it should be remembered that matters of internal management are exempted from the publication requirements of section 3.

Informal conference procedures used by an agency should be publicized with a view to both serving the convenience of the public and facilitating the agency's operations. Such procedures exist widely and are known to the specialized practitioners. The general public should be informed of their availability and as to how and where to take advantage of them.

Forms for application, registration, etc., and the instructions accompanying such forms need not be published in full; publication of a simple statement of the function and contents of the form, and of where copies of the form, if available, may be obtained, is sufficient. H.R. Rep. p. 22 (Sen. Doc. p. 256).

Attention is called to the last sentence of the section, stating "No person shall in any manner be required to resort to organizaion or procedure not so published." Should an agency fail to publish, for example, a listing of its field offices with their functions, persons who have not received actual notice of such agency

organization may contend that they are not bound to resort to a field office prior to institution of their case in the central office.

SUBSTANTIVE RULES

Section 3 (a) (3) provides that every agency shall separately state and currently publish in the Federal Register "(3) substantive rules adopted as authorized by law and statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public, but not rules addressed to and served upon named persons in accordance with law." This exemption for "rules addressed to and served upon named persons in accordance with law" is designed to avoid filling the Federal Register with a great mass of particularized rule making, such as schedules of rates, which have always been satisfactorily handled without general publication in the Federal Register.

The phrase "substantive rules adopted as authorized by law" refers, of course, to rules issued by an agency to implement statutory policy. Examples are the Federal Power Commission's rules prescribing uniform systems of accounts and proxy rules issued by the Securities and Exchange Commission.

Statements of general policy and interpretations need be published only if they are formulated and adopted by the agency for the guidance of the public. The Act leaves each agency free to determine for itself the desirability of formulating policy statements for the guidance of the public. To the extent that an agency, however, enunciates such statements of general policy in the form of speeches, releases or otherwise, the Act requires them to be published in the Federal Register.

The term "public" would not seem to embrace states. For example, the Federal Security Agency sends interpretative guides to states to assist them in complying with the requirements of the Unemployment Compensation provisions of the Social Security laws. Such guides need not be published since they are not for the use of the "public" but only for the state governments.

Section 3 (a) does not require publication in the Federal Register of statements of agency policy and interpretations which are developed and enunciated only in the course of adjudicatory orders and opinions; such orders and opinions are treated as a separate and distinct body of administrative materials under section 3 (b).

An advisory interpretation relating to a specific set of facts

is not subject to section 3. 92 Cong. Rec. 5649 (Sen. Doc. p. 355). For example, a reply from the agency's general counsel to an inquiry from a member of the public as to the applicability of a statute to a specific set of facts need not be published.

SECTION 3(b)—OPINIONS AND ORDERS

Section 3(b) provides that "Every agency shall publish or, in accordance with published rule, make available to public inspection all final opinions or orders in the adjudication of cases (except those required for good cause to be held confidential and not cited as precedents) and all rules." Section 3(b) does not require publication of these materials in the Federal Register or in any other prescribed form. Regular publication of decisions in bound volumes or bulletins, as many agencies are now doing, will suffice; in such cases, however, the agency should publish a rule stating where copies of such orders and opinions may be obtained or inspected during the interval prior to publication. It should be noted that the materials specified by section 3(b) need not be published at all if, in accordance with the agency's rule published in the Federal Register pursuant to section 3(a)(1), they are available for public inspection. It is suggested that to the extent section 3(b) is complied with by making materials available for inspection, such inspection be made possible, where practicable, in regional offices as well as in the agency's central office.

The scope of the phrase "opinions or orders in the adjudication of cases" is governed by section 2(d) and, accordingly, includes orders or opinions issued with respect to licenses. Adjudicatory orders and opinions which are not "final" need not be published or made available for inspection. However, where intermediate orders and opinions would be useful to the public as, say, procedural precedents, agencies may wish to publish them or make them available for inspection in the same manner as final orders and opinions.

An agency may withhold from publication or inspection final orders and opinions "required for good cause to be held confidential and not cited as precedents." If it is desired, however, to rely upon the citation of confidential materials, the agency should first make available some abstract of the confidential material in such form as will show the principles relied upon without revealing the confidential facts.

The last three words of section 3(b) "and all rules" include "rules addressed to and served upon named persons in accordance with law" which are excluded from the publication requirement of section 3(a)(3). See H.R. Rep. p. 50, fn. 7 (Sen. Doc. p. 284). Thus rules involving corporate mergers and reorganizations where all the parties are served need not be published in the Federal Register pursuant to section 3(a); instead the provisions of section 3(b) apply. It is sufficient, therefore, if such rules are made available for public inspection.

SECTION 3(c)—PUBLIC RECORDS

Section 3(c) provides that "Save as otherwise required by statute, matters of official record shall in accordance with published rule be made available to persons properly and directly concerned except information held confidential for good cause found." The introductory saving clause is intended to preserve existing statutory requirements for confidential treatment of certain materials, such as income tax returns.

Each agency should publish in the Federal Register, under 3(a)(1), a rule listing the types of official records in its files, classifying them in terms of whether or not they are confidential in character, stating the manner in which information is available (as by inspection or sale of photostatic copies), the method of applying for information, and by what officials the application will be determined.

The term "official record" is difficult of definition. In general, it may be stated that matters of official record will include (a) applications, registrations, petitions, reports and returns filed by members of the public with the agency pursuant to statute or the agency's rules, and (b) all documents embodying agency actions, such as orders, rules and licenses. In formal proceedings, the pleadings, transcripts of testimony, exhibits, and all documents received in evidence or made a part of the record are "matters of official record."

Section 3 (c) does not purport to define "official record." Each agency must examine its functions and the substantive statutes under which it operates to determine which of its materials are to be treated as matters of official record for the purposes of the section. Indicative of the types of records which are considered official records by Congress are maps, plats, or diagrams in the custody of the Secretary of the Interior (5 U. S. C. 488),

records, books or papers in the General Land Office (28 U. S. C. 672), and registration statements filed with the Securities and Exchange Commission under the Securities Act (15 U. S. C. 77f).

The great mass of material relating to the internal operation of an agency is not a matter of official record. For example, intra-agency memoranda and reports prepared by agency employees for use within the agency are not official records since they merely reflect the research and analysis preliminary to official agency action. Intra-agency reports of investigations are, in general, not matters of official record; in addition, they usually involve matters of internal management and, in view of their nature, must commonly be kept confidential.

But even matters of official record need be divulged only to "persons properly and directly concerned." It is clear that section 3(c) is not intended to open up Government files for general inspection. The phrase "persons properly and directly concerned" is descriptive of individuals who have a legitimate and valid reason for seeking access to an agency's records. See *United States ex rel. Stowell* v. *Deming*, 19 F. 2d, 697 (App. D.C., 1927), certiorari denied, 275 U.S. 531. Each agency is the primary judge of whether the person's interest is such as to require it to make its official records available for his inspection.

An agency may treat matters of official record as "confidential for good cause found" and upon that ground refuse to make them available for inspection. Information held "confidential for good cause found" may be either information held confidential by reason of an agency rule issued in advance (for good cause) making specific classes of material confidential, or such information as is held confidential for good cause found under a particular set of facts. The section does not change existing law as to those materials in Government files which have been heretofore treated as confidential. See *Boske* v. *Comingore*, 177 U.S. 459 (1900); *Boehm* v. *United States*, 123 F. 2d, 791, 805 (C.C.A. 8, 1941).

## III

### SECTION 4—RULE MAKING

In general, the purpose of section 4 is to guarantee to the public an opportunity to participate in the rule making process. With stated exceptions, each agency will be required under this section to give public notice of substantive rules which it proposes to adopt, and to grant interested persons an opportunity to present their views to it. Where rules are required by statute to be made on the record after opportunity for an agency hearing, the provisions of sections 7 and 8 as to hearing and decision will apply in place of the less formal procedures contemplated by section 4(b). With certain exceptions, no substantive rule may be made effective until at least thirty days after its publication in the Federal Register. Section 4 also grants to interested persons the right to petition an agency for the issuance, amendment or repeal of a rule.

#### EXCEPTIONS

In addition to the agencies and functions exempted by section 2(a), section 4 itself contains two broad exceptions to its requirements.

"(1) *any military, naval, or foreign affairs function of the United States*". The exemption for military and naval functions is not limited to activities of the War and Navy Departments but covers all military and naval functions exercised by any agency. Thus, the exemption applies to the defense functions of the Coast Guard and to the function of the Federal Power Commission under section 202(c) of the Federal Power Act (16 U.S.C. 824a (c)). Sen. Rep. p. 39 (Sen. Doc. p. 225); Senate Hearings (1941) p. 502.

As to the meaning of "foreign affairs function", both the Senate and House reports state: "The phrase 'foreign affairs functions,' used here and in some other provisions of the bill, is not to be loosely interpreted to mean any function extending beyond the borders of the United States but only those 'affairs' which so affect relations with other governments that, for example, public rule making provisions would clearly provoke definitely undesirable international consequences." Sen. Rep. p. 13; H.R. Rep. p. 23 (Sen. Doc. pp. 199, 257). See also Representative Walter's statement to the House, 92 Cong. Rec. 5650 (Sen.

Doc. p. 358). It is equally clear that the exemption is not limited to strictly diplomatic functions, because the phrase "diplomatic function" was employed in the January 6, 1945 draft of S. 7 (Senate Comparative Print of June 1945, p. 6; Sen. Doc. p. 157) and was discarded in favor of the broader and more generic phrase "foreign affairs function". In the light of this legislative history, it would seem clear that the exception must be construed as applicable to most functions of the State Department and to the foreign affairs functions of any other agency.

"(2) *any matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts*". The exemption for matters relating to "agency management or personnel" is self-explanatory and has been considered in the discussion of "internal management" under section 3. The exemption of "any matter relating * * * to public property, loans, grants, benefits, or contracts" is intended generally to cover the "proprietary" functions of the Federal Government. 92 Cong. Rec. 5650 (Sen. Doc. p. 358). It will be helpful to consider the implication of each of these phrases separately.

*Public Property.* This embraces rules issued by any agency with respect to real or personal property owned by the United States or by any agency of the United States. Thus, the making of rules relating to the public domain, i.e., the sale or lease of public lands or of mineral, timber or grazing rights in such lands, is exempt from the requirements of section 4. The exemption extends, for example, to rules issued by the Tennessee Valley Authority in relation to the management of its properties, and by the Maritime Commission with respect to ships owned by the United States. The term "public property" includes property held by the United States in trust or as guardian; e.g., Indian property. H.R. Rep. p. 23 (Sen. Doc. p. 257).

*Loans.* This exempts rules issued with respect to loans by such agencies as the Reconstruction Finance Corporation, the Commodity Credit Corporation, and the Farm Credit Administration. It also exempts rules relating to guarantees of loans, such as are made by the Federal Housing Authority and the Veterans Administration, since they are matters relating to public loans.

*Grants.* Rule making with respect to subsidy programs is exempted from section 4. "Grants" also include grant-in-aid programs under which the Federal Government makes payments to state and local governments with respect to highways, airports,

PYM-000453

unemployment compensation, etc.

*Benefits.* This refers to such programs as veterans' pensions and old-age insurance payments.

*Contracts.* All rules relating to public contracts are exempt from section 4. The exemption extends to wage determinations made by the Labor Department under the Davis Bacon Act (40 U.S.C. 276a et seq.) and the Walsh Healey Act (41 U.S.C. 35-45), as conditions to construction and procurement contracts entered into by the Federal Government. See *Perkins* v. *Lukens Steel Co.*, 310 U. S. 113 (1940).

### SECTION 4(a)—NOTICE

Subsections (a) and (b) of section 4 must be read together because the procedural requirements of subsection (b) apply only where notice is required by subsection (a). It is clear that the requirements of "general notice of proposed rule making" apply only to rule making proposed or initiated by an agency; the filing of a petition under section 4 (d) does not require an agency to undertake rule making proceedings in accordance with subsections (a) and (b). H.R. Rep. p. 26 (Sen. Doc. p. 260).

An agency contemplating the issuance of a rule subject to section 4 (a) must publish in the Federal Register a notice of the proposed rule making, "unless all persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law". The reason for the quoted exception is to avoid burdening the Federal Register with notices addressed to particular parties who have been personally served or otherwise have notice. H.R. Rep. p. 51, fn. 8 (Sen. Doc. p. 285). For example, where a proceeding is commenced to establish rates for named carriers or utilities, if a notice complying with section 4(a) is personally served upon such persons, publication in the Federal Register is not required by the subsection.

*Contents of notice.* In both formal[1] and informal rule making, the required notice, whether published in the Federal Register or personally served, must include the following information:

1. "A statement of the time, place, and nature of public rule making proceedings". While section 4(a) does not specify how much notice must be given by an agency before it may conduct public rule making proceedings, it is presumed that each agency

[1] As used here, "formal" rule making means those public rule making proceedings which must be conducted in accordance with sections 7 and 8.

will give reasonable notice.[2] In this connection, each agency should take into account the fact that section 4(c) provides that thirty days must ordinarily elapse prior to a rule becoming effective. Accordingly, each agency should schedule its rule making in such fashion that there will be sufficient time for affording interested persons an opportunity to participate in the rule making as well as for insuring final publication of the rule at least thirty days prior to the desired effective date.

The nature of public rule making may vary considerably from case to case. Under section 4(b) each agency, as this memorandum will indicate *infra,* may conduct its rule making by affording interested persons opportunity to submit written data only, or by receiving a combination of written and oral evidence, or by adopting any other method it finds most appropriate for public participation in the rule making process. However, where an agency is required by statute to conduct a hearing and to reach a decision upon the basis of the record made at such hearing, the formal procedures prescribed by sections 7 and 8 must be pursued. Therefore, the notice, required by section 4(a) should specify the procedure to be employed, that is, formal or informal hearings, submission of written statements with or without opportunity for oral argument, etc.

2. "Reference to the authority under which the rule is proposed". The reference must be sufficiently precise to apprise interested persons of the agency's legal authority to issue the proposed rule.

3. "Either the terms or substance of the proposed rule or a description of the subjects and issues involved". Where able to do so, an agency may state the proposed rule itself or the substance of the rule in the notice required by section 4(a). On the other hand, the agency, if it desires, may issue a more general "description of the subjects and issues involved". It is suggested that each agency consider the desirability of using the latter method if publication of a proposed rule in full would unduly burden the Federal Register or would in fact be less informative to the public. In such a case, the agency may inform interested persons that copies of the proposed rule may be obtained from the agency upon request—this, of course, in addition to the "description of the subjects and issues involved" in the Federal Register. Where there is a "description of the subjects and issues

---

2 See section 8 of the Federal Register Act (44 U.S.C. 308) for a general statutory standard of reasonable notice.

involved", the notice should be sufficiently informative to assure interested persons an opportunity to participate intelligently in the rule making process. Final Report, p. 108.

*Section* 4(a) *and* (b) *applicable only to substantive rules.* The last sentence of section 4(a) exempts from the requirements of section 4(a) and (b), unless otherwise required by statute, "interpretative rules, general statements of policy, rules of agency organization, procedure, or practice". Thus, the rules of organization and procedure which an agency must publish pursuant to section 3(a)(1) and (2) are not ordinarily subject to the requirements of section 4(a) and (b). The further exemption of "interpretative rules" and "general statements of policy" restricts the application of section 4(a) and (b) to substantive rules issued pursuant to statutory authority.[3] See Senate Comparative Print of June 1945, p. 6 (Sen. Doc. p. 19).

*Omission of notice and public procedure for good cause.* The last sentence of section 4(a) authorizes any agency to omit the notice required by that subsection (and the procedure specified by section 4(b)) "in any situation in which the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest". It should be noted that the reasons for which an agency may dispense with notice under section 4(a) are written in the alternative so that if it is "impracticable" or "unnecessary" or "contrary to the public interest" the agency may dispense with notice. Should this be done, the agency must incorporate in the rule issued its finding of "good cause" and "a brief statement of the reasons therefor". In general, it may be said that a situation is "impracticable" when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in section 4 (a). For example, the Civil Aeronautics Board may learn, from an accident investigation, that certain rules as to air safety should be issued or amended without delay; with the safety of the traveling public at stake, the Board could find that notice

---

3 In this connection, the following working definitions are offered:
*Substantive rules*—rules, other than organizational or procedural under section 3(a) (1) and (2), issued by an agency pursuant to statutory authority and which implement the statute, as, for example, the proxy rules issued by the Securities and Exchange Commisson pursuant to section 14 of the Securities Exchange Act of 1934 (15 U.S.C. 78 n). Such rules have the force and effect of law.
*Interpretative rules*—rules or statements issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers. See Final Report, p. 27; Senate Comparative Print of June 1945, p. 5 (Sen. Doc. p. 18); Senate Hearings (1941) p. 330.
*General statements of policy*—statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.

and public rule making procedures would be "impracticable", and issue its rules immediately. "Unnecessary" refers to the issuance of a minor rule or amendment in which the public is not particularly interested. Senate Hearings (1941) p. 828. "Public interest" connotes a situation in which the interest of the public would be defeated by any requirement of advance notice. For example, an agency may contemplate the issuance of financial controls under such circumstances that advance notice of such rules would tend to defeat their purpose; in such circumstances, the "public interest" might well justify the omission of notice and public rule making proceedings. Senate Hearings (1941) p. 812.

SECTION 4(b)—PROCEDURES

*Informal rule making.* In every case of proposed informal rule making subject to the notice requirements of section 4(a), section 4(b) provides that "the agency shall afford interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity to present the same orally in any manner." The quoted language confers discretion upon the agency, except where statutes require "formal" rule making subject to sections 7 and 8, to designate in each case the procedure for public participation in rule making. Such informal rule making procedure may take a variety of forms: informal hearings (with or without a stenographic transcript), conferences, consultation with industry committees, submission of written views, or any combination of these. These informal procedures have already been extensively employed by Federal agencies. Final Report, pp. 103-105. In each case, the selection of the procedure to be followed will depend largely upon the nature of the rules involved. The objective should be to assure informed administrative action and adequate protection to private interests.

Each agency is affirmatively required to consider "all relevant matter presented" in the proceeding; it is recommended that all rules issued after such informal proceedings be accompanied by an express recital that such material has been considered. It is entirely clear, however, that section 4(b) does not require the formulation of rules upon the exclusive basis of any "record" made in informal rule making proceedings. Senate Hearings (1941) p. 444. Accordingly, except in formal rule making governed by sections 7 and 8, an agency is free to formulate rules upon the basis of

PYM-000437

materials in its files and the knowledge and experience of the agency, in addition to the materials adduced in public rule making proceedings.

Section 4 (b) provides that upon the completion of public rule making proceedings "after consideration of all relevant matter presented, the agency shall incorporate in any rules adopted a concise general statement of their basis and purpose". The required statement will be important in that the courts and the public may be expected to use such statements in the interpretation of the agency's rules. The statement is to be "concise" and "general". Except as required by statutes providing for "formal" rule making procedure, findings of fact and conclusions of law are not necessary. Nor is there required an elaborate analysis of the rules or of the considerations upon which the rules were issued. Rather, the statement is intended to advise the public of the general basis and purpose of the rules.

*Formal rule making.* Section 4 (b) provides that "Where rules are required by statute to be made on the record after opportunity for an agency hearing, the requirements of sections 7 and 8 shall apply in place of the provisions of this subsection." Thus, where a rule is required by some other statute to be issued on the basis of a record after opportunity for an agency hearing, the public rule making proceedings must consist of hearing and decision in accordance with sections 7 and 8. The provisions of section 5 are in no way applicable to rule making. It should be noted that sections 7 and 8 did not become effective until December 11, 1946, and, pursuant to section 12, do not apply to any public rule making proceedings initiated prior to that date.

Statutes rarely require hearings prior to the issuance of rules of general applicability. Such requirements, where they exist, appear in radically different contexts. The Federal Food, Drug and Cosmetic Act (21 U.S.C. 301) is almost unique in that it specifically provides that agency action issuing, amending or repealing specified classes of substantive rules may be taken only after notice and hearing, and that "The Administrator shall base his order only on substantial evidence of record at the hearing and shall set forth as part of the order detailed findings of fact on which the order is based." Upon review in a circuit court of appeals, a transcript of the record is filed, and "the findings of the Administrator as to the facts, if supported by substantial evidence, shall be conclusive" (21 U.S.C. 371). It is clear that such rules are "required by statute to be made on the record after opportunity

for an agency hearing". Accordingly, the rule making hearings required by the Federal Food, Drug and Cosmetic Act, initiated on and after December 11, 1946, must be conducted in accordance with sections 7 and 8 of the Administrative Procedure Act.

Statutes authorizing agencies to prescribe future rates (i.e., rules of either general or particular applicability) for public utilities and common carriers typically require that such rates be established only after an opportunity for a hearing before the agency. Such statutes rarely specify in terms that the agency action must be taken on the basis of the "record" developed in the hearing. However, where rates or prices are established by an agency after a hearing required by statute, the agencies themselves and the courts have long assumed that the agency's action must be based upon the evidence adduced at the hearing. Sometimes the requirement of decision on the record is readily inferred from other statutory provisions defining judicial review. For example, rate orders issued by the Federal Power Commission pursuant to the Natural Gas Act (15 U.S.C. 717) may be made only after hearing; upon review in a circuit court of appeals or the Court of Appeals for the District of Columbia, the Commission certifies and files with the court "a transcript of the record upon which the order complained of was entered", and the Commission's findings of fact "if supported by substantial evidence, shall be conclusive". It seems clear that these provisions of the Natural Gas Act must be construed as requiring the Commission to determine rates "on the record after opportunity for an agency hearing". See H.R. Rep. p. 51, fn. 9 (Sen. Doc. p. 285). The same conclusion would be reached with respect to the determination of minimum wages under the Fair Labor Standards Act (29 U.S.C. 201), which contains substantially the same provisions for hearing and judicial review.

The Interstate Commerce Commission and the Secretary of Agriculture may, after hearing, prescribe rates for carriers and stockyard agencies, respectively. Both types of rate orders are reviewable under the Urgent Deficiencies Act of 1913 (28 U.S.C. 47). Nothing in the Interstate Commerce Act, the Packers and Stockyards Act, or the Urgent Deficiencies Act requires in terms that such rate orders be "made on the record", or provides for the filing of a transcript of the administrative record with the reviewing court, or defines the scope of judicial review. However, both of these agencies and the courts have long assumed

Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 102 of 353
PYM-000459

that such rate orders must be based upon the record made in the hearing; furthermore, it has long been the practice under the Urgent Deficiencies Act to review such orders on the basis of the administrative record which is submitted to the reviewing court. *United States* v. *Abilene & Southern Ry. Co.*, 265 U.S. 274 (1924); *Mississippi Valley Barge Line Co.* v. *United States*, 292 U.S. 282 (1934); *Acker* v. *United States*, 298 U.S. 426 (1936). It appears, therefore, that rules (as defined in section 2(c)) which are issued after a hearing required by statute, and which are reviewable under the Urgent Deficiencies Act on the basis of the evidence adduced at the agency hearing, must be regarded as "required by statute to be made on the record after opportunity for an agency hearing".

With respect to the types of rule making discussed above, the statutes not only specifically require the agencies to hold hearings but also, specifically, or by clear implication, or by established administrative and judicial construction, require such rules to be formulated upon the basis of the evidentiary record made in the hearing. In these situations, the public rule making procedures required by section 4(b) will consist of a hearing conducted in accordance with sections 7 and 8.

There are other statutes which require agencies to hold hearings before issuing rules, but contain no language from which the further requirement of decision "on the record" can be inferred, nor any provision for judicial review on the record (as does the Natural Gas Act, *supra*). For example, the Federal Seed Act (7 U.S.C. 1561) simply provides that "prior to the promulgation of any rule or regulation under this chapter, due notice shall be given by publication in the Federal Register of intention to promulgate and the time and place of a public hearing to be held with reference thereto, and no rule or regulation may be promulgated until after such hearing". See also the so-called Dangerous Cargoes Act (46 U.S.C. 170(9)) and the Tanker Act (46 U.S.C. 391a(3)) discussed in Senate Hearings (1941) p. 589. In this type of statute, there is no requirement, express or implied, that rules be formulated "on the record".

There is persuasive legislative history to the effect that the Congress did not intend sections 7 and 8 to apply to rule making where the substantive statute merely required a hearing. In 1941, a subcommittee of the Senate Committee on the Judiciary held hearings on S. 674 (77th Cong., 1st sess.) and other administrative procedure bills. Section 209(d) of S. 674 provided with

respect to rule making that "where legislation specifically requires the holding of hearings prior to the making of rules, formal rule-making hearings shall be held". Mr. Ashley Sellers, testifying on behalf of the Department of Agriculture, called the subcommittee's attention to the fact that in various statutes, such as the Federal Seed Act, in which the Congress had required hearings to be held prior to the issuance of rules, the obvious purpose "was simply to require that the persons interested in the proposed rule should be permitted to express their views". Mr. Sellers drew a sharp distinction between such hearing requirements and the formal rule making requirements of the Federal Food, Drug and Cosmetic Act. Senate Hearings (1941) pp. 78-81, 1515, 1520.[4] Since this situation was thus specifically called to the subcommittee's attention, it is a legitimate inference that with respect to rule making the present dual requirement, i.e., "after opportunity for an agency hearing" *and* "on the record", was intended to avoid the application of formal procedural requirements in cases where the Congress intended only to provide an opportunity for the expression of views. See Mr. Carl McFarland's statement in Senate Hearings (1941) pp. 1343, 1386. See also *Pacific States Box & Basket Co.* v. *White*, 296 U.S. 176, 186 (1935).

*Publication of procedures.* Each agency which will be affected by section 4 should publish under section 3(a)(2) the procedures, formal and informal, pursuant to which the public may participate in the formulation of its rules. The statement of informal rule making procedures may be couched in either specific or general terms, depending on whether the agency has adopted a fixed procedure for all its rule making or varies it according to the type of rule to be promulgated. In the latter instance, it would be sufficient to state that proposed substantive rules will be adopted after allowing the public to participate in the rule making process either through submission of written data, oral testimony, etc., the method of participation in each case to be specified in the published notice in the Federal Register. H.R. Rep. p. 25 (Sen. Doc. p. 259).

### SECTION 4(C)—EFFECTIVE DATES

Section 4(c) provides that "The required publication or service of any substantive rule (other than one granting or recog-

4 See, also, the statement of Acting Attorney General Biddle citing examples of "statutes which require hearings as a part of the rule making procedure without imposing a requirement of formal adversary judicial methods". Senate Hearings (1941) p. 1468.

nizing exemption or relieving restriction or interpretative rules and statements of policy) shall be made not less than thirty days prior to the effective date thereof except as otherwise provided by the agency upon good cause found and published with the rule." This requirement applies regardless of whether the rules are issued after formal or informal procedure.

The discussion on section 4(c) in the reports of both the Senate and House Committees on the Judiciary makes clear that the phrase "The required publication or service of any substantive rule" does not relate back or refer to the publication of "general notice of proposed rule making" required by section 4(a); rather it is a requirement that substantive rules which must be published in the Federal Register (see section 3(a) (3)) shall be so published at least thirty days prior to their effective date. Similarly, "rules addressed to and served upon named persons", when they are substantive in nature, are subject to section 4(c). The purpose of the time lag required by section 4(c) is to "afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take any other action which the issuance of rules may prompt". Sen. Rep. p. 15; H.R. Rep. p. 25 (Sen. Doc. pp. 201, 259).

It is possible that section 4(c) will be interpreted as amending the Federal Register Act so as to require, with respect to rules subject to section 4(c), actual publication in the Federal Register (or service) at least thirty days prior to their effective date, rather than the mere filing of such rules with the Division of the Federal Register as heretofore. In any event, section 4(c) applies only to such *substantive rules* as are not excepted from all the provisions of section 4 by its introductory clause or by section 2(a) of the Act. It is clear, for example, that the effective date of rules issued within the scope of the functions exempted from all of the requirements of section 4 by the introductory clause of that section, will continue to be governed by section 7 of the Federal Register Act (44 U.S.C. 307), rather than by section 4(c) of the Administrative Procedure Act. Thus, where an agency issues rules relating to public property, such rules may be made effective upon filing with the Division of the Federal Register.

Also, section 7 of the Federal Register Act is not superseded in so far as there are involved rules granting or recognizing exemption or relieving restriction or interpretative rules and statements of policy. Thus, there still may be made effective upon filing with the Division of the Federal Register statements of policy

PYM-000462

and interpretative rules. Likewise excepted from the thirty-day requirement of section 4 (c) are rules "granting or recognizing exemption or relieving restriction". For example, if a statute prohibits the doing of an act without prior agency approval and such approval falls within the definition of "rule" in section 2(c), the action of the agency in approving such act, i.e., removing the restriction or providing an exemption, may be made effective without regard to the thirty-day requirement. Senate Hearings (1941) p. 1296. Also, the relaxation of a restrictive rule by an amendment, or the repeal of such a rule, would seem to be within the scope of the exception. The reason for this exception would appear to be that the persons affected by such rules are benefited by them and therefore need no time to conform their conduct so as to avoid the legal conseqences of violation. The fact that an interested person may object to such issuance, amendment, or repeal of a rule does not change the character of the rule as being one "granting or recognizing exemption or relieving restriction", thereby exempting it from the thirty-day requirement.

The requirement of publication not less than thirty days prior to the effective date may be shortened by an agency "upon good cause found and published with the rule". This discretionary exception was provided primarily to take care of the cases in which the public interest requires the agency to act immediately or within a period less than thirty days. Senate Hearings (1941) pp. 70, 441, 588, 650, 812, 1506. Where the persons concerned request that a rule be made effective within a shorter period, this circumstance would ordinarily constitute good cause. Also, it is clear from the legislative history that for good cause an agency may put a substantive rule into effect immediately; in such event, the requirement of prior publication is altogether absent, and the rule will become effective upon issuance as to persons with actual notice, and as to others upon filing with the Division of the Federal Register in accordance with section 7 of the Federal Register Act. Senate Hearings (1941) pp. 594, 599, 1340, 1455. Nothing in the Act precludes the issuance of retroactive rules when otherwise legal and accompanied by the finding required by section 4 (c). H.R. Rep. p. 19, fn. 1 (Sen. Doc. p. 283).

Where an agency, pursuant to the last clause of section 4(a), omits the procedures of section 4 (a) and (b) because "notice and public procedure thereon are impracticable, unnecessary or contrary to the public interest", subsection (c) does not thereby

Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 106 of 353
PYM-000463

become automatically inoperative. If the situation is such as to compel the agency, in addition, to dispense with the thirty-day provision, the rule should also contain the finding required by the last clause of section 4 (c).

Section 4 (c) is not intended to repeal provisions of other statutes which require a period of longer than thirty days between the issuance and effective date of certain rules. For example, the Cotton Standards Act authorizes the Secretary of Agriculture to set cotton classification standards which may not become effective in less than one year (7 U. S. C. 56). The thirty-day period prescribed by section 4(c) of the Administrative Procedure Act does not supersede the one-year period thus required by the Cotton Standards Act.

### SECTION 4(d)—PETITIONS

Section 4(d) provides that "Every agency shall accord any interested person the right to petition for the issuance, amendment, or repeal of a rule." Section 4(d) applies not only to substantive rules but also to interpretations and statements of general policy, and to organizational and procedural rules. It is applicable both to existing rules and to proposed or tentative rules.

The right to petition under section 4(d) must be accorded to any "interested person". It will be proper for an agency to limit this right to persons whose interests are or will be affected by the issuance, amendment or repeal of a rule.

Every agency with rule making powers subject to section 4 should establish, and publish under section 3(a)(2), procedural rules governing the receipt, consideration and disposition of petitions filed pursuant to section 4(d). These procedural rules may call, for example, for a statement of the rule making action which the petitioner seeks, together with any data available in support of his petition, a declaration of the petitioner's interest in the proposed action, and compliance with reasonable formal requirements.

If the agency is inclined to grant the petition, the nature of the proposed rule would determine whether public rule making proceedings under section 4(a) and (b) are required. However, the mere filing of a petition does not require the agency to grant it or to hold a hearing or to engage in any other public rule making proceedings. For example, under section 701(e) of the

Federal Food, Drug and Cosmetic Act (21 U.S.C. 371(e)), the Federal Security Administrator must provide a hearing on a proposed rule only where an application, stating reasonable grounds, is made by an interested industry or a substantial portion of the industry. Section 4(d) was not intended to modify that statute so as to require the Federal Security Administrator to hold a hearing on the petition of a single individual.

The agency need act on the petition only in accordance with its procedures as published in compliance with section 3(a)(2). The denial of a petition is governed by section 6(d). Sen. Rep. p. 15; H.R. Rep. p. 26 (Sen. Doc. pp. 201, 260). Accordingly, prompt notice of such denial should be given to the petitioner, together with a simple statement of the procedural or other grounds therefor.

Neither the denial of a petition under section 4(d), nor an agency's refusal to hold public rule making proceedings thereon, is subject to judicial review. Sen. Rep. p. 44 (Sen. Doc. p. 230).

This subsection (as in the case of the preceding portions of section 4) does not apply to rules relating to the functions and matters enumerated in the first sentence of section 4. The reports of the Senate and House Committees on the Judiciary state that "The introductory clause exempts from *all of the requirements* of section 4 any rule making so far as there are involved (1) military, naval, or foreign affairs functions or (2) matters relating to agency management or personnel or to public property, loans, grants, benefits, or contracts." (Underscoring supplied). Sen. Rep. p. 13; H.R. Rep. p. 23 (Sen. Doc. pp. 199, 257). The petition procedure of section 4(d) is not applicable, for example, to the rules which an agency has issued or is empowered to issue with respect to loans or pensions.

# IV

## SECTION 5—ADJUDICATIONS

Section 5, together with sections 7 and 8, governs the procedure in formal administrative adjudication. In addition, section 5 lists the types of adjudication which are exempted from the detailed procedural requirements of sections 5, 7 and 8. It is to be noted that the excepted types of adjudication are exempt from *all* of the provisions of section 5, as well as of sections 7 and 8. Thus, if a particular matter is "subject to a subsequent trial of the law and the facts de novo in any court", subsection (d), authorizing agencies to issue declaratory judgments, is not applicable.

### GENERAL SCOPE OF FORMAL PROCEDURAL REQUIREMENTS

"Adjudication" is defined as "agency process for the formulation of an order"; "order" is in turn defined as "the whole or any part of the final disposition (whether affirmative, negative, injunctive, or declaratory in form) of any agency in any matter other than rule making but including licensing" (section 2 (d)). Thus, investigatory proceedings, no matter how formal, which do not lead to the issuance of an order containing the element of final disposition as required by the definition, do not constitute adjudication. For example, accident investigations conducted by the Civil Aeronautics Authority pursuant to Title VII of the Civil Aeronautics Act do not result in orders, and therefore do not involve adjudication within the meaning of section 5.[1]

After examining the definition of "rule making" in section 2(c), it is apparent that the residual definition of "adjudication" in section 2 (d) might include many governmental functions, such as the administration of loan programs, which traditionally have never been regarded as adjudicative in nature and as a rule have never been exercised through other than business procedures. The exclusion of such functions from the formal procedural requirements of sections 5, 7 and 8 is accomplished by the introductory phrase of section 5 which limits its application (and, therefore, the application of sections 7 and 8) to cases of "adjudication required by statute to be determined on the record after op-

1 In the Senate Comparative Print of June 1945, p. 2 (Sen. Doc. p. 18), it is stated: "It should be noted that the definition of agencies does not mean that all acts of such agencies are subject to the procedural requirements. * * * If an agency is subject to the proposal under this section, nevertheless it is subject thereto only to the extent that acts, rules, or orders are defined and not further excluded in the following sections and subsections."

portunity for an agency hearing". It has been pointed out that "Limiting application of the sections to those cases in which statutes require a hearing is particularly significant, because thereby are excluded the great mass of administrative routine as well as pensions, claims, and a variety of similar matters in which Congress has usually intentionally or traditionally refrained from requiring an administrative hearing." Senate Comparative Print of June 1945, p. 7 (Sen. Doc. p. 22).

It will be noted that the formal procedural requirements of the Act are invoked only where agency action "on the record after opportunity for an agency hearing" is required by some other *statute*. The legislative history makes clear that the word "statute" was used deliberately so as to make sections 5, 7 and 8 applicable only where the Congress has otherwise *specifically* required a hearing to be held. Senate Hearings (1941) pp. 453, 577; Senate Comparative Print of June 1945, p. 7 (Sen. Doc. p. 22); House Hearings (1945) p. 33 (Sen. Doc. p. 79); Sen. Rep. p. 40 (Sen. Doc. p. 226); 92 Cong. Rec. 5651 (Sen. Doc. p. 359). Mere statutory authorization to hold hearings (e.g., "such hearings as may be deemed necessary") does not constitute such a requirement. In cases where a hearing is held, although not required by statute, but as a matter of due process or agency policy or practice, sections 5, 7 and 8 do not apply. Senate Hearings (1941) p. 1456.

Under section 5 of the Federal Trade Commission Act, for example, it is clear that orders to cease and desist from unfair methods of competition must be issued on the basis of the record made in the hearing which is required by that Act (15 U. S. C. 45). See also section 10 of the National Labor Relations Act (29 U. S. C. 160). Licensing proceedings constitute adjudication by definition and where they are required by statute to be "determined on the record after opportunity for an agency hearing", sections 5, 7 and 8 are applicable. Thus, under section 15 of the Securities Exchange Act (15 U. S. C. 78o), the Securities and Exchange Commission may deny an application for broker-dealer registration or revoke such registration after notice and opportunity for hearing; while the Securities Exchange Act does not expressly require orders of denial or revocation of registration to be made "on the record", such a requirement is clearly implied in the provision for judicial review of these orders in the circuit courts of appeal. Upon such review, the Commission files "a

PYM-000467

transcript of the record upon which the order complained of was entered", and "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." (15 U. S. C. 78y).

Other statutes authorizing agency action which is clearly adjudicatory in nature, such as the revocation of licenses, specifically require the agency to hold a hearing but contain no provision expressly requiring decision "on the record". For example, the Secretary of Agriculture may issue cease and desist orders under section 312 of the Packers and Stockyards Act, 1921 (7 U. S. C. 213), only after "notice and full hearing", and these orders are made reviewable under the Urgent Deficiencies Act. The Department of Agriculture has always assumed that these orders must be based upon the evidentiary record made in the hearing, and the courts have held that upon review the validity of an order issued under the Packers and Stockyards Act must be determined upon the administrative record. *Tagg Bros. & Moorhead* v. *United States*, 280 U. S. 420 (1930). It seems clear that administrative adjudication exercised in this context is subject to sections 5, 7 and 8.

A further group of statutes merely authorizes adjudicatory action after hearing, and contains no reference to decision "on the record" nor any specific provision for judicial review. Thus, under the United States Warehouse Act, the Secretary of Agriculture may suspend or revoke warehousemen's licenses "after opportunity for hearing" (7 U.S.C. 246). It is believed that with respect to adjudication the specific statutory requirement of a hearing, without anything more, carries with it the further requirement of decision on the basis of the evidence adduced at the hearing.[2] With respect to rule making, it was concluded, *supra*, that a statutory provision that rules be issued after a hearing, without more, should not be construed as requiring agency action "on the record", but rather as merely requiring an opportunity for the expression of views. That conclusion was based on the legislative nature of rule making, from which it was inferred, unless a statute requires otherwise, that an agency hearing on proposed rules would be similar to a hearing before a legislative committee, with neither the legislature nor the agency being limited to the material adduced at the hearing. No such rationale

---

[2] It is clear that nothing in the Administrative Procedure Act precludes private parties from waiving their right to a hearing. Similarily, an agency is not prevented from requiring parties to indicate within a reasonable time their desire for a hearing.

applies to administrative adjudication. In fact, it is assumed that where a statute specifically provides for administrative adjudication (such as the suspension or revocation of a license) after opportunity for an agency hearing, such specific requirement for a hearing ordinarily implies the further requirement of decision in accordance with evidence adduced at the hearing. H.R. Rep. p. 51, fn. 9 (Sen. Doc. p. 285). Of course, the foregoing discussion is inapplicable to any situation in which the legislative history or the context of the pertinent statute indicates a contrary congressional intent.

Certain licensing statutes provide that an application for a license may be granted or become effective upon lapse of time without a hearing, but that there must be an opportunity for hearing prior to the denial of the application. See Securities Exchange Act of 1934, section 15(b), (15 U. S. C. 78o(b)) and Communications Act of 1934, section 309 (47 U. S. C. 309). Nothing in section 5 of the Administrative Procedure Act is intended to require hearings where such statutes now permit the granting of licenses without a hearing.

*Exempted adjudications.* Section 5 specifically exempts from its provisions (and, accordingly, from the provisions of sections 7 and 8) six types of adjudicatory functions or proceedings which are discussed hereafter. It is important to note that these exemptions extend to *all* of the provisions of section 5. Furthermore, the exemption is applicable even where the exempted function is required by statute to be exercised "on the record after opportunity for an agency hearing". Sen. Rep. p. 16; H.R. Rep. p. 26 (Sen. Doc. pp. 202, 260).

1. "Any matter subject to a subsequent trial of the law and the facts de novo in any court". This exemption was explained in the reports of the Senate and House Committees on the Judiciary, as follows: "Where the adjudication is subject to a judicial trial de novo [it] is included because whatever judgment the agency makes is effective only in a prima facie sense at most and the party aggrieved is entitled to complete judicial retrial and decision." Sen. Rep. p. 16; H.R. Rep. p. 26 (Sen. Doc. pp. 202, 260). Exempt under this heading are certain proceedings which lead to reparation orders awarding damages, such as are issued by the Interstate Commerce Commission (49 U. S. C. 16) and the Secretary of Agriculture (7 U. S. C. 210). Senate Hearings (1941) pp. 75, 1389, 1508. In the Senate Comparative Print of June 1945

PYM-000469

(p. 8) (Sen. Doc. p. 22) the scope of the exemption was described as follows:

> This exception also exempts administrative reparation orders assessing damages, such as are issued by the Interstate Commerce Commission and the Secretary of Agriculture, since such orders are subject to trial *de novo* in court upon attempted enforcement.

2. "The selection or tenure of an officer or employee of the United States other than examiners appointed pursuant to section 11". This exemption of adjudications involving the selection and tenure of officers other than examiners was made "because the selection and control of public personnel has been traditionally regarded as a largely discretionary function". Sen. Rep. p. 16; H.R. Rep. p. 26 (Sen. Doc. pp. 202, 260). There is excluded from this exemption the selection or tenure of "examiners appointed pursuant to section 11"; this refers to the provision of section 11 that "Examiners shall be removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission * * * after opportunity for hearing and upon the record thereof." Proceedings for the removal of such examiners must be conducted in accordance with sections 5, 7 and 8.

3. "Proceedings in which decisions rest solely on inspections, tests, or elections". The reason for the exemption is that "those methods of determination do not lend themselves to the hearing process". Sen. Rep. p. 16; H.R. Rep. p. 27 (Sen. Doc. pp. 202, 261). This exemption is applicable even though a statute requires an opportunity for an agency hearing; thus the words "rest solely" do not mean that the exemption is available only where decisions are based solely upon inspections, tests, or elections, without opportunity for hearing or other proceedings. Rather, "rest solely" appears to mean that the exemption shall apply where all the issues involved in the decision are determined mainly on the basis of an inspection, test, or election. The legislative history of the Act, commencing with the Final Report of the Attorney General's Committee on Administrative Procedure, pp. 36-38, suggests the following as examples of "proceedings in which decisions rest solely on inspections, tests, or elections":

(a) the denial of airman certificates under section 602 of the Civil Aeronautics Act (49 U. S. C. 552) (statute provides for a hearing); Senate Hearings (1941) pp. 602-3;

(b) the denial or revocation of certificates of seaworthiness by local inspectors of the Coast Guard (46 U. S. C. 391); Senate

Hearings (1941) pp. 833-4;

(c) locomotive inspections by the Interstate Commerce Commission (45 U. S. C. 29) (statute provides for a hearing); Senate Hearings (1941) pp. 833-4;

(d) the grading of grain under the United States Grain Standards Act (7 U. S. C. 71 et seq.); Senate Hearings (1941) pp. 833-4.

The rationale for exempting such adjudications from formal procedural requirements was well stated by the Attorney General's Committee on Administrative Procedure in the following passage:

> In all these cases, as well as in others not here described, the most important element in the decision is the judgment of the man who saw and tested the ship or grain or fruit or locomotive, or who examined the prospective airplane pilot, or seaman, or proposed periodical. Formal proceedings are not, of course, impossible. A trial examiner could be designated; the inspector could be summoned to testify, under oath, concerning his observations just as a traffic officer who gives a driving test to an applicant for a motor operator's permit could be required to describe the applicant's performance to a second officer who could, in turn, decide whether the permit should be issued. But resort to formal procedure in this type of administrative matter, although sometimes provided for as in certain of the instances noted above, is not desired or utilized by the person whose rights or privileges are being adjudicated, because it gives no added protection. The judgment of the inspector who examined the applicant or tested the article would necessarily remain the determining element in the decision, and, in any event, some immediate decision concerning the fitness of an applicant, or of an airplane, or a locomotive, or a ship, is necessary to protect the public interest. That cannot await a formal hearing. Nor would formal procedure give greater assurance of a correct decision. The surest way to ascertain what is the grade of grain is for a skilled inspector to test it; the best way to discover whether the radio equipment of a ship is in proper working order is for a radio mechanic to examine it and test it. (Final Report, p. 37)

For further legislative history relating to this exemption, see Senate Hearings (1941) pp. 590, 602, 833.

4. "The conduct of military, naval, or foreign affairs functions". Both Committee reports state that the section "exempts military, naval, and foreign affairs functions for the same reasons that they are exempted from section 4; and, in any event, rarely if ever do statutes require such functions to be exercised upon hearing." Sen. Rep. p. 16; H.R. Rep. p. 27 (Sen. Doc. pp. 202, 261). Thus, the exercise of adjudicatory functions by the War and Navy Departments or by any other agency is exempt to the extent that the conduct of military or naval affairs is involved. Senate Hearings (1941) pp. 502-3. The term "foreign affairs functions" appears to be used in the same sense as in section 4. H.R. Rep. p. 27 (Sen. Doc. p. 261).

5. "Cases in which an agency is acting as an agent for a

Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 114 of 353
PYM-000471

court". This is self-explanatory. Senate Hearings (1941) pp. 422, 474, 1457.

6. "The certification of employee representatives". This exemption for "the certification of employee representatives such as the Labor Board operations under section 9(c) of the National Labor Relations Act, is included because those determinations rest so largely upon an election or the availability of an election". Sen. Rep. p. 16; H.R. Rep. p. 27 (Sen. Doc. pp. 202, 261). And see Senate Hearings (1941) pp. 260, 271. It also exempts the certification of employee representatives by the National Mediation Board pursuant to section 2(9) of the Railway Labor Act (45 U. S. C. 152).

### SECTION 5(a)—NOTICE

The first sentence of section 5(a) provides that "Persons entitled to notice of an agency hearing shall be timely informed of—

(1) "the time, place, and nature thereof". The subsection does not specify the period of notice of hearing to be given by an agency, other than to require "timely" notice. Whether a given period of time constitutes timely notice will depend upon the circumstances, including the urgency of the situation and the complexity of the issues involved in the proceeding. It is clear that nothing in the subsection revokes the specific provisions of other statutes as to the amount of notice which must be given in various proceedings. See generally section 8 of the Federal Register Act (44 U.S.C. 308) and specific statutory provisions such as section 5 of the Federal Trade Commission Act, requiring 30 days' notice of hearing (15 U. S. C. 45). In addition to specifying the time and place of hearing, the notice should specify the nature of the hearing, e.g., whether a cease and desist order should issue.

The last sentence of section 5(a) provides that "In fixing the times and places for hearings, due regard shall be had for the convenience and necessity of the parties or their representatives." This simply means that consistent with the public interest and the due execution of the agency's functions, each agency shall attempt to schedule hearings at times and places which will be convenient for the parties and their representatives. Sen. Rep. p. 17 (Sen. Doc. p. 203).

(2) "the legal authority and jurisdiction under which the hearing is to be held". The notice should contain reference to the

Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 115 of 353
PYM-000472

agency's authority sufficient to inform the parties of the legal powers and jurisdiction which the agency is invoking in the particular case, and thus enable the parties to raise any legal issues they consider relevant.

(3) "The matters of fact and law asserted". It is not required to set forth evidentiary facts or legal argument. All that is necessary is to advise the parties of the legal and factual issues involved.

*Responsive pleading.* The second sentence of section 5(a) provides that "In instances in which private persons are the moving parties, other parties to the proceeding shall give prompt notice of issues controverted in fact or law; and in other instances agencies may by rule require responsive pleading." In the Committee reports, it is stated that "The second sentence of the subsection applies in those cases where the agency does not control the matter of notice because private persons are the moving parties; and in such cases the respondent parties must give notice of the issues of law and fact which they controvert so that the moving party will be apprised of the issues he must sustain." Sen. Rep. p. 17; H.R. Rep. p. 27 (Sen. Doc. pp. 203, 261). The first clause of this sentence is mandatory. This provision for responsive pleading appears to be applicable, for example, where the moving party is applying for a license and the agency admits as parties or intervenors competitors of the applicant who are opposing the application. Under section 5(a), the agency should require such additional parties to disclose their position promptly. While the subsection does not specify the consequences to be attached to a party's failure so to plead, it would clearly support an agency rule requiring a party to answer specifically the allegations of the moving party, or be deemed to have admitted such allegations.

The second sentence of section 5(a) also provides that "in other instances agencies may by rule require responsive pleading". "In other instances" apparently refers to cases in which the agency, rather than a private party, is the moving party. Thus, the quoted clause authorizes an agency, in adjudicatory proceedings which it has initiated, such as for the suspension or revocation of licenses, to require the respondent to plead responsively, i.e., to "give prompt notice of issues controverted in fact or law".

SECTION 5(b)—PROCEDURE

Section 5(b) provides that "The agency shall afford all interested parties opportunity for (1) the submission and considera-

PYM-000473

tion of facts, arguments, offers of settlement, or proposals of adjustment where time, the nature of the proceeding, and the public interest permit, and (2) to the extent that the parties are unable so to determine any controversy by consent, hearing,[8] and decision upon notice and in conformity with section 7 and 8." The settlement of cases and issues by informal methods is nothing new in Federal administrative procedure. In its Final Report, the Attorney General's Committee on Administrative Procedure pointed out (p. 35) that "even where formal proceedings are fully available, informal procedures constitute the vast bulk of administrative adjudication and are truly the lifeblood of the administrative process".

Like section 5 generally, subsection 5(b) applies only to cases "of adjudication required by statute to be determined on the record after opportunity for an agency hearing". The purpose of this subsection is to provide, so far as practicable, for the informal settlement or adjustment of controversies in lieu of formal adjudicatory proceedings. Section 5(b), however, does not require agencies to settle informally all cases which the parties desire to settle. Rather it requires the agencies to make available opportunities for such settlements, "where time, the nature of the proceeding, and the public interest permit".

Agencies must in some way provide opportunities for informal disposition of controversies. However, the precise manner in which such opportunities are to be afforded has been deliberately left by Congress to development by the agencies themselves. See Senate Comparative Print of June 1945, p. 9 (Sen. Doc. p. 24). The subsection apparently leaves the agencies free to provide such opportunity either before or after the initiation of a formal proceeding (e.g., the issuance of a complaint). If the opportunity is to be made available prior to the issuance of a complaint or notice, the agency must in some way advise the parties that formal proceedings are contemplated. In such a situation, the agency should advise the party at some preliminary stage (investigatory or otherwise) that it is contemplating the initiation of a formal proceeding and that it is giving him an opportunity to settle or adjust the matter. Where the opportunity is made available after the issuance of a notice or complaint, it is sufficient if the agency's published procedures

[8] The comma after "hearing" in section 5(b) is a printer's error.

advise parties as to how an informal settlement or adjustment may be sought.

Whether such opportunity is provided before or after the initiation of the formal proceeding, it should enable parties to present their proposals for settlement to responsible officers or employees of the agency. Since section 5(b) does not prescribe adjustment procedures, they may consist entirely of oral conferences or agencies may require proposals for adjustment or settlement to be submitted in writing. If proposals are submitted and they are unsatisfactory, the agency should consider the advisability of informing the parties involved of the conditions, if any, on which the agency is willing to settle the controversy or accept compliance without formal proceedings. It is clear that section 5(b) does not require an agency to defer formal proceedings indefinitely while parties submit a series of proposals for the purpose of delay.

In the settlement of cases pursuant to section 5(b), agencies may, as heretofore, require parties to enter into consent decrees or orders or stipulations to cease and desist as a part of the settlement. As Representative Walter stated: "The settlement by consent provision is extremely important because agencies ought not to engage in formal proceedings where the parties are perfectly willing to *consent to judgments* or adjust situations informally." [Italics supplied] 92 Cong. Rec. 5651 (Sen. Doc. p. 361). Final Report, pp. 41-42.

The requirement of section 5(b) that agencies provide opportunity for informal settlement is limited to cases "where time, the nature of the proceeding, and the public interest permit". The quoted language is to be treated in the alternative. Where an agency is confronted with the necessity for emergency action or where a statutue requires that a hearing be held within a limited period of time, the agency may be obliged to limit or refuse opportunity for informal settlement. The "nature of the proceeding" may be said to preclude negotiation in situations where the party has declared that he does not intend to comply with a known requirement of the agency or where statutes require that hearings be held in any event.[4] Senate Hearings (1941) p. 1474. Where an agency believes that the informal settlement of an alleged violation or certain classes of violations will not insure future compliance with law, it would be justified in concluding that

[4] For example, the Civil Aeronautics Board is required to hold hearings before granting a certificate of public convenience and necessity for a new route (49 U. S. C. 481).

PYM-000475

such settlement by consent would not be in the public interest.

Each agency should make public, pursuant to section 3(a), the manner in which it will provide interested parties an opportunity for the informal settlement or adjustment of the matters in issue. H.R. Rep. p. 27 (Sen. Doc. p. 261).

### SECTION 5(c)—SEPARATION OF FUNCTIONS

Section 5(c) generally requires each agency, in the adjudication of cases subject to section 5, to establish an internal separation of functions between the officials who hear and decide and those who investigate or prosecute. The discussion will be simplified if the exceptions from the requirements of section 5(c) are considered first.

*Exceptions.* Section 5(c), like the rest of section 5, applies only to cases of adjudication "required by statute to be determined on the record after opportunity for an agency hearing", and if the subject matter of the proceeding is not exempted by the first paragraph of section 5. Rule making, of course, is not subject to section 5(c). Section 5(c), in addition, provides that the provisions of that subsection "shall not apply in determining applications for initial licenses or to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers".

Section 5(c) does not apply to agency proceedings to determine applications for initial licenses—regardless of whether the agency grants or denies the license. "License" is defined in section 2(d). The phrase "initial license" must be interpreted from the context and legislative history.

The Administrative Procedure Act is based upon a broad and logical dichotomy between rule making and adjudication, i.e., between the legislative and judicial functions. See Chapter I. The legislative history of section 5(c) reveals that "determining applications for initial licenses" was exempted from the requirements of the subsection on the ground that such proceedings are similar to rule making. In the Committee reports, it is explained that "The exemption of applications for initial licenses frees from the requirements of the section such matters as the granting of certificates of convenience and necessity, upon the theory that in most licensing cases the original application may be much like rule making. The latter, of course, is not subject to any provision of section 5." Sen. Rep. p. 17; H.R. Rep. p.

30 (Sen. Doc. pp. 203, 262). The rationale for the exemption was further developed by Representative Walter on the floor of the House, as follows: "However, the subsection does not apply in determining applications for initial licenses, because it is felt that the determination of such matters is much like rule making and hence the parties will be better served if the proposed decision—later required by section 8—reflects the views of the responsible officers in the agencies whether or not they have actually taken the evidence." 92 Cong. Rec. 5651 (Sen. Doc. p. 361).

In view of the function of the exemption, the phrase "application for initial licenses" must be construed to include applications by the licensee for modifications of his original license. In effect, this gives full meaning to the broad definition of "license" in section 2(e), i.e., "the whole or part of any agency *permit*, certificate, *approval*, registration, charter, membership, statutory exemption *or other form of permission*". [Italics supplied] In other words, the definition clearly suggests that any agency "approval" or "permission" is a license, regardless of whether it is in addition to or related to an earlier license.[5] Only by such a construction can the appropriate procedures be made applicable to those aspects of licensing which are dominated by policy making considerations and in which accusatory and disciplinary factors are absent. Senate Hearings (1941) p. 1451. In this way, the basic dichotomy of the Act between rule making and adjudication is preserved, because section 5(c) will remain applicable to licensing proceedings involving the renewal, revocation, suspension, annulment, withdrawal or the *agency-initiated* modification or amendment of licenses—i.e., all those phases of licensing in which the accusatory or disciplinary factors are, or are likely to be, present.

This interpretation of the scope of the exemption is consistent with the remainder of its legislative history. When the ad-

[5] Any other interpretation of the exemption will largely destroy it and will result in an erratic application of section 5(c). For example, the function of the Civil Aeronautics Board with respect to certificates of public convenience and necessity increasingly relates to applications for modifications or extensions of existing routes rather than to original applications for entirely new routes. Thus, A, with a certificate for a route from New York to Chicago with a stop at Cleveland, may apply for a modification of the certificate to permit an additional stop at Pittsburgh. The considerations involved in determining such an application for modification of A's certificate are the same as those involved in his original application—traffic flow, availability of facilities, effect on competing carriers, etc. The accusatory and disciplinary elements are entirely lacking. Another example clearly illustrates the inconsistent results of such a narrow construction of the exemption for initial licensing: A has a certificate for a route from New York to St. Louis, and he applies for a modification which will authorize extension of the route to Omaha; B applies for a new certificate authorizing him to operate a route between St. Louis and Omaha. Under the narrow construction of the exemption, section 5(c) would apply to the Board's determination of A's application, but would not be applicable with respect to B's application. Similar anomalies would exist under the Federal Power Act, the Communications Act and the Natural Gas Act, particularly the latter.

ministrative procedure bill (S. 7) was introduced by Senator McCarran in January 1945, the provision that was then section 5(b) contained an exemption for "determining applications for licenses". When S. 7 was reported by the Senate Committee on the Judiciary in November 1945, section 5(c) contained the present language exempting "determining applications for initial licenses". In the discussion of the definitions of "adjudication" and "licensing" in the Committee reports, it is stated that "Licensing is specifically included [in adjudication] to remove any question, since licenses involve a pronouncement of present rights of named parties although they may also prescribe terms and conditions for future observance. Licensing as such is later exempted from some of the provisions of sections 5, 7 and 8 relating to hearings and decisions. * * * *Later provisions of the bill distinguish between initial licensing and renewals or other licensing proceedings.*" [Italics supplied] Sen. Rep. p. 11; H.R. Rep. p. 20 (Sen. Doc. pp. 197, 254). It is apparent from the legislative history that the word "initial" was inserted in the exception to distinguish original applications for licenses, i.e., any agency "approval" or "permission", from applications for renewals of licenses. This is entirely consistent with the underlying analogy of initial licensing to rule making, because renewal proceedings frequently involve a review of the licensee's past conduct and thus resemble adjudication rather than rule making.

The insertion of "initial" similarly distinguishes applications for licenses from modifications or limitations imposed by an agency upon an existing license. Thus, the Senate Committee Report also contains a memorandum from the Attorney General in which it is stated that "The section does apply, however, to licensing, with the exception that section 5(c), relating to the separation of functions, does not apply in determining applications for initial licenses, i.e., original licenses as contradistinguished from renewals or amendments of existing licenses." Sen. Rep. p. 40 (Sen. Doc. p. 226). In referring to "amendments", the quoted language contemplated amendments or modifications imposed by the agency on the ground that in such proceedings, as in renewal proceedings, the issues would often relate to the licensee's past conduct.

It is concluded, therefore, that the exemption from the provisions of section 5(c) of proceedings to determine "applications for initial licenses" extends not only to applications for original

licenses but also to applications by licensees for modification of licenses.

The exception of "proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers" originally read "in determining * * * the past reasonableness of rates". See S. 7, 79th Cong. 2nd sess., as passed by the Senate on March 12, 1946. H.R. Rep. p. 52 (Sen. Doc. p. 286). The exemption was apparently created on the ground that questions as to the past reasonableness of rates are sometimes consolidated with the making of future rates—a rule making function—and that the exception would encourage such consolidation. In the House, the exemption was broadened to include the validity or application of facilities and practices on the theory that such matters also are often consolidated with rule making. H.R. Rep. pp. 30, 52 (Sen. Doc. pp. 262, 286). However, it should be noted that the Act itself does not limit the exception to cases where there is consolidation with rule making proceedings.

*Hearing officers.* The first sentence of section 5(c) provides that "The same officers who preside at the reception of evidence pursuant to section 7 shall make the recommended decision or initial decision required by section 8 except where such officers become unavailable to the agency." Section 8(a) provides that in cases in which the agency has not presided at the reception of the evidence, the officer who presided (or, in cases not subject to section 5(c), such as initial licensing, any other officer or officers qualified to preside at hearings pursuant to section 7) shall make the initial decision or recommended decision as the case may be. Thus, apart from the exceptions referred to above, the officer who presides at the adjudicatory hearing and hears the evidence must prepare the initial or recommended decision, as the case may be, unless he becomes unavailable (as by illness or leaving the agency). Where the hearing officer becomes unavailable to the agency, the agency may itself complete the hearing or substitute another hearing officer to do so.

The second and third sentences of section 5(c) make provision for the separation of the functions of hearing and decision from the functions of investigation and prosecution. The second sentence of section 5(c) provides that:

> Save to the extent required for the disposition of ex parte matters as authorized by law, no such officer shall consult any person or party on any fact in issue unless upon notice and opportunity for all parties to participate; nor shall such officer be responsible to or subject to the sup-

> ervision or direction of any officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency.

The third sentence provides:

> No officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency in any case shall, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 8 except as witness or counsel in public proceedings.

It is thus apparent that the second sentence applies generally to the hearing process or the making of the record; the third, to the decisional process or the making of the initial or recommended decision by the hearing officer. The broad purpose of the second sentence is to assure that hearings be conducted by hearing officers who have not received or obtained factual information outside the record and who are neither supervised nor directed in the conduct of the hearing by agency officials engaged in the performance of investigative or prosecuting functions. To achieve fairness and independence in the hearing process it is first provided that (except for ex parte matters) no hearing officer "shall consult any person or party on any fact in issue unless upon notice and opportunity for all parties to participate". That is, the officer is prohibited from obtaining or receiving evidentiary or factual information bearing on the issues unless, after notice, all parties are permitted to participate. This would apply as well to expert testimony; the officer may not informally obtain evidentiary material from such experts either during or after the hearing, any more than he may from other witnesses.

The broad purpose of the third sentence is to insure that hearing officers make initial or recommended decisions free from the participation or advice of agency personnel engaged in the performance of investigative or prosecuting functions in that or a factually related case.[6] As to the decisional process it is clear that, to insure the separation of the functions of hearing

---

6 The limitation of the prohibition against consultation to those who performed investigative or prosecuting functions "in that or a factually related case", should be construed literally. As this provision originally appeared in H.R. 1203, 79th Cong., 1st sess. (1945), it was a complete prohibition against consultation with investigative and prosecuting personnel, as follows: "No officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency shall participate or advise in the decision, recommended decision, or agency review pursuant to section 8 except as witness or counsel in public proceedings." See Sen. Doc. p. 157.

The phrase "factually related case" connotes a situation in which a party is faced with two different proceedings arising out of the same or a connected set of facts. For example, a particular investigation may result in the institution of a cease and desist proceeding against a party as well as a proceeding involving the revocation of his license. The employees of the agency engaged in the investigation or prosecution of such a cease and desist proceeding would be precluded from rendering any assistance to the agency, not only in the decision of the cease and desist proceeding, but also in the decision of the revocation proceeding. However, they would not be prevented from assisting the agency in the decision of other cases (in which they had not engaged either as investigators or prosecutors) merely because the facts of these other cases may form a pattern similar to those which they had theretofore investigated or prosecuted.

and decision from the functions of investigation and prosecution and to insure the independence of the hearing officer, he may not consult or receive advice from any employee of the agency who is engaged in the performance of investigative or prosecuting functions in that or a factually related case. Likewise, under fundamental principles of due process, he may not receive advice or opinions from private parties or their counsel, unless, after notice, all parties are permitted to participate.

Further, it is manifest from the third sentence of section 5(c) that the hearing officer may obtain advice from or consult with agency personnel not engaged in investigative or prosecuting functions in that or a factually related case. The agency personnel in question may include, for example, the agency heads, the supervisors of the hearing officers, and persons assigned to assist the hearing officer in analyzing the record. Permitting the hearing officer to engage with appropriate agency personnel in an analytical discussion of the record is thoroughly consistent with the purposes of the Act. A principal purpose is that the hearing be followed by an initial or recommended decision proposed by the hearing officer which will focus the parties' attention upon the issues and conclusions of law, fact and policy which, in the hearing officer's judgment, govern the case. The availability to the hearing officer of appropriate assistance and advice will result normally in a more accurate initial or recommended decision and one that better reflects the views of the agency on questions of law and policy. Thus, the parties are better advised on the real issues that must be met in the subsequent procedure before final decision. See Senate Hearings (1941) pp. 266, 465, 646, 662, 836, 1487.

The exemption for the "disposition of ex parte matters as authorized by law" would permit the hearing examiner to act without notice on such matters as requests for adjournments, continuances, and the filing of papers. Sen. Rep. p. 17; H.R. Rep. p. 30 (Sen. Doc. pp. 203, 262). Also, it would apparently permit an examiner to act *ex parte* on requests for subpenas.

The independence of hearing officers is further assured by the requirement that they shall not "be responsible to or subject to the supervision or direction of any officer, employee, or agent engaged in the performance of investigative functions for any agency". As a practical matter this means that an agency's hearing examiners should be placed in an organizational unit

PYM-000481

apart from those to which investigative and prosecuting personnel are assigned, and that the examiners' unit should be under the supervision only of the agency itself or of agency officers who exercise no investigative or prosecuting functions. For example, if the agency's general counsel supervises the investigation and prosecution activities of the agency, the examiners' unit should not be subject to his supervision or control. However, section 5(c) would not prevent the trial examiners from being under the supervision of the general counsel where in fact the supervision of investigative and prosecuting functions is exercised by an associate or assistant general counsel who has no responsibility to the general counsel for such functions but is responsible therefor directly to the agency.

It is clear that nothing in the separation of functions requirements of section 5(c) is intended to preclude agency officials, regardless of their functions, from participating in necesary administrative arrangements, such as the efficient scheduling of hearings.

*The agency.* The third sentence of section 5(c) provides that "No officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency in any case shall, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 8 except as witness or counsel in public proceedings." Thus, on "agency review", the agency heads, as well as the hearing examiner, will be precluded from consulting or obtaining advice from any officer or employee with respect to any case in which, or in a factually related case,[7] such officer or employee has participated in the investigation or prosecution. In other words, the views of officials who investigated and prosecuted the case (or a factually related case) must be presented to hearing examiners and to agency heads in the public proceedings, i.e., hearings or oral argument, or by requested findings, exceptions, and briefs which are served upon the parties. Before discussing the scope of these requirements, it will be useful to consider some aspects of the administrative process.

The expertise of an administrative agency is not limited to the heads of the agency; it includes also the staff of specialists through whom and with whose assistance most of the agency's functions are carried on. The issues in adjudicatory cases, while

7 See discussion of "factually related case" in footnote 6.

frequently less complex and with narrower policy implications than are often involved in rule making, present in many cases difficult questions of law and policy. The determination of whether an industry-wide trade practice violates the Federal Trade Commission Act, or whether a certain series of stock market transactions constitute unlawful manipulation, often involves important and difficult issues. In determining such issues, agency heads have consulted with their principal advisers and specialists. Indeed, it is clearly in the public interest that they continue to do so. Section 5(c) does not purport to isolate the agency heads from their staffs. Rather, in the interest of fair procedure, it merely excludes from any such participation in the decision of a case those employees of the agency who have had such previous participation in an adversary capacity in that or a factually related case that they may be "disabled from bringing to its decision that dispassionate judgment which Anglo-American tradition demands of officials who decide questions". Final Report, p. 56.

An agency officer or employee may not participate or advise in the decision, recommended decision, or agency review of an examiner's initial decision if in that or a factually related case he performed investigative or prosecuting functions. For example, if the agency's general counsel or chief accountant engages in the performance of investigative or prosecuting functions in a case, he becomes unavailable to the agency for consultation on the decision of that or a factually related case. Of course, he could always present his views as witness or counsel in the public proceedings, including the filing of briefs.

Assuming that an agency will in many cases wish to consult with certain of its staff members, it may proceed in one of two ways. It may in a particular case consult with staff members who in fact have not performed investigative or prosecuting functions in that or a factually related case. In the alternative, the agency may find it feasible so to organize its staff assignments that the staff members whom it most frequently desires to consult will be free of all investigative and prosecuting functions. The latter method appears to offer two distinct advantages, particularly where the agency has a considerable volume of cases subject to section 5(c).

First, using the agency's general counsel for an example: If

the investigation and prosecution of adjudicatory cases are performed by the legal division under his supervision, it could be argued that his personal consideration of the routine cases has been so limited that he should be permitted to advise the agency in the decision of such cases. Even assuming that this is permitted by section 5(c), it would seem to be immaterial since his counsel will not be particularly needed in the routine cases. It is in the difficult and novel cases that the agency most needs his advice, and it is in these cases that he is most likely to be consulted extensively by his subordinates. Thus, he becomes unavailable to advise the agency in the very cases in which his advice would be most useful. On the other hand, if the agency so organizes its staff that the general counsel is not responsible for the investigative and prosecuting functions, he would be regularly available to the agency for consultation on the decision of cases.[8]

Second, if an agency thus organizes its staff and, accordingly, identifies the officers with whom it is free to consult in the decision of cases subject to section 5(c), these matters can be spelled out in the agency's published rules of procedure. Such publication would, in effect, inform the public of the identity (by title or group) of the staff members who advise in the decision of such cases. In any litigation on the issue of compliance with section 5(c), the published rules, embodying an organization and division of functions in the light of section 5(c), would assist in establishing proof of compliance with the separation of functions requirements.

The last sentence of section 5(c) sets forth certain exemptions from the requirements of the subsection. These have already been discussed, except the provision that "nor shall it be applicable in any manner to the agency or any member or members of the body comprising the agency". It was pointed out that this exemption "of the agency itself or the members of the board who comprise it—is required by the very nature of administrative agencies, where the same authority is responsible for both the investigation-prosecution and the hearing and decision of cases". Sen. Rep. p. 18; H.R. Rep. p. 30 (Sen. Doc. pp. 204, 262). Thus, if a member of the Interstate Commerce Commission actively participates in or directs the investigation of an adjudicatory case, he will not be precluded from participating with his colleagues in the decision of that case. Sen. Rep. p. 41 (Sen. Doc. p. 227).

8 The general counsel's participation in rule making and in court litigation would be entirely compatible with his role in advising the agency in the decision of adjudicatory cases subject to section 5(c).

SECTION 5(d)—DECLARATORY ORDERS

Section 5(d) provides that "The agency is authorized in its sound discretion, with like effect as in the case of other orders, to issue a declaratory order to terminate a controversy or remove uncertainty." The purpose of section 5(d), like that of the Declaratory Judgment Act (28 U.S.C. 400), is to develop predictability in the law by authorizing binding determinations "which dispose of legal controversies without the necessity of any party's acting at his peril upon his own view". Final Report, p. 30.

This grant of authority to the agencies to issue declaratory orders is limited by the introductory clause of section 5 so that such declaratory orders are authorized only with respect to matters which are required by statute to be determined "on the record after opportunity for an agency hearing". In addition, if the subject matter falls within one of the numbered exceptions in the introductory clause of section 5, such as a matter in which an agency is acting as an agent for a court, section 5(d) does not apply. Sen. Rep. p. 18; H.R. Rep. p. 31 (Sen. Doc. pp. 204, 263). For example, where an agency is authorized after hearing to issue orders to cease and desist from specified illegal conduct, it may, under section 5(d), if it otherwise has jurisdiction, issue a declaratory order declaring whether or not specified facts constitute illegal conduct. On the other hand, while the Securities and Exchange Commission has long issued informal advisory interpretations through its principal officers as to whether a proposed issue of securities would be exempt from the registration requirements of the Securities Act, there is no statutory agency hearing procedure in which this question can be determined; if securities are sold without registration and the Commission believes that registration was required, it can only institute civil or criminal proceedings. Accordingly, section 5(d) does not authorize the Commission to issue declaratory orders as to whether particular securities must be registered under the Securities Act.[9]

Agencies are authorized in their "sound discretion" to issue declaratory orders. They are not required to issue such orders merely because request is made therefor. Sen. Rep. p. 18; H.R. Rep. p. 31 (Sen. Doc. pp. 204, 263). By "sound dis-

[9] Of course, this does not affect the Securities and Exchange Commission's advisory service described above.

cretion", it is meant that agencies shall issue declaratory orders only under such circumstances that both the public interest and the interest of the party are protected. Thus, "a necessary condition of its [declaratory order] ready use is that it be employed only in situations where the critical facts can be explicity stated, without possibility that subsequent events will alter them. This is necessary to avoid later litigation concerning the applicability of a declaratory ruling which an agency may seek to disregard because, in its opinion, the facts to which it related have changed". Final Report, p. 32. Again, since the issuance of declaratory orders is a matter of sound discretion, it is clear that an agency need not issue such orders where it appears that the questions involved will be determined in a pending administrative or judicial proceeding, or where there is available some other statutory proceeding which will be more appropriate or effective under the circumstances. More broadly, it appears that "The administrative issuance of declaratory orders would be governed by the same basic principles that govern declaratory judgments in the courts." Sen. Rep. p. 18; H.R. Rep. p. 31 (Sen. Doc. pp. 204, 263).

PYM-000486

## V

### SECTION 6—ANCILLARY MATTERS

Section 6 defines various procedural rights of private parties which may be incidental to rule making, adjudication, or the exercise of any other agency authority. The introductory words of section 6, "Except as otherwise provided in this Act," are intended to assure that its provisions do not override contrary provisions in other parts of the act. Thus, the opportunity for informal appearance contemplated by section 6(a) is not to be construed so as to authorize *ex parte* conferences during formal proceedings when such conferences are forbidden by other sections of the act. Sen. Rep. p. 18, H.R. Rep. p. 31 (Sen. Doc. pp. 204, 263).

*Governing Definitions.* The provisions of section 6 hinge to a considerable extent upon the definition of the terms "party", "person" and "agency proceeding". These terms are defined in section 2 of the act as follows:

> (b) "Person" includes individuals, partnerships, corporations, associations, or public or private organizations of any character other than agencies. "Party" includes any person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in any agency proceeding; but nothing herein shall be construed to prevent an agency from admitting any person or agency as a party for limited purposes.
>
> * * * *
>
> (g) "Agency proceeding" means any agency process as defined in subsections (c), (d), and (e) of this section. [Defining rule making, adjudication and licensing, respectively.]

### SECTION 6(a)—APPEARANCE

*Formal Appearance.* The first sentence of section 6(a) provides that "Any person compelled to appear in person before any agency or representative thereof shall be accorded the right to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative." This restates existing law and practice that persons compelled to appear in person before an agency or its representative must be accorded the right to be accompanied by counsel and to consult with or be advised by such counsel. Such persons are also entitled to have counsel act as their spokesmen in argument and where otherwise appropriate. Senate Comparative Print of June 1945, p. 10 (Sen. Doc. p. 26). It is clear, of course, that this provision relates only to persons whose appearance is compelled or commanded, and does not extend to persons who appear volun-

tarily or in response to mere request by an agency. Where appearance is compelled, whether as a party or as a witness, the right to counsel exists.

The phrase "or, if permitted by the agency, by other qualified representative" refers to the present practice of some agencies of permitting appearance or representation in certain matters by non-lawyers, such as accountants. The phrasing of this clause, together with the last sentence of the subsection, makes it clear that nothing in the first sentence was intended to change the existing powers of agencies in this respect. See discussion, *infra* at pp. 65-6.

The second sentence of the subsection relates to the rights of "parties" to "agency proceedings". It provides that every "party" shall have the right to appear in any agency proceeding "in person or by or with counsel or other duly qualified representative."[1] The right of a party to appear personally or by or with counsel extends, in view of the definition of "agency proceeding", to proceedings involving rule making, adjudication or licensing. The identity of the "parties" is usually clear in adjudication, licensing and formal rule making proceedings. However, since the provision is not limited to formal proceedings (those governed by sections 7 and 8), but extends to informal rule making proceedings, the term "party", in the latter type of proceeding, means any person showing the requisite interest in the matters involved. Sen. Rep. p. 19; H.R. Rep. p. 31 (Sen. Doc. pp. 205, 263). It is entirely clear that this right to appear in informal rule making proceedings is limited by the nature of the procedure adopted by an agency, pursuant to section 4(b). If the agency, under section 4(b), provides interested persons an opportunity to present their views orally, the agency must allow any person with the requisite interest to appear personally or by counsel or other qualified representative. On the other hand, if the agency desires to hold informal rule making proceedings consisting of the submission of written data, views, or arguments, nothing in section 6(a) requires the agency to provide in addition for personal appearance. In other words, the second sentence of section 6(a) is not intended to limit an agency's discretion as to the type of rule making proceedings to be held in a particular case. (See opening clause of section 6: "Except as otherwise provided in this Act").

1 The phrase "qualified representative", as used in the second sentence of subsection 6(a), relates to non-lawyers whose appearance as representatives for others is left, as under the first sentence of the subsection, to the control of the agencies. See *infra*, pp. 65-6.

PYM-000488

*Informal Appearance.* The third sentence of section 6(a) provides that "So far as the orderly conduct of public business permits, any interested person may appear before any agency or its responsible officers or employees for the presentation, adjustment, or determination of any issue, request, or controversy in any proceeding (interlocutory, summary, or otherwise) or in connection with any agency function." This sentence contemplates that interested persons may appear not only in matters involving rule making, adjudication, and licensing, but also in connection with other agency functions. This provision is not to be construed as requiring an agency to give notice of its proposed action and to invite appearances by interested persons; an agency is not required to provide an opportunity for appearance and adjustment to interested persons unless they request it. Sen. Rep. p. 19 (Sen. Doc. p. 205).

The opportunity for informal appearance contemplated by the third sentence of section 6(a) means that any person should be given an opportunity to confer or discuss with responsible officers or employees of the agency matters in which he is properly interested. This opportunity should be with a responsible officer or employee—one who can decide the matter or whose function it is to make recommendations on such matters—rather than officers or employees whose duties are merely mechanical or formal. Sen. Rep. p. 19; H.R. Rep. p. 32 (Sen. Doc. pp. 205, 264).

This provision for informal appearance is expressly limited by the subsection to "so far as the orderly conduct of public business permits." Clearly, both the right and its limitation should be construed to achieve practical and fair results. Appearance should be allowed except where it would be inconsistent with the orderly conduct of public business. A properly interested person who is permitted to appear should be accorded an opportunity to present his case or proposals to a responsible officer or employee as defined above. Repeated opportunities to present the same arguments or proposals are not required. Further, the act does not require that every interested person be permitted to follow the chain of command to the head of the agency. It was not intended to require the directors of the Reconstruction Finance Corporation, for example, to confer personally with every applicant for a loan. It is sufficient if the opportunity to confer is with an official of such status that he knows the agency's policy, and is able to

PYM-000489

bring unusual or meritorious cases to the attention of the officials who shape the policy or make final decisions.

The opportunity thus to appear "for the presentation, adjustment, or determination of any issue, request, or controversy in any proceeding"—or "in connection with any agency function" relates not only to "agency proceedings" as defined in section 2(g), but also to all other agency functions. It means, for example, that upon request any person should be allowed, where this is feasible, to present his reasons as to why a particular loan or benefit should be made or granted to him. It would also seem to mean that he can present his reasons as to why a particular controversy should be settled informally rather than in formal proceedings with attendant publicity. However, there is no requirement that the agency accept such proposals for informal settlement; if, for example, the agency believes that formal public proceedings will best serve the public interest, it is free to conduct such proceedings.

The reference to "interlocutory" or "summary" proceedings appears to be intended to provide an opportunity for informal appearance and discussion in those situations where an agency takes significant action without prior formal proceedings. H.R. Rep. p. 32 (Sen. Doc. p. 264). For example, section 609 of the Civil Aeronautics Act of 1938 (49 U. S. C. 559) provides that "In cases of emergency, any such certificate [airworthiness certificate, airman certificate, etc.] may be suspended, in whole or in part, for a period not in excess of thirty days, without regard to any requirement as to notice and hearing." Under section 6(a) of the Administrative Procedure Act, the persons who would be affected by such summary action should, if feasible, be allowed to appear and present their views on the proposed action. It is absolutely clear, however, that nothing in this subsection was intended to interfere with the primary objective of assuring safety in air travel. To the extent that the timely execution of the Administrator's duties, i.e., the "orderly conduct of public business," precludes discussion and negotiation, he need not hold such discussions.

There will doubtless be many cases in which an agency will find it necessary to notice a matter for public hearing without preliminary discussion because a statute or the subject matter or the special circumstances so require. Sen. Rep. p. 41 (Sen. Doc. p. 227).

The fourth sentence of section 6(a) provides that "Every agency shall proceed with reasonable dispatch to conclude any matter presented to it except that due regard shall be had for the convenience and necessity of the parties or their representatives." This provision merely restates a principle of good administration.

*Practice Before Agencies.* The last sentence of section 6(a) provides that "Nothing herein shall be construed either to grant or to deny to any person who is not a lawyer the right to appear for or represent others before any agency or in any agency proceeding." The question of the extent to which non-lawyers should be permitted to practice before administrative agencies was deliberately left to the determination of the various agencies, as heretofore. House Hearings (1945) p. 34 (Sen. Doc. p. 80); H. R. Rep. p. 32 (Sen. Doc. p. 264).

More broadly, section 6(a) leaves intact the agencies' control over both lawyers and non-lawyers who practice before them. The reports of the Senate and House Judiciary Committees contain expressions of opinion to the effect that, as to lawyers desiring to practice before an agency, the agency should normally require no more than a statement from a lawyer that he is in good standing before the courts. Sen. Rep. p. 19; H.R. Rep. p. 32 (Sen. Doc. pp. 205, 264). However, the legislative history leaves no doubt that the Congress intended to keep unchanged the agencies' existing powers to regulate practice before them. When the House Committee on the Judiciary held hearings in 1945 on H.R. 1203 (79th Cong., 1st sess.) which, under the title of S. 7, was enacted as the Administrative Procedure Act, the Committee was specifically aware of the fact that H.R. 1203 contained no provision relating to attorneys practicing before agencies, while H.R. 339, and H.R. 1117, also pending before the Committee, contained such provisions. House Hearings (1945) p. 34 (Sen. Doc. p. 80). Finally, during the House debate on S. 7, Representative Kefauver offered the following amendment to section 6:

> Any member of the bar who is in good standing and who has been admitted to the bar of the Supreme Court of the United States or of the highest court of the State of his or her residence shall be eligible to practice before any agency: Provided, however, That an agency shall for good cause be authorized by order to suspend or deny the right to practice before such agency.

The amendment was rejected by the House, apparently on the ground that the subject should be covered by separate legislation. 92 Cong. Rec. 5666-8 (Sen. Doc. pp. 401-405).

It is clear, therefore, that the existing powers of the agencies to control practice before them are not changed by the Administrative Procedure Act. For example, an agency may exclude, after notice and opportunity for hearing, persons of improper character from practice before it, *Goldsmith* v. *Board of Tax Appeals*, 270 U.S. 117 (1926), or exclude parties or counsel from participation in proceedings by reason of unruly conduct, *Okin* v. *Securities and Exchange Commission*, 137 F. (2d) 398 (C.C.A. 2, 1943), or impose reasonable time limits during which former employees may not practice before the agency.

### SECTION 6(b)—INVESTIGATIONS

The first sentence of section 6(b) provides that "No process, requirement of a report, inspection, or other investigative act or demand shall be issued, made, or enforced in any manner or for any purpose except as authorized by law." This is a restatement of existing law. Senate Comparative Print of June 1945, p. 11, Sen. Rep. p. 41 (Sen. Doc. pp. 27, 227).

The second sentence of subsection 6(b) provides that "Every person compelled to submit data or evidence shall be entitled to retain or, on payment of lawfully prescribed costs, procure a copy or transcript thereof, except that in a nonpublic investigatory proceeding the witness may for good cause be limited to inspection of the official transcript of his testimony." Under this, any person compelled to submit data or evidence, either as a party or as a witness, must be accorded the right to retain copies of written data submitted in response to a *subpena duces tecum* or other demand, or, upon payment of lawfully prescribed costs, to procure from the agency a copy of the data thus submitted or a transcript of the oral testimony which he was required to give. This right, it will be noted, is limited to the data and evidence submitted by the particular witness, and does not entitle him to copies or transcripts of the data and evidence submitted by other persons. Moreover, it extends only to persons "compelled" to testify or to submit data, and not to those who are merely requested to do so or who do so voluntarily.

The right defined in the second sentence of section 6(b) is subject to the limitation "That in a nonpublic investigatory proceeding the witness may for good cause be limited to inspection of the official transcript of his testimony." In the Committee reports, it is stated that this limitation was deemed necessary "where

PYM-000492

evidence is taken in a case in which prosecutions may be brought later and it is obviously detrimental to the due execution of the laws to permit copies to be circulated." Sen. Rep. p. 19, H.R. Rep. p. 38 (Sen. Doc. pp. 205, 265). Thus, the phrase "non-public investigatory proceeding" covers all confidential phases of investigations, formal or informal, conducted by agencies to determine whether there have been violations of law. In such situations, the witness may be limited to inspection of such portions of the transcript of investigation as contain his own testimony. This right to inspect the transcript extends only to persons who have been compelled to testify.

SECTION 6(c)—SUBPENAS

The first sentence of section 6(c) provides that "Agency subpenas authorized by law shall be issued to any party upon request and, as may be required by rules of procedure, upon a statement or showing of general relevance and reasonable scope of the evidence sought." The purpose of this provision is to make agency subpenas available to private parties to the same extent as to agency representatives. Sen. Rep. p. 20, H.R. Rep. p. 33 (Sen. Doc. pp. 206, 265); 92 Cong. Rec. 5652 (Sen. Doc. p. 368). It applies to both subpenas *ad testificandum* and subpenas *duces tecum*. It should be emphasized that section 6(c) relates only to existing subpena powers conferred upon agencies; it does not grant power to issue subpenas to agencies which are not so empowered by other statutes. Senate Comparative Print of June 1945, p. 14 (Sen. Doc. pp. 29-30).

The subsection requires the issuance of subpenas to any party "upon request and, as may be required by rules of procedure, upon a statement or showing of general relevance and reasonable scope of the evidence sought." It may be argued from the quoted language that agency subpenas must be issued merely upon request of a party unless the agency requires, by its published procedural rules, a "statement or showing of general relevance and reasonable scope of the evidence sought"; accordingly, each agency which is empowered to issue subpenas should issue rules of procedure stating the manner in which parties are to request subpenas and the contents of such requests. The standard of "general relevance and reasonable scope" should be interpreted and applied in the light of the statutory purpose of making administrative subpenas equally available to private parties and

agency representatives. (See the second sentence of section 12). On the other hand, agencies should consider that subpenas which it may issue to aid private parties, like subpenas issued to assist the agencies themselves, are subject to the legal requirements and limitations restated in the second sentence of section 6(c). Thus, agencies may refuse to issue to private parties subpenas which appear to be so irrelevant or unreasonable that a court would refuse to enforce them.

The right to subpenas stated in section 6(c) is limited to "parties", as defined in section 2(b). Accordingly, the right to administrative subpenas is applicable to parties to rule making, adjudication and licensing proceedings.

The Act is silent as to the responsibility for payment of fees to witnesses called by private parties pursuant to subpenas issued by an agency.[2] It was apparently thought that such a provision should be the subject of separate legislation. Senate Comparative Print of June 1945, p. 11 (Sen. Doc. p. 28). In view of this, it appears that the question of payment of witness fees may be dealt with by reasonable administrative regulations such as many agencies have already adopted.[3]

The second sentence of section 6(c) provides that "Upon contest the court shall sustain any such subpena or similar process or demand to the extent that it is found to be in accordance with law and, in any proceeding for enforcement, shall issue an order requiring the appearance of the witness or the production of the evidence or data within a reasonable time under penalty of punishment for contempt in case of contumacious failure to comply." Upon its face, the subsection in requiring judicial enforcement of subpenas "found to be in accordance with law" is a reference to and an adoption of the existing law with respect to subpenas. For example, nothing in section 6(c) seems intended to

---

2 Section 10 of the Act of August 2, 1946 (Public Law 600, 79th Cong., 2d sess.) provides that "Whenever a department is authorized by law to hold hearings and to subpena witnesses for appearance at said hearings, witnesses summoned to and attending such hearings shall be entitled to the same fees and mileage, or expenses in the case of Government officers and employees, as provided by law for witnesses attending in the United States courts."

3 The following examples appear to be reasonable and appropriate:
*Federal Power Commission*—Rules of Practice Under the Federal Power Act.
Rule 1.181. "Fees of witnesses.—Witnesses who are summoned are entitled to the same fees as are paid for like services in the courts of the United States, such fees to be paid by the party at whose instance the testimony is taken, and the Commission before issuing subpoena may require a deposit of an amount adequate to cover the fees and milage involved." [16 U.S.C. 825f].
*Interstate Commerce Commission*—Rules of Practice.
Rule 56(e). "Witness fees. A witness who is summoned and responds thereto is entitled to the same fee as is paid for like service in the courts of the United States, such fee to be paid by the party at whose instance the testimony is taken at the time the subpena is served." [49 U.S.C. 18].

change existing law as to the reasonableness and scope of subpenas. Similarly, the subsection leaves unchanged existing law as to the scope of judicial inquiry where enforcement of a subpena is sought. In *Endicott Johnson Corp.* v. *Perkins*, 317 U.S. 501 (1943), the Supreme Court held that where the Secretary of Labor sought judicial enforcement of a subpena issued in a proceeding under the Walsh-Healey Public Contracts Act, the District Court was not authorized to determine whether the respondent was subject to that act, as a condition precedent to enforcement of the subpena. Accord, under the Fair Labor Standards Act, *Oklahoma Press Publishing Company* v. *Walling*, 327 U.S. 186 (1946). Nothing in the language of section 6(c) suggests any purpose to change this established rule. It is said only that the court shall enforce a subpena "to the extent that it is found to be in accordance with law." "Law" refers to the statutes which a particular agency administers, together with relevant judicial decisions.

This natural and literal construction of the second sentence of section 6(c) finds conclusive support in the legislative history of the provision. When S. 7 was introduced by Senator McCarran on January 6, 1945, section 6(c) provided that "Upon any contest of the validity of a subpena or similar process or demand, the court shall determine all relevant questions of law raised by the parties, *including the authority or jurisdiction of the agency.*" (Italics supplied). Clearly this language could be construed as intended to change the rule stated in *Endicott Johnson Corp.* v. *Perkins*, *supra*. However, when S. 7 was reported by the Senate Committee on the Judiciary on November 19, 1945 (Sen. Rep. p. 34 (Sen. Doc. p. 220)), section 6 was rephrased in its present form. This significant change in language, as well as the natural and literal reading of section 6(c), is persuasive that the subsection leaves unchanged the scope of judicial inquiry upon an application for the enforcement of a subpena. See also Sen. Rep. p. 41 (Sen. Doc. p. 227); 92 Cong. Rec. A2988 (Sen. Doc. p. 415).

### SECTION 6(d)—DENIALS

Section 6(d) provides that "prompt notice shall be given of the denial in whole or in part of any written application, petition, or other request of any interested person made in connection with any agency proceeding. Except in affirming a prior denial or

Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 138 of 353
PYM-000495

where the denial is self-explanatory, such notice shall be accompanied by a simple statement of procedural or other grounds." This requirement relates to applications, petitions and requests made by "interested persons" in connection with any "agency proceeding", i.e., rule making, adjudication and licensing proceedings. It applies to such proceedings regardless of whether they are formal or informal. Sen. Rep. p. 20, H.R. Rep. p. 33 (Sen. Doc. pp. 206, 265). As in the case of section 4(d), an "interested person" may be defined generally as one whose interests are or will be affected by the agency action which may result from the proceeding. It is clear that with respect to formal proceedings, the only interested persons are those who are "parties" to such proceedings within the meaning of section 2(b).

Section 6(d) has no application to matters which do not relate to rule making, adjudication or licensing. Generally, it is not applicable to the mass of administrative routine unrelated to those proceedings.

The prompt notice of denial required by section 6(d) may be given in writing, addressed to the applicant, or orally (e.g., in the case of a proceeding conducted by an examiner). The required statement of grounds for denial, while simple in nature, must be sufficient to advise the party of the general basis of the denial.

Where the denial is self-explanatory or affirms a previous denial, it need not be accompanied by a statement of reasons; in such cases, it is assumed that the applicant has knowledge of the grounds for denial.

VI

SECTION 7—HEARINGS

The provisions of section 7 govern the conduct of hearings in those cases of rule making and adjudication which are required by sections 4 and 5 to be conducted in accordance with sections 7 and 8. The requirements of section 7 are closely integrated with those of sections 5(c) (as to certain types of adjudication) and 8. Section 7, together with sections 5(c) and 8, became effective on December 11, 1946, and is applicable to proceedings commenced on and after that date. See section 12.

SECTION 7(a)—PRESIDING OFFICERS

The first sentence of section 7(a) provides that "There shall preside at the taking of evidence (1) the agency, (2) one or more members of the body which comprises the agency or (3) one or more examiners appointed as provided in this Act; but nothing in this Act shall be deemed to supersede the conduct of specified classes of proceedings in whole or part by or before boards or other officers specially provided for by or designated pursuant to statute."

Inasmuch as the provisions of section 11 relating to the selection and status of hearing examiners did not become effective until June 11, 1947 (see section 12), it is obvious that until then the agencies could continue to utilize their usual hearing examiners or officers, in compliance, of course, with the other requirements of sections 5(c), 7 and 8.

The last clause of the sentence is designed to permit agencies to continue to utilize hearing officers or boards "specially provided for by or designated pursuant to statute." An earlier draft referred to "other officers specially designated by statute." See Senate Comparative Print, June 1945 pp. 12-13 (Sen. Doc. p. 23). Under the original language, it might have been necessary for such an officer to be designated specifically by a statute to conduct a particular hearing, e.g., in the manner that 19 U.S.C. 1641 requires that hearings to determine whether a customhouse broker's license should be suspended or revoked must be held by the collector or chief officer of the customs. Under the present broader language, the exception will also apply if a statute authorizes the agency to designate a specific officer or employee or one of a specific class of officers or employees to conduct the

PYM-000497

hearing. Examples of statutory provisions for hearing officers who may be utilized without regard to section 11 are: (1) joint hearings before officers of Federal agencies and persons designated by one or more States (e.g., section 13(3) of the Interstate Commerce Act, 49 U.S.C. 13(3)), as well as hearings before joint State boards under section 209(a) of the Federal Power Act (16 U.S.C. 824h), (2) where officers of more than one agency sit, as joint boards composed of members of the Interstate Commerce Commission and the Civil Aeronautics Board pursuant to section 1003 of the Civil Aeronautics Act (49 U.S.C. 643), (3) quota review committees under the Agricultural Adjustment Act of 1938 (7 U.S.C. 1363), and (4) boards of employees under the Interstate Commerce Act (49 U.S.C. 17(2)). Sen. Rep. pp. 41-42, (Sen. Doc. pp. 227-228). A statutory provision which merely provides for the conduct of hearings by any officers or employees the agency may designate, does not come within the exception so as to authorize the agency to dispense with hearing examiners appointed in accordance with section 11. H.R. Rep. p. 34 (Sen. Doc. p. 268).

Generally, whoever presides at the hearing (whether an examiner appointed pursuant to section 11, a member of the agency or a special statutory board or hearing officer) is subject to the remaining provisions of the Act. Sen. Rep. p. 21; H.R. Rep. p. 34 (Sen. Doc. pp. 207, 268). However, where a member of the agency acts as presiding officer, the exception in the last clause of section 5(c) applies, with the result that he is not disqualified, as an examiner would be, by previous participation in the investigation of the case. Similarly, a statute requiring or authorizing a hearing to be conducted by a particular board or officer may have the further effect of requiring such board or officer to participate in the investigation or prosecution or of placing the board or officer under the supervision or direction of investigating or prosecuting officials. See 19 U.S.C. 1641. In the latter case, it would seem that to the extent the general requirements of section 5(c) are inconsistent they are inapplicable.

The second sentence of section 7(a) provides that "The functions of all presiding officers and of officers participating in decisions in conformity with section 8 shall be conducted in an impartial manner." This means, of course, that "They must conduct the hearing in a strictly impartial manner, rather than as the representative of an investigative or prosecuting authority, but

Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 141 of 353
PYM-000498

this does not mean that they do not have the authority and duty—as a court does—to make sure that all necessary evidence is adduced and to keep the hearing orderly and efficient." Sen. Rep. p. 21, H.R. Rep. p. 34 (Sen. Doc. pp. 207, 268). This is not intended to prohibit a hearing officer from questioning witnesses and otherwise encouraging the making of a complete record.

The third sentence of section 7(a) provides that "Any such officer may at any time withdraw if he deems himself disqualified; and, upon the filing in good faith of a timely and sufficient affidavit of personal bias or disqualification of any such officer, the agency shall determine the matter as a part of the record and decision in the case." This provision authorizes any presiding officer to withdraw from a proceeding if he considers himself disqualified, for example, as being related to a party. In addition, a party may, by the "filing in good faith of a timely and sufficient affidavit", present to the agency the issue of the "personal bias or disqualification of any such officer"; thereupon "the agency shall determine the matter as a part of the record and decision in the case". Hearings are not required on every charge of bias or disqualification of a presiding officer.[1] If the affidavit is insufficient upon its face, it may be dismissed summarily. In other cases, the agency may consider it appropriate to investigate the charge itself or by another hearing officer. In any event, the agency's decision and the proceedings upon such an affidavit must be made a part of the record of the case in which the affidavit is filed. Sen. Rep. pp. 21, 42, H.R. Rep. p. 35 (Sen. Doc. pp. 207, 228, 269).

If a court in reviewing the agency's final action finds, contrary to the agency, that the hearing officer was biased or disqualified, the agency action based upon the recommended or initial decision made by such officer is not thereby automatically void; rather, the question is whether the private party was prejudiced by such error. See last sentence of section 10(e). The consequences of such bias or disqualification on the part of a presiding officer are alluded to in the reports of the Senate and House Committees on the Judiciary as follows: "The effect which bias or disqualification shown upon the record might have would be determined by the ordinary rules of law and the other provisions of this bill. If it appeared or were discovered late, it would have the effect—where issues of fact or discretion were important and the con-

1 This is emphasized by the fact that an earlier draft of the bill required such hearings. See Senate Comparative Print, June 1945, p. 13 (Sen. Doc. p. 158).

PYM-000499

duct and demeanor of witnesses relevant in determining them—of rendering the recommended decisions or initial decisions of such officers invalid." Sen. Rep. p. 21, H.R. Rep. p. 35 (Sen. Doc. pp. 207, 269).

#### SECTION 7(b)—HEARING POWERS

Section 7(b) provides that "Officers presiding at hearings shall have authority, subject to the published rules of the agency and within its powers, to (1) administer oaths and affirmations, (2) issue subpenas authorized by law, (3) rule upon offers of proof and receive relevant evidence, (4) take or cause depositions to be taken whenever the ends of justice would be served thereby, (5) regulate the course of the hearing, (6) hold conferences for the settlement or simplification of the issues by consent of the parties, (7) dispose of procedural requests or similar matters, (8) make decisions or recommend decisions in conformity with section 8, and (9) take any other action authorized by agency rule consistent with this Act."

The quoted language automatically vests[2] in hearing officers the enumerated powers to the extent that such powers have been given to the agency itself, i.e., "within its powers." In other words, not only are the enumerated powers thus given to hearing officers by section 7(b) without the necessity of express agency delegation, but an agency is without power to withhold such powers from its hearing officers. This follows not only from the statutory language, "shall have authority", but from the general statutory purpose of enhancing the status and role of hearing officers. Thus, in the Senate Comparative Print of June 1945, p. 14 (Sen. Doc. p. 29), it is stated that "The statement of the powers of administrative hearing officers is designed to secure that responsibility and status which the Attorney General's Committee stressed as essential (Final Report, pp. 43-53 particularly at pp. 45-46 and 50)." See also Sen. Rep. p. 21, H.R. Rep. p. 35, 92 Cong. Rec. 2157 (Sen. Doc. pp. 207, 269, 319-320); cf. Sen. Rep. p. 42 (Sen. Doc. p. 228).

As noted above, the subsection vests in hearing officers only such of the enumerated powers as the agency itself possesses. If an agency lacks the authority to issue subpenas, subsection 7(b) does not grant the subpena power to that agency's hearing

2 Since section 7(b) itself vests these powers (including the subpena power) in hearing officers, *Cudahy Packing Co. v. Holland*, 315 U.S. 357 (1942), and *Fleming v. Mohawk Co.*, 331 U. S. 111 (1947), dealing with the authority of agencies to delegate such powers, have no application here.

officers. Senate Comparative Print, June 1945, p. 14 (Sen. Doc. pp. 29-30). The phrase "subject to the published rules of the agency" is intended to make clear the authority of the agency to lay down policies and procedural rules which will govern the exercise of such powers by presiding officers. Senate Hearings (1941) pp. 658, 1457-1458. For example, if an agency provides by rule that the fact of citizenship must be established in a prescribed manner, the hearing officer must conform to such rule in exercising his power to "rule upon offers of proof and receive relevant evidence". Similarly, if an agency provides that subpenas duces tecum shall be issued only upon written application specifying the documents desired and their relevance, the hearing officer is bound to comply.

Agencies remain free to provide for appeals to the agency heads from rulings of hearing officers in the exercise of the powers enumerated in section 7(b). For example, when a ruling excluding certain evidence, if reversed by the agency, would necessitate reopening of the hearing and recalling witnesses, it may be desirable to permit an immediate appeal from the ruling.

SECTION 7(c)—EVIDENCE

*Burden of proof.* The first sentence of section 7(c) provides that "Except as statutes otherwise provide, the proponent of a rule or order shall have the burden of proof." In the Senate Comparative Print, June 1945, p. 15 (Sen. Doc. p. 31), it is stated that "The provision relating to burden of proof is the standard rule." There is some indication that the term "burden of proof" was not employed in any strict sense, but rather as synonymous with the "burden of going forward".[9] In either case, it is clear from the introductory clause that this general statement was not intended to repeal specific provisions of other statutes which, as by establishing presumptions, alter what would otherwise be the "burden of proof" or the "burden of going forward". Sen. Rep. p. 42 (Sen. Doc. p. 228).

*Evidence.* The second sentence of section 7(c) provides that "Any oral or documentary evidence may be received, but every

[9] Thus, in Sen. Rep. p. 22 (Sen. Doc. p. 208), it is stated: "That the proponent of a rule or order has the burden of proof means not only that the party initiating the proceeding has the general burden of coming forward with a prima facie case but that other parties, who are proponents of some different result, also for that purpose have a burden to maintain." See also H.R. Rep. p. 36 (Sen. Doc. p. 270).

agency shall as a matter of policy provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence and no sanction shall be imposed or rule or order be issued except upon consideration of the whole record or such portions thereof as may be cited by any party and as supported by and in accordance with the reliable, probative, and substantial evidence."

Under section 7(c) it is clear that, as heretofore, the technical rules of evidence will not be applicable to administrative hearings. See also Final Report, p. 70. Thus, it is stated that "the mere admission of evidence is not to be taken as prejudicial error (there being no lay jury to be protected from improper influence) although irrelevant, immaterial, and unduly repetitious evidence is useless and is to be excluded as a matter of efficiency and good practice." H.R. Rep. p. 36, Sen. Rep. p. 22 (Sen. Doc. pp. 270, 208). To carry out this policy, it is advisable that each agency direct its hearing officers to exclude from the record so far as practicable irrelevant, immaterial or unduly repetitious evidence.

Agency action must be supported by "reliable, probative, and substantial evidence." It is said that "These are standards or principles usually applied tacitly and resting mainly upon common sense which people engaged in the conduct of responsible affairs instinctively understand." H.R. Rep. p. 36, Sen. Rep. p. 22 (Sen. Doc. pp. 270, 208). This restates the present law. H.R. Rep. p. 53, fn. 18 (Sen. Doc. p. 287); *Consolidated Edison Co.* v. *National Labor Relations Board*, 305 U.S. 197, 230 (1938); Senate Comparative Print, p. 14 (Sen. Doc. p. 31). It is clear that nothing in section 7(c) is intended to change the standard or scope of judicial review; section 10(e)(5) specifically restates the "substantial evidence rule", as developed by the Congress and the courts, under which the reviewing court ascertains whether the agency's findings of fact are supported by substantial evidence.

Nothing in section 7(c) is intended to preclude an agency from imposing reasonable requirements as to how particular facts must be established—such as age, citizenship, marital status, etc. Nor is an agency forbidden to draw such inferences or presumptions as the courts customarily employ, such as the failure to explain by a party in exclusive possession of the facts, or the presumption of continuance of a state of facts once shown to exist.

Furthermore, section 7(c) does not repeal provisions of other statutes which establish certain presumptions of fact.[4]

*Presentation of evidence.* Section 7(c) provides further that "Every party shall have the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts." It is concluded that the provision is intended to emphasize the right of parties in cases of adjudication (other than determining claims for money or benefits or applications for initial licenses) to present their evidence orally, and in addition to present such "documentary evidence" as would be admissible in judicial proceedings, such as writings and records made in regular course of business. 28 U.S.C. 695. As here used "documentary evidence" does not mean affidavits and written evidence of any kind. Such a construction would flood agency proceedings with hearsay evidence. In the last sentence of the subsection, there appears the phrase "evidence in written form," thus indicating that the Congress distinguished between "written evidence" and "documentary evidence." See also section 203(c) of the Emergency Price Control Act. Again, the subsection expressly states the right to adequate cross-examination. Against this background, it is clear that the "right to present his case or defense by oral or documentary evidence" does not extend to presenting evidence in affidavit or other written form so as to deprive the agency or opposing parties of opportunity for cross-examination, nor so as to force them to assume the expense of calling the affiants for cross-examination. See *Powhatan Mining Co.* v. *Ickes*, 118 F. 2d 105, 109 (C.C.A. 6, 1941).

Of course, the agency may, if it desires, receive such written evidence as it determines would tend to be reliable and probative and the admission of which would not prejudicially deprive other parties or the agency of opportunity for cross-examination. Thus, technical and statistical data may be introduced in convenient written form subject to adequate opportunity for cross-examination and rebuttal. Sen. Rep. p. 42, H.R. Rep. p. 37 (Sen. Doc. pp. 228, 271). Any evidence may be admitted by agreement or if no

---

4 For example, section 20(d) of the Longshoremen's and Harbor Workers' Compensaton Act (33 U.S.C. 920(d)), provides that "In any proceedings for the enforcement of a claim for compensation it shall be presumed, in the absence of substantial evidence to the contrary—(d) that the injury was not occasioned by the willful intention of the injured employee to injure or kill himself or another." See *Del Vecchio* v. *Bowers*, 296 U.S. 280 (1935). See also section 2(a)9 of the Investment Company Act of 1940 (15 U.S.C. 80a-2(9)).

objection is made. *Opp Cotton Mills, Inc.* v. *Administrator*, 312 U.S. 126, 155 (1941).

The provision for "such cross-examination as may be required for a full and true disclosure of the facts" does not, according to the House Committee Report, "confer a right of so-called 'unlimited' cross-examination. Presiding officers will have to make the necessary initial determination whether the cross-examination is pressed to unreasonable lengths by a party or whether it is required for the 'full and true disclosure of the facts' stated in the provision. Nor is it the intention to eliminate the authority of agencies to confer sound discretion upon presiding officers in the matter of its extent. The test is—as the section states—whether it is required 'for a full and true disclosure of the facts.' In many rule making proceedings where the subject matter and evidence are broadly economic or statistical in character and the parties or witnesses numerous, the direct or rebuttal evidence may be of such a nature that cross-examination adds nothing substantial to the record and unnecessarily prolongs the hearings." H.R. Rep. p. 37 (Sen. Doc. p. 271).

In proceedings involving rule making or determining claims for money or benefits or applications for initial licenses, an agency may adopt procedures for the submission of all or part of the evidence in written form. Thus, in rate making and licensing proceedings, which frequently involve extensive technical or statistical data, the agency may require that the mass of such material be submitted in orderly exhibit form rather than be read into the record by witnesses. Similarly, in determining claims for money or benefits, the agency may require that the papers filed in support of the application contain the factual material. Such procedures may be required only "where the interest of any party will not be prejudiced thereby." Typically, in these cases, the veracity and demeanor of witnesses are not important. It is difficult to see how any party's interests would be prejudiced by such procedures where sufficient opportunity for rebuttal exists. However, "To the extent that cross-examination is necessary to bring out the truth, the party should have it." Sen. Rep. p. 23, H.R. Rep. p. 37 (Sen. Doc. pp. 209, 271). Such is the present practice of such agencies as the Civil Aeronautics Board, which has made extensive use of written evidence procedures to simplify records and shorten formal hearings.

SECTION 7(d)—RECORD

*Record.* The first sentence of section 7(d) provides that "The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, shall constitute the exclusive record for decision in accordance with section 8 and, upon payment of lawfully prescribed costs, shall be made available to the parties." The record must include any agency proceedings upon an affidavit of personal bias or disqualification of a hearing officer pursuant to section 7(a). All decisions (initial, recommended or tentative) are required by section 8(b) to be made a part of the record. It is believed, by analogy to judicial practice, that the subsection does not require the transcription of oral arguments for inclusion in the record.

In the interests of economy, certain agencies have followed the practice of not transcribing the stenographic record of the hearing unless there is an appeal from the decision of the officer presiding at the hearing. Section 7(d) does not require an agency to have the record transcribed automatically in every case, but it does require transcription in any case where a party demands a copy of the record, so that it will be available to him "upon payment of lawfully prescribed costs." This requirement is satisfied by the present agency practice of contracting with private stenographic agencies for reporting service on terms that enable parties to obtain copies at a reasonable price.

*Official notice.* The second sentence of section 7(d) provides that "Where any agency decision rests on official notice of a material fact not appearing in the evidence in the record, any party shall on timely request be afforded an opportunity to show the contrary." In the Senate Comparative Print, June 1945, p. 15 (Sen. Doc. p. 32), it is stated that "The rule of official notice is that recommended by the Attorney General's Committee, particularly the safeguard that parties be apprised of matters so noticed and accorded an 'opportunity for reopening of the hearing in order to allow the parties to come forward to meet the facts intended to be noticed.' (Final Report pp. 71-73)." The recommendation of the Attorney General's Committee, which is thus apparently adopted was that "the permissible area of official notice be extended" so as to avoid "laborious proof of what is obvious and notorious," subject to opportunity for rebuttal or explanation, as provided in section 7(d). See the excellent discussion in Final Report, pp. 71-73, pointing out that the process of

official notice should not be limited to the traditional matters of judicial notice but extends properly to all matters as to which the agency by reason of its functions is presumed to be expert, such as technical or scientific facts within its specialized knowledge. Cf. H.R. Rep. p. 38 (Sen. Doc. p. 272).

Agencies may take official notice of facts at any stage in a proceeding—even in the final decision[5]—but the matters thus noticed should be specified and "any party shall on timely request be afforded an opportunity to show the contrary." The matters thus noticed become a part of the record and, unless successfully controverted, furnish the same basis for findings of fact as does "evidence" in the usual sense.

---

5 "Where agencies take such notice they must so state on the record or in their decisions and then afford the parties an opportunity to show the contrary." Sen. Rep. p. 23, H.R. Rep. pp. 37-38 (Sen. Doc. pp. 209, 271). If official notice is taken of facts in the course of the final decision, the proceeding need not be reopened automatically, but the parties will be entitled to request reopening for the purpose of contesting the facts thus officially noticed by the agency.

## VII

### SECTION 8—DECISIONS

The provisions of section 8, together with those of section 5(c), govern the procedure subsequent to hearing. Section 8 applies to cases of rule making and adjudication which are required by sections 4 and 5 to be conducted in accordance with sections 7 and 8. It became effective on December 11, 1946, and is applicable to proceedings commenced on and after that date. See section 12.

### SECTION 8(a)—WHO DECIDES

Section 8(a) provides for intermediate and final decisions, prescribes who shall make them, and defines the decisional relationship between the agency heads and presiding officers.[1] The subsection reads as follows:

> *Action by subordinates.* In cases in which the agency has not presided at the reception of the evidence, the officer who presided (or, in cases not subject to subsection (c) of section 5, any other officer or officers qualified to preside at hearings pursuant to section 7) shall initially decide the case or the agency shall require (in specific cases or by general rule) the entire record to be certified to it for initial decision. Whenever such officers make the initial decision and in the absence of either an appeal to the agency or review upon motion of the agency within time provided by rule, such decision shall without further proceedings then become the decision of the agency. On appeal from or review of the initial decisions of such officers the agency shall, except as it may limit the issues upon notice or by rule, have all the powers which it would have in making the initial decision. Whenever the agency makes the initial decision without having presided at the reception of the evidence, such officers shall first recommend a decision except that in rule making or determining applications for initial licenses (1) in lieu thereof the agency may issue a tentative decision or any of its responsible officers may recommend a decision or (2) any such procedure may be omitted in any case in which the agency finds upon the record that due and timely execution of its functions imperatively and unavoidably so requires.

At the outset, it should be noted that section 8(a) has no application to cases in which the agency itself has presided at the reception of the evidence. The procedures required by this subsection are intended "to bridge the gap between the officials who hear and those who decide cases." H.R. Rep. p. 38 (Sen. Doc. p. 272). If the agency itself, e.g., the Interstate Commerce Commission, hears the evidence, it may decide the case without the use of any intermediate decision. In such cases, however, the agency may, if it desires, preface its final decision with a tentative decision to which the parties may file exceptions.

---

1 Any of the requirements of section 8 may be waived by the parties. Sen. Rep. p. 23 (Sen. Doc. p. 209).

PYM-000507

In cases of adjudication subject to section 5(c) and in which the agency itself has not presided at the reception of evidence, the presiding officer[2] must "initially decide the case or the agency shall require (in specific cases or by general rule) the entire record to be certified to it for initial decision." It is further provided that "Whenever the agency makes the initial decision without having presided at the reception of the evidence [the presiding officer] shall first recommend a decision." That is, in cases of adjudication subject to section 5(c), the presiding officer must make either (a) an "initial" decision which will become the agency's final decision in the absence of an appeal to or review by the agency, or (b) a "recommended" decision which will be followed by an "initial" decision by the agency.

Under the terms of the subsection, the presiding officer's decision will constitute an initial decision unless the agency provides otherwise either by general rule published in the Federal Register or by order in the particular case. Accordingly, each agency should determine whether it desires the decisions of its presiding officers to be "initial" decisions or recommended decisions.

In cases not subject to section 5(c), the agency may provide for the making of initial decisions by "any other officer or officers qualified to preside at hearings pursuant to section 7." That is, in rule making, in "determining applications for initial licenses," and in "proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers," an "initial" decision may be made, for example, by a hearing examiner other than the one who heard the evidence. Further, the fourth sentence of section 8(a) provides that in rule making and in determining applications for initial licenses the agency may issue a tentative decision or *any* of its responsible officers may recommend a decision in lieu of a recommended decision by the hearing examiner who conducted the hearing. This last clause permits, in rule making and determining applications for initial licenses, "the continuation of the widespread agency practice of serving upon the parties, as a substitute for either an examiner's report or a tentative agency report, a report prepared by the staff of specialists and technicians normally engaged in that portion of

---

[2] As here used, presiding officer means the member of the agency, the examiner appointed pursuant to section 11, or the special statutory board or hearing officer who conducted the hearing. See section 7(a). Where the presiding officer becomes unavailable as by illness or leaving the agency, the agency may direct another hearing officer to make an initial or recommended decision, or it may issue a tentative decision, or it may order a rehearing.

the agency's operations to which the proceeding in question relates." Sen. Rep. p. 43[3] (Sen. Doc. p. 229).

Finally, in rule making or determining applications for initial licenses, the agency may itself decide the case without any prior initial, recommended or tentative decision, even though it has not presided at the reception of the evidence, "in any case in which the agency finds upon the record that due and timely execution of its functions imperatively and unavoidably so requires."

*Appeals and review.* Where the agency permits a hearing officer to make an "initial" decision, "in the absence of either an appeal to the agency or review upon motion of the agency within time provided by rule, such decision shall without further proceedings then become the decision of the agency." Parties may appeal from the hearing officer's initial decision to the agency, which must thereupon itself consider and decide the case. Also, the agency may review the hearing officer's initial decision even though the parties fail to appeal. Each agency should publish a rule prescribing the time within which parties may appeal or the agency may call up the case for review.[4] Where the hearing examiner (or other officer where permitted by the subsection) makes a recommended decision, the agency must always make an "initial" or final decision.

In making its decision, whether following an initial or recommended decision, the agency is in no way bound by the decision of its subordinate officer; it retains complete freedom of decision—as though it had heard the evidence itself. This follows from the fact that a recommended decision is advisory in nature. See *National Labor Relations Board* v. *Elkland Leather Co.*, 114 F. 2d 221, 225 (C.C.A. 3, 1940), certiorari denied, 311 U.S. 705. Similarly, the third sentence of section 8(a) provides that "On appeal from or review of the initial decisions of such [hearing] officers the agency shall, except as it may limit the issues upon notice or by rule, have all the powers which it would have in making the initial decision." This is not to say that hearing

---

3 It is to be noted that in "proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers" (if they do not constitute either rule making or the determination of an application for an initial license), an intermediate (i.e., "initial" or "recommended") decision must be made by the hearing examiner who conducted the hearing or by some other officer or officers qualified to preside at hearings pursuant to section 7(a).

4 It is important to note that section 10(c) permits an agency to require parties to appeal from hearing officers' initial decisions to the agency as a prerequisite to obtaining judicial review. Such a requirement must be set forth in a published rule which must further provide that the hearing officer's initial decision shall be inoperative pending the agency's review of the case. Sen. Rep. p. 27, H.R. Rep. pp. 43, 56, fn. 21 (Sen. Doc. pp. 213, 277, 289).

examiners' initial or recommended decisions are without effect. "They become a part of the record [as required by subsection 8(b)] and are of consequence, for example, to the extent that material facts in any case depend on the determination of credibility of witnesses as shown by their demeanor or conduct at the hearing." Sen. Rep. p. 24, H.R. Rep. p. 38 (Sen. Doc. pp. 210, 272). In such cases, it is apparently assumed that agencies will attach considerable weight to the findings of the examiner who saw and heard the witnesses. However, in cases where the credibility of witnesses is not a material factor, or cases where the recommended or initial decision is made by an officer other than the one who heard the evidence, the function of such decision will be, rather, the sharpening of the issues for subsequent proceedings.

Section 8(a) empowers agencies to "limit the issues upon notice or by rule" on appeal from or review of the *initial* decisions of hearing officers. That is, an agency may limit the issues which it will consider in such cases by notice in a particular case or by a general rule published in the Federal Register. It may restrict its review to questions of law and policy or, where it is alleged that erroneous findings of fact have been made by the hearing officer, to determining whether cited portions of the record disclose that the findings are clearly wrong. Final Report, p. 51. See also Sen. Rep. p. 43 (Sen. Doc. p. 229).

Where the hearing officer makes a recommended decision, the agency must itself consider and determine all issues properly presented. However, it may provide that it will consider only such objections to its subordinates' decisions (recommended or initial) as are presented to it as exceptions to such decisions. See *Marshall Field & Co.* v. *National Labor Relations Board*, 318 U.S. 253, 255 (1943); *National Labor Relations Board* v. *Cheney California Lumber Co.*, 327 U.S. 385, 387-88 (1946). It may also require that exceptions be precise and supported by specific citations to the record.[5] The agency in reviewing either initial or recommended decisions may adopt in whole or in part the findings, conclusions and basis therefor stated by the presiding

---

5 See Final Report, p. 52: "The Committee strongly urges that the agencies abandon the notion that no matter how unspecified or unconvincing the grounds set out for appeal, there is yet a duty to reexamine the record minutely and reach fresh conclusions without reference to the hearing commissioner's decision. Agencies should insist upon meaningful content and exactness in the appeal from the hearing commissioner's decision and in the subsequent oral argument before the agency. Too often, at present, exceptions are blanket in character, without reference to pages in the record and without in any way narrowing the issues. They simply seek to impose upon the agency the burden of complete reexamination. Review of the hearing commissioner's decision should in general and in the absence of clear error be limited to grounds specified in the appeal."

officer. On the other hand, it may make entirely new findings either upon the record or upon new evidence which it takes. Also, it may remand the case to the hearing officer for any appropriate further proceedings. Sen. Rep. p. 43, H.R. Rep. pp. 38-39 (Sen. Doc. pp. 229, 272-273).

SECTION 8(b)—SUBMITTALS AND DECISIONS

*Submittals.* The first sentence of section 8(b) provides that "Prior to each recommended, initial, or tentative decision, or decision upon agency review of the decision of subordinate officers the parties shall be afforded a reasonable opportunity to submit for the consideration of the officers participating in such decisions (1) proposed findings and conclusions, *or* (2) exceptions to the decisions or recommended decisions of subordinate officers or to tentative agency decisions, and (3) supporting reasons for such exceptions or proposed findings or conclusions." [Italics supplied]. The procedure thus prescribed for the focusing of issues and arguments is a codification of the present general practice. Senate Comparative Print, June 1945, p. 16 (Sen. Doc. p. 33). "Ordinarily proposed findings and conclusions are submitted only to the officers making the initial [or recommended] decision, and the parties present exceptions thereafter if they contest the result. However, such exceptions may in form or effect include proposed findings or conclusions for the reviewing authority to consider as part of the exceptions." Sen. Rep. pp. 24, 43 (Sen. Doc. pp. 210, 229).

Agencies may require that proposed findings and conclusions and exceptions be supported by precise citation of the record or legal authorities as the case may be. Reasonable time limits for the submission of such materials may be imposed. The opportunity to submit supporting reasons means that briefs on the law and facts which are filed by parties in support of their proposed findings and conclusions and exceptions must be received and considered. Sen. Rep. p. 24, H.R. Rep. p. 39 (Sen. Doc. pp. 210, 273). Section 8(b) does not purport to prescribe opportunities for oral argument. Accordingly, subject to the provisions of particular statutes, each agency must itself determine in what cases oral argument before hearing officers or the agency is necessary or appropriate.[6]

6 See *Morgan* v. *United States*, 298 U.S. 468, 481 (1936): "Argument may be oral or written."

*Decisions.* Section 8(b) further provides: "The record shall show the ruling upon each such finding, conclusion, or exception presented. All decisions (including initial, recommended, or tentative decisions) shall become a part of the record and include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record; and (2) the appropriate rule, order, sanction, relief, or denial thereof."

Since all decisions, whether made by the agency or by a subordinate officer, become a part of the record, the requirement of the first quoted sentence will be satisfied if such decisions in some way indicate the ruling of the agency or such officer upon each requested finding or conclusion or exception presented to the agency or to such officer. The purpose of this requirement is "to preclude later controversy as to what the agency had done." H.R. Rep. p. 54, fn. 19 (Sen. Doc. p. 288).

The form and content of decisions, as prescribed in the last sentence of section 8(b), are discussed in the Committee reports as follows:

> The requirement that the agency must state the basis for its findings and conclusions means that such findings and conclusions must be sufficiently related to the record as to advise the parties of their record basis. Most agencies will do so by opinions which reason and relate the issues of fact, law, and discretion. Statements of reasons, however, may be long or short as the nature of the case and the novelty or complexity of the issues may require.
>
> Findings and conclusions must include all the relevant issues presented by the record in the light of the law involved. They may be few or many. A particular conclusion of law may render certain issues and findings immaterial, or vice versa. Where oral testimony is conflicting or subject to doubt of its credibility, the credibility of witnesses would be a necessary finding if the facts are material. It should also be noted that the relevant issues extend to matters of administrative discretion as well as of law and fact. This is important, because agencies often determine whether they have power to act rather than whether their discretion should be exercised or how it should be exercised. Furthermore, without a disclosure of the basis for the exercise of, or failure to exercise, discretion, the parties are unable to determine what other or additional facts they might offer by way of rehearing or reconsideration of decisions. Sen. Rep. pp. 24-25, H.R. Rep. p. 39. (Sen. Doc. pp. 210-211, 273).

An agency which issues opinions in narrative and expository form may continue to do so without making separate findings of fact and conclusions of law. However, such opinions must indicate the agency's findings and conclusions on material issues of fact, law or discretion with such specificity "as to advise the parties and any reviewing court of their record and legal basis."[7] The

7 Agencies should keep in mind that pursuant to section 3(b) they may cite as precedents only such previous orders and opinions as have been published or made available for public inspection.

requirement that such decisions indicate the reasons for the exercise of discretionary power is a codification of existing good practice. See *Phelps Dodge Corp.* v. *National Labor Relations Board*, 313 U.S. 177, 194-197 (1941).

Nothing in the Act is intended to preclude agency heads from utilizing the services of agency employees as assistants for analysis and drafting. *Morgan* v. *United States*, 298 U.S. 468, 481 (1936). Of course, in adjudicatory cases subject to section 5(c), such assistants could not have performed investigative or prosecuting functions in the cases (or in factually related cases) in which they are so employed. Also, the agency heads are free to employ the hearing officer who heard a particular case as the draftsman of their final decision and otherwise to assist in its formulation. Compare generally section 4(a) of the National Labor Relations Act, as amended.

*Appeals to superior agency*. Nothing in section 8 is intended to cut off any rights which parties may have for appeal to or review by a superior agency. Sen. Rep. p. 23 (Sen. Doc. p. 209). The requirements of subsection 8(b) as to the form and content of decisions do not apply to decisions of a superior agency upon such appeal from or review of the agency's decision.

## VIII

### SECTION 9—SANCTIONS AND POWERS

Section 9 generally prohibits unauthorized action by agencies and prescribes certain rules to govern licensing proceedings. The provisions of section 9 apply to all relevant cases (other than the agencies and functions exempted by section 2(a)) regardless of the applicability of the other sections of the Act.

#### SECTION 9(a)—SANCTIONS

Section 9(a) provides that "in the exercise of any power or authority no sanction shall be imposed or substantive rule or order be issued except within jurisdiction delegated to the agency and as authorized by law." The term sanction is broadly defined in section 2(f) to include the whole or part of any agency "(1) prohibition, requirement, limitation, or other condition affecting the freedom of any person; (2) withholding of relief; (3) imposition of any form of penalty or fine; (4) destruction, taking, seizure, or withholding of property; (5) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees; (6) requirement, revocation, or suspension of a license;[1] or (7) taking of other compulsory or restrictive action."

The original draft of section 9(a) limited the imposition of sanctions to those "as specified and authorized by statute." Senate Comparative Print, June 1945, p. 17 (Sen. Doc. p. 159). The change of the word "statute" to "law" was intentional so as to recognize that an agency may impose a sanction or issue a substantive rule or order if such power is authorized not only by statutes but by treaties, court decisions, commonly recognized administrative practices, or other law. See *United States* v. *MacDaniel*, 7 Pet. (32 U.S.) 1, 13-14 (1833). Both the Senate and House reports recognize that the source of authority for the imposition of a sanction or the issuance of a substantive rule or order may be either specific or general, as the case may be. Sen. Rep. p. 25, H.R. Rep. p. 40 (Sen. Doc. pp. 211, 274).

The purpose of section 9(a) is, evidently, to assure that agencies will not appropriate to themselves powers Congress has not intended them to exercise. Section 9(a) merely restates existing law. Sen. Rep. p. 13 (Sen. Doc. p. 229). Many agencies' powers

1 The denial of an application for a renewal of a license is not a penal measure. *Federal Communications Commission* v. *WOKO*, 329 U.S. 223 (1946). It is, by definition in section 2(f), a form of agency sanction.

PYM-000514

are very clear; they are set forth specifically in the act creating the agency. Still other powers may be readily inferred from the framework of the act creating the agency or may be logically necessary for the conduct of the powers granted to the agency. But whether an agency's powers are express or implied, in either case they may be exercised. Particularly pertinent in this connection is the language of the Supreme Court in *Phelps Dodge Corp. v. National Labor Relations Board*, 313 U.S. 177, 194 (1941):

> A statute expressive of such large public policy as that on which the National Labor Relations Board is based must be broadly phrased and necessarily carries with it the task of administrative application. There is an area plainly covered by the language of the Act and an area no less plainly without it. *But in the nature of things Congress could not catalogue all the devices and strategems for circumventing the policies of the Act. Nor could it define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations.* Congress met these difficulties by leaving the adaptation of means to end to the empiric process of administration.*** the relation of remedy to policy is peculiarly a matter for administrative competence. [*Italics* supplied].

### SECTION 9(b)—LICENSES

Section 9(b) is composed of three sentences, each of which is mutually exclusive of the others. The first sentence applies specifically to applications for licenses, the second to suspension or revocation of licenses, and the third to renewals. Each of these will be considered separately.

*Applications for licenses.* The first sentence of section 9(b) provides: "In any case in which application is made for a license required by law the agency, with due regard to the rights or privileges of all the interested parties or adversely affected persons and with reasonable dispatch, shall set and complete any proceedings required to be conducted pursuant to sections 7 and 8 of this Act or other proceedings required by law and shall make its decision." The import of this sentence is that an agency shall hear and decide licensing proceedings as quickly as possible. Should the licensing proceedings be required by statute to be determined upon the record after opportunity for an agency hearing, an agency will be required to follow the provisions as to hearing and decision contained in sections 7 and 8 of the Act. As to other types of licensing proceedings, the Act does not formulate any fixed procedure (just as no fixed procedure has been formulated for adjudications other than those that are required

PYM-000515

by statute to be determined on the record after opportunity for an agency hearing).

The requirement that licensing proceedings be completed with reasonable dispatch is merely a statement of fair administrative procedure. Congress decided not to set any maximum period of time for agency consideration of applications for licenses. In the first draft of S. 7 there was a provision to the effect that an application for a license would be deemed granted unless the agency within 60 days after the application was made, rendered its decision or set the matter down for hearing. Senate Comparative Print, June 1945, p. 17 (Sen. Doc. p. 159). This provision was dropped in later drafts and replaced with the phrase "with reasonable dispatch."

The term "reasonable dispatch" is not an absolute one and cannot be described in precise terms. What is reasonable for one agency may not be reasonable for another agency. The time necessary to consider license applications for certificates of public convenience and necessity is much greater, as a rule, than that needed for issuing warehousemen's licenses under 7 U.S.C. 244. Similarly, variations in an agency's work-load, reflecting developments in an industry, may result in unavoidable temporary backlogs. Of course, where another statute prescribes a specific period of time for agency consideration of an application for a license, such specific provision will be controlling. For example, under section 355(c) of Title 21, U.S.C., an application for a license for the sale of new drugs becomes effective on the sixtieth day after the filing of the application unless the Federal Security Administrator takes appropriate action.

*Suspension or revocation of licenses.* The second sentence of section 9(b) provides: "Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, no withdrawal, suspension, revocation, or annulment of any license shall be lawful unless, prior to the institution of agency proceedings therefor, facts or conduct which may warrant such action shall have been called to the attention of the licensee by the agency in writing and the licensee shall have been accorded opportunity to demonstrate or achieve compliance with all lawful requirements." This sentence requires an agency to give a licensee an opportunity to change his conduct before his license can be revoked by the agency unless the licensee's conduct is willful or the public health, interest or safety requires otherwise.

Thus, if a particular licensee should under ordinary circumstances transcend the bounds of the privilege granted to him, the agency which has granted him the license must inform him in writing of such conduct and afford him an opportunity to comply with the requirements of the agency before it can revoke, withdraw, suspend or annul his license. While the warning must be in writing, it need not take any special form.

No prior notice need be given if the licensee's conduct is willful. In such a situation the license may be revoked immediately without "another chance." Also, "another chance" need not be given where "the public health, interest, or safety requires otherwise." The latter phrase refers to a situation where immediate cancellation of a license is necessary in the public interest irrespective "of the equities or injuries to the licensee." Sen. Rep. p. 26 (Sen. Doc. p. 212). For example, in case of an accident involving aircraft, the Administrator of Civil Aeronautics may suspend the license of the pilot pending investigation. The public safety and interest require such immediate suspension. 49 U.S.C. 559.

It is clear that the provisions of this second sentence do not apply to temporary permits or temporary licenses. Sen. Rep. p. 26, H.R. Rep. p. 41 (Sen. Doc. pp. 212, 275). Such permits or licenses may be revoked without "another chance" and regardless of whether there is willfulness or whether the public health, interest, or safety is involved. And it is clear, too, that the provisions of this sentence do not apply to renewal of licenses. Renewals are treated specifically in the next sentence.

*Renewal of licenses.* The last sentence of section 9(b) provides: "In any case in which the licensee has, in accordance with agency rules, made timely and sufficient application for a renewal or a new license, no license with reference to any activity of a continuing nature shall expire until such application shall have been finally determined by the agency." This sentence states the best existing law and practice. Sen. Rep. p. 48 (Sen. Doc. p. 229). It is only fair where a licensee has filed his application for a renewal or a new license in ample time prior to the expiration of his license, and where the application itself is sufficient, that his license should not expire until his application shall have been determined by the agency. In such a case the licensee has done everything that is within his power to do and he should not suffer if the agency has failed, for one reason or another, to con-

Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 160 of 353
PYM-000517

sider his application prior to the lapse of his license. Agencies, of course, may make reasonable rules requiring sufficient advance application.[2]

2 The Office of Alien Property of the Department of Justice has adopted such a rule with reference to renewal of licenses. 11 F.R. 177A-629.

## IX

### SECTION 10—JUDICIAL REVIEW

The provisions of section 10 constitute a general restatement of the principles of judicial review embodied in many statutes and judicial decisions.[1] Section 10, it must be emphasized, deals largely with principles. It not only does not supersede special statutory review proceedings, but also generally leaves the mechanics of judicial review to be governed by other statutes and by judicial rules. For example, many statutes provide that where the reviewing court finds that the taking of new evidence would be warranted, such evidence must be presented to the agency with opportunity to modify its findings. See section 9 of the Securities Act (15 U.S.C. 77i). Such provisions continue in effect. Similarly, the time within which review must be sought will be governed, as in the past, by relevant statutory provisions or by judicial application of the doctrine of laches. See Section 5(c) of the Federal Trade Commission Act (15 U.S.C. 45 (c)) and *U.S. ex rel. Arant v. Lane*, 249 U.S. 367 (1919). Accordingly, the general principles stated in section 10 must be carefully coordinated with existing statutory provisions and case law.[2]

Section 10 is applicable irrespective of whether the agency action for which review is sought was governed by the procedural provisions of sections 4, 5, 7 and 8. However, section 10 does not apply to those agencies and functions which are excepted by section 2(a) from all provisions of the Act except section 3. For example, the provisions of section 10 are in no way applicable to the review of agency action taken pursuant to the Housing and Rent Act of 1947.

Section 10 became effective on September 11, 1946, and is applicable from that date to the judicial review of agency action.[3] However, the Department of Justice, in briefs filed in the Supreme Court, has taken the position that section 10 does not apply to cases which were pending in the courts on September 11, 1946. While these cases were decided by the Supreme Court without

---

1 See statements of Carl McFarland, Chairman of the Committee on Administrative Procedure of the American Bar Association, in House Hearings (1945) pp. 37-38 (Sen. Doc. pp. 83-84), and of the Attorney General in Sen. Rep. pp. 38, 43 (Sen. Doc. pp. 224, 229); 92 Cong. Rec. A2982 (Sen. Doc. pp. 406-407).

2 Recognizing the delicacy of this problem and the obligation of Government counsel to render every assistance to the courts in this task, the Attorney General has established a committee within the Department of Justice to assist in developing a uniform approach to the problems which arise in litigation.

3 See section 12 of the Act as to the effective dates of the various provisions of the Act.

any express reference to section 10, it seems fair to infer that the Court has accepted this construction. *United States* v. *Ruzicka*, 329 U.S. 287 (1946); *Board of Governors of the Federal Reserve System* v. *Agnew*, 329 U.S. 441 (1947); *Krug* v. *Santa Fe Pacific Rd. Co.*, 329 U.S. 591 (1947); *Patterson* v. *Lamb*, 329 U.S. 539 (1947).

## SCOPE OF SECTION 10

Section 10 applies "Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion". The intended result of the introductory clause of section 10 is to restate the existing law as to the area of reviewable agency action. House Hearings (1945) p. 38 (Sen. Doc. p. 84).

A statute may in terms preclude, or be interpreted as intended to preclude, judicial review altogether. An example of a statute expressly precluding any judicial review is the Act of March 20, 1933 (38 U.S.C. 705) providing that "All decisions rendered by the Administrator of Veterans' Affairs under the provisions [of designated statutory sections] shall be final and conclusive on all questions of law and fact, and no other official or court of the United States shall have jurisdiction to review by mandamus or otherwise any such decision." Senate Hearings (1941) p. 1358. *Switchmen's Union of North America* v. *National Mediation Board*, 320 U.S. 297 (1943), illustrates the interpretation of a statute as intended to preclude judicial review although the statute does not expressly so provide.[4] Sen. Rep. pp. 43-44 (Sen. Doc. pp. 229-230).

The provisions of section 10 are applicable "Except so far as agency action is by law committed to agency discretion." For an example of such unreviewable agency action, see *United States* v. *George S. Bush & Co.*, 310 U.S. 371 (1940) (action by the President under section 336(c) of the Tariff Act "if in his judgment" such action is necessary). More broadly, there are many statutory provisions which merely authorize agencies to make loans; under such statutes, the agencies' discretion is usually so complete that the refusal to make a loan is not reviewable under section 10 or

4 As S. 7 was introduced in the Senate in January 1945, the introductory phrase of section 10 read "Except (1) so far as statutes *expressly* preclude judicial review". [Italics supplied]. As reported in its present form by the Senate Committee on the Judiciary, the word "expressly" was omitted. This omission provides strong support for the conclusion that the courts remain free to deduce from the statutory context of particular agency action that the Congress intended to preclude judicial review of such action.

any other statute. Also, the refusal by the National Labor Relations Board to issue a complaint is, as heretofore, an exercise of discretion unreviewable by the courts. See *Jacobsen* v. *National Labor Relations Board*, 120 F. 2d 96 (C.C.A. 3, 1941), and Senate Comparative Print of June 1945, p. 19, para. (3) (Sen. Doc. p. 33). For the same reason, the denial of a petition pursuant to section 4(d) of this Act for the issuance, amendment or repeal of a rule is not subject to judicial review. Sen. Rep. p. 44 (Sen. Doc. p. 230).

In addition, the introductory clause of section 10 provides a most important principle of construction for reconciling the provisions of the section with other statutory provisions relating to judicial review. All of the provisions of section 10 are qualified by the introductory clause, "*Except so far as* (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion" [Emphasis supplied]. The emphasized phrase does not mean that every provision of section 10 is applicable except *where* statutes preclude judicial review altogether. Instead, it reads "*Except so far as* (1) statutes preclude judicial review", with the clear result that some other statute, while not precluding review altogether, will have the effect of preventing the application of some of the provisions of section 10. The net effect, clearly intended by the Congress, is to provide for a dovetailing of the general provisions of the Administrative Procedure Act with the particular statutory provisions which the Congress has moulded for special situations.[5] Thus, a civil service employee of the Federal Government who alleges unlawful removal from office, can obtain judicial review only of the question of whether the procedures of the Civil Service Act were followed. *Levine* v. *Farley*, 107 F. 2d 186 (App. D.C., 1939), certiorari denied, 308 U.S. 622. In such a case, the provisions of section 10(e), for example, relating to substantial evidence and to review of abuses of discretion, will not apply.

SECTION 10(a)—RIGHT OF REVIEW

Section 10(a) provides that "Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant

5 This conclusion is supported by the following statement in the Senate Comparative Print, p. 18 (Sen. Doc. p. 36): "The introductory exceptions state the two present general or basic situations in which judicial review is precluded—where (1) the matter is discretionary or (2) statutes withhold *judicial powers*." [Italics supplied].

statute, shall be entitled to judicial review thereof." This statement of the persons entitled to judicial review has occasioned considerable comment because of the use of the phrase "any person suffering legal wrong". This phrase was used as one of limitation and not for the purpose of making judicial review available to anyone adversely affected by governmental action.[6] The delicate problem of the draftsmen was to identify in general terms the persons who are entitled to judicial review. As so used, "legal wrong" means such wrong as particular statutes and the courts have recognized as constituting ground for judicial review. "Adversely affected or aggrieved" has frequently been used in statutes to designate the persons who can obtain judicial review of administrative action.[7] The determination of who is "adversely affected or aggrieved * * * within the meaning of any relevant statute" has "been marked out largely by the gradual judicial process of inclusion and exclusion, aided at times by the courts' judgment as to the probable legislative intent derived from the spirit of the statutory scheme". Final Report, p. 83; see also pp. 84-85. The Attorney General advised the Senate Committee on the Judiciary of his understanding that section 10(a) was a restatement of existing law. More specifically he indicated his understanding that section 10(a) preserved the rules developed by the courts in such cases as *Alabama Power Co.* v. *Ickes*, 302 U.S. 464 (1938); *Massachusetts* v. *Mellon*, 262 U.S. 447 (1923); *The Chicago Junction Case*, 264 U.S. 258 (1924); *Sprunt & Son* v. *U. S.*, 281 U.S. 249 (1930); *Perkins* v. *Lukens Steel Co.*, 310 U.S. 113 (1940); and *Federal Communications Commission* v. *Sanders Brs. Radio Station*, 309 U.S. 470 (1940). Sen. Rep. p. 44 (Sen. Doc. p. 230). This construction of section 10(a) was not questioned or contradicted in the legislative history.[8] Also implied is the continuing role of the courts in determining, in the context of constitutional requirements and the particular statutory pattern, who is entitled to judicial review.

SECTION 10(b)—FORM AND VENUE OF ACTION

Section 10(b) provides that "The form of proceeding for judicial review shall be any special statutory review proceeding

---

6 Compare original provision of S. 7 as introduced in the Senate: "Any person adversely affected by any agency action shall be entitled to judicial review thereof in accordance with this section."

7 See section 9 of the Securities Act (15 U.S.C. 77i), "any person aggrieved"; section 402(b)(2) of the Communications Act (46 U.S.C. 402), "person aggrieved or whose interests are adversely affected"; section 1006 of the Civil Aeronautics Act (49 U.S.C. 646), "person disclosing a substantial interest in such order".

8 See *American Stevedores, Inc.* v. *Porello*, 330 U.S. 446 (1947).

relevant to the subject matter in any court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action (including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus) in any court of competent jurisdiction. Agency action shall be subject to judicial review in civil or criminal proceedings for judicial enforcement except to the extent that prior, adequate, and exclusive opportunity for such review is provided by law."

*Form of action.* Many regulatory statutes provide for judicial review of agency action by requiring the complaining party to file with a circuit court of appeals (or with a district court) a written petition praying that the agency action be modified or set aside; thereafter, the agency files with the reviewing court a transcript of the record.[9] Under such statutory provisions, the filing of a petition to modify or set aside agency action will continue to be the required form of proceeding for judicial review. Similarly, where agency action is now reviewable pursuant to the Urgent Deficiencies Act of 1913 (28 U.S.C. 47), the form of proceeding will consist of suits to enjoin[10] in accordance with the provisions of that Act.

In the absence of any special statutory review proceedings, other forms of action, as heretofore found by the courts to be appropriate in particular situations, will be used. Thus, habeas corpus proceedings should be used to obtain review of exclusion and deportation orders. *U.S. ex rel. Vajtauer* v. *Commissioner of Immigration*, 273 U.S. 103 (1927). Likewise, an order of the Postmaster General suspending second-class mailing privileges may, as before, be tested by a suit to enjoin such action. *Hannegan* v. *Esquire, Inc.*, 327 U.S. 146 (1946). In brief, where agency action is reviewable, but the Congress has not specified the form of review, the courts will continue to select the appropriate form of action.

Also, where a special statutory review proceeding is not legally adequate, the form of proceeding for judicial review will be "any applicable form of legal action * * * in any court of competent jurisdiction". The Act does not purport to define "inadequate",

---

9 See section 5(c) of the Federal Trade Commission Act (15 U.S.C. 45(c)); section 9 of the Securities Act (15 U.S.C. 77i); and section 701 of the Federal Food, Drug and Cosmetic Act (21 U.S.C. 371(f)).

10 "The expression 'special statutory review' means not only special review proceedings wholly created by statute, but so-called common-law forms referred to and adopted by other statutes as the appropriate mode of review in given cases." Sen. Rep. p. 26; H.R. Rep. p. 42 (Sen. Doc. pp. 212, 276).

and thus leaves to the courts the determination of whether a particular statutory review proceeding is legally adequate. As stated by the Attorney General: "if the procedure is inadequate (*i.e., where under existing law a court would regard the special statutory procedure as inadequate and would grant another form of relief*), then any applicable procedure, such as prohibitory or mandatory injunction, declaratory judgment, or habeas corpus, is available". [Emphasis supplied]. Sen. Rep. p. 44 (Sen. Doc. p. 230). Thus, the Act does not provide any new definition of "adequate", but rather assumes that the courts will determine the adequacy of statutory review procedures by the legal standards which the courts themselves have already developed. See *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 48 (1938).

*Venue.* Section 10(b) does not purport to change existing venue requirements for judicial review. In fact, it specifically refers to review "in any court specified by statute", or "in any court of competent jurisdiction". In the report of the House Committee, it is stated that "The section does not alter venue provisions under existing law, whether in connection with specially provided statutory review or the so-called nonstatutory or common-law action variety." H.R. Rep. p. 42 (Sen. Doc. p. 276). See also Representative Walter's statement to the House, 92 Cong. Rec. 5654 (Sen. Doc. p. 369). Thus, for example, station and construction licensing orders issued by the Federal Communications Commission remain reviewable only by the Court of Appeals for the District of Columbia (47 U.S.C. 402(b)). More generally, statutes specifically providing for judicial review in a circuit court of appeals or a district court often designate the venue by relation to the matters involved, such as "any circuit court of appeals of the United States in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein [the person aggrieved] resides or transacts business, or in the Court of Appeals of the District of Columbia". (Section 10(f) of the National Labor Relations Act).[11] Such provisions are continued in effect. So also are the general statutory provisions concerning venue, such as 28 U.S.C. 112 that "no civil suit shall be brought in any district court against any person by any original process or proceeding in any other district than that whereof he is an inhabitant". For the application of this section to suits against

11 For other examples, see 28 U.S.C. 43 for venue of suits to enjoin orders of the Interstate Commerce Commission, section 1006(b) of the Civil Aeronautics Act (49 U.S.C. 646(b)), and section 21 of the Longshoremen's and Harbor Workers' Compensation Act (33 U.S.C. 921).

Government agencies, see *Kentucky Natural Gas Corp.* v. *Public Service Comm.*, 28 F. Supp. 509, affirmed 119 F. 2d 417 (C.C.A. 6, 1941); and *Scientific Mfg. Co.* v. *Walker*, 40 F. Supp. 465 (M.D. Pa. 1941).

*Review in enforcement proceedings.* Section 10(b) also provides that "Agency action shall be subject to judicial review in civil or criminal proceedings for judicial enforcement except to the extent that prior, adequate, and exclusive opportunity for such review is provided by law". In the Committee reports it is stated that "The provision respecting 'prior, adequate, and exclusive * * * review' in the second sentence is operative only where statutes, *either expressly or as they are interpreted*, require parties to resort to some special statutory form of judicial review which is prior in time and adequate to the case." [Emphasis supplied]. Sen. Rep. p. 27; H.R. Rep. p. 42 (Sen. Doc. pp. 213, 276). So interpreted, this provision restates existing law.[12] Thus, a statute may either expressly provide for an exclusive method of judicial review which precludes challenge of agency action in enforcement proceedings,[13] or a court may conclude from the statutory context that such was the legislative intention. *United States* v. *Ruzicka*, 329 U.S. 287 (1946), interpreting the Agricultural Marketing Agreement Act of 1937, is an excellent example of the latter situation.[14] Similarly, section 10(b) leaves intact the doctrine of primary jurisdiction developed by the courts in cases involving the reasonableness of the charges of carriers and public utilities. See *Ambassador, Inc.* v. *United States*, 325 U.S. 317 (1945). It also leaves intact the requirements of the doctrine of exhaustion of administrative remedies. In many situations, however, an appropriate method of attacking the validity of agency action is to set up the alleged invalidity as a defense in a civil or criminal enforcement proceeding.

The adequacy of an exclusive method for judicial review would appear to be governed by the same considerations as the courts would apply in determining the adequacy or inadequacy of a

---

12 The Senate Committee changed the last phrase of the provision from "provided by statute" to "provided by law". See also Senate Comparative Print, June 1945, p. 18 (Sen. Doc. p. 37), stating that "The second sentence states the present rule as to enforcement proceedings." See Representative Walter's statement to the House, 92 Cong. Rec. 5654 (Sen. Doc. p. 369): "These provisions summarize the situation as it is now generally understood. The section does not disturb special proceedings which Congress has provided, nor does it disturb the venue arrangements under existing law."

13 See section 204(d) of the Emergency Price Control Act of 1942.

14 See also *Walling* v. *Cohen*, 48 F. Supp. 850 (E.D. Pa. 1943), affirmed 140 F. 2d 453 (C.C.A. 3, 1944) under the Fair Labor Standards Act, and *Pisano* v. *United States*, 126 F. 2d 601 (C.C.A. 9, 1942), certiorari denied, 317 U.S. 637, under the Federal Trade Commission Act.

statutory review proceeding for the purposes of the first sentence of section 10(b). Thus, the use of the word "prior" in the last sentence of section 10(b) does not mean that the validity of agency action may always be challenged collaterally by way of defense in enforcement proceedings whenever the method of review specified by the Congress does not result in a judicial determination as to the validity of such action prior to the commencement of enforcement proceedings. As indicated above, the Congress intended section 10 as a whole to be integrated and reconciled with existing statutory provisions for judicial review. Specifically, the general principle stated in the last sentence of section 10(b) was not regarded by the Congress as an innovation. Rather, it was said that "The second sentence states the present rule as to enforcement proceedings." Senate Comparative Print, p. 18 (Sen. Doc. p. 37). And further: "These provisions summarize the situation as it is now generally understood. The section [10(b)] does not disturb special proceedings which Congress has provided, nor does it disturb the venue arrangements under existing law." Representative Walter, 92 Cong. Rec. 5654 (Sen. Doc. p. 369).

There are many situations in which the invalidity of agency action may be set up as a defense in enforcement proceedings. On the other hand, there are special statutory arrangements under which the Congress has provided for immediate and continuous enforcement while the exclusive route to judicial review is by first exhausting an administrative procedure; in such an agency proceeding, the agency and the parties make a record with a view toward (a) reconsideration by the agency itself, and (b) providing an adequate factual record as the basis for judicial review by a specified court. See *United States* v. *Ruzicka, supra.* There is nothing to indicate that the Congress intended to repeal by implication such special statutory arrangements for compliance pending orderly judicial review, or to preclude itself from making similar arrangements in the future. Similarly, it is believed that the courts are left free to apply the primary jurisdiction doctrine in enforcement proceedings so as to require issues relating to the alleged unreasonableness of filed tariffs to be first presented to the appropriate administrative agency rather than to an enforcement court. See *Ambassador, Inc.* v. *United States, supra.* In brief, the courts must determine in each case whether the Congress, by establishing a special review procedure,

intended to preclude or to permit judicial review of agency action in enforcement proceedings. And, the extent to which the "opportunity" for judicial review prior to the enforcement proceedings has been waived or disregarded by the defendant in those proceedings must also be considered.

SECTION 10(c)—REVIEWABLE ACTS

The provisions of this subsection defining agency action subject to judicial review are said to "involve no departure from the usual and well understood rules of procedure in this field". Representative Walter, 92 Cong. Rec. 5654 (Sen. Doc. p. 369); Sen. Rep. p. 44 (Sen. Doc. p. 230).

First, it is provided that "Every agency action made reviewable by statute and every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review." Many statutes specifically provide for judicial review of particular agency action, and such action will continue to be reviewable. The second category, "and every final agency action for which there is no other adequate remedy in any court", must be interpreted in the light of other statutory and case law. To begin with, of course, it does not make reviewable agency action as to which "(1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion." Furthermore, this provision does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures. See the first clause of section 10(b). Thus, the Customs Court and the Court of Customs and Patent Appeals retain their present exclusive jurisdictions.[15]

"Agency action", as used in section 10, is defined in section 2(g) as including "the whole or part of every agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." Sen. Rep. p. 11; H.R. Rep. p. 21 (Sen. Doc. pp. 197, 255). While "final", as used to designate reviewable agency action, is not defined in the Act, its meaning may be gleaned from the second and third sentences of section 10(c). Moreover, many regulatory statutes, either expressly or as they are interpreted, have provided for review of (and only of) "final" agency orders, with the result that the judicial construction of such provisions

15 In the Attorney General's memorandum to the Senate Committee, he stated that "'Courts' includes the Tax Court, Court of Customs and Patent Appeals, the Court of Claims, and similar courts. This act does not apply to their procedure nor affect the requirement of resort thereto." Sen. Rep. p. 38 (Sen. Doc. p. 224).

will carry over to the interpretation of "final" as used in section 10(b). See *Rochester Telephone Corp.* v. *United States*, 307 U.S. 125 (1939).

Since "agency action" is defined to include "rule", the question arises as to whether the phrase, "final agency action for which there is no other adequate remedy in any court", provides for direct judicial review of all rules. Many statutes which give rule making powers (particularly rules of general applicability) to agencies make no provision for judicial review of such rules. The validity of such rules has generally been open to challenge in proceedings for their enforcement. In addition, it has been suggested that in appropriate circumstances, review could be obtained in proceedings under the Declaratory Judgment Act (28 U.S.C. 400). It is clear from the legislative history that section 10(c) was not intended to provide for judicial review in the abstract of all rules. Representative Walter stated to the House that "The provisions of this [sub] section are technical but involve no departure from the usual and well understood rules of procedure in this field." 92 Cong. Rec. 5654 (Sen. Doc. p. 369). Also, during the Senate Hearings in 1941, the subect of judicial review of rules was thoroughly discussed. Two of the bills then pending provided for direct judicial review of rules by declaratory judgment proceedings. (See S. 674 and S. 918). The inclusion of such a provision was strongly advocated by a minority of the Attorney General's Committee on Administrative Procedure who stated that their purpose was—

> to adapt declaratory judgment procedure to this special subject. The minority feels that it is unnecessary and unwise to provide for court review (except where otherwise required by particular statutes) of rules in the abstract. On the other hand, such review upon the application of the rule to a particular person, or upon accepted principles of declaratory judgment, should be expressly recognized. In his letter accompanying the veto of the Logan-Walter bill, the Attorney General stated that—
>
> > under the Declaratory Judgments Act of 1934, any person may now obtain a judgment as to the validity of such administrative rules, if he can show such an interest and present injury therefrom as to constitute a "case or controversy."
>
> However, the Declaratory Judgments Act does not altogether fit the subject and needs some limitation (not, it may be noted, extension) to care for the determination of fact issues, since under the Declaratory Judgments Act juries determine the facts under instructions from the presiding judge. In adapting declaratory judgment procedure to this field, some special provision must be made for the determination of facts, for otherwise the facts in the first instance would be determined through judicial rather than administrative process. (Senate Hearings (1941) pp. 1344, 1386.)

In other words, even the proponents of detailed provisions for judicial review of rules did not intend to prescribe an abstract form

PYM-000528

of review going far beyond the limitations of the Declaratory Judgment Act. Thus, it is fair to conclude that the general statement in the first sentence of section 10(c) was not intended to achieve such a result.

The second sentence of section 10(c) provides that "Any preliminary, procedural, or intermediate agency action or ruling not directly reviewable shall be subject to review upon the review of the final agency action." This language was designed "to negative any intention to make reviewable merely preliminary or procedural orders where there is a subsequent and adequate remedy at law available, as is presently the rule." Senate Comparative Print, June 1945, p. 19[16] (Sen. Doc. p. 37). For example, intermediate orders such as orders setting matters for hearing are not reviewable either directly (*Federal Power Commission* v. *Metropolitan Edison Co.*, 304 U.S. 375 (1938)) or collaterally, as by suits for injunction (*Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U.S. 41 (1938)) or declaratory judgment (*Macauley* v. *Waterman S. S. Co.*, 327 U.S. 540 (1946); *Federal Power Commission* v. *Arkansas Power & Light Co., per curiam*, 330 U. S. 802 (1947)). The provision for review of such questions as a part of the review of final agency action restates existing practice. See section 10(e) (4).

Section 10(c) further provides that "Except as otherwise expressly required by statute, agency action otherwise final shall be final for the purposes of this subsection whether or not there has been presented or determined any application for a declaratory order, for any form of reconsideration, or (unless the agency otherwise requires by rule and provides that the action meanwhile shall be inoperative) for an appeal to superior agency authority." This provision, together with the preceding sentence of the subsection, embodies the doctrine of exhaustion of administrative remedies. H.R. Rep. p. 55, fn. 21 (Sen. Doc. p. 289). Agency action which is finally operative and decisive is reviewable. On the other hand, "Action which is automatically stayable on further proceedings invoked by a party is not final." H.R. Rep. p. 43 (Sen. Doc. p. 277).

It is specifically provided that agency action otherwise final is final for the purposes of the subsection notwithstanding a party's failure to apply for any form of agency reconsideration (reopening, rehearing, etc.), unless a statute expressly requires

---

16 See Final Report, pp. 85-86.

an application for such reconsideration as a prerequisite to judicial review. Under statutes such as the Federal Power Act (16 U.S.C. 791, 825l) and the Natural Gas Act (15 U.S.C. 717r) which expressly require that such reconsideration be sought, the filing of an application for reconsideration will continue to be a condition precedent to judicial review. In addition, it would seem that under the common statutory provision that no objection to agency action not urged before the agency shall be considered by the courts, an application for agency reconsideration remains a prerequisite to obtaining judicial review of such an objection. See 15 U.S.C. 77(i) and 49 U.S.C. 646(e). However, under a statute which merely confers upon parties the right to apply for rehearing, it is now clear that an application for such reconsideration need not precede judicial review. See generally, as to the effect of agency rules in this field, *Levers* v. *Anderson*, 326 U.S. 219 (1945).

The last clause of section 10(c) relates to two situations. First, pursuant to section 8(a), an agency may permit its hearing examiners to make initial decisions which will become the agency's final decisions in the absence of an appeal to or review by the agency. The last clause of section 10(c) permits an agency to require *by rule* that in such cases parties who are dissatisfied with the "initial" decisions of hearing officers must appeal to the agency before seeking judicial review, but only if the agency further provides that the hearing officers' decisions shall be inoperative pending such administrative appeals. Thus, an agency with licensing powers may by rule require a party to appeal to it from an initial decision of a hearing officer only if, for example, the license suspension or revocation determined upon by the hearing officer is held in abeyance pending the agency's action on the appeal. Sen. Rep. p. 27; H.R. Rep. pp. 43, 55, fn. 21 (Sen. Doc. pp. 213, 277, 289).

The second and similar application of the last clause of section 10(c) relates to appeals from agency decisions to a superior agency authority. For example, under some circumstances, it would seem that a bureau or other subdivision within an agency may itself be the agency with respect to a particular function. In such a situation, it may be desired to require appeal from the bureau's decision to the department head or other "superior agency authority" as a prerequisite to judicial review. Under section 10(c), such a requirement may be imposed, but only, as

in the case of required appeals from hearing officers' initial decisions, if the agency's decision is inoperative pending such appeal. Sen. Rep. p. 27; H.R. Rep. p. 43 (Sen. Doc. pp. 213, 277).

The requirement that agency action be inoperative pending required appeals to the agency or to superior agency authority does not require the agency to take positive action for the benefit of an applicant. It was not intended to require the issuance of licenses or the payment of benefits in any case where an agency requires that the denial of licenses or benefits be appealed to it or to superior agency authority as a prerequisite to judicial review.[17]

### SECTION 10(d)—INTERIM RELIEF

Section 10(d) provides that "Pending judicial review any agency is authorized, where it finds that justice so requires, to postpone the effective date of any action taken by it. Upon such conditions as may be required and to the extent necessary to prevent irreparable injury, every reviewing court (including every court to which a case may be taken on appeal from or upon application for certiorari or other writ to a reviewing court) is authorized to issue all necessary and appropriate process to postpone the effective date of any agency action or to preserve status or rights pending conclusion of the review proceedings." The first sentence of the subsection is a restatement of existing law.

The second sentence of section 10(d) confers upon every "reviewing court" discretionary authority to stay agency action pending judicial review "to the extent necessary to prevent irreparable injury." The function of such a power is, as heretofore, to make judicial review effective. Sen. Rep. p. 27; H.R. Rep. p. 43 (Sen. Doc. pp. 213, 277). *Scripps-Howard Radio, Inc.* v. *Federal Communications Commission*, 316 U.S. 4 (1942). The subsection does not permit a court to order the grant of an initial license pending judicial review of an agency's denial of such a license. Sen. Rep. p. 27; H.R. Rep. p. 43 (Sen. Doc. pp. 213, 277). By the same logic, the subsection does not give to reviewing courts the power to order interim payment of grants or benefits the denial of which is the subject of review.

---

17 This conclusion is corollary to the following statement made with respect to section 10(d): "This section permits either agencies or courts, if the proper showing be made, to maintain the status quo. While it would not permit a court to grant an initial license, it provides intermediate judicial relief for every other situation in order to make judicial review effective." Sen. Rep. p. 27, H.R. Rep. p. 43 (Sen. Doc. pp. 213, 277).

The stay power conferred upon reviewing courts is to be exercised only "to the extent necessary to prevent irreparable injury." In other words, irreparable injury, the historic condition of equity jurisdiction, is the indispensable condition to the exercise of the power conferred by section 10(d) upon reviewing courts. Sen. Rep. p. 44 (Sen. Doc. p. 230). Mere maintenance of the status quo for the convenience of parties pending judicial review of agency action will not be adequate ground for the exercise of this stay power.[18]

This power to stay agency action is an equitable power, to be exercised "upon such conditions as may be required." Section 10(d) does not require the issuance of stay orders automatically upon a showing of irreparable damage. As in the past, reviewing courts may "balance the equities" in determining whether to postpone the effective date of agency action. Thus, "In determining whether agency action should be postponed, the court should take into account that persons other than parties may be adversely affected by such postponement and in such cases the party seeking postponement may be required to furnish security to protect such other persons from loss resulting from postponement." H.R. Rep. p. 43 (Sen. Doc. p. 277). More broadly, it is clear that a reviewing court in exercising this power may do so under such conditions as the equities of the situation may require.

The "reviewing court" in which section 10(d) vests the power to stay agency action is the court, and only that court, which has obtained jurisdiction to review the final agency action in accordance with subsections (b) and (c) and the applicable provisions of particular statutes.[19] Section 10(d) confers no power upon a court in advance of the submission to it of final agency action for review on the merits. See *Federal Power Commission v. Metropolitan Edison Co.*, 304 U.S. 375, 383 (1938). This is the only logical conclusion to be drawn from the employment of the phrase "reviewing court", rather than "any court." Any other construction would twist section 10(d) into a general grant of power to the Federal courts to review all kinds of questions presented by preliminary and intermediate agency action. The specific provisions of section 10(c) defining reviewable action negate such a result. The legislative history of section 10(d) is

18 This distinction and the Congressional intent with respect to it are clearly illustrated by the fact that when S. 7 was introduced in the Senate, it read: "to the extent necessary to preserve status or rights, afford an opportunity for judicial review of any question of law *or* prevent irreparable injury." [Emphasis supplied]

19 This was the holding in *Avon Dairy Company v. Eisaman*, 69 F. Supp. 500 (N. D. Ohio, 1946).

equally persuasive; as S. 7 was introduced in the Senate, section 10(d) provided for its exercise "to the extent necessary to * * * *afford an opportunity for judicial review of any question of law* or prevent irreparable injury." The italicized language was dropped by the Senate Committee, which reported the subsection in its present form. Finally, section 10(d) provides that the reviewing court may "issue all necessary and appropriate process to postpone the effective date of any agency action or to preserve status or rights *pending conclusion of the review proceedings.*" [Emphasis supplied]. The italicized language is conclusive that the stay power conferred by the subsection is only ancillary to review proceedings—proceedings in which the court is reviewing final agency action within the meaning of section 10(c).

Section 10(d) prescribes no procedure for the exercise of the power which it confers upon reviewing courts to postpone the effective date of agency action. Section 381 of Title 28, U.S. Code,[20] contains general procedural provisions governing the issuance of preliminary injunctions and restraining orders. Since these procedural provisions are in no way inconsistent with section 10(d), they appear to be applicable to the exercise of the power conferred by that subsection. Similarly, the provisions of the Urgent Deficiencies Act (28 U.S.C. 47), governing the procedure for the issuance of interlocutory injunctions and temporary stays, remain applicable in proceedings for judicial review under that Act.

SECTION 10(e)—SCOPE OF REVIEW

The scope of judicial review is defined in section 10(e) as follows:

> So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall (A) compel agency action unlawfully withheld or unreasonably delayed; and (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; (5) unsupported by substantial evidence in any case subject to the requirements of sections 7 and 8 or otherwise reviewed on the record of an agency hearing provided by statute; or (6) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error.

[20] See also Rule 65 of the Federal Rules of Civil Procedure.

This restates the present law as to the scope of judicial review. Senate Comparative Print, June 1945, p. 20[21] (Sen. Doc. p. 39); House Hearings (1945) pp. 37-38 (Sen. Doc. pp. 83-84); Sen. Rep. pp. 38, 43, 44 (Sen. Doc. pp. 224, 229, 230).

Clause (A) authorizing a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed", appears to be a particularized restatement of existing judicial practice under section 262 of the Judicial Code (28 U.S.C. 377). *Safeway Stores, Inc.* v. *Brown*, 138 F. 2d 278 (E.C.A., 1943), certiorari denied, 320 U.S. 797. The power thus stated is vested in "the reviewing court", which, in this context, would seem to be the court which has or would have jurisdiction to review the final agency action. See *Roche* v. *Evaporated Milk Ass'n.*, 319 U.S. 21, 25 (1943). Orders in the nature of a writ of mandamus have been employed to compel an administrative agency to act, *Safeway Stores, Inc.* v. *Brown*, *supra*, or to assume jurisdiction, *Interstate Commerce Commission* v. *United States ex rel. Humboldt Steamship Co.*, 224 U.S. 474 (1912), or to compel an agency or officer to perform a ministerial or non-discretionary act. Clause (A) of section 10(e) was apparently intended to codify these judicial functions.

Obviously, the clause does not purport to empower a court to substitute its discretion for that of an administrative agency and thus exercise administrative duties. In fact, with respect to constitutional courts, it could not do so. *Keller* v. *Potomac Electric Power Co.*, 261 U.S. 428 (1923); *Postum Cereal Co.* v. *California Fig Nut Co.*, 272 U.S. 693 (1927); *Federal Radio Commission* v. *General Electric Co.*, 281 U.S. 464 (1930). However, as in *Safeway Stores* v. *Brown*, *supra*, a court may require an agency to take action upon a matter, without directing how it shall act.

The numbered clauses of section 10(e)(B) restate the scope of the judicial function in reviewing final agency action. Sen. Rep. p. 44 (Sen. Doc. p. 230); Senate Hearings (1941) pp. 1150, 1351, 1400, 1437. Courts having jurisdiction have always exercised the power in appropriate cases to set aside agency action which they found to be "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or

21 "Subsection (e), therefore, seeks merely to restate the several categories of law subject to judicial review."

PYM-000534

short of statutory right; (4) without observance of procedure required by law."

Clause (5) directs reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be * * * unsupported by substantial evidence in any case subject to the requirements of sections 7 and 8 or otherwise reviewed on the record of an agency hearing provided by statute." This is a general codification of the substantial evidence rule which, either by statute or judicial rule, has long been applied to the review of Federal administrative action. *Consolidated Edison Co.* v. *National Labor Relations Board*, 305 U.S. 197 (1938); *National Labor Relations Board* v. *Remington Rand*, 94 F. 2d 862 (C.C.A. 2, 1938). It will be noted that this codified substantial evidence rule is made applicable not only to cases governed by sections 7 and 8, but also to those types of cases in which statutes provide for agency hearings, but which are exempted from sections 7 and 8 by the introductory clause of section 5.

As to clause (6), the legislative history has resulted in misunderstanding. As S. 7 was introduced in the Senate, clause (6) was followed by a provision that "The relevant facts shall be tried and determined de novo by the original court of review in all cases in which adjudications are not required by statute to be made upon agency hearing." When S. 7 was reported by the Senate Committee, the quoted provision was omitted. Notwithstanding, the subsequent legislative history contains repeated statements to the effect that clause (6) embodies the "established rule * * * [which requires a judicial] trial de novo to establish the relevant facts as to the applicability of any rule and as to the propriety of adjudications where there is no statutory administrative hearing." Senate Comparative Print, June 1945, p. 20 (Sen. Doc. pp. 39-40); H.R. Rep. p. 45 (Sen. Doc. p. 279).

To the contrary, the language of clause (6), "to the extent that the facts are subject to trial de novo by the reviewing court", obviously refers only to those existing situations in which judicial review has consisted of a trial de novo. For example, reparation orders under the Interstate Commerce Act and the Packers and Stockyards Act have only prima facie weight and are thus reviewable *de novo*. In addition, there is no "established rule" requiring a judicial trial *de novo* wherever statutes fail to require an agency hearing. Thus, in deportation (8 U.S.C. 155) and mail fraud (39 U.S.C. 259) cases, hearings are held as a matter of

due process although the statutes do not require agency hearings. In both types of cases, the judicial review of agency action has consisted of a review of the record made in the agency proceeding to determine whether the agency action is supported by evidence.[22] Accordingly, since clause (6) of section 10(e) prescribes a judicial trial *de novo* only in situations where other statutes or the courts have prescribed such review, it is clear that deportation and mail fraud orders will continue to be reviewable on the record made in the agency hearing, even though such hearing is not required by statute. Also, in *National Broadcasting Company* v. *United States*, 319 U.S. 190, 227 (1943), it was held that a trial *de novo* was not appropriate where, prior to the issuance of general regulations, the agency conducted a formal hearing although not required by statute to do so.

Finally, section 10(e) provides that "In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error." This appears to restate existing law. Specifically, the phrase "whole record" was not intended to require reviewing courts to weigh the evidence and make independent findings of fact; rather, it means that in determining whether agency action is supported by substantial evidence, the reviewing court should consider all of the evidence and not merely the evidence favoring one side. Senate Hearings (1941) p. 1359.

The last phrase of section 10(e) sums up in succinct fashion the "harmless error" rule applied by the courts in the review of lower court decisions as well as of administrative bodies, namely, that errors which have no substantial bearing on the ultimate rights of the parties will be disregarded. *Market Street Ry.* v. *Comm'n.*, 324 U.S. 548, 561-2 (1945).

22 *Vajtauer* v. *Commissioner*, 273 U.S. 103, 106 (1927) and *Bridges* v. *Wixon*, 326 U.S. 135, 149 (1945) (deportation). In deportation proceedings, a judicial trial *de novo* may be had on the issue of citizenship. *Kessler* v. *Strecker*, 307 U.S. 22, 35 (1939). See *Farley* v. *Simmons*, 99 F. 2d 343, 347 (App. D.C. 1938) certiorari denied, 305 U.S. 651, for review of mail fraud orders; also Senate Hearings, (1941) p. 59.

THE END

PYM-000536

## APPENDIX A

[PUBLIC LAW 404—79TH CONGRESS]
[CHAPTER 324—2D SESSION]

[S. 7]

### AN ACT

To improve the administration of justice by prescribing fair administrative procedure.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### TITLE

SECTION 1. This Act may be cited as the "Administrative Procedure Act".

### DEFINITIONS

SEC. 2. As used in this Act—

(a) AGENCY.—"Agency" means each authority (whether or not within or subject to review by another agency) of the Government of the United States other than Congress, the courts, or the governments of the possessions, Territories, or the District of Columbia. Nothing in this Act shall be construed to repeal delegations of authority as provided by law. Except as to the requirements of section 3, there shall be excluded from the operation of this Act (1) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them, (2) courts martial and military commissions, (3) military or naval authority exercised in the field in time of war or in occupied territory, or (4) functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947, and the functions conferred by the following statutes: Selective Training and Service Act of 1940; Contract Settlement Act of 1944; Surplus Property Act of 1944.

(b) PERSON AND PARTY.—"Person" includes individuals, partnerships, corporations, associations, or public or private organizations of any character other than agencies. "Party" includes any person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in any

agency proceeding; but nothing herein shall be construed to prevent an agency from admitting any person or agency as a party for limited purposes.

(c) RULE AND RULE MAKING.—"Rule" means the whole or any part of any agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of any agency and includes the approval or perscription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing upon any of the foregoing. "Rule making" means agency process for the formulation, amendment, or repeal of a rule.

(d) ORDER AND ADJUDICATION.—"Order" means the whole or any part of the final disposition (whether affirmative, negative, injunctive, or declaratory in form) of any agency in any matter other than rule making but including licensing. "Adjudication" means agency process for the formulation of an order.

(e) LICENSE AND LICENSING.—"License" includes the whole or part of any agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission. "Licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation amendment, modification, or conditioning of a license.

(f) SANCTION AND RELIEF.—"Sanction" includes the whole or part of any agency (1) prohibition, requirement, limitation, or other condition affecting the freedom of any person; (2) withholding of relief; (3) imposition of any form of penalty or fine; (4) destruction, taking, seizure, or withholding of property; (5) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees; (6) requirement, revocation, or suspension of a license; or (7) taking of other compulsory or restrictive action. "Relief" includes the whole or part of any agency (1) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy; (2) recognition of any claim, right, immunity, privilege, exemption, or exception; or (3) taking of any other action upon the application or petition of, and beneficial to, any person.

(g) AGENCY PROCEEDING AND ACTION.—"Agency proceeding" means any agency process as defined in subsections (c), (d), and

PYM-000538

(e) of this section. "Agency action" includes the whole or part of every agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.

## PUBLIC INFORMATION

SEC. 3. Except to the extent that there is involved (1) any function of the United States requiring secrecy in the public interest or (2) any matter relating solely to the internal management of an agency—

(a) RULES.—Every agency shall separately state and currently publish in the Federal Register (1) descriptions of its central and field organization including delegations by the agency of final authority and the established places at which, and methods whereby, the public may secure information or make submittals or requests; (2) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal or informal procedures available as well as forms and instructions as to the scope and contents of all papers, reports, or examinations; and (3) substantive rules adopted as authorized by law and statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public, but not rules addressed to and served upon named persons in accordance with law. No person shall in any manner be required to resort to organization or procedure not so published.

(b) OPINIONS AND ORDERS.—Every agency shall publish or, in accordance with published rule, make available to public inspection all final opinions or orders in the adjudication of cases (except those required for good cause to be held confidential and not cited as precedents) and all rules.

(c) PUBLIC RECORDS.—Save as otherwise required by statute, matters of official record shall in accordance with published rule be made available to persons properly and directly concerned except information held confidential for good cause found.

## RULE MAKING

SEC. 4. Except to the extent that there is involved (1) any military, naval, or foreign affairs function of the United States or (2) any matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts—

(a) NOTICE.—General notice of proposed rule making shall be published in the Federal Register (unless all persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law) and shall include (1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. Except where notice or hearing is required by statute, this subsection shall not apply to interpretative rules, general statements of policy, rules of agency organization, procedure, or practice, or in any situation in which the agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(b) PROCEDURES.—After notice required by this section, the agency shall afford interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity to present the same orally in any manner; and, after consideration of all relevant matter presented, the agency shall incorporate in any rules adopted a concise general statement of their basis and purpose. Where rules are required by statute to be made on the record after opportunity for an agency hearing, the requirements of sections 7 and 8 shall apply in place of the provisions of this subsection.

(c) EFFECTIVE DATES.—The required publication or service of any substantive rule (other than one granting or recognizing exemption or relieving restriction or interpretative rules and statements of policy) shall be made not less than thirty days prior to the effective date thereof except as otherwise provided by the agency upon good cause found and published with the rule.

(d) PETITIONS.—Every agency shall accord any interested person the right to petition for the issuance, amendment, or repeal of a rule.

## ADJUDICATION

SEC. 5. In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved (1) any matter subject to a subsequent trial of the law and the facts de novo in any court; (2) the selection or tenure of an officer or employee of

PYM-000540

the United States other than examiners appointed pursuant to section 11; (3) proceedings in which decisions rest solely on inspections, tests, or elections; (4) the conduct of military, naval, or foreign affairs functions; (5) cases in which an agency is acting as an agent for a court; and (6) the certification of employee representatives—

(a) NOTICE.—Persons entitled to notice of an agency hearing shall be timely informed of (1) the time, place, and nature thereof; (2) the legal authority and jurisdiction under which the hearing is to be held; and (3) the matters of fact and law asserted. In instances in which private persons are the moving parties, other parties to the proceeding shall give prompt notice of issues controverted in fact or law; and in other instances agencies may by rule require responsive pleading. In fixing the times and places for hearings, due regard shall be had for the convenience and necessity of the parties or their representatives.

(b) PROCEDURE.—The agency shall afford all interested parties opportunity for (1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment where time, the nature of the proceeding, and the public interest permit, and (2) to the extent that the parties are unable so to determine any controversy by consent, hearing, and decision upon notice and in conformity with sections 7 and 8.

(c) SEPARATION OF FUNCTIONS.—The same officers who preside at the reception of evidence pursuant to section 7 shall make the recommended decision or initial decision required by section 8 except where such officers become unavailable to the agency. Save to the extent required for the disposition of ex parte matters as authorized by law, no such officer shall consult any person or party on any fact in issue unless upon notice and opportunity for all parties to participate; nor shall such officer be responsible to or subject to the supervision or direction of any officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency. No officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency in any case shall, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 8 except as witness or counsel in public proceedings. This subsection shall not apply in determining applications for initial licenses or to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; nor shall it be applicable in any manner to

the agency or any member or members of the body comprising the agency.

(d) DECLARATORY ORDERS.—The agency is authorized in its sound discretion, with like effect as in the case of other orders, to issue a declaratory order to terminate a controversy or remove uncertainty.

## ANCILLARY MATTERS

SEC. 6. Except as otherwise provided in this Act—

(a) APPEARANCE.—Any person compelled to appear in person before any agency or representative thereof shall be accorded the right to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative. Every party shall be accorded the right to appear in person or by or with counsel or other duly qualified representative in any agency proceeding. So far as the orderly conduct of public business permits, any interested person may appear before any agency or its responsible officers or employees for the presentation, adjustment, or determination of any issue, request, or controversy in any proceeding (interlocutory, summary, or otherwise) or in connection with any agency function. Every agency shall proceed with reasonable dispatch to conclude any matter presented to it except that due regard shall be had for the convenience and necessity of the parties or their representatives. Nothing herein shall be construed either to grant or to deny to any person who is not a lawyer the right to appear for or represent others before any agency or in any agency proceeding.

(b) INVESTIGATIONS.—No process, requirement of a report, inspection, or other investigative act or demand shall be issued, made, or enforced in any manner or for any purpose except as authorized by law. Every person compelled to submit data or evidence shall be entitled to retain or, on payment of lawfully prescribed costs, procure a copy or transcript thereof, except that in a nonpublic investigatory proceeding the witness may for good cause be limited to inspection of the official transcript of his testimony.

(c) SUBPENAS.—Agency subpenas authorized by law shall be issued to any party upon request and, as may be required by rules of procedure, upon a statement or showing of general relevance and reasonable scope of the evidence sought. Upon contest the court shall sustain any such subpena or similar process or demand

to the extent that it is found to be in accordance with law and, in any proceeding for enforcement, shall issue an order requiring the appearance of the witness or the production of the evidence or data within a reasonable time under penalty of punishment for contempt in case of contumacious failure to comply.

(d) DENIALS.—Prompt notice shall be given of the denial in whole or in part of any written application, petition, or other request of any interested person made in connection with any agency proceeding. Except in affirming a prior denial or where the denial is self-explanatory, such notice shall be accompanied by a simple statement of procedural or other grounds.

### HEARINGS

SEC. 7. In hearings which section 4 or 5 requires to be conducted pursuant to this section—

(a) PRESIDING OFFICERS.—There shall preside at the taking of evidence (1) the agency, (2) one or more members of the body which comprises the agency, or (3) one or more examiners appointed as provided in this Act; but nothing in this Act shall be deemed to supersede the conduct of specified classes of proceedings in whole or part by or before boards or other officers specially provided for by or designated pursuant to statute. The functions of all presiding officers and of officers participating in decisions in conformity with section 8 shall be conducted in an impartial manner. Any such officer may at any time withdraw if he deems himself disqualified; and, upon the filing in good faith of a timely and sufficient affidavit of personal bias or disqualification of any such officer, the agency shall determine the matter as a part of the record and decision in the case.

(b) HEARING POWERS.—Officers presiding at hearings shall have authority, subject to the published rules of the agency and within its powers, to (1) administer oaths and affirmations, (2) issue subpenas authorized by law, (3) rule upon offers of proof and receive relevant evidence, (4) take or cause depositions to be taken whenever the ends of justice would be served thereby, (5) regulate the course of the hearing, (6) hold conferences for the settlement or simplification of the issues by consent of the parties, (7) dispose of procedural requests or similar matters, (8) make decisions or recommend decisions in conformity with section 8, and (9) take any other action authorized by agency rule consistent with this Act.

(c) EVIDENCE.—Except as statutes otherwise provide, the proponent of a rule or order shall have the burden of proof. Any oral or documentary evidence may be received, but every agency shall as a matter of policy provide for the exclusion of irrevelant immaterial, or unduly repetitious evidence and no sanction shall be imposed or rule or order be issued except upon consideration of the whole record or such portions thereof as may be cited by any party and as supported by and in accordance with the reliable, probative, and substantial evidence. Every party shall have the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. In rule making or determining claims for money or benefits or applications for initial licenses any agency may, where the interest of any party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form.

(d) RECORD.—The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, shall constitute the exclusive record for decision in accordance with section 8 and, upon payment of lawfully prescribed costs, shall be made available to the parties. Where any agency decision rests on official notice of a material fact not appearing in the evidence in the record, any party shall on timely request be afforded an opportunity to show the contrary.

## DECISIONS

SEC. 8. In cases in which a hearing is required to be conducted in conformity with section 7—

(a) ACTION BY SUBORDINATES.—In cases in which the agency has not presided at the reception of the evidence, the officer who presided (or, in cases not subect to subsection (c) of section 5, any other officer or officers qualified to preside at hearings pursuant to section 7) shall initially decide the case or the agency shall require (in specific cases or by general rule) the entire record to be certified to it for initial decision. Whenever such officers make the initial decision and in the absence of either an appeal to the agency or review upon motion of the agency within time provided by rule, such decision shall without further proceedings then become the decision of the agency. On appeal from or review of the initial decisions of such officers the agency shall, except as it may limit

the issues upon notice or by rule, have all the powers which it would have in making the initial decision. Whenever the agency makes the initial decision without having presided at the reception of the evidence, such officers shall first recommend a decision except that in rule making or determining applications for initial licenses (1) in lieu thereof the agency may issue a tentative decision or any of its responsible officers may recommend a decision or (2) any such procedure may be omitted in any case in which the agency finds upon the record that due and timely execution of its functions imperatively and unavoidably so requires.

(b) SUBMITTALS AND DECISIONS.—Prior to each recommended, initial, or tentative decision, or decision upon agency review of the decision of subordinate officers the parties shall be afforded a reasonable opportunity to submit for the consideration of the officers participating in such decisions (1) proposed findings and conclusions, or (2) exceptions to the decisions or recommended decisions of subordinate officers or to tentative agency decisions, and (3) supporting reasons for such exceptions or proposed findings or conclusions. The record shall show the ruling upon each such finding, conclusion, or exception presented. All decisions (including initial, recommended, or tentative decisions) shall become a part of the record and include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record; and (2) the appropriate rule, order, sanction, relief, or denial thereof.

## SANCTIONS AND POWERS

SEC. 9. In the exercise of any power or authority—

(a) IN GENERAL.—No sanction shall be imposed or substantive rule or order be issued except within jurisdiction delegated to the agency and as authorized by law.

(b) LICENSES.—In any case in which application is made for a license required by law the agency, with due regard to the rights or privileges of all the interested parties or adversely affected persons and with reasonable dispatch, shall set and complete any proceedings required to be conducted pursuant to sections 7 and 8 of this Act or other proceedings required by law and shall make its decision. Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, no withdrawal, suspension, revocation, or annulment of any license shall be lawful

unless, prior to the institution of agency proceedings therefor, facts or conduct which may warrant such action shall have been called to the attention of the licensee by the agency in writing and the licensee shall have been accorded opportunity to demonstrate or achieve compliance with all lawful requirements. In any case in which the licensee has, in accordance with agency rules, made timely and sufficient application for a renewal or a new license, no license with reference to any activity of a continuing nature shall expire until such application shall have been finally determined by the agency.

## JUDICIAL REVIEW

SEC. 10. Except so far as (1) statutes precude judicial review or (2) agency action is by law committed to agency discretion—

(a) RIGHT OF REVIEW.—Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.

(b) FORM AND VENUE OF ACTION.—The form of proceeding for judicial review shall be any special statutory review proceeding relevant to the subject matter in any court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action (including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus) in any court of competent jurisdiction. Agency action shall be subject to judicial review in civil or criminal proceedings for judicial enforcement except to the extent that prior, adequate, and exclusive opportunity for such review is provided by law.

(c) REVIEWABLE ACTS.—Every agency action made reviewable by statute and every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review. Any preliminary, procedural, or intermediate agency action or ruling not directly reviewable shall be subject to review upon the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final shall be final for the purposes of this subsection whether or not there has been presented or determined any application for a declaratory order, for any form of reconsideration, or (unless the agency otherwise requires by rule and provides that the action meanwhile shall be inoperative) for an appeal to superior agency authority.


(d) INTERIM RELIEF.—Pending judicial review any agency is authorized, where it finds that justice so requires, to postpone the effectice date of any action taken by it. Upon such conditions as may be required and to the extent necessary to prevent irreparable injury, every reviewing court (including every court to which a case may be taken on appeal from or upon application for certiorari or other writ to a reviewing court) is authorized to issue all necessary and appropriate process to postpone the effective date of any agency action or to preserve status or rights pending conclusion of the review proceedings.

(e) SCOPE OF REVIEW.—So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall (A) compel agency action unlawfully withheld or unreasonably delayed; and (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; (5) unsupported by substantial evidence in any case subject to the requirements of sections 7 and 8 or otherwise reviewed on the record of an agency hearing provided by statute; or (6) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error.

### EXAMINERS

SEC. 11. Subject to the civil-service and other laws to the extent not inconsistent with this Act, there shall be appointed by and for each agency as many qualified and competent examiners as may be necessary for proceedings pursuant to sections 7 and 8, who shall be assigned to cases in rotation so far as practicable and shall perform no duties inconsistent with their duties and responsibilities as examiners. Examiners shall be removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission (here-

inafter called the Commission) after opportunity for hearing and upon the record thereof. Examiners shall receive compensation prescribed by the Commission independently of agency recommendations or ratings and in accordance with the Classification Act of 1923, as amended, except that the provisions of paragraphs (2) and (3) of subsection (b) of section 7 of said Act, as amended, and the provisions of section 9 of said Act, as amended, shall not be applicable. Agencies occasionally or temporarily insufficiently staffed may utilize examiners selected by the Commission from and with the consent of other agencies. For the purposes of this section, the Commission is authorized to make investigations, require reports by agencies, issue reports, including an annual report to the Congress, promulgate rules, appoint such advisory committees as may be deemed necessary, recommend legislation, subpena witnesses or records, and pay witness fees as established for the United States courts.

### Construction and Effect

Sec. 12. Nothing in this Act shall be held to diminish the constitutional rights of any person or to limit or repeal additional requirements imposed by statute or otherwise recognized by law. Except as otherwise required by law, all requirements or privileges relating to evidence or procedure shall apply equally to agencies and persons. If any provision of this Act or the application thereof is held invalid, the remainder of this Act or other applications of such provision shall not be affected. Every agency is granted all authority necessary to comply with the requirements of this Act through the issuance of rules or otherwise. No subsequent legislation shall be held to supersede or modify the provisions of this Act except to the extent that such legislation shall do so expressly. This Act shall take effect three months after its approval except that sections 7 and 8 shall take effect six months after such approval, the requirement of the selection of examiners pursuant to section 11 shall not become effective until one year after such approval, and no procedural requirement shall be mandatory as to any agency proceeding initiated prior to the effective date of such requirement.

Approved June 11, 1946.

## APPENDIX B

OFFICE OF THE ATTORNEY GENERAL,
*Washington, D. C., October 19, 1945.*

Hon. Pat McCarran,
Chairman, Senate Judiciary Committee,
United State Senate, Washington, D. C.

My Dear Senator: You have asked me to comment on S. 7, a bill to improve the administration of justice by prescribing fair administrative procedure, in the form in which it appears in the revised committee print issued October 5, 1945.

I appreciate the opportunity to comment on this proposed legislation.

For more than a decade there has been pending in the Congress legislation in one form or another designed to deal horizontally with the subject of administrative procedure, so as to overcome the confusion which inevitably has resulted from leaving to basic agency statutes the prescription of the procedures to be followed or, in many instances, the delegation of authority to agencies to prescribe their own procedures. Previous attempts to enact general procedural legislation have been unsuccessful generally because they failed to recognize the significant and inherent differences between the tasks of courts and those of administrative agencies or because, in their zeal for simplicity and uniformity, they propose too narrow and rigid a mold.

Nevertheless, the goal toward which these efforts have been directed is, in my opinion, worth while. Despite difficulties of draftsmanship, I believe that over-all procedural legislation is possible and desirable. The administrative process is now well developed. It has been subject in recent years to the most intensive and informed study—by various congressional committees, by the Attorney General's Committee on Administrative Procedure, by organizations such as the American Bar Association, and by many individual practitioners and legal scholars. We have in general—as we did not have until fairly recently—the materials and facts at hand. I think the time is ripe for some measure of control and prescription by legislation. I cannot agree that there is anything inherent in the subject of administrative procedure, however complex it may be, which defies workable codification.

PYM-000549

Since the original introduction of S. 7, I understand that opportunity has been afforded to public and private interests to study its provisions and to suggest amendments. The agencies of the Government primarily concerned have been consulted and their views considered. In particular, I am happy to note that your committee and the House Committee on the Judiciary, in an effort to reconcile the views of the interested parties, have consulted officers of this Department and experts in administrative law made available by this Department.

The revised committee print issued October 5, 1945, seems to me to achieve a considerable degree of reconciliation between the views expressed by the various Government agencies and the views of the proponents of the legislation. The bill in its present form requires administrative agencies to publish or make available to the public an increased measure of information concerning their organization, functions, and procedures. It gives to that portion of the public which is to be affected by administrative regulations an opportunity to express its views before the regulations become effective. It prescribes, in instances in which existing statutes afford opportunity for hearing in connection with the formulation and issuance of administrative rules and orders, the procedures which shall govern such hearings. It provides for the selection of hearing officers on a basis designed to obtain highly qualified and impartial personnel and to insure their security of tenure. It also restates the law governing judicial review of administrative action.

The bill appears to offer a hopeful prospect of achieving reasonable uniformity and fairness in administrative procedures without at the same time interfering unduly with the efficient and economical operation of the Government. Insofar as possible, the bill recognizes the needs of individual agencies by appropriate exemption of certain of their functions.

After reviewing the committee print, therefore, I have concluded that this Department should recommend its enactment.

My conclusion as to the workability of the proposed legislation rest on my belief that the provisions of the bill can and should be construed reasonably and in a sense which will fairly balance the requirements and interests of private persons and governmental agencies. I think it may be advisable for me to attach to this report an appendix discussing the principle provisions of the bill. This may serve to clarify some of the essential issues, and may

PYM-000550

assist the committee in evaluating the impact of the bill on public and private interests.

I am advised by the Acting Director of the Bureau of the Budget that while there would be no objection to the submission of this report, he questions the appropriateness of the inclusion of the words "independently of agency recommendations or ratings," appearing after the words "Examiners shall receive compensation prescribed by the [Civil Service] Commission" in section 11 of the bill, inasmuch as he deems it highly desirable that agency recommendations and ratings be fully considered by the Commission.

With kind personal regards.

Sincerely yours,

TOM C. CLARK,
*Attorney General*

APPENDIX TO ATTORNEY GENERAL'S STATEMENT REGARDING REVISED COMMITTEE PRINT OF OCTOBER 5, 1945

Section 2: The definitions given in section 2 are of very broad character. It is believed, however, that this scope of definition will not be found to have any unexpected or unfortunate consequences in particular cases, inasmuch as the operative sections of the act are themselves carefully limited.

"Courts" includes the Tax Court, Court of Customs and Patent Appeals, the Court of Claims, and similar courts. This act does not apply to their procedure nor affect the requirement of resort thereto.

In section 2 (a) the words "agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them" are intended to refer to the following, among others: National War Labor Board and the National Railroad Adjustment Board.

In section 2 (c) the phrase "the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances," etc., is not, of course, intended to be an exhaustive enumeration of the types of subject matter of rule making. Specification of these particular subjects is deemed desirable, however, because there is no unanimity of recognition that they are, in fact, rule making. The phrase "for the future" is designed to differentiate, for example, between the process of prescribing rates for the future and the process of determining the lawfulness of rates charged in the past. The latter, of course, is "adjudication" and not "rule making." (*Arizona Grocery Co.* v. *Atchison, Topeka, and Santa Fe Railway Co.* (284 U.S. 370).)

The definitions of "rule making" and "adjudication," set forth in subsections (c) and (d) of section 2, are especially significant. The basic scheme underlying this legislation is to classify all administrative proceedings into these two categories. The pattern is familiar to those who have examined the various proposals for administrative procedure legislation which have been introduced during the past few years; it appears also in the recommendations of the Attorney General's Committee on Administrative Procedure. Proceedings are classed as rule making under this act not merely because, like the legislative process, they result in regulations of

PYM-000552

general applicability but also because they involve subject matter demanding judgments based on technical knowledge and experience. As defined in subsection (c), for example, rule making includes not only the formulation of rules of general applicability, but also the formulation of agency action whether of general or particular applicability, relating to the types of subject matter enumerated in subsection (c). In many instances of adjudication, on the other hand, the accusatory element is strong, and individual compliance or behavior is challenged; in such cases, special procedural safeguards should be provided to insure fair judgments on the facts as they may properly appear of record. The statute carefully differentiates between these two basically different classes of proceedings so as to avoid, on the one hand, too cumbersome a procedure and to require, on the other hand, an adequate procedure.

Section 3: This section applies to all agencies covered by the act, including war agencies and war functions. The exception of any function of the United States requiring secrecy in the public interest is intended to cover (in addition to military, naval, and foreign affairs functions) the confidential operations of the Secret Service, the Federal Bureau of Investigation, United States attorneys, and other prosecuting agencies, as well as the confidential functions of any other agency.

Section 3 (a), by requiring publication of certain classes of information in the Federal Register, is not intended to repeal the Federal Register Act (44 U. S. C. 301 et seq.) but simply to require the publication of certain additional material.

Section 3 (a) (4) is intended to include (in addition to substantive rules) only such statements of general policy or interpretations as the agency believes may be formulated with a sufficient degree of definiteness and completeness to warrant their publication for the guidance of the public.

Section 3 (b) is designed to make available all final opinions or orders in the adjudication of cases. Even here material may be held confidential if the agency finds good cause. This confidential material, however, should not be cited as a precedent. If it is desired to rely upon the citation of confidential material, the agency should first make available some abstract of the confidential material in such form as will show the principles relied upon without revealing the confidential facts.

Section 3 (c) is not intended to open up Government files for

Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 196 of 353
PYM-000533

general inspection. What is intended is that the agencies, to the degree of specificity practicable, shall classify its material in terms of whether or not it is confidential in character and shall set forth in published rules the information or type of material which is confidential and that which is not.

Section 4. The term "naval" in the first exception clause is intended to include the defense functions of the Coast Guard and the Bureau of Marine Inspection and Navigation.

Section 4 (b), in requiring the publication of a concise general statement of the basis and purpose of rules made without formal hearing, is not intended to require an elaborate analysis of rules or of the detailed considerations upon which they are based, but is designed to enable the public to obtain a general idea of the purpose of, and a statement of the basic justification for, the rules. The requirement would also serve much the same function as the whereas clauses which are now customarily found in the preambles of Executive orders.

Section 4 (c): This subsection is not intended to hamper the agencies in cases in which there is good cause for putting a rule into effect immediately, or at some time earlier than 30 days. The section requires, however, that where an earlier effective date is desired the agency should make a finding of good cause therefor and publish its finding along with the rule.

Section 4 (d) simply permits any interested person to petition an agency for the issuance, amendment, or repeal of a rule. It requires the reception and consideration of petitions, but does not compel an agency to undertake any rule-making procedure merely because a petition is filed.

SEC. 5. Subject to the six exceptions set forth at the commencement of the section, section 5 applies to administrative adjudications "required by statute to be determined on the record after opportunity for an agency hearing." It is thus limited to cases in which the Congress has specifically required a certain type of hearing. The section has no application to rule making, as defined in section 2 (c). The section does apply, however, to licensing with the exception that section 5 (c), relating to the separation of functions, does not apply in determining applications for initial licenses, i. e., original licenses as contradistinguished from renewals or amendments of existing licenses.

If a case falls within one of the six exceptions listed at the opening of section 5, no provision of section 5 has any application

to that case; such a case would be governed by the requirements of other existing statutes.

The first exception is intended to exempt, among other matters, certain types of reparation orders assessing damages, such as are issued by the Interstate Commerce Commission and the Secretary of Agriculture, since such orders are admissible only as prima facie evidence in court upon attempted enforcement proceedings or (at least in the case of reparation orders issued by the Secretary of Agriculture under the Perishable Agricultural Commodities Act) on the appeal of the losing party. Reparation orders involving in part an admistrative determination of the reasonableness of rates in the past so far as they are not subject to trial de novo would be subject to the provisions of section 5 generally but they have been specifically exempted from the segregation provisions of section 5 (c). In the fourth exception the term "naval" is intended to include adjudicative defense functions of the Coast Guard and the Bureau of Marine Inspection and Navigation, where such functions pertain to national defense.

Section 5 (a) is intended to state minimum requirements for the giving of notice to persons who under existing law are entitled to notice of an agency hearing in a statutory adjudication. While in most types of proceedings all of the information required to be given in clauses (1), (2), and (3) may be included in the "notice of hearing" or other moving paper, in many instances the agency or other moving party may not be in position to set forth all of such information in the moving paper, or perhaps not even in advance of the hearing, especially the "matters of fact and law asserted." The first sentence of this subsection merely requires that the information specified should be given as soon as it can be set forth and, in any event, in a sufficiently timely manner as to afford those entitled to the information an adequate opportunity to meet it. The second sentence complements the first and requires agencies and other parties promptly to reply to moving papers of private persons or permits agencies to require responsive pleading in any proceedings.

Section 5 (c) applies only to the class of adjudicatory proceedings included within the scope of section 5, i. e., cases of adjudication required by statute to be determined after opportunity for an agency hearing, and then not falling within one of the six excepted situations listed at the opening of section 5. As explained in the comments with respect to section 5 generally, this

Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 198 of 353
PYM-000555

subsection does not apply either in proceedings to determine applications for initial licenses or in those to determine the reasonableness of rates in the past.

In the cases to which this subsection is applicable, if the informal procedures described in section 5 (b) (1) are not appropriate or have failed, a hearing is to be held as provided in sections 7 and 8. At such hearings the same officers who preside at the reception of evidence pursuant to section 7 shall make the recommended decision or initial decision "required by section 8" except where such officers become unavailable to the agency. The reference to section 8 is significant. Section 8 (a) provides that, in cases in which the agency has not presided at the reception of the evidence, the officer who presided (or, in cases not subject to subsection (c) of section 5, an officer or officers qualified to preside at hearings pursuant to section 7) shall make the initial or recommended decision, as the case may be. It is plain, therefore, that in cases subject to section 5(c) only the officer who presided at the hearing (unless he is unavailable for reasons beyond the agency's control) is eligible to make the initial or recommended decision, as the case may be.

This subsection further provides that in the adjudicatory hearings covered by it no presiding officer shall consult any person or party on any fact in issue unless upon notice and opportunity for all parties to participate (except to the extent required for the disposition of ex parte matters as authorized by law). The term "fact in issue" is used in its technical, litigious sense.

In most of the agencies which conduct adjudicative proceedings of the types subject to this subsection, the examiners are placed in organizational units apart from those to which the investigative or prosecuting personnel are assigned. Under this subsection such an arrangement will become operative in all such agencies. Further, in the adjudicatory cases covered by section 5 (c), no officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency in any case shall, in that or a factually related case, participate or advise in the decision, recommended decision or agency review pursuant to section 8 except as witness or counsel in public proceedings. However, section 5 (c) does not apply to the agency itself or, in the case of a multiheaded agency, any member thereof. It would not preclude, for example, a member of the Interstate Commerce Commission personally conducting or supervising an investigation

and subsequently participating in the determination of the agency action arising out of such investigation.

Section 5 (c), applying as it does only to cases of adjudication (except determining applications for initial licenses or determining reasonableness of rates in the past) within the scope of section 5 generally, has no application whatever to rule making, as defined in section 2 (c). As explained in the comment on section 2 (c), rule making includes a wide variety of subject matters, and within the scope of those matters it is not limited to the formulation of rules of general applicability but includes also the formulation of agency action whether of general or particular application, for example, the reorganization of a particular company.

Section 5 (d): Within the scope of section 5 (i. e., in cases of adjudication required by statute to be determined on the record after opportunity for an agency hearing, subject to certain exceptions) the agency is authorized to issue a declaratory order to terminate a controversy or remove uncertainty. Where declaratory orders are found inappropriate to the subject matter, no agency is required to issue them.

Section 6: Subsection (a), in stating a right of appearance for the purpose of settling or informally determining the matter in controversy, would not obtain if the agency properly determines that the responsible conduct of public business does not permit. It may be necessary, for example, to set the matter down for public hearing without preliminary discussion because a statute or the subject matter or the special circumstances so require.

It is not intended by this provision to require the agency to give notice to all interested persons, unless such notice is otherwise required by law.

This subsection does not deal with, or in any way qualify, the present power of an agency to regulate practice at its bar. It expressly provides, moreover, that nothing in the act shall be construed either to grant or to deny the right of nonlawyers to appear before agencies in a representative capacity. Control over this matter remains in the respective agencies.

Section 6 (b): The first sentence states existing law. The second sentence is new.

Section 6 (c): The first sentence entitles a party to a subpena upon a statement or showing of general relevance and reasonable scope of the evidence sought. The second sentence is intended to

PYM-000557

state the existing law with respect to the judicial enforcement of subpenas.

Section 6 (d): The statement of grounds required herein will be very simple, as contrasted with the more elaborate findings which are customarily issued to support an order.

Section 7: This section applies in those cases of statutory hearing which are required by sections 4 and 5 to be conducted pursuant to section 7. Subject to the numerous exceptions contained in sections 4 and 5, they are cases in which an order or rule is to be made upon the basis of the record in a statutory hearing.

Section 7 (a): The subsection is not intended to disturb presently existing statutory provisions which explicity provide for certain types of hearing officers. Among such are (1) joint hearings before officers of the Federal agencies and persons designated by one or more States, (2) where officers of more than one agency sit, (3) quota allotment cases under the Agricultural Adjustment Act of 1938, (4) Marine Casualty Investigation Boards, (5) registers of the General Land Office, (6) special boards set up to review the rights of disconnected servicemen (38 U. S. C. 693h) and the rights of veterans to special unemployment compensation (38 U.S.C. 696h), and (7) boards of employees authorized under the Interstate Commerce Act (49 U. S. C. 17 (2)).

Subject to this qualification, section 7 (a) requires that there shall preside at the taking of evidence one or more examiners appointed as provided in this act, unless the agency itself or one or more of its members presides. This provision is one of the most important provisions in the act. In many agencies of the Government this provision may mean the appointment of a substantial number of hearing officers having no other duties. The resulting expense to the Government may be increased, particularly in agencies where hearings are now conducted by employees of a subordinate status or by employees having duties in addition to presiding at hearings. On the other hand, it is contemplated that the Civil service Commission, which is empowered under the provisions of section 11 to prescribe salaries for hearing officers, will establish various salary grades in accordance with the nature and importance of the duties performed, and will assign those in the lower grades to duties now performed by employees in the lower brackets. It may also be possible for the agencies to reorganize their staffs so as to permit the appointment of full-time

hearing officers by reducing the number of employees engaged on other duties.

This subsection further provides for withdrawal or removal of examiners disqualified in a particular proceeding. Some of the agencies have voiced concern that this provision would permit undue delay in the conduct of their proceedings because of unnecessary hearings or other procedure to determine whether affidavits of bias are well founded. The provision does not require hearings in every instance but simply requires such procedure, formal or otherwise, as would be necessary to establish the merits of the allegations of bias. If it is manifest that the charge is groundless, there may be prompt disposition of the matter. On the other hand, if the affidavit appears to have substance, it should be inquired into. In any event, whatever procedure the agency deems appropriate must be made a part of the record in the proceeding in which the affidavit is filed.

Section 7 (b): The agency may delegate to a hearing officer any of the enumerated powers with which it is vested. The enumeration of the powers of hearing officers is not intended to be exclusive.

Section 7 (c): The first sentence states the customary rule that the proponent of a rule or order shall have the burden of proof. Statutory exceptions to the rule are preserved. Parties shall have the right to conduct such cross-examination as may be required for a full and true disclosure of the facts. This is not intended to disturb the existing practice of submitting technical written reports, summaries, and analyses of material gathered in field surveys, and other devices appropriately adapted to the particular issues involved in specialized proceedings. Whether the agency must in such cases produce the maker of the report depends, as it does under the present law, on what is reasonable in all the circumstances.

It may be noted that agencies are empowered, in this subsection, to dispense with oral evidence only in the types of proceedings enumerated; that is, in instances in which normally it is not necessary to see and hear the witnesses in order properly to appraise the evidence. While there may be types of proceedings other than those enumerated in which the oral testimony of the witnesses is not essential, in such instances the parties generally consent to submission of the evidence in written form so that the

PYM-000559

inability of the agency to compel submission of written evidence would not be burdensome.

The provision regarding "evidence in written form" does not limit the generality of the prevailing principle that "any evidence may be received"; that is, that the rules of evidence as such are not applicable in administrative proceedings, and that all types of pertinent evidentiary material may be considered. It is assumed, of course, that agencies will, in the words of the Attorney General's Committee on Administrative Procedure, rely only on such evidence (whether written or oral) as is "relevant, reliable, and probative." This is meant as a guide, but the courts in reviewing an order are governed by the provisions of section 10 (e), which states the "substantial evidence" rule.

Section 7 (d): The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, shall constitute the exclusive record for decision, in the cases covered by section 7. This follows from the proposition that sections 7 and 8 deal only with cases where by statute the decision is to be based on the record of hearing. Further, section 7 is limited by the exceptions contained in the opening sentences of sections 4 and 5; accordingly, certain special classes of cases, such as those where decisions rest solely on inspections, tests, or elections, are not covered. The second sentence of the subsection enables the agency to take official notice of material facts which do not appear in the record, provided the taking of such notice is stated in the record or decision, but in such cases any party affected shall, on timely request, be afforded an opportunity to show the contrary.

Section 8: This section applies to all hearings held under section 7.

Section 8 (a): Under this subsection either the agency or a subordinate hearing officer may make the initial decision. As previously observed with respect to subsection (c) of section 5, in cases to which that subsection is applicable the same officer who personally presided over the hearing shall make such decision if it is to be made by a subordinate hearing officer. The agency may provide that in all cases the agency itself is to make the initial decision, or after the hearing it may remove a particular case from a subordinate hearing officer and thereupon make the initial decision. The initial decision of the hearing officer, in the absence of appeal to or review by the agency, is (or becomes) the decision of the agency. Upon review the agency may restrict its decision to ques-

PYM-000560

tions of law, or to the question of whether the findings are supported by substantial evidence or the weight of evidence, as the nature of the case may be. On the other hand, it may make entirely new findings either upon the record or upon new evidence which it takes. It may remand the matter to the hearing officer for any appropriate further proceedings.

The intention underlying the last sentence of this subsection is to require the adoption of a procedure which will give the parties an opportunity to make their contentions to the agency before the issuance of a final agency decision. This sentence states as a general requirement that, whenever the agency makes the initial decision without having presided at the reception of the evidence, a recommended decision shall be filed by the officer who presided at the hearing (or, in cases not subject to section 5 (c), by any other officer qualified to preside at section 7 hearings). However, this procedure need not be followed in rule making or in determining applications for initial licenses (1) if, in lieu of a recommended decision by such hearing officer, the agency issues a tentative decision; (2) if, in lieu of a recommended decision by such hearing officer, a recommended decision is submitted by any of the agency's responsible officers; or (3) if, in any event, the agency makes a record finding that "due and timely execution of its function imperatively and unavoidably so requires."

Subsection (c) of section 5, as explained in the comments on that subsection, does not apply to rule making. The broad scope of rule making is explained in the notes to subsection (c) of section 2.

The second exception permits, in proceedings to make rules and to determine applications for initial licenses, the continuation of the widespread agency practice of serving upon the parties, as a substitute for either an examiner's report or a tentative agency report, a report prepared by the staff of specialists and technicians normally engaged in that portion of the agency's operations to which the proceeding in question relates. The third exception permits, in lieu of any sort of preliminary report, the agency to issue forthwith its final rule or its order granting or denying an initial license in the emergent instances indicated. The subsection, however, requires that an examiner issue either an initial or a recommended decision, as the case may be, in all cases subject to section 7 except rule making and determining applications for initial licenses. The act permits no deviation from

this requirement, unless, of course, the parties waive such procedure.

**Section 8 (b): Prior to each recommended, initial, or tentative decision, parties shall have a timely opportunity to submit proposed findings and conclusions, and, prior to each decision upon agency review of either the decision of subordinate officers or of the agency's tentative decision, to submit exceptions to the initial, recommended, or tentative decision, as the case may be. Subject to the agency's rules, either the proposed findings or the exceptions may be oral in form where such mode of presentation is adequate.**

Section 9: Subsection (a) is intended to declare the existing law. Subsection (b) is intended to codify the best existing law and practice. The second sentence of subsection (b) is not intended to apply to temporary licenses which may be issued pending the determination of applications for licenses.

Section 10: This section, in general, declares the existing law concerning judicial review. It provides for judicial review except insofar as statutes preclude it, or insofar as agency action is by law committed to agency discretion. A statute may in terms preclude judicial review or be interpreted as manifesting a congressional intention to preclude judicial review. Examples of such interpretation are: *Switchmen's Union of North America* v. *National Mediation Board* (320 U. S. 297); *American Federation of Labor* v. *National Labor Relations Board* (308 U. S. 401); *Butte, Anaconda & Pacific Railway Co.* v. *United States* (290 U. S. 127). Many matters are committed partly or wholly to agency discretion. Thus, the courts have held that the refusal by the National Labor Relations Board to issue a complaint is an exercise of discretion unreviewable by the courts (*Jacobsen* v. *National Labor Relations Board*, 120 F. (2d) 96 (C. C. A. 3d); *Marine Engineers' Beneficial Assn.* v. *National Labor Relations Board*, decided April 8, 1943 (C. C. A. 2d). certiorari denied, 320 U. S. 777). In this act, for example, the failure to grant a petition filed under section 4 (d) would be similarly unreviewable.

**Section 10 (a): Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review of such action. This reflects existing law. In *Alabama Power Co.* v. *Ickes* (302 U. S. 464), the Supreme Court stated the rule concerning persons entitled to judicial review. Other cases having an important bearing on this subject are**

*Massachusetts* v. *Mellon* (262 U. S. 447), *The Chicago Junction Case* (264 U. S. 258), *Sprunt & Son* v. *United States* (281 U. S. 249), and *Perkins* v. *Lukens Steel Co.* (310 U. S. 113). An important decision interpreting the meaning of the terms "aggrieved" and "adversely affected" is *Federal Communications Commission* v. *Sanders Bros. Radio Station* (309 U. S. 470).

Section 10 (b): This subsection requires that, where a specific statutory method is provided for reviewing a given type of case in the courts, that procedure shall be used. If there is no such procedure, or if the procedure is inadequate (i. e., where under existing law a court would regard the special statutory procedure as inadequate and would grant another form of relief), then any applicable procedure, such as prohibitory or mandatory injunction, declaratory judgment, or habeas corpus, is available. The final sentence of the subsection indicates that the question of the validity of an agency action may arise in a court proceeding to enforce the agency action. The statutes presently provide various procedures for judicial enforcement of agency action, and nothing in this act is intended to disturb those procedures. In such a proceeding the defendant may contest the validity of the agency action unless a prior, adequate, and exclusive opportunity to contest or review validity has been provided by law.

Section 10 (c): This subsection states (subject to the provisions of section 10 (a)) the acts which are reviewable under section 10. It is intended to state existing law. The last sentence makes it clear that the doctrine of exhaustion of administrative remedies with respect to finality of agency action is intended to be applicable only (1) where expressly required by statute (as, for example, is provided in 49 U. S. C. 17 (9)) or (2) where the agency's rules require that decisions by subordinate officers must be appealed to superior agency authority before the decision may be regarded as final for purposes of judicial review.

Section 10 (d): The first sentence states existing law. The second sentence may be said to change existing law only to the extent that the language of the opinion in *Scripps-Howard Radio, Inc.* v. *Federal Communications Commission* (316 U.S. 4, 14), may be interpreted to deny to reviewing courts the power to permit an applicant for a renewal of a license to continue to operate as if the original license had not expired, pending conclusion of the judicial review proceedings. In any event, the court must find,

PYM-000563

of course, that granting of interim relief is necessary to prevent irreparable injury.

Section 10 (e): This declares the existing law concerning the scope of judicial review. The power of the court to direct or compel agency action unlawfully withheld or unreasonably delayed is not intended to confer any nonjudicial functions or to narrow the principle of continuous administrative control enunciated by the Supreme Court in *Federal Communications Commission* v. *Pottsville Broadcasting Co.* (309 U. S. 134). Clause (5) is intented to embody the law as declared, for example, in *Consolidated Edison Co.* v. *National Labor Relations Board* (305 U. S. 197). There the Chief Justice said: "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion (p. 229) * * * assurance of a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force" (p. 230).

The last sentence of this section makes it clear that not every failure to observe the requirements of this statute or of the law is ipso facto fatal to the validity of an order. The statute adopts the rule now well established as a matter of common law in all jurisdictions that error is not fatal unless prejudicial.

Sec. 11: This section provides for the appointment, compensation, and tenure of examiners who will preside over hearings and render decisions pursuant to section 7 and 8. The section provides that appointments shall be made "subject to the civil service and other laws to the extent not inconsistent with this act". Appointments are to be made by the respective employing agencies of personnel determined by the Civil Service Commission to be qualified and competent examiners. The examiners appointed are to serve only as examiners except that, in particular instances (especially where the volume of hearings under a given statute or in a given agency is not very great), examiners may be assigned additional duties which are not inconsistent with or which do not interfere with their duties as examiners. To insure equality of participation among examiners in the hearing and decision of cases, the agencies are required to use them in rotation so far as may be practicable.

Examiners are subject to removal only for good cause "established and determined" by the Commission. The Commission must afford the examiner a hearing, if requested, and must rest its

Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 207 of 353
PYM-000564

decision solely upon the basis of the record of such hearing. It should be noted that the hearing and the decision are to be conducted and made pursuant to the provisions of section 7 and 8.

Section 11 provides further that the Commission shall prescribe the compensation of examiners, in accordance with the compensation schedules provided in the Classification Act, except that the efficiency rating system set forth in that act shall not be applicable to examiners.

Sec. 12: The first sentence of section 12 is intended simply to indicate that the act will be interpreted as supplementing constitutional and legal requirements imposed by existing law.

The section further provides that "no subsequent legislation shall be held to supersede or modify the provisions of this act except to the extent that such legislation shall do so expressly". It is recognized that no congressional legislation can bind subsequent sessions of the Congress. The present act can be repealed in whole or in part at any time after its passage. However, the act is intended to express general standards of wide applicability. it is believed that the courts should as a rule of construction interpret the act as applicable on a broad basis, unless some subsequent act clearly provides to the contrary.

# Exhibit 41

1/30/25, 5:22 PM Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 209 of 353
Agentes de ICE llegan a iglesia en Tucker y se llevan a un feligrés
PYM-000565

Noticias Inmigración Tu Noticiero

Duluth, GA

ANUNCIO

Ad removed. Details

# Agentes de ICE llegan a iglesia en Tucker y se llevan a un feligrés

Inmigración confirma que el domingo arrestó a un total de 956 personas.

Por Marcelo Wheelock
*Publicado: 26 ene 2025, 19:06 GMT-5*

ATLANTA, Georgia (Telemundo Atlanta) - El Servicio de Inmigración y Control de Aduanas (ICE) desplegó este domingo a sus agentes por el área metropolitana de Atlanta y efectuó múltiples arrestos, en lo que han denominado como un “megaoperativo”.

En una de estas operaciones, los oficiales de ICE llegaron a una iglesia hispana en Tucker y arrestaron a un feligrés, según denunció el pastor de la congregación.

Luis Ortiz, ministro de la Iglesia Fuente de Vida, dijo que los oficiales de ICE detuvieron a un inmigrante que asistía al servicio religioso.

Los agentes se apostaron afuera de la iglesia y esperaron a que saliera el padre de dos menores para arrestarlo, según Ortiz.

ANUNCIO

Ad removed. Details

https://www.telemundoatlanta.com/2025/01/27/agentes-de-ice-llegan-iglesia-en-tucker-y-se-llevan-un-feligrs/ 1/6

"Eso fue lo que impidió que los agentes entren a la iglesia", manifestó el religioso en declaraciones que dio a **Telemundo Atlanta** y a otros medios locales.

Los agentes preguntaron por el feligrés por nombre, explicó. "Los agentes de inmigración tienen el nombre y el dato específico de la persona a quien estaban buscando".

ANUNCIO

"Él tiene un grillete, pero también tiene su permiso, su identificación, su Seguro Social y todo en regla. Es algo inexplicable", expresó Ortiz, quien dijo que los oficiales no mostraron una orden de arresto.

"Nuestro mensaje a la comunidad hispana es guardar la calma y tener paciencia", dijo el religioso.

## Fueron cientos los detenidos el domingo, confirma ICE

El arresto del hondureño se produce en un día en que los agentes de ICE detuvieron a un total de 956 personas, según datos proporcionados este domingo por la propia agencia.

## Conozca qué hacer en caso de que ICE llegue a su casa o lo detengan

El nuevo gobierno del presidente Donald Trump ha autorizado las redadas migratorias en iglesias, escuelas y hospitales, como parte de su ofensiva contra los inmigrantes sin papeles.

Este domingo se reportaron múltiples arrestos en varios sectores de metro Atlanta, incluyendo Doraville y Chamblee.

A pesar del temor que existe en la comunidad, desde que se comenzó a conocer sobre los operativos de ICE, en muchos sitios, como por ejemplo la Buford Highway, donde reportaron hoy varios arrestos, todo transcurría con aparente normalidad.

Facebook Watch

Lindsay Williams, portavoz de ICE, confirmó este domingo a **Telemundo Atlanta** que los agentes efectuaron varios operativos en la zona metropolitana de Atlanta.

“El Servicio de Inmigración y Control de Aduanas, junto con socios federales como el FBI, la ATF y la DEA, comenzaron hoy a realizar operaciones específicas en Atlanta para hacer cumplir la ley de inmigración de los Estados Unidos y preservar la seguridad pública y nacional manteniendo a los delincuentes extranjeros potencialmente peligrosos fuera de nuestras comunidades”, indicó Williams.

Facebook Watch

ICE CONFIRMA MEGA OPERATIVO DE ARRESTOS EN ATLANTA ESTE DOMINGO.

641 67 360

**Este lunes tendremos más información sobre los operativos en metro Atlanta en nuestras emisiones de Noticias Telemundo Georgia a las 12:00 pm, 5:30 pm, 6:00 pm y 11:00 pm. Puede ver nuestros noticieros haciendo clic aquí.**

*Derechos de autor 2025 WKTB. Reservados todos los derechos.*

**Save Thousands Paying Off Your Credit Card Balance With These Cards**
Tackle your credit card debt interest-free with 18 months of 0% APR on balance transfers. These no annual fee cards are unbeatable choices. We even found one for fair credit applicants...
Forbes | Sponsored

**The 1 Skin Cream Walmart Shoppers Are Snapping Up Quickly (Where To Buy It)**
Walmart shoppers are snapping up this new wrinkle cream and here's where to buy it
South Beach | Sponsored

**Seniors Born 1941-1979 Receive 7 Big Benefits This Month**

# Exhibit 42

# "Human Dignity is Not Dependent on a Person's Citizenship or Immigration Status"

Bishop Mark J. Seitz (USCCB), Sr. Mary Haddad, RSM (CHA), and Kerry Alys Robinson (CCUSA) have issued a statement in response to action taken by the Trump Administration rescinding guidance related to "protected areas" in immigration enforcement.

January 23, 2025



WASHINGTON – The following statement was issued in response to action taken by the Trump Administration rescinding guidance related to "protected areas" in immigration enforcement.

"Catholic health care, Catholic Charities agencies, and the Church's other social service ministries work daily to feed, house, heal, educate, and meet people's needs in communities across our nation. Through these ministries—together with the Church's responsibility to proclaim the Gospel and celebrate the sacraments—we uphold the belief that all people are conceived with inherent dignity, reflecting the image of God. Through our parishes, shelters, hospitals, schools, and other Church institutions, we recognize that this dignity is not dependent on a person's citizenship or immigration status. Moreover, the charitable services we provide are fundamental to who we are as Christians. 'For the Church, charity is not a kind of welfare activity which could equally well be left to others, but is a part of her nature, an indispensable expression of her very being' (*Deus caritas est*, no. 25).

"We recognize the need for just immigration enforcement and affirm the government's obligation to carry it out in a targeted, proportional, and humane way. However, non-emergency immigration enforcement in schools, places of worship, social service agencies, healthcare facilities, or other sensitive settings where people receive essential services would be contrary to the common good. With the mere rescission of the protected areas guidance, we are already witnessing reticence among immigrants to engage in daily life, including sending children to school and attending religious services. All people have a right to fulfill their duty to God without fear. Turning places of care, healing, and solace into places of fear and uncertainty for those in need, while endangering the trust between pastors, providers, educators and the people they serve, will not make our communities safer.

"Our organizations stand ready to work on a better path forward that protects the dignity of all those we serve, upholds the sacred duty of our providers, and ensures our borders and immigration system are governed with mercy and justice."

This statement was offered by Bishop Mark J. Seitz, chairman, U.S. Conference of Catholic Bishops' Committee on Migration, Sr. Mary Haddad, RSM, president and CEO, Catholic Health Association of the

Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 216 of 353
PYM-000573

United States, and Kerry Alys Robinson, president and CEO, Catholic Charities USA.

###

**MEDIA CONTACTS:**

**USCCB Public Affairs**
202-541-3200
Email Me

Share Tweet Email Share Share

# Exhibit 43

Secretary
U.S. Department of Homeland Security
Washington, DC 20528

January 20, 2025

MEMORANDUM FOR: Caleb Vitello
Acting Director
U.S. Immigration and Customs Enforcement

Pete R. Flores
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

FROM: Benjamine C. Huffman
Acting Secretary

SUBJECT: Enforcement Actions in or Near Protected Areas

---

This memorandum addresses Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) enforcement actions in or near areas that the Department of Homeland Security (DHS) previously determined require special protection. It is effective immediately. This memorandum supersedes and rescinds Alejandro Mayorkas's October 27, 2021 memorandum entitled, Guidelines for Enforcement Actions in or Near Protected Areas.

Our brave men and women in uniform put their lives on the line every day to advance the rule of law and keep our people safe. As part of that work, officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location.

Going forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense. It is not necessary, however, for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced. The Director of ICE and the Commissioner of CBP may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion.

This memorandum is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

# Exhibit 44

BRIEFINGS & STATEMENTS

# PRESS BRIEFING BY PRESS SECRETARY KAROLINE LEAVITT

January 29, 2025

1:06 P.M. EST

MS. LEAVITT: Good afternoon, everybody.

Q Good afternoon.

MS. LEAVITT: How are we? Good to see all of you. It's an honor to be here with all of you. A lot of familiar faces in the room, a lot of new faces.

And President Trump is back, and the golden age of America has most definitely begun.

The Senate has already confirmed five of President Trump's exceptional Cabinet nominees: Secretary of State Marco Rubio, Defense Secretary Pete Hegseth, CIA Director John Ratcliffe, Homeland Security Secretary Kristi Noem, and Treasury Secretary Scott Bessent. It is imperative that the Senate continues to confirm the remainder of the president's well-qualified nominees as quickly as possible.

As you have seen during the past week, President Trump is hard at work fulfilling the promises that he made to the American people on the campaign trail. Since taking the oath of office, President Trump has taken more than 300 executive actions; secured nearly $1 trillion in U.S. investments; deported illegal alien rapists, gang members, and suspected terrorists from our homeland; and restored common sense to the federal government.

I want to take a moment to go through some of these extraordinary actions.

On day one, President Trump declared a national emergency at our southern border to end the four-year-long invasion of illegal aliens under the previous administration. Additionally, President Trump signed an executive order to end catch and release and finish construction of his effective border wall. By using every

lever of his federal power, President Trump has sent a loud and clear message to the entire world: America will no longer tolerate illegal immigration.

And this president expects that every nation on this planet will cooperate with the repatriation of their citizens, as proven by this weekend, when President Trump swiftly directed his team to issue harsh and effective sanctions and tariffs on the Colombian government upon hearing they were denied a U.S. military aircraft full of their own citizens who were deported by this administration. Within hours, the Colombian government agreed to all of President Trump's demands, proving America is once again respected on the world stage.

So, to foreign nationals who are thinking about trying to illegally enter the United States, think again. Under this president, you will be detained, and you will be deported.

Every day, Americans are safer because of the violent criminals that President Trump's administration is removing from our communities.

On January 23rd, ICE New York arrested a Turkish national for entry without inspection who is a known or suspected terrorist. On January 23rd, ICE San Francisco arrested a citizen of Mexico unlawfully present in the United States who has been convicted of continuous sexual abuse of a child aged 14 years or younger. ICE Saint Paul has arrested a citizen of Honduras who was convicted of fourth-degree criminal sexual conduct with a minor. ICE Buffalo arrested a citizen of Ecuador who has been convicted of rape.

ICE Boston arrested a citizen of the Dominican Republic who has a criminal conviction for second-degree murder. This criminal was convicted of murder for beating his pregnant wife to death in front of her five-year-old son.

And ICE Saint Paul also arrested a citizen of Mexico who was convicted of possessing pornographic material of a minor on a work computer.

These are the heinous individuals that this administration is removing from American communities every single day. And to the brave state and local law enforcement officers, CBP, and ICE agents who are helping in the facilitation of this deportation operation, President Trump has your back and he is grateful for your hard work.

On the economic front, President Trump took immediate action to lower costs for families who are suffering from four long years of the Biden administration's destructive and inflationary policies. President Trump ordered the heads of all executive departments and agencies to help deliver emergency price relief to the American people, untangle our economy from Biden's regulatory constraints, and end the reckless war on American energy.

President Trump also signed sweeping executive orders to end the weaponization of government and restore common sense to the federal bureaucracy. He directed all federal agencies to terminate illegal diversity, equity, and inclusion programs to help return America to a merit-based society.

President Trump also signed an executive order declaring it is now the policy of the federal government that there are only two sexes: male and female. Sanity has

been restored.

Before I take your questions, I would like to point out to — all of you once again have access to the most transparent and accessible president in American history. There has never been a president who communicates with the American people and the American press corps as openly and authentically as the 45th and now 47th president of the United States.

This past week, President Trump has held multiple news conferences, gaggled on Air Force One multiple times, and sat down for a two-part interview on Fox News, which aired last week. As Politico summed it up best, "Trump is everywhere again," and that's because President Trump has a great story to tell about the legendary American revival that is well underway.

And in keeping with this revolutionary media approach that President Trump deployed during the campaign, the Trump White House will speak to all media outlets and personalities, not just the legacy media who are seated in this room, because apporting — according to recent polling from Gallup, Americans' trust in mass media has fallen to a record low. Millions of Americans, especially young people, have turned from traditional television outlets and newspapers to consume their news from podcasts, blogs, social media, and other independent outlets.

It's essential to our team that we share President Trump's message everywhere and adapt this White House to the new media landscape in 2025. To do this, I am excited to announce the following changes will be made to this historic James S. Brady Briefing Room, where Mr. Brady's legacy will endure.

This White House believes strongly in the First Amendment, so it's why our team will work diligently to restore the press passes of the 440 journalists whose passes were wrongly revoked by the previous administration.

We're also opening up this briefing room to new media voices who produce news-related content and whose outlet is not already represented by one of the seats in this room. We welcome independent journalists, podcasters, social media influencers, and content creators to apply for credentials to cover this White House. And you can apply now on our new website, WhiteHouse.gov/NewMedia.

Starting today, this seat in the front of the room, which is usually occupied by the press secretary staff, will be called the "new media" seat. My team will review the applications and give credentials to new media applicants who meet our criteria and pass United States Secret Service requirements to enter the White House complex.

So, in light of these announcements, our first questions for today's briefing will go to these new media members whose outlets, despite being some of the most viewed news websites in the country, have not been given seats in this room.

And before I turn to questions, I do have news directly from the president of the United States that was just shared with me in the Oval Office from President Trump directly — an update on the New Jersey drones: After research and study, the drones that were flying over New Jersey in large numbers were authorized to be flown by the FAA for research and various other reasons.

Many of these drones were also hobbyists — recreational and private individuals that enjoy flying drones. In meanti- — in the — in time, it got worse, due to curiosity. This

was not the enemy. A — a statement from the president of the United States to start this briefing with some news.

And with that, I will turn it over to questions, and we will begin with our new media members: Mike Allen from Axios, Matt Boyle from Breitbart.

Mike, why don't you go ahead.

Q Thank you very much. Karoline, does the president see anything fishy about DeepSeek, either its origins or its cost? And could China's ability to make these models quicker, cheaper affect our thinking about expanding generation data centers, chip manufacturing?

MS. LEAVITT: Sure. The president was asked about DeepSeek last night on Air Force One when he gaggled for, I think, the third or fourth time throughout the weekend with members of the traveling press corps. The president said that he believes that this is a wake-up call to the American AI industry. The last administration sat on their hands and allowed China to rapidly develop this AI program.

And so, President Trump believes in restoring American AI dominance, and that's why he took very strong executive action this past week to sign executive orders to roll back some of the onerous regulations on the AI industry. And President Trump has also proudly appointed the first AI and crypto czar at this White House, David Sacks, whom I spoke with yesterday — very knowledgeable on this subject. And his team is here working every single day to ensure American AI dominance.

As for the national security implications, I spoke with NSC this morning. They are looking into what those may be, and when I have an update, I will share it with you, Mike.

Q And, Karoline, you say "restore" U.S. dominance. Is there fear that the U.S. either is falling or has fallen behind? And how would the president make sure the U.S. stays ahead?

MS. LEAVITT: No. The president is confident that we will restore American dominance in AI.

Matt.

Q Yeah. So, Karoline, first off, thank you to you and President Trump for actually giving voices to new media outlets that represent millions and millions of Americans. The thing I would add — the — I've got a two-part question for you. The first is just: Can you expand upon what steps the White House is going to take to bring more voices, not less — which is what our founder, Andrew Breitbart, believed in — into this room, where they rightly belong?

MS. LEAVITT: Yeah, absolutely. And as I said in my opening statement, Matt, it is a priority of this White House to honor the First Amendment. And it is a fact that Americans are consuming their news media from various different platforms, especially young people. And as the youngest press secretary in history, thanks to President Trump, I take great pride in opening up this room to new media voices to share the president's message with as many Americans as possible.

In doing so, number one, we will ensure that outlets like yours — Axios and Breitbart, which are widely respected and viewed outlets — have an actual seat in this room

every day. We also, again, encourage anybody in this country — whether you are a TikTok content creator, a blogger, a podcaster — if you are producing legitimate news content, no matter the medium, you will be allowed to apply for press credentials to this White House.

And as I said earlier, our new media website is WhiteHouse.gov/NewMedia, and so we encourage people to apply. Again, as long as you are creating news-related content of the day and you're a legitimate independent journalist, you're welcome to cover this White House.

Q And secondly, Karoline, you sa- — you laid out several of the actions that President Trump has taken. Obviously, it's a stark contrast to the previous administration and a breakneck speed from President Trump. Can we expect that pace to continue as the hun- — the — you know, the first 100 days moves along here and beyond that?

MS. LEAVITT: Absolutely. There is no doubt President Trump has always been the hardest working man in politics. I think that's been proven over the past week. This president has, again, signed more than 300 executive orders. He's taken historic action.

I gaggled aboard Air Force One to mark the first 100 days of this administration — 4:00 p.m. last Friday — first 100 hours, rather. And this president did more in the first 100 hours than the previous president did in the first 100 days.

So, President Trump, I think you can all expect to — for him to continue to work at this breakneck speed. So, I hope you're all ready to work very hard. I know that we are.

Zeke Miller.

Q Thanks, Karoline. A question that we've asked your predecessors of both parties in this job. When you're up here in this briefing room speaking to the American public, do you view yourself and your role as speaking on — advocating on behalf of the president, or providing the unvarnished truth that is, you know, not to lie, not to obfuscate to the American people?

MS. LEAVITT: I commit to telling the truth from this podium every single day. I commit to speaking on behalf of the president of the United States. That is my job. And I will say it's very easy to speak truth from this podium when you have a president who is implementing policies that are wildly popular with the American people, and that's exactly what this administration is doing. It's correcting the lies and the wrongs of the past four years, many of the lies that have been told to your faces in this very briefing room. I will not do that.

But since you brought up truth, Zeke, I would like to point out, while I vow to provide the truth from this podium, we ask that all of you in this room hold yourselves to that same standard. We know for a fact there have been lies that have been pushed by many legacy media outlets in this country about this president, about his family, and we will not accept that. We will call you out when we feel that your reporting is wrong or there is misinformation about this White House.

So, yes, I will hold myself to the truth, and I expect everyone in this room to do the same.

Q And, Karoline, just on a substantive question. Yesterday, the White House Office of Management and Budget directed an across-the-board freeze with — with some exceptions for individual assistance. We understand just federal grants.

MS. LEAVITT: Right.

Q It's caused a lot of confusion around the country among Head Start providers, among providers — from services to homeless veterans, provid- — you know, Medicaid providers, states saying they're having trouble accessing the portal. Could you put — help us clear up some confusion —

MS. LEAVITT: Yes.

Q — give some certainty to folks? And then also, is that uncertainty — how does that uncertainty service the president's voters?

MS. LEAVITT: Well, I think there's only uncertainty in this room amongst the media. There's no uncertainty in this building.

So, let me provide the certainty and the clarity that all of you need. This is not a blanket pause on federal assistance in grant programs from the Trump administration. Individual assistance, that includes — I'm not naming everything that's included, but just to give you a few examples — Social Security benefits, Medicare benefits, food stamps, welfare benefits — assistance that is going directly to individuals will not be impacted by this pause.

And I want to make that very clear to any Americans who are watching at home who may be a little bit confused about some of the media reporting: This administration — if you are receiving individual assistance from the federal government, you will still continue to receive that.

However, it is the responsibility of this president and this administration to be good stewards of taxpayer dollars. That is something that President Trump campaigned on. That's why he has launched DOGE, the Department of Government Efficiency, who is working alongside OMB. And that's why OMB sent out this memo last night, because the president signed an executive order directing OMB to do just this. And the reason for this is to ensure that every penny that is going out the door is not conflicting with the executive orders and actions that this president has taken.

So, what does this pause mean? It means no more funding for illegal DEI programs. It means no more funding for the Green New Scam that has ta- — cost American taxpayers tens of billions of dollars. It means no more funding for transgenderism and wokeness across our federal bureaucracy and agencies. No more funding for Green New Deal social engineering policies. Again, people who are receiving

Menu THE WHITE HOUSE Search

And President Trump is looking out for you by issuing this pause because he is being good steward of your taxpayer dollars.

Q Thanks, Karoline.

MS. LEAVITT: Sure.

Q How long is this pause going to last? And how is the Trump administration recommending that organizations that rely on federal funding make payroll, pay their rent in the meantime?

MS. LEAVITT: It is a temporary pause, and the Office of Management and Budget is reviewing the federal funding that has been going out the door, again, not for

individual assistance, but for all of these other programs that I mentioned.

I also spoke with the incoming director of OMB this morning, and he told me to tell all of you that the line to his office is open for other federal government agencies across the board, and if they feel that programs are necessary and in line with the president's agenda, then the Office of Management and Budget will review those policies.

I think this is a very responsible measure. Again, the past four years, we've seen the Biden administration spend money like drunken sailors. It's a big reason we've had an inflation crisis in this country, and it's incumbent upon this administration to make sure, again, that every penny is being accounted for honestly.

Q Why impose this pause with so little notice? Why not give organizations more time to plan for the fact that they are about to lose, in some cases, really crucial federal funding —

MS. LEAVITT: There was —

Q — at least for a — for a period of time?

MS. LEAVITT: There was notice. It was the executive order that the president signed.

There's also a freeze on hiring, as you know; a regulatory freeze; and there's also a freeze on foreign aid. And this is a — again, incredibly important to ensure that this administration is taking into consideration how hard the American people are working. And their tax dollars actually matter to this administration.

You know, just during this pause, DOGE and OMB have actually found that there was $37 million that was about to go out the door to the World Health Organization, which is an organization, as you all know, that President Trump, with the swipe of his pen in that executive order, is — no longer wants the United States to be a part of. So, that wouldn't be in line with the president's agenda.

DOGE and OMB also found that there was about to be 50 million taxpayer dollars that went out the door to fund condoms in Gaza. That is a preposterous waste of taxpayer money.

So, that's what this pause is focused on: being good stewards of tax dollars.

Q And so, this doesn't affect —

MS. LEAVITT: Jennifer.

Q — Meals on Wheels or Head Start or disaster aid?

MS. LEAVITT: Again, it does not affect individual assistance that's going to Americans.

Q To follow up on Nancy, do you think there will be a list of who is affected and how much money is affected? How — how will these contractors and organizations know if they are actually being — having their funding frozen?

And then, secondly, if you're willing, can you just clarify, is the end goal of this to essentially challenge Congress or to — to prove that the president can withhold federal funding? Is — in other words, is this an attempt to pick a fight to prove that he can do this?

MS. LEAVITT: No, absolutely not. As it says right here in the memo, which I have — and I'd encourage all of you to read it — it says, "The American people elected President Trump to be the president of the United States and gave him a mandate to

increase the impact of every federal dollar." "This memo requires federal agencies to identify and review all Federal financial assistance programs and supporting activities consistent with the president's policies and requirements."

The American people gave President Trump an overwhelming mandate on November 5th, and he's just trying to ensure that the tax money going out the door in this very bankrupt city actually aligns with the will and the priorities of the American people.

(Cross-talk.)

Brian Glenn.

Q Yes. Welcome.

MS. LEAVITT: Thank you.

Q You look great. You're doing a great job.

MS. LEAVITT: Thank you.

Q You talked about transparency. And some of us in this room know how just transparent President Trump has been the last five or six years; I think you'll do the same.

My question is, do you think this latest incident with the president of Colombia is indicative of the global, powerful respect they have for President Trump moving forward not only to engage in — in economic diplomacy with these countries but also world peace?

MS. LEAVITT: Absolutely. I'll echo the answer that the president gave on Air Force One last night when he was asked a very similar question by one of your colleagues in the media: This signifies peace through strength is back, and this president will not tolerate illegal immigration into America's interior.

And he expects every nation on this planet, again, to cooperate with the repatriation of their citizens who illegally entered into our country and broke America's laws. Won't be tolerated.

And as you saw, the Colombian government quickly folded and agreed to all of President Trump's demands. Flights are underway once again.

(Cross-talk.)

Diana.

Q Two questions on deportations, if I may. President Trump had said on the campaign trail that he would deport pro-Hamas students who are here on visas, and on his first day in office, he signed an executive order that said, quote, "The U.S. must ensure that admitted aliens and aliens otherwise already present in the U.S. do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles." So, should we take this executive order as Trump saying he would be open to de- — deporting those students who are here on visas, but, you know, hold pro-Hamas sympathies?

MS. LEAVITT: The president is open to deporting individuals who have broken our nation's immigrations laws. So, if they are here illegally, then certainly he is open to deporting them, and that's what this administration is hard at work at doing.

We receive data from DHS and from ICE every single day. From what we hear on the ground, ICE agents are feeling incredibly empowered right now because they actually have a leader in this building who is supporting them in doing their jobs that

they were hired to do, which is to detain, arrest, and deport illegal criminals who have invaded our nation's borders over the past four years. That's what the president is committed to seeing.

Q One more.

MS. LEAVITT: Peter.

Q Just following up on that, Karoline —

Q Karoline, if I could ask you very quickly, just following up on the question on immigration. First, President Trump, during the course of the campaign in 2024, said the following about illegal im- — immigration. He said, "They're going back home where they belong, and we start with the criminals. There are many, many criminals." NBC News has learned that ICE arrested 1,179 undocumented immigrants on Sunday, but nearly half of them — 566 of the migrants — appear to have no prior criminal record besides entering the country illegally.

MS. LEAVITT: (Laughs.)

Q Is the president still focused exclusiv- — which is a civil crime, not a — not a — it's not criminal —

MS. LEAVITT: It's a federal crime.

Q It's a fed- — so, I'm asking though, he said he was going to focus on those violent offenders first. So, is violent offenders no longer the predicate for these people to be deported?

MS. LEAVITT: The president has said countless times on the campaign trail — I've been with him at the rallies; I know you've been there covering them too, Peter — that he is focused on launching the largest mass deportation operation in American history of illegal criminals.

And if you are an individual, a foreign national, who illegally enters the United States of America, you are, by definition, a criminal. And so, therefore —

Q So, to be clear, it's not exclusively —

MS. LEAVITT: — you are subject deportation.

Q I apologize for interrupting. So, to be clear, it's not — violent criminals do not receive precedence in terms of the deportations taking place?

MS. LEAVITT: The president has also said — two things can be true at the same time. We want to deport illegal criminals, illegal immigrants from this country. But the president has said that, of course, the illegal dr- — criminal drug dealers, the rapists, the murderers, the individuals who have committed heinous acts on the interior of our country and who have terrorized law-abiding American citizens, absolutely, those should be the priority of ICE. But that doesn't mean that the other illegal criminals who entered our nation's borders are off the table.

Q Understood. Then let me ask you a separate question about the confusion that still exists across the country right now as it relates to the — the freeze — or the pause, as it's described. President Trump, of course, ran — one of the key policy items was that he was going to lower prices, lower the cost of everything from groceries, as he often said. But in many of the cases, it would seem that some of these moves could raise prices for real Americans on everything from low-income heating — that program; childcare programs. Will nothing that the

president is doing here, in terms of the freeze in these programs, raise prices on ordinary Americans?

MS. LEAVITT: What particular actions are you referring to that would —

Q I'm referring to LHEAP right now. That's the low-income heating program, for example. We can talk about — there's no clarity, so I could refer to a lot of them. We don't know what they are specifically. Can you tell us that LHEAP — that LIHEAP is not one of those affected?

MS. LEAVITT: So, you're asking a hypoc- — -thetical based on programs that you can't even identify?

Q No, I just identified — I —

MS. LEAVITT: What I can tell you is that the —

Q Well, just to be — just to be clear, since you guys haven't identified, let's do it together, just for Americans at home. Medicaid, is that affected?

MS. LEAVITT: I gave you a list of examples — Social Security, Medicare, welfare benefits —

Q Medicaid too, correct?

MS. LEAVITT: — food stamps — that will not be impacted by this federal pause. I can get you the full list after this briefing from the Office of Management and Budget. But I do want to address the cost cutting, because that's certainly very important, and — and cutting the cost of living in this country. President Trump has taken historic action over the past week to do that. He actually signed a memorandum to deliver emergency price relief for American families, which took a number of actions. I can walk you through those.

He also repealed many onerous Biden administration regulations. We know, over the past four years, American households has been essentially taxed $55,000 in regulations from the previous administration. President Trump, with the swipe of his pen, rescinded those, which will ultimately put more money back in the pockets of the American people. So, deregulation is a big deal.

And then, when it comes to energy, I mean, the president signed an executive order to declare a national energy emergency here at home, which is going to make America energy dominant. We know that energy is one of the number-one drivers of inflation, and so that's why the president wants to increase our energy supply: to bring down costs for Americans. The Trump energy boom is incoming, and Americans can expect that.

Q Please share that memo. Thank you.

MS. LEAVITT: I will.

(Cross-talk.)

Q Karoline, I think — some of the confusion, I think, may be here with this pause on federal funding. You've made it clear you're not stopping funds that go directly to individuals, but there certainly are lots of organizations that receive funding and then may pass along a benefit — Meals on Wheels, for one. They provide meals for over 2.2 million seniors.

What is the president's message to Americans out there, many of whom supported him and voted for him, who are concerned that this is going to impact them directly, even if, as you said, the funding isn't coming directly to their wallet?

MS. LEAVITT: I have now been asked and answered this question four times. To individuals at home who receive direct assistance from the federal government, you will not be impacted by this federal freeze. In fact, OMB just sent out a memo to Capitol Hill with Q and A to — to clarify some of the questions and the answers that all of you are a- — are asking me right now.

Again, direct assistance will not be impacted. I've been asked and answered about this OMB memo. There's many other topics of the day.

Jacqui Heinrich.

Q But on indirect assistance, Karoline —

Q Thank you, Karoline.

Q — if it's going to another organization and then trickling down?

MS. LEAVITT: Direct assistance that is in the hands of the American people will not be impacted.

Again, as I said to Peter, we will continue to provide that list as it comes to fruition. But OMB right now is focused on analyzing the federal government's spending, which is exactly what the American people elected President Trump to do.

(Cross-talk.)

Q Thank you, Karoline.

Q And one question on immigration, Karoline. On immigration.

Q Thank you, Karo- —

Q Of the 3,500 arrests ICE has made so far since President Trump came back into office, can you just tell us the numbers? How many have a criminal record versus those who are just in the country illegally.

MS. LEAVITT: All of them, because they illegally broke our nation's laws, and, therefore, they are criminals, as far as this administration goes. I know the last administration didn't see it that way, so it's a big culture shift in our nation to view someone who breaks our immigration laws as a criminal. But that's exactly what they are.

Jacqui.

(Cross-talk.)

Q Karoline, on tariffs.

Q But you made a point of going with the worst first.

Q On tariffs.

Q They all have a criminal record?

Q And welcome to the briefing room.

MS. LEAVITT: If they broke our nation's laws, yes, they are a criminal.

Yes.

Q Thank you. On stripping security details for figures like John Bolton, Pompeo, Brian Hook. Senator Tom Cotton said that he's seen the intelligence and the threat from Iran is real for anyone who played a role in the Soleimani strike. He voiced concern it wouldn't just impact those individuals but potentially their family, innocent bystanders, friends — anyone who is near them when they're out in public. Is the president open to reconsidering his decision?

MS. LEAVITT: The president was asked and answered this yesterday, and he was firm in his decision, despite some of the comments that you had referenced. And

he's made it very clear that he does not believe American taxpayers should fund security details for individuals who have served in the government for the rest of their lives.  And there's nothing stopping these individuals that you mentioned from obtaining private security.

That's where the president stands on it.  I have no updates on that.

Q   Is there any concern that this decision might jeopardize the administration's ability to hire the best advisers for these kinds of positions in the future?

MS. LEAVITT:  No.  In fact, I've talked to the Presidential Personnel Office who has told me directly that there is such an influx of resumes for this administration that it's incredibly overwhelming.  There is no lack of talent for the Trump administration.  Reagan Ree- —

Q   And would he — would he take any responsibility —

Q   Thanks, Karoline.

Q   — if anything happened to these people?  Would he feel at all that his decision was a factor in that?

MS. LEAVITT:  The president was asked and answered this yesterday.  I'd defer you to his comments.

Q   Thanks, Karoline.

Q   Karoline —

MS. LEAVITT:  Reagan, since you're in the back row, I hear y- — the back row hasn't gotten much attention in the last four years —

Q   Yes, thank you.

MS. LEAVITT:  — so I'm happy to answer your question.

Q   And I can project.  (Laughter.)

Does the president intend to permanently cut off funding to NGOs that are bringing illegal foreign nationals to the country, such as Catholic Charities?

    MS. LEAVITT:  I am actually quite certain that the president signed an executive order that did just that, and I can point you to that.

    Q   One more, Karoline.

MS. LEAVITT:  Yeah.

Q   President Trump issued an executive order on increased vetting for refugees in visa applications.

MS. LEAVITT:  That's right.

Q   Part of that order was considering an outright ban for countries that have deficient screening processes.  Has the president considered yet which countries might fall into this category?  Are countries like Afghanistan or Syria under consideration for a full ban?

MS. LEAVITT:  Yeah.  So, the president signed an executive order to streamline the vetting for visa applicants and for illegal immigrants in this country who are coming, of course, from other nations.

It also directed the secretary of State to review the process and make sure that other countries around the world are being completely transparent with our nation and the individuals that they are sending here.  And so, the secretary of State has been directed to report back to the president.  I haven't seen that report yet.  We've only been here for a few days.

(Cross-talk.)

Q Karoline, two questions for you. One on the freeze in federal funding. Who advised the president on the legality of telling government agencies that they don't have to spend money that was already appropriated by Congress?

MS. LEAVITT: Well, as the OMB memo states, this is certainly within the confines of the law.

So, White House Counsel's Office believes that this is within the pe- — president's power to do it, and therefore, he's doing it.

Q Okay. So, they disagree with lawmakers who say that they don't have the power to — to freeze this funding?

MS. LEAVITT: Again, I would point you to the language in the memo that clearly states this is within the law.

Q And on what happened on Friday night. The — the administration fired several inspectors general without giving Congress the 30-day legally required notification that they were being fired. I think only two were left at DO- — DHS and the DOJ. And then, yesterday, we saw several prosecutors — I believe 12 — fired from the Justice Department who worked on the investigations into the president. As you know, they are career prosecutors; therefore, they are afforded civil service protections. How is the administration deciding which laws to follow and which ones to ignore?

MS. LEAVITT: So, it is the belief of this White House and the White House Counsel's Office that the president was within his exe- — executive authority to do that. He is the executive of the executive branch, and, therefore, he has the power to fire anyone within the executive branch that he wishes to.

There's also a case that went before the Supreme Court in 2020: ~~Scaila~~ [Seila] Law LLC, v. the Customs — the [Consumer Financial Protection] Bureau ~~Protection~~. I would advise you to look at that case, and that's the legality that this White House has rested on.

Q So, you're confident that if they bring lawsuits against you — those prosecutors who were fired — that — that they will succeed?

MS. LEAVITT: We will win in court, yes.

Q And did he personally direct this, given they worked on the classified documents investigation and the election interference investigation?

MS. LEAVITT: This was a memo that went out by the Presidential Personnel Office, and the president is the leader of this White House. So, yes.

Q So, it did come from him?

MS. LEAVITT: Yes, it came from this White House.

(Cross-talk.)

Q Karoline.

MS. LEAVITT: Sir.

Q Thank you. Congrats on your first day behind the podium.

MS. LEAVITT: Thank you.

Q President Trump ended funding for UNRWA and also designated the Houthis a foreign terrorist organization.

MS. LEAVITT: That's right.

Q Both were decisions that the previous administration had reversed. So, here's my question: Will there be an investigation into who gave the previous administration this terrible advice?

MS. LEAVITT: Well, that's a very good point. I haven't heard discussions about such an ins- — investigation, but it wouldn't be a bad idea, considering that the Houthis cer- — certainly are terrorists. They have launched attacks on U.S. naval ships across this world, and so I think it was a very wise move by this administration to redesignate them as a terrorist group, because they are. And I think it was a foolish decision by the previous administration to do so.

As for an investigation, I'm not sure about that, but it's not a bad idea.

(Cross-talk.)

Josh.

Q Thank you for the question. I appreciate it. Can you give us an update on the president's plan for his tariff agenda? He spoke a lot about this yesterday, and there's a couple of dates coming up that —

MS. LEAVITT: Sure.

Q — he's spoken to. Number one, February 1st. He's alluded to both the potential for tariffs for Canada and Mexico but also China to take effect on those days. Where is — what's he thinking about that?

MS. LEAVITT: Yeah.

Q Should those countries expect that on the 1st?

MS. LEAVITT: Again, he was asked and answered this question this past weekend when he took a lot of questions from the press, and he said that the February 1st date for Canada and Mexico still holds.

Q And what about the China 10 percent tariff that he also had mused about last Tuesday going into effect on the same date?

MS. LEAVITT: Yeah, the president has said that he is very much still considering that for February 1st.

Q And then, separately, yesterday, he talked also about sectoral tariffs on, for instance, pharmaceuticals, as well as semiconductor computer chips. He talked about steel, aluminum, and copper. What's the timeline on those? Is that a similar sort of "coming days" thing or —

MS. LEAVITT: Yeah, so when the president talked about that in his speech yesterday, that actually wasn't a new announcement. That was within a presidential memorandum that he signed in one of the first days here in the White House on his America First trade agenda. So, there's more details on those tariffs in there.

As far as a date, I don't have a specific date to read out to you, but the president is committed to implementing tariffs effectively, just like he did in his first term.

Q And then — and then, finally, he also was asked on the plane when he gaggled about the potential for a universal tariff. He was asked maybe about two and a half percent.

MS. LEAVITT: Yeah.

Q There was a report about that. He said he wanted "much bigger than that." Should we understand that these tariffs would add up? You know, in other words, you might have country-specific tariffs like Canada, Mexico, China. You might have

sectoral tariffs, like on pharmaceuticals, as well as a potential universal tariff on top of that. Do these stack on one or the other, or would one sort of take precedence over another?

MS. LEAVITT: All I can point you to is what the president has said on this front: the February 1st date for Canada and Mexico and also the China tariff that he has discussed.

He rejected the 2.5 percent tariff. He said that was a little bit too low. He wants it to be higher.

I'll leave it to him to make any decisions on that front.

Q Do you have any comment on what the —

(Cross-talk.)

Q — what the Mexicans and Canadians —

MS. LEAVITT: Phil.

Q — have done so far? Do you have any comment on whether that has met the bar of what he wants to see on fentanyl? Thank you.

MS. LEAVITT: I — I won't get ahead of the president, again, on advocating to foreign nations on what they should or shouldn't do to get away from these tariffs. The president has made it very clear, again, that he expects every nation around this world to cooperate with the repatriation of their citizens. And the president has also put out specific statements in terms of Canada and Mexico when it comes to what he expects in terms of border security.

We have seen a historic level of cooperation from Mexico. But, again, as far as I'm still tracking — and that was last night talking to the president directly — February 1st is still on the books.

Q Thank you.

MS. LEAVITT: Phil.

Q Thank you, Karoline. Quick programming note, and then a question on taxes.

MS. LEAVITT: A programming note.

Q Well, in terms of programming, should —

MS. LEAVITT: That sounds fun.

Q — we expect to see you here every day? How frequently will these —

Q That's a good question.

Q — press briefings be?

MS. LEAVITT: It is a good question, April.

So, look, the president, as you know, is incredibly accessible. First day here, he wanted all of you in the Oval Office. You got a 60-minute press conference with the leader of the free world — while he was simultaneously signing executive orders, I may add. That's pretty impressive. I don't think the previous office holder would be able to pull such a thing off.

So, look, the president is the best spokesperson that this White House has, and I can assure you that you will be hearing from both him and me as much as possible.

Q And then a question about tax cuts. You know, the president has promised to extend the tax cuts from the previous term. I'm curious, you know, does the president support corresponding spending cuts, as some Republicans have called

for in Congress? And will the new Treasury secretary be leading those negotiations with the Hill, as Mnuchin did during the first administration?

MS. LEAVITT: The president is committed to both tax cuts and spending cuts.

And he has a great team negotiating on his behalf, but there's no better negotiator than Donald Trump, and I'm sure he'll be involved in this reconciliation process as it moves forward.

(Cross-talk.)

Q Karoline, in the announcement that you made last night on the Iron Dome, it said the president had directed that the United States will build this Iron Dome.

MS. LEAVITT: Yeah.

Q When you read into the executive order, it seemed short of that. It asked for a series of studies —

MS. LEAVITT: Yeah.

Q — and reports back on — can you tell us whether the president has directed this and, if he is this concerned on this issue, why the suspensions that we saw listed by OMB included so many different nuclear programs, nonproliferation programs, programs to blend down nuclear weapons, and s- — and so forth?

MS. LEAVITT: First of all, when it comes to the Iron Dome, the executive order directed the implementation of the — of an Iron Dome. It also, as you said, kind of directed research and studies to see if — or — or how the United States can go about doing this, particularly the Department of Defense.

When it comes to the other question that you asked about those specific programs, again, I would say, this is not a — a ban; this is a temporary pause and a freeze to ensure that all of the money going out from Washington, D.C., is in align with the president's agenda.

And as the Office of Management and Budget has updates on what will be kick-started, once again, I will provide those to you.

Q Can you clarify for a sec what you were saying before on Medicaid? It wasn't clear to me whether you were saying that no Medicaid would be cut off. Obviously, a lot of this goes to states before it goes to individuals and so forth. So, are you guaranteeing here that no individual now on Medicaid would see a cutoff because of the pause?

MS. LEAVITT: I'll check back on that and get back to you.

Jon.

Q Thanks a lot, Karoline. As you know, in the first week that the president was in office, signed an executive order as it relates to birthright citizenship — trying to eliminate that. Now, 22 state attorney generals have said that this is unconstitutional. A federal judge has just agreed with their argument. What's the administration's argument for doing away with birthright citizenship?

MS. LEAVITT: The folks that you mentioned have a right to have that legal opinion, but it is in disagreement with the legal opinion of this administration.

This administration believes that birthright citizenship is unconstitutional, and that is why President Trump signed that executive order. Illegal immigrants who come to this country and have a child are not subject to the laws of this jurisdiction. That's the opinion of this administration.

We have already appealed the rul- — the lawsuit that was filed against this administration, and we are prepared to fight this all the way to the Supreme Court if we have to, because President Trump believes that this is a necessary step to secure our nation's borders and protect our homeland.

Monica.

Q And then on foreign policy — on foreign policy, Karoline —

Q Thank you, Karoline. It's great to see you, and you're doing a great —

Q — on foreign policy, if I may. The president's commitment to the NATO defense Alliance, is it as strong as the prior administration? Is it the same as when he served as president in his first term in office?

MS. LEAVITT: As long as NATO pays their fair share.

And President Trump has called on NATO Allies to increase their defense spending to 5 percent. You actually saw the head of NATO at Davos last week on Bloomberg Television saying that President Trump is right and if Europe wants to keep itself safe, they should increase their defense spending.

I would just add that there was no greater ally to our European allies than President Trump in his first term. The world, for all nations in Europe, and, of course, here at home was much safer because of Presidents Tru- — Trump's peace through strength diplomatic approach.

Monica.

Q Karoline —

Q Thank you. Thank you, Karoline. And it's great to finally be called on as well in the briefing room. I appreciate that.

MS. LEAVITT: You're welcome.

Q Of course, we know President Trump just got back from North Carolina and California meeting with victims of natural disasters. There's the two-year anniversary of the East Palestine, Ohio, toxic train derailment. Does the president have any plans to go visit the victims of that toxic spill or just visit in general?

MS. LEAVITT: Not — no plans that I can read out for you here. If that changes, I will certainly keep you posted.

What I can tell you is that President Trump still talks about his visit to East Palestine, Ohio. That was one of the turning points, I would say, in the previous election campaign, where Americans were reminded that President Trump is a man of the people. And he, as a candidate, visited that town that was just derailed by the train derailment — no pun intended — and he offered support and hope, just like I saw the president do this past week.

It was a purposeful decision by this president, on his first domestic trip, to go to North Carolina and to California to visit with Americans who were impacted by Hurricane Helene and also by the deadly fires — a red state and a blue state, both of which feel forgotten by the previous administration and the federal government. That has now — that has now ended under President Trump.

He will continue to put Americans first, whether they're in East Palestine, in Pacific Palisades, or in North Carolina.

(Cross-talk.)

Sure.

Q Thank you, Karoline. On California, could you please clarify what the military did with the water last night, as referenced in the president's Truth Social post?

MS. LEAVITT: The water has been turned back on in California, and this comes just days after President Trump visited Pacific Palisades and, as you all saw, applied tremendous pressure on state and local officials in Pacific Palisades, including Los Angeles Mayor Karen Bass, to turn on the water and to direct that water to places in the south and in the middle of the state that have been incredibly dry, which has led to the expansion — the rapid expansion of these fires.

Q So, could you clarify what the military's role was, where the water came from, and how it got there?

MS. LEAVITT: Again, the Army Corps of Engineers has been on the ground in California to respond to the devastation from these wildfires. And I would point out that just days after President Trump visited the devastation from these fires, the water was turned on. That is because of the pressure campaign he put on state and local officials there, who clearly lack all common sense.

And I will never forget being at that round table with the president last week and hearing the frustration in the voices of Pacific Palisades residents who feel as though their government has just gone insane. Before President Trump showed up on the scene, Karen Bass was telling private property owners that they would have to wait 18 months to access their private property.

So, this administration, the president and his team that's on the ground in California — Ric Grenell, who he has designated to oversee this great crisis — ha- — will continue to put pressure on Karen Bass and state and local officials to allow residents to access their properties.

This is a huge part of it. These residents want to take part in their own clearing out of their properties. They should be able to do that. It's the United States of America. What happened to our freedom? Clearly, it's gone in California, but not anymore under President Trump.

Q Karoline —

MS. LEAVITT: April.

Q Karoline, welcome to the briefing room.

MS. LEAVITT: Thank you.

Q Several questions. One on the pause. Will minority-serving institutions, preferably colleges and universities, have those monies held back temporarily at this moment?

MS. LEAVITT: Again, I have not seen the entire list, because this memo was just sent out. So, I will provide you all with updates as we receive them. Okay?

Q Karoline —

Q And secondly — als- —

Q Karoline.

Q Also, secondly, when it comes to immigration, there is this southern border focus. What happens to those who have overstayed their visas? That is part of the broken immigration system. In 2023, there was a report by the Biden administration, the Homeland Security Department, that said overstays of visas were three times more than usual. Will there be a focus on the overstays for visas as well?

MS. LEAVITT: If an individual is overstaying their visa, they are therefore an illegal immigrant residing in this country, and they are subject to deportation.

Q And also, lastly —

MS. LEAVITT: Yes.

Q Lastly, as we're dealing with anti-DEI, anti-woke efforts, we understand this administration could — is thinking about celebrating Black History Month. Have you got any word on that? Anything that you can offer to us?

MS. LEAVITT: As far as I know, this White House certainly still intends to celebrate, and we will continue to celebrate American history and the contributions that all Americans, regardless of race, religion, or creed, have made to our great country. And America is back.

Christian Datoc.

Q Thanks, Karoline. Just real quick. You mentioned the inflation executive order the president signed, but egg prices have skyrocketed since President Trump took office. So, what specifically is he doing to lower those costs for Americans?

MS. LEAVITT: Really glad you brought this up, because there is a lot of reporting out there that is putting the onus on this White House for the increased cost of eggs. I would like to point out to each and every one of you that, in 2024, when Joe Biden was in the Oval Office — or upstairs in the residence sleeping; I'm not so sure — egg prices increased 65 percent in this country. We also have seen the cost of everything, not just eggs — bacon, groceries, gasoline — have increased because of the inflationary policies of the last administration.

As far as the egg shortage, what's also contributing to that is that the Biden administration and the Department of Agriculture directed the mass killing of more than 100 million chickens, which has led to a lack of chicken supply in this country, therefore a lack of egg supply, which is leading to the shortage.

So, I will leave you with this point. This is an example of why it's so incredibly important that the Senate moves swiftly to confirm all of President Trump's nominees, including his nominee for the United States Department of Agriculture, Brooke Rollins, who is already speaking with Kevin Hassett, who is leading the economic team here at the White House, on how we can address the egg shortage in this country.

As for cots, I laid out — costs — I laid out the plethora of ways that President Trump has addressed saving costs for the American people over the past week. He looks forward to continuing to doing that —

Q Karoline, what —

MS. LEAVITT: — in the days ahead.

(Cross-talk.)

Thank you, guys, so much. I'll see you soon.

END 1:52 P.M. EST

News

Administration

Issues

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

THE WHITE HOUSE

WH.GOV

Copyright

Privacy

# Exhibit 45

PYM-000595

COLLEGE OF ARTS & SCIENCES
Department of Religion

 Department of Religion › Affiliated Programs › Baptist Studies Center for Research › Resources › Baptist Denominations in Am

# Baptist Denominations in America

Alliance of Baptists

American Baptist Association

American Baptist Churches USA

Baptist Bible Fellowship International

Baptist General Convention of Texas

Baptist Missionary Association of America

Canadian Baptists of Atlantic Canada

Converge

Cooperative Baptist Fellowship

Foundations Baptist Fellowship International

General Association of Regular Baptist Churches (GARBC)

National Association of Free Will Baptists

National Baptist Convention/USA Inc.

National Baptist Convention of America Inc., International

National Missionary Baptist Convention of America

North American Baptist Conference

Pentecostal Free Will Baptists

Primitive Baptists

Seventh Day Baptists

Southern Baptist Convention

Venture Church Network

PYM-000596

# Department of Religion

COLLEGE OF ARTS & SCIENCES

  

Tidwell Bible Building
575 James Avenue
Waco, TX 76706

One Bear Place #97284
Waco, TX 76798-7284

Religion_Department@baylor.edu

(254) 710-3735

GENERAL INFORMATION ACADEMICS & RESEARCH ADMINISTRATION ADMISSIONS GATEWAYS FOR ...

About Baylor
Athletics
Ask Baylor
Bookstore
Calendar
Campus Map
Directory
Give to Baylor
News
Search
Social Media
Strategic Plan

Anonymous Reporting
Annual Fire Safety and Security Notice
Cost of Attendance
Digital Privacy
Legal Disclosures
Mental Health Resources
Report It
Title IX
Web Accessibility

Copyright © Baylor® University. All rights reserved.
Baylor University • Waco, Texas 76798 • 1-800-229-5678

# Exhibit 46

# Fast Facts on American Religion

▾ **How many religious congregations are there in the United States?**

There is no official directory for all the congregations in the country, so sociologists of religion have to rely on statistical estimates from surveys and results from the decadal US Religion Census. The numbers of churches in the US are often disputed, and to complicate matters, thousands of new churches open each year while thousands of others close.

Hartford Institute estimates there are roughly 370,000 religious congregations in the United States. This figure is midway between the lower US Religion Census 2020 count of 356,642 religious congregations and the higher estimate of 384,000 by Simon G. Brauer (2017, "How Many Congregations Are There? Updating a Survey-Based Estimate," in the *Journal for the Scientific Study of Religion*, Vol. 56, No. 2, pp. 438-448). Within this estimate of 370,000, approximately 332,000 are Protestant and other Christian churches, 23,000 are Catholic and Orthodox churches, and about 15,000 are religious congregations or communities of other faiths.

**Want to know more?** Check out the US Religion Census.

▸ **How big are US churches?**

▸ **How many people go to church each Sunday?**

▸ **How many denominational groups are there in the United States?**

▸ **How multiracial are US churches?**

▸ **How many clergymen and women are there in the United States?**

▸ **What's the average age of congregational leaders?**

▸ **Is there a clergy shortage since the pandemic?**

▸ **`at's the definition of a megachurch, and how many are there in the United States?**

▸ **Where are megachurches located?**

▸ **How many Muslims are there in the United States?**

▸ **How quickly are Muslim mosques growing in the US?**



77 Sherman Street | Hartford, CT 06105

phone: (860) 509-9542
email: hirr@hartfordinternational.edu



Privacy Policy

Sitemap

© 2024 Hartford Institute for Religion Research. All rights reserved.

# Exhibit 47

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,<br><br>Plaintiffs,<br><br>**v.**<br><br>**U.S. Department of Homeland Security,** *et al.*,<br><br>Defendants. | **Civil Case No. 8:25-cv-243-TDC** |

**DECLARATION OF AMAR SHERGILL**

I, Amar Singh Shergill, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am a member of the Sikh Temple Sacramento Executive Management Committee.
2. I have been a member of Sikh Temple Sacramento Sangat (congregation) for over two decades.
3. I am active in Sikh community life both generally and at Sikh Temple Sacramento.
4. Sikh Temple Sacramento was inaugurated in 1983. Our grounds include a more than 20,000 square-foot prayer hall and 26,000 square-foot community kitchen.
5. Sikh Temple Sacramento is a place of worship for the Sikh population in the Greater Sacramento area, approximately 30,000 people.

**Gurdwaras**

6. Sikh Temple Sacramento is a *gurdwara*: a Sikh place of worship, learning, and community gathering. *Gurdwara* literally means "gateway to the guru."

7. Gurdwaras are sacred and sovereign institutions. They are places that Sikhs gather for fellowship, worship, and *langar* (sharing in a communal meal).

8. Gurdwaras are central to all major life events for Sikhs. Birth, marriage, and death are all marked with worship and langar.

9. Central to the concept of a Gurdwara is that all people must be welcomed in the space without fear. Like all Gurdwaras, Sikh Temple Sacramento is open to people of all religions and backgrounds.

10. The *Nishaan Sahib* (Sikh flag) flies outside every gurdwara, including ours, and is viewed as a beacon of refuge and hope for anyone in need. The *Nishaan Sahib* signals that anyone from any religion, community, or background is welcome.

**Sikh Faith**

11. The Sikh worldview centers around the idea of *Ik Onkar* (oneness). Sikhs believe that people of all faiths worship one divine being who created this world and lives within it. *Ik Onkar* means that the divine is equally present in all people and that every human being is equal in the eyes of God—whatever their religion, social identity, or immigration status.

12. Sikh scripture is at the center of Sikh life and is placed literally and figuratively in a central role at the Gurdwara. The *Guru Granth Sahib* (Sikh scripture) is revered and respected as a living Guru (teacher) and is written as prose and poetry, allowing part of every worship service to be conducted with communal singing.

13. During worship at the Gurdwara, community members, including children, often lead the congregation in singing and prayer. Community members may also explain basic ideas and lessons from the selections.

14. While most of our larger gatherings occur on Sundays, langar (communal meal) is always available at our Gurdwara. People of all backgrounds and identity groups are welcome to join.

15. The Sikh faith does not have an ordained clergy. Any person from the congregation may lead religious services and assist in preparing langar. Both acts are fundamentally a communal effort.

16. In general, fully and meaningfully practicing the Sikh faith requires joining with the community in service and prayer. We refer to the community with whom we gather for worship and communal meals as our *Sangat*.

17. Sikhs seek the presence of our Sangat to meaningfully express our faith.

18. For example, a subset of the Sangat is the *Khalsa*. The Khalsa is a congregation of those who have been initiated fully into the Sikh faith. To be initiated, they received *Amrit*, a core component of our religious practice. Receiving Amrit is a Sikh religious ceremony that is often analogized to baptism. Amrit must be received from others in the Khalsa.

19. Sikhs who have joined the Khalsa carry all the major outwards symbols attributed to the Sikh faith today, including but not limited to the wearing of the *dastaar* (Sikh turban), uncut hair, and carrying the *Kirpan*.

**DHS's New Policy**

20. DHS's new policy allowing immigration enforcement at houses of worship allows ICE agents to conduct surveillance, investigate, raid, and make arrests at Gurdwaras, including ours.

21. Knowing that our Gurdwara may be subject to government surveillance and raids by armed agents is burdening our religious exercise, as our faith invites us to gather in community with one another.

22. The new policy had an immediate chilling effect on worship and fellowship at our Gurdwara.

23. We have already heard from members of our Sangat who are concerned that participation in Sikh religious life at the Gurdwara may put them at risk because of the new policy.

24. Some of the people who are concerned are undocumented, but even people with legal immigration status are unsure whether it is safe to attend.

25. It is my understanding that almost ninety percent of our congregation are first- or second-generation immigrants. About half are first-generation immigrants.

26. Decreased attendance at our Gurdwara hinders our ability to carry out essential religious practices with the entire Sangat.

27. Because communal worship and fellowship is so important to Sikh practice, keeping community members from attending the Gurdwara harms not just those who are too fearful to attend but also everyone else at the Gurdwara.

28. DHS's new policy is also reducing Gurdwara attendance and interfering with our religious exercise by renewing our collective concern, grounded in Sikh history, of government interference in our ability to freely practice our faith.

29. Throughout our history, Sikhs have known the pain of having the sanctity of our Gurdwaras violated, especially by the government. In the lead up to the Sikh Genocide of 1984, the Indian military conducted Operation Blue Star, a coordinated assault on the

Golden Temple and other Gurdwaras throughout Punjab that claimed the lives of thousands of Sikhs.

30. As long as DHS's new policy is in effect, it will impair Sikhs' ability to practice our faith freely, openly, and without concern.

31. Despite the threat that the DHS's policy poses to the Sangat, I remain in *Chardi Kala* (eternal joyous optimism, especially in times of great challenge) with my fellow Sikhs, and we will work together for *Sarbat Da Bhalla* (the betterment of all humanity).

Elk Grove, California
February 4, 2025

Amar Singh Shergill

# Exhibit 48

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the Religious Society of Friends,** ***et al.*****,**

Plaintiffs,

**v.**

**U.S. Department of Homeland Security,** ***et al.*****,**

Defendants.

**Civil Case No. 8:25-cv-243-TDC**

**DECLARATION OF REV. DR. JEFF HAYES**

I, Jeff Hayes, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am the Senior Minister of Oakland Baptist Church in Rock Hill, South Carolina, which I usually refer to as "Oakland." I have held that role since 2017.
2. As Senior Minister, I am the spiritual leader of the church and lead the church in accomplishing its work with God's help and guidance.
3. I grew up Baptist, am a native of South Carolina, and have also served churches in Greenville, Spartanburg, and Barnwell counties. I consider myself an active member of Baptist communities.
4. I hold a Bachelor of Arts in Religion from Furman University and a Master of Divinity and Doctor of Ministry degree from Gardner-Webb University.

**Church Structure**

5. Oakland is located at 1067 Oakland Avenue in Rock Hill, South Carolina.

6. Oakland owns the land on which it is located and is a legally incorporated 501(c)(3) not-for-profit corporation.

7. Oakland Baptist Church was founded in 1950. It is affiliated with the Cooperative Baptist Fellowship, a Baptist denomination comprised of theologically moderate churches. Our church has been a member of CBF for at least 20 years and is also a member of CBF South Carolina.

8. Including members and regular attendees, our congregation is approximately 500 people. We do not consider immigration status when reviewing candidates for membership.

9. Oakland Baptist Church has five interrelated core purposes that reflect our Baptist beliefs and commitments. Those are:

   a. To propagate the Gospel of our Lord Jesus Christ through service to our local community as well as to the uttermost parts of the world, depending always on the leadership of the Holy Spirit;

   b. To provide regular opportunity for Bible study and other forms of Christian education, public worship, services, and fellowship;

   c. To sustain the ordinances, doctrines, and ethics set forth in the teachings of our Lord Jesus Christ;

   d. To channel our talents and material gifts to the advancement of the Kingdom of God; and

   e. To serve our Lord Jesus Christ in all areas of life.

10. In 2022, Oakland adopted seven goals associated with our Vision plan for the church. One of those goals is to be an "open, inviting, and inclusive community of faith where

everyone can find a place of belonging." A subsequent strategy to accomplish that goal reads: "intentionally working to increase diversity in our laity and partnerships that reflects the diversity and inclusiveness we value." DHS's new policy prevents us from attaining this goal.

**Loving Our Neighbors**

11. Oakland is committed to being an open, inviting, and inclusive community of faith. Our faith is about relationships, and it drives us to find intentional ways to connect new people into the life of our church, regardless of where they are on their faith journey.
12. Our scriptures tell us repeatedly (for example, in Leviticus 19:9-18, Matthew 22:33-40, Mark 12:28-31, Luke 10:25-28, Galatians 5:14, and James 2:8) that we should love our neighbor as ourselves. Jesus tells us that our neighbors are everyone, including those who are completely different from us (Luke 10:25-37).
13. Oakland has therefore covenanted with God to be a servant church that recognizes the infinite worth of every person. A core component of that covenant with God is that our differences—whatever they may be and including with respect to immigration status—do not separate us but rather increase our understanding and strengthen the bonds of Christian love.
14. In fact, our faith requires us to know and serve our neighbors, including immigrants and refugees.
15. For example, Leviticus 19:33–34 reads: "When an alien resides with you in your land, you shall not oppress the alien. The alien who resides with you shall be to you as the citizen among you; you shall love the alien as yourself, for you were aliens in the land of Egypt: I am the LORD your God." And in Matthew 25:35, Jesus says, "I was hungry

and you gave me food, I was thirsty and you gave me something to drink, I was a stranger and you welcomed me."

16. Our faith thus compels us to share the love of Christ with immigrant and refugee communities. We live that aspect of our faith in several ways.

17. First, we house the Carolina Immigrant Alliance, a legal clinic led by one of our deacons, choir members, and Sunday School teachers. The Immigrant Alliance is in the church building, and supporting its work is an essential component of living our faith. The Immigrant Alliance counsels all kinds of immigrants, both documented and undocumented, and has served over 200 clients from at least 34 countries. Since DHS changed its policy to allow ICE enforcement at churches, people in our community are afraid to come to the Immigrant Alliance for help.

18. Second, we offer weekly ESL classes in our fellowship hall that are completely run by volunteers from our church. Since DHS changed its policy and started allowing ICE enforcement at houses of worship, attendance at those classes has declined because people are afraid of immigration enforcement at the church.

19. Third, we welcome all who wish to join, regardless of their immigration status.

20. While we do not inquire about our parishioners' legal status, I know of at least two long-time members who may lose their temporary protected status soon and who are therefore fearful of attending services. One of those members has led our children's time moments during worship, and the other used to work for the church in a maintenance position. Because ICE is now able to enter houses of worship, these individuals—who have been members of our church for over ten years—are now fearful of attending services.

21. We have additional congregants who are immigrants, both documented and undocumented. They too are now afraid to come to our sacred space to worship, since DHS's new policy means they might be targeted or even just swept up in a raid while here.

**Worshipping God**

22. Oakland's congregation has covenanted to be faithful to the public worship of God, which is one of our core religious practices.

23. To fulfill that covenant with God, Oakland holds regular meetings for the purpose of public worship, Christian education, and fellowship.

24. All these meetings are open to the public, as our faith requires. Nehemiah 8-9, Psalm 86:9-10, John 4:23-24.

25. Limiting those meetings to those with legal immigration status would contradict our faith. One of our core values is being a church that shows God's love via mutual respect and acceptance of others in all walks of life.

26. But it would also contradict our faith as well as our God-given vision for the church to encourage our immigrant neighbors to join us when we know they might now be targeted by ICE even during worship. Our faith leads us to commit to missions, where we serve our neighbors both locally and globally. Knowingly putting our neighbors in danger violates our faith.

27. Even our non-immigrant parishioners are disturbed by DHS's new policy. Some are considering not attending worship out of fear of armed intrusion by ICE.

28. I myself am the parent of two young children, and I don't know how I could explain law enforcement officers with guns coming in to interrogate and arrest our neighbors and fellow worshippers.

York County, South Carolina
February 3, 2025

Rev. Dr. Jeff Hayes

# Exhibit 49

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**Philadelphia Yearly Meeting of the Religious Society of Friends, *et al.*,**

Plaintiffs,

**v.**

**U.S. Department of Homeland Security,** *et al.*,

Defendants.

**Civil Case No. 8:25-cv-243 TDC**

**DECLARATION OF REVEREND DOCTOR PAUL BAXLEY**

I, Paul Baxley, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

**The structure of the Cooperative Baptist Fellowship**

1. I am the Executive Coordinator of the Cooperative Baptist Fellowship, which is incorporated in the state of Georgia.

2. CBF is a network of churches, individuals, and partners inviting each other into deeper community, equipping each other for ministry and seeking the transformation of God's world.

3. CBF is made up of more than 1,400 individual congregations, more than 40 field personnel (what some other religions refer to as missionaries) bearing witness to Jesus Christ around the world, nearly 1,200 endorsed chaplains and pastoral counselors, 15

state and regional organizations, dozens of theological schools and partner organizations and so much more.

4. The relationship between CBF and its member congregations involves mutual participation and contribution. Congregations contribute to CBF financially, serve on our governance bodies, and participate in missions and advocacy. CBF supports congregations in myriad ways, including through financial assistance and field personnel. CBF also seeks to help pastors and other congregational leaders thrive through offering leadership development, educational materials, spiritual formation support and opportunities for networking and renewal.

5. CBF's 1,400 congregations operate in 37 states, Puerto Rico and the District of Columbia in the United States.

6. Many of CBF's congregations own the property that houses their church. Some do not and instead rent or use another space. Some—including one in Richmond, Virginia, for example—use houses of worship that are owned by other denominations.

7. Our diverse community includes partners all over the world, and our Fellowship supports a wide range of missions and ministries that give people meaningful opportunities to put their faith to action. With a deep respect for freedom, diversity, and equality, we encourage autonomy while inviting dynamic collaboration.

8. CBF is managed under the direction and authority of the Governing Board, which provides fiscal and legal oversight to the Fellowship. As Executive Coordinator, I answer to the Governing Board.

9. CBF employs 86 people.

10. Currently, 44 of CBF's employees are field personnel.

11. Field personnel generally work in a specific geographic region. Among other things, they work in close partnership with many individual congregations both within and outside their region. Congregations who choose to directly partner with CBF field personnel provide financial assistance, send volunteer teams to meet the needs of the particular ministry, bring in the field personnel to help educate a church in how to carry out its own ministry, and pray for the field personnel and those to whom they are ministering.

12. Several field personnel work directly with immigrants including asylum seekers, refugees, visa holders and those without documentation. CBF congregations have built relationships with those field personnel to support their ministries and learn firsthand how immigration issues in border states impact the rest of the country. These congregations supply blankets, clothing, toiletry and personal care items, and food for migrants. Meeting physical needs and learning the migrants' stories of faith and resilience strengthens the faith of CBF congregations who see a picture of God at work in awe-inspiring ways.

13. I am a member of a CBF church. And I travel extensively to other CBF congregations as part of my duties. In a typical month I preach in a different CBF church three Sundays a month. I also attend some annual meetings of our state and regional organizations, seek other opportunities to engage congregational leaders, and visit field personnel throughout the year.

**Core tenets of our faith and their relation to immigration**

14. As Cooperative Baptists, God invites us and equips us to share and spread the hope of Christ. Whether we're feeding the hungry, advocating for the unheard, nurturing a

young person's calling to ministry, endorsing a chaplain to serve or helping families get back on their feet after a disaster, we and those with whom we minister experience transformation.

15. Our understanding of Baptist faith and practice is based on our commitment to the historic Baptist principles of religious liberty, church-state separation, autonomy of the local congregation, and the freedom to interpret Scripture under the guidance of the Holy Spirit. Our fellowship further affirms the centrality of local congregations to the mission of Jesus Christ and the equal participation of women and men in all aspects of church leadership and Christian ministry.

16. As followers of Jesus it is most essential that we are doing what Jesus tells us to do. Most directly, Jesus said in Matthew 25: "I was a stranger and you welcomed me." Many people forget that as a child, Jesus himself lived life as a refugee. His parents took him in his earliest years and fled the country of his birth because of the cruelty of Herod's regime.

17. In the faces of immigrants and refugees who are fleeing political or religious persecution, or who are seeking sanctuary from tyrants, we see nothing less than the face of Jesus. To welcome a stranger is to welcome Jesus.

18. In his first mission sermon, Jesus announced that his calling was to "bring good news to the poor, release to the captives, recovery of sight to the blind and to let the oppressed go free." When we show hospitality to immigrants and refugees, when we help them find home, health, life and opportunity among us, we are fulfilling that mission of Jesus.

19. Jesus' command to welcome strangers and therefore welcome him, continues a prominent theme of Old Testament scriptures. In Exodus and Deuteronomy, the Hebrew

people are charged to welcome strangers because they were once strangers in Egypt. The prophet Micah commands that faithful people "do justice, love kindness and walk humbly with God."

20. Other New Testament scriptures affirm Jesus' mandate as well. In Romans 12:9, Paul commands that we show hospitality to strangers. In Ephesians 2:19, Paul promises "you are no longer strangers and sojourners but fellow citizens with the saints." In Hebrews 13, the writer affirms that when we show hospitality to strangers, we entertain angels without knowing it.

21. We have other reasons to welcome immigrants and refugees. When we meet immigrants and refugees from around the world, we see children of God, made in the image of God, loved unconditionally by God as are all people of the world. We know the Gospel of Jesus Christ is intended as "good news of great joy for all people" because that's what the Christmas angels told us.

22. With the most quoted words of Scripture of all, we know that "God so loved the world." For this reason among many others, we reject any suggestion that God loves people of one nation more than God loves people of other nations.

23. The most essential identifying mark for Christians is not legal documents we hold but rather the professions of faith we make in Jesus and a life we live together in the power of Christ. The waters of baptism are more powerful than national citizenship, native language, or any other barrier.

24. Because God's love is global and because the church is global, we also know that God has always worked in the world by sending people across borders and boundaries. That was true early in the biblical story when God called Abram to leave his country and go

"to the land I will show you." It was true when Paul travelled across the known world working with people from many cultures to start churches.

25. There has always been an unmistakable connection between the mission of God and migration. God sends people from us and to us to do God's work among us. That's why when we receive strangers we entertain angels. God sends people from other places with other gifts to strengthen our faith and advance the ways we serve God's mission.

**Cooperative Baptist Fellowship's worship with and ministry to immigrants**

26. CBF is committed to ministry among immigrants and refugees. Our ministries with immigrants and refugees are a matter of deep faith in that they flow from the commands of Jesus and the teachings of Scripture.

27. From CBF's inception, we have been commissioning field personnel to serve among migrant populations of the world and for more than two decades we have had a team of field personnel serving in the United States doing ministry with people from other countries.

28. A significant number of CBF partner congregations are engaged in direct ministry with immigrants and refugees, either through partnerships with our field personnel, relationships with local faith-based nonprofits, or ministries they have developed themselves. Some of those ministries are explicitly focused on immigrants and refugees, while others serve immigrants in the context of ministries with a wider focus such as feeding ministries, housing ministries, and educational programs.

29. CBF partner congregations who engage these ministries range from our most theologically conservative to our most theologically progressive and represent everyone in between.

30. Many of our field personnel minister to immigrant communities. They do so without regard to legal immigration status, into which field personnel do not inquire.

31. CBF partner congregations offer a broad array of services and classes to minister to their local communities—including immigrants. Those ministries include, but are not limited to, food pantries, children's ministry, clothing closets, job-training programs, housing assistance, child-care assistance, medical and dental clinics, addition recovery programs, hypothermia-prevention shelters, and mental-health counseling. Most of these ministries take place in the same church building used for worship services.

32. Some of CBF's partner congregations' ministries are specifically geared to immigrant communities. The most prominent are English as a Second Language classes. The majority of ESL classes are held in the same church buildings used for worship services. Some other ministries for immigrant communities include resettling refugees; offering legal, counseling, or translation services; and supplying money or volunteers to nonprofits who provide direct services to immigrants.

33. Between CBF congregations and field personnel, we are currently ministering to immigrants from more than 50 countries.

34. Our ministry to immigrants does not merely provide them with basic necessities, like food and clothing. Our ministry also provides immigrants with community, a sense of belonging, connection to other people, and other things necessary for anyone to grow and flourish in a new country. Creating the conditions for people to thrive—not just survive—is an expression of our religious beliefs.

35. Our relationship with immigrants and refugees is not merely a reflection of our deep beliefs to care for others. It is a reflection of our beliefs that these brothers and sisters in Christ make us and our religious community better

36. CBF has benefitted from the leadership of immigrants at every level—from CBF staff to volunteers at local congregations.

37. Having people from different backgrounds—including immigrants—as an integral part of our faith community transforms our faith body to look more like the body of Christ. We learn from them different ways of understanding and experiencing the Holy Spirit.

38. CBF employs immigrants. CBF churches have staff who are immigrants and members who are immigrants. Immigrants are lay leaders in our congregations including serving as deacons and small group leaders and contributing to worship as ushers, choir members, offering prayers in their native languages, and reading scripture.

39. Some of CBF's congregations share their church buildings with an ethnic congregation or a congregation that worships in a language other than English.

40. Many of these congregations that worship in languages other than English are also CBF congregations. I believe that these congregations have large numbers of immigrants as members. We do not ask about the legal immigration status of anyone who attends these congregations or any other congregations.

41. CBF partner congregations have worked to incorporate other languages into worship that is primarily in English. For example, we have had members of congregations give blessings, deliver prayers, read scripture, or sing hymns in their native language because it helps all congregants encounter God in new and different ways.

42. Although our immigrant congregants come from all over the world, CBF congregations have a large number of Spanish speakers. Spanish is the primary language for some CBF congregations.

43. At CBF's National General Assembly, we provide contemporaneous Spanish translation during our plenary sessions and worship. CBF is continually increasing the number of print and digital resources we provide in Spanish.

**How DHS's new policy harms Cooperative Baptist Fellowship and its members**

44. The Department of Homeland Security's new policy that allows immigration enforcement at or near houses of worship has already caused CBF and its members immense harm and will continue to do so.

45. CBF has been asked by congregations across the country how to protect their immigrant members who have expressed that they are afraid for their safety.

46. In response to DHS's new policy, some congregations have reported that fewer people, especially immigrants, are attending worship. Having fewer people in worship is a significant harm to our religious exercise—we believe that everyone should be able to worship freely. And whether it means more people singing and praying together, or a heightened feeling of communal worship, having more people (especially those of different backgrounds) is important for exercise of our religion.

47. Having fewer congregants for worship hurts CBF in myriad ways. For one, much of CBF's budget comes from contributions from our congregations. Fewer worshippers means less money for the congregations, and it means fewer contributions to CBF.

48. The harm of reduced number of worshippers goes well beyond financial harm. CBF and its congregations rely heavily on volunteer engagement—in ministry, advocacy, and

governance. Fewer people attending services means fewer people to get involved in that volunteer work that runs our community.

49. A reduced number of worshippers also harms the work done by our field personnel. Our field personnel work directly with congregations in many ways. Among other things, field personnel receive financial and volunteer support from congregations. If congregations have fewer worshippers, they will have fewer resources—financially and otherwise—to support the work of our field personnel. In addition, many worshippers who stay home out of fear of immigration-enforcement operations are people most in need of our ministries. If those worshippers continue to avoid interacting with their congregations, the religious work of our field personnel will be diminished.

50. Losing immigrant worshippers also lessens our ability to experience God by diminishing the ways in which we can learn from those who have lived courageously and had different experiences of the Holy Spirit.

51. Over time, CBF and its congregations have included people of different races, ethnicities, and nationalities at every level, including leadership. In short, our leadership has transformed our body to more closely resemble the body of Christ. If our congregations continue to experience reduced attendance by immigrants out of fear, we will lose staff, volunteers, and lay leaders of diverse backgrounds. Because diversity has brought us closer to resembling the body of Christ, losing it would be a grave harm to our ability to live out our religious beliefs.

52. In response to DHS's new policy, some congregations have reported that there has been a noticeable decline in people engaging with ministry for immigrant communities, especially ESL classes. One congregation has reported that its ESL program usually

brings in about 30 people. Now about 10 attend. That is a 66% decline in the ESL program.

53. One CBF congregation has reported that since DHS announced its new policy, not only are fewer people attending ESL classes, those who are not attending are acting differently—they are not responding to emails and are otherwise difficult to reach, which was not the case before.

54. One CBF congregation has had fewer participants in its low-income ministry; fewer people are engaging with the congregation's food pantry and clothing shelter, among other things. For CBF, serving these communities is not just community service, it is an exercise of our religious beliefs. Fewer participants in these services means fewer people with whom we can commune for worship and fellowship.

55. As another example, one of our pastors has a habit when driving away to roll down her window and say hello to church families that she sees. She was driving away from the church at a time when people were leaving an outreach ministry that provides food and clothing. The ministry serves a large number of immigrants. After DHS adopted its new policy, she was driving away from church when she saw an immigrant family that was a part of the congregation. She rolled down her window to shout hello. The family was visibly scared by someone shouting at them from a car outside of the church. The pastor now questions whether she should greet people in the way she has a habit of doing because immigrant congregants are in a constant state of fear that she does not want to exacerbate.

56. I understand that most immigration-enforcement officers are armed. Some members of CBF congregations would be uncomfortable with the presence of guns in their houses of worship.

57. CBF and its congregations would suffer immensely from immigration-enforcement operations at our houses of worship. The operations would interrupt our worship, including by traumatizing children and other congregants who would witness one of their fellow worshippers being arrested by armed federal officers.

58. The very threat of this enforcement means that many worshippers cannot attend services or ministry with a clear mind, ready to worship. Instead, they are worried about the potential of an immigration-enforcement operation.

59. Although some immigrant members of our community are staying home out of fear, for some the response has been more dramatic. For example, one attender of a CBF congregation was here on a visa. She had previously worshipped with the congregation, led in worship, volunteered, and attended Sunday School. Despite being here legally, her family sent her back to Central America so that she could be prepared to receive others who might be deported.

60. CBF has received multiple requests for advice from our congregations who are responding directly to communities gripped with fear of immigration enforcement at churches. CBF has been forced to give pastors advice that requires redirecting resources or, in some instances, goes against our core beliefs. For example, we have advised pastors to give pastoral care at the homes of immigrants who are too afraid to leave for fear of ICE enforcement at churches. That means that time the pastor would otherwise spend at church is spent off-site, including in transit. Alternatively, we have advised

some congregations who are afraid that they can lock the church doors so that immigration officers cannot simply walk in. Not only does locking the door mean that a church needs to have someone work the door to let in congregants, it also goes against a core belief of ours that our doors should be open—literally and figuratively—to anyone that wants to join us for worship. At least one CBF congregation, fearing immigration-enforcement operations, posted signs to designate areas in its building as public or private to make clear to potential federal agents where they are not allowed to enter.

61. From experience, CBF knows that immigration enforcement can be done without entering churches. For example, in 2018, a congregant of a CBF church in North Carolina was deported after attending a regular check-in with ICE, accompanied by his associate pastor. Gille Bikindou had previously been denied asylum and although a judge ordered his deportation, he was released on an order of supervision. For almost eight years he regularly checked in with ICE. In early 2018, at a seemingly routine check-in, he was arrested and deported. DHS did not, and did not need to, enter the church to detain Mr. Bikindou. Among others, CNN reported on Mr. Bikindou's story: https://www.cnn.com/2018/02/22/us/church-fights-deportation-gilles-bikindou/index.html.

Decatur, Georgia
February 2, 2025

Paul Baxley

Rev. Dr. Paul Baxley

# Exhibit 50

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends, *et al.*,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**U.S. Department of Homeland Security,** *et al.*,<br><br>Defendants. | **Civil Case No. 8:25-cv-243 TDC** |

**DECLARATION OF REVEREND DOCTOR RANDALL CARTER**

I, Randall Carter, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

**The structure of Temple Baptist Church**

1. Temple Baptist is a congregation of Baptist Christians and Christians from other traditions.
2. Temple Baptist is located at:

   2121 Umstead Rd.

   Durham, NC 27712.
3. Temple Baptist is a church and legally incorporated 501(c)(3) nonprofit organization.
4. Temple Baptist owns the property on which the church is located.
5. Temple Baptist's congregation includes approximately 150 people.

6. The Baptist church formed out of the Reformation and into a "free" church movement. Congregations work together across networks and partnerships for greater ministry and mission.
7. In the United States, there are several Baptist groups, associations, and denominations.
8. Temple Baptist is and has been a member of the Cooperative Baptist Fellowship since 2004.
9. Temple Baptist also is and has been a member of the Cooperative Baptist Fellowship of North Carolina since 2004.
10. CBFNC partners with CBF along with other state and regional CBF organizations.
11. Temple Baptist would never turn away a member based on immigration status, and we do not ask current or prospective members about immigration status.
12. Temple Baptist would never refuse to serve anyone through any of our ministries based on immigration status, and we do not ask those we serve about immigration status.

**My roles at Temple Baptist and CBFNC and my faith**

13. I am the Senior Pastor of the Temple Baptist Church, which is incorporated in the state of North Carolina.
14. I am also the interim director of CBFNC's Welcome House network. This network includes around 60 churches, who work to provide temporary housing to refugees and other vulnerable populations.
15. As Temple Baptist's Senior Pastor, I serve as the legal agent and representative of Temple Baptist.
16. I have been in my position for two-and-a-half years.
17. I grew up Baptist and am an active member in Baptist communities.

**Core tenets of our faith and their relation to immigration**

18. As Baptists, our primary and essential commitment is to Jesus Christ as the crucified and risen Son of God.

19. Baptists are not creedal and so do not insist on creedal affirmation for church membership.

20. Baptists affirm the Holy Scriptures of the Old Testament and New Testament as the final authority for faith and practice in the life of the believer and the believers' church. We affirm the inspiration and the purpose of the Scriptures as described in 2 Timothy 3:15–17: "[A]nd how from infancy you have known the Holy Scriptures, which are able to make you wise for salvation through faith in Christ Jesus. All Scripture is God-breathed and is useful for teaching, rebuking, correcting and training in righteousness, so that the servant of God may be thoroughly equipped for every good work."

21. We affirm the classic and orthodox statements of the Christian Faith found in early church statements like the Apostles' Creed and the Nicene Creed. The content of these creeds reflects well our connection to historic Christian convictions, with the references in these creeds to the "catholic" church understood to mean the universal church and not the particular Roman Catholic Church.

22. We affirm historic Baptist convictions including believer's baptism, priesthood of believers, religious freedom (as well as a free church), and congregational polity. We recognize these convictions are different from other Christian traditions. We long for unity in the church, and at the same time we hold these convictions deeply as our witness to the larger church.

23. We believe the Biblical way to live out the Christian faith is in active participation in the community of believers. While many other expressions of the Christian faith exist, nothing takes the place of the local body of believers. We believe the local church is responsible before God for decision making and ministry, including decisions about leadership in the church.

24. We affirm the giftedness and calling of women and men in the church, including to ordained leadership. We believe the Bible celebrates the gifts and leadership of women and men in the local church, including leadership as deacons and pastors.

25. We affirm the call to evangelism and missions. Jesus told his disciples, "As the Father has sent me, so I send you." John 20:21. God the Father sent Jesus to the world and for the whole world. Jesus then sent his disciples into the world with the Good News of salvation. We believe our call is to embody the Good News of God's Kingdom in Jesus locally in North Durham and to wherever in this world God leads us to go and to partner.

26. Temple Baptist is committed to welcoming immigrants and refugees. At the heart of this commitment is a profound theological and scriptural foundation.

27. At Temple Baptist, our faith calls us to practice the ministry of "radical" hospitality. Leviticus 19:33–34 captures this call to welcome the vulnerable: "When an alien resides with you in your land, you shall not oppress the alien. The alien who resides with you shall be to you as the citizen among you; you shall love the alien as yourself, for you were aliens in the land of Egypt: I am the LORD your God."

28. Our commitment to the Lordship of Jesus Christ guides our values as a church. And Jesus emphasizes the divine importance of hospitality by equating welcoming the

stranger with welcoming himself. In Matthew 25:35, Jesus says, "I was hungry and you gave me food, I was thirsty and you gave me something to drink, I was a stranger and you welcomed me."

29. And so, our faith teaches that God calls us to welcome the "alien" and "stranger." And our faith obligates us to answer that call by welcoming immigrants into our communities and equipping them to resettle among us.

30. We believe that each immigrant in our community is an individual made in the image of God with inherent worth and dignity, and that radical hospitality is an opportunity to recognize and honor this humanity. Welcoming the stranger is not just an act of kindness but a divine calling on all our lives to reflect the heart of the gospel and the love of Christ to those most in need.

31. Our Christian faith compels us to address systemic issues that hinder refugee families from flourishing—including by advocating for just and compassionate immigration policy.

32. It is our duty as Christians to use our tangible resources, including space in our building and on our campus and land, to be the hands and feet of Christ by welcoming these members into our communities.

33. As heated debates about immigration continue on the national stage, we believe it is more important than ever for Christians to practice compassion to the vulnerable and the stranger, and to shape the conversation around immigration toward greater hospitality instead of being shaped by inflammatory political rhetoric.

**Temple Baptist's worship and ministry with immigrants**

34. On most Sundays, approximately 10% of active-worship attendance includes persons born outside the United States.
35. Our spiritual commitments are reflected in our ministry with refugees and immigrants.
36. For example, Temple Baptist participates in the Welcome House Triangle West network.
37. Welcome House is a ministry of radical hospitality that provides temporary reception housing ministry for refugees and immigrants who do not have a place to live upon arrival to the United States.
38. Welcome House partners with CBFNC, refugee agencies, and partner churches, as well as individuals that provide a hospitality ministry to vulnerable neighbors in the Raleigh/Durham/Chapel Hill area.
39. All Welcome House guests are sponsored by an agency or church.
40. Through Temple Baptist's Welcome House ministry, we turned a vacant home on our church's property into a space to provide temporary housing for refugee families.
41. This initiative allows Temple Baptist to serve out its religious mission of radical hospitality to the "alien" and "stranger."
42. It has also provided an opportunity for members of Temple Baptist's congregation and I to meet refugees from around the world who have escaped danger and persecution to seek a new life in Durham. Simply having more exposure to refugee families has helped our congregation gain a broader, more connected vision of community. This, in turn, has fostered a more welcoming and inclusive church environment and shaped a greater

understanding of challenges refugees face, such as the rapid depletion of resettlement stipends due to expensive temporary accommodations.

43. Working with immigrant families, whether from the Democratic Republic of Congo, Afghanistan, or Myanmar, to name a few, has made policy become personal. Immigrants are not mere political issues; they are individuals with families, stories, and intrinsic value. Through my ministry at Temple Baptist, I have helped a Congolese family adjust to living in a small rental house, connected with Afghan families through driving practice, and helped a Burmese family purchase a new car. These personal connections underscore the resilience and generosity of refugee families and the profound impact of genuine welcome and support.

**How DHS's new policy harms Temple Baptist**

44. The Department of Homeland Security's new policy that allows immigration enforcement at or near houses of worship has already caused Temple Baptist immense harm and will continue to do so.

45. We have immigrant worshippers that attend Temple Baptist. We do not ask their immigration status.

46. We have seen a reduced number of immigrants willing to attend worship or engage in our ministries. I believe that this is out of fear of immigration enforcement.

47. I am aware that immigrant members of our worship community are afraid of immigration enforcement. They do not feel that church and our ministries are the sacred and safe space that they used to be.

48. DHS's new policy of immigration-enforcement in houses of worship creates confusion and fear. Even those who participate in worship and activities with Temple Baptist who

believe their immigration status to be legal now question their place and safety among us.

49. For example, a Venezuelan family in the United States on a "temporary protected status" designation now fear that they will not be able to stay long term. They simply want to get settled into work and school for their children but fear that their Hispanic appearance will make them a target.

50. Similarly, Afghans that moved through our Welcome House are also experiencing uncertainty about their status. They have asked questions about long-term security for them and their families and are afraid that they will be sent back to the terror of the Taliban.

51. These are examples of the kinds of fears in our church community that cause these families to become more isolated rather than believe they can freely show up at the church.

52. Having fewer people in worship is a significant harm to our religious exercise—we believe that everyone should be able to worship freely. And whether it means more people singing and praying together, or a heightened feeling of communal worship, having more people (especially those of different backgrounds) is important for exercise of our religion.

53. Having fewer congregants for worship hurts Temple Baptist in myriad ways. For one, much of Temple Baptist's budget comes from contributions from its members. Fewer worshippers means less money for Temple Baptist, and subsequently a diminished ability to serve out its religious mission through worship and ministry.

54. The harm of reduced number of worshippers goes well beyond financial harm. Temple Baptist relies heavily on volunteer engagement—in ministry, advocacy, and governance. Fewer people attending services means fewer people to get involved in that volunteer work that runs our community and fulfills our spiritual obligations to attend to the hungry and thirsty, to welcome the stranger, to take care of the sick, to clothe the naked, and to visit the prisoner, among other duties.

55. Moreover, we answer God's call to welcome the "alien" and "stranger" through our ministry with refugees and immigrants. Having fewer people willing to be served and welcomed by these ministries is a significant harm to our religious exercise.

56. For example, if fewer people are willing to use the home on Temple Baptist's property for temporary housing, we will be less able to serve out our mission through our participation in the Welcome House ministry.

57. Losing immigrant participants in our ministry services also lessens our ability to continue gaining a broader, more connected vision of community, which fosters a more welcoming and inclusive church environment.

58. Over time, Temple Baptist's members have included people of different races, ethnicities, and nationalities at every level, including leadership. In short, our leadership has transformed our body to more closely resemble the body of Christ. If our congregation continues to experience reduced attendance by immigrants out of fear, we will lose staff, volunteers, and lay leaders of diverse backgrounds. Because diversity has brought us closer to resembling the body of Christ, losing it would be a grave harm to our ability to live out our religious beliefs.

59. I believe that any immigration-enforcement action, or the threat of immigration enforcement, at Temple Baptist would cause serious harm to our religious exercise, services, and ministries.

60. I understand that most immigration-enforcement officers are armed. Some members of Temple Baptist would be uncomfortable with the presence of guns on church property.

61. Temple Baptist and its members would suffer immensely from immigration-enforcement operations at our houses of worship. The operations would interrupt our worship and ministry services, including by traumatizing children and other congregants who would witness one of their fellow worshippers being arrested by armed federal officers.

62. The very threat of this enforcement means that many Temple Baptist members cannot attend services or ministry with a clear mind, ready to worship. Instead, they are worried about the potential of an immigration-enforcement operation.

63. Knowing that immigration enforcement could happen on church property, at any of our worship services, or at any of our many ministries serving refugees and immigrants, I cannot be as encouraging of any immigrant joining us for worship or being served by our ministries. As much as their presence in both contexts would benefit our religious experience, I do not feel comfortable knowing that their attendance could subject them to armed federal officers.

Durham, North Carolina
February 4, 2025

Rev. Dr. Randall Carter

Rev. Dr. Randall Carter

# Exhibit 51

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends, *et al.*,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**U.S. Department of Homeland Security,** *et al.*,<br><br>Defendants. | **Civil Case No. 8:25-cv-243 TDC** |

**DECLARATION OF REVEREND JUAN L. GARCIA**

I, Juan L. Garcia, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am the Moderator of the Cooperative Baptist Fellowship.

2. The Moderator is the highest-ranking officer in CBF.

3. I am a pastor of a Hispanic congregation in Newport News, Virginia, which includes people from Mexico, Central America, South America, and the Caribbean.

4. I am an immigrant and a native Spanish speaker.

5. My views on immigration are not just personal—they are theological.

6. I believe that we have a religious duty to be a community that invites, welcomes and embraces everyone God puts in our way—the full spectrum of humanity—to be a part of this spiritual and redeeming journey we have been called to.

7. I recently gave an address to CBF's Winter Governance Meeting in Decatur, Georgia. In my address, I spoke about DHS's new policy allowing immigration-enforcement at houses of worship and what harms it causes to CBF, its congregations, and our faith community.

8. I delivered the address mere days after ICE had conducted an immigration-enforcement arrest at a church fewer than 10 miles away, in Tucker, Georgia. So the immigration enforcement in Tucker was not just a news story to me and many members of CBF. It was, instead, something close, personal, and viscerally terrifying.

9. For CBF, for many of our congregations, and for people to whom I minister, the threat of immigration enforcement at houses of worship is not a hypothetical possibility. It is something that has caused immediate and drastic harms to our faith community.

10. The Hispanic community in this country, regardless of their immigration status (documented or undocumented), is afraid, is suffering, is being targeted and persecuted, is wondering when they will be the next victims of an ICE raid, or when someone will call immigration on them, or what will happen to their children if they get arrested and deported.

11. I am a U.S. citizen. But I am concerned and afraid. I am afraid for what might happen to me and my family, because we are brown, we have accents, we speak primarily Spanish or Spanglish, we do ministry with and for the Hispanic community, and because we know that immigration enforcement so often relies on those outward indicators of nationality—regardless of legal status.

12. Recently, a couple of families of my church (one from Venezuela and one from Ecuador) came down for prayer at the end of our service. I have the habit of asking people about what they want me to pray for. The first family told me, "Pastor, for peace in the midst of all that

is happening," and the second, "Pastor, we have an appointment with Immigration to put our fingerprints, and we are afraid." As I was praying for that family, I began to feel not only their fears and concerns, but my own, and the ones of many more like us. So, I broke down. As I embraced them, I began to sob and cry out in anguish and desperation—like when you are in a situation where you don't see a way out in sight. Halfway through my prayer, it was no longer a prayer and intercession for them, it was a prayer and intercession for all of us, Hispanic Immigrants, facing the uncertainty and fear of this imminent and unrestraint threat. "God, embraced us. God, have mercy. God, we are afraid. God, we need you."

13. Fear and insecurity caused by the threat of immigration enforcement are real and we are beginning to see their effects in our houses of worship. I have heard that some Hispanic parishioners are thinking of no longer attending church for fear of being intercepted by ICE. Others have already stopped attending. Some of our congregants have decided to leave their homes only to work and buy food.

14. Our Hispanic churches are no longer sanctuaries of peace, refuge, and safety. Our worship services can be interrupted at any moment. Our people are so concerned about the possibility of receiving those unwanted visitors that one of our ushers, a gentleman from Ecuador, asked me, "Pastor, what are we going to do? We always keep the doors open, but there are people who come that we don't know. Should we keep them open, or should we keep them close and locked all the time?" Those are the things that now a pastor like me is worrying about. Now, for our own safety, we have to begin to scrutinize those who come into our doors to see if they are legit visitors or ICE agents.

15. DHS's new policy is harming people at every level of CBF and its congregations—from those who attend church all the way to the Governing Board.

16. The threat of immigration enforcement at our houses of worship hurts all of us, but it is especially harmful to our Latino/a brothers and sisters, pastors, leaders and co-workers. We are suffering for this persecution. We are sad for what our people are going through. We are mad about the constant lies expressed about our people and the vicious attacks we are receiving.

17. Our Lord Jesus was an immigrant and a refugee fleeing persecution. In our own history as people of God, we were immigrants in the land of Egypt. So our God and our faith compel us to stand for the immigrant and refugee community in times of persecution as these.

Newport News, Virginia
February 3, 2025

Rev. Juan Garcia

# Exhibit 52

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,

Plaintiffs,

**v.**

**U.S. Department of Homeland Security,** *et al.*,

Defendants.

**Civil Case No. 8:25-cv-243-TDC**

**DECLARATION OF NANCY BLACK**

I, Nancy B. Black, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am a member of the Brooklyn Friends Meeting, located in Brooklyn, New York.

2. I have been attending the Brooklyn Friends Meeting since approximately 1972.

3. I am currently co-clerk of the pastoral care subcommittee of the ministry and counsel committee and a member of the finance and collections committee at the Brooklyn Friends Meeting.

4. I previously served as Clerk of the Brooklyn Friends Meeting in the 1990s. I have also previously served on the nominating committee, the ministry and counsel committee, and the Brooklyn Friends School committee.

5. I also served as clerk of New York Quarterly Meeting from 2007-2011.

6. I was a professor of English at Brooklyn College, where I taught a diverse range of students for approximately 40 years.

**Worship at the Brooklyn Friends Meeting**

7. I regularly attend weekly worship at the Brooklyn Friends Meeting House.

8. Brooklyn Friends Meeting offers three meetings for worship on Sundays, and one meeting for worship on Tuesdays. It also holds a variety of other spiritual activities.

9. Brooklyn Friends Meeting has approximately 300 members.

10. Worship consists of sitting in silence and waiting to hear the voice of God. We sometimes refer to this process as seeking the inner Light, inner voice, or the Christ within.

11. Brooklyn Friends Meeting is made up of a large and diverse collection of people, and everybody's voice matters. One of our key testimonies concerns equality.

12. Listening to everyone's voice, and inviting everyone in, is central to our worship.

13. We welcome children of all ages into the meeting house. During worship, they attend First Day School, which includes religious instruction. The children join the meeting toward the end of worship.

14. When worship concludes, we invite members and attenders to share joys and sorrows and requests to be held in the Light, i.e., sharing the names of people whom they want the meeting to pray for. That is an important aspect of our worshipful activity.

15. Thereafter, we exchange greetings by shaking hands or hugging those around us.

16. The meeting concludes by breaking bread together, during which time members socialize and committees engage in some of their spiritual work.

17. On the first Sunday of each month, worship is preceded by gathering to sing hymns for approximately 45 minutes before worship formally begins.

18. Brooklyn Friends Meeting offers some of its worship services via Zoom. Zoom worship is important because it enables Friends who have not been able to attend worship in person, because of illness, mobility issues, distance, or other factors, access to worship.
19. For many, though, there is something essential about in-person worship.
20. Additionally, Zoom worship is not accessible to all Brooklyn Friends Meeting members, some of whom do not have access to the equipment required for remote participation.

**Engagement with the community**

21. Brooklyn Friends Meeting has existed since 1835, and it has been meeting in the same meeting house, at 110 Schermerhorn Street, since 1857.
22. Brooklyn Friends Meeting engages with our racially, ethnically, and socioeconomically diverse community, including members of the immigrant community, in a number of ways.
23. An important part of our history and our faith is seeing the Divine in everyone and welcoming everyone to be a part of our community.
24. We have a Welcoming Committee, which greets people when they come to the door and shows them inside.
25. There is a banner on the fence at our meeting house welcoming refugees and immigrants. The banner has hung there since at least 2020.
26. We also open our meeting house to the community, in both formal and informal ways.
27. On the last Sunday of every month, Brooklyn Friends Meeting holds a community dinner at its meeting house, which is open not just to members and attenders, but all

people in the community. It is frequently attended by people who are experiencing food insecurity, including, at times, a number of migrants.

28. Twice a week, we host the University Settlement House, which provides educational and social services to immigrants and low-income families, at our meeting house. The University Settlement House provides pastoral care, community wellness, workshops, connections to social services, and other resources to members of the community during the office hours that it holds at our meeting house.

29. Once a week, students from neighboring Brooklyn Frontiers High School, located next door to our meeting house, come to the meeting house kitchen to attend a cooking class.

**The importance of communal worship with all-comers, including immigrants**

30. We have a large and diverse number of members, attenders, and others from the community who join for weekly worship.

31. Communal worship is a core aspect of my faith and religious exercise, and restrictions on communal worship negatively affect my religious exercise and ability to practice my faith.

32. As Quakers, we have no ministers; each person who worships in a meeting is a minister, in a way. Every person is crucial to the meeting, because everyone has their own connection to Spirit, or access to the Divine. Continuing revelation through people is critical.

33. That is true regardless of whether a person speaks in a meeting or not. It is the presence of Friends communing for worship that allows us to center down, which deepens the worship.

34. The loss of members or attenders negatively affects our religious exercise because it deprives us of an essential part of our ministry not to have those voices in the room. Fewer people means less God in the room. It would be like omitting books of the Bible, because people are our texts.

35. The loss of members or attenders strikes at the heart of who we are and how we worship.

36. The specter or actual presence of armed law enforcement officers coming near or inside our meeting house during worship is very disturbing and incredibly disruptive.

37. The new policy creates an environment of fear.

38. I believe that it may lead some members of our community to refrain from attending weekly worship in person.

39. People ceasing attending weekly worship negatively affects the ability of our attenders and members to gather together for communal worship.

40. People ceasing attending weekly worship diminishes my own ability to worship.

41. Brooklyn Friends Meeting is a peaceful, nonviolent, and safe space. Ours is an open and inviting door.

42. The presence of armed law enforcement officers near or inside our meeting house would go against our pacifist values.

43. The presence of armed law enforcement officers in our meeting house would also disrupt our worship in other ways, including by disrupting our ability to engage in the quiet reflection that is necessary to access the Divine.

Brooklyn, New York
February 3, 2025

Nancy B. Black

# Exhibit 53

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,

Plaintiffs,

**v.**

**U.S. Department of Homeland Security,** *et al.*,

Defendants.

**Civil Case No. 8:25-cv-243-TDC**

**DECLARATION OF STEVEN MOHLKE**

I, Steven Mohlke, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

**The history and structure of New York Yearly Meeting of the Religious Society of Friends**

1. New York Yearly Meeting of the Religious Society of Friends, Inc., is a New York not-for-profit religious corporation organized under Section 15 of the New York Religious Corporations Law. It is the governing and advisory umbrella organization for 65 Quaker congregations—Monthly Meetings—across New York, Northern New Jersey, and Southwest Connecticut.

2. New York Yearly Meeting is located at:

   15 Rutherford Place

   New York, NY 10003

3. New York Yearly Meeting has existed since 1695, and it has met continuously since 1696.

4. A Yearly Meeting in the Quaker religion is an association, a yearly gathering, and the way of describing Quakers within a certain region.

5. New York Yearly Meeting is part of two wider organizations of Quaker Yearly Meetings: Friends General Conference and Friends United Meeting. But there is no wider denominational authority beyond the Yearly Meeting.

6. Monthly meetings are the basic organizational unit in the Quaker religion. Monthly meetings are authorized to have their own by-laws and budgets. They own or rent their own meeting houses and places of worship.

7. At least five of New York Yearly Meeting's monthly meetings meet for worship inside other denominations' houses of worship, including Presbyterian churches, a Methodist church, an interdenominational church, and another multi-denominational space. I believe that it would be difficult for law enforcement to determine whether the church was being used at any given time for Quaker worship or other worship.

8. To be a monthly meeting, a meeting must be recognized by a quarterly, regional, or half-yearly meeting that is a subregion of New York Yearly Meeting.

9. New York Yearly Meeting has 65 Monthly Meetings with approximately 2,900 members. It also includes approximately 10 additional informal worship groups.

10. New York Yearly Meeting instructs its monthly meetings on minimum requirements to be recognized as a monthly meeting.

11. New York Yearly Meeting publishes a book of discipline known as Faith and Practice, which provides trusted guidance for its monthly meetings and their members.

12. New York Yearly Meeting may offer spiritual and practical support to its monthly meetings.

13. Most monthly meetings write an annual state-of-the-meeting report, which is sent to New York Yearly Meeting, which in turn writes a report for the whole of New York Yearly Meeting.

14. New York Yearly Meeting does not manage the budget of its monthly meetings. But if a monthly meeting closes down, generally the monthly meeting's assets transfer to New York Yearly Meeting.

15. Monthly meetings fund New York Yearly Meeting in part, through an annual covenant donation. Approximately 60% of the budget of New York Yearly Meeting comes from monthly meetings.

16. New York Yearly Meeting gathers three times per year for worship, fellowship, and decision-making about the development of the Quaker faith in our region.

17. When we meet, we understand the Yearly Meeting to be its own worshipping body. As part of the worshipping body, the New York Yearly Meeting has its own clerk.

18. New York Yearly Meeting emphasizes that all Quakers in its region are part of our community. Its gatherings are attended by the members of its constituent monthly meetings and others who are not official members but are active participants in our worshipping body.

19. All are welcome to attend New York Yearly Meeting's gatherings. New York Yearly Meeting would never turn anyone away, and we do not ask about immigration status.

20. All are also invited to participate in New York Yearly Meeting's decision-making.

21. We believe that there is that of God in everyone, and therefore we are all joined in community. This prompts us to open our doors and welcome the stranger.

22. When some voices, including immigrant voices, are not present and are missing from our decision-making, we can make decisions that are not true to what God would have us do.

23. Many of New York Yearly Meeting's monthly meetings are located in areas with large populations of immigrants, including its monthly meetings in both urban and more rural areas.

24. Many of these monthly meetings have active members who are immigrants.

25. For example, one of New York Yearly Meeting's member monthly meetings is made up of documented refugees. Even though all members are documented or U.S. citizens, I know that if law enforcement is present at or near the church, worshippers would choose not to attend.

26. Another of our monthly meetings is in an area with a large and growing Spanish-speaking population and is considering adding weekly worship in Spanish.

27. Another of our monthly meetings, which is located in a rural, farm-oriented community, works actively with the large migrant populations in the area.

**My role in New York Yearly Meeting and my faith**

28. I am General Secretary of New York Yearly Meeting. The position is roughly equivalent to that of Executive Director for the organization.

29. As General Secretary, I serve as the legal agent of and am authorized to execute documents on behalf of New York Yearly Meeting.

30. The General Secretary directly supervises 6 staff members.

31. I have been in my position for seven-and-a-half years.

32. I am an active member in the Religious Society of Friends and a member of Ithaca Monthly Meeting of the Religious Society of Friends.

33. I also facilitate regular workshops on Quaker decision-making for Friends inside and outside New York Yearly Meeting.

34. I believe that any immigration-enforcement action at a Quaker meeting house or at any place where a meeting for worship is occurring would cause serious harm to the religious exercise of New York Yearly Meeting and its monthly meetings. And I believe that the threat of immigration-enforcement actions at a Quaker meeting house or at any place where a meeting for worship is occurring causes serious harm to the religious exercise of New York Yearly Meeting and its monthly meetings.

35. Knowing that immigration enforcement can happen at a monthly meeting, annual gathering, or other worship event, I cannot be as encouraging of immigrants joining us for worship. Encouraging immigrants to come to worship knowing that they may be placed in harm's way, or that their lives may be made harder as a result of an encounter with immigration-enforcement officers, conflicts with my religious beliefs.

36. I believe that threatened or actual immigration-enforcement action near or inside a Quaker meeting house or at any place where a meeting for worship is occurring may lead some members of New York Yearly Meeting to refrain from attending worship.

37. When you introduce the possibility of armed law-enforcement officers showing up at or near Quaker meeting houses, it is discouraging of worship.

38. Quakers believe in nonviolence. We do not believe in taking up arms.

39. Having any armed presence in a Quaker meeting house would be distracting and make it difficult if not impossible to worship. If I was aware of an armed presence outside a

Quaker meeting house, it would be similarly distracting and it would burden my ability to worship. It would put me in a different state other than worship.

Ithaca, New York
February 3, 2025

Steven Mohlke

# Exhibit 54

NIH Public Access
PYM-000049
Author Manuscript
Soc Sci Med. Author manuscript; available in PMC 2012 August 1.

Published in final edited form as:
*Soc Sci Med.* 2011 August ; 73(4): 586–594. doi:10.1016/j.socscimed.2011.06.007.

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

# The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA

**Karen Hacker, M.D., M.P.H.**,
Institute for Community Health, Cambridge Health Alliance, Harvard Medical School

**Jocelyn Chu, Sc.D., M.P.H.**,
Institute for Community Health, Cambridge Health Alliance, Harvard Medical School

**Carolyn Leung, Ed.D.**,
Tufts Clinical Translational Science Institute, Tufts Medical School, Boston, MA

**Robert Marra, M.B.A.**,
Community Affairs, Cambridge Health Alliance, Cambridge, MA

**Alex Pirie, B.A.**,
Immigrant Service Providers Group/Health, Somerville, MA

**Mohamed Brahimi, M.A.**,
Muslim American Civic and Cultural Association, Malden MA

**Margaret English, M.A**,
Institute on Urban Health Research, Bouvé College of Health Sciences; Northeastern University

**Joshua Beckmann, M.P.H., M.S.W**,
Institute on Urban Health Research, Bouvé College of Health Sciences; Northeastern University

**Dolores Acevedo-Garcia, PhD, MPA-URP**, and
Institute on Urban Health Research, Bouvé College of Health Sciences; Northeastern University

**Robert P. Marlin, M.D., Ph.D.**
Department of Medicine, Cambridge Health Alliance, Harvard Medical School

## Abstract

U.S. immigrants have faced a changing landscape with regard to immigration enforcement over the last two decades. Following the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, and the creation of the Immigration and Customs Enforcement (ICE) agency after the attacks of September 11, 2001, detention and deportation activity increased substantially. As a result, immigrants today are experiencing heightened fear of profiling and deportation. Little research exists on how these activities affect the health and well-being of U.S. immigrant communities. This study sought to address this gap by using community-based participatory research to investigate the impact of enhanced immigration enforcement on

© 2011 Elsevier Ltd. All rights reserved.

Corresponding Author: Karen Hacker, M.D., M.P.H.; Institute for Community Health, Cambridge Health Alliance, Associate Professor of Medicine, Harvard Medical School. Khacker@challiance.org.

**Publisher's Disclaimer:** This is a PDF file of an unedited manuscript that has been accepted for publication. As a service to our customers we are providing this early version of the manuscript. The manuscript will undergo copyediting, typesetting, and review of the resulting proof before it is published in its final citable form. Please note that during the production process errors may be discovered which could affect the content, and all legal disclaimers that apply to the journal pertain.

immigrant health in Everett, Massachusetts, USA, a city with a large and diverse immigrant population. Community partners and researchers conducted 6 focus groups with 52 immigrant participants (documented and undocumented) in five languages in May 2009. The major themes across the groups included: 1) Fear of deportation, 2) Fear of collaboration between local law enforcement and ICE and perception of arbitrariness on the part of the former and 3) Concerns about not being able to furnish documentation required to apply for insurance and for health care. Documented and undocumented immigrants reported high levels of stress due to deportation fear, which affected their emotional well-being and their access to health services. Recommendations from the focus groups included improving relationships between immigrants and local police, educating immigrants on their rights and responsibilities as residents, and holding sessions to improve civic engagement. Immigration enforcement activities and the resulting deportation fear are contextual factors that undermine trust in community institutions and social capital, with implications for health and effective integration processes. These factors should be considered by any community seeking to improve the integration process.

### Keywords

Immigrants; Immigration and Customs Enforcement; USA; deportation fear; 9/11; stress, access to care; community-based participatory research

## Background

U.S. immigrants have faced a changing landscape with regard to immigration enforcement over the last two decades After the passage of the Illegal Immigration Reform and Immigrant Responsibility Act (IRRIRA) of 1996, detention of illegal immigrants increased and the categories for persons subject to detention expanded along with the types of crimes for which noncitizens could be deported (Miller, 2005). With the creation of Immigration and Customs Enforcement (ICE), a new division within the Department of Homeland Security, following the attacks of September 2011, the growth of detention and deportation activities accelerated (U.S. Immigration and Customs Enforcement, 2009). Now, with the advent of section 287(g) agreements which allow local police officers to carry out enforcement of federal immigration law ( Rodriguez, Chishti, Capps, & St. John, 2010) even longtime documented immigrants are being targeted for deportation for minor offenses ( Miller, 2005).

Simultaneously, there has been a progressive shift in responsibility for immigration policy and enforcement from the federal government to states and locales (Fix & Tumlin, 1997; Suarez-Orozco & Suarez-Orozco, 2009). Communities where immigrant populations are most concentrated are struggling to address the strains associated with the influx of diverse and, at times, undocumented populations. Local institutions, including police departments, schools, and health systems, are developing their own de-facto policies to accommodate these new populations (Steinberg, 2008). At times, these local policies directly conflict with federal ICE mandates. For example, the 2007 ICE raids in New Haven, CT occurred within days of the city adopting a “resident identification card” that allowed documented and undocumented immigrants to open bank accounts and use other municipal services (www.Eyewitness News 3, 2007).

The contextual factors present in receiving communities greatly influence the assimilation patterns of new immigrants. According to segmented assimilation theory, immigrants follow divergent assimilation paths based in part on the characteristics of the host community (Portes, Fernandez-Kelly, & W., 2005; Portes & Rumbaut, 2006; Zhou, 1997). Community context includes socio-economic conditions and governmental policies which may support

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

or impede assimilation including discrimination, bifurcated labor markets, poverty and crime (Portes et al., 2005; Xie & Greenman, 2005). Immigration enforcement policies related to detention and health care access are important contextual factors influencing the integration process. For example, the negative effect of detention and temporary status on the mental health of asylum seekers has been well documented in Australia, Japan, and Europe (Ichikawa, Nakahara, & Wakai, 2006; Keller, Rosenfeld, Trinh-Shevrin, Meserve, Sachs, Leviss et al., 2003; Silove, Steel, & Mollica, 2001). Sequelae of policies that limit immigrants access to health care have been documented in Germany, Spain and Canada among others (Castaneda, 2009; Magalhaes, Carrasco, & Gastaldo, 2010; Torres & Sanz, 2000).

The daily threat of discovery and deportation is likely to create fear and emotional distress for both documented and undocumented immigrants, thus impeding integration (K. E. Miller & Rasmussen, 2010; Silove et al., 2001; Steinberg, 2008). So too, the loss of loved ones who are detained or deported may create unexpected economic challenges and new responsibilities for children left behind (Chaudry, Capps, Pedroza, Castaneda, Santos, & Scott, 2010). According to Viruell-Fuentes (2007), immigrants' experience of stigmatization translates to stress, isolation, and marginalization. This may lead to depression and anxiety, as well as lack of personal empowerment and self-advocacy (Viruell-Fuentes, 2007). Thus, this chronic fear may have a deep negative impact on integration as well as health outcomes.

In the U.S., the effects of ICE activity on immigrant stress levels and health status have only recently been examined (Capps, Castañeda, Chaudry, & Santos, 2007; Massachusetts Immigrant and Refugee Advocacy Coalition, 2010; Steinberg, 2008). Studies on the impact of Proposition 187, a 1994 California state ballot initiative which prevented undocumented immigrants from accessing publicly funded health care, found that immigrants feared obtaining medical care and delayed or discontinued care as a result (Asch, Leake, Anderson, & Gelberg, 1998; Asch, Leake, & Gelberg, 1994; Berk & Schur, 2001; Fenton, Catalano, & Hargreaves, 1996). Deportation fear has also been associated with poorer self-perceived health, and activity limitation following ICE raids (Cavazos-Rehg, Zayas, & Spitznagel, 2007; Steinberg, 2008).

In the last fifteen years, Massachusetts cities have become home to increasing numbers of immigrant residents. In 2007, over 14% percent of Massachusetts residents were immigrants (Clayton-Mathews, Karp, & Watanabe, 2009). Everett, Massachusetts, with a population of 38,037, is an exampleof a city that has experienced rapid diversification, with immigrants predominantly coming from Haiti, Central America, Brazil and North Africa (U.S. Census Bureau, 2010). Today, Everett hosts the fourth largest concentration of immigrants in the state (34.8%) (Clayton-Mathews et al., 2009; U.S. Census Bureau, 2010).

Rising concerns about the impact of ICE activities on immigrant health emerged in 2009 as Everett community members reported immigrants missing health appointments due to their fear of being stopped en route by ICE or local police and deported. This concern was validated with a brief questionnaire of local health providers. As a result, members of the Everett community representing local organizations, churches and immigrant led advocacy groups approached researchers at the Institute for Community Health to examine this issue in depth using a community-based participatory research (CBPR) approach.

The goal of this CBPR project was to determine whether increased ICE activity was affecting the health and health care of immigrants in Everett. Specifically, the project sought to: 1) Learn more about the impact of ICE activities on immigrant health through a series of focus groups with a diverse population of immigrants, and 2) Develop a set of recommendations for community action. The data described herein provide insight into the

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

concerns and fears of immigrants and the factors contributing to them. The analysis of these perspectives provides information that can be used to inform local policies here and abroad in communities that are experiencing rapid diversification through immigration.

### The Setting

As a community, Everett has attempted to integrate newly arriving immigrants into the fabric of the city. The Multicultural Affairs Commission (MAC) was created in 2005 and included immigrant and non-immigrant members. MAC efforts included: monthly Everett Dialogues with immigrants and city leaders, community forums to assess and improve immigrant access to health care services, a "Welcome To Everett" guide on city services and regulations for all newcomers to Everett and other projects including a youth/elder oral history project that paired recently arrived immigrant youth with older long term residents. Such channels of communication also allowed immigrant communities to voice their concerns about ICE activities in Everett.

Six Everett community agencies, many members of the MAC, who had been actively involved in addressing immigrant issues in Everett, were involved in the research project: the Joint Committee for Children's Health Care in Everett (JCCHCE), the Everett Literacy Program, the Muslim American Civic and Cultural Association (MACCA), Immaculate Conception and St. Anthony's Catholic churches, La Comunidad, Inc., and the Everett police department. The JCCHCE focuses its efforts on improving access to health care and is actively involved in enrollment in both insurance and in the state Health Care Safety Net program ("Health Safety Net-HSN (Free Care): An Overview," 2010). The two Catholic churches' congregations include large numbers of Haitians and Brazilians. La Comunidad and MACCA are emerging immigrant service organizations focused on Latinos and the Arab and Muslim population respectively and both are led by immigrants. The Everett Literacy Program provides the majority of English Second Language courses in Everett. Representatives from these groups had extensive experience in coalition building, community organizing, and addressing immigrant concerns. Representatives also participated from the Everett Community Health Partnership; a collaborative of the Cambridge Health Alliance, the Everett Police Department, the Everett Public Schools and the City of Everett.

Research support included scientists from the Institute for Community Health, health care providers from the Cambridge Health Alliance, and researchers from the Harvard School of Public Health and Tufts Medical School. They contributed diverse expertise in clinical issues, qualitative and quantitative methods, CBPR, immigrant health, and demography.

## Methods

### Community-Based Participatory Research

A CBPR approach calls for the participation of community partners in every aspect of the research process, from problem identification to dissemination of results (Israel, Schulze, Parker, & Becker, 1998). In this study members of the communities at risk identified the problem for study and approached researchers to help them answer their questions. They were critical partners in recruitment, conduct and analysis of the research, and the promulgation of recommendations. Given the highly sensitive nature of the issues under investigation, it would have been impossible to access the multiple immigrant groups without their engagement.

The project ran from February 2009 through February 2010. The team of community members and investigators met regularly as a working group of 10 members throughout the project. Human subjects' approval for the study was obtained from the Cambridge Health

NIH-PA Author Manuscript

Alliance on February 30, 2009. Community partners were included in the IRB submission as co-investigators.

### Conceptual Framework

The working group began by developing a conceptual framework that illustrated the various ways in which increased immigration enforcement efforts might impact immigrant health (Fig. 1). After an initial discussion, researchers drafted a framework that was then continually refined by the working group, supplemented with additional factors and used to highlight important components. For example, community members identified issues surrounding driver's licenses, and the lack thereof, as a major problem leading to arrests and consequently, to missed health care appointments. They also raised concerns about how immigrants viewed the relationships between local police and ICE based on prior experiences in their countries of origin. The resulting collaboratively developed framework not only helped guide the project but illuminated new areas for investigation that would not have been identified without a CBPR approach.

### Focus Group design

To investigate the primary questions of interest, the working group chose to utilize a focus group methodology. Focus groups allow for an in-depth examination of issues and given the sensitive nature of the work, also allow for data to be collected in a safe, non-threatening manner that encourages honest responses. Community members chose to conduct focus groups with the predominant immigrant groups - Spanish speakers (mostly Central Americans), Portuguese speakers (Brazilians), Haitian Creole speakers, and Arabic speakers (predominantly Moroccans) - in order to capture perspectives across Everett. They also decided to conduct several mixed heritage English language focus groups to incorporate immigrants from other countries and provide a dialogue between immigrant groups.

The working group met several times to design the focus group moderator's guide. The guide built on the conceptual framework and included questions about the immigrant experience in the U.S.; questions about the impact of immigration enforcement on overall community anxiety and fear; and questions on the impact of any fear or anxiety on health and health seeking behaviors. Additional questions on experiences with law enforcement (i.e. the Everett police) and the perceived relationship between local police and ICE were asked to better understand how community members interpreted these interactions. The focus group closed with questions on perceptions of safety and security and asked what recommendations would improve the lives of immigrants. A short survey was used at the beginning of the focus groups to capture information on demographics and prior use of health care services.

### Participants/recruitment

Criteria for participation included being foreign-born and resident in Everett. Facilitators, who were bilingual immigrant community members representing the dominant language groups (Spanish, Portuguese, Arabic, and Haitian Creole), were responsible for recruitment. These individuals had extensive networks of immigrant community contacts and could effectively conduct outreach to the communities of interest. They used snowball sampling-that is asking one person to ask another-and tried to insure that their groups were diverse in age, gender, legal status, and use of the health care system. Facilitators-who were community members, asked about legal status before the focus groups began. Similar to classification schemes used in other studies, immigrants who were either U.S. citizens or legal permanent residents were considered documented and those who were not were considered undocumented (M. A. Rodriguez, Bustamante, & Ang, 2009).

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

### Conduct of the Focus Groups

Based on conversations with immigrant representatives and potential participants, we were strongly discouraged from making audio-recordings. We were told that this would dissuade participation and thus decided against using audio-tape. Instead, bilingual note-takers (2 pergroup) wrote in the language of the group and later translated their notes into English. In all but one focus group, one of the notetakers was a member of the research team. The research team provided a two-hour training for the facilitators and note-takers on research ethics and how to conduct a focus group and record information.

Six focus groups were held in May 2009 in familiar Everett locations that were comfortable for immigrant participants (churches and agency offices). Prior to beginning each group, the facilitator read the consent form aloud and verified that everyone understood the content. Acknowledging the sensitivity of the topic area, consent was obtained by a show of hands rather than signature. Participants were also given the anonymous pre-survey translated into their own language to fill out.

### Analysis

Immediately following focus groups, facilitators and notetakers were asked to provide initial impressions of themes drawn from the groups via an electronic survey. Notetakers from non- English-speaking groups then translated their notes into English. Notes from each focus group were combined into one version and validation was done with the facilitator of the group who reviewed the notes for accuracy. Subsequently, a meeting that included both research team members and community facilitators took place to debrief from the focus groups and identify emerging themes.

In the next phase, a smaller subcommittee made up of six researchers collected all the notes and utilized the emerging themes as categories to code content. Initially, each researcher reviewed the focus group that they had attended and coded statements according to the emerging themes while also looking for additional themes. Then the subcommittee reconvened to review the themes, assess missing and/or combined themes in each of the focus groups and agree upon a thematic codebook. The subcommittee then presented to the working group for input and incorporated their feedback into a revised codebook which was used to recode the focus group data. Finally, the subcommittee examined common and divergent themes across the focus groups. This information was also submitted back to the working group to ensure that the agreed upon categories were consistent with their perceptions.

## Results

Fifty-two immigrants participated in the focus groups. Their demographics and health characteristics are shown in Table 1. This ethnically and linguistically diverse population was mostly female (65%), had health insurance (75%), had seen a doctor in the last year (71%) and were largely undocumented (63%).

### Focus Groups

A number of common themes spanned all of the focus groups; however four themes were particularly salient.

**1)** Fear of deportation: Undocumented participants spoke of the ever present fear that at any time, they might be arbitrarily picked up and deported back to their country of origin. Documented participants were concerned for the welfare of family and friends.

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

**2)** Perception of collaboration between local law enforcement and ICE leading to unlimited discretion to arrest immigrants: Participants–regardless of documentation status-believed that the local police were an arm of a larger federal authority and were working closely with ICE. There was also a belief that local and state police had the authority to deport individuals.

Both of these themes had implications for additional themes related to access to health care and perceived health which included:

**3)** Concerns about documentation required for insurance and health care: Both documented and undocumented immigrants discussed fears that giving out personal information to acquire health insurance or health care would be reported to ICE.

**4)** Fear of deportation and its relationship to emotional well-being and health care compliance: Documented and undocumented participants in all groups reported feelings of anxiety and hopelessness resulting from the ever present fear of deportation. In some cases this led to avoidance of care (missed appointments, refusal to complete state documents to obtain health coverage and subsequent lack of insurance).

### Fear of Deportation

Fear of deportation was identified by members in all focus groups. Individuals expressed anxiety about being asked for documentation and “picked up” indiscriminately by authorities.

> There is a fear of being deported if they (immigrants) don’t have papers, or if they do something “bad”. Even minor infractions of the law, such as a traffic violation, can get someone deported. *(Haitian Creole-speaking participant)*

> I am too scared to ask for help. For everything they request documents. For everything they ask for the social security number. I am always scared, there is always fear. *(Spanish-speaking participant)*

The unpredictable nature of ICE activity and deportation described in numerous stories of disappearing friends and relatives made people feel helpless in the face of powerful authorities and added to their sense of vulnerability.

> They (ICE) go with paper and if [they are] looking for someone above, if they accidentally go to the first floor and you don’t have documentation they will take you anytime, you never know. I have a friend who used to live in Chelsea and was taken by immigration. *(English-speaking participant)*

Some even worried that other immigrants would report them to authorities.

> ICE came to my house at 7 in the morning back in 2004. Our neighbor sold us out. I was very scared. They wanted to check the house, claiming that I was hiding illegal people. …I really thought I was going to be deported at that moment… *(Arabic-speaking participant)*

While one might assume that only undocumented immigrants would experience this fear, documented immigrants were also fearful for their family members or because their own “status” might be questioned.

> Back in 2004 they came in to my house too and told me that I was hosting a lot of undocumented immigrants and that they were sleeping on the floor. I was lucky I had a work permit back then and none of that information they had was true and they asked me if I worshiped in a mosque on regular basis and if I knew of any plot

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

> or attack that was going to take place against the U.S. I was very scared. *(Arabic-speaking participant)*

Many participants were particularly worried about the impact of ICE activity and deportation on their children or on children of other immigrants. They reported numerous stories of children being left behind when parents were picked up and taken by ICE.

> My sister-in-law had 2 girls. She got deported and someone else had to take care of the children *(English-speaking participant)*

Overall, deportation fear seemed to affect all the immigrants in the focus groups, regardless of their documentation or their country of origin. The ever-present concern that at any time, ICE might take you from your family, created an environment of insecurity.

> (I) want to feel safe but I cannot. Sometimes I want to go somewhere but I am afraid, if they take me while I am away, I couldn't forgive myself because I would leave my son and husband. It changes the way I live. *(English-speaking participant).*

> Any time I leave my house, I don't know if I will be arrested and deported. I tell my kids if I get deported you have to take care of each other… *(Arabic-speaking participant)*

### Relationships between Police and ICE

Given the fear expressed about deportation, it was not surprising that both local and state law enforcement officials were perceived to be closely related to ICE. The distrust for law enforcement was expressed in all the focus groups. In some cases the perception of police connection to ICE was reflective of the situation in their own countries.

> The separation between the police and ICE is something hard to understand as in Brazil they are all interconnected. *(Portuguese-speaking participant)*

> (I) don't feel free to go to police department and report a crime. (I'm) afraid to say because they might take me to investigation. I can't share information with the police. I am afraid because I am undocumented. *(English-speaking participant)*

This perceived connection between ICE and police only serves to increase fear as many immigrants discussed being targeted and stopped by police for no particular reason and assumed that the next step would be deportation.

> Once I was shopping for groceries…and when I stepped out of the supermarket to put my bags in the car, I noticed a police officer checking me out. When I entered my car and turned it on, she came up behind me with her lights on, asking for my driver's license.....*(Portuguese-speaking participant)*

Despite not having valid driver's licenses, many undocumented immigrants continued to drive out of necessity, needing to transport their families and get to their jobs. In the Everett area, while there is limited public transportation (buses) driving is often essential especially since equipment (cleaning devises, painting tools, etc) is needed for jobs and distances to employment are not walkable. However, many felt that they were targeted by authorities for minor violations and only then identified as undocumented. This in turn could lead to arrest or other consequences. These "traffic stops" made immigrants hyper-vigilant about the police presence in Everett.

> He (a friend) does not understand how come the police officers have no definite set of rules to follow, when they pull over a driver with no driver's license. Some of them send the person to jail, some tow the car and some just let the person go. *(Portuguese-speaking participant)*

It also caused some to report taking alternate routes in order to avoid streets where they had experienced negative interactions with police.

> Police stopped me 2 years ago. I take an alternate route, [I am] afraid to pass the place where police stopped me. It takes more time. *(English-speaking participant)*

Overall, the fear of deportation and the distrust of police were prominent themes throughout the focus groups. While undocumented immigrants were particularly vocal about this, documented immigrants were also impacted, not only in cases of mistaken identity, but also by the deportation of relatives and friends.

### Obstacles to Health Care

Many felt that the documentation required to obtain health insurance was an obstacle to getting the care they needed. In Massachusetts, individuals such as undocumented immigrants who are ineligible for insurance, can access the Health Safety Net program. This state funded program provides payment for health care.("Health Safety Net-HSN (Free Care): An Overview," 2010) While not actually insurance, most immigrants do not differentiate it from insurance. However, enrollment requires documentation and renewals are required frequently. Thus, whether obtaining insurance, or "Health Safety Net", immigrants still worried that by disclosing their legal status they would be vulnerable to ICE or law enforcement action and as a result some immigrants avoided using the health care system.

> I won't go to the hospital because they usually want information and if I don't have them, they call ICE. I rather stay home to feel safe. *(Haitian Creole-speaking participant)*

> I was always afraid to go to the hospital, but I forced myself when my son got sick. I got Masshealth, but as soon as I heard about the New Bedford incident *[a workplace raid to identify undocumented workers which occurred in New Bedford, Massachusetts]),* I called Masshealth and told them I was moving to another state so they can cancel it. I wanted to minimize the risk of getting caught. *(Arabic-speaking participant)*

In some cases, avoidant behavior led to neglecting health needs.

> I know a lady whose husband was deported. She has 14 cavities in her mouth and she wouldn't go to the dentist and seek medical help because of fear…*(Arabic-speaking participant)*

While fears about disclosure were prioritized, all of the groups identified cost as a further obstacle to getting health care.

### Impact of Fear on Health and Mental Health

Participants noted that their fear of deportation impacted both their physical conditions and their emotional health. For some, this resulted in missing health care appointments when ICE was in the vicinity.

> There was an ICE raid in East Boston. My mother was afraid to go to her visit… My brother was supposed to take my mom to the clinic and he couldn't go cause ICE was on the street and he was afraid. (English-speaking participant)

For others, fear was blamed for specific health outcomes such as depression and hypertension.

> The fear is causing stress and depression. People are afraid of police, afraid to go out, afraid to walk on the street. You don't want people to be scared of you, to call

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

> the police on you. How could you not have stress? I'm young. All my hair is falling out. *(Haitian Creole-speaking participant)*

> For my boyfriend, it raises his blood pressure. He is scared of everything. *(Spanish-speaking participant)*

### Additional Themes

While the purpose of this study was to understand the relationship between ICE activity and health, discrimination based on race and or ethnicity emerged as a common theme across focus groups.

> I have three strikes (a term used in baseball referring to three strikes and you are out of the game) against me; female, black, immigrant. *(Haitian Creole-speaking participant)*

> It only happens to the Hispanic. Never a White. Police always have a hidden agenda for *Hispanics. (Spanish-speaking participant)*

The Arabic-speaking group spoke about their experience with ethnic discrimination. One individual provided a story regarding her own deportation:

> They [ICE] came to my doorstep, they said you're coming with us and the officer wanted to handcuff me in front of my kids. I told him please don't do it [in] front of my kids and mom and he said you have no right these are the rules, until another officer told him to do it. When they put me in the car, on the way they started to ask me if I had any ties with Al Qaeda and they asked me if I know Bin Laden personally.… they ask me to remove my scarf (hejab). Even if it's against my religion to take it off… *(Arabic-speaking participant)*

The Arabic-speaking group was the only group to express a sense of defiance and injustice regarding ICE. They urged people to confront immigration and local law enforcement authorities and know their rights rather than remain helpless.

> I don't care anymore because I'm sick of it. Why are we asked if we're legal or not? We pay our taxes like everybody else. Get out there and know your rights! ASK, ASK, ASK, you need to know your rights. *(Arabic-speaking participant)*

## Recommendations from groups

At the end of each focus group, participants were asked to provide strategies for improving their lives in Everett. Suggestions fell into four main areas:

1. Immigrants identified the need for **additional information** on several subjects: health care access (what to expect in health care facilities), on the differences between local law enforcement and ICE, and on their rights and responsibilities as Everett residents. They felt that this information should be widely disseminated through natural channels such as churches, schools, and media outlets.

2. The majority of participants identified the need for more **advocacy** to reform immigration law, to provide drivers' licenses to all, and to expand access to higher education for undocumented children.

3. Many felt that **training** in cultural competency for police, health care workers and city hall staff would improve relationships with immigrant communities. They also felt that the workforce should be diversified to reflect the populations residing in Everett.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

   4.  Participants recommended immigrant-police **community meetings** where issues
       could be discussed and communication improved.

## Discussion

The study of social and behavioral determinants of health increasingly reveals the role that
environmental stressors play in individuals' health. Segmented assimilation theory provides
one lens through which to view the impact of these factors on integration trajectories of
immigrants. Underlying integration processes are social relationships. While it is widely
known that there is a causal link between social relationships and health (House, Landis, &
Umberson, 1988) less is known about the mechanisms and processes that inform this link. In
this study, as outlined in our framework (Fig. 1), we explored the links between "fear of
deportation" and immigrant health in an attempt to enhance our understanding of these
mechanisms.

To date, research has identified social isolation and economic segregation along racial/ethnic
lines as important determinants of heath status. So too, social capital and the accompanying
access to both tangible and psychosocial resources, has been identified as a determinant of
health (Kawachi, Subramanian, & Almeida-Filho, 2002). While studies show that
immigrants in ethnic enclaves have high social connectedness through "kin-based" networks
(relatives, extended family, other immigrants), these social networks can be fairly insular
and thereby limit access to resources such as health care, social support programs and other
city services (Viruell-Fuentes & Schulz, 2009). This has been described as "bonding" social
capital but relationships outside these networks ("bridging social capital") are also needed to
insure access to services and knowledge that support health.(Kim, Subramanian, &
Kawachi, 2006). "Trust" as a key aspect of social capital, has been linked in and of itself to
various health outcomes (Subramanian, Kim, & Kawachi, 2002). The lack of "trust" in the
institutions of a host community may diminish one's ability to establish bridging social
capital and thus result in negative health consequences (ranging from poor access to health
services to poor mental health and isolation). In this study, we identified an overarching
belief among focus group participants that those in positions of authority-police, health care
personnel, and health insurers-had power to interact with ICE and initiate the deportation
process. This belief was a major factor in undermining the "trust" that immigrants,
particularly undocumented immigrants, had for their host communities. While one might
assume that trust is expected to be less where the rule of law is weaker, this was not the case
for our participants who instead, were in fear of the way that the law is exercised. Without
trust, immigrants felt chronically insecure in their host community and were reticent to seek
care when needed. Many of the factors that contribute to the vulnerability of immigrant
communities are well described but how deportation fear contributes to this vulnerability
and subsequently to health is less well understood (Derose, Bahney, Lurie, & Escarce,
2009). Thus our findings make an important contribution to clarifying the ways in which we
conceptualize the processes that connect trust, social capital and health.

### Health consequences of deportation fear

Deportation fear had a negative effect on health at both the individual and communal level.
At the individual level, deportation fear affected healthcare access as well as emotional and
physical health. Health access was decreased as a result of required documentation and due
to the presence of police or ICE in the vicinity. While similar findings have been described
elsewhere, (Asch et al., 1998; Asch et al., 1994; Berk & Schur, 2001; Castaneda, 2009;
Magalhaes et al., 2010; McGuire & Georges, 2009) the connection between local law
enforcement activity and health status has not been previously reported

From a physical and emotional perspective, participants noted that fear of deportation exacerbated their chronic diseases such as depression, high blood pressure, and anxiety while also producing a range of physical symptoms (hair loss, headaches). Past studies of the impact of chronic fear on health have focused mainly on crime related fear for those living in disadvantaged communities. Stafford et al. (2007) postulated that fear of crime leads to avoidance of both social and physical activity. This in turn may have a long term impact on vulnerability, self-medication, and immune response (Stafford, Chandola, & Marmot, 2007).

Similar to the fear of crime, the impact of chronic deportation fear may exacerbate current health conditions while increasing vulnerability to others. It may also reverberate across populations acting as a prolonged biological stressor with associated health consequences (Castaneda, 2009). In this study, for example, the impact of deportation fear was experienced across different immigrant groups regardless of their country of origin or immigration status. When immigrant communities do not trust their community institutions, they are less likely to fully engage as members of the community. This also has implications for the health of the city in which they live (Carpiano, 2006; Subramanian et al., 2002). When immigrant groups do not trust law enforcement and abstain from reporting crime, it is difficult to maintain security. When they avoid health care for communicable diseases, it becomes difficult to maintain the public's health (Asch et al., 1998; Davis & Henderson, 2003; Lysakowski, Pearsall, & Pope, 2009).

As noted in other studies (Portes et al., 2005; Romero, Martinez, & Carvajal, 2007), the immigrants in this project also reported pervasive experiences of discrimination based not only on their immigrant status but also on their race or ethnicity. However, only the Arab participants expressed defiance over these events. Arabic communities have experienced significant profiling and discrimination since the terrorist attacks in the US on September 11, 2001 (Akram & Johnson, 2001–2003;Lauderdale, 2007). In addition, the negative depiction of Arabs as America's enemies along with repeated longterm cultural stereotyping are likely to be root causes of the defiant attitudes we encountered (Wray-Lake, Syvertsen, & Flanagan, 2008). The context of reception for Arabic speakers is particularly challenging given these realities and while much has been written about the relationship between racism and health (Krieger, 2003; Viruell-Fuentes, 2007; Williams, Neighbors, & Jackson, 2008), the specific relationship between deportation fear, racism and health in this population deserves further study.

## Recommendations

Many of the recommendations from the focus groups echoed those highlighted in a recent Massachusetts report by the Governor's Advisory Council on Refugees and Immigrants including those related to improved relationships between local law enforcement and immigrant communities (Egmont, Millona, Chacon, Tambouret, Hohn, & Borges-Mendez, 2009). As part of this CBPR study, these recommendations along with study results were presented to a large audience of immigrants, Everett city and school officials and local police for feedback and discussion. This forum produced a set of actionable citywide proposals that immigrant leaders are now taking forward. Many are actively involved with statewide advocacy groups seeking to reform national immigration law. As a first local step, the police and immigrant groups have met several times and initial reports from both community members and police suggest that communication is improving. Additionally, both parties have agreed to start a multi-lingual call-in cable TV show to discuss issues of interest, e.g., police traffic stops, domestic violence, and reporting crimes, This police/immigrant dialogue has the potential to reduce disinformation about law enforcement rules and regulations circulating among immigrants and simultaneously improve security for the

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

community as a whole. This simple measure can be an effective tool to decrease deportation fear and could be adopted by other communities facing rapid diversification.

The findings from this study have important practical implications for Everett and other communities experiencing a rapid influx of immigrants. Given the current level of increased ICE activity, it is likely that immigrants nationwide are experiencing heightened deportation fear. Strategies to improve immigrant integration need to include the civic institutions that play critical roles in immigrants' daily lives. Police departments must clarify and possibly adjust their relationships with ICE in order to develop and maintain trust with immigrant communities. Health care providers need to be aware of the stressors affecting their immigrant patients in order to provide appropriate care and health care institutions must consider ways to identify patients without creating further anxiety. Building trust will require all partners to provide a unified local response for success.

## Limitations

This study has several limitations. First, it is based on a small sample of focus group participants who were recruited from one community and may not be representative of all immigrants in Everett or in other communities. However, the primary themes identified, including fear of deportation, were consistently noted across all focus groups regardless of language spoken or country of origin and echoed previous concerns voiced by immigrants in Everett. In addition, the pivotal role of immigrant advocacy organizations in the community helped to provide a safe space for discussion and allowed us to reach populations, including the undocumented, which would otherwise be unavailable for study. Successful research with these populations requires a safe place for data collection (Marcelli, Holmes, Estella, da Rocha, Granberry, & Buxton, 2009; Marcelli, Holmes, Troncosco, Granberry, & Buxton, 2009; Suro, 2005). We acknowledge that focus group participants may have had greater social capital and less fear than others given their relationship to immigrant leaders and willingness to voice their opinions. Thus, we speculate that the themes expressed are even more likely to resonate among others who prefer to remain anonymous. Alternatively, the leaders may have recruited like-minded individuals and thereby the participants may have reflected leaders' opinions. We talked with the facilitators and found that most did not know the majority of participants in their groups, nor did they know the opinions they were likely to express. In fact, based on early discussions with the leaders, there were numerous unexpected findings in the focus groups that had not been anticipated, including the concerns surrounding the provision of documentation in health care facilities.

While we heard a great deal about stress and depression, we did not use validated tools to specifically assess these conditions and, therefore, are unable to determine whether participants suffered from specific mental health conditions.

Lastly, due to the confidential nature of the study, we were unable to record the content of the focus groups. However, by having native speakers take notes, translate information and subsequently vet the information with facilitators, we were able to obtain the important thematic content while maintaining trust.

## Conclusion

As noted in Everett, Massachusetts, perceptions about the relationship between those in positions of local authority and national immigration policy can undermine trust in community institutions. Loss of trust can further marginalize an already vulnerable population by diminishing bridging social capital. This has implications for the health of individuals and the communities in which they live. As noted by Portes and Rumbaut, (2006) the "context of reception" for immigrants – that is the policies of the receiving

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

government, conditions of the host labor market and the characteristics of ethnic communities - determine the incorporation trajectories of newcomers (Portes & Rumbaut, 2006). While national immigration reform remains elusive, each individual community - be it Everett or elsewhere – will continue to influence the integration of immigrant populations and as such be responsible for building the necessary trusting relationships to ensure immigrant health and well-being.

## Acknowledgments

This work was conducted with support from Harvard Catalyst | The Harvard Clinical and Translational Science Center (NIH Award #UL1 RR 025758 and financial contributions from Harvard University and its affiliated academic health care centers). The content is solely the responsibility of the authors and does not necessarily represent the official views of Harvard Catalyst, Harvard University and its affiliated academic health care centers, the National Center for Research Resources, or the National Institutes of Health. In addition, we would like to thank all the immigrants who shared their stories with us during the focus groups. Without them the work would not have been possible

## References

Akram SM, Johnson KR. Race, civil rights, and immigration law after September 11, 2001: The targeting of Arabs and Muslims. NYU Annual Survey American Law. 2001–2003; 58:295.

Asch S, Leake B, Anderson R, Gelberg L. Why do symptomatic patients delay obtaining care for tuberculosis? American Journal of Respiratory and Critical Care Medicine. 1998; 157(4 Pt 1):1244–1248. [PubMed: 9563746]

Asch S, Leake B, Gelberg L. Does fear of immigration authorities deter Tuberculosis patients from seeking care? Western Journal of Medicine. 1994; 161(4):373–376. [PubMed: 7817547]

Berk ML, Schur CL. The effect of fear on access to care among undocumented Latino immigrants. Journal of Immigrant Health. 2001; 3(3):151–156. [PubMed: 16228780]

Capps, R.; Castañeda, RM.; Chaudry, A.; Santos, R. Paying the Price: The impact of immigration Raids on America's Children. Washington, DC: National Council of La Raza; 2007.

Carpiano RM. Towards a neighborhood resource-based theory of social capital for health: Can Bourdieu and sociology help? Social Science & Medicine. 2006; 62:165–175. [PubMed: 15992978]

Castaneda H. Illegality as risk factor: A survey of unauthorized migrant patients in a Berlin clinic. Social Science & Medicine. 2009; 68:1552–1560. [PubMed: 19246143]

Cavazos-Rehg PA, Zayas LH, Spitznagel EL. Legal status, emotional well-being and subjective health status of Latino immigrants. Journal of the Natlonal Medical Association. 2007; 99(10):1126–1131.

Chaudry, A.; Capps, R.; Pedroza, JM.; Castaneda, RM.; Santos, R.; Scott, MM. U. Institute. Facing our future: Children in the aftermath of immigration enforcement. Washington, DC: Urban Institute; 2010.

Clayton-Mathews, A.; Karp, F.; Watanabe, P. Massachusetts Immigrants by the Numbers: Demographic Characteristics and Economic Footprint. Malden, MA: The Immigrant Learning Center, Inc; 2009.

Davis RC, Henderson NJ. Willingness to report crimes: The role of ethnic group membership and community efficacy. Crime & Delinquency. 2003; 49:564–580.

Derose KP, Bahney BW, Lurie N, Escarce JJ. Review: immigrants and health care access, quality, and cost. Medical Care Research and Review. 2009; 66(4):355–408. [PubMed: 19179539]

Egmont, W.; Millona, E.; Chacon, R.; Tambouret, N.; Hohn, M.; Borges-Mendez, R. Massachusetts New Americans Agenda. Boston, MA: 2009.

Fenton JJ, Catalano R, Hargreaves A. Effect Of Proposition 187 On Mental Health Service Use In California: A Case Study. Health Affairs. 1996; 15(1):182–190. [PubMed: 8920582]

Fix, M.; Tumlin, K. Welfare reform and the devolution of immigrant policy Series A. Washington, D.C: The Urban Institute; 1997.

Health Safety Net-HSN (Free Care). [Accessed 3/11/2011 ] An Overview. MassResources.org. 2010. http://www.massresources.org/pages.cfm?contentID=50&pageID=13&Subpages=yes

House JS, Landis KR, Umberson D. Social relationships and health. Science. 1988; 241(4865):540–545. [PubMed: 3399889]

Ichikawa M, Nakahara S, Wakai S. Effect of post-migration detention on mental health among Afghan asylum seekers in Japan. Australian and New Zealand Journal of Psychiatry. 2006; 40(4):341–346. [PubMed: 16620316]

Israel BA, Schulze AJ, Parker EA, Becker AB. Review of Community-Based Research: Assessing partnership approaches to improve public health. Annual Review of Public Health. 1998; 19:173–202.

Kawachi I, Subramanian SV, Almeida-Filho N. A glossary for health inequalities. Journal of Epidemiology & Community Health. 2002; 56(9):647–652. [PubMed: 12177079]

Keller AS, Rosenfeld B, Trinh-Shevrin C, Meserve C, Sachs E, Leviss JA, et al. Mental health of detained asylum seekers. Lancet. 2003; 362(9397):1721–1723. [PubMed: 14643122]

Kim D, Subramanian SV, Kawachi I. Bonding versus bridging social capital and their associations with self rated health: a multilevel analysis of 40 US communities. Journal of Epidemiology & Community Health. 2006; 60(2):116–122. [PubMed: 16415259]

Krieger N. Does racism harm health? Did child abuse exist before 1962? On explicit questions, critical science, and current controversies: an ecosocial perspective. American Journal of Public Health. 2003; 93(2):194–199. [PubMed: 12554569]

Lauderdale DS. Birth outcomes for Arabic-named women in California before and after September 11. Demography. 2007; 43(1):185–201. [PubMed: 16579214]

Lysakowski, M.; Pearsall, AA.; Pope, J. Policing in new immigrant communities. U. S. Department of Justice; Washington, D.C: 2009.

Magalhaes L, Carrasco C, Gastaldo D. Undocumented migrants in Canada: a scope literature review on health, access to services, and working conditions. Journal of Immigrant and Minority Health. 2010; 12(1):132–151. [PubMed: 19657739]

Marcelli, E.; Holmes, L.; Estella, D.; da Rocha, F.; Granberry, P.; Buxton, O. (In)Visible (Im)migrants: The health and socioeconomic integration of Brazilians in metropolitan. Boston. San Diego, California: Center for Behavioral and Community Health Studies, San Diego State University; 2009.

Marcelli, E.; Holmes, L.; Troncosco, M.; Granberry, P.; Buxton, O. Permanently temporary: The health and socioeconomic integration of Dominicans in metropolitan. Boston. San Diego, California: Center for Behavioral and Community Health Studies, San Diego State University; 2009.

Massachusetts Immigrant and Refugee Advocacy Coalition. New Bedford Immigration raids. Boston, MA: 2010. http://www.miracoalition.org/home/new-bedford-immigration-raids

McGuire S, Georges J. Undocumentedness and liminality as health variables. Advances in Nursing Science. 2009; 26(3):185–195. [PubMed: 12945654]

Miller KE, Rasmussen A. War exposure, daily stressors, and mental health in conflict and post-conflict settings: Bridging the divide between trauma-focused and psychosoical frameworks. Social Science & Medicine. 2010; 70:7–16. [PubMed: 19854552]

Miller TA. Blurring the boundaries between immigration and crime control after September 11th. Boston College Third World Law Journal. 2005; 25(1):1–43.

Portes A, Fernandez-Kelly PWH. Segmented assimilation on the ground: The new second generation in early adulthood. Ethnic and Racial Studies. 2005; 28(6):1000–1040.

Portes, A.; Rumbaut, RG. Immigrant America. Berkeley and Los Angeles, CA: University of California Press; 2006.

Rodriguez, C.; Chishti, M.; Capps, R.; StJohn, L. A program in flux: New priorities and implementation challenges for 287 (g). Washington, D.C: Migration Policy Institute; 2010.

Rodriguez MA, Bustamante AV, Ang A. Perceived quality of care, receipt of preventive care, and usual source of health care among undocumented and other Latinos. Journal of General Internal Medicine. 2009; 24(Suppl 3):508–513. [PubMed: 19841999]

Romero AJ, Martinez D, Carvajal SC. Bicultural stress and adolescent risk behavriors in a community sample of Latinos and Non-Latino european Americans. Ethnicity and Health. 2007; 12(5):443–463. [PubMed: 17978943]

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

Silove D, Steel Z, Mollica RF. Detention of asylum seekers assault on health, human rights, and social development. Lancet. 2001; 357:1436–1437. [PubMed: 11356469]

Stafford M, Chandola T, Marmot M. Association between fear of crime and mental health and physical functioning. American Journal of Public Health. 2007; 97(11):2076–2081. [PubMed: 17901443]

Steinberg, N. Policy Analysis Exercise. Boston, MA: The Urban Institute; 2008. Caught in the middle: Undocumented immigrants between federal enforcement and local integration.

Suarez-Orozco C, Suarez-Orozco MM. Educating Latino immigrant students in the twenty-first century: Principles for the Obama administration. Harvard Educational Review. 2009; 79(2):327–340.

Subramanian SV, Kim DJ, Kawachi I. Social trust and self-rated health in US communities: a multilevel analysis. Journal of Urban Health. 2002; 79(4 Suppl 1):S21–34. [PubMed: 12473696]

Suro, R. Attitudes about immigration and major demographic characteristics. Washington, D.C: Pew Hispanic Center; 2005.

Torres AM, Sanz B. Health care provision for illegal immigrants: should public health be concerned? Journal of Epidemiology & Community Health. 2000; 54(6):478–479. [PubMed: 10818127]

U.S. Census Bureau. [Accessed 3/11/2011] State and County Quickfacts. 2010. http://quickfacts.census.gov/qfd/states/25/2521990.html

U.S. Immigration and Customs Enforcement. ICE Fiscal Year 2008 Annual Report. Washington, D.C: U.S. Immigration and Customs Enforcement; 2009.

Viruell-Fuentes EA. Beyond acculturation: Immigration, discrimination, and health research among Mexicans in the United States. Social Science & Medicine. 2007; 65(7):1524–1535. [PubMed: 17602812]

Viruell-Fuentes EA, Schulz AJ. Toward a dynamic conceptualization of social ties and context: implications for understanding immigrant and Latino health. American Journal of Public Health. 2009; 99(12):2167–2175. [PubMed: 19833986]

Williams DR, Neighbors HW, Jackson JS. Racial/Ethnic discrimination and health: Findings from community studies. American Journal of Public Health. 2008; 98(Supplement 1):S29–S37. [PubMed: 18687616]

Wray-Lake L, Syvertsen AK, Flanagan CA. Contested Citzenship and social exclusion: Adolescent Arab American immigrants' views of the social contract. Applied Development Science. 2008; 12(2):84–92.

www.Eyewitness News 3. New Haven Approves Immigrant ID Cards. Vol. 3. Hartford, CT: Eyewitness News; 2007. http://www.wfsb.com/news/13444574/detail.html

Xie, Y.; Greenman, E. Research Reports. Ann Arbor, Michigan: Population Studies Center, University of Michigan; 2005. Segmented assimilation theory: A reformulation and empirical test.

Zhou M. Segmented assimilation: Issues, controversies, and recent research on the new second generation. International Migration Review. 1997; 31(4):975–1008. [PubMed: 12293212]

Research highlights

- Uses a community Based Participatory Research approach to examine the impact of US immigration enforcement policies on daily lives.
- It contributes to our understanding of the mechanisms that undermine immigrant trust, social capital and health
- One of the few studies to identify common impediments to integration across immigrant groups of mixed documentation status
- By providing new perspectives on the acculturation paradigm, this study helps operationalize the "context of reception"

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript



**Figure 1.**
Impact of ICE Activities on Immigrant Health *Conceptual Framework*

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

**Table 1**

Demographics of the Focus Groups

| | Total | Arabic | Portuguese | Haitian Creole | Spanish | English 1 | English 2 |
|---|---|---|---|---|---|---|---|
| | N=52 *N* | N=8 *N* | N=8 *N* | N=8 *N* | N=8 *N* | N=8 *N* | N=12 *N* |
| **Age** | | | | | | | |
| 19–29 | 15 | 3 | 4 | 3 | 2 | 2 | 1 |
| 30–45 | 17 | 2 | 2 | 3 | 4 | 3 | 3 |
| 46–59 | 16 | 3 | 1 | 0 | 1 | 3 | 8 |
| >60 | 4 | 0 | 1 | 2 | 1 | 0 | 0 |
| **Country of Origin** | | | | | | | |
| Morocco | 8 | 8 | | | | | |
| Brazil | 18 | | 8 | | | 3 | 7 |
| Haiti | 11 | | | 8 | | 1 | 2 |
| El Salvador | 9 | | | | 5 | 2 | 2 |
| China | 2 | | | | | 2 | |
| Peru | 2 | | | | 2 | | |
| Guatemala | 1 | | | | 1 | | |
| Columbia | 11 | | | | | | 1 |
| **Documented** | | | | | | | |
| Yes | 19 | 1 | 0 | 6 | 4 | 6 | 2 |
| No | 33 | 7 | 8 | 2 | 4 | 2 | 10 |
| **Gender** | | | | | | | |
| Male | 19 | 2 | 6 | 5 | 2 | 2 | 2 |
| Female | 33 | 6 | 2 | 3 | 6 | 6 | 10 |
| **Education*** | | | | | | | |
| Primary | 8 | 2 | 1 | 2 | 2 | 0 | 1 |
| Some High School | 21 | 2 | 3 | 3 | 4 | 1 | 8 |
| High School Grad | 11 | 2 | 4 | 1 | 1 | 3 | 3 |
| Some College | 4 | 1 | 0 | 0 | 0 | 1 | 0 |
| Completed College | 8 | 1 | 0 | 0 | 1 | 3 | 0 |

| | Total | Arabic | Portuguese | Haitian Creole | Spanish | English 1 | English 2 |
|---|---|---|---|---|---|---|---|
| | **N=52** *N* | **N=8** *N* | **N=8** *N* | **N=8** *N* | **N=8** *N* | **N=8** *N* | **N=12** *N* |
| **City** | | | | | | | |
| Everett | 36 | 7 | 8 | 5 | 5 | 2 | 9 |
| Other | 16 | 1 | 0 | 3 | 3 | 6 | 3 |
| **Health Insurance** | | | | | | | |
| Yes | 39 | 8 | 5 | 6 | 6 | 7 | 7 |
| No | 13 | 0 | 3 | 2 | 2 | 1 | 5 |
| **Saw a Doctor in Last Year** | | | | | | | |
| Yes | 37 | 6 | 4 | 6 | 6 | | 8 |
| No | 15 | 2 | 4 | 2 | 2 | 1 | 4 |

* Two of the Haitian Creole group did not respond to the Education question

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

# EXHIBIT 55

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536

January 31, 2025

MEMORANDUM FOR: Russell Hott
Acting Executive Associate Director
Enforcement and Removal Operations

Robert Hammer
Acting Executive Associate Director
Homeland Security Investigations

FROM: Caleb Vitello
Acting Director

SUBJECT: Common Sense Enforcement Actions in or Near Protected Areas

---

On January 20, 2025, Acting Secretary Benjamine C. Huffman issued a memorandum titled, *Enforcement Actions in or Near Protected Areas*, superseding and rescinding effective immediately the October 27, 2021, *Guidelines for Enforcement Actions in or Near Protected Areas* memorandum from former Secretary Alejandro N. Mayorkas. The Acting Secretary's memorandum acknowledges the ability of the Department's law enforcement personnel to apply enforcement discretion to balance a variety of interests, including the degree to which law enforcement actions occur in protected areas. [1]

For this reason, the Department will not be issuing bright line rules regarding where immigration laws are permitted to be exercised. Instead, the Acting Secretary authorized the Director of U.S. Immigration and Customs Enforcement (ICE) and the Commissioner of U.S. Customs and Border Protection to issue further guidance to assist law enforcement personnel in exercising appropriate enforcement discretion.

---

[1] For purposes of ICE immigration enforcement action, protected areas include schools (pre-schools through post-secondary, including colleges, universities, and vocational and trade schools); hospitals; churches, synagogues, mosques, or other institutions of worship; and a site during the occurrence of a public demonstration, such as a march, rally, or parade.

I have great faith in the judgment of our law enforcement personnel and, accordingly, charge Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area. AFODs and ASACs may provide authorization for such actions either verbally or in writing. Before authorizing an immigration enforcement action at a site where a public demonstration is underway, AFODs and ASACs must consult with local Office of the Principal Legal Advisor leadership for guidance on constitutional considerations.

Any further guidance your Directorates develop should be coordinated together and developed in consultation with the ICE Office of Regulatory Affairs and Policy and OPLA to ensure consistency and legal sufficiency.

Disclaimer

This guidance does not, is not intended to, and may not be construed to create or modify any right or benefit, substantive or procedural, enforceable at law by any party against the United States, its agencies, its officers, or any person.

Distribution:

Deputy Director
Executive Associate Director, Enforcement and Removal Operations
Executive Associate Director, Management and Administration
Associate Director, Office of Professional Responsibility
Principal Legal Advisor
Assistant Director, Office of Civil Rights Compliance
Assistant Director, Office of External Affairs
Assistant Director, Office of Firearms and Tactical Programs
Assistant Director, Office of Regulatory Affairs and Policy
Chief of Staff, Office of the Director
Deputy Chief of Staff, Office of the Director

# EXHIBIT 56

# Trump's early actions drive Baltimore-area immigrants into hiding

John-John Williams IV

2/10/2025 5:30 a.m. EST

"Fear, cruelty and chaos is the point," says Vanessa Cardenas, executive director of America's Voice, a national pro-immigration organization based in Washington, D.C. (Westend61/Getty Images)

Subscribe for $1

Sign In

Case 8:25-cv-00243-TDC Document 49-3 Filed 02/11/25 Page 329 of 353
PYM-000672

Carlos Raba, co-owner and executive chef of Remington's Clavel, says he has already lost two employees because of President Donald Trump's aggressive immigration policies.

A dishwasher from Nicaragua returned to his country on Saturday. Another employee, who Raba described as his "right hand," also left the restaurant in recent days, to return to Honduras.

"They don't want to be incarcerated or handcuffed. Who wants to be treated like that?" said Raba, who was nominated as the James Beard Award's Best Chef: Mid-Atlantic in 2022. He also owns Nana, a taqueria in Towson.

Across the Baltimore region, immigrants, regardless of status, have responded to Trump's tough talk and early moves on immigration by altering their routines.

The Baltimore Banner thanks its sponsors. Become one.

Some have pulled back from more public venues. Others, including Raba's employees, are avoiding the scrutiny of Immigration and Customs Enforcement (ICE) and are leaving the country.

**Additional stories by John-John Williams IV**

- Maryland's immigrant support groups see a surge in requests following Trump win
- Is a welcoming Maryland ready for an increase in its immigrant populations?

Subscribe for $1

**ceremony**

People who work with the immigrant community said they have noticed a significant dip in attendance at church services, in school and at outreach programs ranging from recreational to educational.

They attribute that decrease to a frightened population. Some are undocumented, some are scared of getting caught up in sweeps even if they are documented, and there's widespread intimidation from the government's anti-immigrant sentiment.

President Donald Trump signs a series of executive orders in the Oval Office during his first week in office. (Anna Moneymaker / Getty Images)

Subscribe for $1

In his first month as a returning president, Trump has signed at least 10 orders and actions related to immigration, many of them controversial. Federal judges have blocked his effort to end birthright citizenship for children of parents who are in the U.S. illegally. His administration has fanned talk of mass ICE raids, and said it is stepping up use of a U.S. naval base at Guantanamo Bay as a detention for migrants.

Trump has repeatedly said the crackdown on immigration is a result of an effort to reduce crime. His administration has also said that the act of entering this country illegally is a criminal act. Opponents have pushed back on both assertions.

The Baltimore Banner thanks its sponsors. Become one.

Making immigrants so uncomfortable that they voluntarily return to their home countries is a goal of the Trump administration, said Vanessa Cardenas, executive director of America's Voice, a national pro-immigration organization based in Washington, D.C.

"Fear, cruelty and chaos is the point," she said. "That is the most troubling about this situation that we face right now."

Subscribe for $1

2/10/25, 11:12 AM President Trump's early actions drive Baltimore-area immigrants into hiding - The Baltimore Banner
PYM-000675

Annette Karanja, a Baltimore County community activist working primarily with the East African immigrant population. (Courtesy of Annette Karanja)

Annette Karanja, a Baltimore County community activist working primarily with the East African immigrant population, said she knows of an immigrant who recently quit her job at a cleaning company because she felt "super exposed at

Subscribe for $1

https://www.thebaltimorebanner.com/politics-power/national-politics/trump-executive-orders-baltimore-immigrants-hiding-EWZ5WGNEBVDGNNR6LB… 5/15

"People have adjusted their behavior. They are more vigilant," Karanja said. "They are less likely to interact with government institutions" such as those that provide food assistance.

Because many immigrants are from mixed status families, they are also hesitant about being so visible, Karanja said.

The Baltimore Banner thanks its sponsors. Become one.

About 13,000 undocumented people reportedly live in Baltimore, according to the most recently available Census data. The city's foreign-born residents make up about 8% of the city's total population, or about 45,000 people, city officials say.

Mark Parker, the councilman representing Southeast Baltimore's District 1, has seen a decreased presence among immigrant populations.

After a report last month of ICE agents arresting people at a food distribution parking lot in Montgomery County, there was a 30% drop in the number of immigrants going to Baltimore City distribution locations, Parker said he has been told by distribution operators.

Subscribe for $1

Mark Parker, the councilman representing Southeast Baltimore's District 1, says the church where he is an associate pastor has seen Latino attendance drop. (Ulysses Muñoz/The Baltimore Banner)

Even though the report about the ICE arrests in Montgomery County was later found to be false, Parker said he and others needed to convince parishioners to return to the feeding ministry at Breath of God Lutheran Church in Highlandtown, where he is an associate pastor.

"It's hard for people to make decision when they don't know what information they can trust," he said.

The Baltimore Banner thanks its sponsors. Become one.

Subscribe for $1

He said Sunday morning bilingual worship services have seen an 80% drop in attendance among Latino congregants since January.

But other churches with large Latino congregations haven't seen their pews emptying. Father Ako Walker, pastor of Sacred Heart of Jesus Catholic Church in Highlandtown, where migrants make up 95% of the 2,500 families that attend, said he believes that people have strengthened their faith during these tense times.

Instead, Walker has been told that, outside of church, his migrant congregants are trying to keep out of public places, staying indoors "as much as possible."

"There is the fear that ICE might nab them," he said.

One Honduran member of the church who has lived in the United States for the past 16 years, said his family has stopped frequenting restaurants, stores and other establishments "because of the fear that surrounds them."

The Baltimore Banner thanks its sponsors. Become one.

The church member, who requested anonymity for fear of deportation, owns a furniture store and said Trump's policies have created apprehension for them to operate it.

Subscribe for $1

2/10/25, 11:12 AM President Trump's early actions drive Baltimore-area immigrants into hiding - The Baltimore Banner
PYM-000879

ALEXANDER
Jewelry
CH BEAUTY SALON
ROPA COLOMBIANA
HIGHLANDTOWN

The city's foreign-born residents make up about 8% of the city's total population. Neighborhoods including Highlandtown are home to many Latinos. (Ulysses Muñoz / The Baltimore Banner)

He said he is not alone in his feelings.

"I can see the fear in the parishioners," he said, adding that he is undocumented and has never committed a crime.

The groups that Cardenas' organization works with are reporting noticeable absences among immigrants, particularly in schools.

"People are pulling back," she said. "There is a lot of concern about people being able to function day-to-day."

Subscribe for $1

https://www.thebaltimorebanner.com/politics-power/national-politics/trump-executive-orders-baltimore-immigrants-hiding-EWZ5WGNEBVDGNNR6LB... 9/15

The reticence among parents was evident late last month at Baltimore City College when the school was abuzz with unsubstantiated reports of ICE showing up on the campuses. At City College that day, multiple parents did not want to be named when interviewed by a Baltimore Banner reporter.

Officials with the Baltimore City and Baltimore County school systems did not respond to a request seeking recent attendance data.

Mary Kate Schneider, director of global studies at Loyola University Maryland, is not surprised to hear that immigrants have become less visible since Trump has come into power.

"They have done the job of drumming up fear among the population," she said. "This is absolutely by design."

Trump's actions in his second term have been much "swifter" because Trump has been able to remove "institutional obstacles" he faced his first presidency, she said.

"Courts are more favorable to him," Schneider said. "He's been quick to assemble a team of loyalists around him."

*Baltimore Banner reporters Ellie Wolfe and Maya Lora contributed to this story.*

**John-John Williams IV**

johnj.williams@thebaltimorebanner.com

John-John Williams IV is a diversity, equity and inclusion reporter at The Baltimore Banner. A native of Syracuse, N.Y. and a graduate of Howard University, he has lived in Baltimore for the past 17 years.

**Subscribe for $1**

# EXHIBIT 57



ⓘ BETA S › BUSINESS

BREAKING

# Everything To Know About Trump's 'Mass Deportation' Plans: DHS Head Noem Suggest Non-Violent Immigrants Could Be Sent To Guantanamo

**Sara Dorn** Forbes Staff
*Sara Dorn is a Forbes news reporter who covers politics.*

**Molly Bohannon** Forbes Staff
*Molly Bohannon has been a Forbes news reporter since 2023.*

9

Feb 9, 2025, 10:01am EST

**TOPLINE** Homeland Security Secretary Kristi Noem did not rule out Sunday that the Trump administration could try to send undocumented immigrants who have committed non-violent crimes like shoplifting to Guantanamo Bay, amid the administration expanding its facilities at the prison complex, as the U.S. carries out what President Donald Trump said would be the "largest deportation operation" in its history.



ⓘ BETA

The White House said the "largest deportation operation" in U.S. history was underway. COPYRIGHT 2023 THE ASSOCIATED PRESS. ALL RIGHTS RESERVED

**TIMELINE**

- **Feb. 9**

  When asked on CNN if the Trump administration could send undocumented immigrants found guilty of non-violent offenses—like theft or shoplifting—to Guantanamo Bay, Noem did not rule out the possibility, saying she "doesn't know what the president will decide" in terms of utilizing the facility for immigration detention and indicating it will have "different levels of incarceration."

- **Feb. 7**

  Noem visited Guantanamo Bay as the Trump administration expands its use of the complex to detain undocumented immigrants, creating what The New York Times describes as a "tent city" on the U.S. Navy base, with Noem's visit coming as more than 30 immigrants, whom the Trump administration said belonged to a Venezuelan gang, were transported to the facility.

- **Feb. 6**

The Justice Department filed a lawsuit in the Northern District of Illinois

ⓘ BETA eging immigration policies in Illinois and Chicago are "designed to and interfere with" the Trump administration's immigration efforts, as prosecutors requested those policies—including Chicago's "Welcoming City" ordinance—to be blocked.

- **Feb. 4**

Secretary of State Marco Rubio said El Salvador's President Nayib Bukele proposal to jail deportees, including American convicts, was "a very generous offer," but added: "There are obviously legalities involved ... We'll have to study it and see how something like that can even be applied," The New York Times reported.

- **Feb. 4**

Leavitt confirmed the first flights of migrants to Guantánamo Bay—where Trump said the U.S. is building a massive facility to house up to 30,000 deported migrants—were underway while speaking on Fox Business, though she did not specify how many people were flown to the naval base or where they will go after that.

- **Feb. 4**

In addition to El Salvador agreeing to hold deportees in its prisons, Leavitt said Venezuela "agreed to repatriation flights" and Colombia "agreed to cooperate with the repatriation of illegal Colombian nationals that we have found" in our country.

- **Feb. 3**

Bukele agreed to take in deportees from the U.S. of any nationality, including American criminals, and hold them in the country's infamous and controversial mega-prison, CECOT, in exchange for a fee that Bukele

said "would be relatively low for the U.S. but significant for" El Salvador as part of a way for the U.S. to "outsource part of its prison system."

ⓘ BETA

- **Feb 3**

Homeland Security Secretary Kristi Noem released an order set to be published in the Federal Register on Wednesday that will remove the temporary protected status designation of an estimated 348,202 Venezuelans, giving them 60 days from when the order is published until they lose the right to work in the U.S.

- **Jan. 29**

Defense Department officials said Immigration and Customs Enforcement will house arrested migrants at the Buckley Space Force Base near Aurora, Colorado, as the Denver metro area is reportedly among the initial target areas for ICE arrests.

- **Jan. 29**

Trump said he will sign an executive order instructing the Departments of Defense and Homeland Security to construct a facility capable of holding 30,000 deported migrants at Guantánamo Bay naval base as immigration officials have made approximately 6,000 arrests since Trump took office, including 1,016 on Jan. 29, straining Homeland Security's network of detention facilities that were already nearing capacity before the Trump administration ramped up arrests.

- **Jan. 27**

Immigration and Customs Enforcement said it arrested 1,179 people, the largest figure since Trump took office—compared to 308 arrests on Trump's first full day in office, and 282 arrests per day in September before Trump took over.

- **Jan. 27**

Trump, at a conference for House Republicans in Miami, said he wants

ⓘ BETA

ople who have been arrested "many, many times" to get "the hell out of our country," suggesting he could pay foreign countries a "small fee" for them to maintain American prisoners so the United States could cut spending on government-owned and private prisons.

- **Jan. 27**

Several Quaker groups filed a lawsuit against the Department of Homeland Security over Trump's decision to end ICE's prohibition on operating in churches, alleging Trump's policy "deters congregants from attending services" and "is a violation of every individual's constitutional right to worship and associate freely," Skye Perryman, president and CEO of the nonprofit Democracy Forward, which is facilitating legal representation for the plaintiffs, told NBC.

- **Jan. 26**

The administration said arrests could pick up quickly: The Washington Post reports ICE officials have been told to aim for 1,200 to 1,500 daily arrests, including at least 75 arrests by each of the agency's roughly two dozen field offices.

- **Jan. 26**

ICE said it launched "enhanced targeted operations" in Chicago in partnership with the FBI and other federal agencies, while immigration enforcement actions were also reported in Atlanta, Puerto Rico, Colorado, Los Angeles and Austin, Texas, according to CNN.

- **Jan. 26**

White House Border Czar Tom Homan, who was on the ground in Chicago alongside Acting Deputy Attorney General Emil Bove, told CNN

ICE would initially prioritize "criminal aliens" and "as many public safety and national security threats as possible."

ⓘ BETA

- **Jan. 26**

  The White House said Colombia backed down from its promise to block military deportation flights, after Trump threatened tariffs and economic sanctions against the country if it did not accept U.S. military planes carrying deported migrants.

- **Jan. 25**

  Brazil's Ministry of Foreign Affairs demanded answers over what it said was "degrading treatment" of deportees on a U.S. military flight that arrived there on Jan. 24 carrying 88 passengers, some of whom arrived in handcuffs.

- **Jan. 21**

  ICE and Border Patrol agents have been ordered to deport people who cross the border without authorization immediately and conduct "expedited removals" for people found within the interior of the United States, CBS reported, while major raids are expected in various cities.

- **Jan. 20**

  Trump signed a string of executive orders targeting immigration shortly after he was sworn in: The military was ordered to the border, migrants can no longer make advance appointments with border officials, parole programs were suspended and migrants must wait in Mexico while their asylum cases play out.

## WHEN DID THE MASS ARRESTS AND DEPORTATIONS START?

Deportation flights began on Jan. 23 as the "largest deportation operation" in U.S. history was underway, according to the White House. It remains to

be seen whether the number of deportations surpass the number under Biden—which was greater than the number under the first Trump administration.

ⓘ BETA

### WHERE WILL THE DEPORTATIONS HAPPEN?

The Trump administration is reportedly aiming to make examples of sanctuary cities—which have policies not to cooperate with the federal government on immigration enforcement—by conducting mass arrests there first, according to the Wall Street Journal. NBC lists Chicago, New York, Los Angeles, Denver and D.C. as possible early targets, citing unnamed sources. Cities with large immigration shelter systems, including Los Angeles, Denver and Miami, are also targets, the Journal reported. ICE said it conducted operations in Chicago and Newark, New Jersey, in late January, though it's not immediately clear whether the operations were linked to the agency's larger deportation efforts.

### WHO IS BEING TARGETED?

Trump has repeatedly emphasized that migrants accused of crimes will be the initial targets for deportation, but he's also said all migrants in the U.S. illegally could be subject to deportations—and many arrestees reportedly didn't have criminal records. Homan has said ICE could arrest more undocumented immigrants who aren't suspected of crimes but were found near people who were ICE targets, a practice known as "collateral arrests." Meanwhile, the Trump administration expanded a policy that allows federal officials to expedite deportations for migrants who can not prove they have applied for asylum and have been in the U.S. for less than two years. Previously, officials were only allowed to process migrants for expedited removal who were apprehended within 100 miles of the border and could prove they had been in the U.S. for at least two weeks, but the expanded policy applies to the entire U.S. The American Civil Liberties Union has challenged the expanded expedited removal rule in court.

### WHY ARE 'MASS DEPORTATIONS' DIFFICULT?

While Trump has said the deportations would begin "very quickly," some of the operations will likely require Congress to approve additional funding, as ⓘ BETA already faces a budget shortfall to maintain existing deportation levels in the current spending plan that expires on March 14, according to NBC. There are also a limited number of beds to hold people in pre-deportation and planes to use for deportation flights, though Trump ordered the military to assist with aircraft and detention space—and removals are only possible if countries are willing to accept deportees, posing a challenge as some countries like Colombia push back.

**Exclusive Invitation: Save up to 60% on a Forbes Membership**

Email address

Get Offer

By signing up, you agree to receive this newsletter, other updates about Forbes and its affiliates' offerings, our Terms of Service (including resolving disputes on an individual basis via arbitration), and you acknowledge our Privacy Statement. Forbes is protected by reCAPTCHA, and the Google Privacy Policy and Terms of Service apply.

## HOW ARE LOCAL OFFICIALS PREPARING?

Leaders in sanctuary cities are taking a mixed approach. Some, including in New York City and Philadelphia, have softened their rhetoric against Trump's hardline immigration policies, apparently aware that criticizing the initiatives could make them targets for raids. Philadelphia Mayor Cherelle Parker and District Attorney Larry Krasner did not answer directly when asked by NBC in recent days whether the city was a sanctuary city, for example. New York City Mayor Eric Adams has continued to own the label, but he has criticized the Biden administration as the city has dealt with an influx of migrants over the past year. Other local leaders in sanctuary cities, including in Chicago and Denver, have doubled down on their vows to protect migrants in the wake of Trump's election. Denver Mayor Mike Johnston suggested that citizens and local police could team together to physically prevent ICE arrests, he told the Denverite.

## HAVE CITIZENS BEEN CAUGHT UP IN RAIDS?

Newark Mayor Ras Baraka said on Jan. 23 that ICE agents raided a "local establishment" without a warrant and detained "undocumented residents"

ⓘ BETA

ell as some U.S. citizens. Among the detainees was a U.S. military veteran, who Baras said "suffered the indignity of having the legitimacy of his military documentation questioned." ICE reportedly said the agency may encounter U.S. citizens while conducting operations and may request identification to "establish an individual's identity," citing the Newark raid.

#### DO CHURCHES PROVIDE COVER FOR MASS DEPORTATIONS?

No. The Trump administration announced on Jan. 21 it was cancelling a policy preventing ICE from making arrests in schools, churches and hospitals. The administration has also indicated it could conduct raids at workplaces, a tactic the Biden administration typically avoided.

#### HOW DOES THE LAKEN RILEY ACT IMPACT DEPORTATIONS?

It subjects more people to immediate deportations by instructing federal officials to detain and deport undocumented migrants accused of minor crimes, such as shoplifting, before they're actually convicted. It's unclear how quickly ICE can begin implementing the law, which passed Congress on Jan. 22, as the agency has said it needs an additional $27 billion in funding to carry out the new measures.

#### WHAT SPECIAL POWERS HAS TRUMP GIVEN LAW ENFORCEMENT TO DEPORT PEOPLE?

In addition to empowering ICE to raid previously protected venues, Trump ordered the FBI, DEA, ATF, U.S. Marshals and the Bureau of Prisons to scan their databases for information on the possible whereabouts and identities of undocumented migrants in the U.S. The president also instructed federal officials to investigate local authorities that interfere with the new anti-immigration measures, according to a Justice Department memo sent Jan. 21 and obtained by NBC News.

#### HOW IS MEXICO PREPARING FOR MASS DEPORTATIONS?

Border towns have begun to erect tents where migrants who travel to the border and realize they can not cross under the new Trump-era restrictions

can take refuge, The Associated Press reported. The Mexican government is building shelters in nine border cities to receive deportees and will bus some ⓘ BETA le to their home cities, according to the AP. Mexico also initially refused to take a deportation flight—along with Colombia—though administration officials say it was later cleared up, according to multiple reports.

## HOW MUCH WILL MASS DEPORTATIONS COST?

The pro-immigration American Immigration Council estimates a one-time push to deport all 11 million undocumented immigrants would cost $315 billion, while deporting one million people a year would cost $88 million annually. The operation could also have economic impacts, the group notes, including lost tax revenue, less consumer spending and labor shortages—especially in industries like agriculture and construction. Trump has defended the costs, saying there is "no price tag" for his mass deportation plans and "we have no choice."

## FURTHER READING

House Passes Laken Riley Act—Likely First Bill Trump Signs Into Law (Forbes)

Can Trump End Birthright Citizenship? What To Know After Judge Blocks Executive Order (Forbes)

Trump's Executive Orders: Here Are All His Big Day-One Actions On Immigration, Energy, TikTok And More (Forbes)

**Sara Dorn** Follow

Sara Dorn is a Forbes news reporter who covers politics, with a focus on elections and Capitol Hill. She joined Forbes in 2022 and is based in New York. She's... **Read More**

**Molly Bohannon**

Molly Bohannon is a reporter on the news team, where she covers a range of breaking news stories including politics, foreign and national news, and the intersection of... **Read More**

# EXHIBIT 58



NATIONAL SECURITY

# Trump is 'angry' that deportation numbers are not higher

Arrests and deportations of undocumented people are lower than what President Donald Trump has promised, and that is "driving him nuts," one source told NBC News.

00:16 / 02:03

Get more news LIVE on NBC NEWS NOW.

Feb. 7, 2025, 3:28 PM CST / Updated Feb. 7, 2025, 4:48 PM CST

**By Kristen Welker and Julia Ainsley**

WASHINGTON – Agents at Immigration and Customs Enforcement are under increasing pressure to boost the number of arrests and deportations of undocumented immigrants, as President Donald Trump has expressed anger that the amount of people deported in the first weeks of his administration is not higher, according to three sources familiar with the discussions at ICE and the White House.

A source familiar with Trump's thinking said the president is getting "angry" that more people are not being deported and that the message is being passed along to "border czar" Tom Homan,

Homeland Security Secretary Kristi Noem, White House Deputy Chief of Staff Stephen Miller and acting ICE Director Caleb Vitello.

“It’s driving him nuts they’re not deporting more people,” said the person familiar with Trump’s thinking.

“After four years of the Biden administration’s outright incompetence and negligence, the Trump administration has re-established a no-nonsense enforcement of and respect for the immigration laws of the United States,” Kush Desai, a White House spokesperson, said in a statement. “Hundreds of violent, predatory, and gang-affiliated criminal illegal aliens have already been rounded up and deported by ICE since President Trump took office – and the Trump administration is aligned on securing our borders and ensuring that mass deportations are conducted quickly and effectively to put Americans and America First.”

A source familiar with internal conversations at ICE said Homan has a daily conference call with ICE agents in which he has been known to express his frustration with ICE numbers.

Another source said Homan is “unhappy” and has “made his unhappiness known” about the relatively low numbers of arrests and deportations.

Meanwhile at ICE, Vitello told agents in January to aim to meet a daily quota of 1,200-1,400 arrests. According to numbers ICE has posted on X, the highest single day total since Trump was inaugurated was just 1,100, and the number has fallen since that day. On Tuesday of this week, arrests of immigrants were over 800, according to a source familiar with the numbers. But last weekend, there were only about 300 arrests, another source told NBC News.

In order to fulfill Trump’s Inauguration Day promise of “millions and millions” of deportations, the Trump administration would have to be deporting over 2,700 immigrants every day to reach 1 million in a year.

And, as NBC News has reported, arrests do not always equal immediate detentions, much less deportations. Of the more than 8,000 immigrants arrested in the first two weeks of the Trump administration, 461 were released, according to the White House.

---

Kristen Welker

Kristen Welker is the moderator of "Meet the Press."

---

# EXHIBIT 59

PYM-000693

← **Post**

Secretary Kristi Noem
@Sec_Noem

7 AM in NYC. Getting the dirt bags off the streets.

POLICE
ICE
ICE
ICE

