```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                         GREENBELT DIVISION

 3  _____
                                       )
    PHILADELPHIA YEARLY MEETING OF      )
 4  THE RELIGIOUS SOCIETY OF            )
    FRIENDS ET. AL.,                    )
 5                                      )
         Plaintiffs,                    )
 6                                      )Docket Number
              vs.                       )8:25-cv-00243-TDC
 7                                      )
    U.S. DEPARTMENT OF HOMELAND         )
 8  SECURITY,                           )
                                        )
 9       Defendant.                     )
    _____)
10                   TRANSCRIPT OF TRO HEARING
11          BEFORE THE HONORABLE THEODORE D. CHUANG
                UNITED STATES DISTRICT COURT JUDGE
12          THURSDAY, FEBRUARY 13, 2025, AT 10:30 A.M.

13  APPEARANCES:

14  On Behalf of the Plaintiffs:

15       BY:  BRADLEY GIRARD, ESQUIRE
                ALETHEA ANNE SWIFT, ESQUIRE
16             ANDREW BOOKBINDER, ESQUIRE
                AUDREY WIGGINS, ESQUIRE
17             SARAH GOETZ, ESQUIRE
           DEMOCRACY FORWARD FOUNDATION
18         1445 New York Avenue NW
           Washington, DC  20005
19         (202)448-9090

20  On Behalf of the Defendants:

21       BY:  KRISTINA WOLFE, ESQUIRE
                ANDREW WARDEN, ESQUIRE
22         DOJ-Civ
           1100 L Street NW
23         Suite 7301
           Washington, DC  20005
24         (202)616-5084

25          ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***
```

```
 1                        P R O C E E D I N G S

 2          (Court called to order.)

 3          DEPUTY CLERK:  All rise.  The United States District

 4  Court for the District of Maryland is now in session.  The

 5  Honorable Theodore D. Chuang presiding.

 6          THE COURT:  Thank you everyone, please be seated.

 7          DEPUTY CLERK:  The matter now pending before this

 8  court is Civil Action TDC-25-0243, Philadelphia Yearly Meeting

 9  of the Religious Society of Friends, et al., versus the U.S.

10  Department of Homeland Security, et al.

11          We are here today.

12          For the purpose of a hearing on a motion for preliminary

13  injunction.

14          Counsel please identify yourselves for the record.

15          MR. GIRARD:  Bradley Girard on behalf of plaintiffs.

16          MS. SWIFT:  This is Anne Swift on behalf of

17  plaintiffs.

18          MR. BOOKBINDER:  Andrew Bookbinder on behalf of the

19  plaintiffs.

20          THE COURT:  Good morning.

21          MS. WOLFE:  Kristina Wolfe on behalf of defendants,

22  and I'm joined by Mr. Andrew Warden.

23          THE COURT:  Good morning.  I think we have another

24  couple counsel here as well who are on the brief; is that

25  correct?
```

1        **MR. GIRARD:**  Yes, Your Honor.  I'm joined by Audrey

2   Wiggins on behalf of plaintiffs, as well as Sarah Goetz.

3        **THE COURT:**  If you can squeeze in this area, you can.

4   I don't -- we just have a smaller-size courtroom based on the

5   architecture here.

6      Okay.  So we're here for a hearing on a motion for

7   preliminary injunction filed by the plaintiffs.  It's fully

8   briefed, I believe.  I do have a number of questions for both

9   sides, and I certainly want to hear anything you want to add.

10  You certainly don't need to repeat anything you've already said

11  in your briefs, but you can certainly emphasize key points.

12     I don't, on the one hand, keep an absolute clock on these

13  things, but -- and I will -- because of my questions, perhaps

14  you'll go longer than you wanted to.  We'll try to keep the

15  time equal to both sides, to the extent they want that time.

16  So I'll keep track of it in that regard.

17     But since it's your motion, we'll start with the

18  plaintiffs.  Go ahead.

19        **MR. GIRARD:**  Good morning, Your Honor.  May it please

20  the Court.

21     Communal worship is at the heart of religious liberating.

22  As a direct result of DHS's new policy, people, regardless of

23  their immigration status, are avoiding plaintiffs' houses of

24  worship.  That means fewer people to deliver the message of

25  God, fewer people to engage in ministry, fewer volunteers,

1  fewer donations and more.

2      These are all concrete, legally cognizable harms, and they

3  are harming plaintiffs now.

4      This is not a case in which plaintiffs propose some

5  speculative future harm by a hypothetical future action.  As

6  long as DHS's policy remains in effect, plaintiffs will

7  continue to suffer serious injuries.  A preliminary injunction

8  is appropriate.

9      **THE COURT:**  Can you start off by telling me what you

10 believe the policy is?  I think the government takes the view

11 that they have just rescinded this other memo.  There is

12 still -- in both instances, there was discretion, there may be

13 supervisory approval required.  But what do you -- what do you

14 consider to be the policy from the documents that we have?

15     **MR. GIRARD:**  Well, I consider the policy from the

16 documents to be that there is absolutely no guidance when it

17 comes to immigration enforcement operations at houses of

18 worship other than, and I'm quoting the government, a healthy

19 dose of common sense.  That's it.

20     Now, we can look to the -- to the statute, 1357, and the

21 implementing regulations that are at issue here which give

22 immigration operation -- immigration agents just enormous

23 authority to conduct warrantless investigations.

24     **THE COURT:**  But there's no -- there's no statement

25 that there's an affirmative policy to go to houses of worship

 1  for law enforcement?

 2          **MR. GIRARD:**  Well, Your Honor --

 3          **THE COURT:**  It's just --

 4          **MR. GIRARD:**  I think the statement could be read as

 5  being an affirmative policy, you know, when the new

 6  statement -- the new policy was announced, DHS said, as part of

 7  the reason for it, that rapists and murderers were hiding in

 8  churches.

 9          **THE COURT:**  Did they say that was part of the reason

10  for the policy, or that was just a separate statement that was

11  made in the same time frame?

12          **MR. GIRARD:**  No, that was the statement announcing

13  the recision of the old memo, and announcing the new policy.

14  That was what was put on DHS's with website.  That was the

15  official announcement that the sensitive locations or protected

16  areas memo had been rescinded, and that instead, it was being

17  replaced by a common sense standard.

18          **THE COURT:**  Okay.  So what should I do with the -- or

19  how do you believe we should consider this -- the telememo

20  issued by ICE on January 31st, 2025?  I notice you didn't

21  reference it in either -- well, it didn't exist at the

22  beginning, but in your reply brief, you didn't talk about it.

23          **MR. GIRARD:**  Well, we didn't talk about it in the

24  reply brief, one, it's not yet public, we haven't seen it.  It

25  was just attached as an exhibit.

1        But assuming that this is what the policy is, we don't
2   actually think it's much of a meaningful change.  It doesn't
3   address all of DHS, for one.  There are other component
4   agencies or subagencies of DHS.
5        But also, I think it's just dressing up in some new
6   language basically the same policy.
7        It does, I will -- I will say, suggest that there should
8   be some sort of supervise approval.  But if you look at what
9   that is, one, it doesn't say when that supervisor approval is
10  necessary.  It does say, when it comes to public protests, that
11  the supervisor approval is necessary beforehand.  But it
12  doesn't say that for houses of worship.
13       Two, verbal or written approval is okay.
14       And three, at the level of the supervisor, from what I
15  understand, it's about the level of a lieutenant.
16       Now, you pair that, given what this administration has
17  said, which is we're going for the largest mass deportation in
18  history, we're going to get rid of millions and millions of
19  people -- we know that two heads of ICE just a couple of days
20  ago were fired because they weren't deporting enough people.
21       One of the administration people -- heads is calling ICE
22  on a daily basis saying you need to up the numbers, we need to
23  meet a quota of arrests.
24       And so we think it's pretty cold comfort that, you know,
25  someone can call a lieutenant and say, hey, I want to enforce

7

1    at a house of worship.

2            **THE COURT:**  Okay.  First of all -- what you're

3    saying, though, is the Mayorkas policy did talk about

4    headquarters approval or your designee or your -- the person

5    you delegate to.  So going to the ICE director or the

6    commissioner of CBP and saying, well, your approval or someone

7    you designate, which I'm not sure it was ever actually

8    designated who that would be.

9        But you're saying that that versus an assistant special

10   agent in charge, who is one of the leaders of any field office,

11   that that's the constitutional violation, is switching from

12   headquarters, maybe, or whoever they dealt -- I mean, I'm not

13   sure they couldn't have delegated to the assistant special

14   agent in charge, to be honest.

15           **MR. GIRARD:**  No, Your Honor.

16           **THE COURT:**  So that's the constitutional violation?

17           **MR. GIRARD:**  No, Your Honor, and I want to be

18   perfectly clear here.  We are not here defending the old

19   policy.  We are not saying that this old -- the Mayorkas memo,

20   or what has existed for the last 30 years, is what is

21   constitutionally required and the change from that is the

22   constitutional problem.  I think there's problems with the old

23   memo as well, I think, at least arguably.

24           **THE COURT:**  Let's go to that, this may be skipping to

25   the end.

 1      But you're asking for an injunction that basically

 2  imposes, on a temporary basis, a policy that's more stringent

 3  than even the Mayorkas memo or the Morton memo or any of these

 4  other memos you cited going back 30 years, correct?

 5          **MR. GIRARD:**  That is correct, Your Honor.

 6          **THE COURT:**  Okay.  And what's the basis for the view

 7  that you need to have a judicial warrant just to go to a place

 8  of worship?  Is there any authority for that?

 9          **MR. GIRARD:**  Well, Your Honor, I think the basis for

10  it -- and we understand that, you know, there's a lot of -- the

11  Court has a lot of latitude in fashioning a preliminary

12  injunction, but the standard under RFRA is strict scrutiny, and

13  the standard under the First Amendment claim is exacting

14  scrutiny.

15      The government has to show that if it wants to go and

16  conduct immigration enforcement at houses of worship, it has to

17  satisfy one of those standards.

18      Now, it hasn't, and it hasn't even tried in its

19  opposition, but what we suggested as judicial warrant or

20  exigent circumstances is just an example of this is something

21  that we think probably satisfies --

22          **THE COURT:**  So where is the limit to that?  Because

23  even -- I know you said there's no evidence this has ever

24  happened, and I'm not disagreeing with that.  But what if there

25  were someone charged with or believed to have committed a very

1    serious crime, a murder or something like that, and they were

2    in the public part of a house of worship, or in the parking

3    lot, you're saying that they would have to go get a warrant

4    even though they have never required one before?

5            **MR. GIRARD:**  Well, I think that they would either

6    have to get a warrant or show exigent circumstances.

7            **THE COURT:**  Again, what case has ever said that?  I

8    mean, we -- this policy might be somewhat unprecedented for the

9    last 30 years, but we lived under this other regime for about

10   30 years where there was a list of -- well, there's a list of

11   activities, some of which were deemed to be, you know, limited

12   circumstances under which this could occur.  In other

13   iterations, those were ones that needed approval, what have

14   you.

15       But none of those directors or none of those secretaries

16   ever imposed anything like what you're proposing now.  And I'm

17   not aware of any challenges to any of those policies that were

18   successful, saying that a warrant is required just to do any

19   kind of law enforcement activity in publicly available areas

20   just because it's a house of worship.  I mean, you're asking

21   for a pretty broad extension of how the First Amendment is

22   viewed.

23           **MR. GIRARD:**  Well, Your Honor, I don't think it's

24   actually terribly -- a terribly broad extension, and I think

25   there's a couple of things going on here that I would like to

1  address.

2      The first is, when looking at what it is that the policy

3  needs to be, I think that we have to look at the standard under

4  the claims that we're bringing, which, again, the government

5  has to satisfy a strict or exacting scrutiny.

6      And potentially, there's another way that the government

7  could satisfy strict or exacting scrutiny.  As I mentioned, in

8  its memo opposing our motion, it doesn't even attempt to.

9      And so when it comes to granting some kind of preliminary

10  relief, we think that this would satisfy strict scrutiny.  And

11  as we go through the case and fully litigate the case, then we

12  can talk about, you know, what -- in terms of some kind of

13  permanent injunction, what that standard would be.

14      Now, you brought up there's been 30 years of this old

15  policy, and we haven't seen challenges to it where somebody

16  demanded that there be exigent circumstances or judicial

17  warrant.

18      Now, I will say if you look at Exhibit 29 that we filed,

19  that is the report filed by ICE, and there's a list of all the

20  immigration enforcement operations from 2017 to 2020, it's a

21  three-year period, by my count, there were 11 immigration

22  enforcement actions at houses of worship, and eight of those

23  had a judicial warrant.

24      So I actually don't think it's that hard for the

25  government to do.

1      And in terms of why this hasn't been --

2          **THE COURT:** I'm not sure I'm understanding -- Exhibit

3  29 is a -- I guess it's from a -- all I have is a description.

4  I don't see any list here. Maybe I've got a printout -- this

5  is from your submission.

6      You're saying this has been 11 such actions?

7          **MR. GIRARD:** I might have gotten the exhibit number

8  wrong.

9          **THE COURT:** Perhaps. Yeah. Okay.

10         **MR. GIRARD:** But there's --

11         **THE COURT:** We can look for it.

12         **MR. GIRARD:** Congress-- and I can correct that in

13 just a moment. I do have a list here.

14     But the point is that Congress required ICE to submit a

15 list of all of its enforcement actions at these sensitive

16 locations. And from October of 2017 to October of 2020, which

17 is what we have from this report, there's a list of all of

18 those actions. And as I said, 11 of them were at houses of

19 worship, and in eight of them, they had a judicial warrant.

20     So, again, we don't think it's all that impractical or

21 impossible for ICE or DHS -- DHS's other subagencies to do it

22 because they have done it in the past.

23     Now, going again to the question of why hasn't this been

24 challenged in the last 30 years or why hasn't anybody argued

25 that this is the case, and I think that really goes to the

environment that the government itself has created here.

The government rescinded this policy, it made clear that churches are -- that it's open season on any immigrant anywhere including at churches.  It has called immigrants dirt bags.  It has said that it wants to deport millions and millions of them. And it's a very understandable, if not predictable, result; people are not going to their houses of worship.  And that wasn't case in the last 30 years.

**THE COURT:**  Okay.  So before we -- I understand that distinction, but before we get to the merits of this, the government raises the issue of standing.  I think there may be different ways that you could argue this, but maybe you can tell me what is your best example, whether -- you know, and which plaintiff is at issue here, where there's an actual injury, in fact, that's concrete and particularized that's actual and imminent, not something that is speculative or in the future.

**MR. GIRARD:**  I think the best example is CBF.  I think every plaintiff has strong examples, but I'll start -- or I'll stick with CBF because I do think it's the strongest.

**THE COURT:**  Okay.

**MR. GIRARD:**  When we're talking about a concrete and particularized injury, we don't have to talk about one that's imminent; we can talk about one that is actual and one that's happening.

1    And I think, you know, the easiest way to do this, to kind

2    of march through it, is to point to examples in which courts,

3    including the Supreme Court, have found that this is a legally

4    recognized interest, and then I can point to the specific harm

5    that we alleged to that interest.

6        **THE COURT:**  Okay.

7        **MR. GIRARD:**  And so the first is kind of a -- as a

8    broad umbrella and infringing upon a particular religious

9    belief.  And to get a bit more specific, it is to inhibit or

10   hinder people from gathering in communal worship.

11       The Supreme Court has made very clear that that's an

12   injury.  If you look at *Cuomo,* if you look at *Newsom v. Tandon,*

13   any of the kind of COVID cases.  This is particularly -- this

14   is exactly what was alleged here, right?  These churches, these

15   houses of worship came to the courts and said the restrictions

16   under COVID are stopping us from gathering for our communal

17   worship, and that is an injury to our First Amendment rights.

18       And the Court said yes, that is an injury to your First

19   Amendment rights.

20       That's exactly what we have.

21       And for all of the plaintiffs, that is obviously an issue,

22   but, again, I'll stick with CBF.  And I can point you to some

23   examples in the -- in the record in which the CBF members

24   say -- again, this is why it's actual and not imminent, people

25   are not showing up; people as a direct result of this policy

1    are not coming.

2        Oh so if you look at the Carter declaration that's Exhibit

3    50, Paragraphs 46 through 47, if you look at the Baxley

4    declaration at Paragraph 52, if you look at the Hayes

5    declaration, that's Exhibit 48, and you look at Paragraph 17

6    and 18, these are all examples in which our declarants have

7    sworn in affidavits that as a direct result of this policy,

8    they know people are showing up in fewer numbers.

9        **THE COURT:**  Remind me of what they say in terms of

10    how they know as a direct result of this policy, as opposed to

11    generalized law enforcement or something else?  What are they

12    going off of there?

13        **MR. GIRARD:**  And the people have told them, and

14    that's mentioned in the declarations, that they have been told

15    that people aren't showing up specifically because of this

16    policy, because they are afraid of ICE enforcement at the

17    houses of worship.

