## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

PHILADELPHIA YEARLY MEETING OF
THE RELIGIOUS SOCIETY OF FRIENDS,
NEW ENGLAND YEARLY MEETING OF
THE RELIGIOUS SOCIETY OF FRIENDS,
BALTIMORE YEARLY MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS, INC.,
ADELPHI FRIENDS MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS,
RICHMOND FRIENDS MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS,
NEW YORK YEARLY MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS, INC.,
COOPERATIVE BAPTIST FELLOWSHIP
and
SIKH TEMPLE SACRAMENTO,

      Plaintiffs,

      v.

U.S. DEPARTMENT OF
HOMELAND SECURITY and
KRISTI NOEM,
*in her official capacity as*
*Secretary of Homeland Security,*

      Defendants.

Civil Action No. 25-0243-TDC

### MEMORANDUM OPINION

For over 30 years, the United States government has imposed various limitations and safeguards on the execution of immigration enforcement actions in or near places of worship. In light of the First Amendment's protections relating to religious exercise, such limitations served to mitigate the potential collision between the interests of government and religion that would inevitably arise from intrusions by armed law enforcement officers into churches, synagogues,

mosques, temples, and other places of worship. On January 20, 2025, the United States Department of Homeland Security ("DHS") abruptly removed all such limitations and safeguards and instead left decisions on whether to conduct such enforcement actions to the unilateral discretion of individual officers. Three different faith communities have now challenged this action.

Specifically, Plaintiffs Philadelphia Yearly Meeting of the Religious Society of Friends; New England Yearly Meeting of the Religious Society of Friends; Baltimore Yearly Meeting of the Religious Society of Friends, Inc.; Adelphi Friends Meeting of the Religious Society of Friends; Richmond Friends Meeting of the Religious Society of Friends; and New York Yearly Meeting of the Religious Society of Friends, Inc. (collectively, the "Quaker Plaintiffs"), along with Plaintiffs Cooperative Baptist Fellowship ("CBF") and Sikh Temple Sacramento ("the Sikh Temple"), have filed a civil action against Defendants DHS and Secretary of Homeland Security Kristi Noem, in her official capacity (collectively, "DHS"), in which they allege that the new policy relating to immigration enforcement actions in or near places of worship violates their right to freedom of expressive association under the First Amendment to the United States Constitution, U.S. Const. amend. I; the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb-4; and the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706. Plaintiffs have filed a Motion for a Temporary Restraining Order and Preliminary Injunction, which is fully briefed. The Court held a hearing on the Motion on February 13, 2025. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.    Protected Areas Guidance (1993–2021)

From at least 1993 to 2021, various agencies within the federal government charged with enforcing the nation's immigration laws have issued and applied policy guidance governing immigration enforcement actions in or near certain locations that have been referred to as either "sensitive locations" or "protected areas," including such locations as places of worship, schools, health care facilities, and sites of parades and demonstrations. *E.g.*, Joint Record ("J.R.") 82–83, 189–90, ECF Nos. 49-2, 49-3. For example, on May 17, 1993, James Puleo, the Acting Associate Commissioner of Operations for the Immigration and Naturalization Service, issued a memorandum stating in part that it was "a policy of the Service to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies." J.R. 67. On July 3, 2008, Julie Myers, the Assistant Secretary of Homeland Security for United States Immigration and Customs Enforcement ("ICE") issued a memorandum that referenced Puleo's memorandum and directed that ICE personnel "should refrain from conducting enforcement action or investigative activities at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies," except in certain identified "limited circumstances." J.R. 80. From October 24, 2011 to October 27, 2021, a memorandum issued by ICE Director John Morton ("the Morton Memorandum"), placed restrictions on ICE enforcement actions at or focused on a broader of list of "sensitive locations," including places of worship and the sites of religious ceremonies, J.R. 82–84, and from January 18, 2013 to October 27, 2021, a memorandum issued by David Aguilar, the Deputy Commissioner of United States Customs and Border Protection ("CBP") ("the Aguilar Memorandum"), similarly restricted the ability of CBP officers and agents to conduct enforcement

activities at or near a similar list of sensitive locations that included places of worship and sites of religious ceremonies.

On October 27, 2021, Secretary of Homeland Security Alejandro Mayorkas issued a memorandum to the leaders of ICE and CBP, which are component agencies of DHS, entitled "Guidelines for Enforcement Actions in or Near Protected Areas" ("the Mayorkas Memorandum" or "the 2021 Policy"). J.R. 188. The Mayorkas Memorandum replaced the Morton and Aguilar Memoranda and provided guidance relating to law enforcement actions in or near a non-exhaustive list of "protected areas," which included a "school," a "medical or mental healthcare facility," a "place of worship or religious study," a "place where children gather," a "social services establishment," a "place where disaster or emergency response and relief is being provided," a "place where a funeral, graveside ceremony, rosary, wedding, or other religious or civil ceremonies or observances occur," and a "place where there is an ongoing parade, demonstration, or rally." J.R. 189–90.

The Mayorkas Memorandum directed that, as a "foundational principle," "[t]o the fullest extent possible, [DHS] should not take an enforcement action in or near a protected area." J.R. 190. Enforcement actions included "arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." J.R. 191. As a qualification to this principle, the guidance recognized that "there might be limited circumstances under which an enforcement action needs to be taken in or near a protected area," including but not limited to when: (1) "[t]he enforcement action involves a national security threat"; (2) "[t]here is an imminent risk of death, violence, or physical harm to a person"; (3) "[t]he enforcement action involves the hot pursuit of an individual who poses a public safety threat"; (4) "the enforcement action involves the hot pursuit of a personally observed border-

4

crosser"; (5) "[t]here is an imminent risk that evidence material to a criminal case will be destroyed"; and (6) "[a] safe alternative location does not exist." J.R. 190–91.

When such limited circumstances justified an enforcement action in or near a protected area, law enforcement officers or agents were generally required to seek "prior approval from their Agency's headquarters," or an official delegated by the agency head to provide such approval, before taking the action. J.R. 191. The guidance noted, however, that "[i]f the enforcement action is taken due to exigent circumstances and prior approval was therefore not obtained, Agency headquarters" or the delegated official "should be consulted post-action." *Id.* The guidance further provided that "[t]o the fullest extent possible, any enforcement action in or near a protected area should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area." *Id.*

## II.    The 2025 Policy

On January 20, 2025, Acting Secretary of Homeland Security Benjamine C. Huffman sent a memorandum ("the Huffman Memorandum") to the Acting Director of ICE and the Senior Official Performing the Duties of the Commissioner of CBP addressing ICE and CBP "enforcement actions in or near areas that [DHS] previously determined require special protection." J.R. 574. As its primary action, the Huffman Memorandum states that "effectively immediately," it "supersedes and rescinds" the Mayorkas Memorandum. *Id.*

As guidance in place of the rescinded Mayorkas Memorandum, the Huffman Memorandum states:

> Our brave men and women in uniform put their lives on the line every day to advance the rule of law and keep our people safe. As part of that work, officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location.

5

> Going forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense. It is not necessary, however, for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced.

*Id*. It further provides that the "Director of ICE and the Commissioner of CBP may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion." *Id*.

On January 21, 2025, DHS issued a press release relating to the issuance of the Huffman Memorandum in which a DHS spokesperson stated:

> This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murders and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.

J.R. 329.

On January 31, 2025, pursuant to the Huffman Memorandum, Acting ICE Director Caleb Vitello issued a memorandum entitled "Common Sense Enforcement Actions in or Near Protected Areas" ("the Vitello Memorandum"). J.R. 669. The Vitello Memorandum defines protected areas to include "schools"; "hospitals"; "churches, synagogues, mosques, or other institutions of worship"; and "a site during the occurrence of a public demonstration, such as a march, rally, or parade." J.R. 669 n.1. As guidance, it "charge[s] Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area" and states that "AFODs and ASACs may provide authorization for such actions either verbally or in writing." J.R. 670. Although the Vitello Memorandum requires AFODs and ASACs to "consult with local Office of the Principal Legal Advisor leadership for guidance on constitutional considerations" before "authorizing an immigration enforcement action

6

at a site where a public demonstration is underway," it does not contain a similar requirement for enforcement actions at any other protected areas, including places of worship. *Id.* Although the Vitello Memorandum applies only to ICE personnel and does not apply to CBP personnel, the Court will refer to the Huffman and Vitello Memoranda collectively as "the 2025 Policy."

## III.   Plaintiffs' Religious Beliefs and Practices

Plaintiffs come from three distinct religious groups: Quakers, Cooperative Baptists, and Sikhs. Plaintiffs have submitted declarations of individuals associated with each of these groups setting forth the religious beliefs and practices relevant to the resolution of the Motion and the impact of the 2025 Policy on these beliefs and practices.

### A.   The Quaker Plaintiffs

The Quaker Plaintiffs are comprised of six different communities, or meetings, of the Religious Society of Friends, which has practiced the Quaker faith in America dating back to the 1600s. "Yearly meetings" constitute the highest organizational bodies in the Religious Society of Friends and meet annually for worship and to make decisions about issues that affect constituent units, which include monthly meetings, the basic organizational unit in the Quaker religion. Generally, monthly meetings have been incorporated, have by-laws, have a budget, and own a meeting house, which is a space where worship and community-based activities take place.

As to Quakers' belief system, among the core tenets is the belief that humans can and do experience God directly. In light of this belief, Quakers do not have an assigned individual who directs their spiritual development and believe that at any given time a person may experience the divine and receive a message that is intended to be shared broadly. Indeed, it is "essential" for spiritual development that Quakers "be able to hear God's word, no matter who it comes from." J.R. 3. Thus, in regular, scheduled worship, Quakers gather in their meeting house and sit facing

the center of the room in "expectant waiting." J.R. 4. When God enters and shares with an individual a message intended to be shared with the other worshippers, that member stands and communicates that message with the rest of the meeting in a practice called "vocal ministry." *Id.* Quakers believe that different life experiences lead people to hear and understand God in somewhat different ways, such that having a diversity and richness of human experience within the meeting provides a richer, fuller understanding of how God is speaking to individuals and the community.

The communal aspect of worship is central to the exercise of the Quaker faith. Even those sitting quietly and not engaging in vocal ministry are actively participating. From the "communal togetherness" during worship, members share a deep spiritual bond and understanding that "something special has happened." *Id.* Further, after worship, members share "joys and concerns" through which they may request the community to hold someone in the Light, the Quaker version of praying for somebody. J.R. 8. The session ends with attendees shaking hands and greeting one another. As a result of these practices, even when there are opportunities to participate in worship remotely, "attending worship in the Meeting House is a much more powerful religious experience." J.R. 6.

Quakers also have shared beliefs and ways of living, known as "testimonies." J.R. 33. For example, Quakers are well known for their "peace testimony" in that most oppose all war, for any reason, and would describe themselves as pacifists. J.R. 5. Quakers also share the testimony of equality, under which Quakers see God in all people, such that they value and worship without regard to a person's background, including immigration status. The Quaker faith, in particular the New England Yearly Meeting, has strong ties to Central America, South America, and Africa and has attendees from those regions. The Adelphi Friends Meeting is located in an area with a large

8

Hispanic population and regularly supports immigrant families, including from Nicaragua, Afghanistan, Burundi, and Kenya, some of whom join the meeting for worship. The Philadelphia Yearly Meeting has monthly meetings located in areas with a high immigrant population. The Quaker Plaintiffs generally do not inquire into the immigration status of their members. They also act on the testimony of equality by providing services that directly support immigrants, including by providing interpretive services at large meetings, offering English classes for refugees, driving worshippers to immigration appointments, and sponsoring new immigrant families upon arrival.

