**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| PHILADELPHIA YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 8:25-cv-00243-TDC |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' PARTIAL MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ...................................................................................................... 2

    I.   Statutory Background ................................................................................ 2

    II.  DHS's Internal Guidance ......................................................................... 3

    III. Plaintiffs' Lawsuit ................................................................................... 6

    IV. Related Lawsuits ..................................................................................... 8

STANDARD OF REVIEW ...................................................................................... 8

ARGUMENT .......................................................................................................... 10

    I.  The Huffman Memorandum Is Not Final Agency Action Subject To Review ........... 10

    II. Immigration Enforcement Is Committed To Agency Discretion By Law ................... 19

CONCLUSION ....................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

CASES

*Adams v. Bain*,
　697 F.2d 1213 (4th Cir. 1982) ................................................................ 8

*Arizona v. Biden*,
　31 F.4th 469 (6th Cir. 2022) ................................................................ 14

*Arizona v. United States*,
　567 U.S. 387 (2012).................................................................... 2, 20, 22

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009).................................................................... 9

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
　785 F.3d 710 (D.C. Cir. 2015) ................................................ 14, 15

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007)................................................................ 9

*Bennett v. Spear*,
　520 U.S. 154 (1997)................................................................ 11

*Cal. Cmtys. Against Toxics v. EPA*,
　934 F.3d 627 (D.C. Cir. 2019) ................................................ 12

*Casa de Md. v. U.S. Dep't of Homeland Sec.*,
　924 F.3d 684 (4th Cir. 2019) ................................................ 24

*Chen Zhou Chai v. Carroll*,
　48 F.3d 1331 (4th Cir. 1995) ........................................ 15, 16, 18, 19

*City of New York v. Dep't of Def.*,
　913 F.3d 423 (4th Cir. 2019) ........................................ 10, 11, 17

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
　313 F.3d 852 (4th Cir. 2002) ................................................ *passim*

*Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*,
　800 F.2d 1514 (9th Cir. 1986) ................................................ 22

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................................................ *passim*

*Holbrook v. Tenn. Valley Auth.*,
   48 F.4th 282 (4th Cir. 2022) ............................................................................... 14

*In re KBR, Inc.*,
   744 F.3d 326 (4th Cir. 2014) ................................................................................. 9

*Interstate Com. Comm'n v. Bhd. of Locomotive Eng'rs*,
   482 U.S. 270 (1987) ............................................................................................. 20

*Invention Submission Corp. v. Rogan*,
   357 F.3d 452 (4th Cir. 2004) ......................................................................... 16, 17

*Jake's Fireworks Inc. v. Consumer Prod. Safety Comm'n*,
   105 F.4th 627 (4th Cir. 2024) ............................................................................... 9

*JGE ex rel. Tasso v. United States*,
   772 F. App'x 608 (10th Cir. 2019) ..................................................................... 22

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ............................................................................................... 9

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ......................................................................................... 14, 15

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ............................................................................................. 11

*Mennonite Church USA v. U.S. Dep't of Homeland Sec.*,
   ---F.Supp.3d---, 2025 WL 1094223 (D.D.C. Apr. 11, 2025) ............................... 8

*Mayor & City Council of Baltimore v. CFPB*,
   No. MJM-25-458, 2025 WL 814500 (D. Md. Mar. 14, 2025) ......................... 13, 16

*Nadendla v. WakeMed*,
   24 F.4th 299 (4th Cir. 2022) ................................................................................. 9

*Nat'l Fed'n of the Blind v. U.S. Abilityone Comm'n*,
   421 F. Supp. 3d 102 (D. Md. 2019) ..................................................................... 10

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ............................................................................. 12

*Parsons v. U.S. Dep't of Just.*,
   878 F.3d 162 (6th Cir. 2017) ........................................................................ 16

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ...................................................................................... 18

*Pharm. Coal. for Patient Access v. United States*,
   126 F.4th 947 (4th Cir. 2025) ...................................................... 10, 20, 23

*Phila. Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*,
   ---F.Supp.3d---, 2025 WL 585768 (D. Md. Feb. 24, 2025) ............................ 7

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) .................................................................................... 24

*Sierra Club v. EPA*,
   955 F.3d 56 (D.C. Cir. 2020) ................................................ 11, 13, 16, 17

*Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*,
   528 F.3d 310 (4th Cir. 2008) ............................................................. *passim*

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) .................................................................................... 22

*U.S. Army Corps. of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016) .................................................... 11, 15, 16, 19

*United States v. Texas*,
   599 U.S. 670 (2023) ............................................................ 22, 23, 24

*Vill. of Bald Head Island v. U.S. Corps of Eng'rs*,
   714 F.3d 186 (4th Cir. 2013) ...................................................................... 11

<small>STATUTES</small>

5 U.S.C. § 551(13) ....................................................................................... 11

5 U.S.C. § 553(b)(3) ..................................................................................... 18

5 U.S.C. § 701, *et seq.* ............................................................................... 1, 6

5 U.S.C. § 701(a)(2) .............................................................................. 10, 19

5 U.S.C. § 704 ....................................................................................... 10, 11

8 U.S.C. § 1103(a)(1) ............................................................................................. 2, 12

8 U.S.C. § 1226(a) ............................................................................................. 3, 12, 21

8 U.S.C. § 1226(c)(1) ................................................................................................. 3

8 U.S.C. § 1226a ....................................................................................................... 21

8 U.S.C. § 1227(a) ...................................................................................................... 3

8 U.S.C. § 1231(a)(1)(A) ....................................................................................... 3, 21

8 U.S.C. § 1231(a)(2) ............................................................................................. 3, 21

8 U.S.C. § 1252(f)(1) .................................................................................................. 7

8 U.S.C. § 1357(a) ..................................................................................................... 21

8 U.S.C. § 1357(a)(1) .................................................................................................. 3

8 U.S.C. § 1357(a)(3) .................................................................................................. 3

