## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,<br><br>Plaintiffs,<br><br>**v.**<br><br>**U.S. Department of Homeland Security,** *et al.*,<br><br>Defendants. | Civil Case No. 8:25-cv-243-TDC |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

Introduction ...................................................................................................................1

Factual Background .......................................................................................................2

Standard of Review........................................................................................................5

Argument .......................................................................................................................6

I.     The 2025 Policy is reviewable final agency action. ...........................................6

II.    The 2025 Policy is not committed to agency discretion by law. .......................14

III.   Plaintiffs have adequately alleged that notice-and-comment rulemaking was required. .............................................................................................................21

Conclusion ...................................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner,*
    387 U.S. 136 (1967) ......................................................................................... 6, 9, 14

*Adams v. Richardson,*
    480 F.2d 1159 (D.C. Cir. 1973) ................................................................................. 16

*Am. Acad. of Pediatrics v. FDA,*
    379 F. Supp. 3d 461 (D. Md. 2019) ........................................................................... 14

*Appalachian Power Co. v. E.P.A.,*
    208 F.3d 1015 (D.C. Cir. 2000) ................................................................................. 14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................................................... 5

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................................................ 6, 7, 10

*Bowen v. Mich. Acad. of Family Physicians,*
    476 U.S. 667 (1986) ................................................................................................... 19

*Casa de Maryland v. DHS.,*
    924 F.3d 684 (4th Cir. 2019) ............................................................... 6, 16, 17, 21

*Chen Zhou Chai v. Carroll,*
    48 F.3d 1331 (4th Cir. 1995) ............................................................................ 13, 21

*Children's Hosp. of the King's Daughters, Inc. v. Azar,*
    896 F.3d 615 (4th Cir. 2018) ............................................................................ 21, 22

*City of New York v. U.S. Dep't of Defense,*
    913 F.3d 423 (4th Cir. 2019) ...................................................................................... 6

*Cohen v. United States,*
    578 F.3d 1 (D.C. Cir. 2009) ......................................................................................... 8

*Cohen v. United States,*
    650 F.3d 717 (D.C. Cir. 2011) .................................................................................... 8

*Dalton v. Specter,*
    511 U.S. 462 (1994) ................................................................................................... 11

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) ............................................................................................ 14, 15

*Department of Homeland Security v. Regents of the University of California*,
591 U.S. 1 (2020).............................................................................................. 17

*Doe v. Tenenbaum*,
127 F. Supp. 3d 426 (D. Md. 2012)............................................................ 8, 10

*Elec. Privacy Info. Ctr. v. DHS*,
653 F.3d 1 (D.C. Cir. 2011)............................................................................. 22

*Elecs. of N.C., Inc. v. Se. Power Admin.*,
774 F.2d 1262 (4th Cir. 1985) ........................................................................ 18

*Evans v. B.F. Perkins Co.*,
166 F.3d 642 (4th Cir. 1999) ............................................................................ 5

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
313 F.3d 852 (4th Cir. 2002) ..................................................................... 10, 11

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)...................................................................................... 7, 11

*Garcia v. Neagle*,
660 F.2d 983 (4th Cir. 1981) .......................................................................... 19

*Heckler v. Chaney*,
470 U.S. 821 (1985)................................................................... 15, 16, 17, 19

*Holbrook v. Tennessee Valley Authority*,
48 F.4th 282 (4th Cir. 2022) ........................................................................... 13

*Int'l Refugee Assistance Project v. Trump*,
585 U.S. 1028 (2018).................................................................................. 7, 14

*Int'l Refugee Assistance Project v. Trump*,
883 F.3d 233 (4th Cir. 2018) ...................................................................... 7, 14

*Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*,
874 F.2d 205 (4th Cir. 1989) .......................................................................... 22

*Lincoln v. Vigil*,
508 U.S. 182 (1993)................................................................................... 14, 22

*Lucero v. Early*,
873 F.3d 466 (4th Cir. 2017) ............................................................................ 5

*Nat'l Fed'n of Fed. Workers v. Weinberger*,
818 F.2d 935 (D.C. Cir. 1987)........................................................................ 20

*OSG Bulk Ships, Inc. v. United States*,
    132 F.3d 808 (D.C. Cir. 1998) ......................................................... 16

*Parsons v. U.S. Dep't of Justice*,
    878 F.3d 162 (6th Cir. 2017) ........................................................... 8

*Perez v. Mortgage Bankers Ass'n*,
    575 U.S. 92 (2015) ......................................................................... 21

*Pharmaceutical Coalition for Patient Access v. United States*,
    126 F.4th 947 (4th Cir. 2025) ......................................................... 18

*Sierra Club v. EPA*,
    955 F.3d 56 (D.C. Cir. 2020) ................................................... 13, 14

*Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*,
    528 F.3d 310 (4th Cir. 2008) ..................................................... 6, 18

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) ........................................................... 8

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016) ............................................................ 6, 8, 9, 14

*United States v. Texas*,
    599 U.S. 670 (2023) ....................................................................... 20

*Webster v. Doe*,
    486 U.S. 592 (1988) ....................................................................... 19

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    586 U.S. 9 (2018) ............................................................. 14, 15, 20

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ......................................................................... 6

*WWHT, Inc. v. FCC*,
    656 F.2d 807 (D.C. Cir. 1981) ....................................................... 19

