**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**Philadelphia Yearly Meeting of the Religious Society of Friends** *et al.*,

Plaintiffs,

**v.**

**U.S. Department of Homeland Security** *et al.*,

Defendants.

**Case No. 8:25-cv-243-TDC**

**COMBINED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


Table of Authorities ........ ii

Introduction ........ 1

Argument ........ 1

- **I.** Plaintiffs have standing. ........ 1
- **II.** The 2025 Policy violates the Administrative Procedure Act. ........ 6
- **III.** The 2025 Policy violates Plaintiffs' rights of expressive association. ........ 10
- **IV.** The 2025 Policy violates Plaintiffs' rights under RFRA. ........ 12
- **V.** The Court should vacate the 2025 Policy and enter a permanent injunction. ........ 16

Conclusion ........ 20

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abel v. United States*,
362 U.S. 217 (1960)........................................................................................18, 20

*Ams. for Prosperity v. Bonta*,
594 U.S. 595 (2021)............................................................................................15

*Apache Stronghold v. United States*,
101 F.4th 1036 (9th Cir. 2024) ..........................................................................13

*Appalachian Power Co. v. E.P.A.*,
208 F.3d 1015 (D.C. Cir. 2000) ...........................................................................8

*Arizona v. Biden*,
31 F.4th 469 (6th Cir. 2022) ................................................................................7

*Arizona v. California*,
460 U.S. 605 (1983)..............................................................................................7

*Arizona v. United States*,
567 U.S. 387 (2012)........................................................................................19, 20

*Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016)..............................................................................................8

*Ass'n of Flight Attendants-CWA AFL-CIO v. Huerta*,
785 F.3d 710 (D.C. Cir. 2015)..............................................................................7

*Benham v. City of Charlotte*,
635 F.3d 129 (4th Cir. 2011) ................................................................................2

*Bennett v. Spear*,
520 U.S. 154 (1997)..............................................................................................2

*Bethel World Outreach Ministries v. Montgomery Cnty. Council*,
706 F.3d 548 (4th Cir. 2013) ..............................................................................14

*Bowen v. Roy*,
476 U.S. 693 (1986)............................................................................................13

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000)............................................................................................11

*Brotherhood of R.R. Trainmen v. Balt. & O.R. Co.*,
331 U.S. 519 (1947)............................................................................................19

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014)............................................................................................15

*California v. Texas*,
593 U.S. 659 (2021) .......... 3

*Casa de Maryland v. DHS*,
924 F.3d 684 (4th Cir. 2019) .......... 9

*CASA, Inc. v. Noem*,
792 F. Supp. 3d 576 (D. Md. 2025) .......... 16

*Chen Zhou Chai v. Carroll*,
48 F.3d 1331 (4th Cir. 1995) .......... 7

*City of New York v. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019) .......... 8

*Clapper v. Amnesty Int'l*,
568 U.S. 398 (2013) .......... 5

*Couch v. Jabe*,
679 F.3d 197 (4th Cir. 2012) .......... 15

*Department of Commerce v. New York*,
588 U.S. 752 (2019) .......... 3, 4, 5

*DHS v. Regents of the University of California*,
591 U.S. 1 (2020) .......... 10

*Diamond Alt. Energy v. EPA*,
606 U.S. 100 (2025) .......... 3, 5

*Env't Health Tr. v. FCC*,
9 F.4th 893 (D.C. Cir. 2021) .......... 10

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 3

*Fighting Finest, Inc. v. Bratton*,
95 F.3d 224 (2d Cir. 1996) .......... 11

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026) .......... 3

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
313 F.3d 852 (4th Cir. 2002) .......... 8

*Franciscan All., Inc. v. Becerra*,
553 F. Supp. 3d 361 (N.D. Tex. 2021) .......... 17

*Garland v. Aleman Gonzalez*,
596 U.S. 543 (2022) .......... 16

*Gentile v. SEC*,
974 F.3d 311 (3d Cir. 2020) .......... 9

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006)........................................................................................ 14, 15

*Greenhill v. Clarke*,
944 F.3d 243 (4th Cir. 2019) .................................................................................. 15

*Immigrant Defs. L. Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025) ................................................................................ 16

*Invention Submission Corp. v. Rogan*,
357 F.3d 452 (4th Cir. 2004) .................................................................................... 8

*Johnson v. United States*,
333 U.S. 10 (1948)................................................................................................ 18

*Kidd v. Mayorkas*,
734 F. Supp. 3d 967 (C.D. Cal. 2024) ..................................................................... 18

*Laird v. Tatum*,
408 U.S. 1 (1972)..................................................................................................... 4

*Lane v. Holder*,
703 F.3d 668 (4th Cir. 2012) .................................................................................... 2

*Liberty Univ., Inc. v. Lew*,
733 F.3d 72 (4th Cir. 2013) .................................................................................... 14

*Lincoln v. Vigil*,
508 U.S. 182 (1993)................................................................................................. 7

*Lyng v. International Union*,
485 U.S. 360 (1988)............................................................................................... 12

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988)........................................................................................ 12, 13

*Mayor & City Council of Balt. v. Trump*,
416 F. Supp. 3d 452 (D. Md. 2019)............................................................................ 8

*Miccosukee Tribe of Indians v. United States*,
163 F.3d 1359 (11th Cir. 1998) .............................................................................. 13

*Miranda v. Garland*,
34 F.4th 338 (4th Cir. 2022) .................................................................................... 20

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)............................................................................................... 17

*Mullin v. Al Otro Lado*,
146 S. Ct. 2079 (2026)............................................................................................ 16

*N.S. v. Dixon*,
141 F.4th 279 (D.C. Cir. 2025)................................................................................ 20

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958) .......... 11

*Nat'l TPS All. v. Noem*,
166 F.4th 739 (9th Cir. 2026) .......... 16

*Ngure v. Ashcroft*,
367 F.3d 975 (8th Cir. 2004) .......... 9

*Payton v. New York*,
445 U.S. 573 (1980) .......... 18

*Pharm. Coal. for Patient Access v. United States*,
126 F.4th 947 (4th Cir. 2025) .......... 9