18        And, you know, I don't think -- again, we don't have to

19    get into imminent, because this is actual, but I think their

20    fear is not only reasonable, but as we show in some of the news

21    articles that we've submitted, it's a fear that people are

22    experiencing across the country.  This isn't some kind of

23    eggshell person who is really afraid and staying home.  We have

24    reports from churches, you know, across the geographical scope

25    and across different denominations saying --

1          **THE COURT:**  But how does that help you?  You have

2    three plaintiffs, entities now, and if some other church or

3    place of worship is being injured in another state, another

4    denomination, how do you get constitutional standing out of

5    that?

6          **MR. GIRARD:**  Well, Your Honor, I don't

7    think that's --

8          **THE COURT:**  That's the question I'm asking.  That's

9    the gatekeeping function we have.

10         **MR. GIRARD:**  Of course.  And I'm not intending to

11   argue or imply in any way that the fact that other folks at

12   other denominations are afraid gives our plaintiffs standing.

13   Our plaintiffs, I think, have standing because they have shown

14   people who they know at their congregations are not showing up.

15         **THE COURT:**  So I get the logic of it.  I do.  How do

16   you address *Laird* and *Clapper*, the two cases cited by the

17   government, where there was a policy in both cases that was

18   going to be law enforcement activity?  The parties legitimately

19   said, you know, we might be the target of that.  But they

20   couldn't show that anyone had specifically targeted them,

21   either they had done something to them or they were about to.

22   And so the Court said no standing.

23      How do you address those?

24         **MR. GIRARD:**  Well, I think if I can point to you

25   Pages 12 and 13 of *Laird* specifically, I think it actually

raises what's happening here.  What it said is, you know,
government action that has an indirect affect on First
Amendment rights can be challenged, you still just have to show
some injury beyond the chill, right?  It's not just enough to
say, oh, I feel chilled because there's the potential
perspective of some enforcement.  You have to show another
legally cognizable injury.  And that's what we have here,
right?

What we have here, as I've said, the legally recognized
interests in communal worship.  And what we've alleged is that
there are actually happening injuries to that legally
recognized interest.

We are not just alleging a chill.  Despite what the
government wants to frame this case as and tries to make this a
case about chill, this isn't simply a case about chill.

**THE COURT:**  But the folks not showing up, they are
just -- no one -- you haven't, I think, provided anything
saying that they have been personally targeted, or even them as
a group.

So isn't that also just a subjective chill, what these
parishioners or congregants are doing and not doing?  And under
*Clapper*, that might still be a problem, isn't it?

**MR. GIRARD:**  No, Your Honor, I actually don't think
that it is.  Right?  Because I think what that gets to under
*Clapper* is the causation, the chain of causation issue.

1    And if you look at *FDA v. Alliance for Hippocratic*

2  *Medicine*, I think that really helps us out here in framing some

3  of this.

4    What the Court said there is, look, if there's an action

5  by a third party that causes harm to the plaintiff, it just has

6  to be likely that they are going to respond in a certain way.

7  And as I said, it's not a matter of whether this is likely,

8  this is actually happening.

9    So we're not bringing a claim on behalf of somebody who

10  might stay home themselves.  They might feel a subjective chill

11  and just arguing, oh, well, this person feels chilled, that's

12  enough, that I think is a *Clapper* problem.

13    What we're arguing is, well, look, the government

14  instituted a new policy.  As a direct result of that policy,

15  which we have alleged plainly, people are not showing up and

16  our plaintiffs are suffering as a result.  And there's nothing

17  in *Clapper* that says -- *Clapper* or *Laird* that says that that's

18  unacceptable.  Now --

19    **THE COURT:**  What about Footnote 7 in *Laird* -- in

20  *Clapper*?  It says that because they are based on a -- they do

21  not establish injury that's fairly traceable because they are

22  based on third-party subjective fear of surveillance.  Isn't

23  that what we have here, is third parties' subjective fear of

24  surveillance or enforcement against them?

25    **MR. GIRARD:**  No, Your Honor, because I think in

1    *Clapper*, they weren't able to actually show an other injury.

2    It was just about the chill.  And the result here is a host of

3    injuries.

4        Now, I've only listed one, but I think there are plenty

5    more.  So I think that --

6            **THE COURT:**  But, again, the injury here of not -- of

7    having people not come is at least arguably based on those

8    individuals' subjective fear of being -- the subjective

9    enforcement action.  And how do you get around that part of

10   *Clapper*?

11           **MR. GIRARD:**  Well, I think the -- to maybe give a

12   little bit of a hypothetical change to *Clapper*, which I think

13   would maybe align a little bit more with this case, and I do

14   think would make *Clapper* come out differently, if, say, the

15   plaintiff in *Clapper* was a lawyer who was working on a host of

16   these various issues and lost all of its business, right,

17   because people weren't coming, because people knew that this

18   government program means my contact or my communications with

19   my lawyer is potentially -- or, you know, reasonably -- I can

20   reasonably believe that's going to be monitored, I'm just not

21   going to hire these lawyers.

22       Now, do I think that they would have won in *Clapper*?

23   Probably not.  But I think they would have cleared the

24   threshold bar of standing, because those lawyers would be able

25   to say, and this is what *Clapper*, *Laird*, all of these cases

1    say, if it's more than just a subjective chill, if you are

2    experiencing a legally recognized injury, then, yeah, that's

3    enough to get you past the standing bar.

4            **THE COURT:**  So in that case, if I recall, there were

5    U.S. persons who were saying their foreign contacts might not

6    want to talk to them anymore because of this.  And there wasn't

7    specific evidence that those individuals were declining to.

8    There was a concern that they might.  Actually, I think in the

9    footnote, it does -- maybe they did provide some evidence that

10   that was going on, but they found -- the Court found it

11   unconvincing that it showed that people -- those overseas

12   individuals were actually reacting to this.

13          What you're saying is, if you've got specific evidence

14   that the third parties, meaning the congregants, are

15   specifically acting in a way that's driven specifically via

16   this policy, that would be a distinction.

17           **MR. GIRARD:**  I do think that would be a distinction.

18   And, you know, I think the kind of the second question in

19   *Clapper* really highlights why the plaintiffs there didn't have

20   standing, which was the question of the manufactured standing.

21   Right?  The plaintiffs there said, oh, well, we have to spend

22   money or we have to act differently as plaintiffs because of

23   this chill.

24          And the Court said, well, if the chill is the only injury

25   you have, you then can't -- which we won't acknowledge chill is

1  an injury just in itself -- you can't then spend money or

2  divert resources in response to just that chill.  That's not

3  enough.  That's just kind of a way of manufacturing it.

4      **THE COURT:**  So would you agree, then, in this case,

5  that things that the churches or houses of worship are doing in

6  reaction may not be sufficient?

7      **MR. GIRARD:**  Well, I think the parallel would be,

8  say, if one of the houses of worship said, look, we had to

9  invest money in a security system.  We have cameras outside of

10  the church because we think ICE might show up.  And that is a

11  monetary injury.  Monetary injuries are legally cognizable,

12  that is enough.  That, I think, is a *Clapper* problem as well.

13      But again, that's not the sort of injury that we show.

14      And this -- you know, the *Clapper*, *Laird* issue, I think,

15  you know, goes back quite some time.

16      And I would point the Court to the Ninth Circuit's opinion

17  in the *Presbyterian Church (USA)*, which specifically and very

18  clearly says, and this was in response to law enforcement

19  investigations at a -- at houses of worship.  That case says

20  well, look, people stopped showing up to the house of worship,

21  that is enough for standing under the First Amendment.

22      **THE COURT:**  Sure, I agree with you on that.

23      The problem, I think, perhaps is in *Presbyterian Church*,

24  the government had actually physically gone into those churches

25  to conduct surveillance, all of the plaintiffs.  We don't have

1    that here.  You don't have anybody, I -- if I am not mistaken,

2    in which there was an actual intrusion or even threatened

3    intrusion to the specific location.

4        And *Laird* went through a list of cases in which they said,

5    well, in all of these cases, there was some direct targeting of

6    the plaintiff, and we don't have that here.

7        Why isn't that a problem for you in this case?

8            **MR. GIRARD:**  No, Your Honor, I'm not saying that --

9            **THE COURT:**  Let me just ask a broader question.

10        I mean, maybe there's a way to make this all work, but it

11    would be a lot easier, from your perspective, if you

12    actually -- I mean, you've told me what you have so far is you

13    have CBF has had people tell them, and it's in the affidavits,

14    that they are not coming, and they are not coming because of

15    this policy, or something to that effect.  And that is the same

16    scenario that you have, perhaps, in the *Presbyterian Church*

17    case.

18        What you don't have is anybody actually threatening them

19    or the church with enforcement activity.

20        Is that something that you might have in some form at some

21    point, whether that you would amend the complaint with or amend

22    the record with?  Is there any prospect of something like that

23    coming up, either for these plaintiffs or anyone else?  Because

24    it seems as if you had something like that, this would be not

25    that complicated.

1          **MR. GIRARD:**  I think that if we had something like

2  that, it wouldn't that complicated, but it would be a different

3  case.  And it would be the case that the government is

4  opposing, but it's not the case that we're bringing, right?

5  This isn't a challenge to a specific enforcement action at a

6  specific house of worship.

7          **THE COURT:**  Again, but it would just be on the issue

8  of standing to say that you've actually been injured here,

9  because as in *Laird*, this isn't just a theoretical concern that

10  it could happen to your church, it would have actually

11  happened.

12          **MR. GIRARD:**  Well, Your Honor, I don't think --

13          **THE COURT:**  Or even if they -- I'm not sure what the

14  right set of facts would be, but anything that shows that they

15  actually are interested in doing anything at any of your

16  locations.

17          **MR. GIRARD:**  Well, Your Honor, I don't think that

18  they have to.  Now, it might --

19          **THE COURT:**  What case says that?  Is there a case in

20  which standing was found because of threatened law enforcement

21  action, surveillance where there wasn't something in which

22  there was a specific targeting of the plaintiff, such as in

23  *Presbyterian Church*, where they did this recording scheme and

24  it was done not just across the country, and these plaintiffs

25  weren't just saying, well, we're worried that's going to happen

1  to us, it actually happened to them?

2          **MR. GIRARD:**  Well, Your Honor, I don't have a case

3  that's on all fours, and I think for a couple of reasons.

4      One, this policy.  And this policy, when paired with what

5  the administration had said, is something that is -- is quite

6  new.  The -- for 30 years, across different administrations,

7  there was a policy about -- there was an official policy about

8  not enforcing or not conducting immigration enforcement at

9  houses of worship.  And I think that before that, I think it's

10 reasonable to think that it probably just wasn't done in part

11 because these are such sensitive and sacred locations, and

12 because it's not necessary.

13         **THE COURT:**  But there were plenty of examples --

14 well, *Laird* and *Clapper* being two, in which there was an

15 enforcement policy that people aren't happy with.  And in those

16 cases, you know, people challenged them, even though they

17 hadn't been specifically targeted, and they said no.

18     Are there any examples where people challenged those kinds

19 of policies, and the Court said, yes, there is standing?

20         **MR. GIRARD:**  Well, I don't have one off the top of my

21 head, by I am glad that you just raised that with *Laird* and

22 *Clapper*.  And I don't want to get too kind of lost in mixing up

23 some of the different elements of standing.

24     I think it's important to be able to break them down

25 because marching through them, I do think it's quite clear that

1  the plaintiffs have standing here and that the Court doesn't

2  have to break any new ground to find as much.

3      I think the kind of easy, informal way of putting it that

4  the Supreme Court just did an *FDA v. Alliance for Hippocratic*

5  *Medicine*, is the question for standing is what's it to you,

6  right?

7      Is this just a policy disagreement or kind of a

8  theoretical problem that you have you think that the government

9  shouldn't be acting in this way?  Or do you have an injury?

10      And what *Laird* and *Clapper* said was, well, look, these

11  plaintiffs themselves allege nothing more than that they are

12  being chilled.  They cannot allege another injury and fact that

13  is legally cognizable.

14      So at the legally cognizable injury and fact stage, we

15  have multiple -- and I can, again, continue with kind of going

16  through those, because I think the -- some of your questions,

17  Your Honor, get into the issue of causation, which is a

18  different step, which requires a different analysis, I think we

19  also satisfy pretty easily.

20          **THE COURT:**  So going back to, like you said, the

21  specific connections, the specific injuries, the -- you noted

22  that CBF is your best scenario, and that's because they have

23  specific people saying that they aren't coming because of this.

24      Am I correct, therefore, that we don't have that with

25  respect to the Quakers or to the Sikhs that -- you know, where

1   they have actually got evidence of decreased attendance for

2   this reason as opposed to what they think might happen?

3          **MR. GIRARD:**  No, Your Honor, I just, you know,

4   focused on CBF because I think they are the strongest, just

5   because we have, you know, some more specific information from

6   them on this front.

7      But if you look at the Sikh declaration as well, that's

8   the Shergill declaration, and that makes very clear and makes

9   explicit that people aren't coming as --

10         **THE COURT:**  Which exhibit is this, by the way?

11         **MR. GIRARD:**  That's Exhibit 47.

12         **THE COURT:**  Okay.

13         **MR. GIRARD:**  And that makes clear in no uncertain

14  term that people aren't coming as a result of fear of this

15  policy.

16         **THE COURT:**  What about the Quaker affidavits?

17  There's a lot of them.  I am not sure I saw anyone saying that.

18  I heard them say -- I think I saw them saying we're concerned

19  this might happen.  I'm not sure anyone documented, or even

20  without specific documentation was saying that, yes, we

21  actually have a decrease at this point.

22         **MR. GIRARD:**  Well, for --

23         **THE COURT:**  Am I right about that?  Or am I missing

24  something that you can point me to?

25         **MR. GIRARD:**  No, I think that you're right that we

1  don't have anybody saying -- unlike the Hayes declaration, the
2  CBF declaration, we have an example of one ESL program that is
3  now experiencing a 66 percent decline, we don't have anything
4  like that with the Quakers.  And I think some of that is just
5  unique to the form of Quaker worship.
6      But I also think that for the Quakers, there is
7  certainly -- certainly it's a reasonable inference that can be
8  drawn given that.
9      But also the Quakers have to go to another one of these
10 legally recognized cognizable injuries.
11         THE COURT:  Sure.
12      MR. GIRARD:  The Quakers have certainly stated one of
13 those as well, which is the -- you can describe it as a
14 conscience injury, if you want.  It's the kind of injury from
15 *Hobby Lobby* or from *Fulton v. Philadelphia,* and it's putting
16 religious people to a choice, right?  That some government
17 action or some government policy makes people have to choose
18 between two different things.  Either way, it's going to
19 violate one of their religious beliefs.
20         THE COURT:  *Hobby Lobby,* or what was the other case
21 that you referenced?
22         MR. GIRARD:  *Fulton v. The City of Philadelphia.*
23         THE COURT:  So I guess the question is -- again, I
24 think one of the issues *is in Hobby Lobby,* there was a specific
25 policy that they were going to have to abide by, if I'm not

1   mistaken, that created this choice.

2       What is the analogy to this case from that?

3           **MR. GIRARD:**  So the Quaker beliefs, part of the

4   expression or their exercise of faith is not only welcoming but

5   encouraging immigrants to come to their services.  And if they

6   do that, then they run headlong into one of their other

7   beliefs, which is not putting somebody in harm's way.

8       Now, the Court might ask in response to that, well, are

9   they really putting somebody in harm's way?  Do you have facts

10  that show that somebody will necessarily be put in harm's way

11  if they get invited to one of these Quaker meetings?

12      And I don't mean to assume that that's the next question,

13  but I -- just given your previous questions --

14          **THE COURT:**  Sure.  That's a good question to answer.

15          **MR. GIRARD:**  -- I think that this is -- this is where

16  *Hobby Lobby* actually really helps the plaintiffs out here, too,

17  in that, look, these are their religious beliefs, and this is

18  what they believe.  It's not for a Court to say, well, that's

19  an irrational belief.  Right?

20      It was the same exact thing in *Hobby Lobby*.

21          **THE COURT:**  No, I agree with that.  That is a

22  principle that comes out of *Hobby Lobby*.  I guess, going back

23  to the -- we'll move to merits in a moment, but just on the

24  standing question.  I mean, that could be something that could

25  happen to them, but what's the evidence that they were actually

1  at that choice now and being compelled to do so by the

2  government's action the way it was in *Hobby Lobby*, where they

3  set up this policy saying you've got to have your -- you got to

4  cover these certain conditions or there's a consequence?

5          **MR. GIRARD:**  Well, I think -- again, I want to be

6  very careful to not dip too much into the merits when we are

7  talking about standing, because I do think that's a mistake

8  that the government makes, and I don't want to repeat that

9  mistake.

10     I think this sort of whether you want to call it a

11  conscience injury, however you want to describe it, is a

12  legally cognizable injury, and the Quaker plaintiffs have

13  alleged that they have said I cannot encourage -- I cannot

14  follow and exercise my religious belief in encouraging people

15  to come without violating some other belief of mine.