Since DHS announced the 2025 Policy, members of the Quaker Plaintiffs have reacted with serious concern over its impact on their religious practice. For example, at the Richmond Friends Meeting, at least one attendee has inquired about whether the threat of immigration enforcement would require meetings to lock their doors during worship, which interferes with Quakers' religious commitment to communal worship. Some attendees who are people of color have expressed fear of enforcement actions in or around the meeting, concern that they could be mistaken for being undocumented, and discomfort in attending meetings because armed immigration officers can operate in or around the meeting. At the Green Street Meeting, within the Philadelphia Yearly Meeting, even immigrant members who are United States citizens have expressed fear of immigration enforcement at meetings.

According to Michael Levi, a member of the Adelphi Friends Meeting, because Quaker worship is communal, decreases in attendance as a result of the 2025 Policy would cause a "significant harm" to the worship experience, in part because "one's life experience affects how one hears the spirit and what conclusions one might draw," as "a diversity of worshippers allows [Quakers] to experience God in a broader, more encompassing way." J.R. 10. In particular, at Adelphi Friends Meeting, where "worship is open to all comers—no matter their status" and a

9

significant number of immigrants attend worship, meetings have been "enriched by the presence of these immigrants" because members "have had experiences that [they] would certainly not have had if immigrants did not join [them] for worship." *Id.* Thus, as Levi asserts, "enforcement actions that stop[] people from entering our meeting house—or scare[] them from doing so—affects us personally, viscerally, emotionally, and theologically." J.R. 11.

Beyond reducing or threatening to reduce attendance at worship services, immigration enforcement actions at Quaker meetings would inhibit religious exercise in other ways. In light of Quakers' pacifist views, the presence of armed law enforcement officers in or near meeting houses is "inconceivable and contrary to" the Quaker faith and harms Quaker religious practice by hindering attendees' ability to connect with God. J.R. 12, 34. As attested to by Roni Kingsley, Clerk of the Richmond Friends Meeting, "[e]ven the idea of there being weapons at meeting is distressing enough to make it very difficult to engage in waiting worship and will discourage attendance." J.R. 34. According to a member of the Putney Friends Meeting, which is part of the New England Yearly Meeting, the presence of armed officers outside the meeting house would cause some people not to attend the meeting or even to leave the meeting entirely. Moreover, some Quakers, regardless of their own legal status, will not be as encouraging of immigrants joining them for worship out of fear for the immigrants' safety, even though the lack of immigrants attending worship undermines the religious experience because it lessens the ability of attendees "to hear God and what God is trying to tell us." J.R. 11. Finally, because yearly meetings such as New England Yearly Meeting and Baltimore Yearly Meeting receive a portion of their budget from their constituent monthly meetings, and because monthly meetings receive contributions from members, a reduction in the number of members attending monthly meetings would have a financial impact on both monthly meetings and yearly meetings.

10

### B.    The Cooperative Baptist Fellowship

CBF is "a network of churches, individuals, and partners" that "equip[] each other for ministry and seek the transformation of God's world." J.R. 610. Specifically, CBF includes over 1,400 congregations; over 40 "field personnel," consisting of CBF's equivalent of missionaries; approximately 1,200 "endorsed chaplains and pastoral counselors"; and 15 state- or region-specific organizations. J.R. 610–11. The CBF-member congregations operate in 37 states, the District of Columbia, and Puerto Rico.

Cooperative Baptists believe that because Jesus Christ was a refugee, "the faces of immigrants and refugees" are "the face of Jesus." J.R. 613. Cooperative Baptists' faith thus "compels [them] to share the love of Christ with immigrant and refugee communities" and to provide those communities with "'radical' hospitality." J.R. 607, 626. Doing so allows Cooperative Baptists to "fulfill[] the mission of Jesus." J.R. 613. Many CBF congregations "have large numbers of immigrants as members." J.R. 617. For example, at the Temple Baptist Church in Durham, North Carolina, on most Sundays, approximately 10 percent of worship attendees are immigrants.

Cooperative Baptists' religious commitment to serving immigrants manifests itself in various ways. Some CBF congregations and CBF field personnel are engaged in direct ministry explicitly focused on immigrants and refugees, while others serve immigrant communities as part of broader ministry efforts. Among other activities, they host food pantries, distribute clothes, conduct job-training programs, provide housing and child-care assistance, and host health clinics, often in the same church building they use for their worship services. CBF congregations also assist with resettling refugees and provide legal, counseling, and translation services for immigrants. For example, the Oakland Baptist Church in Rock Hill, South Carolina hosts at its

11

church building a legal clinic for immigrants known as the Carolina Immigrant Alliance and offers English as a second language ("ESL") courses in its fellowship hall, both led by volunteers from the church. Another CBF church provides temporary housing to immigrant families. Ultimately, "[c]reating the conditions for people to thrive—not just survive—is an expression" of Cooperative Baptists' religious beliefs. J.R. 616.

Since DHS announced the 2025 Policy, CBF congregations have observed a change in behavior among their members. Congregations have reported that "fewer people, especially immigrants, are attending worship." J.R. 618. Those no longer attending worship include immigrants with legal status and those without legal status. J.R. 607–08, 629–30. For example, the Oakland Baptist Church reports that two long-time members who have temporary protected status, including one who served the congregations by leading "children's time moments during worship," are now fearful of attending services. J.R. 607. Temple Baptist Church has an immigrant family on lawful temporary protective status which fears that its members' Hispanic appearance will make them a target. Reverend Dr. Randall Carter, Senior Pastor for the Temple Baptist Church, attributes CBF's diminished attendance to the fact that immigrant members "do not feel that church and [CBF] ministries are the sacred and safe space that they used to be." J.R. 629. Further, he states that some CBF members "would be uncomfortable with the presence of guns" in their church, which would occur if armed ICE agents entered the premises to conduct enforcement activities. J.R. 632. Indeed, ICE "conducted an immigration-enforcement arrest at a church fewer than 10 miles away" from the site of CBF's Winter Governance Meeting in Decatur, Georgia at which DHS's 2025 Policy was being discussed. J.R. 634.

According to CBF's Executive Coordinator, Reverend Dr. Paul Baxley, the reduced attendance, particularly of people from different backgrounds, reduces the "feeling of communal

worship" and lessens the ability of CBF members "to experience God by diminishing the ways" they can "learn from those who have lived courageously and had different experiences of the Holy Spirit," thereby causing harm to CBF religious exercise. J.R. 618–19. The reduced attendance also harms CBF financially because "much of CBF's budget comes from contributions from [its] congregations," and it also reduces the number of volunteers to operate its community service activities. J.R. 618. Moreover, since DHS adopted the 2025 Policy, the number of individuals seeking assistance from CBF, whether at food pantries, clothing shelters, or legal clinic sessions has also declined. In particular, attendance at ESL classes has declined as a result of fear of immigration enforcement, with one congregation reporting a 66 percent decline in ESL attendance. Because such community service is an exercise of CBF religious beliefs, such reduced attendance directly hinders CBF congregations' ability to exercise those beliefs.

Reverend Baxley has also stated that the 2025 Policy has caused CBF to give advice to its members that "goes against our core beliefs." J.R. 621. For example, CBF has told some congregations "that they can lock the church doors so that immigration officers cannot simply walk in" even though doing so "goes against a core belief" of CBF's that its congregations' "doors should be open—literally and figuratively—to anyone that wants to join [them] for worship." J.R. 621–22. At the same time, the 2025 Policy has also compelled CBF to contradict its faith in that it is part of CBF's faith to "encourage our immigrant neighbors to join us," but to do so violates their religious belief that they should not knowingly put "our neighbors in danger," which would occur if such immigrants attended services because they could be "targeted by ICE even during worship." J.R. 608.

13

C.      **The Sikh Temple**

The Sikh Temple is a Gurdwara, or place of worship, for the Sikh population in the Sacramento, California area, comprising approximately 30,000 people. Approximately 50 percent of the Sikh Temple's congregation consist of immigrants.

The Sikh worldview centers around the idea of Ik Onkar, or oneness, which means that the divine is equally present in all people and that every human being is equal in the eyes of God—whatever their religion, social identity, or immigration status. Gurdwaras are places that Sikhs gather for fellowship, worship, and "langar," the sharing in a communal meal with their community, referred to as their Sangat. J.R. 600. In general, fully and meaningfully practicing the Sikh faith requires joining with the community in service and prayer. Because the Sikh faith does not have an ordained clergy, any person from the congregation may lead religious services and assist in preparing langar. During worship at the Gurdwara, community members often lead the congregation in singing and prayer.

Central to the concept of a Gurdwara is that all people must be welcomed in the space without fear. In light of this precept, and the communal nature of worship, Amar Singh Shergill, a member of the Executive Management Committee of the Sikh Temple, has asserted that the knowledge that the Sikh Temple may be subject to government surveillance and raids by armed agents burdens its members' exercise of religion, in part because DHS's new policy has had "an immediate chilling effect on worship and fellowship" at its Gurdwara, and decreased attendance hinders the Sikh Temple's ability to carry out essential religious practices with the entire Sangat. J.R. 602. Specifically, the Sikh Temple has already heard from members who are concerned that participation in Sikh religious life at the Gurdwara may put them at risk because of the 2025 Policy. Some of those concerned are undocumented, but even Sikhs with legal immigration status are

14

unsure whether it is safe to attend. The 2025 Policy is also reducing attendance and interfering with the Sikh Temple's religious exercise because it is renewing concern among members about governmental intrusions on the sanctity of their places of worship, which derives from a history of violent military assaults on Gurdwaras.

## DISCUSSION

In the Motion, Plaintiffs seek a preliminary injunction barring DHS from "implementing, enforcing, or acting pursuant to DHS's 2025 Policy regarding enforcement actions in or near houses of worship . . . or from carrying out immigration-enforcement operations at houses of worship absent a judicial warrant or exigent circumstances." Mot. at 1, ECF No. 26.

To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

In addition to arguing that Plaintiffs have failed to establish each of the requirements for a preliminary injunction, DHS also argues that the Motion should be denied because (1) Plaintiffs lack standing; and (2) Plaintiffs' proposed injunction is statutorily barred. The Court will first address these two threshold issues.

15

## I.    Standing

DHS argues that Plaintiffs lack standing to assert their claims. Because Article III of the

United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies,"

plaintiffs in federal civil actions must demonstrate standing to assert their claims. *Lujan v. Defs.*

*of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" requirements of

standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the

injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the

injury will be "redressed by a favorable decision." *Id.* at 560–61 (citations omitted). Standing

must be established for each claim and form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547

U.S. 332, 352 (2006). When there are multiple plaintiffs, the Court need only determine that there

is at least one plaintiff with standing for a particular claim in order to consider the claim. *Town of*

*Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). As relevant here, "standing requirements

are somewhat relaxed in First Amendment cases." *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir.

2013). Here, DHS contends that Plaintiffs have not established any element of standing.