8 U.S.C. § 1357(e) ................................................................................................. 3, 21

Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-2000bb-4 ......................... 6

**RULES**

Federal Rule of Civil Procedure 12(b)(1) ........................................................... 2, 8, 10

Federal Rule of Civil Procedure 12(b)(6) ........................................................... 2, 9, 10

## **INTRODUCTION**

This case involves a challenge to a change in internal guidance provided by Defendant Department of Homeland Security (DHS) to its immigration enforcement officers. For decades, DHS has issued internal guidance to immigration enforcement officers governing the factors they should consider, and the approvals they should obtain, before conducting enforcement actions in certain locations.  That guidance has often changed.  In 2021, then Secretary of Homeland Security Alejandro Mayorkas issued a guidance memorandum (Mayorkas Memorandum) that identified certain areas—including, as relevant here, places of worship—as protected areas, generally explained when immigration enforcement officers should pursue enforcement in those areas, noting that the exercise of judgment was required, and provided that prior authorization by a supervisory official was required unless exigent circumstances were present. In January 2025, then-acting Secretary of Homeland Security Benjamine Huffman issued new internal guidance (Huffman Memorandum) instructing immigration officers to exercise their "discretion" and "common sense" when conducting immigration enforcement activities in or near places of worship and other sensitive locations. The Huffman Memorandum also authorized DHS's enforcement components to issue further guidance, which U.S. Immigration and Customs Enforcement (ICE) has recently done, directing supervisory officials to make case-by-case determinations about enforcement actions in or near protected areas.

Plaintiffs, a number of religious organizations, filed this lawsuit alleging, as relevant here, the Huffman Memorandum violates the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* (APA), in four respects: (1) it is arbitrary and capricious because it does not provide a reason for rescinding the Mayorkas Memorandum and fails to consider alternative action; (2) it is contrary to Plaintiffs' First Amendment right to expressive association; (3) it is in excess of

1

statutory jurisdiction, authority, or limitations because it cannot satisfy strict scrutiny; and (4) DHS was required to engage in notice-and-comment rulemaking to rescind the Mayorkas Memorandum. *See* Am. Compl. for Declaratory & Injunctive Relief, ¶¶ 151, 159, 169, 177, ECF No. 28 (Am. Compl).

Plaintiffs' APA claims, however, are not reviewable under the APA because the Huffman Memorandum does not constitute final agency action from which legal consequences flow and the guidance the memorandum provides immigration enforcement officers in the field is committed to DHS's discretion by law. Accordingly, this Court should dismiss Plaintiffs' APA claims pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Plaintiffs' notice-and-comment claim (Count VI) should also be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim because the Huffman Memorandum is a general statement of policy and thus exempt from the APA's notice-and-comment requirements.

## **BACKGROUND**

### I.    **Statutory Background**

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Through the Immigration and Naturalization Act (INA) and related statutes, Congress has established an "extensive and complex" framework for the "governance of immigration and alien status." *Id.* at 395. "A principal feature" of this congressionally established "removal system is the broad discretion exercised by immigration officials." *Id.* at 396.

Congress has charged the Secretary of Homeland Security with "administration and enforcement" of immigration laws. *See* 8 U.S.C. § 1103(a)(1). As relevant here, Congress has

vested immigration officers with broad authority to arrest, detain, and remove aliens who are unlawfully present or otherwise removable. *See id.* §§ 1226(a) (permitting arrest and detention upon a warrant issued by the Secretary); 1226(c)(1) (the Secretary "shall take into custody any alien" who has committed certain crimes), 1231(a)(1)(A), (2) (authorizing detention of aliens with final removal orders); *see also* §§ 1227(a) (grounds for deportability); 1357(a)(1) (listing powers that immigration officers may exercise, including interrogation without a warrant of "any alien or person believed to be an alien as to his right to be or to remain in the United States").

This authority is subject to only a few location-based rules. Congress has limited certain investigative activities at farms. *See id.* § 1357(e) (prohibiting officers from entering a farm or other outdoor agricultural operation for investigative purposes "without the consent of the owner (or agent thereof) or a properly executed warrant"). And it has granted immigration officers expanded authority for investigations near the border. *See id.* § 1357(a)(3) (providing that within 25 miles of an international border, immigration officers may have access, without a warrant, to any "private lands, but not dwellings"). But Congress has not otherwise imposed any location-based restrictions—such as restrictions related to places of worship—on the general arrest and detention authority of immigration officers.

## II.    DHS's Internal Guidance

Since at least 1993, DHS or its predecessor, the Immigration and Naturalization Service, has permitted immigration enforcement activities in or near sensitive locations, including places of worship, with prior supervisory approval or where exigent circumstances are present. *See, e.g.*, Mem. from James A. Puleo, Acting Assoc. Comm'r, Immigr. & Naturalization Serv., "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" (May 17, 1993) (Puleo Memorandum) (JR Ex. 11, PYM-000067-69); Mem. from

John Morton, Director, ICE, "Enforcement Actions at or Focused on Sensitive Locations" (Oct. 24, 2011) (Morton Memorandum) (JR Ex. 16, PYM-000082-84).  As Director Morton explained, the agency's guidance was "not intended to categorically prohibit lawful enforcement operations" but rather is "meant to ensure that ICE officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations[,]" particularly when a situation arises that does not permit prior approval. Morton Memorandum at 2 (JR Ex. 16, PYM-000083); *see also* Mem. from David V. Aguilar, Deputy Comm'r, U.S. Customs & Border Prot., "U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations" (Jan. 18, 2013) at 1-2 (JR Ex. 17, PYM-000085-86) ("[w]hen situations arise" that do not permit "prior written approval, Agents and Officers are expected to exercise sound judgment and common sense"); Puleo Memorandum at 6 (JR Ex. 11, PYM-000068) ("officers are expected to exercise good judgment concerning the appropriate action to take" when exigent circumstances arise that do not permit prior approval).