**Statutes**

5 U.S.C. § 551 ..................................................................................... 21

5 U.S.C. § 701 ..................................................................................... 14

5 U.S.C. § 702 ....................................................................................... 6

5 U.S.C. § 704 ....................................................................................... 6

5 U.S.C. § 706 ........................................................................ 6, 19, 23

8 U.S.C. § 1357 ................................................................................... 21

**Regulations**

8 C.F.R. § 287.8 ................................................................................................. 21

# INTRODUCTION

For three decades, the government has restricted immigration enforcement at houses of worship and other "protected areas," concluding that it can enforce its immigration laws in ways that would not "restrain people's access to essential services or engagement in essential activities." To that end, the Secretary of Homeland Security barred immigration-enforcement activities at protected areas "[t]o the fullest extent possible"—in the absence of exigent circumstances or supervisory approval, agents could not carry out enforcement actions in these locations.

The government has now reversed course. In January, the Secretary issued a memorandum rescinding the longstanding policy and authorizing agents to conduct immigration-enforcement operations at protected areas, including houses of worship. The 2025 Policy gives agents unfettered authority to carry out enforcement in or near formerly protected areas, bound only by individual agents' own subjective "common sense."

The revocation of the protected-areas safe harbor is having the expected result. People, regardless of their immigration status, now fear attending houses of worship. For Plaintiffs and their members, the present threat of surveillance, interrogation, or arrest at their houses of worship means, among other things, fewer congregants participating in communal worship—especially immigrant worshippers; a diminished ability to provide or participate in religious ministries; and interference with their ability to practice their faith—including their religious commands to welcome all-comers to worship and not to put any person in harm's way.

The government now seeks to shield its actions from judicial review under the Administrative Procedure Act, insisting that the 2025 Policy did not meaningfully alter the manner in which officers and agents can carry out immigration enforcement at formerly protected areas, and that the new policy has no genuine legal effect on Plaintiffs. But the government has worked a sea change in the law, displacing an existing policy with one that impinges Plaintiffs' and their

members' ability to exercise their religious beliefs. And it has done so without following required procedures, not least explaining the reasons for its about-face and weighing the consequences and possible alternatives. The government's attempt to evade judicial review under the APA should be rejected, and its motion should be denied.

## FACTUAL BACKGROUND

**A.** From at least 1993 to 2021, it was the government's policy to not conduct immigration-enforcement operations in "protected areas," also referred to as "sensitive locations."

In 1993, Acting Associate Commissioner of the Immigration and Naturalization Service, James Puleo, issued a memorandum directing that enforcement operations at places of worship, funerals, or other religious ceremonies "require advance written approval by the District Director or Chief Patrol Agent." Am. Compl., Ex. 11, PYM-000067, ECF No. 28-12. The memo directed the District Director or Chief Patrol Agent to weigh "[t]he availability of alternative measures," "[t]he importance of the enforcement objective," and how agents could "minimize the impact on operation of the . . . place of worship." *Id.* at PYM-000068. The memo explained that exceptions to the policy must be approved beforehand in writing unless certain exigent circumstances arose that require an officer to proceed—for those, "the matter must be reported immediately" up the chain of command.

In 2008, Assistant Secretary of U.S. Immigrations and Customs Enforcement, Julie Myers, reiterated the importance of avoiding enforcement "at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies, except in limited circumstances." Am. Compl., Ex. 15, PYM-000080, ECF No. 28-16. According to Assistant Secretary Myers, "[p]recedent for this approach is clear." Once again, the memo outlined the kinds of extreme situations that would require ICE personnel to act at or near sensitive locations,

including "terrorism-related investigations, matters of public safety, or actions where no enforcement activity is involved." *Id.* at PYM-000081.

In 2011, ICE Director John Morton issued a memo superseding the 1993 and 2008 memos. Director Morton explained that the "policy is designed to ensure" that enforcement does not occur at "sensitive locations such as schools and churches unless" exigent circumstances exist—such as terrorism, imminent risk of death, pursuit of a dangerous felon, or an imminent risk of destruction of evidence material to a criminal case—or the agents had received prior written approval. Am. Compl., Ex. 16, PYM-000082, ECF No. 28-17. Under the 2011 memo, even when an enforcement action was merely near a sensitive location, ICE agents were required to "conduct themselves in a discrete manner, maintain surveillance if no threat to officer safety exists and immediately consult their supervisor prior to taking other enforcement action(s)." *Id*. at PYM-000084.

In 2021, DHS Secretary Alejandro Mayorkas rescinded and superseded the prior memos while reaffirming the government's longstanding policy. Secretary Mayorkas's memo described a "fundamental" and "bedrock" principle: DHS can accomplish its mission "without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." Am. Compl., Ex. 20, PYM-000189, ECF No. 28-21. The memo recognized that enforcement actions even near sensitive locations could "restrain people from accessing the protected area to receive essential services or engage in essential activities." *Id.* at PYM-000190. The memorandum thus set out DHS's "obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area." *Id.* Enforcement actions included "arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." *Id.* at PYM-000191.