*Presbyterian Church (U.S.A.) v. United States*,
870 F.2d 518 (9th Cir. 1989) .......... 4

*RAICES v. Mullin*,
174 F.4th 81 (D.C. Cir. 2026) .......... 16

*Real Alts., Inc. v. Sec'y of Health & Human Servs.*,
867 F.3d 338 (3d Cir. 2017) .......... 14

*Rutan v. Repub. Party of Ill.*,
497 U.S. 62 (1990) .......... 11

*Sherbert v. Verner*,
374 U.S. 398 (1963) .......... 14

*Sierra Club v. EPA*,
955 F.3d 56 (D.C. Cir. 2020) .......... 8

*Sierra Club v. U.S. Dep't of Interior*,
899 F.3d 260 (4th Cir. 2018) .......... 2, 5

*Soumah v. Collett*,
No. 23-2473, 2025 WL 638472 (D. Md. Feb. 27, 2025) .......... 7

*Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n*,
528 F.3d 310 (4th Cir. 2008) .......... 9

*Tabbaa v. Chertoff*,
509 F.3d 89 (2d Cir. 2007) .......... 11

*Texas v. Cardona*,
743 F. Supp. 3d 824 (N.D. Tex. 2024) .......... 17

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) .......... 16

*United Presbyterian Church v. Reagan*,
738 F.2d 1375 (D.C. Cir. 1984) .......... 4

*United States v. Hardman*,
297 F.3d 1116 (10th Cir. 2002) .................................................. 13

*United States v. Texas*,
599 U.S. 670 (2023).................................................. 5

*United States v. Weldin*,
377 U.S. 95 (1964).................................................. 19

*Warner v. City of Boca Raton*,
420 F.3d 1308 (11th Cir. 2005) .................................................. 13

*WWHT, Inc. v. FCC*,
656 F.2d 807 (D.C. Cir. 1981).................................................. 8

*Zurcher v. Stanford Daily*,
436 U.S. 547 (1978).................................................. 18

**Statutes**

5 U.S.C. § 701(a)(2).................................................. 8

5 U.S.C. § 703.................................................. 17

8 U.S.C. § 1226(a) .................................................. 18, 19, 20

8 U.S.C. § 1252(f)(1) .................................................. 16, 18, 19, 20

8 U.S.C. § 1357(a) .................................................. 18, 19, 20

8 U.S.C. § 1221-32 .................................................. 16

42 U.S.C. § 2000bb-1(c).................................................. 17

*Immigration and Nationality Act of 1952*, § 287, 66 Stat. 163 (1952) .................................................. 19

**Regulations**

8 C.F.R. § 236.1(b) .................................................. 20

8 C.F.R. § 287.5(e).................................................. 19, 20

**Other Authorities**

*Detailed Guide to the United States Code Content and Features*, Office of the Law Revision Counsel at II.A—Headings,
https://perma.cc/3PYJ-V3PA.................................................. 19

*The New Shorter Oxford English Dictionary* (1993).................................................. 13-14

U.S.C.I.S., Immigration and Nationality Act,
https://perma.cc/2V6T-6LEG .................................................. 19

## INTRODUCTION

DHS's cross motion and response does not present any evidence. Nor does it dispute any of Plaintiffs' evidence. Instead, DHS miscasts the 2025 Policy as mere internal guidance, cherrypicks and mischaracterizes the record, and asks this Court to ignore settled legal standards in favor of unsupported and novel analysis. This Court has twice rejected the bulk of DHS's arguments. It should do so again. For the few issues that remain, DHS's arguments are meritless. As Plaintiffs have shown, this Court should grant their motion for summary judgment, vacate the 2025 Policy, and enter a permanent injunction that satisfies strict scrutiny.

## ARGUMENT

### I. Plaintiffs have standing.

**A. Injury in fact:** As Plaintiffs explained, the 2025 Policy caused them multiple injuries, including reduced attendance, loss of funds, loss of volunteers, and being put to the impossible choice whether to encourage immigrants to join for worship. Pls.' Br. 15-16. DHS does not contest that these injuries are cognizable Article III harms. Instead, it argues that Plaintiffs' unrebutted evidence cannot show the 2025 Policy impeded their missions. DHS Br. 6. DHS is wrong on both the facts and the law.

For starters, DHS ignores the conscience injuries Plaintiffs suffered by being put to the impossible choice of either not encouraging immigrants to attend services or knowingly putting them in harm's way. *See, e.g.*, Pls.' Br. 11-12. Likewise, DHS ignores that the 2025 Policy forced Plaintiffs to compromise core religious beliefs, including maintaining unlocked doors, weapons-free houses of worship, and worshipping without fear of government interference. Pls.' Br. 11-13.

Where DHS does address injuries, it focuses on one fact—a 66% decline at an ESL program—and argues that this does not show "a sustained decline" that impeded Plaintiffs' efforts to carry out their missions. DHS Br. 6. DHS creates from whole cloth the requirement that an injury be

sustained for some amount of time before it becomes cognizable. And, while an impediment to an organization's ability to carry out its mission is one type of cognizable harm, *see Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012), Plaintiffs explained (at 15-16) that they suffered additional cognizable injuries, including reduced attendance at houses of worship, *see Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 523 (9th Cir. 1989); *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011). DHS simply ignores the bulk of Plaintiffs' evidence showing those harms (among others). *See* Pls.' Br. 10-13, 15-16.[1]

**B. Causation:** In response to Plaintiffs' showing of causation, Pls.' Br. 16, DHS rehashes arguments this Court already rejected. The Court should reject those arguments at this stage, too.

**1.** DHS argues (at 7) that the Administration's general increase in immigration enforcement caused people to avoid houses of worship. But causation is satisfied by a showing that "the challenged action is in part responsible for frustrating" their exercise of rights. *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 283 (4th Cir. 2018) (citation omitted). Causation does not require that the challenged action "be the sole or even immediate cause of the injury." *Id.* at 284 (citing *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)). And, as this Court concluded, Mem. Op. 23-24, ECF 60, Plaintiffs' unrebutted evidence ties their harms to the 2025 Policy, Pls.' Br. 16. What other courts decided on different records is irrelevant. *See* DHS Br. 8.