16     Now, the -- the question of, well, is the -- is the

17  government forcing them to do that?

18     Now, I think that's a merits question, right?  I think the

19  injury-in-fact question isn't is the government forcing them.

20  The injury-in-fact question is simply is there a legally

21  recognized interest, and have you alleged that that interest is

22  being violated?  Now --

23          **THE COURT:**  Well, isn't it the same problem you have

24  where -- whether it's spending money, it's their decision to --

25  whether it's to stop telling people to come, or what have you,

1  that's their subjective, in advance reaction which *Clapper* says

2  isn't -- isn't an injury at that point?

3          **MR. GIRARD:**  Well, no, I don't think that's right,

4  Your Honor, not when it comes to this kind of religious

5  conscience decision, right?  That -- being -- being faced with

6  that choice, some people might think it's an irrational choice,

7  but it is their religious belief, and that is enough to show

8  that there is an injury in fact.  Now, again --

9          **THE COURT:**  Already at this point, though, that's the

10 question.  I understand that to be the theory in general.

11     But this injury has already occurred?

12         **MR. GIRARD:**  Yes, this injury has occurred.

13     And if you look at the Quaker declarations, they don't

14 say, in the future, I won't be able to do this; they say I

15 cannot -- like, in the present tense, I currently cannot

16 encourage immigrants to come knowing that I will be putting

17 them in harm's way.

18     And that's not just some -- again, it's not a theoretical

19 interest.

20     As we have pointed out, the Adelphi meeting house is in an

21 area that is over 50 percent immigrant.  That is much, much

22 higher than the national average.  Many of their neighbors

23 around the meeting are immigrants.  They have vast interactions

24 as all of these -- or many of these meeting houses do.

25     And that has been a way in which they've engaged with the

1    immigrant community, that folks come to join them in worship.

2        This isn't, again, I want to just theoretically be able to

3    tell some immigrant to come.  If you look through the

4    declarations, these are communities with which they engage in a

5    very meaningful way.  And now they are saying "I cannot

6    encourage them to come, and that is a violation of my

7    religion."

8        **THE COURT:**  Is there a case that supports that

9    concept at the standing level, where, again, it's not a

10   prohibition by the government but it's a policy they put out

11   there that the plaintiff feels they need to react to in a

12   certain way?

13       **MR. GIRARD:**  Well, I think *Hobby Lobby* squarely

14   answers this, right?  Because this is -- part of what the

15   government was arguing in *Hobby Lobby* was, well, look, it's

16   actually not putting you to this choice, because you can just

17   not offer health insurance.

18       And the folks in *Hobby Lobby*, the owners of Hobby Lobby,

19   and what the Supreme Court said, eventually agreeing with them

20   was, oh, well, not offering health insurance is also a

21   violation of our religious beliefs.

22       And so that's just not enough of an answer that you can

23   technically avoid this in different ways.

24       **THE COURT:**  But, again, that's on the merits.

25       The question is -- in that case, there was a policy saying

you need to do this or this; you have choices, but you have to

do something.

We don't have that here.  We have a policy that's been

tossed out there, the parties are reacting to it, and do you

have any example where they react to it in this way and say,

well, this enforcement policy it's not necessarily been

directed at me yet, but I'm concerned it will, and, therefore,

I need to do these things?

**MR. GIRARD:**  Well, Your Honor, I don't know that -- I

don't know that that's relevant for the injury-in-fact

question.  I think maybe if what you're getting at is

causation, I don't have a particular case in which somebody is

saying, "I have these religious beliefs, I'm put to this

choice," and a Court would say either, no, you don't, or, sure,

even though we think it's very unlikely.

Because I do think it's a kind of step-by-step analysis,

which is, is this a legally cognizable harm?  And the answer is

yes.  And have you alleged sufficient facts that you are

suffering this legally cognizable harm and not just some kind

of chill?  The answer is yes, then you move on and you go to

the question of connotation.

**THE COURT:**  You also throw out associational

standing, but it's just kind of thrown out there.  I don't have

an affidavit from anyone, or even a specific person, whether

it's anonymous or not, you would say, well, here's a member

1    that is injured, and we're going under a theory of

2    associational standing, is that something you want to flesh out

3    in any way, or is there more detail to that, or are you just

4    not pursuing that right now?

5         MR. GIRARD:  No, I'm happy to flesh that out.  I

6    think the reason we didn't particularly respond to it is

7    because the government never raised it.

8       I think -- we don't raise associational standing for the

9    Gurdwara because that is an individual entity.

10      But if you look at CBF, and you look at the Quaker Yearly

11   Meetings.  So the Quaker Yearly Meetings are the umbrella.

12   They have standing on their own but also associational

13   standing.

14      And we give -- for each of the Yearly Meetings, we have

15   specific declarations on behalf of one of the individual

16   meeting houses.  And they explain why each of those individual

17   meeting houses would have standing, and that, I think, is the

18   big question in associational standing.

19        THE COURT:  But you're still referring to the entity,

20   the religious entity, you're not trying to say that there's

21   member -- like individual congregants or worshipers who you are

22   taking -- you are pursuing associational standing through?

23        MR. GIRARD:  Through -- if what you mean is kind of a

24   second level of --

25        THE COURT:  Yeah, I'm just trying to understand what

1    the argument is.

2       I mean, I thought what it was, was something along the

3    lines of -- I don't know the structure and even if it bears

4    this, but CBF may say that everybody who attends our church is

5    a member, for some reason, because that's the structure they

6    have.  And we're asserting standing based on an injury to those

7    members, meaning the people -- not the organization itself or

8    the leadership, but the rank-and-file people who come or don't

9    come.

10       Are you making that argument?

11          **MR. GIRARD:**  I think I understand.

12       I think that, as a kind of general matter, we are focusing

13    on the rights of the houses of worship themselves, and I do

14    think that because the house of worship is kind of a unique

15    particular type of corporate entity that is also, if you look

16    at especially the Quakers, you know, that the meetings are

17    viewed both as entities themselves but also the collection of

18    people.

19          **THE COURT:**  No, I understand.  But it's still at

20    that -- I mean, the meeting, even these monthly meetings are,

21    again, on the house of worship side not on the attendee side.

22    You're not arguing a standing based on any injury to an

23    attendee itself as a member?  I just want to make sure I

24    understand that.

25          **MR. GIRARD:**  Right.  I think -- I think that's right.

1    I mean, I think the case law isn't super clear about this when

2    houses of worship are asserting their own interest as houses of

3    worship because I think it's -- I think it's just treated as

4    they are asserting their own interest.  But also because of a

5    house of worship, it's not just a building, it's also the

6    congregation of people.

7         **THE COURT:**  Sure.

8         **MR. GIRARD:**  Now, they don't generally, I think, have

9    to point out, oh, here is John Doe, one of our congregants, we

10   have associational standing on behalf of him.  I think the

11   houses of worship have their own standing.

12        **THE COURT:**  Okay.  And that's what you're focused on?

13        **MR. GIRARD:**  Yeah.  I was -- the question -- the

14   question, Your Honor, about the associational -- I thought you

15   were referencing the yearly meeting and -- I apologize.

16        **THE COURT:**  Okay.  So then last question on standing,

17   but I think I already asked it, it sounded to me like you are

18   not interested or not in a position at any point in the near

19   future to identify any connections to actual members or people

20   in their congregations who are specifically targeted or have

21   been the subject of a -- any kind of enforcement action or even

22   threatened enforcement action that would supplement the record

23   in any way.

24        Do you want an opportunity to do that, or you don't think

25   that would be something that would be fruitful?

1          **MR. GIRARD:**  I don't think it would be fruitful,

2    because I don't think that the claims actually require it.  I

3    don't think that's a necessary element of standing here.  I

4    think --

5          **THE COURT:**  So you're going to let this whole thing

6    rise and fall on what you have?  Because as you can tell, I'm a

7    little skeptical, so --

8          **MR. GIRARD:**  No, I understand, Your Honor.  And

9    that's why I think, again, going back to the kind of big

10   question from FDA, is what's it to you, and then kind of

11   marching through the specific steps.

12         And so what's it to you?  The question is, are you

13   injured?  Do you have a legally cognizable interest that is

14   being injured?  If you can say yes, then we go to causation.

15         Now, can you show that there's causation?  And if the

16   answer to that is yes, then -- then we've cleared the standing

17   bar.

18         Now, you can clear the standing bar and still lose on the

19   merits.  I think our merits arguments are quite strong, too.

20         I do want to talk about causation just briefly, which is,

21   you know, causation, the question is, is this injury fairly

22   traceable to the actions of the defendant?  It doesn't need to

23   be the only cause, it doesn't need to be the final cause.  This

24   isn't a tort standard.

25         And, again, I point the Court to the *FDA v. Alliance For*

1  *Hippocratic Medicine.*  And what the Court says there is, look,

2  if you have -- if you have an unregulated party -- I think a

3  lot of -- if I can just kind of back up for a moment.  I think

4  a lot of what Your Honor's questions are getting to, is you're

5  an unregulated party.  These plaintiffs here are unregulated

6  parties.  They are not yet -- they have not yet suffered this

7  enforcement from the government.  Now, don't you need to show

8  that you are suffering this enforcement or have suffered this

9  enforcement?

10      And what *FDA v. Alliance for Hippocratic Medicine* said,

11  that unregulated parties can have standing too.  That is fine.

12  Now, what it means is that --

13          **THE COURT:**  Didn't they find no standing in that

14  case?

15          **MR. GIRARD:**  They did because the chain of causation

16  was so attenuated there, what the Court said there is the

17  standard, then, for an unregulated party is that if plaintiffs

18  can show that the third parties will likely react in

19  predictable ways, that, in turn, will likely injure the

20  plaintiffs.

21      And what the Court held there was, look, there are so many

22  different things that could happen, these third parties, they

23  are unidentified, we don't really know what's happening, this

24  really, really, long chain of causation.  But the standard is

25  still, will a third party react in a likely -- likely react in

1  a predictable way?  And will it likely injure the plaintiffs?

2      And I think we can just remove the words "likely" here,

3  because, again, we're not talking about the potential of

4  imminent threats.  We're talking about third parties, the

5  people who are not attending these services.  This is a

6  predictable way.  This is part of the reason that when Your

7  Honor was asking about other people -- people at other

8  congregations or in other states, why that gives us standing

9  here.

10     And it's not to say, oh, well, we have standing on behalf

11 of them, it's to say this is not only predictable that people

12 will respond in this way, it is the likely and -- you know,

13 it's what's happening kind of regardless.

14         **THE COURT:**  But if it hasn't happened yet at some of

15 these congregations, then doesn't that mean it's not likely to

16 happen?  Or shouldn't it have happened by now if it's really

17 just driven by these forces that you're referring to?

18         **MR. GIRARD:**  I am not sure what the --

19         **THE COURT:**  Again, we have all of these Quaker

20 meetings who are concerned this might happen, but they can't

21 say that it has happened.  And it's been several weeks now.

22     And you're saying at other places, there have been major

23 issues with attendance.  But if they don't have them, then how

24 can you argue that it's likely to happen to them, when it

25 hasn't happened, you know, so far?

1          **MR. GIRARD:**  Well, Your Honor, I'm certainly not

2     conceding that it hasn't happened.  I want to be clear about

3     that.

4          I think that reading the declarations, I think it's

5     perfectly reasonable to infer that it is happening.

6          Again, I think part of it is the nature of Quaker worship

7     and that it's not led by anybody in particular.  I think

8     there's not the same kind of congregational body with the

9     leader looking out and seeing the same people.

10         **THE COURT:**  Okay.  I understand.

11         **MR. GIRARD:**  But we only have to have one plaintiff

12    that has standing.  And we do have this at both CBF and the

13    Gurdwara, right?  That this isn't likely that people are going

14    to start acting in this way, and it's not likely going to harm

15    the plaintiffs.

16         People are acting this way and it is causing harm to the

17    plaintiffs.  And that's enough to show for an unregulated

18    party.

19         And I think that the concern here, and what the government

20    tries to raise is, you're an unregulated party, you need to

21    show that you're going to be regulated.

22         That's just not the standard.  And that's why I'm

23    resisting a little bit of the questions when it comes to are

24    you going to have or do you need to have.

25         **THE COURT:**  No, I understand.  Why don't we move on

1    to the merits.  We've been going for quite a while on this.

2         Let's start with the First Amendment expressive

3    association theory here.

4         First off, I had a question for you about what is the

5    appropriate standard under *Roberts*?  At least in terms of the

6    compelling interest, if there is -- or a standard for, you

7    know, when the government's action can be justified.  *Roberts*

8    refers to any kind of infringement can be justified by

9    compelling state interests unrelated to the suppression of

10   ideas that cannot be achieved through means significantly less

11   restrictive of associational freedoms.

12        You cite *Americans for Prosperity,* which is a newer case.

13   Different standard, or at least the language is different,

14   about substantial relation between the action and a

15   sufficiently important governmental interest and narrow

16   tailoring.  Obviously it's a more recent case, but that case

17   seems to focus on compelled disclosure issues and even brings

18   in compelled disclosure cases that are not in the expressive

19   association context.

20        So one way to read that, is that's the standard when you

21   have a compelled disclosure question, but we don't have one

22   here.

23        So which standard is the right one, in your view?

24             **MR. GIRARD:**  In my view, I think what the Court was

25   doing in *Americans for Prosperity* wasn't clarifying the

1  standard for compelled disclosure cases, I think it was

2  clarifying the exacting scrutiny standard.  Exacting scrutiny

3  is kind of in this weird middle zone.

4      **THE COURT:**  Well, it was clarifying that, but you're

5  saying that's what you think applies to all expressive

6  association cases?

7      **MR. GIRARD:**  I think that's the standard.  I do think

8  that's the fair reading of *Americans for Prosperity.*  I think

9  we win under whatever the -- however the standard is described,

10 because I do think that what the government is doing here,

11 there's absolutely no compelling interest.

12     However, a court might want to describe what the

13 government's interest is.

14     I still think there needs to be some kind of match between

15 the government interest and the challenge policy.

16     And then I think that it certainly fails at the narrow

17 tailoring step regardless of what precisely the standard is.

18     **THE COURT:**  So you agree -- you're taking the view

19 *Americans for Prosperity* is the standard.  It seems to me like

20 it's a slightly lower standard than *Roberts* had, you would

21 agree with that?  Exacting is not as -- it's a lower standard

22 than the effectively strict scrutiny in *Roberts?*

23     **MR. GIRARD:**  I think that's right.  I think the

24 strict scrutiny standard in *Roberts* and the cases that followed

25 was a little bit squishy, and I think part of what the Court

1  was doing in *Americans for Prosperity* was clarifying that it's

2  exacting scrutiny.

3      Now, if Your Honor disagrees and wants to apply strict

4  scrutiny, I'm very happy with that.

5          **THE COURT:**  I understand.  I just wanted to get your

6  view on it.

7      So then in terms of the specific infringement on

8  expressive association, again, I think you throw out different

9  theories.  What's your best theory, most straightforward theory

10 for showing that there is such a violation here?

11         **MR. GIRARD:**  The most forward theory is the right to

12 congregate for the sake of communal worship.  I think that if

13 the right to expressive association means anything in the

14 religion context, and we know, from what the Court has said,

15 that it does apply in the religion context, it has to mean the

16 right to gather for the sake of communal worship.

17     And that is what we are showing, not only alleging what I

18 think is pretty clear, is being grossly violated.  You know,

19 the right to gather with others isn't just kind of a

20 hypothetical or theoretical interest, right?  This is, as

21 explained in these declarations, core to the religious

22 practice.

23     Now, I think there's two separate -- two separate ways in

24 which we see this, which is the act of worship -- worship

25 services themselves.  As the Quakers show, you know, you're

1  literally taking away the ability for people to hear God.

2  You're -- whether it's at a Gurdwara, you're taking away the

3  ability for us to hear from other people who are going to

4  potentially lead these services.

5       If you imagine just going to a Baptist church, and the

6  pews are half empty, and the hymns don't sound the same, and

7  when you greet people to offer them peace, that, you know,

8  again, there's fewer people there, this is -- this is

9  unquestionably kind of at the core of what it is for a lot of

10 peoples' religious exercise, and the government is really

11 stopping that.

12      **THE COURT:**  So under the *Boy Scouts* case, it seems as

13 if there needs to be some sort of significant burden or effect

14 on this association.  So some of it seems to be a matter of

15 degree.

16      And, again, does that come down to sort of how bad the

17 attendance issues are, or do you think just one person who is

18 missing who otherwise would be there is enough?

19      **MR. GIRARD:**  Well, Your Honor, when it comes to one

20 person, I think it depends, right?  Because it really does

21 depend on the religious worship that we're talking about.

22      So I don't think it's a question that I can kind of just

23 answer at the one person level.  Now, if the one person is the

24 priest --

25      **THE COURT:**  Where is the line, in your view?

1          **MR. GIRARD:**  You know, I think that the line isn't

2     terribly clear in the case law.  I think that it's a question

3     of, you know, significant interference or substantial

4     interference.