### A.    Injury in Fact

To satisfy the requirement of an "injury in fact," Plaintiffs must identify "an invasion of a

legally protected interest" that is "concrete and particularized" and "actual or imminent, not

conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*,

504 U.S. at 560). Notably, the "leniency of First Amendment standing manifests itself most

commonly in the doctrine's first element: injury-in-fact." *Cooksey*, 721 F.3d at 235. Although

Plaintiffs have asserted a variety of injuries or potential injuries, they focus most specifically on

the injury of a reduction in attendance at worship services and ministry programs. In the Amended

Complaint, Plaintiffs allege that the 2025 Policy "is already resulting in and will continue to result

16

in fewer congregants attending and participating in worship services" and "will reshape—and, indeed, is already reshaping—the composition of Plaintiffs' worship services and meetings by diminishing the attendance and participation of members of immigrant communities." Am. Compl. ¶ 140, ECF No. 28. More specifically, Reverend Baxley of CBF has stated in his declaration that "[i]n response to DHS's new policy, some congregations have reported that fewer people, especially immigrants are attending worship," as well as that "there has been a noticeable decline in people engaging with ministry for immigrant communities, especially ESL classes." J.R. 618, 619. As reported by Reverend Dr. Jeff Hayes, a minister at CBF's Oakland Baptist Church, those who now fear coming to CBF churches include "documented and undocumented immigrants" who are concerned that "since DHS's new policy . . . they might be targeted or even just swept up in a raid while" at church. J.R. 608. Notably, one CBF congregation has reported a 66 percent decrease in attendance at its ESL program, while another has reported fewer participants in its low-income ministry activities, including its food pantry and clothing shelter. According to Reverend Hayes, attendance at his church's ESL classes "has declined because people are afraid of immigration enforcement at the church." J.R. 607.

Such reductions in attendance cause injury to Plaintiffs. At a first level, as stated by Reverend Baxley, because much of CBF's budget comes from contributions by its congregations, "[f]ewer worshippers means less money for the congregations." J.R. 618. Because CBF relies heavily on volunteers for its ministry and other activities, reduced attendance also causes the harm of having "fewer people to get involved in [the] volunteer work that runs our community." J.R. 619. Moreover, in light of CBF's emphasis on communal worship, Reverend Baxley has asserted that reduced attendance causes "significant harm to our religious exercise" because having more attendees "singing and praying together" provides a "heightened feeling of communal worship,"

17

and that a reduction in the number of immigrant worshippers "lessens our ability to experience God by diminishing the ways in which we can learn from those who have lived courageously and had different experiences of the Holy Spirit." J.R. 618, 619. Further, because CBF considers its ministry programs to be not just community service, but an exercise of religious beliefs, reductions in participation in ESL classes and other ministry programs harm its members' ability to practice their faith.

The other Plaintiffs also report actual or imminent reductions in attendance. The Sikh Temple reports that "DHS's new policy is . . . reducing Gurdwara attendance and interfering with our religious exercise," that it "had an immediate chilling effect on worship and fellowship at our Gurdwara," and that those concerned about whether it is safe to attend include not only undocumented individuals but also members with legal immigration status. J.R. 602. Particularly where the Sikh faith does not have ordained clergy, and members of the congregation therefore may lead the services, including in singing and prayer, the Sikh Temple asserts that the "[d]ecreased attendance hinders our ability to carry out essential religious practices with the entire Sangat." *Id.*

After the announcement of the 2025 Policy, members of the Quaker Plaintiffs have expressed concern about decreased attendance because attendees may be mistaken for being undocumented, J.R. 33, and because, in light of Quakers' pacificist beliefs, "[e]ven the idea of there being weapons at meeting," which would occur if armed immigration officers conduct enforcement actions at religious institutions, "is distressing enough to make it very difficult to engage in waiting worship and will discourage attendance," J.R. 34. Reductions in attendance would have a particularly adverse impact on Quaker meetings because they are communal sessions at which any attendee can receive and share the word of God, and "one's life experience affects

18

how one hears the spirit and what conclusions one might draw," so "a diversity of worshippers allows [Quakers] to experience God in a broader, more encompassing way." J.R. 10. Reduced attendance would also have an adverse financial impact because Quaker meetings rely in part on contributions from meeting attendees.

A reduction in attendance at religious services and activities constitutes a concrete injury in fact. In *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989), in which several churches filed a lawsuit arising from immigration officers' surreptitious recording of church services, the court held that the plaintiffs had sufficiently alleged a concrete injury for standing purposes by asserting that:

> [A]s a result of the surveillance of worship services, members have withdrawn from active participation in the churches, a bible study group has been canceled for lack of participation, clergy time has been diverted from regular pastoral duties, support for the churches has declined, and congregants have become reluctant to seek pastoral counseling and are less open in prayers and confessions.

*Id*. at 521–22. The court specifically rejected the argument that these harms impacted individual worshippers but not the churches themselves. *Id.* at 522. Rather, it held that "[w]hen congregants are chilled from participating in worship activities, when they refuse to attend church services because they fear the government is spying on them . . . we think a church suffers organizational injury because its ability to carry out its ministries has been impaired." *Id.* As in *Presbyterian Church*, Plaintiffs allege that the 2025 Policy, which effectively expands DHS's ability to engage in immigration enforcement actions on the premises of their places of worship, has caused or imminently will cause a decrease in attendance at worship services and ministry programs that results in a comparable harm to Plaintiffs. Most notably, CBF has already identified a specific decrease in attendance at both worship services and ministry services such as ESL classes that has

caused both financial harm and an impairment to its ability to carry out its ministry activities. Plaintiffs have therefore sufficiently alleged an injury in fact for standing purposes. *See id.*

DHS's citation to *Laird v. Tatum*, 408 U.S. 1 (1972), and *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), does not alter this conclusion. As to the injury-in-fact prong, DHS argues that these cases establish that, in the absence of actual application of a government investigative program against Plaintiffs, a subjective, speculative chilling effect arising from that program cannot establish a concrete injury-in-fact that is "certainly impending." Opp'n at 7, ECF No. 34 (quoting *Clapper*, 568 U.S. at 409). In *Laird*, the plaintiffs, in asserting a First Amendment challenge to a United States Department of the Army data-gathering system established to assist with an Army response to domestic civil disturbances, which they deemed to intrude on "lawful and peaceful civilian political activity," alleged only that their injury was "a 'chilling' effect on the exercise of their First Amendment rights" caused by "the existence and operation of" the Army program, without any explanation of when and how they might be targeted by such data-gathering activity or any assertion of any other harm arising from the program. *Laird*, 408 U.S. at 2–3. While the Court held that this asserted chilling effect on plaintiffs was "not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm," *id.* at 13–14, here, Plaintiffs are not relying on an abstract chilling effect arising from the 2025 Policy to establish a concrete injury; rather, they have alleged an objective harm in the form of a reduction in attendance at worship services and ministry programs.

In *Clapper*, the plaintiffs, consisting of "attorneys and human rights, labor, legal, and media organizations" whose work would cause them to engage in confidential electronic communications with foreign individuals located abroad, asserted a First Amendment challenge to section 702 of the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. § 1881a, which authorized electronic

surveillance of foreign individuals reasonably believed to be located outside the United States. *Clapper*, 568 U.S. at 401, 406. In alleging injuries, however, the plaintiffs asserted only that the plaintiffs' communications would likely be acquired through this program at some point in the future, and that they had engaged in their own proactive undertaking of "costly and burdensome measures to protect the confidentiality of their international communications." *Id.* at 401–02. The Court ultimately deemed the first alleged injury "too speculative" to be "certainly impending" because it relied on a "highly attenuated chain of possibilities" that would need to occur before the plaintiffs' communications would be actually intercepted pursuant to the challenged program, and the second alleged injury improper because it would allow plaintiffs to "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* at 410, 416. Here, Plaintiffs do not rely on either type of alleged injury and instead have asserted an actual injury in the form of reduced attendance, with both financial and other impacts, that is not merely "certainly impending" but has already occurred.

Finally, DHS's reliance on *United States v. Texas*, 143 S. Ct. 1964 (2023), is misplaced. DHS asserts that this case demonstrates that there can be no cognizable injury based on the statement that "parties challenging immigration enforcement priorities lack an Article III injury because such lawsuits 'run up against the Executive's Article II authority to enforce federal law.'" Opp'n at 11 (quoting *Texas*, 143 S. Ct. at 1971). In *Texas*, however, the Court found that the plaintiffs, consisting of several states, lacked standing to assert a claim that DHS's new guidelines for immigration enforcement violated the law because they needed to require more arrests of noncitizens. *See Texas*, 143 S. Ct. at 1968. The lack of standing, or any concrete injury, was based not on a general principle that Article II bars lawsuits relating to Executive Branch policies governing arrests and prosecutions, but on the specific principle that "when the Executive Branch

21

elects *not* to arrest or prosecute, it does not exercise coercive power over an individual's liberty or property, and thus does not infringe upon interests that courts often are called upon to protect." *Id.* at 1971. An injury can occur, however, when as in the present case, an Executive Branch policy could result in arrests of specific individuals. *See id.* at 1971 n.2. As for the general language about Article II authority, where Plaintiffs' claim does not challenge the Executive Branch's prioritization of immigration law enforcement or decisions on how many arrests to make pursuant to those laws, but instead challenges only whether the policy on the location of such law enforcement activity may infringe on constitutional or statutory rights arising from intrusions on Plaintiffs' places of worship, such language does not prevent Plaintiffs from asserting a cognizable injury arising from such an enforcement policy.

For the foregoing reasons, the Court concludes that Plaintiffs have sufficiently alleged an injury in fact arising from the reduced attendance at religious services and ministry programs.

###### B.    Traceability

Next, Plaintiffs must demonstrate that their asserted injury is fairly traceable to DHS's actions. *See Lujan*, 504 U.S. at 560. Under this requirement, plaintiffs need not establish that the challenged action is the "proximate cause" of the injury and instead need only show that it is "in part responsible for" the asserted injury. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013) (stating that "the concept of concurrent causation" is "useful in evaluating" this element); *see also Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 283 (4th Cir. 2018). When a plaintiff is challenging a government policy or action and "the plaintiff is an unregulated party" in that the policy or practice is directed at third parties, traceability "ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and

22

perhaps on the response of others as well.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1557 (2024) ("*FDA*") (quoting *Lujan*, 504 U.S. at 562).

Here, Plaintiffs have both alleged and produced evidence that supports the conclusion that attendance at worship services and ministry programs is decreasing at least in part as the result of the 2025 Policy. Reverend Baxley has specifically attributed the decline in CBF's attendance to "DHS's new policy," J.R. 618, 619, and in fact the decline in attendance at ESL classes has been reported "since DHS announced its new policy," J.R. 620. The Sikh Temple also directly attributes the decline in attendance to "DHS's new policy," J.R. 602, and the Quaker Plaintiffs link the concerns about imminent reductions in attendance to the 2025 Policy. Where the religious institutions themselves, after hearing from their members, have concluded that the reduced attendance is caused by the 2025 Policy, and where it appears to have occurred only since the issuance of the 2025 Policy, DHS's attempts to contest the validity of this causal connection are not persuasive.

Although DHS argued at the hearing on the Motion that reduced attendance could be a reaction to the general announcements of an increase in immigrant enforcement activity in the same time frame, it fails to credit the fact that some of the expressed concerns relate specifically to the presence of immigration officers at places of worship, not in the general community. For example, the Quaker Plaintiffs have stated that their members are expressing discomfort in attending meetings specifically because of the potential that armed immigration officers may be operating in or around the meeting, which would run afoul of Quaker beliefs relating to pacifism. The Sikh Temple has also identified a specific concern about armed law enforcement officers inside their places of worship arising from a history of military intrusions into Gurdwaras. The

23

Court therefore finds that Plaintiffs have sufficiently alleged that the "the asserted injury is fairly traceable" to the 2025 Policy. *See Lujan*, 504 U.S. at 560.