In October 2021, the then-Secretary of Homeland Security issued updated guidance regarding enforcement activities in or near sensitive locations.  Mem. from Alejandro Mayorkas, Sec'y of Homeland Sec., "Guidelines for Enforcement Actions in or Near Protected Areas" (Oct. 27, 2021) (Mayorkas Memorandum) (JR Ex. 20, PYM-000188-92).  The Mayorkas Memorandum stated that "[t]o the fullest extent possible, we should not take an enforcement action in or near a protected area." *Id.* at 3 (JR Ex. 20, PYM-000190).  This statement did *not* prohibit enforcement actions in or near places of worship.  Rather, it recognized that there were circumstances "under which an enforcement action" in or near a sensitive location "needs to be taken[,]" including "exigent circumstances[.]" *Id.* at 3-4 (JR Ex. 20, PYM-000190-91).  Absent exigent circumstances, immigration officers could "seek prior approval from their Agency's

4

headquarters, or as" component commissioners, directors, and other senior officials "otherwise delegate," before conducting an enforcement action in or near a sensitive location. *Id.* at 4 (JR Ex. 20, PYM-000191). The Mayorkas Memorandum offered a non-exhaustive list of circumstances that would justify an enforcement action in or near a sensitive location, but emphasized that the list included "only examples," was "not complete," and that "the exercise of judgment is required." *Id.* (JR Ex. 20, PYM-000191). The exercise of judgment is also required when determining what constitutes "near" for purposes of an enforcement action. *Id.* at 3 (JR Ex. 20, PYM-000190).

In addition, the Mayorkas Memorandum made clear that "[t]his guidance does not limit an agency's or employee's statutory authority . . . ." *Id.* at 4 (Ex. 20, PYM-000191). The Mayorkas Memorandum also clarified that the guidance did not create any right enforceable against the United States: "This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 5 (JR Ex. 20, PYM-000192).

On January 20, 2025, then-Acting Secretary of Homeland Security Huffman issued new guidance on enforcement actions in or near sensitive locations, superseding the Mayorkas Memorandum. Mem. from Benjamine C. Huffman, Acting Sec'y, ICE, "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) (Huffman Memorandum) (JR Ex. 43, PYM-000574). The Huffman Memorandum eschewed default or bright-line rules, observing that officers frequently exercise discretion "to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location." *Id.* (JR Ex. 43, PYM-000574). It directed that "[g]oing forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense" when considering enforcement actions in or near

sensitive locations.  *Id.*  While the Huffman Memorandum stated that "[i]t is not necessary" for DHS "to create bright line rules regarding where our immigration laws are permitted to be enforced," it acknowledged that component heads "may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion." *Id.*

Then-acting ICE Director Caleb Vitello subsequently issued further guidance.  Mem. from Caleb Vitello, Acting Director, ICE, "Common Sense Enforcement Actions in or Near Protected Areas" (Jan. 31, 2025) (Vitello Memorandum) (JR Ex. 55, PYM-000669-70).  The Vitello Memorandum reiterated that ICE officers should exercise discretion and directed supervisory oversight over enforcement actions in or near sensitive locations by charging ICE Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) "with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area."  *Id.* at 2 (JR Ex. 55, PYM-000670).  Such supervisory ICE officials "may provide authorization for such actions either verbally or in writing." *Id.* (JR Ex. 55, PYM-000670).

## III.    Plaintiffs' Lawsuit

Plaintiffs, several religious organizations, initiated this lawsuit on January 27, 2025, alleging the Huffman Memorandum substantially burdens their exercise of religion in violation of the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb-2000bb-4 and impedes their First Amendment right of expressive association. Compl. for Declaratory & Injunctive Relief ¶¶ 93-118, ECF No. 1 (Compl.).  Plaintiffs also assert the Huffman Memorandum violates the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq*, in four respects: (1) it is arbitrary and capricious because it does not provide a reason for rescinding the Mayorkas Memorandum; (2) it is contrary to a constitutional right, namely the First Amendment right of

expressive association; (3) it is in excess of statutory jurisdiction, authority, or limitations because it cannot satisfy strict scrutiny; and (4) it is without observance of procedure required by law because it did not go through the notice-and-comment process.  Compl. Counts III-VI, ¶¶ 120-154.  Plaintiffs seek a declaration that the Huffman Memorandum is unconstitutional and an order enjoining Defendants from "implementing, enforcing, or acting pursuant to" the memorandum.  *Id.*, Prayer for Relief at 38-39.

On February 4, 2025, Plaintiffs amended their complaint, adding three religious organizations to the lawsuit.  *See* Am. Compl.  Plaintiffs also moved for a temporary restraining order and preliminary injunction on the basis that the Huffman Memorandum violates their First Amendment right of expressive association and their right to exercise religion under RFRA.  *See* Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj., ECF No. 26-1.  Plaintiffs did not seek a preliminary injunction on the basis of their APA claims. *See id.*

The Court granted Plaintiffs' motion in part on February 24, 2025.  *See* Mem. Op., ECF No. 60; Order, ECF No. 61; *see also Phila. Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, ---F.Supp.3d---, 2025 WL 585768 (D. Md. Feb. 24, 2025).  The Court found that Plaintiffs likely had standing and had made a sufficient showing on their First Amendment and RFRA claims.  *See generally* Mem. Op.  The Court, however, rejected Plaintiffs' request for a nationwide injunction that altered the status quo by requiring Defendants to obtain a judicial warrant before carrying out enforcement actions in or near Plaintiffs' places of worship.  *See* 2025 WL 585768 at *25-26; *see also* Prelim. Inj., ECF No. 62.  The Court, consistent with Section 1252(f)(1) of Title 8 of the U.S. Code, further limited the injunction by not "restrict[ing] or enjoin[ing] DHS's ability to engage in arrests pursuant to an administrative warrant." 2025 WL 585768 at *14; *see also* Prelim. Inj., ECF No. 62.