Like its predecessors, the 2021 memorandum recognized exigent circumstances that might require immigration enforcement at sensitive locations, including national security threats; imminent risk of death, violence, or physical harm to a person; hot pursuit of a person who poses a public-safety threat; hot pursuit of a personally observed border-crosser; imminent risk of destruction of evidence related to a criminal case; and where a safe alternative location does not exist. *Id.* at PYM-000191. When exigent circumstances were present, officers generally were required to obtain prior approval before conducting an enforcement operation at or near a protected area. *Id.* Were prior approval not to be obtained, the guidance instructed that "Agency headquarters" or a delegated official "should be consulted post-action." *Id.*

**B.** On January 20, 2025, Acting Secretary of Homeland Security Benjamine Huffman issued a memorandum rescinding the previous policy. The memo directs that, "Going forward, law enforcement officers should continue to use [their] discretion along with a healthy dose of common sense" in carrying out immigration-enforcement activities in protected areas. Am Compl., Ex. 43, PYM-000574, ECF No. 28-44. The memo explained that DHS would not "create bright line rules regarding where our immigration laws are permitted to be enforced." *Id.*

The following day, DHS issued a statement explaining that the former policy "tie[d] the hands" of federal agents. The statement describes houses of worship specifically as places that "criminal aliens—including murderers and rapists" use "to hide." Revoking the previous policy, DHS directed that agents "use common sense." Am. Compl., Ex. 30, PYM-000329, ECF No. 28-31.

**C.** Following the issuance of the 2025 Policy, Plaintiffs—houses of worship across several denominations—filed this lawsuit, alleging that the new policy allowing immigration-enforcement officers virtually untrammeled authority to carry out enforcement activities in or near their houses

of worship violated their First Amendment rights of expressive association, the Religious Freedom Restoration Act, and the Administrative Procedure Act. In their Complaint, Amended Complaint, and preliminary-injunction papers, Plaintiffs have explained that the new policy burdens their religious exercise by, among other things, impeding their ability to gather with fellow congregants, including immigrants, for communal religious worship.

Alongside their First Amendment and RFRA claims, Plaintiffs have alleged that the new policy violates the APA in several ways: it is arbitrary and capricious, it was required to be promulgated through notice-and-comment rulemaking, it is contrary to constitutional right (namely, the First Amendment right of expressive association), and it is in excess of statutory jurisdiction, authority, or limitations (RFRA).

On February 24, 2025, the Court granted Plaintiffs' motion for a preliminary injunction on their First Amendment and RFRA claims. Defendants now seek to dismiss Plaintiffs' APA claims.

## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (internal citation omitted). And on a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the court must accept as true the well-pleaded facts in the complaint and view the facts in the light most favorable to the plaintiffs, drawing all reasonable inferences in their favor. *See Lucero v. Early*, 873 F.3d 466, 469 (4th Cir. 2017). The complaint need contain only sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**ARGUMENT**

The APA creates a "'strong presumption' of judicial review of agency action." *Casa de Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 697 (4th Cir. 2019) (quoting *Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 528 F.3d 310, 316 (4th Cir. 2008)); *see* 5 U.S.C. § 702. The statute requires courts to hold unlawful and set aside final agency actions that are, among other things, not in accordance with law, arbitrary and capricious, or without observance of procedure required by law. 5 U.S.C. §§ 706(2)(A), (D).

Plaintiffs' APA claims—that the 2025 Policy violates their rights under the First Amendment and RFRA, that it is arbitrary and capricious, and that it was enacted without required notice-and-comment rulemaking—are reviewable because the 2025 Policy is final agency action and because it is not committed to agency discretion by law.

**I.    The 2025 Policy is reviewable final agency action.**

**A.** The Administrative Procedure Act provides for judicial review of a "final agency action for which there is no adequate remedy in a court." 5 U.S.C. § 704. An agency action includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 431 (4th Cir. 2019). The APA's use of "action" covers "comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).

An agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal citations omitted) (cleaned up). Courts take a "'pragmatic' approach . . . to finality," *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)). As part of that "pragmatic" approach, agency action becomes "immediately

reviewable when it gives notice of how a certain statute will be applied even if no action has yet been brought." *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 285 (4th Cir. 2018) (Gregory, C.J., concurring) (internal citation omitted), *judgment vacated on other grounds*, 585 U.S. 1028 (2018). Plaintiffs have adequately pleaded final agency action here.

Defendants do not contest the first prong of this inquiry. *See* Memo. in Support of Defs.' Partial Mot. to Dismiss at 12, ECF No. 78-1. Nor could they—Acting Secretary Huffman's issuance of the 2025 Policy, the 2025 Policy's taking immediate effect upon publication, and the 2025 Policy's explicitly superseding and rescinding the 2021 Policy mark the consummation of DHS's decision-making with respect to its directive to law-enforcement officers regarding immigration enforcement in or near protected areas.

The 2025 Policy likewise satisfies the second prong of the final-agency-action inquiry because it determines legal "rights or obligations" and creates "legal consequences." *Bennett*, 520 U.S. at 177. At this step, "[t]he core question is . . . whether the result of [the agency's decision-making] process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (plurality opinion). The answer here is yes, in two respects.