**2.** DHS also argues there is no causation because the 2025 Policy is merely "a modest change in internal DHS guidance," so any reductions in attendance are unreasonable or based on misunderstandings. DHS Br. 7-8, 10-11. DHS's factual premise and legal conclusions are wrong.

---

[1] To the extent that DHS faults Plaintiffs for not showing new harms "[m]ore than a year later," DHS Br. 6, there is a simple reason for that: the Court's preliminary injunction, which protected Plaintiffs from the 2025 Policy during that time.

First, the 2025 Policy was no modest change; it upended a three-decade policy of avoiding immigration enforcement "[t]o the fullest extent possible" in or near houses of worship. JR4. The Mayorkas Memo contained both procedural and substantive limits on immigration enforcement. JR369-70 ¶ 12. "In all, the Mayorkas Memo was a restrictive policy and the agents understood it as such." JR370 ¶ 15. Now, agents may operate at houses of worship limited by nothing more than "common sense." JR2. Put plainly, the 2025 Policy "is a significant change." JR371 ¶ 20.

The Court need not take Plaintiffs' word for it. DHS explained that the 2025 Policy "will not tie the hands of" DHS agents like the former policy. JR146. And DHS's own brief describes (at 32) the 2021 Policy as "unduly restrictive and far less timely and effective" than the 2025 Policy.

Second, when causation depends in part on the actions of a third party, the question is not whether a third party's response is "objectively reasonable." DHS Br. 10 (quoting *Benham*, 635 F.3d at 135). The question is whether the third party "'will likely react in predictable ways' that in turn will likely injure the plaintiffs." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)). "When third party behavior is predictable, commonsense inferences may be drawn" to support causation. *Diamond Alt. Energy v. EPA*, 606 U.S. 100, 116 (2025). And Plaintiffs are not required to "introduce evidence from expert[s]" or "from directly regulated third parties to show how third parties would likely respond." *Id.* at 120-21; *see also First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1125 (2026). So even if the evidence tying reductions in attendance to the 2025 Policy wasn't enough to show causation (it is), it is certainly predictable that people's attendance would decline in the face of an increased risk of governmental intrusion. *See* Pls.' Br. 16; Mem. Op. 27, ECF 60.

*Department of Commerce v. New York*, 588 U.S. 752 (2019), is instructive. There, the Court rejected the Government's argument that any harm to the plaintiff states resulting from a new

citizenship question on the census was not fairly traceable to the Government because it "depend[ed] on the independent action of third parties"—those likely to abstain from responding to the census, despite a legal obligation to do so. *Id.* at 767. As this Court concluded, Mem. Op. 27, ECF 60, Plaintiffs here have a stronger showing of causation than in *Department of Commerce*. That case relied on *future* actions of third parties, *see* 588 U.S. at 767, but Plaintiffs' evidence shows that people had already stopped attending worship and ministry. Pls.' Br. 15-16.

DHS's other cases are irrelevant because they do not involve third parties' actions—they involve whether a subjective chill is a standalone injury. *Laird v. Tatum* held that plaintiffs lacked standing where they failed to allege any "specific present objective harm or a threat of specific future harm" aside from subjective chilling. 408 U.S. 1, 14 (1972). Likewise, *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984), held that a "chilling effect" alone does not create a cognizable injury without any "past or immediately threatened" harm "apart from the 'chill' itself." And *Clapper v. Amnesty Int'l*, 568 U.S. 398, 410 (2013), held that self-inflicted costs in response to subjective chilling are not Article III injuries. None of these cases addressing *injury* touch on whether the 2025 Policy *caused* the cognizable injuries Plaintiffs have shown.[2]

**3.** Nor is the new policy too attenuated because the reactions of third parties are so far removed from its "distant (even if predictable) ripple effects." DHS Br. 11 (quoting *All. for Hippocratic Med.*, 602 U.S. at 383). In *Alliance for Hippocratic Medicine*, the Court held that doctors challenging the FDA's approval of a drug relied on a speculative chain: approval of the drug would lead to it being prescribed, which could lead to adverse reactions, which could lead to a future

[2] DHS faults the Court for relying on *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 520 (9th Cir. 1989). DHS Br. 10. But the Court cited that case for its holding that a reduction in attendance at worship is a cognizable Article III *injury*. Mem. Op. 19-20, ECF 60. So DHS's factual comparison is beside the point.

increase in patient visits, which could then cause harms to the doctors. 602 U.S. at 390-91. Likewise, *Clapper* rejected a "highly attenuated chain of possibilities," including statutory requirements and judicial oversight, among other things. 568 U.S. at 410.

No such speculative chain exists here: The 2025 Policy caused congregants to stay home, which harmed Plaintiffs. That is not the "unprecedented and limitless approach" rejected by *Alliance for Hippocratic Medicine*. *See* 602 U.S. at 391. That is like *Department of Commerce*, where a similar chain—government action would predictably cause third parties to act in a way that would injure the plaintiff-states—was found sufficient to establish causation. 588 U.S. at 767.

**4.** Finally, DHS argues Plaintiffs do not have standing because they challenge "downstream effects of the government's immigration enforcement policies," so their claims "run up against the Executive's Article II authority to enforce federal law." DHS Br. 12 (quoting *United States v. Texas*, 599 U.S. 670, 678 (2023)). It is unclear how *Texas*, a case about injury and redressability, bears on causation. Regardless, in *Texas*—an "extraordinarily unusual lawsuit," 599 U.S. at 686—the plaintiffs lacked standing "to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id.* at 674. Plaintiffs do not seek more enforcement actions or challenge the prioritization of specific enforcement actions. So this case does not ask the Court to weigh the "propriety of enforcement choices" based on resource allocation and public policy. *Id.* at 679.