5          And I do think that the allegations here, whatever the

6     line is, whether it's significant or substantial, I don't think

7     it's kind of a hard numerical line.  I do think that whatever

8     the standard is, whatever the line is that the Court draws,

9     that the plaintiffs have cleared it.

10         I can point, as well, now setting aside the question of

11    the actual worship services, I think ministry is another big

12    one.  And as I mentioned in the Hayes declaration, there's a

13    ESL class that was down 66 percent.  And, you know, I do want

14    to be clear, I think it can be easy to think about terms like

15    ministry, or words like "welcoming the stranger" as being a

16    little bit, you know, amorphous or free of content.

17         And I do want to point to some of what's is in the

18    declarations about ministry and why this -- precisely what this

19    is, and why this matters to the CBF clients, right, which is

20    the idea of welcoming the stranger.  This is providing language

21    services, this is providing food, this is providing clothing.

22    This is -- and this is happening out of their houses of

23    worship, and these are acts of faith.

24         This is the religious exercise to see populations that are

25    coming to this country who are having trouble, especially in

1  the current climate, getting on their feet and saying we are

2  welcoming you as an exercise of our faith, we want to help you

3  get on your feet, we want you to be able to be able to build

4  community and be a part of this community.

5      And we're seeing CBF saying, look, people aren't showing

6  up to these things.

7          **THE COURT:**  So let's assume all that is correct, and

8  that you are even -- and it is an expression of belief and

9  association.  Do we have an example, or do you have an example

10  of the scenario or case in which the expressive association

11  right was infringed upon, again, not by a direct either mandate

12  or prohibition, but by the effect of a policy that didn't

13  specifically say you can't associate, you can't -- or you have

14  to associate with certain people?  Which is most of the cases

15  seem to be you have to associate with certain people, but I

16  think it can work in both directions.

17      But here, we don't have a direct mandate saying you

18  must -- you may not have these folks here.  It's just the

19  effect of something that doesn't tell them not to do this.

20      Do you have an example where that has been found to be a

21  violation of the right?

22          **MR. GIRARD:**  I don't have an example at my

23  fingertips.

24      What I will say is that I do think that falls a little bit

25  into what the government is arguing in both RFRA and the first

amendment, which is that this -- for there to be a burden, it
has to be a directly coercive burden, and that's just not what
the law says.  So I don't think that it requires showing that
the government says this person or this group of people are not
allowed to be here.

What the standard is, and this is repeated in the Fourth
Circuit's *Benham* case, which is this government action likely
to deter a person of ordinary firmness, when you're talking
about, you know, reducing membership or making it less
attractive, as the Court said in *Rumsfeld.*

And what I think, you know, not only our declarations and
the allegations show, but again, going to those stories across
the country, is that yes, these are people of ordinary
firmness.  People are -- across the country are not going to
their houses of worship.  They are not going to these places
where there's ministry to build community because they are
afraid.

This isn't, again, some kind of eggshell sort of person
who is staying home.  This is people in droves, afraid.  And I
think if the standard is that is this likely to deter a person
of ordinary firmness from going, I think the answer is plainly
yes.

Both in our specific allegations, and if just looking at
what else is happening across the country, I think it's very
reasonable -- and, you know, I'll point the Court to the study

1    that we put into the record, which is I think two years old

2    now, but it was the largest study to date of immigrant

3    attitudes in the United States.

4         And it said that 26 people, regardless of their own

5    immigration status were afraid -- 26 percent of people,

6    regardless of their own immigration status, were afraid of

7    immigration enforcement.

8         And I think, you know, one thing to talk about with people

9    of ordinary firmness or the reasonableness of people staying

10   away, I want -- is I do want to highlight a very practical

11   point here.  The administration, what you hear a lot kind of in

12   public statements, including in the announcement of this

13   policy, is, look, you have the criminals and then you have

14   everybody else.  And if you are everybody else, you don't have

15   anything to worry about; if you're a criminal, well, we're

16   going to deport you and you deserve it anyway.

17        But I think that, you know, really kind of muddies that.

18   There's a huge spectrum here.  As somebody who attended law

19   school and has English as a first language, I don't understand

20   much of the immigration system.

21        For somebody who is here for whom English might not be

22   their first language, the -- who has a temporary protected

23   status, or received the DACA deferral, or has an asylum claim

24   pending, they understandably might not know precisely what

25   their immigration status is.

1          **THE COURT:**  So even accepting that there might be --

2    that might be a reasonable step or concern, I think the

3    government does raise this question of whether there's any kind

4    of limiting principle here.  I mean, it seems as if -- even if

5    you have sympathetic facts, your theory seems to be that if

6    there's anything that the government does, even that --

7    indirectly, not even directly, but indirectly decreases

8    attendance at these -- at a religious institution, that's a

9    constitutional violation.  So why is that not the end result of

10   your approach here?

11         **MR. GIRARD:**  I don't think that's right, Your Honor.

12   And I think for a few reasons.

13        First off, I think there's the standing issue, and a lot

14   of the kind of hypothetical we're going to open the flood gates

15   issues, right?  Because, again, the -- they still have to

16   allege an injury in fact, and they have to show causation.

17        And, again, the chain of causation here, I think, is

18   pretty clear.

19         **THE COURT:**  Well, I mean there could be even more

20   direct -- so what if they -- the government reinstituted the

21   military draft, so then you lose 10, 20 percent of your

22   congregation?  Does that violate the freedom of expressive

23   association?  Now you can't commune in the same way.

24         **MR. GIRARD:**  No -- no, I don't think it would violate

25   it.  I think this would be an example in which the government

1   could pretty easily satisfy exacting scrutiny.  It's just

2   saying, look, we need a draft for the sake of our national

3   defense, we applied this to everybody who is over the age of

4   18.  And, yes, it's narrowly tailored; we're doing this the

5   best that we can.  And I think that would easily survive

6   exacting scrutiny.

7        The problem here is the government can't survive exacting

8   scrutiny, it doesn't even try to.

9        The government's policy here is, Well, look there's

10  rapists and murderers hiding in churches.  We present no

11  evidence of that ever happening or that churches are, you know,

12  being used as criminal hideouts.  And as a result of this, we

13  now say that we have the right to go conduct warrantless

14  immigration enforcement operations at any and every house of

15  worship in the country.

16       There is no, you know, as we point out in the brief, the

17  government cannot satisfy exacting scrutiny when there's a

18  dramatic mismatch between what it is the government is saying

19  its interests are and what the policy is.  And the only extent

20  we know what the government's interests are is rapists and

21  murderers are hiding in --

22            **THE COURT:**  Let's go to the RFRA issue.

23       I think the compelling interest, even though the tests are

24  different, it's the same type of analysis, but they are -- to

25  even get to that, you need to have a substantial burden on the

1   exercise of religious beliefs, which typically, at least in the

2   case law, is a scenario under which the government requires the

3   plaintiffs to do something that violates their beliefs or --

4   either requires them to do something that violates their

5   beliefs or prohibits them from doing something they have to do

6   to carry out their beliefs.

7       And, again, we don't have any specific mandate or

8   prohibition here.  So what is your best theory on how there is

9   still a substantial burden, and do you have any authority for

10  the idea that it doesn't have to be one or the other, that it

11  doesn't have to be a mandate or a prohibition?

12       **MR. GIRARD:**  Absolutely, Your Honor.

13       And I will say, just at the outset, I do think that the

14  conscience injury that is alleged by all of the plaintiffs, but

15  that we focused on what the Quakers in this discussion, again,

16  all of the plaintiffs have said this in their allegations, or

17  in their declarations, but that kind of conscience injury is

18  putting them to a course of choice, and that's what *Hobby Lobby*

19  recognized.

20       But setting that aside for a moment, I'm happy that you

21  raised this issue, because the government focuses exclusively,

22  again, on direct coercion.

23       And, of course, direct coercion is -- is enough to satisfy

24  the substantial burden standard.  That's how most of these

25  cases come up.

1    But there's a -- I can point to why as a general matter

2  that's not necessary, and then point to a specific Fourth

3  Circuit case that I think really helped out.  It's not as a

4  general matter enough, because under RFRA, Congress did not

5  define substantial burden.  So what the courts have said is,

6  okay, we look to pre-Smith cases to help define substantial

7  burden.

8    And pre-Smith cases make clear that an indirect burden

9  would be sufficient for a substantial burden under the free

10  exercise analysis.

11    And so *Thomas v. Review Board, Sherbert,* they -- *Thomas v.*

12  *Review Board* says, and I quote, compulsion may be indirect.

13    Now, to point to -- to put a little meat on the bones

14  there, *Bethel World Ministries*, which we cite in I think both

15  our briefs, but at least our opening brief, is a Fourth Circuit

16  case.  And it was a case about land use, so it's technically

17  under RLUIPA.

18    But as we point out in our footnote, that the language is

19  the same, the sister statutes and substantial burden is

20  interpreted the same.

21    What the Court there said is, okay, well, look, usually

22  these are direct coercion.  But that doesn't make sense in

23  every instance, right?

24    And in that case, it was building -- it was seeking a

25  permit to build a church.  And the government denied the

1  permit, and the church said this is a substantial burden.  And

2  the government made a similar argument about, look, we're not

3  putting them to an impossible choice, we are not demanding that

4  they do something or refrain from doing something.  We just

5  denied them a permit.

6      And what the Court said, yeah, that's not enough.  Because

7  technically, the church can go buy a different plot of land

8  somewhere else and build its building somewhere else.  It can

9  do something else, but you're still substantially burdening the

10  religious exercise.

11      So what the Court added to it was kind of a gloss on a

12  certain amount of pressure that stops a religious institution

13  from being able to exercise the religion.

14          **THE COURT:**  So -- but isn't the standard not pressure

15  to prevent you or to even make it difficult to exercise your

16  religion, it's pressure to modify your behavior and to violate

17  your beliefs?

18      So, again, in most of these cases, there's an actual

19  belief you can point to and say I'm now compelled to violate it

20  because of this burden?  What is the best analysis on these

21  facts as to how that's actually occurring here?  Not just that

22  it's made more difficult, because there are cases that say just

23  making your exercise of religion more difficult isn't enough.

24  It's got to be something that causes you to violate your

25  belief, put substantial pressure on you to violate your

1  beliefs.

2  　　　　MR. GIRARD:  Well, Your Honor, I want to be clear, I

3  think that that framing, that language is specific to -- that's

4  a different way of describing the direct coercion.  That isn't

5  just the --

6  　　　　THE COURT:  So give me a case in which it wasn't

7  just -- that there was no violation of beliefs, it was just it

8  made it harder.  Because you have cases like *Ling*, in which

9  they are saying, look, making it more difficult is not enough,

10  other cases say making it more expensive is not enough.  It's

11  got to be something that effectively causes you to violate your

12  beliefs.

13  　　　And I don't agree with that, because when I accept the

14  language from *Liberty University* that is substantial pressure,

15  that's not direct coercion.  Direct would be a prohibition.  I

16  agree with you a substantial pressure could mean less than

17  that.

18  　　　But I'm still not seeing an example of where there's not

19  actually that pressure to violate beliefs, not just to make it

20  more difficult to practice your religion.

21  　　　　MR. GIRARD:  Well, Your Honor, I think *Bethel World*

22  *Ministries* is exactly that case.  The government there said,

23  look, you know, we're just denying you a permit.  There's

24  nothing about denying you a permit that is itself violating

25  your religious briefs or forcing you to.  And you can always go

1   buy another piece of land and you can build your big church on

2   another piece of land in a different county.

3       And the Fourth Circuit said that's not enough.  That is

4   still a substantial burden, even though it doesn't force to you

5   make this different choice.

6       Now, I'm happy that you raised *Ling*, because the

7   government, I think, really hangs its hat on *Ling*.  And it

8   skips from direct coercion to *Ling* and what I think are best

9   described as the incidental burdens skipping over indirect

10  burdens in cases like *Bethel World Ministries.*

11      The incidental burden cases, I think, are a particular and

12  pretty narrow carve-out that certainly don't apply here.

13      So a case like *Ling* or a case like *Apache Stronghold* out

14  of the Ninth Circuit, which if Your Honor is not familiar, it's

15  a matter of the government selling a piece of its land and a

16  tribe saying, look, you're selling this land is going to

17  destroy it, and that's going to harm our --

18          **THE COURT:**  Both cases are pretty much the same

19  scenario, right?

20          **MR. GIRARD:**  Exactly, exactly.

21      And what the courts have said is, look, when we're talking

22  about the government managing its own internal affairs, then

23  that can't be enough.  That's when -- even if it -- even if it

24  absolutely has an effect on your religious exercise, when the

25  government is managing its own internal affairs, then it's an

1  incidental burden.

2      Even in extreme cases -- and I think that's why this is a

3  narrow carve-out.  If you look at the language in *Apache*

4  *Stronghold,* the Ninth Circuit recognized, look, this is

5  actually making their religious -- their religious exercise

6  impossible.  We understand that.

7      But government handling and managing its own internal

8  affairs, we just have to treat differently.  I think it's a

9  practical reason more than anything.  The government dealing

10  with its own land has to be able to sell it and buy it and

11  treat it as its wants.  And, of course, there are people who

12  are going to have objections to it.

13      But when it comes to dealing with internal affairs, that's

14  just something that, I think, the courts have drawn a pretty

15  strict line on.

16          **THE COURT:**  So even if there's -- accepting that

17  there's a theoretical possibility, it doesn't have to be a

18  direct mandate, what is your best factual -- set of facts in

19  this case that best illustrate that there is a substantial

20  burden under RFRA, minding of the theories that you posited

21  within the facts that you've presented?

22          **MR. GIRARD:**  I'll point to again CBF's ministry as

23  one, right?  That there's this -- the act of ministering to

24  immigrant communities is a very serious exercise of their

25  religious beliefs.  And they say that in their declarations in

no uncertain terms.  And people are not showing up to -- to these ministries.

People -- again, there was a 66 percent decline in an ESL class.  People are afraid, and they are not coming.  And it's not just, oh, we want to help immigrants get on their feet; it is this is our true religious exercise.

**THE COURT:**  But no one is saying they can't do that. They are saying they can't do it as much.  So why isn't that a problem?  It's not as if -- you know, again, this isn't one of those cases -- the classic RFRA cases, you know, in the prison, you can't have a beard, you can't wear your headdress, whatever, and you absolutely can't do that, even whether it's direct or indirect, well, that's a violation of their beliefs. They are still able to do this, they just can't do it as much or as much as they would like, how is that a violation?

**MR. GIRARD:**  Well, Your Honor, I think because this is where you get to the indirect.  And I understand that, you know, the substantial burden under indirect can -- can be a little tougher, just because it's not a simple yes or no binary choice as it is in direct coercion.

But I think the question of, well, look, you're not stopped from doing it has never -- is never enough under RFRA, for one, I think because generally the people, you know, get to define what their own -- what their own religious exercise is and what is fulfilling as religious exercise, but I --

1          **THE COURT:**  But you're saying that just by decreasing

2     the ability or making it more difficult so you can't minister

3     to as many people, that that's a violation -- that's a

4     substantial burden.  Under RFRA, again, something that creates

5     substantial pressure to violate your beliefs.  So you're saying

6     that the belief has to be not just that we're going to do this,

7     but we're have to do this for X number of people or otherwise

8     we violated our beliefs?

9          I didn't see anything in there saying that it violates

10    their beliefs to only minister to 33 percent of the group as

11    opposed to 100 percent.

12         **MR. GIRARD:**  Again, Your Honor, I don't mean to push

13    back too much, but I don't want to buy -- buy into the framing

14    of the government that this has to violate your belief.  That's

15    not the standard.

16         The standard is --

17         **THE COURT:**  That's the language in *Liberty*

18    *University.*  Give me a case that says something different.

19         **MR. GIRARD:**  Again, *Bethel World Ministries.*

20         When it comes to indirect burdens, the standard is

21    substantial burden, it is not forcing you to violate your

22    belief.  It is does it substantially burden your religious

23    exercise.

24         And I will point to why I think *Bethel* is such a good

25    case.

1    If you look at *Bethel,* the issue there was, look, we have

2    too many congregants, and we need to build a bigger church.

3    Now, we're finding ways to minister to those other congregants,

4    but it's really starting to hamper our religious exercise, and

5    so we need this permit to build a bigger church.  And the

6    county said no.  The court said that is a substantial burden.

7        Now, I don't think *Bethel* needed to say, well, we only

8    have space for 300; it is our religious belief that we need to

9    have space for 500; and if we have anything shy of 500, then it

10   violates our religious belief.  Because again, the standard is

11   substantial burden and not whether something specifically

12   violates it.

13       Now --

14       **THE COURT:**  So how do you square that with *Liberty*

15   *University* then?  Even if there's -- and again, I understand in

16   RLUIPA, there's a way to say it's the same standard.  But if

17   you ask me, the RFRA cases are a little bit more on point than

18   the RLUIPA cases if there's going to be any kind of conflict

19   between the two.

20       **MR. GIRARD:**  Well, I don't think there needs to be a

21   conflict.