Again relying on *Clapper*, DHS also argues that Plaintiffs cannot show traceability because the causal chain between the 2025 Policy and the decline in attendance "rests on a speculative chain of attenuated possibilities." Opp'n at 12–13. In *Clapper*, however, the chain of causation between the challenged policy and the potential injury to the plaintiffs that was deemed insufficient included not just the step of the Government deciding to target the communications of the plaintiffs' foreign contacts, but also the additional intervening steps of the Government invoking the challenged authority under 50 U.S.C. § 1881a as opposed to another legal basis for conducting the surveillance and, more importantly, of independent third parties, specifically judges of the Foreign Intelligence Surveillance Court, approving the action, as required by § 1881a. *Clapper*, 568 U.S. at 410. Here, the 2025 Policy would be relevant to all intrusions at places of worship, and because Plaintiffs primarily object to warrantless entries, the chain of causation does include the intervening step of approval of the intrusions by independent third parties. Thus, Plaintiffs' chain of causation in this case is far less attenuated than in *Clapper* and rests on the straightforward proposition that based on the announcement of the 2025 Policy, members and attendees of Plaintiffs' religious institutions, particularly undocumented immigrants but also lawful immigrants, would reduce their attendance out of a fear of being the subject of, or being caught up in, immigration enforcement actions at those places of worship.

Finally, DHS asserts that this causal connection does not establish traceability because it "would be the consequence of 'unfettered choices' made by some of the 'independent actors' that are not before the Court," specifically, the decisions and choices of Plaintiffs' members and attendees. Opp'n at 12 (quoting *Lujan*, 504 U.S. at 562). Although DHS is correct that standing

24

is "substantially more difficult to establish" when the "causal relation between injury and challenged action depends upon the decision of an independent third party," standing is "not precluded" under such circumstances. *California v. Texas*, 141 S. Ct. 2104, 2117 (2021). Since *Clapper*, in which the Court referenced its "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors" and declined to rely on such a causal link to find standing, *Clapper*, 568 U.S. at 414, the United States Supreme Court has clarified the principles governing consideration of such theories of traceability. In *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), after referencing *Clapper*, the Court found that a theory of traceability for standing purposes could succeed if it rested not on "mere speculation about the decisions of third parties" but instead on "the predictable effect of Government action on the decisions of third parties." *Id.* at 2566. In pursuing such a theory, the plaintiff must show that the third parties at issue "will likely react in predictable ways" that will lead to an injury to the plaintiff. *Id.*; *see FDA*, 144 S. Ct. at 1557; *California*, 141 S. Ct. at 2109 (quoting *Dep't of Commerce*, 139 S. Ct. at 2566).

In *Department of Commerce*, a group of state governments and other public and private entities challenged the Secretary of Commerce's decision to include a question about citizenship on the 2020 census form and asserted standing based on the contention that some percentage of noncitizens would decline to respond to the census because of that question, and that, as a result, certain state plaintiffs would have undercounted populations and thus incur injuries such as reduced federal funding calculated based on census data. *Id.* at 2565. Although the Government asserted that "any harm to [the plaintiffs] is not fairly traceable to the Secretary's decision, because such harm depends on the independent action of third parties choosing to violate their legal duty to respond to the census," the Court rejected the Government's argument based on its conclusion

25

that the plaintiffs had shown that those third parties "will likely react in predictable ways to the citizenship question, even if they do so unlawfully and despite the requirement that the Government keep individual answers confidential." *Id.* at 2566. Since *Department of Commerce*, multiple courts have found traceability for purposes of standing based on the assertion that immigrants, including undocumented immigrants, will act in predictable ways that result injuries to the plaintiffs. *See, e.g.*, *Texas v. United States*, 126 F.4th 392, 412 (5th Cir. 2025) (concluding that Texas had demonstrated traceability for standing purposes sufficient to challenge DHS's Final Rule establishing the Deferred Action for Childhood Arrivals program ("DACA") where it put forward "sufficient, unrebutted evidence to support the 'common-sense assertion' that, absent DACA, some recipients would leave the United States"); *United States v. Iowa*, 126 F.4th 1334, 1343 (8th Cir. 2025) (concluding that the United States had demonstrated traceability for standing purposes sufficient to challenge a state law criminalizing the presence of undocumented immigrants within Iowa where the fact that "aliens would leave Iowa in response to the law is a 'predictable effect'" that would force federal officials to expend resources to locate them and would antagonize foreign nations, as referenced in a press release by the Government of Mexico); *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 487–89 (D. Md. 2019) (finding causation for standing purposes sufficient to challenge the State Department's policy modifying the criteria for determining whether a visa applicant is likely to be a public charge if admitted to the United States, where the plaintiff, a city government, alleged that "immigrants and their families will react in 'predictable ways' to the changes" in that fewer will seek public benefits, thereby injuring the plaintiff by impeding its ability to provide benefits and social services and causing higher usage of city services in lieu of federal services).

Here, as in *Department of Commerce*, the Court can and will find traceability based on the actions of third-party members and attendees of Plaintiffs' congregations, particularly immigrants, in declining to attend worship services and ministry programs in response to the 2025 Policy. Such a response is not a matter of speculation but instead a "predictable" reaction. *Dep't of Commerce*, 139 S. Ct. at 2566. Indeed, the predictability of this reaction is stronger than in *Department of Commerce* because there is evidence, in the form of declarations from Plaintiffs, that some such individuals have already stopped attending worship services and ministry programs as a direct result of the 2025 Policy. Moreover, other facts in the record support the conclusion that the decisions to stop attending are predictable, including the facts that (1) the press release in which DHS announced the 2025 Policy stated that "[c]riminals will no longer be able to hide in America's schools and churches to avoid arrest," J.R. 329; and (2) there was recently an immigration enforcement action at a church only 15 minutes away from a CBF church in Georgia. J.R. 347; *see* Reply at 5, ECF No. 10. The traceability requirement is therefore satisfied.

### C.    Redressability

Lastly, Plaintiffs must show that their asserted injury is redressable. To do so, Plaintiffs must demonstrate that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sierra Club*, 899 F.3d at 284 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). The "second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *FDA*, 144 S. Ct. at 1555 (quoting *Sprint Commc'ns Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id*. Further, the "burden imposed by this requirement is not onerous." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018). Plaintiffs

"need not show that a favorable decision will relieve [their] every injury." *Id.* (alteration in original) (quoting *Sierra Club*, 899 F.3d at 284). "Rather, plaintiffs 'need only show that they personally would benefit in a tangible way from the court's intervention.'" *Id.* (quoting *Sierra Club*, 899 F.3d at 284). "The removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Sierra Club*, 899 F.3d at 285.

Here, at a minimum, Plaintiffs seek a return to the 2021 Policy that existed prior to the 2025 Policy. Under the 2021 Policy, immigration enforcement in or near places of worship was subject to specific restrictions not present in the 2025 Policy. First, the 2021 Policy required that immigration enforcement actions not be taken at places of worship and other protected areas "[t]o the fullest extent possible." J.R. 189. Second, the 2021 Policy identified a list of only six "limited circumstances" under which such actions could be taken. J.R. 190–91. Even allowing for the fact that the list was non-exhaustive, it is reasonable to infer that the range of scenarios under which an immigration enforcement action could occur at a place of worship is meaningfully narrower under the 2021 Policy than under the 2025 Policy, the latter of which includes neither of the restrictions referenced above. In turn, it is reasonable to infer that a return to the 2021 Policy would reduce both the number of enforcement actions that would occur at a place of worship and the level of fear and concern over such actions that has caused the reduction in attendance at Plaintiffs' places of worship. Indeed, Plaintiffs operated their places of worship under the 2021 Policy without experiencing the kind of concern and reduced attendance that they are currently experiencing. Even assuming that some members of Plaintiffs would remain concerned about venturing to public places like houses of worship in light of the general increase in immigration enforcement separate from the 2025 Policy, redressability is satisfied if a favorable ruling would result in "[t]he removal of even one obstacle to the exercise of one's rights, even if other barriers

28

remain." *Sierra Club*, 899 F.3d at 285. The Court therefore concludes that Plaintiffs have shown

a "non-speculative likelihood that the injury would be redressed by a favorable judicial decision."

*Cooksey*, 721 F.3d at 238.

For the foregoing reasons, the Court concludes that Plaintiffs have met their burden to

establish standing at this stage of the case.

**II.      8 U.S.C. § 1252(f)(1)**

DHS also argues that this Court cannot grant Plaintiffs' requested injunction because a

provision of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252(f)(1), prohibits it from

doing so. 8 U.S.C. § 1252, entitled "Judicial review of orders of removal," includes the following

subsection:

> Regardless of the nature of the action or claim or of the identity of the party or
> parties bringing the action, no court (other than the Supreme Court) shall have
> jurisdiction or authority to enjoin or restrain the operation of the provisions of part
> IV of this subchapter, as amended by the Illegal Immigration Reform and
> Immigrant Responsibility Act of 1996, other than with respect to the application of
> such provisions to an individual alien against whom proceedings under such part
> have been initiated.

8 U.S.C. § 1252(f)(1). The Supreme Court has held that § 1252(f)(1) "generally prohibits lower

courts from entertaining injunctions that order federal officials to take or to refrain from taking

actions to enforce, implement, or otherwise carry out" Part IV of the Immigration Subchapter of

the INA, which consists of 8 U.S.C. §§ 1221–1232. *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057,

2064–65 (2022). However, § 1252(f)(1) bars only the grant of injunctive relief applicable beyond

the circumstances of an individual alien and "does not deprive the lower courts of all subject matter

jurisdiction over claims brought under sections 1221 through 1232." *Biden v. Texas*, 142 S. Ct.

2528, 2539 (2022). Moreover, § 1252(f)(1) does not bar injunctions affecting DHS's authority

pursuant to provisions of the INA outside of §§ 1221–1232 "simply because of collateral effects

29

on a covered provision." *Al Otro Lado v. Exec. Office of Immigr. Rev.*, 120 F.4th 606, 627 (9th Cir. 2024); *Texas v. U.S. Dep't of Homeland Security*, 123 F.4th 186, 209–10 (5th Cir. 2024) (citing *Garland*, 142 U.S. at 2067 n.4).