7

IV.    **Related Lawsuits**

The Huffman Memorandum has been challenged in two separate lawsuits.  In *Mennonite Church USA v. U.S. Department of Homeland Security*, several religious organizations filed a similar suit to this case alleging the Huffman Memorandum violated of the First Amendment, RFRA, and the APA. *See* No. 25-00403-DLF (D.D.C. filed Feb. 11, 2025).   Plaintiffs subsequently moved for a preliminary injunction. *See id.*, Pls.' Mot. for Prelim. Inj., ECF No. 11. The court denied Plaintiffs' motion for failure to establish a substantial likelihood of standing. *See id.* ECF Nos. 30, 31; *see also Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, --- F.Supp.3d---, 2025 WL 1094223 at *8 (D.D.C. Apr. 11, 2025).

In *Denver Public Schools v. Noem*, No. 1:25-cv-00474-DDD-KAS (D. Colo. filed Feb. 12, 2025), the Denver Public School system filed a lawsuit alleging the Huffman Memorandum violated the APA and moved for preliminary relief.  The court denied the motion for lack of standing.  *See id.*, Minute Entry, ECF No. 37 (denying motion for a temporary restraining order and preliminary injunction for the reasons stated on the record); *see also Mennonite Church USA*, No. 25-00403-DLF, Defs.' Mem. in Opp'n to Pls.' Mot. for Prelim, Inj. Ex. B, *Denver Pub. Schs.*, Transcript of Hearing on TRO at 54-55, ECF No. 16-2.

## STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges a court's jurisdiction over the subject matter of the suit.  The motion may either attack the court's subject matter jurisdiction by asserting "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," or may assert that as a factual matter, the plaintiff cannot meet his burden of establishing a jurisdictional basis for the lawsuit. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).  Under the latter approach, the Court "may consider evidence

outside the pleadings" to determine whether subject matter jurisdiction exists. *In re KBR, Inc.*, 744 F.3d 326, 333 (4th Cir. 2014) (citation omitted). Further, "[i]t is to be presumed that a cause lies outside" a federal court's limited jurisdiction, and the "burden of establishing the contrary rests upon" the plaintiff. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of the claims pled in a complaint." *Nadendla v. WakeMed*, 24 F.4th 299, 304 (4th Cir. 2022) (citation omitted). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when there are sufficient factual allegations to draw "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Although a court must accept as true the factual allegations in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation," and a "formulaic recitation of the elements of a cause of action" is not enough. *Twombly*, 550 U.S. 555 (citation omitted). Moreover, a complaint is not sufficient if it "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Defendants assert Plaintiffs' APA claims should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) because the Huffman Memorandum is not final agency action reviewable under the APA. *See Jake's Fireworks Inc. v. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) ("finality under the APA is a jurisdictional requirement"). Notably, Plaintiffs' notice-and comment claim (Count VI of the Amended Complaint) fails for the same reasons the Huffman Memorandum is not final agency action and thus may also be dismissed pursuant to Rule 12(b)(6).

Alternatively, if the Court were to conclude that the Huffman Memorandum is final agency action, Plaintiffs claims should be dismissed because the Huffman Memorandum's guidance for immigration enforcement officials is committed to agency discretion by law. The Fourth Circuit recently confirmed that a court lacks subject matter jurisdiction when an action is committed to agency discretion by law and thus should be dismissed under Rule 12(b)(1). *See Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir. 2025). However, some district courts in this Circuit have previously taken a different view. *See, e.g.*, *Nat'l Fed'n of the Blind v. U.S. Abilityone Comm'n*, 421 F. Supp. 3d 102, 118 n.4 (D. Md. 2019) ("a complaint seeking review of agency action 'committed to agency discretion by law' . . . has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6), not under the jurisdictional provision of Rule 12(b)(1)" (citation omitted)).

## ARGUMENT

"Although there is a 'strong presumption' in favor of judicial review of agency action," *Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 528 F.3d 310, 316 (4th Cir. 2008) (citation omitted), the APA imposes several limitations. Two of those limitations bar Plaintiffs' APA claims. First, the Huffman Memorandum does not constitute "final agency action" because it does not have any direct and appreciable legal consequences and thus does not determine rights or obligations, but rather is internal guidance to immigration enforcement officers regarding their exercise of discretion. 5 U.S.C. § 704. Second, immigration enforcement guidance is a matter committed to agency discretion by law. *Id.* § 701(a)(2).

## I.    The Huffman Memorandum Is Not Final Agency Action Subject To Review

"The term 'action' as used in the APA is a term of art that does not include all conduct on the part of the government." *City of New York v. Dep't of Def.*, 913 F.3d 423, 430-31 (4th Cir.

2019) (quoting *Vill. of Bald Head Island v. U.S. Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013)).  "[T]he APA defines 'agency action' to include 'the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.'"  *Id.* at 431 (quoting 5 U.S.C. § 551(13)).  Judicial review of "agency action" is available only to challenge a "final agency action for which there is no other adequate remedy in a court . . . ."  5 U.S.C. § 704; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("When, as here, review is sought not pursuant to [a] specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'" (quoting 5 U.S.C. § 704)); *City of New York*, 913 F.3d at 430 ("Judicial review under the APA . . . is limited to 'final action actions'" (quoting 5 U.S.C. § 704)).

Agency action may be deemed final if two conditions are satisfied.  "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature."  *U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* (quoting *Bennett*, 520 U.S. at 178).  The second prong of the finality test is satisfied if the action has "direct and appreciable legal consequences."  *Id.* (quoting *Bennett*, 520 U.S. at 178); *see also Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 859 (4th Cir. 2002) ("Agency action which carries 'no direct and appreciable legal consequences' is not reviewable under the APA." (citation omitted)).