First, DHS's action is "one by which rights or obligations have been determined," *Bennett*, 520 U.S. at 178 (internal citation omitted), because the 2025 Policy marks a change in what is required of federal law-enforcement officers with respect to enforcement activities in or near protected areas. Though Defendants pass off the 2025 Policy as only trivially different from the 2021 Policy, this Court has already found otherwise:

> Under the 2021 Policy, immigration enforcement in or near places of worship was subject to specific restrictions not present in the 2025 Policy. First, the 2021 Policy required that immigration enforcement actions not be taken at places of worship and other protected areas "[t]o the fullest extent possible." J.R. 189. Second, the 2021 Policy identified a list of only six "limited circumstances"

> under which such actions could be taken. J.R. 190-91. Even allowing for the fact that the list was non-exhaustive, it is reasonable to infer that the range of scenarios under which an immigration enforcement action could occur at a place of worship is meaningfully narrower under the 2021 Policy than under the 2025 Policy, the latter of which includes neither of the restrictions referenced above.

*See* Mem. Op. at 28, ECF No. 60. This policy change, and the attendant determination of obligations of immigrant-enforcement officers, is itself sufficient to satisfy the final-agency-action requirement. *See Doe v. Tenenbaum*, 127 F. Supp. 3d 426, 461 (D. Md. 2012) (stating that the relevant inquiry under *Bennett* is whether the agency action "determined its own rights or obligations" *or* "determine[d] Plaintiff's rights or obligations"); *see also Parsons v. U.S. Dep't of Justice*, 878 F.3d 162, 167 (6th Cir. 2017) ("[A]gency actions that legally bind an agency or prevent other government actors from pursuing a particular course of action cause legal consequences." (citing *Hawkes Co.*, 578 U.S. at 598-99)); *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) ("Courts consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations."). And the 2025 Policy is no less binding or legally consequential just because it replaces clear guidelines and limiting principles with unfettered officer discretion.

Second, and relatedly, the new policy has legal consequences for Plaintiffs because the policy revoked the safe harbor for protected areas that existed under the 2021 Policy. *See Hawkes Co.*, 578 U.S. at 599. When "parties can rely on [a policy] as a norm or safe harbor by which to shape their actions," that agency action "can be binding as a practical matter." *Cohen v. United States*, 578 F.3d 1, 9 (D.C. Cir. 2009) (internal citations omitted), *aff'd en banc*, 650 F.3d 717 (D.C. Cir. 2011); *see also, e.g., Texas*, 933 F.3d at 442 (creation of a safe harbor demonstrates that "an agency's action binds it and thus has legal consequences"). "It follows that . . . the denial of [a] safe harbor" has legal consequences, too. *Hawkes Co.*, 578 U.S. at 599. That conclusion is in

keeping with the "'pragmatic' approach" to finality that courts take. *Id.* (quoting *Abbott Laboratories*, 387 U.S. at 149).

The 2021 Policy created a safe harbor for Plaintiffs' houses of worship, their members, and other attendees: as explained above, houses of worship and other protected areas were off-limits for immigration-enforcement activities "[t]o the fullest extent possible," and required exigent circumstances or internal supervisory approval. The 2025 Policy unshackled immigration-enforcement officers from the restrictions of the 2021 Policy, entrusting them with unfettered authority to carry out enforcement actions in formerly protected areas, bound only by individual agents' subjective "common sense" determinations. In other words, it revoked the safe harbor. Under the 2025 Policy, there are no protected areas.

That the 2021 Policy required some degree of discretionary decision-making, e.g., whether exigent circumstances existed in a given situation, does not undermine the policy's clear, predictable, mandatory guidelines. Formerly protected areas are now subject to immigration-enforcement operations in ways they were not before the 2025 Policy. They no longer enjoy the safe harbor created by the 2021 Policy, regardless of its exceptions for exigent circumstances and internal supervisory approval. Under the 2025 Policy, Plaintiffs are left exposed to immigration-enforcement activities according to the whims of individual ICE agents. These are legal consequences giving rise to final agency action.

**B.** Defendants argue that the reviewability of the 2025 Policy hinges on whether the 2021 Policy was final agency action and that the 2025 Policy is not final agency action regardless. But Plaintiffs do not challenge the 2021 Policy, and Defendants' arguments on the 2025 Policy are unavailing.

**1.** Defendants rest on a crabbed reading of the meaning of "final agency action." Defendants argue that the 2021 Policy and the 2025 Policy cannot be final agency action because neither had any "direct regulatory effect on [P]laintiffs," MTD Memo at 12, ECF No. 78-1 (quoting *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 858 (4th Cir. 2002)), imposing no "obligations, prohibitions, or restrictions on Plaintiffs," nor "criminal or civil penalties for noncompliance," *id.* at 16. But although direct regulatory effects or criminal or civil liability may be sufficient indicia of final agency action, they are not necessary.

As another court in this District has pointed out, "it bears emphasis that the *Bennett* court stated the second prong of the finality test in the disjunctive. That is, 'the action must be one by which rights or obligations have been determined, **or** from which legal consequences will flow.'" *Tenenbaum*, 127 F. Supp. 3d at 461 (emphasis in original) (quoting *Bennett*, 520 U.S. at 178). "[T]he finality vel non of agency action does not automatically turn on the presence of legal consequences to the plaintiff." *Id.* What's more, finality "does not require that the agency action confer rights or obligations on the *plaintiff*." *Id.* (emphasis added). An "equally apposite question" under the second prong of the *Bennett* test is whether the agency action "determined its *own* rights or obligations." *Id.* For the reasons explained above, the 2025 Policy (and the 2021 Policy, for that matter) determined DHS's and its employees' own obligations regarding immigration enforcement in or near protected areas. And the 2025 Policy carries legal consequences for Plaintiffs and their members and attendees.