**C. Redressability:** "If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." *Diamond Alt. Energy*, 606 U.S. at 111 (quoting *All. for Hippocratic Med.*, 602 U.S. at 380-81). Redressability is met if "granting the requested relief would at least mitigate, if not eliminate, the alleged harm." *Sierra Club*, 899 F.3d at 285. "[R]emoval of even one obstacle to the exercise of one's rights, even if other barriers remain," suffices. *Id.* As Plaintiffs explained (at 16), the Court need not speculate: the preliminary injunction *did* mitigate many of

Plaintiffs' harms. *See* Pls.' Br. 13-15. And that makes sense. As DHS elsewhere argues (at 7), the Administration is aggressively conducting immigration enforcement everywhere. Naturally, then, under an injunction, Plaintiffs' houses of worship became one of the few places at which people know that something more than "common sense" limits DHS agents' ability to surveil, interrogate, and arrest.

DHS's "close examination" of specific declaration language again ignores the bulk of the undisputed evidence. DHS Br. 13. For example, DHS quibbles with one declarant stating that he "*believe[s]* that attendance at *most* CBF churches" rebounded. DHS Br. 13 (quoting JR199 ¶ 57 (emphasis added by DHS)). The government ignores that the declarant's belief was based on "engagement with congregations and reports from congregation leaders." JR199 ¶ 57. And DHS ignores that same declarant's statements that ESL classes "generally returned to pre-injunction levels," JR199 ¶ 58, that preschool ministries "return[ed] to more normal operations and attendance," JR199 ¶ 59, and that CBF churches "have seen an increase in attendance from immigrants and citizens alike because of the protections of the injunction," JR200 ¶ 65. Other declarants likewise explained the relief the preliminary injunction gave them. *See, e.g.*, JR230 ¶¶ 44-46; JR239 ¶¶ 49-53; JR301 ¶¶ 32-33.

DHS faults Plaintiffs for not providing "specific numbers or other evidence" in support. DHS Br. 13. But DHS cites no case holding that plaintiffs can meet the threshold bar of standing only by showing "specific numbers." Nor does DHS explain why Plaintiffs need "other evidence," especially when DHS does not dispute any of Plaintiffs' existing evidence.

## II. The 2025 Policy violates the Administrative Procedure Act.

**A. Reviewability:** This Court held that the 2025 Policy is reviewable final agency action not committed to agency discretion. Mem. Op. 18, ECF 92; *see also* Pls.' Br. 17-20. DHS asks the Court to revisit those legal conclusions but provides no new reasons to do so. *See Soumah v.*

*Collett*, No. 23-2473, 2025 WL 638472, at *4 (D. Md. Feb. 27, 2025) (citing *Arizona v. California*, 460 U.S. 605, 618 (1983)).[3]

**1.** Final agency action: DHS concedes that the 2025 Policy marks the consummation of its decision-making. It contests that the 2025 Policy determines the legal rights and obligations of agents operating in or near sensitive locations and has legal consequences for Plaintiffs whose congregations and members no longer enjoy the 2021 Policy's safe harbor, *see* Pls.' Br. 17-18.

DHS maintains that neither the 2021 Policy nor the 2025 Policy determined agents' rights or obligations because both permitted individual discretion, DHS Br. 15-17. DHS again minimizes the magnitude of change the 2025 Policy meant for decades-old limits on enforcement in or near houses of worship "[t]o the fullest extent possible," *see* Mem. Op. 33, ECF 60. That the former policy permitted *some* discretion in limited, specific circumstances does not erase its clear, mandatory guidelines. DHS's cases, on the contrary, involve guidance parties were "free to ignore," *see Ass'n of Flight Attendants-CWA AFL-CIO v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015) (citation omitted); *Arizona v. Biden*, 31 F.4th 469 (6th Cir. 2022), or did not even analyze final agency action, *see Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir. 1995); *Lincoln v. Vigil*, 508 U.S. 182 (1993).

DHS's arguments about the legal consequences to Plaintiffs also fail. DHS insists that agents' discretion under the 2021 Policy means that there never was a safe harbor. But agency action creates a safe harbor if, as here, it "narrows the field" of regulatory targets or "limits the potential

---

[3] DHS cites to preliminary-injunction decisions in three other challenges to the 2025 Policy to support its threshold APA arguments. DHS Br. 15-16, 18. None are in the Fourth Circuit. More importantly, only one actually analyzed final agency action. *See New Eng. Synod v. DHS*, 824 F. Supp. 3d 118 (D. Mass. 2026). The reasoning set forth in that decision, now on appeal, does not provide a sound basis to depart from the legal conclusions this Court already reached.

liability" of regulated parties, *Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599-600 (2016); *see also Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 499-501 (D. Md. 2019).

In the alternative, DHS argues (at 17-18) that the legal consequences to Plaintiffs depend on independent actions of immigrant worshippers. But DHS's cases do not bear on the 2025 Policy's direct effects on both DHS agents and Plaintiffs. *See, e.g.*, *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 859-61 (4th Cir. 2002) (nonbinding report on secondhand smoke had no legal consequences just because it might encourage other entities to regulate tobacco); *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459-60 (4th Cir. 2004) (Patent and Trademark Office's advertising campaign about "invention promotion scams" had no legal consequences for promoter that believed it would lose business); *Sierra Club v. EPA*, 955 F.3d 56, 60, 64 (D.C. Cir. 2020) (EPA guidance document represented "initial information-gathering phase," was the "first of a two-step approach," and regulated parties could "ignore the Guidance entirely"); *see also City of New York v. Dep't of Def.*, 913 F.3d 423 (4th Cir. 2019) (court did not address finality).

Finally, DHS cannot evade APA review (at 16) by tacking boilerplate language to the bottom of a policy document. *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000).

**2.** Agency discretion: The 2025 Policy is not the rare action "committed to agency discretion by law." § 701(a)(2). There is law to apply; it is an affirmative enforcement policy, not a nonenforcement one; and it is a categorical policy, not a one-off decision. *See* Pls.' Br. 18-20.