22       I think that, you know, the courts, when they are

23   describing the direct coercion side of things, I think

24   sometimes I've made a mistake of describing it as if it's the

25   only way to show that there's a substantial burden.

1     I think this is what the Court corrected in *Bethel World*

2  *Ministries.*  It recognized that, yeah, look, in most of these

3  cases, this is going to be an issue of direct coercion where

4  somebody is forced to violate their religious beliefs, and so

5  courts, I think, have a tendency to write it in that way.

6     And the government quotes some of these cases that, you

7  know, I think absolutely say that, but what the courts say in

8  those cases is that this is the only way, that this is the only

9  way that there's a substantial burden, and that's what *Bethel*

10  *World Ministries* corrected.

11     And I think the courts who have actually addressed this

12  outside of the Fourth Circuit as well have come to the same

13  conclusion, have recognized.  So, you know, there's a 2024 case

14  in the Ninth Circuit and a 2016 case in the Third Circuit in

15  which the courts recognize precisely to the answer of Your

16  Honor's question of, like, yeah, but can't you still -- can't

17  you still do this in some way?

18          **THE COURT:**  Which cases are you referring to?

19          **MR. GIRARD:**  So the Ninth Circuit is *Fuqua v. Raak*.

20  That's 120 F.4th at 1346.  And the Third Circuit case is

21  *Mack v. Warden* 839 F.3d 286.

22          **THE COURT:**  Okay.  Why don't we move to the issue of

23  any kind of remedy, if we get that far.

24     Among other things, your -- your -- I mean we've talked

25  about the judicial warrant issue a little bit.  But regardless

59

1  of what the injunction is, you're asking for something that

2  extends across the country to all places of worship.

3      And I think what we've been discussing here is that a

4  violation is somewhat -- of either of those provisions is tied

5  pretty specifically to the beliefs of the party whose rights

6  have been infringed upon.

7      So unless you're saying every religion is the same, how

8  can one apply an alleged -- or a likely violation as to, let's

9  say, CBF and say that means that there's a -- there's a likely

10  violation to everyone across the country?

11      Help me out with that.

12          **MR. GIRARD:**  Sure, Your Honor.

13      And, again, I don't think it's a matter of likely

14  violation.  I think it's a matter that their religious exercise

15  is currently being violated.

16      And I think, you know, I -- I understand that nationwide

17  injunctions aren't the norm.  This is not something we ask for

18  lightly.  We understand that the courts do not grant them

19  lightly.

20      I think the reason we asked for a nationwide injunction is

21  the core question is, will plaintiffs get all of the relief

22  without -- without a national injunction?  And I think the

23  answer is no.

24      And I can say why for a couple of reasons.

25      First off, there's the practical reason of there's, you

60

1    know, close to 1700 specific houses of worship here that are

2    being represented.  And --

3              **THE COURT:**  Among the three plaintiffs?

4              **MR. GIRARD:**  Among the three plaintiffs, yes.  Across

5    37 states, and then add in D.C. and Puerto Rico.  And we're

6    asking DHS officials to have a list of 1700 houses of worship,

7    some of which meet in other houses of worship, as we allege in

8    the -- as was explained in the declarations.

9        And so to know, well, this meeting house is being rented,

10   and they are in a Presbyterian church, even though the

11   Presbyterians aren't covered here, as the -- as DHS is

12   conducting its -- as the statute and regulation otherwise give

13   them the ability to conduct warrantless immigration enforcement

14   operations at any place that is open to the public.  So we

15   think it will be quite confusing in that sense.

16             **THE COURT:**  I mean, 1700 seems like a lot, but do you

17   know how many overall houses of worships there are in the

18   United States?

19             **MR. GIRARD:**  Well, I think the numbers vary.  We

20   tried to --

21             **THE COURT:**  I imagine it's a lot bigger than that,

22   but --

23             **MR. GIRARD:**  The number is very difficult.

24             **THE COURT:**  Sure.

25             **MR. GIRARD:**  It's the best -- what we put in the

1   brief is upwards of 350,000.

2        But it's not a matter of the percentage chance that DHS is

3   going to go into the wrong one, because, again, the -- the

4   fear, the possibility of that happening doesn't give us

5   complete relief.

6        And I think that actually gets to a really important point

7   as too why we don't have -- we wouldn't get broad relief

8   otherwise.

9        If, say, it's just our clients and not a national

10  injunction, what we have alleged, and what I think we've shown,

11  is that people are not showing up out of fear.  This isn't just

12  members, although members, too, these are immigrant

13  communities.  These are people who are new to the country.

14  These are people, for many instances, who don't speak English

15  as their first language.  And they show up to the country, and

16  they hear we're going to get rid of all the dirt bags, we're

17  kicking millions and millions of people out, and houses of

18  worship are no longer safe.

19       And if we say, well, look, you're in a neighborhood,

20  there's six houses of worship in your neighborhood, don't

21  worry, that one is a CBF church, you can go there, and you can

22  feel safe --

23            **THE COURT:**  But I thought your claim was based on the

24  harm to the houses of worship?

25            **MR. GIRARD:**  It is.

1          **THE COURT:**  So there's a house of worship who says,

2   you know, we don't actually care how many people come, that's

3   not part of our belief system, then why would they get the

4   benefit of this injunction when it has nothing to do with their

5   beliefs?

6          **MR. GIRARD:**  Well, Your Honor, I think -- again, I'm

7   not trying to highlight the other houses of worship in that

8   hypothetical -- in that example.  It's not even a hypothetical.

9       I'm trying to highlight that for our clients, it's going

10  to be pretty meaningless to say, oh, well, we know that DHS

11  can't come here.  And we are open to all without the fear of

12  this because people still aren't going to show up.  People in

13  these neighborhoods aren't going to -- the stranger walking by

14  who they do want to welcome, this is part of their core

15  religious belief, I don't know how they are going to convey to

16  that person, if they are going to chase them down and say, oh,

17  well look, don't go to that Presbyterian church because DHS can

18  come there, but you're safe here, when they are two blocks

19  away.

20         **THE COURT:**  I see.  Okay.  I understand that.

21      Last question on this is whether if you -- I know you said

22  you wanted this judicial warrant requirement.  If the best you

23  could come up with, or the best the Court would give you would

24  be a return to the status quo, does that help you in any way,

25  or not really?  Or you do just as soon have the motion denied?

1    If the answer was well, you can get back to the Mayorkas

2 memo maybe.  I mean, you could have that.  But to ask for

3 something that's never been done before might be a bridge too

4 far, would you say let's just start all over again and just

5 forget about it, or would you still welcome that?

6         **MR. GIRARD:**  No, Your Honor, I think that's a very

7 difficult choice between losing outright and getting relief

8 that isn't quite relief.  And I can explain why I think it's

9 not quite relief.

10    I do think it's important that the Mayorkas memo had

11 exigent circumstances in it.  It provided guidance.  It

12 provided an overall idea for how --

13         **THE COURT:**  I mean, you had a list of what they

14 considered the limited circumstances, and it was cabined.  Now,

15 granted, there was an out.  It was not an exhaustive list.

16    But they specifically said, here's six things, you have to

17 do it to the full extent possible.  You don't get into these

18 places.  And here's the six scenarios where it might be okay.

19 And, yes, you can go beyond that, but it certainly was limited.

20    It wasn't -- I mean, unless you want to agree with them

21 and just say that the memo didn't do anything.

22    But I read that as having a very specific limitation, even

23 though not an absolute limitation, but saying not just that

24 these are exigent circumstances, it says these are limited

25 circumstances under which you can go in, and it's either got to

1  be these or something else that's kind of like these

2  effectively.  And you're saying you wouldn't take that?

3          **MR. GIRARD:**  No, no.  I'm not saying that, Your

4  Honor.  I'm saying -- look, I very much agree that despite what

5  the government says on the first page of its opposition, that

6  this is not a, quote, modest change in pre-approval process, I

7  do think that having exigent circumstances really does matter.

8      I think the reason that I want to get to, the Mayorkas

9  memo it's exigent circumstances or supervisor approval.

10          **THE COURT:**  I'm actually not -- well, it's the

11  government's memo, so maybe I should ask them.

12      But I read two things that you're not even talking about,

13  one is it says that the requirement is that to the fullest

14  extent possible, we don't go to these places.  It's basically

15  saying unless there's like -- it's the least restrictive means

16  type analysis.

17      And then the other thing it says is, there's these limited

18  circumstances on which you can go against that fullest extent

19  possible, and then there's this extra part that says, well,

20  assuming you're in that universe of these limited circumstances

21  where you could go in, you still need supervisory approval,

22  unless it's exigent, in which case you can get it after the

23  fact.  That's how I read it.  Which, frankly, I think is more

24  favorable to you than you're reading it, so good to know how

25  you are reading it.

1        **MR. GIRARD:**  No, that is true, Your Honor.  And if

2   that's the government's position as well, then I think we might

3   be talking about something different.

4        I guess the reason that I read it differently is that

5   there's the pre-approval, and then there's the, well, if this

6   happens under exigent circumstances or otherwise, then you

7   get -- you have to contact your supervisor after.  And I don't

8   think that the pre-approval in the memo is terribly clear.

9        I don't think it's a pre-approval of exigent

10  circumstances, because otherwise, why would you call after, if

11  you had any exigent circumstances?

12       I think the idea of --

13       **THE COURT:**  That's why I think it's pre-approval just

14  to do any of these limited circumstances, or something kind of

15  like it.  That even though you may need -- you know, may be a

16  national security thing, you should get pre-approval, unless

17  it's exigent, in which case you can go and then ask questions

18  later, which makes sense, I think, but --

19       **MR. GIRARD:**  And, again, that might be how the

20  government reads it.

21       **THE COURT:**  Well, they read it as if there's no

22  difference, like you said.  So we'll see what they say.  But I

23  understand.

24       **MR. GIRARD:**  I do want to address quick why if our

25  reading of it is correct, it's not the relief I think would do

1    much.

2        Again, given that two ICE superiors were recently fired,

3    that they are trying to institute quotas, not quotas of

4    particular types of criminals, as they say, but just arrest

5    quotas that the secretary, who is a defendant here, has

6    recently suggested that nonviolent criminals, like shoplifters,

7    might be sent to Guantánamo Bay.

8        I just don't think that there's all that much of an

9    atmosphere inside DHS where getting supervisor approval without

10   very specific, very clear and not kind of on the whim of a

11   supervisor, without those kind of guidelines.  I think that

12   what I can see, given, again, the environment here, is a whole

13   lot of approval being given.  And I think that people would

14   understand that and that it wouldn't really solve the harms.

15        **THE COURT:**  I understand.  Okay.

16        Why don't we go to the government, then.  They have been

17   waiting patiently.

18        **MR. GIRARD:**  Thank you, Your Honor.

19        **THE COURT:**  Ms. Wolfe, is it you?

20        **MS. WOLFE:**  Good morning, Your Honor.

21        I think the past hour and few minutes of your conversation

22   with Mr. Girard has shown that *Clapper* simply forecloses --

23        **THE COURT:**  Before we get to *Clapper*, I just want to

24   make sure I understand the facts here, because just to finish

25   where we started, or start where we finished with Mr. Girard,

1  in terms of what the policy actually is, you've offered now

2  this Vitello memo, but you didn't get into too much detail on

3  it, do I consider that as part of the policy, even though it

4  only covers ICE, it doesn't cover CBP.  The defendant here is

5  the Department of Homeland Security.  So what do I do with

6  that?

7      **MS. WOLFE:**  Yes, that is the part of the policy

8  that --

9      **THE COURT:**  But it doesn't do anything if you're a

10  CBP agent or officer, correct?

11      **MS. WOLFE:**  That is correct.  The CBP has not issued

12  guidance at this point.

13      **THE COURT:**  So should I -- do I need to do two

14  different analyses, one for ICE and one for CBP, or can I just

15  do on based on the common denominator, which is the Huffman

16  memo?  Seems like a lot of work to do it twice.

17      **MS. WOLFE:**  I apologize, Your Honor.  Yes, it does

18  seem like a lot of work to do it twice.

19    ICE and CBP have two different jurisdictions.  ICE

20  primarily has jurisdiction within the interior of the

21  government, and so I think is the primary component.

22      **THE COURT:**  Correct.  But CBP has this authority

23  within a hundred miles of the border, which they -- trust me, I

24  used to work in that department.  They use that quite

25  frequently.

1    **MS. WOLFE:**  Yes.

2        **THE COURT:**  So it's not an irrelevant thing to talk

3    about what their capabilities are in this area.

4        **MS. WOLFE:**  So in light of the fact that CBP has not

5    yet issued further guidance as the January 2025 memo says, I do

6    think that to be prudent, there would need to be two analyses.

7        **THE COURT:**  Okay.  And then what distinction, if any,

8    are you drawing between those two memos, then?  Or what does

9    the Vitello memo add, if anything?

10       **MS. WOLFE:**  So the Vitello memo adds that -- it adds

11   back in the supervisory approval.  Supervisory approval, as we

12   discussed this morning, is at the local level versus in the

13   2021 memo that was at the headquarter level, unless it was

14   delegated down, and the memo doesn't indicate who those

15   delegees might be.

16       But it still has pre-approval, whether that be written or

17   verbal, by a supervisor before an activity would take place.

18       **THE COURT:**  Okay.  Do you agree with me, as I raised

19   with Mr. Girard, that there -- at least -- at least two

20   distinctions between the Mayorkas memo and this combination of

21   the Huffman and Vitello memos.  One is that the Mayorkas memo

22   said that to the fullest extent possible, you don't go into a

23   protected area.  And that's gone.  That's not part of the new

24   guidance.

25       And then, secondly, it said there are limited

69

1    circumstances under which you can, and it lists them.  Does say

2    that there could be others, but it has that list of limited --

3    not exigent circumstances, as I read it.  Those are the limited

4    circumstances in which you can go in.

5         And then even to do that, you need to have exigent

6    circumstances or supervisor approval.

7         But this enumerated list, which, again, is not exhaustive,

8    but it's at least an identified list, is no longer part of

9    this.

10        So whereas before, the guidance was you don't go in unless

11   it's one of these five or six categories, or it's something

12   that falls into the same category of a limited circumstance.

13        And now there's no such category, it's just -- it's just

14   the supervisory approval, which you're right, is in common,

15   although the level might be different.  But these two

16   differences -- I mean, there are these two difference, the

17   fullest extent possible and this set of limited circumstances,

18   neither of which exist anymore, correct?

19             **MS. WOLFE:**  That is correct, Your Honor.

20             **THE COURT:**  Okay.  So -- and then am I correct,

21   though, that just factually, the Mayorkas memo came in on

22   October of 2021?  The policy before that was the Morton and

23   Aguilar memos that went back to, like, 2011 or 2012.  But that

24   remained in effect from 2011 or 2012 until 2021, correct?

25   There's nothing in between, no recision or modification that we

 1  haven't gotten?

 2            **MS. WOLFE:**  That is correct.

 3            **THE COURT:**  Okay.  Thank you.

 4       So you were talking about standing.  And on the one hand,

 5  as you noted, I mean, *Clapper* is relevant.  But it does seem as

 6  if there's a big difference between that and the present case,

 7  which is they really identified no harm other than just being

 8  worried.

 9       Here, we actually have at least one of these churches has

10  an actual drop in attendance, at least one can read the facts

11  that way.

12       Assuming that that happened, that there was an actual drop

13  in attendance, why isn't that a key distinguishing factor?

14            **MS. WOLFE:**  Because that drop in the attendance is

15  based on their subjective fear of application of the policy.

16       As we point out in our papers, as discussed here,

17  plaintiffs have provided no evidence indicating that any of

18  their -- any of their religious organizations have been

19  targeted or there is a threat of targeted -- of targeting, or

20  that any of their members are going to be the subject of an

21  enforcement operation, or that there is a threat of enforcement

22  separation.

23       So, again, in *Clapper*, where you had the -- the plaintiffs

24  there were concerned that Section 702 of the FISA was going to

25  target the individuals that they wanted to communicate with --

1    in -- outside the country, and they -- and they changed their

2    behavior and stopped communicating with those individuals using

3    certain mechanisms via the phone, via e-mail.  That wasn't

4    because they had specific knowledge of what the targeting

5    practices were.  It was based on their subjective fear.

6         And that is the same thing here.  That --

7         THE COURT:  Well, but the equivalent would have been

8    if there was evidence that these plaintiffs in *Clapper*, the

9    journalist, or whoever they were, that they could formally

10   report that our foreign contacts who we used to interact with,

11   which is an important part of what we do, we suspect that they

12   are going to be targeted; and, in fact, we now know that they

13   are all declining to talk to us now, and there's a harm to

14   that -- to us, whether it's financial or otherwise.  And not

15   only have they declined to talk to us, but their reasoning is

16   that it's because of this new policy.

17        We don't have that fact in *Clapper*.  In fact, I think in

18   *Clapper*, they went through this convoluted analysis saying

19   that, well, one of the biggest problems is that to even have an

20   issue, it has to go through this -- well, before we get to

21   that, but that's a big distinction in terms of there being an

22   injury.  And then we can get to the traceability in a second.