Here, the conduct at issue in the Motion generally is not governed by the covered provisions. Although the Huffman Memorandum does not define what conduct constitutes an "enforcement action," J.R. 574, the Mayorkas Memorandum defined enforcement actions within the scope of the 2021 Policy as including, but not limited to, "arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance," J.R. 191. At the hearing, DHS acknowledged that this conduct largely falls outside the covered provisions referenced in § 1252(f)(1). Indeed, the core of these activities is governed by 8 U.S.C. § 1357, which outlines the powers of "immigration officers and employees" to act without a warrant, which include the authority to arrest, interrogate, and search aliens under certain circumstances. 8 U.S.C. §§ 1357(a), (c). The parties agree that § 1357 falls outside of the scope of § 1252(f)(1). In their Amended Complaint and reply brief, Plaintiffs have clarified that the injunction they seek is specific to DHS's implementation of 8 C.F.R. § 287.8(f), a regulation that governs "site inspections," which are defined as "enforcement activities undertaken to locate and identify aliens illegally in the United States, or aliens engaged in unauthorized employment, at locations where there is a reasonable suspicion, based on articulable facts, that such aliens are present." *Id.* That regulation was promulgated pursuant to 8 U.S.C. § 1357(a). *See Olivia-Ramos v. Attorney General*, 694 F.3d 259, 283 (3d Cir. 2012); *United States v. Quintana*, 623 F.3d 1237, 1239-40 (8th Cir. 2010). Thus, § 1252(f)(1) does not bar the Court from issuing an injunction relating to this case. *See Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 813–14 (9th Cir. 2020) (holding that "§ 1252(f)(1)'s limitations do not apply" to an

injunction relating to the authority under 8 U.S.C. § 1357(d)); *Texas*, 123 F.4th at 209–10 (finding that § 1252(f)(1) does not bar an injunction relating to DHS's authority under 8 U.S.C. § 1357(a)(3)).

A review of 8 U.S.C. §§ 1221–1232, however, reveals one provision that appears to provide the authority for certain types of enforcement actions that could be at issue under the 2025 Policy. 8 U.S.C. § 1226, which is entitled "Apprehension and detention of aliens," includes § 1226(a), which provides that "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Thus, the Court concludes that any injunction may not restrict or enjoin DHS's ability to engage in arrests pursuant to an administrative warrant and will specify that limitation in any injunction.

III.    **Likelihood of Success on the Merits**

Having addressed DHS's threshold arguments, the Court turns to the requirements for a preliminary injunction. In their Motion, Plaintiffs argue that they are likely to succeed on the merits of their First Amendment claim and their RFRA claim. Where Plaintiffs did not reference their APA claims in the Motion, the Court will not consider those claims in relation to the Motion.

Plaintiffs assert that they are likely to succeed on the merits of their First Amendment and RFRA claims because the 2025 Policy both significantly affects their First Amendment right to expressive association and substantially burdens the free exercise of their religions under RFRA, and DHS has not made the required showings to justify such burdens. Before the Court addresses whether the 2025 Policy likely violates these provisions, the Court first defines the specific contours of the 2025 Policy and its effects on immigration enforcement actions.

31

Where the primary action effected by the Huffman Memorandum was the rescission of the Mayorkas Memorandum, the 2025 Policy significantly expands the range of situations, and thus the likelihood, that DHS will conduct an immigration enforcement action in or near a place of worship. Under the Mayorkas Memorandum, ICE and CBP were directed that they should not take an enforcement action in or near a place of worship to "the fullest extent possible," and that such actions were to occur only in certain "limited circumstances." J.R. 190–91. It specifically identified these "limited circumstances" by providing a non-exclusive list of such circumstances consisting of: a national security threat; an imminent risk of death, violence, or physical harm to a person; the hot pursuit of an individual who poses a public safety threat or of a personally observed border-crosser; an imminent risk that evidence material to a criminal case will be destroyed; and the absence of a safe alternative location for the enforcement action. J.R. 190–191. Even when a contemplated law enforcement action fell within one of those categories or a comparable circumstance, DHS officers and agents needed to obtain prior approval from ICE or CBP headquarters, unless there were exigent circumstances, in which case they were required to consult with their headquarters post-action.

The 2025 Policy does away with all of these limitations and safeguards, including the "fullest extent possible" requirement, the requirement that an action fall within the category of "limited circumstances," and the requirement of headquarters approval or ratification, and now permits individual officers and agents to engage in enforcement actions in or near places of worship at their unilateral discretion. Though the Vitello Memorandum adds a requirement of authorization from a local supervisor, without specifying when such approval must be secured, it does not reinstate any of the three main safeguards contained in the Mayorkas Memorandum and in any event applies only to ICE personnel, not to CBP personnel. Accordingly, the effect of the

32

2025 Policy, which allegedly burdens Plaintiffs' religious expression and exercise, is that it has eliminated all of the previous limitations and safeguards on DHS immigration enforcement actions in or near places of worship and permits them to occur subject only to the "common sense" and "discretion" of the officer or agent. J.R. 574.

### A.    First Amendment

Plaintiffs first assert that they are likely to succeed on the merits of their claim that the 2025 Policy violates their First Amendment right to expressive association. The First Amendment to the United States Constitution provides that:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Indeed, as the Court stated in *Roberts*:

> An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed. According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.

*Id.* at 622 (internal citation omitted).

To determine whether the right to expressive association has been infringed, courts consider, first, "whether the group engages in 'expressive association,'" *Boy Scouts of America v. Dale*, 530 U.S. 640, 649 (2000); second, whether the challenged state action would "significantly affect" or "burden" the group's desired expression, *id.* at 650, 653; and third whether the

33

governmental interest justifies the burden on the expressive association, *id.* at 658–59; *see also Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 442 (3d Cir. 2000) (adopting this framework for expressive association claims).

At the hearing on the Motion, DHS confirmed that there is no dispute that Plaintiffs, by engaging in communal worship and related activities, are engaged in expressive association. *See Roberts*, 468 U.S. at 622 (stating that the right to expressive association reaches the "right to associate with others in pursuit of a wide variety of . . . religious . . . ends"). The Court therefore focuses on the second and third prongs.

### 1.    Significant Burden

Plaintiffs assert that the 2025 Policy, by rescinding the limitations and safeguards on immigration enforcement actions in or near places of worship contained in the Mayorkas Memorandum and providing no guidelines for such actions other than the "discretion" and "common sense" of immigration enforcement officers, significantly affects or burdens their right of expressive association. J.R. 574. The right to expressive association can be significantly affected or burdened by state action in a variety of ways. For example, one form of burdening the right is an "'intrusion into the internal structure or affairs of an association' like a 'regulation that forces the group to accept members it does not desire.'" *Boy Scouts*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623). The Supreme Court has also "held laws unconstitutional that require disclosure of membership lists for groups seeking anonymity, or impose penalties or withhold benefits based on membership in a disfavored group." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 69 (2006) (internal citations omitted). Because these laws "made group membership less attractive," they implicated "the same First Amendment concerns about affecting the group's ability to express its message." *Id.* The right of expressive association can also be

34

significantly burdened by law enforcement activity that interferes with the ability of individuals to participate in the activities of a religious organization. *See Tabbaa v. Chertoff*, 509 F.3d 89, 101 (2d Cir. 2007) (finding that a law enforcement operation to conduct searches of individuals who had attended religious conferences imposed a significant burden on the right of expressive association).

Notably, a government action may significantly affect or burden the right of expressive association without intending to do so and without directly restricting the right of individuals to associate freely. *See Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 461 (1958) ("*NAACP*"); *Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, *UAW*, 485 U.S. 360, 367 n.5 (1988). The right is "protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Lyng*, 485 U.S. at 367 n.5 (quoting *Bates v. Little Rock*, 361 U.S. 516, 523 (1960)). The infringement may occur when it "inevitably follow[s] from . . . the governmental action." *NAACP*, 357 U.S. at 461.

A government policy may burden associational rights by deterring attendance at religious activities. In *Tabbaa*, CBP, acting on intelligence that gave it "reason to believe that persons with known terrorist ties" would be attending certain Islamic conferences including the Reviving the Islamic Spirit ("RIS") Conference in Toronto, Canada, instituted "a special inspection operation pursuant to which all individuals who attended" one of the conferences and then "sought entry into the United States were subject to the kind of screening procedure normally reserved for suspected terrorists," including searches of their persons and vehicles, questioning, fingerprinting, and photographing. *Tabbaa*, 509 F.3d at 92. Upon the filing of a First Amendment claim by the plaintiffs, who had attended the RIS Conference and were subjected to this procedure on their

35

return from Canada, CBP argued that the operation "only incidentally interfered with" the plaintiffs' expressive associational rights because they did not bar or prevent the plaintiffs from attending the RIS Conference, and the plaintiffs were not actually "chilled" by the inspections because some expressed a willingness to attend future conferences. *Id.* at 94–95, 101. The court rejected these arguments and held that the operation imposed a sufficiently "significant" burden on plaintiffs' right to expressive association both because the searches had effectively penalized them for exercising their First Amendment right to attend a religious conference, and because "the prospect of being singled out for such extensive processing could reasonably deter others from associating at similar conferences." *Id*. at 101–02 (ultimately upholding the operation because it was supported by a compelling governmental interest and was narrowly tailored).

Here, Plaintiffs argue that it is likely that the 2025 Policy imposes, and in fact has already imposed, a significant burden on expressive associational rights because intrusions on places of worship by immigration enforcement officers in order to engage with and possibly arrest individuals will "deter[] attendance at worship, ministry, and other events that occur at houses of worship," especially among immigrants, "by causing fear of surveillance, interrogation, or arrest." Mot. at 16, ECF No. 26-1. Significantly, Plaintiffs all serve immigrant communities, including undocumented immigrants: several of the Quaker Plaintiffs have a large number of immigrant worshippers, provide services to immigrants, or are located among large immigrant populations; CBF has congregations with large numbers of immigrants and specifically provides services to immigrants and refugees; and approximately half of the Sikh Temple's congregation consists of immigrants, including undocumented members. Despite the specter of immigration enforcement actions pursuant to the 2025 Policy, the Quaker Plaintiffs, CBF, and the Sikh Temple have all affirmed that their religious beliefs include welcoming and encouraging all to attend their services,

36

regardless of immigration status, the Quaker Plaintiffs and CBF have further specified that they do not inquire about immigration status, and none of Plaintiffs have disavowed a willingness to continue to serve undocumented immigrants. Plaintiffs' places of worship are therefore within the range of locations likely to be targeted for immigration enforcement actions pursuant to the more permissive 2025 Policy. Such enforcement actions, however, are likely to result in decreases in attendance by immigrant worshippers. Indeed, as discussed above in relation to standing, the present record demonstrates that even the threat of enforcement actions pursuant to the 2025 Policy has already caused reductions in attendance at Plaintiffs' places of worship. *See supra* part I.A. Most notably, CBF has reported actual reductions in attendance already occurring at both worship service and ministry programs such as food pantries, legal clinics, and ESL classes. The Sikh Temple has also reported decreased attendance. Those no longer attending include not only undocumented immigrants, but also immigrants with legal status who are fearful of immigration enforcement actions because they may be mistaken for undocumented immigrants. Further, the Quaker Plaintiffs have reported that members of color are expressing discomfort in attending meetings because of the potential that armed immigration officers may be operating in or around the meeting. Where a decline in the attendance of Plaintiffs' immigrant worshippers has already been motivated by the mere threat of enforcement, it follows that actual application of the 2025 Policy against Plaintiffs would lead to even greater declines in attendance.

Such reductions in attendance significantly affect Plaintiffs' expressive association because Plaintiffs' beliefs require communal worship and activities. For the Quaker Plaintiffs, the communal aspect of worship is "central to the exercise of the Quaker faith," J.R. 4, because they believe that any individual can experience an encounter with God, and individuals share their messages from God with all other congregants during worship. A reduction in the number of

worshippers, particularly immigrant worshippers, adversely affects the religious experience of all attendees of a meeting because "a diversity of worshippers allows [Quakers] to experience God in a broader, more encompassing way," J.R. 10, especially where Quakers believe that individuals with different life experiences hear and understand God differently.