"Whether an agency action has 'direct and appreciable legal consequences' . . . is a 'pragmatic' inquiry."  *Sierra Club v. EPA*, 955 F.3d 56, 62 (D.C. Cir. 2020) (quoting *Hawkes*, 578 U.S. at 598-99).  The Court of Appeals for the District of Columbia Circuit has explained

11

that such an injury requires an examination of the "concrete consequences" the challenged action "has or does not have as a result of the specific statutes and regulations that govern it." *Id.* at 63 (quoting *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019)). When evaluating the "concrete consequences" of an agency guidance document, the District of Columbia Circuit considers several factors including (1) "the actual legal effect (or lack thereof)" of the action "on regulated entities"; (2) "the agency's characterization of the guidance"; and (3) "whether the agency has applied the guidance as if it were binding on regulated parties." *Id.* at 62-63 (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014)).

Plaintiffs assert in their Amended Complaint that the Huffman Memorandum "is a final agency action because it is 'the consummation of the agency's decisionmaking process' and it determines 'rights [and] obligations' and creates 'legal consequences[,]'" namely the "creation or revocation of [a] safe harbor[]." Am. Compl. ¶¶ 148, 156, 165, 175 (citation omitted). Defendants do not dispute that the Huffman Memorandum meets the first prong of the finality test set forth in *Hawkes*. However, the memorandum does not have "direct and appreciable legal consequences" and, therefore, does not satisfy the second prong.

To begin, whether the Huffman Memorandum has sufficient concrete consequences for purposes of finality is, in large part, dependent on whether the Mayorkas Memorandum constituted a final agency action subject to review under the APA. It did not.

The Mayorkas Memorandum had no actual legal effect because it "ha[d] no direct regulatory effect on [P]laintiffs." *Flue-Cured Tobacco*, 313 F.3d at 858. DHS's enforcement authority is derived from the INA. *See, e.g.*, 8 U.S.C. §§1103(a)(1) ("The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens"); 1226(a) ("On warrant

12

issued by the Attorney General, an alien may be arrested and detained . . . .").  The Mayorkas Memorandum offered no interpretations of the INA or related statutes or regulations; indeed, it did not reference a single statutory or regulatory provision.  *See generally* Mayorkas Memorandum (JR Ex. 20, PYM 000188-192).  Moreover, the memorandum imposed "no obligations, prohibitions, or restrictions" on Plaintiffs.  *Sierra Club*, 955 F.3d at 63; *see also* Mayorkas Memorandum (JR Ex. 20, PYM-000188-92).  "[A]n agency action does not have sufficient concrete consequences" and thus does not have direct and appreciable legal consequences, "when it imposes 'no obligations, prohibitions, or restrictions' on a regulated party." *Mayor & City Council of Baltimore v. CFPB*, No. MJM-25-458, 2025 WL 814500 at *10 (D. Md. Mar. 14, 2025) (quoting *Sierra Club*, 955 F.3d at 63).

Nor did the Mayorkas Memorandum withdraw discretion from immigration enforcement officers.  *See Sierra Club*, 955 F.3d at 64 ("the amount of discretion . . . authorities retain after publication of the . . . [g]uidance" is "[p]aramount" in determining whether a guidance document has "direct and appreciable legal consequences").  Although the Mayorkas Memorandum expressly provided that immigration enforcement officers should, "[t]o the fullest extent possible" refrain from taking enforcement actions in or near sensitive locations, it did not prohibit such actions.  *See* Mayorkas Memorandum at 2-4 (JR Ex. 20 at PYM-000189-91).  The memorandum merely required immigration enforcement officers to seek approval from their components' headquarters or delegee; the decision to pursue enforcement thus remained within the discretion of immigration enforcement officers and the approval official.  Further, the phrase "[t]o the fullest extent possible," *id.* at 2 (JR Ex. 20, PYM-000189), "recognizes that there might be limited circumstances under which an enforcement action needs to be taken in or near" a sensitive location, *id.* at 3 (JR Ex. 20, PYM-000190).  And those "limited circumstances" are not

cabined to the list of examples provided in the memorandum—the memorandum expressly stated that the list of examples "is not complete." *Id.* at 3-4 (JR Ex. 20, PYM-000190-91). This recognition that immigration enforcement actions are not prohibited in or near sensitive locations did not just "suggest[] room for discretion[,]" *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282, 294 (4th Cir. 2022), it expressly required "the exercise of judgement[,]" Mayorkas Memorandum at 4 (JR Ex. 20, PYM-000191). So too, did the determinations of "[w]hether an area is a 'protected area'" in the first instance and what constitutes "near" a sensitive location. *Id.* at 2-3 (JR Ex. 20, PYM 000189-90). Far from retracting immigration enforcement officers' discretion, the Mayorkas Memorandum simply informed the exercise of their discretion.

Further, the Mayorkas Memorandum characterized its guidance as non-binding. The memorandum provided that the "guidance does not limit an agency's or employee's statutory authority[.]" *Id.* at 4 (JR Ex. 20, PYM-000191). The memorandum also expressly disclaimed that it created any binding or enforceable legal rights. *See id.* at 5 (JR Ex. 20, PYM-000192) ("This guidance is not intended to, does not, and may not be relied upon to create any right of benefit, substantive or procedural, enforceable at law by any party in any administrative, civil or criminal matter.").