**2.** Defendants also maintain that any concrete consequences resulting from the 2025 Policy stem from the independent actions of third parties—in its view, immigrants who fear immigration enforcement and thus decline to attend worship services—which cannot give rise to the legal consequences that satisfy the second prong of finality. *See* MTD Memo at 16-17, ECF No. 78-1.

For this proposition, Defendants rely heavily on *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*. MTD Memo at 12, 16-17, ECF No. 78-1. Their reliance is misplaced. That case concerned whether a report about the ill-effects of secondhand smoke published by the EPA was final agency action. *Flue-Cured Tobacco*, 313 F.3d at 854. The Fourth Circuit concluded that it was not. *Id.* at 862. The underlying statute in that case "explicitly prohibit[ed] the Report from having any regulatory effect," hence the report had no legally binding authority. *Id.* at 858. The court went on to conclude that any ancillary persuasive effects that the report might have on third parties—i.e., whether and how *other* federal agencies might use the findings of the report to inform their "independent agency decisionmaking," or to whether private entities would rely on the findings "to impose tobacco-related restrictions"—did not make the report reviewable final agency action. *Id.* at 859-61.

*Flue-Cured Tobacco* is about whether an agency action necessarily satisfies the finality requirement's second prong whenever the agency action influences the actions or decision-making of third parties. The pair of Supreme Court decisions it relied on for its analysis makes that clear. *See Franklin v. Massachusetts*, 505 U.S. at 797-98 (report of Secretary of Commerce on census results was not final agency action because it "carrie[d] no direct consequences for the reapportionment" at issue—it was a "tentative recommendation" that the President (the final decision-maker) was not obligated to rely on when conveying the census results to Congress); *Dalton v. Specter*, 511 U.S. 462, 469-70 (1994) (report of Secretary of Defense recommending closures of certain Naval shipyards was not final agency action because the recommendations in the report were just that—recommendations that the President could take or leave as he saw fit).

By contrast, the 2025 Policy does not simply share recommendations or best practices with respect to immigration enforcement at protected areas that others (or even DHS and its agents) are

free to take or leave as they see fit. Rather, the action challenged here represents Acting Secretary Huffman's command to DHS and its employees on the subject: no longer should you avoid enforcement activities at protected areas to "the fullest extent possible"; instead, you should carry out such enforcement activities according to your own common sense. And in all events, Plaintiffs do not rely on the downstream consequences to immigrant worshippers alone to satisfy *Bennett*'s second prong; as explained above, there are direct effects on DHS and its employees and on Plaintiffs.

**3.** Defendants also argue that neither the 2021 Policy nor the 2025 Policy fundamentally changed ICE agents' authority to carry out immigration-enforcement activities at protected areas— neither policy has ever unilaterally prohibited officers from carrying out enforcement action in or near protected areas. MTD Memo at 13-14, 16, ECF No. 78-1. Defendants suggest that the retention of any discretion by immigration-enforcement officers means that neither policy can amount to final agency action.

Plaintiffs have already explained, and this Court has already found, that the 2025 Policy marked a shift in DHS policy by rescinding the 2021 Policy and "significantly expand[ing] the range of situations, and thus the likelihood, that DHS will conduct an immigration enforcement action in or near a place of worship," Mem. Op. at 32, ECF No. 60. The "effect of the 2025 Policy . . . is that it has eliminated all of the previous limitations and safeguards on DHS immigration enforcement actions in or near places of worship and permits them to occur subject only to the 'common sense' and 'discretion' of the officer or agent." *Id.* at 33. In other words, the 2025 Policy *did* change officers' authority to carry out immigration-enforcement activities in or near protected areas. That is so regardless of the fact that the 2021 Policy allowed for some enforcement activities at protected areas under exigent circumstances or with supervisory approval.

More to the point, Defendants supply no binding case law to support their position that any officer discretion means that an agency action is nonfinal. In *Holbrook v. Tennessee Valley Authority*, 48 F.4th 282, 295 (4th Cir. 2022), which Defendants cite (at 14), the court assessed whether the agency action was "committed to agency discretion by law"—not whether it constituted final agency action. And in *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir. 1995), cited by Defendants (at 15), the court analyzed—without mentioning final agency action at all—whether agency action was subject to notice-and-comment rulemaking.

Defendants cite one decision out of the D.C. Circuit purporting to stand for the proposition that "the amount of discretion" is "[p]aramount" in determining whether an agency policy has "direct and appreciable legal consequences." *See* MTD Memo at 13, ECF No. 78-1 (citing *Sierra Club v. EPA*, 955 F.3d 56, 64 (D.C. Cir. 2020)). But that case concerned a challenge to an EPA guidance document to help states determine minimum air-quality standards that had several features not applicable here: the guidance document was part of an "initial information-gathering phase," "the first of a two-step approach" to identify appropriate values; state permitting authorities were free to rely on the values outlined in the guidance, to develop their own values based on the guidance, "or even to ignore the Guidance entirely"; the guidance document "explicitly preserv[ed] state discretion" to adhere to the guidance, or not; and the guidance was not sufficient to justify permitting determinations. *Sierra Club*, 955 F.3d at 60, 63-64.

**4.** The government argues that the 2021 Policy and 2025 Policy are nonbinding, quoting the boilerplate language included at the bottom of each memo providing that it is "not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." MTD Memo at 14, 17, ECF No. 78-1. But boilerplate language included at the bottom of a guidance document

does not prevent the document from having "legal consequences." *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000).