DHS argues (at 19-20) there is no law to apply because the INA and other statutes delegate broad discretion to enforce immigration laws and do not set administrable geography-based restrictions on DHS's enforcement authority. But Plaintiffs bring First Amendment, RFRA, and APA claims, and those laws—not the INA—provide the governing standards. The overwhelming weight of authority confirms this principle. *See, e.g.*, *WWHT, Inc. v. FCC*, 656 F.2d 807, 815 n.15

(D.C. Cir. 1981) ("In no event would a finding of nonreviewability . . . preclude judicial review when constitutional violations have been alleged."); *see also* Pls.' Br. 18-19.

DHS contends (at 20-22) that because the 2025 Policy confers discretion on agents to make enforcement decisions, it is akin to an individual-enforcement determination and is thus unreviewable. But as in *Casa de Maryland v. DHS*, 924 F.3d 684, 699 (4th Cir. 2019), Plaintiffs challenge the 2025 Policy as a categorical matter, not any specific enforcement taken (or not taken) under it or its predecessor. Mem. Op. 14-15, ECF 92. DHS's cited cases only underscore why the 2025 Policy is not an individual enforcement decision. *See, e.g.*, *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 953 (4th Cir. 2025) (advisory opinion explaining that plaintiff could be sanctioned for proposed course of conduct not reviewable); *Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 528 F.3d 310, 317 (4th Cir. 2008) (decision to bring enforcement action against mine owner but not independent contractor not reviewable); *Ngure v. Ashcroft*, 367 F.3d 975, 993 (8th Cir. 2004) (individual challenge to BIA's application of new policy of "affirmance without opinion" not reviewable); *Gentile v. SEC*, 974 F.3d 311, 318 (3d Cir. 2020) (administrative subpoenas as part of specific investigation not reviewable).

**B. Arbitrary and Capricious:** Plaintiffs showed the 2025 Policy is arbitrary and capricious for four different reasons: DHS failed to explain its departure from longstanding prior policy, substantiate the problem, explain its rejection of alternatives, and account for reliance interests. *See* Pls.' Br. 20-23. DHS does not address its failure to substantiate the problem or explain its rejection of alternatives—so it has waived those arguments. On the two deficiencies DHS does address, it argues that its drastic departure from a decades-old policy was merely a modest change, so its scant explanation was sufficient and Plaintiffs' reliance was unreasonable. Neither argument withstands scrutiny.

DHS's statement (at 24) that, as a general matter, officers "frequently apply enforcement discretion" does not explain DHS's removal of significant limits that have long cabined that discretion to protect houses of worship specifically. And DHS's bare conclusion that "bright line rules" are no longer "necessary," *id.* also lacks the requisite reasoning, as it "provide[s] 'neither assurance that [DHS] considered the relevant factors" nor "a discernable [analytical] path to which the court may defer." *Env't Health Tr. v. FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021).

DHS also contends (at 25) that the decades-old former policy engendered no reliance interests because that policy still permitted enforcement and the reliance interests were not as strong as those in *DHS v. Regents of the University of California*. But as this Court held, the 2021 Policy provided—and the 2025 Policy revoked—a safe harbor on which houses of worship and congregants could rely. Mem. Op. 11-12, ECF 92. In all events, it is not Plaintiffs' burden to show reliance interests; it was DHS's obligation "to assess *whether*" those interests existed, "determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33 (emphasis added). It did not. *See* JR1-91.

**C. Remaining APA violations:** As addressed next, the 2025 Policy is also contrary to constitutional right, contrary to law, and in excess of statutory limitations because it violates the First Amendment and RFRA.

**III. The 2025 Policy violates Plaintiffs' rights of expressive association.**

**A. Burden on expressive association:** With substantial evidentiary support, Plaintiffs showed how the 2025 Policy significantly affects their rights of expressive association. *See* Pls.' Br. 23-27. Rather than disputing this evidence, DHS ignores it. Nor does DHS provide any evidentiary support for its cross-motion. Instead, DHS misreads the doctrine and recycles arguments this Court already rejected.

DHS argues that the 2025 Policy does not interfere with free association rights in a "direct and substantial" way because it does not impose a penalty, withhold benefits, require disclosure of membership, or interfere with internal affairs. DHS Br. 32-33. But, as DHS acknowledges, "the interference with associational rights must be 'direct and substantial' *or* 'significant.'" DHS Br. 32 (quoting *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996)) (emphasis added). That DHS arguably has "taken no direct action" to restrict Plaintiffs' rights "does not end the inquiry" because the abridgement of "indispensable liberties," "even though unintended, may inevitably follow from varied forms of governmental action." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461 (1958). "What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." *Rutan v. Repub. Party of Ill.*, 497 U.S. 62, 77-78 (1990).

DHS asserts that the 2025 Policy does not impose a "significant" burden either, because it is a "neutral and generally applicable government action" that does not "single out houses of worship for enhanced law enforcement activity." DHS Br. 34. But DHS cites no case limiting free-association challenges to neutral and generally applicable government action. *Cf. Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000) (holding that neutral and generally applicable state public-accommodations law violated group's expressive association rights). And DHS *did* single out houses of worship when it announced its new policy meant "[c]riminals" would "no longer be able to hide in America's schools and churches to avoid arrest." JR146.

As this Court concluded, "[a] government policy may burden associational rights by deterring attendance at religious activities." Mem. Op. 34-36, ECF 60 (discussing *Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007)). DHS tries to distinguish *Tabbaa* by arguing that the plaintiffs there were detained, unlike here. DHS Br. 34. But DHS ignores that the Second Circuit also explained that

the burden on plaintiffs' expressive-association rights was significant because "the prospect of being singled out . . . could reasonably deter others from associating." *Tabbaa*, 509 F.3d at 102.