23        Just in terms of whether there's an injury, isn't that a

24   distinction were there was no injury other than subjective

25   concern, and here we have at least potentially an injury which

1   this *Presbyterian Church* case out of the Ninth Circuit

2   recognizes declining membership under certain circumstances

3   could be an injury?

4           **MS. WOLFE:**  That case recognizes that, certainly,

5   Your Honor.  I will point out that it is pre-*Clapper*.

6           **THE COURT:**  Sure.

7           **MS. WOLFE:**  So we don't know what the Ninth

8   Circuit -- how they would come out today.

9           **THE COURT:**  *But Clapper* didn't deal with things like

10  declining membership.  There was no evidence of any decline in

11  anything.  There was just the concern that maybe these sources

12  would stop talking to us.  But there was no evidence that they

13  actually did.

14          **MS. WOLFE:**  Correct.

15     But the declining membership is based on the subjective

16  fear.  And there is nothing currently in the record before this

17  Court that would indicate that that fear is based on -- on some

18  objective manifestation.

19          **THE COURT:**  I think we have the fact that there was

20  an arrest at a church about 15 minutes away from one of the CBP

21  churches.  So there's geographic proximity.  And, again, that's

22  not something that existed in *Clapper*, I don't believe.

23          **MS. WOLFE:**  There's geographic proximity, yes.  But

24  my understanding -- and we did not have an opportunity to

25  address that particular --

```
 1              THE COURT:  That's why we're here.

 2              MS. WOLFE:  -- in plaintiffs' reply brief.

 3              THE COURT:  That's why we're here.

 4              MS. WOLFE:  So I will speak based on the conferrals

 5    that I had with my client, that that particular action was

 6    taken pursuant to authority under Section 4 of the INA, that

 7    there was --

 8              THE COURT:  Which is what?

 9              MS. WOLFE:  Section --

10              THE COURT:  It's hard enough with the ones we have

11    here.

12              MS. WOLFE:  It's particularly Section 1231, which

13    that there was an order of removal.

14              THE COURT:  8 U.S.C. 1231?

15              MS. WOLFE:  8 U.S.C. 1231.  So that there was an

16    order of removal for that particular individual.

17         I also understand that the agents did not enter the

18    building.  They were in a parking lot of a commercial strip

19    mall.  And that the arrest took place in -- in that parking lot

20    of the commercial strip mall that had multiple businesses

21    there.

22         So, you know, plaintiffs have said in their reply that

23    they are not challenging the defendant's ability to engage in

24    enforcement conduct or enforcement operations pursuant to those

25    authorities under 8 U.S.C. Section 1221 through 8 U.S.C.
```

1   Section 1231.

2            **THE COURT:**  But wouldn't -- wouldn't a -- you're

3   saying there was a warrant, or what are you saying?

4            **MS. WOLFE:**  There was an arrest warrant pursuant to

5   an order of removal.

6            **THE COURT:**  Okay.  Because 13 -- this goes back here,

7   you know, the bar and injunction.

8            **MS. WOLFE:**  Right.

9            **THE COURT:**  1357, you seem to acknowledge in your

10  footnote that's not covered by this bar.

11           **MS. WOLFE:**  That is correct.

12           **THE COURT:**  And so if there's actions occurring under

13  that provision, then they are not covered by the bar.

14           **MS. WOLFE:**  That is correct.

15           **THE COURT:**  And so what's hard to say, is it seems as

16  if there are some things that are covered by both in the sense

17  that, I guess, an action with a warrant would be 1231, you're

18  saying?  But a warrantless action going in to interview people,

19  or maybe even to arrest someone without a warrant, which they

20  can do under 1357, under certain circumstances, that's a

21  different situation.

22           **MS. WOLFE:**  Correct.

23           **THE COURT:**  So would you agree that, again, we're a

24  couple of steps away from it, but if there were some injunction

25  enjoining an activity under 1357, that would not run afoul of

1  the bar that you've cited?

2         **MS. WOLFE:**  Correct.

3         **THE COURT:**  Okay.  So what you're saying, going back

4  to this, is you're saying that this particular action was

5  something else.

6         **MS. WOLFE:**  That is not the subject of plaintiffs'

7  challenge today, as they have described it in their reply

8  papers.

9         **THE COURT:**  But in terms of whether there is sort of

10  an objective impact that, you know, a person of ordinary

11  firmness would react a certain way, is it really the case that

12  something happening that close by isn't just subjective fear

13  but it's based on facts?  And this notion you're just referring

14  to about what the authority was, I mean, none of us knew that.

15  You probably didn't know that until you talked to someone who

16  is actually there.  No one else in the community has access to

17  that information.  So why isn't that still a relevant factor on

18  the standing question?

19         **MS. WOLFE:**  Is -- is 15 minutes considered to be near

20  a place of worship?  That -- I mean, that's -- that's unclear.

21  That, again, speaking to plaintiff --

22         **THE COURT:**  So if we're here, and something happens

23  in College Park, you're saying that we can't consider that as

24  something that could cause us to be concerned about things

25  here?  If there was a break-in, let's say, if you're in a

1  neighborhood, or in a community, and, you know, you hear

2  there's break-ins going on 15 minutes away, is it reasonable

3  for you to be concerned about a break-at your house?  Or you're

4  just saying, well, that's just totally irrational?

5          **MS. WOLFE:**  No, I'm not saying that that's

6  irrational, Your Honor.

7      But something happening 15 minutes away doesn't

8  necessarily mean that it's happening to you.

9      Again, there's no evidence in the record that there has

10  been a targeted activity, enforcement activity at any plaintiff

11  organization or any of their members' places of worship.

12          **THE COURT:**  So if there were, would you agree, then,

13  that there is standing, given the alleged injuries?  And again,

14  you don't have to, on the merits, agree with these injuries,

15  but just to have enough at this stage.

16      Would you agree -- you know, let's say CBF had gotten a

17  flier from ICE saying we're going to be coming by your area

18  relatively soon, would that be enough?  Or coming by your

19  facility relatively soon just to check on things?

20          **MS. WOLFE:**  I certainly think it's a closer question

21  certainly on the injury section, that it would be much closer

22  to having demonstrated a -- a future injury that is certainly

23  impending, yes.

24          **THE COURT:**  But what do you think is actually

25  required, if you're not saying that's enough?

1          **MS. WOLFE:**  So it's a hypothetical that there's a

2     flyer that says ICE is going to come within the next three

3     months?

4          **THE COURT:**  What if there's a -- and I know they

5     don't necessarily use these -- well, I mean let's say there's a

6     marked vehicle that is sitting in the parking lot one day, and

7     they are like, look, that looks like them, we have an imminent

8     fear of injury here, or an imminent injury here.

9          **MS. WOLFE:**  On a marked -- a marked vehicle?

10         **THE COURT:**  Yeah, ICE or CBP, or just someone walking

11    by wearing an ICE jacket, an agent, you know, wearing one of

12    those jackets they wear, and they are on the premises, or right

13    on the curtilage of the premises.  I'm just trying to

14    understand what you think would be enough because I -- you're

15    saying this is not enough, but tell me what's enough.

16         **MS. WOLFE:**  I think some demonstration that they --

17    that the -- that the particular place of worship is being

18    targeted.

19         So, yes, if there is a marked vehicle or if there are

20    agents who are dressed in uniform that clearly say ICE, and

21    they are in the parking lot on the curtilage, that they are,

22    you know, making drive-bys on a routine basis, so engaged in

23    overt surveillance of a particular place of worship, then I

24    think that would be enough.

25         **THE COURT:**  Okay.

1          **MS. WOLFE:**  But we don't have -- we don't have

2     evidence of that having --

3          **THE COURT:**  Not yet, I suppose.  I mean, who knows

4     what will happen in the future.

5          Let me ask you, though, going back to *Clapper*, it seemed a

6     very significant part of that opinion was that there were

7     multiple steps in between the policy and the concerns of the

8     plaintiffs and the people who they might interact with and the

9     actual injury.  And the biggest one they focused on was the

10    fact that any of this action would have to go through the FISA

11    court.  And to predict what a court would do, as part of your

12    causation analysis, they felt like that was too much.  And that

13    wasn't even the only intervening step.

14         And I noticed in your brief, you tried to replicate that

15    and say there's a five-step process.  But frankly, this seems a

16    lot more direct.  There's no intervening -- I mean, the

17    defense -- the plaintiffs want this, but right now there's no

18    warrant requirement for some of this stuff, so you don't have

19    to go through an independent court.

20         There's no real obvious other -- I mean, you mentioned

21    that there could be different intervening pauses of some of

22    this activity.  We don't really have that here.  It's not as

23    if -- I mean, I think there was a concern that there was

24    perhaps more of a generalized fear of surveillance of

25    electronic communications in that case.

1      I mean, here, it seems pretty strong that folks are

2  reacting to this.  And maybe -- again, they may even be able to

3  say they are reacting to this.

4      So isn't that just an issue of causation and traceability,

5  and don't we have very different facts here?

6           MS. WOLFE:  Well, number one, the ICE policy, the ICE

7  January 2025 memo does insert supervisory approval, so that

8  there is that step that has to be gone through.  But --

9           THE COURT:  But it doesn't limit it to these limited

10  circumstances that are in the Mayorkas memo, which were ones

11  that people could legitimately say, look, this doesn't apply to

12  me.  Or I'm not someone involved in a national security

13  violation, I'm not someone with a criminal -- I'm not

14  destroying evidence.

15      And the churches could say, well, we don't think we have

16  people of those types.

17      But now it could be anyone, including -- anyone with any

18  kind of suspected immigration violation.  It doesn't have to be

19  any of those categories.

20      So isn't that a big difference?

21           MS. WOLFE:  That is -- I mean, that is a difference,

22  Your Honor.  But I think going to the issues of causation and

23  redressability, as is clear here that the primary driving

24  factor of the fear here is not the January 2025 memo, but as

25  plaintiffs' counsel has described --

1          **THE COURT:**  How do you know that?  How do you know

2     that?  I mean, granted it happened the same day as the

3     administration beginning.  But if in the past there wasn't a

4     lot of activity at churches or places of worship, and now

5     people are afraid to go there, this is the one policy that

6     effectively establishes that it's much easier to do that,

7     why -- again, and at this stage, I mean, they don't need to

8     prove this beyond a reasonable doubt, but, you know, if they

9     make that kind of a showing, isn't that enough to keep going?

10          **MS. WOLFE:**  Well, the showing that they have made,

11     Your Honor, that they have -- even today, before you have

12     talked about, is the environment and the administration's

13     decision to prioritize immigration enforcement, you know,

14     except for the memo itself.

15          But, again, for the past --

16          **THE COURT:**  What they are saying is that the memo --

17     even though you're right, it doesn't say the magic words "we're

18     going to churches now."

19          **MS. WOLFE:**  Right.

20          **THE COURT:**  By taking away these -- or the language

21     fullest extent, if possible we're not going there, obviously by

22     taking that away, you're saying we are going there, even if

23     this -- you know, beyond that sort of very extreme scenario,

24     and then also by taking away these limited circumstances under

25     which they would go into a place of worship or other protected

1  area, now it's just whatever reason the supervisor thinks is

2  okay.

3      I mean, why can't they read that -- why wouldn't a

4  reasonable person read that as something that shows that

5  there's now a policy that involves going to churches, at least

6  a lot more than in the past?

7          **MS. WOLFE:**  But the policy, again, is to exercise

8  discretion and to exercise common sense.  And -- and not

9  specifically saying that you have the unfettered ability to --

10  to go to --

11          **THE COURT:**  You have the unfettered ability in

12  general because common sense is -- I mean, no one can enforce

13  that.  There's no legally -- I mean, if they came in here and

14  tried to bring a case against someone saying this was against

15  their common sense, I mean, we would probably say that's just a

16  totally unusable standard.

17      So that's not -- I mean, the only thing you have is the

18  ASAC approval or something like that maybe for part of the

19  department but not all of the department.

20      And, again, they're working under a guidance that puts no

21  limits on areas, even soft limits on areas, or reasons why they

22  could go there versus now.

23      I mean, there have been cases in which there's been a

24  recision of a prior policy, like the recision of DACA or other

25  things coming out of the Department of Homeland Security.

1       And no one said, well, they didn't say that they are now

2   doing the opposite of the memo, so there's nothing to see here.

3   Everyone took the view that by taking that away, that was an

4   actual substantive change.

5           **MS. WOLFE:**  Well, the policy has been now in place

6   for about three weeks.  And, again, there's nothing in the

7   record currently before this court that indicates that -- that

8   the defendants have gone in to a place of worship beyond the

9   incident in Georgia, which was pursuant to an order of removal,

10  which is not something that plaintiffs are not challenging the

11  authority to do.

12          **THE COURT:**  Okay.  So I asked you a question about

13  this 8 U.S.C. 1252(f)(1).  I just wanted to clarify, though,

14  you said 1357 isn't covered by that.

15      But as I read that, again, those are sort of warrantless

16  intrusions into the -- well, at or near places of worship or

17  other protected areas.

18      And so these things that are listed in the -- I think they

19  are listed in the Mayorkas memo as defining what a law

20  enforcement action is.

21      Arrests, civil apprehensions, searches, inspections,

22  seizures, service of charging documents or subpoenas,

23  interviews, or surveillance, are those all things that they

24  conduct under 1357?  Or more specifically, are any of those

25  covered by 1221 to 1231?

1    **MS. WOLFE:**  Some of those things are certainly

2    covered by 12 -- Sections 1221 through 1231.

3    **THE COURT:**  Which ones?

4    **MS. WOLFE:**  So arrests, under Section 1226, you can

5    have the attorney general or the secretary of the department

6    issue an arrest warrant for apprehension based on probable

7    cause that an individual is here in the United States in

8    violation of the law.  Again, under Section 12 --

9    **THE COURT:**  So on that point, again, it's not a

10   judicial warrant, it's administrative, but what you're saying

11   is if there's an administrative warrant, there can be no

12   injunction of that activity, correct?

13   **MS. WOLFE:**  Correct.

14   **THE COURT:**  So it's not quite what the plaintiffs

15   were looking for, but obviously they would probably prefer that

16   there were warrants for any activities, even if they are

17   administrative.

18   So you're saying that if every time they go on the

19   property they've got an administrative warrant, or something

20   stronger than that, there could be no injunction of that, but

21   that would only be certain circumstances.  So if they have no

22   warrant, it's not covered by 1226?

23   **MS. WOLFE:**  If they have no warrant, it's not covered

24   by 1226.

25   **THE COURT:**  Okay.  So other than arrest with

1  warrants, is there anything else on that list that you believe

2  is covered by 1221 to 1231?

3          **MS. WOLFE:**  Yeah.  Certain inspections, certain

4  seizures pursuant to -- excuse me, inspections or searches

5  pursuant to Section 1225 that --

6          **THE COURT:**  What are those?

7          **MS. WOLFE:**  -- that would not be covered.

8     I believe those are inspections based on requests for

9  asylum.

10    I'm sorry.  I don't have the provision in front -- in

11 front of me.

12         **THE COURT:**  Okay.

13         **MS. WOLFE:**  But the activity that plaintiffs are most

14 concerned about would be the warrantless activity that is

15 authorized under Section 1357.  That includes warrantless

16 inspections, that would include warrantless arrests.

17         **THE COURT:**  Okay.  And interviews and things like

18 that, or surveillance and things like that?

19         **MS. WOLFE:**  Exactly.  Exactly.

20         **THE COURT:**  I'm just looking up 1225 here to see what

21 it says, help us all out.

22    I mean, this seems like an inspection at the border, isn't

23 it?

24         **MS. WOLFE:**  Right, an inspection -- I think it's --

25 does not -- it's not limited to the border, but inspection for

1  purposes of request for asylum, if my memory serves me

2  correctly.

3          **THE COURT:**  I mean this seems like a stretch to say

4  this is something that would happen just with folks going to a

5  place of worship.  I mean, it talks about stowaways and people

6  who are either presenting at the border.

7          **MS. WOLFE:**  I mean, the primary authorities, as I

8  mentioned, Your Honor, would be 1226 and 1231.

9          **THE COURT:**  Okay.  Okay.  And what's 1231 again?

10          **MS. WOLFE:**  1231 is the administrative warrant for

11  arrest based on a final order of removal.

12          **THE COURT:**  Okay.  So in either way, there was a

13  warrant of some kind?

14          **MS. WOLFE:**  There's a -- yes.

15          **THE COURT:**  Okay.  So under RFRA, we had -- I had

16  this discussion with the plaintiffs' counsel, but, you know,

17  they cited *Burwell v. Hobby Lobby*, and that does seem to stand

18  for the proposition that you can't -- the courts are not in

19  position to evaluate the sincerity or reasonableness or

20  validity of beliefs of a religious organization.

21      So under that principle, would you agree, or at least --

22  are you contesting in any way the sincerity of the beliefs that

23  they have offered in their submission of the three

24  organizations?