For CBF, having fewer participants in worship services harms its religious exercise because "[h]aving more people (especially those of different backgrounds) is important for" their religious exercise because of the "heightened feeling of communal worship" that comes from having "more people singing and praying together." J.R. 618. Moreover, because Collective Baptists believe that their faith "compels" them to "to share the love of Christ with immigrant and refugee communities," J.R. 607, 626, and to provide "radical hospitality" to the vulnerable, J.R. 626, it is part of their religious exercise to provide services to immigrant communities, including through food pantries, legal services clinics, and ESL courses for immigrants. Fewer participants accessing these services thus also significantly burdens the exercise of their religious beliefs.

As for the Sikh Temple, "fully and meaningfully practicing the Sikh faith requires joining with the community in service and prayer." J.R. 601. Where the Sikh faith does not have an ordained clergy such that any person in a Sikh congregation can lead a religious service and prepare a langar, and community members may explain the "ideas and lessons from the selections" from Sikh scripture, decreased attendance at the Gurdwara "hinders [their] ability to carry out essential religious practices." J.R. 602.

In addition, the 2025 Policy will significantly affect Plaintiffs' expressive association by removing any meaningful limitations on intrusions into places of worship by armed law enforcement officers. The Quaker Plaintiffs have attested that pacifism is "deeply ingrained in the Quaker faith," such that "[h]aving weapons or armed people in or around the meeting is

38

inconceivable and contrary to our faith." J.R. 33. Robin Mohr, the Clerk of the Green Street Meeting within the Philadelphia Yearly Meeting, has stated that many people choose to join the meeting because of this commitment to nonviolence and "because they understand that Quaker meetings are a place of peace and nonviolence." J.R. 63. Indeed, because Quaker worship requires sitting quietly, releasing distractions, and reaching "an inner stillness that leads to Spirit-led listening," the "idea of there being weapons at meeting is distressing enough to make it very difficult to engage in waiting worship and will discourage attendance." J.R. 34. Even now, and as attested to by Roni Kingsley, the Clerk of the Richmond Friends Meeting, the "knowledge that ICE agents can interrupt our worship is already making our members less likely to attend." J.R. 33.

Similarly, the Sikh Temple attests that, in light of a history of military assaults on Sikh Gurdwaras, the potential for intrusions by armed government personnel pursuant to the 2025 Policy "will impair Sikhs' ability to practice our faith freely, openly, and without concern." J.R. 603. As with the Quaker Plaintiffs, the Sikh Temple notes that "DHS's new policy is" already "reducing Gurdwara attendance" as a result. J.R. 602. The 2025 Policy has therefore rendered membership in Plaintiffs' religious institutions "less attractive." *Rumsfeld*, 547 U.S. at 69.

As recognized by the Supreme Court, this Court must "give deference to an association's assertions regarding the nature of its expression," and "must also give deference to an association's view of what would impair its expression." *Boy Scouts*, 530 U.S. at 653. Indeed, in accordance with this principle, DHS, at the hearing on the Motion, stated that it is not contesting the sincerity of Plaintiffs' asserted beliefs. Where Plaintiffs' communal religious exercise will be significantly and adversely affected by reductions in attendance resulting from immigration enforcement actions pursuant to the 2025 Policy, armed law enforcement officers operating in or near places of worship

pursuant to the 2025 Policy will adversely affect the ability of Quakers and Sikhs to follow their religious beliefs or worship freely, and these burdens have already begun to occur based only on the issuance of that Policy, it is likely that Plaintiffs will be able to establish that the 2025 Policy is significantly affecting or burdening their expressive association rights.

DHS resists this conclusion by arguing that, to the extent that the 2025 Policy deters immigrants or others from attending services at Plaintiffs' places of worship, the chilling of that attendance is not "objectively reasonable" where the 2025 Policy merely directs immigration officers to exercise their "discretion" and "common sense." J.R. 574. As an initial matter, the Court notes that the "objectively reasonable" standard referenced by DHS relates to the issue of First Amendment standing, not necessarily to the issue of whether there is an actual infringement of a First Amendment right. *See Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011). In any event, the linkage between the 2025 Policy and the corresponding decreased attendance is objectively reasonable where, as discussed above, the 2025 Policy's main effect was the removal of all major limitations and safeguards on immigration enforcement actions in or near places of worship. *See supra* part III.

In addition, the reasonableness of congregants' reaction is bolstered by the facts that: (1) the press release announcing the 2025 Policy specifically referenced the need to conduct immigration enforcement operations in or near places of worship through the statement that "[c]riminals will no longer be able to hide in America's schools and churches to avoid arrest," J.R. 329; (2) a national media outlet reported that "ICE agents . . . said they believe that rescinding the Mayorkas order is going to free them up to go after more illegal immigrants, because illegal immigrants have until now been able to hide near schools and churches and avoid arrest," J.R. 315; and (3) an immigrant was apprehended by ICE at a church in Georgia which Plaintiffs assert is

40

only 15 minutes away from a CBF church. Further, the reaction among immigrants with legal status is reasonable in light of news reports of ICE agents allegedly detaining even United States citizens. *See, e.g.*, J.R. 331. And given that each of Plaintiffs has religious beliefs that cause them to welcome and serve immigrants, has significant immigrant membership or operates in communities with significant immigrant populations, and has not disavowed that they will continue to serve immigrants both with and without legal status, it is reasonable to expect that DHS will direct immigration enforcement toward Plaintiffs specifically. The Court therefore finds that the requirement of a significant burden on expressive association has been satisfied.

## 2.    Interest Balancing

The fact that a government policy or practice imposes a significant burden on expressive association does not itself establish a violation of the First Amendment. Under *Roberts*, such a policy or practice is nevertheless constitutional if it serves "compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. Although DHS, at the hearing, agreed that this standard applies, Plaintiffs have argued that the applicable standard is that of "exacting scrutiny" articulated more recently in *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021), under which the challenged policy must have "a substantial relation" with a "sufficiently important government interest" that "reflect[s] the seriousness of the actual burden on First Amendment rights," and must also be "narrowly tailored to the government's asserted interest." *Id.* at 2383 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). Where *Americans for Prosperity Foundation* states that the exacting scrutiny standard is applicable to First Amendment challenges to "compelled disclosure," such as requirements to disclose lists of members or donors, *see id.*, and compelled disclosure is not at issue in this case, the Court finds that the *Roberts* standard applies.

41

Notably, the asserted governmental interest must relate not to the interest in having the overall policy, but to the interest in applying it to Plaintiffs despite its impact on their expressive association as informed by their particular religious beliefs. *Cf. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431–32 (2006) (stating that under RFRA, the compelling interest test derived from cases relating to the free exercise of religion "look[s] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[s] the asserted harm of granting specific exemptions to particular religious claimants"). Thus, DHS must articulate (1) how allowing immigration enforcement actions to occur in or near Plaintiffs' places of worship outside of the limitations and safeguards in the 2021 Policy furthers a compelling state interest; and (2) how that interest cannot be satisfied through "means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623.

DHS has offered no argument on how the 2025 Policy, specifically the rescission of the limitations and safeguards in the 2021 Policy and the adoption of a policy without any limits other than "discretion" and "common sense," J.R. 574, meets these requirements. Instead, DHS argues that it is premature to evaluate whether the 2025 Policy violates First Amendment rights because "there is no government action to analyze" and to do so would result in an "advisory opinion." Opp'n at 23. As discussed above, however, Plaintiffs have established standing and thereby may properly seek a ruling, and they have already demonstrated harm arising from the 2025 Policy. *See supra* part I. Courts routinely evaluate government policies under the First Amendment that have yet to be specifically applied to a plaintiff, based on a consideration of the impact of the policy on the plaintiffs' specific religious beliefs, precisely because to do so could avoid any infringement of that right. *See, e.g.*, *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2309, 2313, 2318 (2023) (concluding that, in the context of a pre-enforcement challenge, the potential

application of a Colorado anti-discrimination statute to the plaintiff in the conduct of a wedding website business would violate her First Amendment rights where the plaintiff asserted she might be compelled to produce content contrary to her religious beliefs, and there was a credible threat of sanctions); *Tingley v. Ferguson*, 47 F.4th 1055, 1064-65, 1084–89 (9th Cir. 2022) (conducting First Amendment analysis where the plaintiff brought a pre-enforcement challenge to a state statute subjecting licensed health care providers to discipline for performing conversion therapy on patients where the plaintiff asserted that the ban violated his religious beliefs). Where Plaintiffs have articulated their own religious beliefs and practices, which include inclusion of and service to immigrants both with and without legal status, and have thus shown how their places of worship are susceptible to being the target of immigration enforcement actions pursuant to the 2025 Policy that could infringe on their associational rights, the same kind of evaluation is appropriate here.

The failure to articulate a governmental interest is also difficult to understand where DHS has argued that Plaintiffs' claim has no "limiting principle," as the primary limit on any infringement on a First Amendment right is the balancing of interests at issue at this stage of the analysis. *See Tabbaa*, 509 F.3d at 92 (upholding a CBP operation even though it imposed a significant burden on the plaintiffs' First Amendment rights, where CBP established that it was justified by a compelling state interest and could not be achieved by significantly less restrictive means). Regardless, where DHS has not identified or articulated a governmental interest to justify the application of the 2025 Policy to Plaintiffs, the Court cannot uphold that application, whether under the *Roberts* standard or the exacting scrutiny standard of *Americans for Prosperity Foundation*.

Even assuming that the Government could establish the requisite compelling state interest, the Court finds that, on the present record, the 2025 Policy cannot be deemed to meet the second

requirement that the asserted state interest "cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. The Mayorkas Memorandum, by requiring that law enforcement operations in or near places of worship be avoided "to the fullest extent possible" and by placing limitations on the circumstances under which they could occur, demonstrates that such a significantly less restrictive policy exists, and DHS has offered no argument on how that policy, or another policy with more limits and safeguards than are present in the 2025 Policy, cannot achieve the governmental interests motivating the 2025 Policy. In fact, the Vitello Memorandum itself contains one limitation specific to enforcement actions at sites "where a public demonstration is underway," which requires consultation with legal counsel "for guidance on constitutional considerations" before an enforcement action is approved, which was not applied to proposed enforcement actions at places of worship. J.R. 670. Similarly, 8 U.S.C. § 1357, which as discussed above governs the core enforcement activities that are the subject of Plaintiffs' proposed injunction, *see supra* part II, contains a limitation on enforcement actions at a farm or "other outdoor agricultural operation"—that consent of the owner or a warrant is required before an officer or agent may enter for the purpose of "interrogating a person believed to be an alien as to the person's right to be or to remain in the United States"—that could be, but has not been, applied to places of worship. 8 U.S.C. § 1357(e); *cf. Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 730–31 & n.40 (2014) (finding, for purposes of a RFRA claim, that pre-existing statutory and regulatory exemptions demonstrate that the governmental interest in a policy may be accomplished "equally well" through the less-restrictive approaches contained in the exemptions).

Accordingly, the Court concludes that, even if DHS had identified a compelling state interest as justification for the 2025 Policy, DHS has failed to show that any such interest "cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468

U.S. at 623. For substantially the same reasons, the Court also concludes that the 2025 Policy, which imposes virtually no limitations or safeguards on immigration enforcement at places of worship, is not "narrowly tailored," as required by the exacting scrutiny standard. *Americans for Prosperity Found.*, 141 S. Ct. at 2383.