Viewing these statements in combination with the "conditional language that preserve[d] officials' discretion[,]" *Arizona v. Biden*, 31 F.4th 469, 477 (6th Cir. 2022), to conduct immigration enforcement actions in or near sensitive locations and the fact that the memorandum imposes no obligations, prohibitions, or restrictions on Plaintiffs, it is clear that the Mayorkas Memorandum was a general statement of policy that merely "explain[ed] how the agency will . . . exercise its broad enforcement discretion[.]" *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) (citation omitted); *see also Lincoln v. Vigil*, 508

U.S. 182, 197 (1993) (general statements of policy "advise the public prospectively on the manner in which the agency proposes to exercise a discretionary power" (citation omitted)); *Chen Zhou Chai*, 48 F.3d 1331, 1341 (4th Cir. 1995) (holding a rule that authorizes but does not compel agency officials to take or refrain from taking action "leaves the agency officials free to exercise their discretion" and thus is a general statement of policy).  A general statement of policy is neither binding on the public nor the agency, and the agency "retains the discretion and the authority to change its position[.]" *Ass'n of Flight Attendants*, 785 F.3d at 716 (citation omitted).  The Mayorkas Memorandum, therefore, did not create a safe harbor for places of worship or other sensitive locations.  *See Hawkes*, 578 U.S. at 598 (holding that the "definitive nature" of the agency's jurisdictional determination "gives rise to 'direct and appreciable legal consequences'" because it binds the agency in subsequent litigation and limits a landowner's potential civil liability for a five-year period (citation omitted)).  As such, the Mayorkas Memorandum was not final agency action because it did not have sufficiently concrete consequences and thus did not carry "direct and appreciable legal consequences." *Flue-Cured Tobacco*, 313 F.3d at 859 (citation omitted).

Given that the Mayorkas Memorandum is a non-binding guidance document that did not create a safe harbor for sensitive locations and thus did not give rise to any "direct and appreciable legal consequences" that would satisfy the second prong of the finality inquiry, it follows that the Huffman Memorandum did not revoke a safe harbor for sensitive locations and, therefore, also does not give rise to any "direct and appreciable legal consequences" that would satisfy the second prong of the finality inquiry.

To be sure, the Huffman Memorandum, like the Mayorkas Memorandum, offers no interpretations of the INA, imposes "no obligations, prohibitions, or restrictions, and 'compels

action by neither the [Plaintiffs] nor [Defendants].'" *Sierra Club*, 955 F.3d at 64 (citation omitted); *see also* Huffman Memorandum (JR Ex. 43, PYM-000574). In other words, the Huffman Memorandum does not require nor prohibit enforcement actions in or near sensitive locations. Immigration enforcement officers "retained the[ir] discretion to carry out or abstain from enforcement actions in or near sensitive locations. *Chen Zhou Chai*, 48 F.3d at 1341. For this reason alone, the memorandum does not have an actual legal effect on regulated entities and, therefore, does not give rise to "direct and appreciable legal consequences." *See Mayor & City Council of Baltimore*, 2025 WL 814500 at *10 (citation omitted).

In the absence of any obligations, prohibitions, or restrictions on Plaintiffs, the Huffman Memorandum does not expose Plaintiffs to criminal or civil penalties for noncompliance. *See Hawkes*, 578 U.S. at 600 (holding, in part, that the challenged agency decision had direct and appreciable legal consequences because the petitioners risked significant criminal and civil penalties if they did not comply with the agency's determination); *see also Parsons v. U.S. Dep't of Just.*, 878 F.3d 162, 167 (6th Cir. 2017) ("[A]gency actions that expose an individual to criminal or civil liability cause legal consequences.").

Instead, the "consequences complained of by [P]laintiffs stem from independent actions taken by third parties." *Flue-Cured Tobacco*, 313 F.3d at 860. Indeed, Plaintiffs allege in their Amended Complaint that many immigrants fear immigration enforcement since the Huffman Memorandum was issued, which has allegedly deterred some immigrants from attending worship services. *See, e.g.*, Am. Compl. ¶¶ 87-89. But an agency action that "produc[es] only coercive pressure[] on third parties" does not give rise to the direct and appreciable legal consequences required to satisfy the second prong of the finality inquiry. *Flue-Cured Tobacco*, 313 F.3d at 859-61. The "independent responses and choices of third parties . . . cannot be imputed to" an

16

agency "for purposes of determining whether its conduct was final agency action." *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 460 (4th Cir. 2004) (citation omitted); *see also City of New York*, 913 F.3d at 431 ("It is not enough for plaintiffs to simply identify a governmental action that ultimately affected them through the 'independent responses and choices of third parties,' or mere 'coercive pressures.'" (quoting *Flue-Cured Tobacco*, 313 F.3d at 859, 861)). The lack of direct and appreciable legal consequences renders the Huffman Memorandum non-final agency action. *See Flue-Cured Tobacco*, 313 F.3d at 862. To hold otherwise, as the Fourth Circuit noted in *Flue-Cured Tobacco*, would subject "almost any agency policy or publication" to "judicial review." *Id.* at 861.

This conclusion is further supported by DHS's characterization of the Huffman Memorandum as a non-binding policy statement. *See Sierra Club*, 955 F.3d at 62-63. DHS states, as it did in the Mayorkas Memorandum, that the "memorandum is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." Huffman Memorandum (Ex. 43, PYM-000574). The Huffman Memorandum's authorization of enforcement component heads to "issue further guidance to assist officers in exercising appropriate enforcement discretion" confirms its non-binding nature. *Id*. Like the Mayorkas Memorandum, these statements when viewed in conjunction with the lack of any obligations, prohibitions, or commands and the corresponding lack of direct consequences demonstrate that the Huffman Memorandum is a general statement of policy.

Finally, with respect to "whether the agency has applied the guidance as if it were binding on regulated parties," *Sierra Club*, 955 F.3d at 62-63 (citation omitted), Plaintiffs do not allege that Defendants have been targeting places of worship and other sensitive locations for

17

immigration enforcement since the Huffman Memorandum was issued.  They point to a single enforcement action in or near a non-Plaintiffs' place of worship.  *See* Am. Compl. ¶ 90.  A single account of an immigration enforcement action in or near a sensitive location does not demonstrate that DHS views the Huffman Memorandum as binding on regulated entities or as compelling immigration enforcement officers to carry out enforcement actions in or near places of worship or other sensitive locations.