**5.** Finally, the government suggests that the 2025 Policy is not final agency action because Plaintiffs have not alleged that Defendants have carried out enforcement actions under it. MTD Memo at 17-18, ECF No. 78-1 (citing *Sierra Club*, 955 F.3d at 62-63). That is wrong. Plaintiffs alleged that ICE is carrying out immigration-enforcement activities at formerly protected areas. *See, e.g.*, Am. Compl. ¶ 90, ECF No. 28 (describing immigration enforcement activity at Georgia church). In all events, whether an agency action is final does *not* depend on whether the agency has enforced the change. *See, e.g.*, *Hawkes Co.*, 578 U.S. at 599 (quoting *Abbott Laboratories*, 387 U.S. at 149); *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 285 (4th Cir. 2018) (Gregory, C.J., concurring), *judgment vacated on other grounds*, 585 U.S. 1028 (2018); *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 487 (D. Md. 2019).

## II.  The 2025 Policy is not committed to agency discretion by law.

The APA's strong presumption of judicial review may be overcome if the challenged agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). But that exception is construed "quite narrowly," otherwise "[a] court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018). The exception is thus "restrict[ed] to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Id.* (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019)).

The Supreme Court has confirmed that "few cases" rise to this level—those involving "agency decisions that courts have traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum appropriation or a decision not to reconsider a final action," *Weyerhaeuser*, 586

U.S. at 23 (internal citations omitted), or "a decision not to institute enforcement proceedings, or a decision by an intelligence agency to terminate an employee in the interest of national security," *Dep't of Com.*, 588 U.S. at 772.

Defendants maintain that the 2025 Policy is one of those "rare" actions committed to agency discretion, and thus unreviewable, because agency enforcement decisions are an area where courts have traditionally declined to interfere, DHS has broad discretion to enforce immigration laws, and the 2025 Policy does not apply or interpret any statute or regulation. MTD Memo at 21-22, ECF No. 78-1. Defendants are wrong at each turn.

**A.** Defendants assert that the 2025 Policy is unreviewable because it is an "agency decision about whether to pursue enforcement action" akin to *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). *See* MTD Memo at 22, ECF No. 78-1. Defendants' reliance on *Heckler* and related case law is misplaced.

*Heckler* held that an agency's decision "not to prosecute or enforce, whether through civil or criminal process," in an individual case is presumptively immune from judicial review under Section 701(a)(2). *See* 470 U.S. at 831. Like a prosecutor's decision not to indict, a decision to take or not to take enforcement action in a specific instance against a particular regulated entity is "regarded as the special province of the Executive Branch." *Id.* at 832. But the Court did not hold that an agency has unreviewable authority to make sweeping policy determinations about enforcement or nonenforcement, even as it has discretion to choose to enforce, or not, in a particular instance. Nor did it deny reviewability when an agency "'consciously and expressly adopt[s] a general policy'" of enforcement or nonenforcement. *Id.* at 833 n.4 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc) (per curiam)).

That is because individual enforcement determinations rely on "a complicated balancing of a number of factors which are peculiarly within [the agency's, and not the Court's] expertise," including "whether a violation has occurred," "whether agency resources are best spent on this violation or another," "whether the agency is likely to succeed if it acts," "whether the particular enforcement action requested best fits the agency's overall policies," and "whether the agency has enough resources to undertake the action at all." *Id.* at 831. Those questions do not animate evaluation of an agency's "broad or general enforcement policy," and judicial review of such policies does not run the risk of substituting a court's reasoning over an agency's expertise.

Accordingly, "single-shot" enforcement determinations like the one in *Heckler* are presumptively immune from judicial review, whereas policies of enforcement or nonenforcement of a given provision of law are reviewable. *See Casa de Md.*, 924 F.3d at 699 (quoting *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 811-12 (D.C. Cir. 1998)).

The 2025 Policy is more like the latter. For more than 30 years, Defendants maintained a general policy regarding immigration enforcement in protected areas; the 2025 Policy rescinded that policy and replaced it with a policy that allows enforcement on a much broader basis. Evaluating the 2025 Policy under the APA does not require the Court to second-guess the judgment of immigration-enforcement officers about any particular enforcement decision; it requires the Court to evaluate whether Defendants have articulated a satisfactory explanation for its departure from a longstanding immigration policy, and to determine whether the new policy comports with the First Amendment and RFRA—assessments squarely within the Court's bailiwick.

*Heckler* is not controlling here for an additional reason: *Heckler* involved an agency's *refusal* to carry out an enforcement action in a particular context, and nonenforcement decisions are distinct from affirmative enforcement decisions. That is because "when an agency refuses to act it

generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Heckler*, 470 U.S. at 832 (emphasis in original). On the other hand, "when an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner." *Id.*

The Supreme Court relied on this distinction in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020). There, *Heckler* was not dispositive of whether the rescission of DHS's Deferred Action for Childhood Arrivals program was committed to agency discretion "because DACA is not simply a non-enforcement policy." *Id.* at 17-18. The DACA memorandum established processes for carrying out the program, including identifying affected individuals and determining their status—determinations that were "'effectively 'adjudicat[ions]'" that resulted in "an 'affirmative act of approval,' the very opposite of a 'refus[al] to act.'" *Id.* at 18 (first alteration in original) (quoting *Heckler*, 470 U.S. at 831-32). DACA "created a program for conferring affirmative immigration relief," and hence DACA—and its rescission—was "an 'action [that] provides a focus for judicial review.'" *Id.* (citing *Heckler*, 470 U.S. at 832).