*Lyng v. International Union*, 485 U.S. 360 (1988) (cited at DHS Br. 34), is not to the contrary. *International Union* held that a statute withholding food stamps during a strike did not prevent strikers from exercising their free-association rights "in any significant manner." *Id.* at 366. DHS omits the Court's reasoning that the food-stamp statute was "exceedingly unlikely" to "prevent individuals from continuing to associate." *Id.* Plaintiffs have shown the opposite is true here.

Finally, DHS's argument that the government "simply could not operate" if a court concluded that "law enforcement activity prevent[ed] expressive association merely by discouraging attendance," DHS Br. 35 (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452 (1988)), is doubly wrong. First, DHS cites (at 28) a free-exercise case that had nothing to do with expressive association. *See Lyng*, 485 U.S. at 452. Second, DHS restricted enforcement at houses of worship for decades, so there is little doubt the government can operate under that regime.

**B. Exacting scrutiny:** DHS waives its argument that the 2025 Policy satisfies exacting scrutiny, instead taking its chances with strict scrutiny. *See* DHS Br. 35 n.4. As Plaintiffs' opening brief explained (at 34-35), and we explain further below (at 14-15), that argument fails.

**IV. The 2025 Policy violates Plaintiffs' rights under RFRA.**

**A. Substantial burden on religious exercise:** Plaintiffs showed, again with record evidence, how the 2025 Policy substantially burdens their religious exercise by, among other things, disrupting communal worship, impeding religious obligations of service, and undermining the makeup and structures of their religious communities. *See* Pls.' Br. 30-34. DHS all but ignores those arguments, that evidence, and this Court's earlier finding of a substantial burden. Instead, DHS makes two arguments that are wrong and irrelevant.

First, DHS argues that the burdens on Plaintiffs' religious exercise are merely incidental, stemming from "the conduct of the [g]overnment's internal procedures." DHS Br. 26 (quoting *Bowen v. Roy*, 476 U.S. 693, 700 (1986)). That makes no sense. For decades, DHS imposed substantial limits on enforcement actions at houses of worship. And DHS's own website explained the policy to the public and directed where to file complaints if agents violated it. JR152-60. Now, agents can surveil, investigate, and raid houses of worship according to their "common sense." Categorizing a change in how the government interacts with the public as "conduct by government of its own affairs," *Lyng*, 485 U.S. at 451, stretches the word "internal" past its breaking point.

DHS's cases prove the point. In *Bowen,* a father argued that the issuance and internal-government use of a social-security number for his child substantially burdened his religious beliefs. 476 U.S. at 697. That objection to the Government's internal use of a social-security number was analogized to "a sincere religious objection to the size or color of the Government's filing cabinets." *Id*. at 700. Beyond *Bowen*, the government's use of its own land has been deemed "internal." *See Lyng*, 485 U.S. at 458.[4] DHS does not cite a single case in which the way that Government agents were directed to engage *with the public* was treated as an internal matter.

DHS also contends that finding a substantial burden on Plaintiffs' rights here would create "a free-exercise veto over otherwise permissible law enforcement activity." DHS Br. 28. Not so. A substantial burden is not just *any* inconvenience or incidental effect on religion. The word "substantial" in RFRA limits it to obstacles that are significant in amount or extent—rather than minor, incidental, or insubstantial effects. *See The New Shorter Oxford English Dictionary* (1993)

[4] *See also Apache Stronghold v. United States*, 101 F.4th 1036, 1103 (9th Cir. 2024) (en banc) (per curiam), *cert. denied*, 145 S. Ct. 1480 (2025); *United States v. Hardman*, 297 F.3d 1116 (10th Cir. 2002); *Warner v. City of Boca Raton*, 420 F.3d 1308 (11th Cir. 2005); *Miccosukee Tribe of Indians v. United States*, 163 F.3d 1359 (11th Cir. 1998).

(defining "substantial" as "of ample or considerable amount or size"). Thus, a substantial burden exists where government action leads religious practitioners to modify their behavior in a way that considerably deters, diminishes, or meaningfully obstructs religious exercise. *See Sherbert v. Verner*, 374 U.S. 398, 405 (1963); *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 553-54 (4th Cir. 2013). On the other hand, unchanged religious behavior can indicate there is no substantial burden. *See Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 100-01 (4th Cir. 2013); *see also Real Alts., Inc. v. Sec'y of Health & Human Servs.*, 867 F.3d 338, 364 (3d Cir. 2017). The 2025 policy significantly impeded Plaintiffs' ability to engage in core religious exercise—including communal worship and ministry. So this Court can find the 2025 Policy substantially burdens *Plaintiffs'* religious exercise without weighing in on DHS's hypotheticals.

**B. Strict scrutiny:** Because the 2025 Policy substantially burdened Plaintiffs' religious exercise, DHS must show that it furthers a compelling government interest and that it is the least-restrictive means to achieve that interest. DHS fails at both steps.

**1.** As Plaintiffs explained (at 34-35), strict scrutiny requires DHS to show a compelling interest in enforcement at houses of worship. Nevertheless, DHS insists (at 29-30) that immigration-enforcement *generally* is a compelling interest. But "RFRA, and the strict scrutiny test it adopted, contemplate an inquiry more focused than the Government's categorical approach." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430 (2006).

When DHS finally turns to enforcement at houses of worship, it abandons the only justification in the administrative record—that murderers and rapists are hiding in churches. *See* JR146. Instead, DHS invents a standard asking whether a religious exemption would undermine

the government's interests. DHS Br. 30 (citing *Gonzales*, 546 U.S. at 431).[5] That's simply not what *Gonzales* (or any other case) says. And DHS's new test makes no sense for determining whether an interest is compelling. If the government could show a compelling interest just by saying an exemption would undermine its interests, it is hard to see what government interests would not rise to the level of compelling. DHS also insists that vague security concerns are enough to show a compelling interest. DHS Br. 31. DHS relies on *Couch v. Jabe*, which addressed the unique security concerns in a prison. 679 F.3d 197, 201 (4th Cir. 2012). And there, the Court concluded that the prison administrators sufficiently showed "*specific* health and security concerns" *Couch*, 679 F.3d at 202 (emphasis added). DHS has made no such showing.