25          **MS. WOLFE:**  No, Your Honor, the government is not.

1          **THE COURT:**  So we can accept those beliefs, and then

2    the question is just are they burdened and so forth?

3          **MS. WOLFE:**  Correct.

4          **THE COURT:**  Okay.  And then in terms of the burden,

5    you've heard Mr. Girard talk about doesn't have to be a direct

6    prohibition, it can be substantial pressure.

7        Do you agree with all that, that these can be indirect

8    burdens?

9          **MS. WOLFE:**  The government agrees, yes, it can be a

10   burden based on substantial pressure.

11         **THE COURT:**  And so do you agree, for example that,

12   this Bethel World outreach case sort of supports that

13   proposition?

14         **MS. WOLFE:**  Your Honor, I haven't looked at the

15   Bethel case within the past few hours, so I don't want to make

16   representations about that.

17         **THE COURT:**  Okay.  Fair enough.  Fair enough.  Nor

18   had I.

19       Okay.  So in terms of whether there needs to be an actual

20   violation of your beliefs, or whether it can just substantially

21   burden your exercise of the religion, do you agree with

22   Mr. Girard that it's the latter, that it doesn't have to effect

23   an actual violation of beliefs, just something that hinders it

24   to the point that it's significant?

25         **MS. WOLFE:**  That's not -- that is not the

1  government's reading of the substantial pressure test.

2        **THE COURT:**  What is your reading?

3        **MS. WOLFE:**  The substantial pressure test says that

4  it has to modify the behavior of the plaintiff or violate --

5  violate their beliefs.  And that is simply not here.  We --

6        **THE COURT:**  Well, modified behavior and violated

7  beliefs sound like two different things.  Are they?

8        **MS. WOLFE:**  I think that -- I think they can be.

9        **THE COURT:**  So there can be a violation just if it

10  causes a modification of beliefs?

11        **MS. WOLFE:**  If it causes a modification of their --

12  their behavior and how they are carrying out their beliefs.

13        **THE COURT:**  So that would be sufficient?

14        **MS. WOLFE:**  For substantial pressure?

15        **THE COURT:**  Yes.

16        **MS. WOLFE:**  If they're modifying -- if plaintiffs are

17  modifying their behavior.

18        **THE COURT:**  I'm sorry.  Is that -- you're agreeing

19  with that?

20        **MS. WOLFE:**  Yes.

21        **THE COURT:**  Okay.

22        **MS. WOLFE:**  If plaintiffs are modifying their

23  behavior, but that's not their allegation.  Plaintiffs aren't

24  modifying their behavior.

25        **THE COURT:**  Well, they're saying they're starting to

1  lock doors now, they're no longer encouraging people to attend,

2  things like that.  That's modification, isn't it?

3      **MS. WOLFE:**  But is that -- but RFRA permits some

4  burden, right?  So locking -- locking a door or refraining from

5  welcoming everyone is not -- I don't think that plaintiffs have

6  shown that that is a substantial burden.

7      **THE COURT:**  Well, I mean, I think they have even said

8  that that might even be a violation of their beliefs, to lock

9  the doors and stuff.

10     And so, again, you just said that you're not questioning

11 the sincerity of these beliefs.  So you or others might decide

12 well, that's not a big deal, wouldn't bother me, but if it

13 actually burdens their religion, who are we to challenge that?

14     **MS. WOLFE:**  But the memo isn't -- the memo is not

15 either through a command or through a prohibition or through a

16 set of conduct, pressuring them to do that.

17     **THE COURT:**  But you just said that substantial

18 pressure can be enough.  It doesn't have to be a direct command

19 or a direct prohibition, it can be indirect through substantial

20 pressure.

21     **MS. WOLFE:**  It can be indirect through substantial

22 pressure, but that pressure, as described today, is based on

23 speculative fear that plaintiffs and their member organizations

24 are -- are or will be imminently threatened with enforcement

25 activity.  And they have simply not shown that.  So --

1          **THE COURT:**  So having the Secretary -- Secretary of

2    Homeland Security on social media with an ICE jacket and saying

3    we're going to send the dirtbags home, that's not somewhat out

4    of the norm to the point where it would take us beyond

5    speculation?

6       I mean, if all they did was quietly changed this memo,

7    perhaps.  But in terms of, you know, whether this is really

8    just speculation or not, I mean, there seems to be a full court

9    press in this area.

10         **MS. WOLFE:**  Certainly this administration has

11   prioritized the enforcement of the nation's immigration laws.

12   But that prioritization -- that prioritization is, as

13   plaintiffs say, is not what's being challenged here, the

14   government's priorities; it is the effect of this particular

15   memo.

16      And this particular memo that neither commands nor

17   prohibits nor sets forth conduct, nor has been shown at least

18   in the record to date, to have targeted any particular member

19   organization of plaintiffs.  It is simply speculative at this

20   juncture.

21         **THE COURT:**  So if it -- which, as I said, I think the

22   way I read it is, it does expand the scenarios under which you

23   could go to a place of worship.  Before, it largely said you

24   can't, unless it's one of these five areas, with, again, some

25   exceptions that can be identified through judgment.  But these

1  are largely the five or six areas you can do this.

2      And we're not doing this unless it's -- you know, to the

3  fullest extent possible, they are avoiding going into these

4  places.

5      So as I read it, they have expanded the universe of

6  scenarios and lowered the bar for going into these locations.

7      Do you have a case or some other authority saying that

8  that kind of change, not an absolute prohibition, but a change

9  in scope or a change in likelihood or probability is

10  insufficient under RFRA to establish this substantial burden?

11          **MS. WOLFE:**  No, I do not.

12          **THE COURT:**  So you agree that it's a little bit just

13  sort of in the eye of the beholder, or at least it's a

14  fact-based analysis?

15          **MS. WOLFE:**  That's right, it's a fact-based analysis.

16  And it's a fact-based analysis that we currently do not have

17  concrete facts here to -- to conduct that and help guide that

18  analysis.

19          **THE COURT:**  So that -- I know that's your position,

20  and -- but if for some reason I disagreed with that, and there

21  was a burden found in your brief, you don't really address

22  compelling interests, least restrictive means.  I have some

23  sense of what you would say about compelling interests.

24      The least restrictive means part, would you have any

25  argument of that type, given that we just used to have a policy

1    that was more narrow?  So there are less restrictive ways to do

2    this, aren't there?

3              **MS. WOLFE:**  The -- the delta between the policy, when

4    you're setting aside exigent circumstances, which if you look

5    at the list in the 2021 memo where it -- it says the

6    enforcement action involves a national security threat, there's

7    an eminent risk of death or violence, the action involves a hot

8    pursuit, those are the types of circumstances that give rise to

9    an exigent circumstance.

10             **THE COURT:**  So I'm not sure I read it that way.

11        Let's go back to the bottom of Page 3 of the Mayorkas

12   memo.

13        It says, exceptions and limitation on scope.

14        So again, it starts off by saying the fundamental

15   principle, to the fullest extent possibly we should not take an

16   enforcement action in or near a protected area.  And then it

17   says that recognizes there might be limited circumstances under

18   which an enforcement action needs to be taken.  Not that these

19   are exigent circumstances, but just limited circumstances.  And

20   it lists examples, which are the six things you referenced.  It

21   does say it's not complete.

22        But I read that as saying because we're saying fullest

23   extent possible, the only reason you can go into one of these

24   protected area is if it's a limited circumstance, which it

25   includes these six areas, it could be more, but this is

1  basically the main categories.

2        And then it says absent exigent circumstances.  It doesn't

3  say absent these exigent circumstances.  It says absent exigent

4  circumstances, an agent or officer must seek prior approval.

5        And then it says, if it is taken due to exigent

6  circumstances, then there can be post- consultation.

7        So I read that as saying that these are the six or so

8  categories we're narrowing it down to, with some potential to

9  expand it based on exercise of judgment.  And that you need --

10 in addition to it being in one of these categories, you also

11 need to have an agent or an officer approval -- you need to get

12 approval, unless there's an exigency, meaning that there's no

13 time for this.

14       Now, some of these do seem generally exigent, like hot

15 pursuit, but not all of them.  A national security threat, that

16 could be something that you have to go into right away or you

17 could get prior approval.  And it seems to suggest prior

18 approval, unless you really can't.

19       And so, again, I read this as basically the list with some

20 narrow exceptions.

21       And then the exigent circumstances analysis is really

22 designed to decide whether it's pre-approval or post-approval.

23       Do you have a different way of looking at this?

24       **MS. WOLFE:**  I, Your Honor, view the reference to

25 absent exigent circumstances to be describing the list of six

1    items.

2          THE COURT:  Well, how come it doesn't say absent

3    these exigent circumstances?  I mean, I think that's the only

4    reasonable way to read this.  It says -- and, again, if you

5    look at the prior section, it describes these as the limited

6    circumstances.  It doesn't say these are exigent circumstances

7    in general.

8       So the limitations are these six areas, with the

9    exception -- and the exigent circumstances issue is about when

10   you get approval.

11         MS. WOLFE:  So accepting that, accepting your

12   premise, so that we you don't waste any more of your time.

13         THE COURT:  I mean, if there's another way -- if you

14   want to point me to language that may cause me to take a

15   different view, I'm happy to look at it, if you want to point

16   me to something else in here I'm missing.

17         MS. WOLFE:  The language that I see is what I pointed

18   out in reference to absent exigent circumstances.

19      But again, accepting the Court's reading of this document,

20   most of these six items do qualify or would be considered to be

21   exigent circumstances.

22      So at bottom, the difference between the 2021 guidance and

23   the 2025 ICE guidance really is the level at which the

24   supervisory pre-approval for --

25         THE COURT:  So you're taking the view that despite

1    all this language here and the limited circumstances section of

2    this memo, that under the Mayorkas memo, the department -- I

3    mean, they could have gone in for any reason, just to do an

4    inquiry about whether someone might not be -- might not have

5    lawful status, just so long as they got a supervisor to sign

6    off on it?  Didn't have to fit into one of these categories or

7    something equivalent?

8         **MS. WOLFE:**  Yes, Your Honor.

9         And, in fact, it specifically says that the list is not

10   complete, and it urges decision-makers to exercise their

11   judgment in making determinations on whether or not they should

12   conduct an enforcement activity at or near a place of worship.

13   Or, excuse me, this is -- a sensitive location.  It encompasses

14   more than just a place of worship.

15        **THE COURT:**  Right.  Okay.

16        Okay.  So then on the expressive association issue, I

17   think the Boy Scouts of America case sets forth some of the

18   factors to consider, or the element.  One is, is there

19   expressive association?

20        Will you agree that there is expressive association here,

21   it's really more about the other issues that you're debating?

22        **MS. WOLFE:**  Certainly everyone has the right to

23   gather for purposes of exercise of their religion.  Yes, that

24   is --

25        **THE COURT:**  So you would agree -- you would agree

1  that these plaintiffs are engaged in expressive association,

2  the question is whether it's being burdened?

3          **MS. WOLFE:**  Correct.

4          **THE COURT:**  And then on that, you heard my question

5  to Mr. Girard about the standard.

6      Is it the *Roberts* standard or the *Americans for Prosperity*

7  standard we should consider?  Because, again, I -- it seemed to

8  me *Americans for Prosperity* was focused on compelled disclosure

9  issues, but, admittedly, it's not completely clear.

10         **MS. WOLFE:**  I think here, Your Honor, that the --

11  certainly *American Prosperities* is a more recent case, but the

12  case that is most directly on point, and I think is relied upon

13  more significantly for -- under -- I'd refer would be the

14  *Roberts* case.

15         **THE COURT:**  So even though that's largely a higher --

16  probably, at least in my view, it seems to be a higher

17  standard, you would agree that that's the appropriate one to

18  apply?

19         **MS. WOLFE:**  I think for RFRA, yes, Your Honor.

20         **THE COURT:**  Well, actually, no, we're not --

21         **MS. WOLFE:**  If you -- I'm sorry.

22         **THE COURT:**  Yeah, expressive association.

23         **MS. WOLFE:**  Expressive association.  I'm sorry, Your

24  Honor.  Let me shift -- let me shift focuses.

25      I think whether you were to -- when we get to the point

1  where we -- if we need to look at the standard to apply, that,

2  you know, the government here could meet either standard.

3  Certainly the *American Prosperities* is a slightly lower

4  standard.  But, again, the *Roberts* case seems to be a bit more

5  applicable here in terms of the analysis.

6          **THE COURT:**  Okay.  That's helpful to know.

7      And then for this one, would you agree that the

8  requirements to establish a burden or a significant effect are

9  either -- would you say they are the same, or is it a lower bar

10 than for RFRA in that there's not this issue, at least I

11 haven't seen a case that refers to this burden being one that

12 sort of causes a violation of the religious beliefs, which I

13 know we're debating with the other side as to whether that's a

14 requirement or not.  But this one doesn't seem to have anything

15 like that.  It's really more about, you know, a significant

16 burden or effect on the right.

17         **MS. WOLFE:**  That's correct.

18         **THE COURT:**  Okay.  So you would agree it's perhaps a

19 lower bar, then, for the -- on the burden issue than for RFRA?

20         **MS. WOLFE:**  Yes, I think so.

21         **THE COURT:**  Okay.  And so, you know, under *Rumsfeld,*

22 there's some language in there about certain state actions that

23 make group membership less attractive may violate the freedom

24 of expressive association, so do you agree that that's the

25 standard, or at least part of the standard?

1        **MS. WOLFE:**  It can certainly -- it can certainly be

2   part of the standard.  But if you look at what the Court was

3   saying in *Rumsfeld,* it was looking at activities that would

4   make gathering with that group more unattractive, like, you

5   know, requiring them to admit members or requiring them to take

6   a particular position on something.  Again, there was some

7   direct action there that would make it less attractive to join

8   that group.

9        **THE COURT:**  So would you agree that, for example, if

10   the policy actually was we're going to station an ICE vehicle

11   at every church, even though that doesn't compel anything in

12   particular, that might make it less attractive for some, and

13   that might be a violation?

14        **MS. WOLFE:**  But that's not requiring plaintiff --

15        **THE COURT:**  But it makes it less attractive to be a

16   member of this church if we have ICE vehicles outside every

17   day -- every time you go.  I know that's not our facts.

18        **MS. WOLFE:**  That's not our facts.

19        **THE COURT:**  But in terms of just sort of where -- you

20   know, what would it take, it seems like something like that

21   might be enough, wouldn't it be?

22        **MS. WOLFE:**  If there was a marked ICE vehicle with

23   agents and uniforms inside -- outside of every single --

24        **THE COURT:**  Or just the plaintiffs' locations.

25        **MS. WOLFE:**  -- of a church, or the plaintiffs'

1  location, if they are flooding that location, then -- and

2  making it more difficult to -- to attend, whether by having to

3  navigate through that or, again, just the overwhelming visual

4  presence there.

5           **THE COURT:**  Okay.  But since physical presence is so

6  20th century, I mean, what if this was all done online and they

7  just broadcast on social media, you know, these Quaker churches

8  or meeting houses, we're going to be targeting those and we're

9  going to all of those at some point, would that be enough?

10          **MS. WOLFE:**  Well, that's not the situation here.

11          **THE COURT:**  I know, I'm just trying to understand

12  where you think the line is.  I understand your position is

13  you're on the good side of the line for purposes of a

14  non-violation.  I'm just trying to understand where you think

15  the line would get crossed.

16          **MS. WOLFE:**  If there is a blast that says we are

17  going to target all Quaker churches, or we're going to -- or

18  meeting houses, I believe, is the appropriate term to use, or

19  if there was a blast that we are going to target a particular

20  meeting house, then for expressive purposes, expressive

21  gathering purposes for that particular meeting house, or again,

22  if the blast was we're targeting within the next week or two

23  weeks or the next three months, focusing on Quaker meeting

24  houses.

25          **THE COURT:**  What if it wasn't Quaker meeting houses?

1    What if it was just we're coming to Greenbelt, Maryland, and

2    we're going to all the places of worship there, and you happen

3    to be in Greenbelt, Maryland, wouldn't that be enough?  Or your

4    church or place of worship was in Greenbelt, Maryland?

5          **MS. WOLFE:**  If the statement was we're going to

6    target every single place of worship?

7          **THE COURT:**  Not every one, but we're doing -- we're

8    doing an initiative.  We're going to be going in -- can they

9    promise they will go to every single one?  Probably not.  I

10   mean, the resources might not be there.

11       But they're saying we're targeting this particular

12   community and all of their places of worship, would that burden

13   the expressive association right?

14         **MS. WOLFE:**  Well, again, that's not the circumstance

15   that is presented here because we don't have that statement.

16         **THE COURT:**  But it doesn't have to be just one church

17   itself or one denomination.  It could be a geographic

18   targeting.  It could be however you wanted to define it.

19       But if you -- if you knew that your place of worship was

20   in that target zone or target category, wouldn't that be enough

21   if they said, look, we're going to be doing enforcement actions

22   at, again, geography, denomination, however it describes it

23   where you're clearly -- you're clearly included?