### B.    RFRA

Plaintiffs also assert that they are likely to succeed on the merits of their RFRA claim. RFRA provides "very broad protection for religious liberty." *Burwell*, 573 U.S. at 693. The statute provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section." 42 U.S.C. § 2000bb-1(a). Subsection (b) states that "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(b). It also defines "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A).

The plaintiffs have the burden of establishing that "a substantial burden has been imposed on the exercise of sincerely-held religious beliefs," and upon such a showing, the Government has the burden to demonstrate that the policy furthers a "compelling governmental interest" and that it does so by "the least restrictive means." *Goodall by Goodall v. Stafford Cnty. Sch. Bd.*, 60 F.3d 168, 171 (4th Cir. 1995); *Gonzales*, 546 U.S. at 428–29.

### 1.    Substantial Burden

Plaintiffs assert that the 2025 Policy, including its rescission of the 2021 Policy, substantially burdens various sincerely-held religious beliefs. Under RFRA, a "substantial

burden" requires "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 100 (4th Cir. 2013) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). The "use of the phrase 'violate his beliefs'" in the substantial burden standard "does not exclude non-mandatory religious conduct or beliefs." *Davis v. Wigen*, 82 F.4th 204, 212 (3d Cir. 2023). In *Davis*, the court held that, under the same standard applied in *Liberty University*, a prison policy that prevented a couple from getting married imposed a substantial burden on their exercise of religion under RFRA even though the couple's religion did not affirmatively require them to get married, because "marriage 'had profound religious significance for them' and because they 'viewed their marriage as an expression of' their Christian faith." *Davis*, 82 F.4th at 207, 212; *compare id.* at 211–12 *with Liberty Univ., Inc.*, 733 F.3d at 100. The United States Court of Appeals for the Fourth Circuit has adopted this approach in the context of a land use claim under the analogous Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc. *Cf. Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 555–56 (4th Cir. 2013) (holding that under RLUIPA a plaintiff can demonstrate a substantial burden in support of a land use RLUIPA claim by establishing that "a government regulation puts substantial pressure on it to modify its behavior" but does not need to show that it "pressures the plaintiff to violate its beliefs"); *Gonzales*, 546 U.S. at 436 (stating that RLUIPA allows individuals "to seek religious accommodations pursuant to the same standard as set forth in RFRA").

Most notably, the plain language of RFRA references a prohibition on the Government "substantially burden[ing] a person's exercise of religion," 42 U.S.C. § 2000bb-1(a), and "exercise of religion" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C §§ 2000bb-2(4), 2000cc-5(7)(A). The substantial burden

prong therefore can be satisfied if a government policy imposes substantial pressure to modify one's religious exercise, even if it does not compel a direct violation of a specific religious belief. At the hearing, DHS agreed that the substantial burden element can be satisfied if plaintiffs demonstrate only that a government policy substantially pressures them to modify their behavior in carrying out their beliefs.

Here, Plaintiffs generally rely on the same beliefs and alleged burdens on those beliefs underlying their claim of a significant burden on their First Amendment right to expressive association. As described above, Plaintiffs have provided facts showing that, in light of their religious beliefs and practices relating to immigrants, they can reasonably expect to face immigration enforcement actions at their places of worship pursuant to the 2025 Policy, that such actions will likely result in declines in attendance at their worship and ministry services, and that such declines are, in fact, already occurring. *See supra* part III.A.1. They have further demonstrated that, as a result of such enforcement actions and declining attendance, certain core religious beliefs and practices will be significantly burdened, including the beliefs that each of Plaintiffs' religions require regular, communal worship; that at least CBF requires, as part of its religious exercise, that its congregations engage in services to support immigrants and refugees; and that, for the Quaker Plaintiffs in particular, the presence of any firearms in worship services, such as those of armed law enforcement officers, violates their faith. *See supra* part III.A.1. As with a First Amendment expressive association claim, RFRA requires that courts give deference to Plaintiffs' religious beliefs and thus assess not whether the plaintiffs' religious beliefs are "reasonable," but only whether they reflect "an honest conviction." *Burwell*, 573 U.S. at 724–25. Indeed, as stated at the hearing, DHS does not contest the honesty or sincerity of Plaintiffs' beliefs.

47

Based on the same facts discussed in the First Amendment analysis, the Court concludes that Plaintiffs are likely to succeed in demonstrating that, under RFRA, enforcement actions authorized by the 2025 Policy will substantially burden, at a minimum, (1) the Quaker Plaintiffs' pacifist beliefs; and (2) Plaintiffs' communal worship and CBF's immigrant-focused services. First, as to the Quaker Plaintiffs, where pacifism is "deeply ingrained in the Quaker faith," J.R. 33, to the point where "having weapons or armed people in or around [a Quaker] meeting is inconceivable and contrary to [Quaker] faith," J.R. 33–34, any intrusions by armed law enforcement officers on one of the Quaker Plaintiffs' meeting houses, which could be expected to occur in light of the close ties between several of the Quaker Plaintiffs and immigrant communities and the lack of limitations and safeguards in the 2025 Policy, would directly violate the Quaker faith. In addition, they would "hamper [the Quaker Plaintiffs'] ability to connect to God," J.R. 12; "be incredibly disruptive and traumatic," J.R. 25; and "cause significant harm to [their] religious exercise," J.R. 18. Thus, while subject to the balancing of interests at the second stage of the analysis, the 2025 Policy, which permits immigration enforcement actions at places of worship without any specific limitations or safeguards other than "common sense," imposes a substantial burden on the Quaker Plaintiffs by requiring them to accept an intrusion that directly violates their religious beliefs. J.R. 574.

Second, the Court finds that the 2025 Policy also imposes a substantial burden on Plaintiffs' exercise of religion in relation to their communal worship and CBF's immigrant-focused services by undermining Plaintiffs' ability to engage in such religiously compelled activities. *See supra* part III.A.1. Immigration enforcement actions at Plaintiffs' places of worship pursuant to the 2025 Policy would impose substantial pressure on Plaintiffs to modify their behavior by preventing them from worshipping with a larger and more diverse group of congregants and thereby inhibiting their

exercise of central facets of their respective religions. Indeed, the decrease in attendance at communal worship services and ministry programs that CBF and the Sikh Temple are already experiencing as result of the 2025 Policy demonstrates that it has already created that substantial burden.

Hindrances to communal worship can establish a substantial burden for RFRA purposes. In *Sabir v. Williams*, 53 F.4th 51 (2d Cir. 2022), two Muslim federal prisoners whose beliefs required that they pray five times a day "with the largest possible number of other Muslims" because doing so "multiplies the blessings and utility of prayer" challenged under RFRA the prison's policy "restricting prayer in groups of more than two people to the prison's chapel," which was frequently unavailable. *Id.* at 55. The court found that the restriction on the number of people who could pray communally outside the chapel substantially burdened the plaintiffs' religious exercise under RFRA, even though the plaintiffs could still engage in some form of communal prayer. *Id.* at 60 (finding that the reduced form of communal prayer was "insufficient to eliminate that substantial burden").

Here, as in *Sabir*, the fact that Plaintiffs can still engage in some form of communal worship, or the fact that CBF congregations can still provide services to immigrants to some extent, does not eliminate the burden that stems from having to worship with or serve a reduced number of people. Because enforcement actions pursuant to the 2025 Policy can be expected to cause fewer congregants to attend communal worship, and because the 2025 Policy has in fact already caused such reductions in attendance, the 2025 Policy effectively compels Plaintiffs to engage in worship with a smaller congregation and with fewer immigrants, even though their beliefs call for worship with as large and diverse a community as possible. Similarly, the 2025 Policy imposes a substantial burden on CBF because although its congregations are religiously compelled to serve

immigrant communities to "fulfill the mission of Jesus," J.R. 613, the decreased attendance resulting from the 2025 Policy has undermined their ability to provide such services to as many people as they had previously served.

In response, DHS argues that Plaintiffs' RFRA claim amounts to an objection to "the Government's internal affairs" because the Huffman Memorandum is an internal guidance document that does not require any particular action, and that it cannot impose a substantial burden because it requires only the exercise of "common sense" and discretion." Opp'n at 17. As discussed above, the 2025 Policy's rescission of the Mayorkas Memorandum, in fact, effected a substantial change to DHS's immigration enforcement policy and its impact on individuals and groups outside of the Government by eliminating the specific limitations and safeguards set forth in the 2021 Policy and thus expanding the ease with which immigration enforcement actions could occur at places of worship. *See supra* part III. Indeed, the January 21, 2025 DHS press release, which touted the 2025 Policy as a means to facilitate conducting apprehensions in churches, acknowledged this fact.

DHS also argues that "it is speculative that Plaintiffs' members and other congregants will cho[o]se to refrain from in-person attendance at worship services and other communal gatherings." Opp'n at 17. This argument ignores the statements in the declarations of CBF and the Sikh Temple supporting the conclusion that those organizations will have reduced attendance as a result of immigration enforcement actions that can be expected to be conducted at places of worship pursuant to the 2025 Policy, and that they are in fact already experiencing such decreases due to the fear of such immigration enforcement actions. For example, in his declaration on behalf of CBF, Reverend Baxley states that "[i]n response to DHS's new policy, some [CBF] congregations have reported that fewer people, especially immigrants, are attending worship" and that "some

congregations have reported that there has been a noticeable decline in people engaging with ministry for immigrant communities." J.R. 618–19. Indeed, in one particularly stark example, a CBF congregation reported that its ESL program, which typically attracted 30 people, is now attended by only 10 people. J.R. 619–20. In his declaration on behalf of the Sikh Temple, Amar Shergill states that the 2025 Policy "had an immediate chilling effect on worship and fellowship at our Gurdwara" and that "DHS's new policy is also reducing Gurdwara attendance." J.R. 602. Thus, the substantial burden that the 2025 Policy has placed on Plaintiffs is far from speculative and is already occurring.

Moreover, as discussed in the Court's analysis of Plaintiffs' First Amendment claim, it is reasonable to expect that such enforcement actions will occur at Plaintiffs' places of worship where DHS specifically stated in its press release announcing the 2025 Policy that "criminals will no longer be able to hide in America's schools and churches to avoid arrest," J.R. 329, and where certain Quaker Plaintiffs, CBF, and the Sikh Temple operate places of worship with, or in areas with, significant immigrant populations. *See supra* part III.A.1. The Court therefore finds that the substantial burden requirement has been satisfied.

### 2.    Compelling Interest and Least Restrictive Means

Upon this finding of a substantial burden, DHS is required to demonstrate that the 2025 Policy "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b); *Burwell*, 573 U.S. at 726. As to the first requirement, DHS must "demonstrate that the compelling interest . . . is satisfied through application of the challenged [policy] 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales*, 546 U.S. at 430–31 (quoting 42 U.S.C. § 2000bb-1(b)). Thus, a court must look "beyond broadly

51

formulated interests justifying the general applicability of government [policies] and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431. This inquiry, in turn, requires a court "to look to the marginal interest in enforcing" the challenged policy against the parties in the case before it. *Burwell*, 573 U.S. at 727. Thus, where in a RFRA claim, the plaintiff is effectively seeking an exemption from the government policy, such as if the Quaker Plaintiffs specifically requested an exception to the 2025 Policy to bar armed law enforcement officers from intruding into their meetings, DHS must identify a compelling governmental interest that justifies the denial to Plaintiffs of exceptions in the form of, at a minimum, the application of the limitations and safeguards required by the 2021 Policy that were eliminated by the 2025 Policy.