In sum, the Huffman Memorandum does not compel any specific law enforcement action, leaves the exercise of enforcement discretion to the judgment of DHS personnel in each case, and does not create a "right or benefit."  Accordingly, the Huffman Memorandum does not have sufficient "concrete consequences" that give rise to "direct and appreciable legal consequences" required to satisfy the second prong of the finality inquiry.  This Court, therefore, lacks subject matter jurisdiction over Plaintiffs' APA claims.

It also bears noting the non-binding nature of both the Mayorkas and Huffman memoranda demonstrates Plaintiffs' claim that DHS's issuance of the Huffman Memorandum "without going through the notice-and-comment process . . . is not in observance of procedure required by law" is without merit.  *See* Am. Compl., Count VI ¶¶ 176-79.  General policy statements are exempt from the APA's notice-and-comment requirements. 5 U.S.C. § 553(b)(3).  By contrast, rules that must generally be adopted through notice-and-comment are those that create legally enforceable rights or obligations. *See Perez v. Mort. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *Chen Zhou Chai*, 48 F.3d 1340.  As discussed above, both the Mayorkas and Huffman Memorandums are quintessential policy statements: they announce how DHS's immigration enforcement officers should exercise their discretion when contemplating whether to pursue (or forebear from) enforcement—a decision "generally committed to an agency's absolute

discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *Speed Mining*, 528 F.3d at 317-19. But they do not alter the rights or obligations of any person or entity because they do not have "direct and appreciable legal consequences." *Hawkes*, 578 U.S. at 597.

Plaintiffs' contention to the contrary misses the mark. *See* Am. Compl. ¶¶ 176-79. If the Huffman Memorandum's announcement about how immigration enforcement officers should exercise their discretion vis-à-vis enforcement in or near sensitive locations is a substantive or legislative rule requiring notice-and-comment, then *a fortiori* so was the Mayorkas Memorandum. Critically, though, the Mayorkas Memorandum itself was not adopted through notice and comment. So even on Plaintiffs' own theory, the Mayorkas Memorandum would be *void ab initio*—leaving Plaintiffs without a remedy. *See Chen Zhou Chai*, 48 F.3d at 1341 n.9 (noting that if the interim rule at issue were a substantive rule, as the plaintiff claims, then it would have been invalid from the date of its issuance for failure to comply with the APA's notice and comment requirements). For these reasons, Count VI of Plaintiffs' Amended Complaint should also be dismissed for failure to state a claim.

## II.    Immigration Enforcement Is Committed To Agency Discretion By Law

Even if this Court views the Huffman Memorandum as final agency action, Plaintiffs' APA claims are not cognizable because discretionary policy choices about how best to enforce the Nation's immigration laws are committed to agency discretion by law. The APA bars judicial review of agency action to the extent that it "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agency action may be deemed committed to agency discretion "even where Congress has not affirmatively precluded review[.]" *Heckler*, 470 U.S. at 830. Where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"—where, effectively, "there is no law to apply"—the APA

does not permit judicial review. *Id.* (citation omitted); *see also Pharm. Coal. for Patient Access*, 126 F.4th at 964 ("Agency action is committed to the agency's discretion when no judicially manageable standards are available to assess how and when an agency should exercise its discretion such that a court would have "'no law to apply.'" (citation omitted)).

"In determining whether a 'meaningful standard' for reviewing agency discretion exists, courts consider the particular language and overall structure of the statute in question[.]" *Speed Mining*, 528 F.3d at 317 (citation omitted). "Congress may limit an agency's exercise of enforcement power if it wishes," but only when Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under § 701(a)(2)[.]" *Heckler*, 470 U.S. at 833-34. Courts may also consider whether, as a matter of tradition, action is committed to agency discretion. *See id.* at 832 ("[S]uch a decision has traditionally been 'committed to agency discretion,' and we believe that the Congress enacting the APA did not intend to alter that tradition."); *see also Speed Mining*, 528 F.3d at 317 (courts also consider "the nature of the administrative action at issue" when determining whether an action is committed to agency discretion (citation omitted)). Where "the type of agency decision in question has traditionally been committed to agency discretion," the action does not "become[] reviewable" just because "the agency gives a reviewable reason" for it (or fails to do so). *Interstate Com. Comm'n v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282-83 (1987) (citation omitted). Under these standards, DHS's adoption of the Huffman Memorandum is committed to agency discretion by law.

The analysis begins with the statute. Congress, through the INA and other statutes, has granted DHS broad discretion in enforcing the Nation's immigration laws. *See Arizona*, 567 U.S. at 396 ("A principal feature of the" congressionally established "removal system is the broad

20

discretion exercised by immigration officials."). Nothing in the INA indicates that Congress intended to "limit [the] agency's exercise of enforcement power . . . , either by setting substantive priorities, or by otherwise circumscribing [the] agency's power to discriminate among issues or cases it will pursue." *Heckler*, 470 U.S. at 832-33. Thus, the INA's enforcement provisions, far from seeking to impose constraints on the agency's "exercise of enforcement power," affords the Executive Branch ample discretionary authority to prioritize when and, as relevant here, where it will enforce the law. *Id.* at 833.

Indeed, as previously discussed, the INA imposes few location-based restrictions on DHS's broad authority to investigate and make arrests, and it evinces only limited intent to dictate agency discretion with respect to the mechanics of enforcement. *See, e.g.*, 8 U.S.C. §§ 1226(a), 1231(a)(1)(A), (2), 1357(a). For example, Congress limits when immigration enforcement officers may enter a farm or similar agricultural operation for investigative purposes. *Id.* § 1357(e). But aside from the requirement to obtain warrants in certain circumstances, *see, e.g.*, *id.* § 1226a, Congress has not placed other restrictions on Defendants' enforcement discretion, such as whether, when, or under what circumstances immigration officers may enter or approach places of worship and other sensitive locations. The INA's silence with respect to sensitive locations "leaves th[e] [C]ourt with no manageable standard to apply[]" to the Huffman Memorandum. *Speed Mining*, 528 F.3d at 317 (concluding that the Federal Mine Safety and Health Act provided no manageable standard to apply to the Secretary's exercise of enforcement discretion because this Act provided "no direction" regarding which mine operator (*i.e.* owner-operator, lessee-operator, supervisor, independent contractor, etc.) should receive a citation for a violation of the Act).