So too here. The 2025 Policy is a rescission of DHS's longstanding policy restricting immigration-enforcement in or near protected areas. In other words, it is a policy of affirmative enforcement, not nonenforcement, underscoring the appropriateness of judicial review.

The Fourth Circuit decisions that Defendants cite only reinforce this conclusion. In *Casa de Maryland*, the court held that DHS's decision to rescind DACA was reviewable agency action, for DHS was neither "exercise[ing its] discretion in an individual case" nor determining that its resources would be best spent pursuing one violation over another. 924 F.3d at 698-99. Instead, the agency had rescinded "a general enforcement policy in existence for over five years and

affecting hundreds of thousands of enrollees based on the view that the policy was unlawful." *Id.* at 699. Its decision was therefore reviewable. *Speed Mining, Inc. v. Federal Mine Safety & Health Review Commission*, 528 F.3d 310 (4th Cir. 2008), and *Pharmaceutical Coalition for Patient Access v. United States*, 126 F.4th 947 (4th Cir. 2025), are the flip side of the coin. In *Speed Mining*, the court held that the Secretary of Labor's decision to bring an enforcement action against one mine owner but not against the independent contractor who actually committed the violations was not reviewable. 528 F.3d at 318-19. And in *Pharmaceutical Coalition*, the court found unreviewable an HHS advisory opinion issued to the plaintiff indicating that a proposed course of action could result in sanctions if carried out. 126 F.4th at 952-53. The court rejected the plaintiff's "disparate treatment" argument that because the agency declined to pursue enforcement against others for similar conduct, it was obligated to disclaim any potential enforcement in that case, too. *Id.* at 964-65. In other words, the Fourth Circuit has found enforcement policies or rules reviewable but declined to second-guess agencies' judgment about individual enforcement determinations.

**B.** In all events, even if the Court were to hold that the 2025 Policy amounted to agency-enforcement decisions that are unreviewable under 5 U.S.C. § 706(2)(A), that does not foreclose review of Plaintiffs' claims that the policy is contrary to constitutional right under 5 U.S.C. § 706(2)(B) and in excess of statutory authority under 5 U.S.C. § 706(2)(C).

The Fourth Circuit has reiterated the Supreme Court's admonition that even "'agency action [that] is committed to agency discretion by law' is not completely shielded from judicial review." *Elecs. of N.C., Inc. v. Se. Power Admin.*, 774 F.2d 1262, 1267 (4th Cir. 1985). "[C]ourts may review agency actions for certain types of errors that fall within the APA's Section 701(a)(2) exception to judicial review. For example, an agency decision that violates a statutory or constitutional command . . . is not immune from judicial review," even when a "lawful exercise"

of that agency decision would be immune. *Id.* "Even where action is committed to absolute agency discretion by law, courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations." *Id.* (quoting *Garcia v. Neagle*, 660 F.2d 983, 988 (4th Cir. 1981)).

*Heckler* and the related case law that Defendants cite do not address whether the presumption of nonreviewability with respect to enforcement decisions applies to agency action that is alleged to violate the Constitution. *See* 470 U.S. at 838 (recognizing that "[n]o colorable claim [has been] made . . . that the agency's refusal to institute proceedings violated any constitutional rights of respondents"). In his concurring opinion in *Heckler*, Justice Brennan underscored that the Court's decision did not address the scope of reviewability where "a nonenforcement decision violates constitutional rights." *Id.* at 839 (Brennan, J., concurring). He explained that "[i]t may be presumed that Congress does not intend administrative agencies . . . to ignore clear jurisdictional, regulatory, statutory, or constitutional commands . . . ." *Id.* Unless Congress says otherwise—and even if it does—agency action should be reviewable for unconstitutionality and statutory violations.

Other cases confirm this important limitation on APA nonreviewability. *See, e.g.*, *WWHT, Inc. v. FCC*, 656 F.2d 807, 815 n.15 (D.C. Cir. 1981) ("In no event would a finding of nonreviewability on the ground that an action is committed to agency discretion preclude judicial review when constitutional violations have been alleged."); *see also Webster v. Doe*, 486 U.S. 592, 603 (1988) (interpreting statute to permit constitutional claims in order to "avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim" (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 n.12 (1986))).

This limiting principle disposes of the core problem animating the doctrine of nonreviewability: that courts cannot review agency action when there is no judicially manageable standard, i.e., when there is "no law to apply," *see Weyerhaeuser*, 586 U.S. at 23. The Constitution, and the statutes that the challenged action is alleged to violate, provide the applicable legal standard. *See, e.g.*, *Nat'l Fed'n of Fed. Workers v. Weinberger*, 818 F.2d 935, 941 n.11 (D.C. Cir. 1987) ("Here, there is clearly 'law to apply'—the Constitution.").