**2.** Likewise, Plaintiffs explained (at 35) that the new policy is not the least-restrictive means of furthering DHS's interest, because getting a judicial warrant would still allow DHS to conduct immigration enforcement at houses of worship, but would not give agents carte blanche to interrupt worship and intrude on sacred spaces. DHS's only response is that getting a warrant would "contravene[] decades of uncontested DHS practice" and would not serve its interests "equally well." DHS Br. 31 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 731 (2014)). But it is DHS's burden to show that it considered and rejected less-restrictive means. *Greenhill v. Clarke*, 944 F.3d 243, 251 (4th Cir. 2019). And its unsupported assertion cannot be enough to make that showing. DHS also argues that a return to the Mayorkas Memo is not less restrictive because it would be "unduly restrictive and far less timely and effective." DHS Br. 32. But although DHS "may well prefer" simpler administration of its interests, heightened scrutiny demands more. *Ams. for Prosperity v. Bonta*, 594 U.S. 595, 614-15 (2021).

[5] DHS's formulation actually asks whether the interest would be undermined by *denying* the religious exemption. DHS Br. 30. Plaintiffs assume that DHS erred and meant granting.

**V. The Court should vacate the 2025 Policy and enter a permanent injunction.**

Plaintiffs' motion showed why the Court should declare unlawful and set aside the 2025 Policy and enter a permanent injunction. Pls.' Br. 35-40. It further explained why the injunction should apply even where DHS has issued itself an administrative warrant. DHS fails to defeat Plaintiffs' showings that the requested relief is warranted and necessary.

**A. Vacatur:** DHS argues (at 35-36) that vacatur is barred here by 8 U.S.C. § 1252(f)(1), which prohibits relief that would "enjoin or restrain the operation of" 8 U.S.C. §§ 1221-32. But Section 1252(f)(1) simply does not apply where "plaintiffs seek forms of relief beyond injunctive relief, including . . . vacatur." *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 596 (D. Md. 2025). DHS acknowledges that the Fifth Circuit has rejected its argument that vacatur imposes a "restrain[t]" within the meaning of Section 1252(f)(1)," and that the Ninth Circuit has held "similarly" with respect to preliminary APA relief. DHS Br. 36 n.5 (citing *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022); *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 990 (9th Cir. 2025)). In fact, the Ninth Circuit has also held that final "set-aside relief under APA § 706 does not 'enjoin' or 'restrain' actions in violation of § 1252(f)(1)." *See Nat'l TPS All. v. Noem*, 166 F.4th 739, 759 (9th Cir. 2026). The D.C. Circuit, too, has rejected DHS's argument and held that "Section 1252(f)(1) [is] inapplicable to vacatur." *RAICES v. Mullin*, 174 F.4th 81, 119 (D.C. Cir. 2026). DHS "respectfully disagree[s]" with these holdings. DHS Br. 36 n.5. But DHS cannot muster a single case in its favor: *Garland v. Aleman Gonzalez* expressly declined to address the argument that § 1252(f)(1) limited other forms of relief "practically similar to an injunction," 596 U.S. 543, 551 n.2 (2022), and the concurrence DHS cites discussed declaratory judgment without mentioning vacatur, *see Mullin v. Al Otro Lado*, 146 S. Ct. 2079, 2097-99 (2026) (Thomas, J., concurring).

**B. Permanent injunction:** Plaintiffs explained (at 36-37) why they have satisfied the *Nken* standard for injunctive relief. DHS does not address that argument. Instead, it asserts without

elaboration (at 36) that an injunction is unnecessary because vacatur would provide Plaintiffs with "complete relief." But vacatur alone would mean a return to the Mayorkas Memo. And without an injunction, DHS would not be bound by the Court's prior interpretation of the Mayorkas Memo. Instead, DHS would be free to treat the Mayorkas memo as no more than suggested guidance, as it has argued time and again. That means, among other things, DHS would be free to carry out immigration-enforcement operations at houses of worship, even where no exigency exists, based on supervisory approval alone. The harm is compounded by the Mayorkas Memo's authorization of designated supervisors to delegate their approval powers even lower down the chain. *See* JR6. Because vacatur alone is not "sufficient to redress [Plaintiffs'] injury," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 166 (2010), a permanent injunction providing the specificity required by Rule 65(d) is appropriate. *See also* 5 U.S.C. § 703 (APA claimants may pursue "actions for declaratory judgments or writs of prohibitory or mandatory injunction"); 42 U.S.C. § 2000bb-1(c) (RFRA claimants may "obtain appropriate relief against a government").

What's more, an injunction also prevents DHS from simply re-adopting the 2025 Policy in substantially similar form, which it might do if the Court's remedy were limited to vacatur. *See, e.g.*, *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024) ("Given that the Department has enacted similar guidance in the past and may attempt to do so again . . . , a broader injunction is necessary to provide complete relief."); *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 376-77 (N.D. Tex. 2021) (granting permanent injunction in RFRA case after agency readopted materially identical policy). For all these reasons, the requested injunction would have "meaningful practical effect independent of . . . vacatur." *Monsanto*, 561 U.S. at 165.

**C. Fourth Amendment:** DHS argues (at 37-38) that requiring a judicial warrant is prohibited because the Fourth Amendment doesn't require it. But Plaintiffs' claims are not based on the

Fourth Amendment, so the scope of that Amendment's protection is not at issue in this case. To satisfy RFRA, any DHS policy must satisfy strict scrutiny, and "the preconditions for a warrant—probable cause, specificity with respect to the place to be searched and the things to be seized, and overall reasonableness," *Zurcher v. Stanford Daily*, 436 U.S. 547, 565 (1978)—are likely sufficient. *Zurcher* itself explained that court should apply the Fourth Amendment's "warrant requirements with particular exactitude when First Amendment interests would be endangered." 436 U.S. at 565. To the extent DHS suggests that administrative warrants would meet strict scrutiny because they are equivalent to judicial warrants, it is wrong. *See, e.g.*, *Abel v. United States*, 362 U.S. 217, 230 (1960) (declining to decide whether administrative warrants satisfied the Fourth Amendment's warrant requirement). "When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent." *Payton v. New York*, 445 U.S. 573, 586 n.24 (1980) (internal quotation marks omitted) (quoting *Johnson v. United States*, 333 U.S. 10, 13-14 (1948)).