24         **MS. WOLFE:**  Well, that would certainly remove the

25   subjective and speculative nature of -- of the harm.

1          **THE COURT:**  Well, I'm not talking about standing.

2    I'm also talking about whether that's a violation of the

3    expressive association right.

4       Because, again, it makes it less attractive to be there.

5    It's also -- significantly affects your ability, at least some

6    members of the -- or some of the institutions.

7          **MS. WOLFE:**  Again, we don't have that here.

8          **THE COURT:**  I understand.

9          **MS. WOLFE:**  We're not presented with those -- with

10   those facts here.  And there's nothing to indicate, at least in

11   the record before this Court, that ICE intends to -- ICE or DHS

12   intends to issue some type of statement or to -- or to target

13   any particular community, any particular geographic region, any

14   particular place of worship or congregation or -- or, you know,

15   other belief, whether it be the Quakers or the Methodists or

16   the Presbyterians.  There's nothing here.

17         **THE COURT:**  So if the secretary, in her social media

18   post with the ICE black jacket, had said, more specifically,

19   we're going into churches, we're going into mosques, everywhere

20   in the country -- or in your state, maybe it was state

21   specific, a violation?

22         **MS. WOLFE:**  In your state?  That's a pretty wide

23   geographic area.

24         **THE COURT:**  So you're saying they can threaten

25   actual, you know -- they can say we're going to your location,

1  but just so long as it's general enough, there's no -- there's

2  no burden on the right of expressive association?

3          **MS. WOLFE:**  No significant burden.  Right?  Because

4  the standard is not that there's no burden, Your Honor.  The

5  standard, whether you look at it from direct and substantial,

6  or from significant interference, is there has to be

7  significant interference.

8      And -- and so a broad statement by an agency head that is

9  untethered to any particular, you know, target, or any

10  particular announcement, I think while certainly there may be

11  some interference, it would not rise to the level of

12  significance.

13          **THE COURT:**  Okay.  My last question regards -- I

14  mentioned with Mr. Girard the possibility, if there were, some

15  sort of injunction, what the scope would be, and he raised the

16  question of -- raised the point that if there's 37,000 -- I

17  don't know what the right number was, but a large number of CBF

18  churches or otherwise, and if one were to just say there's an

19  injunction related to certain places of worship, that members

20  of the community who are being sort of asked to or encouraged

21  to come, which is part of the beliefs of these locations, would

22  just -- you know, they wouldn't be all convincing to say, well,

23  come to our location, we're protected or not covered by any

24  policy versus the one next door.  Now, that's just not

25  something that's a realistic thing that everyone would

1 understand, what do you make of that argument?

2 **MS. WOLFE:** Well, plaintiffs here have not availed

3 themselves of any measures to seek relief on behalf of parties

4 who are not before this court.

5 They haven't attempted to certify or -- or indicated that

6 they intend to certify a class. They haven't raised

7 third-party standing issues.

8 So there is no basis for them to seek relief on behalf of

9 parties who are certainly not before the Court.

10 **THE COURT:** What about the line of cases in which

11 immigration or restrictions are viewed to be -- you know,

12 there's a need for uniformity among them? And that has been

13 used in some instances to warrant broader relief than just the

14 parties? And these are immigration restrictions of sorts?

15 **MS. WOLFE:** I think still, Your Honor, we don't have

16 parties before the Court.

17 We also have a circumstance where we have another similar

18 lawsuit that has been filed in the District Court for the

19 District of Columbia, and to issue a nationwide injunction

20 would infringe on that Court's ability to fashion relief as it

21 sees fit, and to percolate these issues up through the sister

22 circuits here.

23 So there's -- there's just -- there's no basis.

24 I also didn't hear Mr. Girard say that there was some

25 reason why they could not provide a list of their members'

1   organizations with the -- their addresses.

2          **THE COURT:**  I mean, I am assuming they could, it's

3   just that they are saying that that would be -- that wouldn't

4   be effectual.  But I hear what you're saying.

5       Okay.  Is there anything else you want offered that we

6   haven't covered?  You've had substantially less time, I think,

7   that Mr. Girard, so --

8          **MS. WOLFE:**  I think that back to the standing issue,

9   not only does *Clapper* foreclose plaintiffs' -- on the -- the

10  information in the evidence that is currently before the Court,

11  that there is a threat of a certainly impending injury here,

12  that in turn --

13         **THE COURT:**  Doesn't *Clapper* also say, at least it

14  leaves open the idea that the standard under *Monsanto* could be

15  substantial risk.

16      So are we certain exactly what the standard is?  I mean,

17  they said in that case, either way, it didn't make a

18  difference.  But they do say that substantial risk may be the

19  test in certain circumstances.

20         **MS. WOLFE:**  Well, we're seeking -- plaintiffs are

21  seeking prospective relief here.  And so --

22         **THE COURT:**  I saw that in your brief.  Maybe you can

23  just be a little more clear.

24      Is there a particular part of the opinion that makes clear

25  that that is the test for prospective relief as opposed to just

1    an injunction in general?

2        Because, I mean, again, I -- I certainly take your point,

3    that factually that case is a lot closer, but they do reference

4    a substantial risk standard and don't eliminate it.

5            **MS. WOLFE:**  I know that the Supreme Court in *City of*

6    *Los Angeles v. Lyons* in the context of prospective injunctive

7    relief has the standard that the Supreme Court there

8    articulated was certainly imminent relief -- or excuse me,

9    certainly imminent harm.

10            **THE COURT:**  Imminent or impending, same thing, in

11   your view?

12            **MS. WOLFE:**  Imminent, impending, I think those words

13   are used interchangeably, Your Honor.

14            **THE COURT:**  Remind me, is that postdate *Clapper*?

15            **MS. WOLFE:**  It predates *Clapper*.

16            **THE COURT:**  They are never as clear as we would all

17   like them to be, I suppose.

18        Yeah, I'm looking at Footnote, I think, 5 of *Clapper*, that

19   allows for a different test under *Monsanto*.

20        Okay.  Anything else, then?  Go ahead.

21            **MS. WOLFE:**  But I think even under a substantial

22   risk, that standard, which we did not brief, Your Honor, and we

23   certainly can brief that, if that would be helpful to you, but

24   even there, under a substantial risk, plaintiffs have not shown

25   a substantial risk because, again, they have not pointed to

any -- any indication that their members are or will soon be the target of -- of an enforcement action.

But moving from injury, I think even if you were to disagree, Your Honor, and you would say -- they've shown enough here for injury, in terms of causation, again, a lot of the discussion today has been about -- to use language that was used here, the environment in which the 2025 memo was issued.

And the -- the environment, the government's decision to shift course, so to speak, and to prioritize immigration enforcement is really, from what I've heard today, and from what my takeaway from plaintiffs' reply papers, is the driving force here, and is the cause of their injury, not necessarily this particular -- this particular memo that potential worshipers and congregants may or may not be aware of.

And that also then raises the issue of redressability, and whether the requested relief here would redress that injury, would address the fears that are chilling deterrents, and would encourage people who made a choice to --

**THE COURT:** Well, they don't have to solve everyone's concerns. It could just have an impact moving the needle in their direction, that would be sufficient on redressability, wouldn't it?

**MS. WOLFE:** But there's nothing here to indicate that it would move the needle at all. Simply because of, again, as plaintiffs have put it, the environment in which the memo was

1  issued, that here we're talking about the prioritization of

2  enforcing the nation's immigration laws.

3  　　　　　**THE COURT:**  Okay.  Thank you.

4  　　　　　**MS. WOLFE:**  Thank you.

5  　　　　　**THE COURT:**  Now, Mr. Girard, you've had, I think --

6  not by your choice, but by my questions, you've had more time,

7  but since it's your motion, I'll give you a brief opportunity,

8  if you want to have any rebuttal, just on very limited points

9  raised by Ms. Wolfe.

10  　　　　　**MR. GIRARD:**  Yes, Your Honor.  Thank you very much.

11  　　I have a few points in response, but I do want to just

12  quickly correct something that I said, a citation that was

13  wrong.

14  　　It's not the Baxley declaration -- or it is the Baxley

15  declaration that's Exhibit 49, Paragraph 52, that talks about

16  the 66 percent decrease at the ESL class.  It was not the Hayes

17  declaration.

18  　　　　　**THE COURT:**  Okay.

19  　　　　　**MR. GIRARD:**  Although I will say that the Hayes

20  declaration at Paragraph 18 does say reduction in their ESL

21  class as a specific result of the DHS policy, it's just not

22  where those 66 percent is found.

23  　　Second, Exhibit 19 is the report to Congress that I had

24  mentioned.

25  　　So in response to a few things the government had said,

1    I'll start with standing and the question about *Clapper*, and to

2    get to some of the Court's earlier questions about if the third

3    party has a kind of subjective chill, then doesn't that break

4    standing?  And I think that's actually the wrong question.

5        And I think it's important because the question about the

6    subjective chill is a question about the injury, the legally

7    cognizable injury, and that is a question for the plaintiffs.

8        When you're talking about questions of third parties, the

9    standard for that is not do they themselves have a legally

10   cognizable injury, because we're not talking about standing for

11   the third parties.  This isn't a third-party standing case.

12       When we're talking about third parties, I think the

13   standard is better taken from *FDA v. Alliance for Hippocratic*

14   *Medicine*.  And that's what I talked about will a third party

15   act -- likely act in a way that is likely to cause harm.

16       The Court there could have said that the third party

17   needed to have an injury in fact for you to rely on it, but

18   that wouldn't really make much sense, because the injury in

19   fact is for the plaintiffs.  The plaintiffs are the ones that

20   need to show standing.  And we have shown an injury in fact.

21   We don't need to show that there is an injury in fact for the

22   third parties for the people who don't come.  All we need to

23   show is that they likely respond in a way that is likely to

24   harm us, and as I said, we have shown that.

25       I think a lot of the government's reading of the briefs

1  and what we heard up here today, again, it is -- it's arguing a

2  different case, and it's ignoring some of the things in the

3  record.

4      We have shown -- and I pointed the Court to some examples

5  in the record, I have more if would you like -- but very

6  specific allegations that people are not showing up, and they

7  are not showing up as a result of the DHS policy.  This isn't

8  speculation.  This isn't kind of hoping that the Court can read

9  into that.  This is what has been said.  And as I said, it is

10  very much in the record.

11          THE COURT:  Okay.  And it's focused on CBF and

12  perhaps the Sikhs?

13          MR. GIRARD:  Yes.

14          THE COURT:  Okay.

15          MR. GIRARD:  So I think I also want to get to the

16  merits and the question of causation and redressability.  I

17  think once it's understood what we're actually alleging here,

18  what we're actually arguing, is these legally cognizable harms

19  to the plaintiffs caused by the policy, I don't think that

20  those are terribly tough questions once it's properly framed.

21      I do want to say that I heard the government talk about

22  our allegations and our case being about the overall

23  atmosphere.  I don't think that's right.  I think that there

24  are, again, very specific allegations and specific harms that

25  are alleged.

1    We raise the overall atmosphere because I do think it

2    points to the reasonableness of third parties who aren't going

3    out to their houses of worship.

4    And I think, you know, the government both on that point

5    and overall kind of has to reap what it sows, right?  Which is,

6    there was some hypotheticals about, okay, well, certain

7    geographic area or certain religion if ICE said we're going to

8    go after them.

9    And the government, from what I heard, resisted anything

10   other than unless there's a specific house of worship targeted,

11   that's not going to be enough.  And the broader that it goes,

12   the more people and the more houses of worship that it

13   threatens to say well, it's unreasonable then -- if you are in

14   Greenbelt, and the government has said we're going to houses of

15   worship in Greenbelt, it's unreasonable to have a fear of that,

16   and it's unreasonable for people to stay home unless the

17   government has said we are coming to your specific house of

18   worship in Greenbelt.

19   Some of the hypos that opposing counsel had said, well, if

20   you had ICE in ICE jackets and ICE vehicles outside of a house

21   of worship.

22   I think what the government wants, then, it wants to put

23   out a broad policy and all of these statements about the broad

24   policy, and I do think that houses of worship specifically were

25   mentioned when the policy was -- when the 2025 policy was put

1   into place.

2       And when people have understandable and natural fear of

3   that policy, and our clients and other houses of worship across

4   the country suffer, for DHS to then say, oh, well, look, we

5   just said we can go to all of them.

6       We don't know -- you don't know that it's going to come to

7   yours, but that's precisely the reason that there's this

8   injury.  People don't know, so they are staying home because it

9   could happen at any time.  And I think that's a perfectly

10  reasonable thing for a third party to do in this circumstance,

11  and it is harming our clients right now.  And that is of the

12  government's own creation.

13      So I think the government, in saying, yes, we can do

14  anything, there's -- you know, it's fair game, it's open

15  season, doesn't then get to rely on, oh, well, we've told

16  everybody we can go after them but not until we actually go

17  after you can you do anything.

18      And to be honest, I'm not sure what could be done post a

19  raid at any of our particular houses of worship, or any

20  particular house of worship generally, because I assume, then,

21  you know, that the government would come in and say, well, you

22  can't prove that's going to happen again, and so there's not

23  really much we can do there.

24      I think the fear, again, is what I want to focus on,

25  because that is what's causing our clients harm and it's

1   causing them harm right now.

2        **THE COURT:**  Can I ask a question?  And then I think

3   we'll have to wrap up.  Frankly, I meant to ask it earlier.

4        Among the alleged violations of RFRA, for example, I mean,

5   you focused on the communal aspect of worship, there's a lot of

6   discussion in the affidavits from the Quakers about their

7   pacifist beliefs, their beliefs of nonviolence, not having

8   firearms on the meeting house premises, things like that.

9        What was the purpose of that language?  Does that -- are

10  you saying that helps to support a RFRA violation, a first

11  free assoc -- expressive association violation, or something

12  else?

13       **MR. GIRARD:**  I do think it -- I think it goes to

14  both.  Again, I think the idea of the -- of armed agents coming

15  in for no -- with no warrant for no reason other than to just

16  conduct kind of general immigration enforcement operations is

17  something that has already harmed the idea, the freedom of the

18  worship by our clients and I think will continue to harm them,

19  especially as pacifists who might not want to go to houses of

20  worship.

21       So I think it does really add to their religious beliefs

22  and particularly why this is a problem for them.

23       Also, it helps to get to the second part of that choice

24  that they shouldn't have to face, putting people in harm's way,

25  especially when people are armed.

1    Your Honor, I know you want to wrap up.  If I could have

2  just one moment to address something that a colleague --

3        **THE COURT:**  Okay.  Very quickly.

4        **MR. GIRARD:**  That I might have -- I just don't want

5  to give the impression that under your reading of the 2021

6  memo, which, you know, the fullest extent possible, and it's

7  not just free supervisory approval authority that there are

8  outlined in very specific terms.  I did not mean to imply that.

9  We would be opposed and would rather lose the motion than to go

10  back to that.  And so I just did want to clarify.

11        **THE COURT:**  Okay.

12        **MR. GIRARD:**  Thank you, Your Honor.

13        **THE COURT:**  Thank you very much.  I'll take the

14  matter under advisement.  I know it's a motion for preliminary

15  injunction, so we'll try to get you some ruling relatively

16  quickly.

17    I did want -- actually, either side, since some time has

18  passed since the filings, and then I don't know how much time

19  will pass before ruling, is there anything anyone wants to

20  supplement the record with at some point, based on new

21  information that may have postdated that, or are we content

22  with what we have?

23    There's no new memos that have come out, for example, and

24  I know I already asked Mr. Girard about facts, but I don't know

25  if there's anything else they want to offer about besides that.

1          **MR. GIRARD:**  We don't have anything specific unless

2    there's something that Your Honor would like us to address.

3    But no.

4          **THE COURT:**  Okay.

5          **MS. WOLFE:**  And, Your Honor, at this juncture, we

6    don't have anything to add.

7       As I said earlier, CBP has not issued any further

8    guidance.  Should that change, we would obviously alert the

9    Court and plaintiffs.

10          **THE COURT:**  Okay.

11          **MS. WOLFE:**  And if any other guidance were to issue

12    from either DHS or ICE, we would do the same.

13          **THE COURT:**  Sure.  Okay.  Well, thank you very much

14    for the arguments.  It's been very helpful.  And we'll give you

15    a ruling as soon as we can.

16       Thank you.

17          **DEPUTY CLERK:**  All rise.  This Honorable Court now

18    stands adjourned.

19       (Proceedings were concluded at 1:06 p.m.)

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4        I, Paula J. Leeper, Federal Official Court Reporter, in

5   and for the United States District Court for the District of

6   Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

7   the foregoing is a true and correct transcript of the

8   stenographically-reported proceedings held in the

9   above-entitled matter and the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12                          Dated this 19th day of February 2025.

13

14

15                          /S/ Paula J. Leeper
                            _____
16
                            Paula J. Leeper, RPR, CRR
17                          Federal Official Reporter

18

19

20

21

22

23

24

25