As with the First Amendment claim, DHS has not even attempted to satisfy this burden and argues that it is premature to evaluate whether the 2025 Policy violates RFRA because "there is no specific government action to analyze" and to do so would result in an "advisory opinion." Opp'n at 18. This argument is unpersuasive for the same reasons articulated in relation to the First Amendment claim. *See supra* part III.A.2. Further, although DHS asserts that it cannot articulate the governmental interest "[w]ithout particular concrete facts to analyze how the [Huffman] Memorandum might operate," Opp'n at 19, Plaintiffs have already provided facts relating to their particular circumstances, including their own religious beliefs and practices and how they are burdened by actions authorized by the 2025 Policy such as intrusions by armed law enforcement officers. Thus, as with the First Amendment claim, where DHS has not attempted to articulate a compelling governmental interest for the 2025 Policy, the Court cannot uphold the 2025 Policy on this basis.

Finally, even assuming that DHS could establish the requisite governmental interest, it still must demonstrate that the policy is "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b)(2); *Burwell*, 573 U.S. at 728. This standard "is exceptionally demanding," and can be met only if DHS shows "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Burwell*, 573 U.S. at 728. Where this requirement is even more stringent than its counterpart in the expressive association context, the Court finds that the 2025 Policy cannot be deemed to meet this requirement based on substantially the same reasons discussed in relation to Plaintiffs' First Amendment claim. *See supra* part III.A.2. In particular, it cannot meet the "least restrictive means" requirement where the 2021 Policy itself provides an example of a less restrictive means that has not been shown to be inadequate to meet the governmental interest, and where the Vitello Memorandum includes a limitation—consisting of a requirement of legal consultation—that applies to immigration enforcement actions conducted at demonstrations but not at places of worship and thereby provides greater protection to secular First Amendment activity than religious First Amendment activity. The Court therefore finds that Plaintiffs' have established a likelihood of success on the merits of the RFRA claim as well.

## IV.    Irreparable Harm

The second requirement for a preliminary injunction is that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief. *See Winter*, 555 U.S. at 20. "[T]he denial of a constitutional right . . . constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). Where the Court has found a likelihood of success on Plaintiffs' First Amendment freedom of expressive association claim, *see supra* part III.A., the deprivation of such a constitutional right alone would constitute irreparable harm. *See*

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (finding that infringement on a First Amendment right, even for "minimal periods of time, unquestionably constitutes irreparable injury" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))). Accordingly, the Court concludes that Plaintiffs will likely suffer irreparable harm in the absence of preliminary relief.

The Court also finds that a violation of Plaintiffs' rights under RFRA constitutes an irreparable harm for the purposes of issuing preliminary relief. Although the Fourth Circuit has not addressed whether a plaintiff satisfies the irreparable harm requirement by demonstrating a violation of RFRA, various other United States Courts of Appeals have concluded that "irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 609 (8th Cir. 2022); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001).

In asserting that Plaintiffs have not shown that they are likely to suffer irreparable harm, DHS merely repeats its arguments that Plaintiffs' asserted burdens on their religious exercise and expressive association are too speculative and subjective to establish standing and a likelihood of success on the merits. Where the Court has reached different conclusions and found that Plaintiffs are likely to succeed on the merits of their First Amendment and RFRA claim, *see supra* part III, DHS has not provided a persuasive basis for the Court to decline to apply the above-referenced case law. Accordingly, the Court finds that Plaintiffs have established a likelihood that they will suffer irreparable harm absent preliminary relief.

54

V.    **Balance of the Equities and the Public Interest**

The remaining requirements for a preliminary injunction are that the balance of equities tips in the plaintiffs' favor, and that an injunction is in the public interest. *See Winter*, 555 U.S. at 20. When one party is the Government, these two factors merge and are properly considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In general, the Government and the public interest are not harmed by a preliminary injunction that temporarily enjoins a policy that is likely to be unconstitutional under the present circumstances. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d. 507, 521 (4th Cir. 2002); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013). Where the Court has concluded that the 2025 Policy is likely to violate Plaintiffs' First Amendment right to expressive association, these factors weigh in Plaintiffs' favor.

Beyond this principle, the facts in the record further demonstrate that these factors favor of an injunction. Plaintiffs have provided evidence that the willingness of their congregants to attend worship and participate in ministry services is presently being chilled, and that, particularly at CBF and the Sikh Temple, attendance at such activities has already declined. Plaintiffs have thus shown that religious exercise is being hindered by the 2025 Policy for entire congregations, including United States citizens and immigrants with legal status, whose ability to worship is undermined by such reduced participation. In contrast, DHS has provided no facts demonstrating how its interests, in increased immigration enforcement or otherwise, would be materially and adversely impacted by an injunction, particularly one that would serve to pause the rescission of the 2021 Policy, as it has identified no necessary enforcement operations that could not be accomplished within the framework of the 2021 Policy or that cannot be accomplished without intruding on Plaintiffs' places of worship. The Court therefore finds that the balance of the equities and the public interest weigh in Plaintiffs' favor.

## VI.    Remedy

Where all four required elements have been established, the Court will grant a preliminary injunction. The parties, however, disagree on the scope of the injunction in two respects. First, as to the specific terms of the injunction, Plaintiffs do not seek to return to the status quo as it existed under the 2021 Policy; instead, they seek an injunction enjoining DHS "from carrying out immigration-enforcement operations at houses of worship absent a judicial warrant or exigent circumstances." Mot. at 1, ECF No. 26. Second, as to the geographic reach of the injunction, Plaintiffs seek a nationwide injunction. DHS opposes both of these requests and argues that any injunction should be "limited to restoring the status quo ante of applying the 2021 [Policy]" and should do so as to Plaintiffs only. Opp'n at 26.

As to the terms of the injunction, "the traditional function of a preliminary injunction" is to "maintain the status quo until after a trial and final judgment." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). An injunction that "alter[s] the status quo before the case even begins" is a "mandatory injunction" and is "warranted only in the most extraordinary circumstances." *Id.* (internal citations omitted). Here, Plaintiffs request such a mandatory injunction in that the 2021 Policy did not require DHS to obtain a judicial warrant prior to conducting an immigration enforcement action at a place of worship absent exigent circumstances. Plaintiffs, however, have provided no legal authority for such a judicial warrant requirement, at least as to public areas within the places of worship. Moreover, at this stage of the litigation, Plaintiffs have not made any showing that a return to the 2021 Policy would burden their rights under the First Amendment or RFRA. Further, such a requirement would effectively impose an injunction on DHS's authority under 8 U.S.C. § 1226(a) to make arrests pursuant to an administrative warrant, which would be barred by 8 U.S.C. § 1252(f)(1). *See supra* part II.

Accordingly, the Court will not impose Plaintiffs' proposed mandatory preliminary injunction and will instead enter an injunction that bars the application of the 2025 Policy to Plaintiffs' places of worship, including its rescission of the 2021 Policy, such that DHS will be required to abide by the terms of 2021 Policy when pursuing enforcement actions in or near Plaintiffs' places of worship. Thus, pursuant to the 2021 Policy, DHS will be required to avoid enforcement actions in or near places of worship "to the fullest extent possible" and may undertake such enforcement actions only under one of the "limited circumstances" identified in the Mayorkas Memorandum or a comparable circumstance, and only with the advanced approval of ICE or CBP headquarters or, in the event of exigent circumstances, with post-action approval. J.R. 190-91. In light of 8 U.S.C. § 1252(f)(1), the injunction will not restrict or enjoin DHS's ability to engage in arrests at places of worship pursuant to an administrative or judicial warrant. *See supra* part II.

As for the geographic scope of the injunction, "[d]istrict courts have broad discretion to craft remedies based on the circumstances of a case, but likewise must ensure that 'a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (quoting *Roe v. Dep't of Defense*, 947 F.3d 207, 231 (4th Cir. 2020)). Pursuant to this authority, district courts may issue nationwide injunctions in various circumstances, including "when the facts would not require different relief for others similarly situated to the plaintiffs," *id.*, and when such an injunction is "necessary to afford relief to the prevailing party," *Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001).

Here, the Court concludes that a nationwide injunction is not warranted because its ruling on the likelihood of success on the merits is premised on how the 2025 Policy would interact with the specific religious beliefs, religious practices, and composition of Plaintiffs' congregations, as

described in the Motion and the attached declarations, including in particular their beliefs relating to communal worship, service to immigrants, and pacifism. Plaintiffs have not shown that the 2025 Policy would imposes the same kind of burdens, as required to establish constitutional or statutory violations, on all other religious institutions across the nation. Thus, this is not a case, as Plaintiffs claim, in which "application of the challenged policy does not turn on individual characteristics of the plaintiffs." Mot. at 28, ECF No. 26-1. Because the Court cannot find on the present record that "the facts would not require different relief for others similarly situated to the plaintiffs," *HIAS, Inc.*, 985 F.3d at 326, a nationwide injunction is not warranted. Further, Plaintiffs' invocation of the need for uniformity in the nation's immigration laws and policies, which sometimes serves as an appropriate rationale for a nationwide injunction, *see, e.g. Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547, 548 (2016); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2020), is unpersuasive here because the nature and terms of the 2021 Policy are such that even if it were required to be applied nationwide, it would not necessarily result in completely uniform enforcement of immigration laws across all places of worship.

Finally, Plaintiffs have not shown that an injunction applicable only to them cannot provide them with full relief. Plaintiffs have provided no basis to conclude that they could not provide to DHS, for purposes of enforcement of the injunction, a list of the locations of their places of worship and of other sites at which they may hold their worship services. Although Plaintiffs argue that their religious beliefs requiring them to welcome all persons to their places of worship would remain undermined if individuals they encourage to attend their services remain reluctant to attend absent a nationwide injunction, they have not provided a sufficient factual basis to support that assertion. Regardless, at this stage of the litigation, that fact alone cannot support the

conclusion that a nationwide injunction applicable to all places of worship can be justified where the Court's finding of a likelihood of success on the merits is specific to the 2025 Policy's application to Plaintiffs' particularized religious beliefs and practices. The preliminary injunction will therefore bar the application of the 2025 Policy only at Plaintiffs' places of worship.

In issuing this injunction, the Court does not question that law enforcement, when necessary, must have the ability to conduct operations in or near places of worship. Nor does the Court make any findings on whether the 2025 Policy meets, exceeds, or falls short of what the First Amendment and RFRA require. The Court finds only that at this early stage of the case, on the sensitive and fraught issue of when and under what circumstances law enforcement may intrude into places of worship to conduct warrantless operations, the 2025 Policy's lack of any meaningful limitations or safeguards on such activity likely does not satisfy these constitutional and statutory requirements as to Plaintiffs, and that a return to the status quo is therefore warranted until the exact contours of what is necessary to avoid unlawful infringement on religious exercise are determined later in this case.

## CONCLUSION

For the foregoing reasons, the Motion for a Preliminary Injunction will be GRANTED IN PART and DENIED IN PART. The Motion will be granted in that a preliminary injunction will be granted to bar application of the 2025 Policy, and to return to the 2021 Policy, as to Plaintiffs only, as specified in the accompanying Preliminary Injunction. The Motion will be otherwise denied. A separate Order shall issue.

Date: February 24, 2025



THEODORE D. CHUANG
United States District Judge

59