Moreover, the "nature of the administrative action at issue further supports [the] conclusion" that the Huffman Memorandum is committed to agency discretion by law. *Speed Mining*, 528 F.3d at 318 (citation omitted).  An agency's enforcement choices are "an area in which the courts have traditionally been most reluctant to interfere." *Id.* (citation omitted).  The Supreme Court and the Fourth Circuit have long recognized that agency decisions about whether to pursue enforcement action are committed to agency discretion.  For example, in *Heckler*, the Supreme Court held that "an agency's decision not to prosecute or enforce, whether through civil and criminal process, is a decision generally committed to an agency's absolute discretion."  470 U.S. at 831.  The Fourth Circuit applied this principle in *Speed Mining*.  There, a coal mine operator asserted that the agency should not have cited it for safety violations because another company, a contractor, was more directly responsible.  *See* 528 F.3d at 317-19.  The Fourth Circuit held that decisions about which party or parties to target for enforcement action were committed to agency discretion and unreviewable.  *See id.*

The rationale underpinning this principle is twofold.  First, enforcement decisions traditionally involve considerable agency discretion.  *See United States v. Texas*, 599 U.S. 670, 678 (2023) ("Under Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021)); *see also Arizona*, 567 U.S. at 396 ("A principal feature of the removal system is the broad discretion exercised by immigration officials."); *JGE ex rel. Tasso v. United States*, 772 F. App'x 608, 612 (10th Cir. 2019) ("law enforcement decisions surrounding the investigation and prosecution of crimes . . . involve the exercise of discretion"); *Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*, 800 F.2d 1514, 1523 (9th

Cir. 1986) ("the Administrator need not promulgate rules constraining his discretion as to when to employ a particular statutory enforcement action").

Second, enforcement decisions "often involve[] complicated interest-balancing of factors within the agency's expertise." *Pharm. Coal. for Patient Access*, 126 F.4th at 964. The Supreme Court has held that agency decisions are "general[ly] unsuitabl[e]" for judicial review when they require "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise" or involve where best to spend "agency resources," including whether the agency "is likely to succeed if its acts" and "whether the particular enforcement action requested best fits the agency's overall policies." *Heckler*, 470 U.S. at 831. An agency is "'far better equipped than the courts' to balance these factors and determine its enforcement priorities." *Speed Mining*, 528 F.3d at 318 (quoting *Heckler*, 470 U.S. at 831-32). "This is true for both presumptively unreviewable decisions not to enforce . . . and presumptively reviewable decisions to enforce." *Id.* at 318. Indeed, the Fourth Circuit recently confirmed that decisions to pursue enforcement fall within the scope of *Heckler's* holding. *Pharm. Coal. for Patient Access*, 126 F.4th at 964-65 (an agency's "decision not to disavow possible enforcement . . . falls within the holding of *Heckler*" and is unreviewable because the decision implicates how the agency "employs its enforcement discretion").

The same holds true for immigration enforcement choices. The Supreme Court recently emphasized in *United States v. Texas*, 599 U.S. 670 (2023), that lawsuits like this one challenging agency immigration enforcement policies "run up against the Executive's Article II authority to enforce federal law[,]" *id.* at 678, and "courts generally lack meaningful standards for assessing the propriety of enforcement choices" with respect to arrest and detention, given the needs of the Executive Branch to weigh "resource constraints and regularly changing public-

safety and public-welfare needs . . . when devising arrest and prosecution policies." *Id.* at 679-80. This "complicated balancing process in turn leaves courts without meaningful standards for assessing those policies." *Id.* at 680; *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999) ("Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." "These concerns are greatly magnified in the deportation context." (citation omitted)).

The Fourth Circuit's decision in *Casa de Maryland v. U.S. Department of Homeland Security*, 924 F.3d 684 (4th Cir. 2019), does not counsel otherwise.  There, the Fourth Circuit held DHS's decision to rescind the program known as Deferred Action for Childhood Arrivals (DACA) was reviewable because the decision was "based on the agency's legal interpretation." *Id.* at 699 (citations omitted).  Here, as discussed above, the Huffman Memorandum, like the Mayorkas Memorandum, does not interpret the INA or related statutes or regulations. *See supra* at 13, 15.  Nor does it impose any obligations, prohibitions, or restrictions on regulated persons or entities. *Id.*  Instead, the Huffman Memorandum provides guidance to inform the exercise of enforcement discretion on a case-by-case basis.  *See* Huffman Memorandum (JR Ex. 43, PYM-000574) (recognizing that immigration enforcement officers "frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location").

Because there are no meaningful standards by which to assess Defendants' exercise of discretion, the Huffman Memorandum is committed to agency discretion by law.  The Court should accordingly dismiss Plaintiffs' APA claims.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Counts III-VI of Plaintiffs' Amended Complaint.

Dated:  April 17, 2025                    Respectfully submitted,

                                          YAAKOV M. ROTH
                                          Acting Assistant Attorney General

                                          ALEXANDER K. HAAS
                                          Branch Director

                                          ANDREW I. WARDEN
                                          Assistant Branch Director

                                          /s/ *Kristina A. Wolfe*
                                          KARIMA ORTOLANO (MA Bar No. 707575)
                                          KRISTINA A. WOLFE (VA Bar No. 71570)
                                          United States Department of Justice
                                          Civil Division
                                          Federal Programs Branch
                                          1100 L Street, NW
                                          Washington, D.C. 20530
                                          Tel: 202-353-4519
                                          Fax: 202-616-8470
                                          Email:  Kristina.Wolfe@usdoj.gov