**C.** DHS's general discretion to carry out the Nation's immigration laws does not compel a different conclusion. It is true that the government generally has wide latitude to set and enforce immigration policy. But Defendants do not cite any law for the proposition that challenges to "agency immigration enforcement policies," MTD Memo at 23, ECF No. 78-1, are among the narrow categories of action committed to agency discretion. Nor for the more general proposition that conveying broad discretion to an agency renders agency actions undertaken under that authority unreviewable. Instead, the immigration-related cases that it cites (none of which specifically addresses whether the challenged action is committed to agency discretion under the APA) do not deviate from the principles about enforcement discretion discussed above.

Defendants' reliance on general language about "the Executive's Article II authority to enforce federal law" *See* MTD Memo at 23-24, ECF No. 78-1 (quoting *United States v. Texas*, 599 U.S. 670, 678 (2023)) is also beside the point. This Court has already concluded that "general language about Article II authority, where Plaintiffs' claim does not challenge the Executive Branch's prioritization of immigration law enforcement or decisions on how many arrests to make pursuant to those laws," did not "prevent Plaintiffs from asserting a cognizable injury." Mem. Op. at 22, ECF No. 60.

**D.** Finally, Defendants suggest that there is no law to apply because the Immigration and Naturalization Act does not specifically address protected areas. *See* MTD Memo at 20-21, ECF No. 78-1. The 2025 Policy relates to immigration-enforcement activities that are governed by 8 U.S.C. § 1357, "which outlines the powers of 'immigration officers and employees' to act without a warrant . . .," and 8 C.F.R. § 287.8(f), a DHS implementing regulation "that governs 'site inspections.'" Mem. Op. at 30, ECF No. 60. These sources of authority provide the basis for the agency action that Plaintiffs challenge.

### III. Plaintiffs have adequately alleged that notice-and-comment rulemaking was required.

The APA requires agency rules to go through notice-and-comment rulemaking. *Casa de Maryland*, 924 F.3d at 701. "Rule" is defined broadly and includes any "'statement[s] of general or particular applicability and future effect' that are designed to 'implement, interpret, or prescribe law or policy.'" *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 95-96 (2015) (quoting 5 U.S.C. § 551(4)). The "critical question in distinguishing between legislative rules" (which are subject to notice-and-comment) and "general statements of policy" (which are not) is "whether the statement 'is of present binding effect.'" *Casa de Maryland*, 924 F.3d at 702 (quoting *Elec. Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 7 (D.C. Cir. 2011)). Legislative rules may "supplement[] a statute, adopt[] a new position inconsistent with existing regulations, or otherwise effect[] a substantive change in existing law or policy.'" *Id.* (quoting *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018)). General statements of policy "advise the public prospectively" regarding how an agency "proposes to exercise a discretionary power." *Id.* (quoting *Vigil*, 508 U.S. at 197).

The 2025 Policy is more than a mere "clarification or explanation of an *existing statute or rule*." *Chen Zhou Chai*, 48 F.3d at 1341 (emphasis in original). It does not "simply state what the administrative agency thinks the statute means," or "'remind' affected parties of existing duties."

*Children's Hosp.*, 896 F.3d at 620 (quoting *Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989)). The 2025 Policy effects a substantive change in DHS's authority to carry out immigration-enforcement operations at protected areas, stripping away a safe harbor and adopting a new policy of individual officers' "common sense." It is not reminding DHS officers, Plaintiffs, or the public of a policy already in existence—it is breaking new ground.

Defendants argue that notice-and-comment rulemaking was not required for the same reasons that they think the 2025 Policy did not constitute final agency action: the 2025 Policy creates no legal rights, obligations, or consequences, and simply acknowledges officers' discretionary authority. *See* MTD Memo at 18-19, ECF No. 78-1. That is wrong, for the reasons explained above.

Defendants also argue that if the 2025 Policy was required to be promulgated through notice-and-comment rulemaking, then so too was the 2021 Policy (which was not), "leaving Plaintiffs without a remedy." MTD Memo at 19, ECF No. 78-1. Whether the 2021 Policy is susceptible to a challenge under § 706(2)(D) is a question left for another day. Plaintiffs do not challenge the 2021 Policy, and the Court can resolve Plaintiffs' Section 706(2)(D) claim without addressing it. And even if the 2021 Policy is procedurally infirm, that is no reason not to address the procedural infirmity of the 2025 Policy. The government should not be permitted to hide behind one unlawful agency action to shield itself from judicial review of another.

Plaintiffs have adequately alleged that the 2025 Policy was issued "without observance of procedure required by law" under 5 U.S.C. § 706(2)(D).

## CONCLUSION

For these reasons, the Court should deny the government's motion to dismiss.

May 1, 2025

Respectfully submitted,

 /s/ Sarah Goetz
Sarah Goetz (Bar No. 31570)
Bradley Girard (Bar No. 31437)
Alethea Anne Swift (Bar No. 30829)
Andrew Bookbinder (Bar No. 31486)
J. Sterling Moore (Bar No. 31562)
Audrey Wiggins*
Skye Perryman*

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
sgoetz@democracyforward.org
bgirard@democracyforward.org
aswift@democracyforward.org
abookbinder@democracyforward.org
smoore@democracyforward.org
awiggins@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs*

*Admitted* pro hac vice

**CERTIFICATE OF SERVICE**

I, Sarah Goetz, hereby certify that I today filed the foregoing document with the Clerk of the Court for the United States District Court for District of Maryland, Southern Division, by using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users who have appeared in this case.

/s/ Sarah Goetz    
*Counsel for Plaintiffs*