**D. Administrative warrants:** Section 1252(f)(1) does not limit this Court's ability to enter Plaintiffs' requested injunction because that injunction would affect only where an administrative warrant could be *executed* under Section 1357(a), not DHS's authority to *issue* that warrant under Section 1226(a). *See* Pls.' Br. 39-40. "There is a clear distinction between the authority to issue warrants under § 1226(a) and the one to execute arrests under § 1357." *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 985 (C.D. Cal. 2024). DHS dismisses *Kidd* as "baselessly stating" that "the *execution* of warrants is governed by" Section 1357 "without reference to Section 1357's unambiguous text." DHS Br. 39 n.6. But DHS ignores that Section 1357(a) unambiguously grants the authority to "execute and serve any . . . warrant." 8 U.S.C. § 1357(a).

DHS's own regulations recognize the same distinction made in *Kidd*. For example, 8 C.F.R. § 287.5(e)(3), which DHS cites (at 39), authorizes officers "to exercise the power pursuant to [§ 1357(a)] to *execute* warrants of arrest . . . *issued* under [§ 1226]." 8 C.F.R. § 287.5(e)(3) (emphases added); *see also* 8 C.F.R. § 287.5(e)(1) (authorizing officers to "exercise the power" conferred by Section [1357(a)] to execute a search warrant).[6]

Instead of addressing that statutory and regulatory text, DHS argues that Section 1357(a) does not apply to execution of warrants because the section's heading in the U.S. Code is "Powers without warrant." DHS Br. 39. But that heading is not part of the text actually enacted in the underlying statute; it was added later by well-intentioned but unelected editors. *See* 66 Stat. 233 (Jun. 27, 1952) (no headings). "[I]n some cases, such as where there are no headings in the original act . . . , the Code editors will provide or modify headings for the Code section." *Detailed Guide to the United States Code Content and Features*, Office of the Law Revision Counsel at II.A—Headings, https://perma.cc/3PYJ-V3PA. But "the Code cannot prevail over the Statutes at Large when the two are inconsistent," as they are here. *See United States v. Weldin*, 377 U.S. 95, 98 n.4 (1964) (cleaned up). And even if the heading were enacted text, it would be relevant only if it "shed light on some ambiguous word or phrase," it could not "undo or limit that which the text makes plain." *Brotherhood of R.R. Trainmen v. Balt. & O.R. Co.*, 331 U.S. 519, 529 (1947).

DHS's cases do not help it either. *Arizona v. United States*—which was not a case about Section 1252(f)(1)—confirmed that Section 1226(a) delegates to the Attorney General the discretion "to issue a warrant" for arrest and detention pending a removal determination. 567 U.S. 387, 407 (2012). And although *Arizona* described Section 1357(a)'s grant of authority when "no

[6] The regulations refer to "section 287(a)" of the INA—codified at 8 U.S.C. § 1357(a)—and "section 236" of the INA—codified at 8 U.S.C. § 1226. *See* U.S.C.I.S., Immigration and Nationality Act, https://perma.cc/2V6T-6LEG.

federal warrant has been issued," *Id*. at 408, it did not have reason to address Section 1357(a)'s additional express authority to execute warrants. *Arizona* did, however, rely on 8 C.F.R. § 287.5(e)(3), *see* 567 U.S. at 407-08, which, as just explained, states that the power to issue administrative warrants comes from Section 1226(a) and the power to execute those warrants comes from Section 1357(a). Likewise, *Abel v. United States*, did not consider how Section 1252(f)(1) applies to Sections 1226(a) and 1357(a)—it was a decision issued 36 years before Section 1252(f)(1) was enacted that addressed the distinction between administrative and judicial warrants. 362 U.S. 217, 232 (1960). And as Plaintiffs explained (at 39), the Fourth Circuit's decision in *Miranda v. Garland* turned on an injunction that constrained a decision that Section 1226(a) delegated the government discretion to make. 34 F.4th 338, 346, 356 (4th Cir. 2022). But Section 1226(a) does not delegate DHS discretion to decide *where* an administrative warrant may be executed, only discretion to decide *whether* to issue it.

Finally, contrary to what DHS argues (at 40), *N.S. v. Dixon*, 141 F.4th 279 (D.C. Cir. 2025), did not explain that 8 C.F.R. § 287.5(e)(3) claims its authority from statutes covered by Section 1252(f)(1). It was addressing a different regulation. 141 F.4th at 289 ("8 C.F.R. Part 236—which encompasses the regulation providing that only those classes of officers listed in 8 C.F.R. § 287.5(e)(3) may serve an I-200 form, *id.* § 236.1(b)—claims its authority in part from 8 U.S.C. §§ 1226 and 1231."). And *Dixon* reached its conclusion—that enjoining arrests both with and without a warrant implicated Section 1226(a)—without addressing the distinction between issuing warrants and executing them that *Kidd* recognized and DHS's regulations reflect. *See* 141 F.4th at 288-90. In any event, *Dixon* is not binding and this Court should not repeat its error.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion and deny Defendants' motion.

August 7, 2026

Respectfully submitted,

*/s/ Bradley Girard*

Bradley Girard (Bar No. 31437)
Sarah Goetz (Bar No. 31570)
Andrew Bookbinder (Bar No. 31486)
J. Sterling Moore (Bar No. 31562)
Ayesha Khan (Bar No. 21509)
Elena Goldstein (Bar No. 31738)
Skye Perryman (Bar No. 31707)

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
bgirard@democracyforward.org
sgoetz@democracyforward.org
abookbinder@democracyforward.org
smoore@democracyforward.org
akhan@democracyforward.org
egoldstein@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs*